FILED
May 11, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001824620

13

1  MARC A. LEVINSON (State Bar No. 57613)
   JEFFERY D. HERMANN (State Bar No. 90445)
2  STACY E. DON (State Bar No. 226737)
   ORRICK, HERRINGTON & SUTCLIFFE LLP
3  400 Capitol Mall
   Sacramento, CA  95814-4497
4  Telephone:    916-447-9200
   Facsimile:    916-329-4900
5  malevinson@orrick.com
   jhermann@orrick.com
6  sdon@orrick.com

7  JAMES E. SPIOTTO (*Pro hac vice application pending*)
   ANN ACKER (*Pro hac vice application pending*)
8  CHAPMAN AND CUTLER LLP
   111 West Monroe Street
9  Chicago, IL  60603
   Telephone:    (312) 845-3000
10 Facsimile:    (312) 516-1900
   spiotto@chapman.com
11 acker@chapman. com

12 Attorneys for Bank of Montreal

13

14            UNITED STATES BANKRUPTCY COURT

15              EASTERN DISTRICT OF CALIFORNIA

16                  SACRAMENTO DIVISION

17

| | |
|---|---|
| 18  In re: | Case No.  09-29162 |
| 19  SK FOODS, L.P. | RAL– 19 |
| a California Limited Partnership, | Chapter 11 |
| 20        Debtor. | |
| 21 | Date:      May 12, |
| 22 | Time:      10:00 a.m.<br>Place:     Courtroom 34 |
| 23 | 501 I Street<br>Sacramento, CA 95814 |
| 24 | Judge:     Hon. Robert S. Bardwil |

25  **DECLARATION OF LAWRENCE A. MIZERA IN SUPPORT OF JOINDER OF BANK**
    **OF MONTREAL IN THE DEBTORS' MOTION FOR ORDER AUTHORIZING**
26                    **APPOINTMENT OF CHAPTER 11 TRUSTEE**

27  / / /

28  / / /

OHS West:260658694.1

DECLARATION OF
LAWRENCE A. MIZERA

1     I, Lawrence A. Mizera, declare:

2     1.     I am a resident of the State of Illinois.  If called upon to testify in this case, I could competently testify to the following facts upon personal knowledge.  Capitalized terms not defined herein shall have the same meaning ascribed to such terms in the Pre-Petition Credit Agreement (defined below).

2.     I am a Managing Director of Bank of Montreal, a Canadian chartered bank with its principal place of business at 115 S. LaSalle Street, Chicago, Illinois 60603.  I have been employed by Bank of Montreal and its predecessors and its affiliates since 1978.

3.     My responsibilities as a Managing Director of Bank of Montreal include monitoring and directing Bank of Montreal's role as a Pre-Petition Lender and Pre-Petition Agent (defined below).

4.     The Declaration is submitted for the Court's consideration at the hearing on the motions brought herewith by the Pre-Petition Agent or Petitioning Creditors.

## BACKGROUND OF THE BORROWERS

5.     SK Foods, L.P. (the *"Company"* or *"SK Foods"*) is a California-based producer of tomato products.  It markets these products to food manufacturers and retail and foodservice marketers.  Together with its affiliates, SK Foods has two processing plants.  One plant, operated by borrower SK Foods, is located in Lemoore, California in proximity to the tomato fields in the San Joaquin Valley.  The other, which is operated by borrower RHM Industrial/Specialty Foods, Inc. (*"RHM"*), is located in the Sacramento Valley and is commonly known as "Colusa Canning."  RHM, together with SK Foods, are referred to collectively herein as the "Borrowers" or the "Debtors."

6.     The primary work performed at each facility is the production and packing of tomato products into industrial drums and bins.  The Borrowers also pack ready-to-use tomatoes into cans and glass containers.  The typical annual production at these facilities exceeds 175

1  million pounds of tomato paste and over 24 million jars of pasta sauce, with approximately one

2  million tons of tomatoes processed. The Borrowers are also "certified organic" processors, which

3  is a service of paramount importance to several key customers who solely rely on SK Foods'

4  ability to provide such items.

5         7.     Due to the seasonal nature of the tomato crop, the Borrowers' business cycle is

6  also seasonal. Each May and June, the Borrowers must expend significant resources to prepare

7  for the tomato packing season, which typically lasts from July to September. The cash needs of

8  the Borrowers are highest during this period, and absent proper and timely preparation for the

9  packing season, the value associated with the 2009 packing season will be lost.

10  

11         8.     I have been informed by the Borrowers that both SK Foods and RHM are directly

12  or indirectly controlled by Scott Salyer through the Scott Salyer Revocable Trust.

13  

14  <center>**THE LOAN DOCUMENTS**</center>

15         9.     Attached hereto as Exhibit 1 is a true and correct copy of the Amended and

16  Restated Credit Agreement dated as of September 28, 2007 (as heretofore amended, the *"Pre-*

17  *Petition Credit Agreement"*) among SK Foods, L.P., RHM Industrial/Specialty Foods, Inc., the

18  Guarantors from time to time parties thereto (the *"Pre-Petition Guarantors"*), the Lenders from

19  time to time parties thereto (the *"Pre-Petition Lenders"*), Bank of Montreal, as Administrative

20  Agent (in such capacity, the *"Pre-Petition Agent"*) and LaSalle Bank, National Association, as

21  Syndication Agent (the *"Syndication Agent"*). The Pre-Petition Credit Agreement and the other

22  documents and instruments (including those evidencing the liens and security interests and the

23  guarantees executed and delivered in connection therewith are referred to herein as the *"Pre-*

24  *Petition Loan Documents"*).

25  

26        10.    The Pre-Petition Credit Agreement provides that notes evidencing the

27  indebtedness thereunder may be issued at the request of the applicable Pre-Petition Lender.

28  

OHS West:260658694.1           - 3 -           DECLARATION OF
                                                                      LAWRENCE A. MIZERA

11.    As of May 5, 2009 (the *"Petition Date"*), the Debtors were indebted without claim, defense, counterclaim, recoupment or offset of any kind, in the aggregate amount of not less than $195,486,982 plus accrued and unpaid liquidated interest, costs, expenses and other charges thereon, in respect of loans, advances and other financial accommodations made by the Pre-Petition Lenders to the Debtor in accordance with the Pre-Petition Loan Documents (collectively, the *"Pre-Petition Obligations"*).  True and correct copies of the Pre-Petition Loan Documents are attached hereto and are set forth below in the following chart:

| Exhibit 1 | Amended and Restated Credit Agreement dated September 28, 2007 |
|---|---|
| Exhibit 1(a) | First Amendment to Amended and Restated Credit Agreement dated February 1, 2008 |
| Exhibit 1(b) | Limited Waiver dated April 25, 2008 |
| Exhibit 1(c) | Limited Waiver dated July 15, 2008 |
| Exhibit 1(d) | Waiver Re: Financial Statements dated August 31, 2008 |
| Exhibit 1(e) | Second Amendment to Amended and Restated Credit Agreement dated September 15, 2008 |
| Exhibit 1(f) | First Forbearance Agreement dated March 31, 2009 |
| Exhibit 1(g) | Second Forbearance Agreement dated April 3, 2009 |
| Exhibit 2 | Revolving Notes in favor of U.S. Bank National Association; Bank of the West; Bank of Montreal; LaSalle Bank, National Association; and Wells Fargo Bank, N.A., each dated September 28, 2007 |
| Exhibit 3 | Term Notes in favor of U.S. Bank National Association; Bank of the West; Bank of Montreal; LaSalle Bank, National Association; and Wells Fargo Bank, N.A., each dated September 28, 2007 |
| Exhibit 4 | Swing Note in favor of Bank of Montreal dated September 28, 2007 |
| Exhibit 5 | Amended and Restated Security Agreement dated September 28, 2007 |
| Exhibit 6 | UCC Financing Statements |
| Exhibit 7 | Assigned Account Agreement dated October 1, 2006 by and among Bank of Montreal, as Administrative Agent, SK Foods, L.P., and Harris N.A. regarding deposit accounts at Harris N.A. known as account numbers 398-797-1 and 398-760-9 |
| Exhibit 8 | Deed of Trust and Security Agreement with Assignment of Rents dated November 1, 2006 from SK Foods, L.P. regarding property in Lemoore, Kings |

| | | |
|---|---|---|
| | | County, California recorded on November 3, 2006 as Document Number 0632757 |
| Exhibit 8(a) | | First Supplement to Deed of Trust and Security Agreement with Assignment of Rents dated September 28, 2007 between SK Foods, L.P. and Bank of Montreal, as Administrative Agent recorded on October 17, 2007 as Document Number 0726443 |
| Exhibit 8(b) | | Second Supplement to Deed of Trust and Security Agreement with Assignment of Rents dated September 12, 2008 between SK Foods, L.P. and Bank of Montreal, as Administrative Agent recorded on September 26, 2008 as Document Number 0818024 |
| Exhibit 9 | | Deed of Trust and Security Agreement with Assignment of Rents dated May 17, 2007 from RHM Industrial/Specialty Foods, Inc. regarding property in Williams, Colusa County, California recorded on May 21, 2007 as Document Number 2007-0002918 |
| Exhibit 9(a) | | First Supplement to Deed of Trust and Security Agreement with Assignment of Rents dated September 28, 2007 between RHM Industrial/Specialty Foods, Inc. and Bank of Montreal, as Administrative Agent recorded on November 6, 2007 as Document Number 2007-0005790 |
| Exhibit 9(b) | | Second Supplement to Deed of Trust and Security Agreement with Assignment of Rents dated September 12, 2008 between RHM Industrial/Specialty Foods, Inc. and Bank of Montreal, as Administrative Agent recorded on November 19, 2008 as Document Number 2008-0005298 |
| Exhibit 10 | | Mortgage, Fixture Filing and Security Agreement with Assignment of Rents dated March 24, 2009 from SK Foods, L.P. regarding property in Manalee, Island of Lanai, County of Maui, State of Hawaii recorded on March 31, 2009 as Document Number 3843496 |
| Exhibit 10(a) | | Search Report issued by Corporation Service Company dated as of March 19, 2009 |
| Exhibit 11 | | Deed of Trust and Security Agreement with Assignment of Rents dated March 24, 2009 from SK Foods, L.P. regarding property in Placer County, California recorded on March 26, 2009 as Document Number 20090024080 |
| Exhibit 11(a) | | Search Report issued by Corporation Service Company dated as of March 19, 2009 |
| Exhibit 12 | | Master Waiver and Amendment Agreement dated September 28, 2007 Re: Chase Equipment Leasing Inc. Agreements |
| Exhibit 13 | | Debt Subordination Agreements each dated as of September 28, 2007 together with certified copies of the underlying agreements from:<br>• Cedenco Australia Partnership (two agreements)<br>• Cedenco Foods (one agreement) |

OHS West:260658694.1

DECLARATION OF
LAWRENCE A. MIZERA

| Exhibit 14 | UCC tax judgment and other lien summary chart[1] |

12.     The Pre-Petition Loan Documents are (and at all applicable times have been) secured by valid, enforceable and properly perfected first priority liens and mortgages on and security interests in substantially all of the Debtors' personal property assets and certain real property except for liens released by agreement of the Pre-Petition Lenders or otherwise permitted by the Pre-Petition Loan Documents to the extent such exist and are valid and enforceable on the Petition Date (the *"Pre-Petition Collateral"*).

13.     The documents which are attached hereto demonstrate that the Pre-Petition Lenders' security interests in and liens on the Pre-Petition Collateral were properly perfected and are first, valid, perfected and enforceable security interests in and liens on all of the Pre-Petition Collateral to the extent not previously released or subject to permitted liens as provided for in the Pre-Petition Loan Documents or other agreements of the Pre-Petition Lenders.

### ALLEGED CRIMINAL ACTIVITY BY THE BORROWERS AND THEIR EMPLOYEES

14.     I have been informed by the Borrowers that SK Foods including its principal, Mr. Scott Salyer, is the subject of a Federal criminal and civil investigation of bribery, price fixing and other illegal and fraudulent acts allegedly carried out by members of senior management and third party brokers acting on behalf of SK Foods.  A true and correct copy of a Sacramento Bee article discussing the scheme is attached hereto as Exhibit 15.  According to court records, certain employees or agents of SK Foods have entered into plea and cooperation agreements with the United States Attorney's office for the Eastern District of California and the United States Department of Justice for conduct in the course of their employment.  These individuals have

---

[1]     This chart summarizes the UCC tax judgment and other lien searches for Debtors and related affiliates. Copies of the actual filings are not attached thereto due to their voluminous nature, but can be provided to the court upon request.

pled guilty to a pattern of racketeering activity, money laundering and price fixing related to the introduction or delivery for introduction of adulterated and misbranded food by SK Foods into interstate commerce.  A true and correct copy of the Randall Lee Rahal Plea and Cooperation Agreement is attached hereto as Exhibit 16 and a true and correct copy of the Jennifer Lou Dahlman Plea and Cooperation Agreement is attached hereto as Exhibit 17.  According to court records, the United States of America has also brought a complaint for *in rem* forfeiture of certain cash payments received by Randall Rahal acting on behalf of SK Foods that alleges fraudulent and illegal conduct by SK Foods.  A true and correct copy of the complaint for *in rem* forfeiture is attached hereto as Exhibit 18.  The investigation is ongoing.  *See* Ex. 15 (Sacramento Bee article cited above discussing ongoing nature of investigation).

15.     In April of 2009, Mr. Salyer requested an in-person meeting with the Agent which I attended.  At this meeting, which took place on April 14, 2009, Mr. Salyer presented an offer that was filled with conditions totally apart from the business of the Borrowers, apparently designed to benefit Mr. Salyer personally and his other interests.  A true and correct copy of his list of demands for the "SK Family" is attached hereto as Exhibit 19 and is incorporated herein. The offer was completely unacceptable to the Agent and, given the nature of the demands, raised a question of whether the offer was made in a sincere effort to resolve the matter by Mr. Salyer or rather to create an issue for some imaginative lawsuit against the Banks that Mr. Salyer was contemplating.  Mr. Salyer made the agreement of the Borrowers to proceed with the section 363 sale process in a chapter 11 bankruptcy that had been recommended by the Borrowers' advisor, Chanin Capital Partners (*"Chanin"*), contingent upon a number of personal demands including millions of dollars for Mr. Salyer's and other employees' personal criminal defense and pre-bankruptcy releases from the Lenders of any and all liability, including the LLC guaranties, which would encompass potential claims for millions of dollars of the Debtors' cash (Lenders' cash collateral) transferred or diverted to Salyer and his affiliates.  (Chanin had expressed the

view that a section 363 bankruptcy sale process was necessary given the cloud on the Borrowers and existing management due to allegations related to the criminal and civil investigation.)  The Agent informed Mr. Salyer these demands were unacceptable.  The Agent was later informed that Mr. Salyer had taken umbrage at the way in which his demand was received by the Agent.  It appeared to me that Mr. Salyer was attempting somehow to paint himself as a victim while at the same time trying to extract conditions for his personal benefit that were unprecedented.

16.    On April 15, 2009, I was informed that SK Foods had terminated the employment of FTI Consulting, its turnaround advisor, and also that Steven Sebastian, the Chief Restructuring Officer, had resigned.  The Agent was concerned by this report since the Pre-Petition Lenders had taken comfort in the presence of an experienced turnaround advisor and the possibility of a chief restructuring officer.  On April 17, 2009, Mr. Salyer followed up with a letter outlining a revised proposal again with numerous personal demands.  A true and correct copy of the letter is attached hereto as Exhibit 20 and is incorporated herein.  Thus, although Mr. Salyer had been told by his own advisors that a bankruptcy filing was required, he continued to try to extract funding for his own alleged interests, contrary to the best interests of creditors.  The requests of Mr. Salyer were so unprecedented as to be inexplicable.  Indeed, the conduct of Mr. Salyer appeared possibly motivated by an attempt to draw an angry response from the Pre-Petition Lenders, which Mr. Salyer could use in some other forum.

17.    Further, despite having agreed to do so, the Borrowers failed to present an acceptable Budget to the Agent as required under the Pre-Petition Loan Documents.  Further, Mr. Salyer refused to allow the Agent's financial advisor to have appropriate access to the books and records in violation of the Pre-Petition Loan Documents.

18.    The continued employment of FTI Consulting and the delivery of an acceptable Budget had been conditions of the Agent's forbearance.  The Notice of Standstill Termination, Acceleration of Obligations and Demand for Payment, Exhibit 21 hereto, was issued by the Agent

on April 16, 2009 pursuant to which all outstanding amounts due under the Loan Documents became immediately due and payable. No such amounts have been paid by the Debtors.

19.    Subsequently, I was informed that Mr. Salyer had agreed to proceed with a voluntary chapter 11 filing for the Borrowers on May 6, 2009. I was also told that the Borrowers had executed "irrevocable resolutions" authorizing such filing and that the voluntary chapter 11 Petitions were signed. Proposed bankruptcy counsel to the Borrowers made a presentation on a conference call to Bank of Montreal and the Pre-Petition Lenders as to the Borrowers' firm intent to file a chapter 11 proceeding.

20.    It was clear to all that the only viable option for the Company is a sale process as recommended by Chanin through a section 363 bankruptcy sale of the Borrowers' assets to a third party purchaser before the 2009 Pack. Without that agreed-upon process, there would be a significant burn of cash collateral of the Pre-Petition Lenders with no rational basis for funding the 2009 Pack. A new owner and operator of the business without the conflicts, self-dealing and government investigations that burdened Mr. Salyer and his executive management team was the only way to keep the lights on, operate the business and achieve funding for the 2009 Pack. This could only be accomplished by the filing of a chapter 11 proceeding and a prompt sale for the benefit of growers, employees, customers and the Pre-Petition Lenders. In order to position the business for a section 363 sale, funding was required for the sale process.

21.    To that end, for the last two months, Bank of Montreal has sought to obtain from the Borrowers a budget that made sense and assured and funded the sale process. True to form, each time efforts were made to identify an acceptable budget, Mr. Salyer would insist upon patently inappropriate payments designed to further Mr. Salyer's own interests which were totally unrelated to funding necessary and reasonable costs of operation.

22.    The most frustrating episode with Mr. Salyer took place on May 5, 2009. As late as the morning of May 5, 2009, Borrowers' counsel had provided assurances of a voluntary filing

DECLARATION OF
LAWRENCE A. MIZERA

by May 6, 2009, a date recognized by all as the latest filing date if a sale process was to be successful. After extensive discussions between the financial advisors to the Pre-Petition Agent and the Borrowers, Bank of Montreal and the Pre-Petition Lenders agreed to fund substantial critical vendors and other costs, including payroll, aggregating in excess of $3 million, as part of a bankruptcy filing effort. The Bank of Montreal and its advisors worked diligently with Borrowers' counsel to prepare for a voluntary chapter 11 filing and had scheduled a final call at 1:00 p.m. Pacific time on May 5, 2009 to make sure everything was in order prior to the Borrowers filing of the Petitions which, as previously noted, were already signed and the subject of irrevocable resolutions to file by the respective Boards of Directors of the Borrowers. At 11:30 a.m. Pacific time, a conversation took place between the cash management personnel of the Borrowers and the Pre-Petition Lenders to review cash management postpetition and the process to fund the $3 million later that day. After wire instructions were received by Bank of Montreal, a call took place with counsel for the Borrowers in which counsel relayed that the "irrevocable" resolutions to file the chapter 11 proceedings were revoked by Mr. Salyer and that he instructed that no bankruptcy filings should be made. This outcome, if left unchecked, would be the death knell to the continued operation of the Company. There would be no chapter 11 filing, no sale process as planned and no new purchaser to operate and fund the 2009 Pack. The efforts of the Pre-Petition Lenders to continue to allow the Borrowers to use cash collateral over the last two months despite borrowing base deficiencies in excess of $15 million and significant erosion of the Lenders' collateral would all be for naught.

23.    Mr. Salyer's related companies are also experiencing significant operational and liquidity crises. For example, on May 5, 2009, Eric Schwartz, Chief Operating Officer of Salyer American, a division of the SK Foods group, resigned over concerns about financial problems at the company. A copy of an article describing the events surrounding Schwartz's resignation is attached hereto as Exhibit 22. Also on May 5, 2009, news reports began to surface that Salyer

- 10 -

American had dropped its opposition to a bank-appointed receiver in a proceeding in Monterey County Superior Court. The Monterey County Superior Court proceeding was commenced by certain lenders of Salyer American to recover approximately $34 million in unpaid loans. A copy of an Associated Press article describing Salyer American's agreement to the appointment of a bank-selected receiver is attached hereto as Exhibit 23.

24.     Finally, on May 5, 2009 news reports surfaced that another purchasing manager had pled guilty to accepting bribes from SK Foods, casting a further shadow over the Debtors operations. A copy of an article in the San Francisco Chronicle describing the guilty plea of Robert Turner is attached hereto as Exhibit 24.

25.     Given the timing of the 2009 Pack period, and the need to provide cash collateral to keep the lights on at the Borrowers, the Pre-Petition Lenders had no choice but to file an involuntary petition with respect to the Borrowers. The Pre-Petition Lenders took this action in the best interests of all parties concerned to provide a mechanism for funding the Borrowers for a sale process and to obtain relief from the Court in the form of an independent trustee who will be motivated by the best interests of the estate and not burdened with the purported self-dealing and conflict of interest which Mr. Salyer and executive management have.

26.     The Pre-Petition Loan Documents set forth above and attached as exhibits hereto were received, kept and maintained by Bank of Montreal in the course of its regularly conducted business activities, and it is a regular practice of Bank of Montreal's business activities to make, execute and maintain such documents.

27.     Although I believe that the foregoing and attached documents (Exhibits 1 through 14) establish the validity, seniority and first priority of the Pre-Petition Agent's and Pre-Petition Lenders' security interest and liens in the Debtors' property to secure the Pre-Petition Obligations, there may be other relevant documents, some of which may be in the possession of the Debtors or third parties, and on behalf of the Pre-Petition Agent and the Pre-Petition Lenders,

1    I respectfully reserve the right to supplement the record with such documents as appropriate or

2    necessary.

3         I declare that under penalty of perjury under the laws of the United States of America and

4    the State of California that the foregoing is true and correct.

5                        [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OHS West:260658694.1

DECLARATION OF
LAWRENCE A. MIZERA

Executed this ___11___ day of May 2009 at _CHICAGO, IL_____.

Lawrence A. Mizera

Declaration of Lawrence A. Mizera