FILED
May 11, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001824651

85

MARC A. LEVINSON (State Bar No. 57613)
JEFFERY D. HERMANN (State Bar No. 90445)
STACY E. DON (State Bar No. 226737)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall
Sacramento, CA  95814-4497
Telephone:    916-447-9200
Facsimile:    916-329-4900
malevinson@orrick.com
jhermann@orrick.com
sdon@orrick.com

JAMES E. SPIOTTO (*Pro hac vice application pending*)
ANN ACKER (*Pro hac vice application pending*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL  60603
Telephone:    (312) 845-3000
Facsimile:    (312) 516-1900
spiotto@chapman.com
acker@chapman. com

Attorneys for Bank of Montreal

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No.  09-29162-D-11 |
| SK FOODS, L.P.<br>a California Limited Partnership, | RAL – 19 |
| Debtor. | Chapter 11 |

EXHIBITS 1(A) – 1(G) TO DECLARATION OF LAWRENCE A. MIZERA IN SUPPORT OF JOINDER OF BANK OF MONTREAL IN THE DEBTOR'S MOTION FOR ORDER AUTHORIZING APPOINTMENT OF CHAPTER 11 TRUSTEE

# EXHIBIT 1(A)

# FIRST AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT

This First Amendment to Amended and Restated Credit Agreement (herein, the *"Amendment"*) is entered into as of February 1, 2008, among SK Foods, L.P., a California limited partnership (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.), a California corporation (*"Colusa Canning,"* and, together with SK Foods, the *"Borrowers,"* and, individually, a *"Borrower"*), the direct and indirect Subsidiaries of the Borrowers from time to time party to this Agreement, as Guarantors (the *"Guarantors"*), the several financial institutions from time to time party to this Agreement, as Lenders (the *"Lenders"*), and Bank of Montreal, as Administrative Agent (the *"Administrative Agent"*).

## PRELIMINARY STATEMENTS

A.  The Borrowers, the Guarantors, the Lenders and the Administrative Agent entered into a certain Amended and Restated Credit Agreement, dated as of September 28, 2007 (the Credit Agreement, as the same may be amended from time to time, being referred to herein as the *"Credit Agreement"*). All capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.

B.  The Borrowers have requested that the Lenders make certain amendments to the Credit Agreement, and the Lenders are willing to do so under the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1.    AMENDMENTS.

Subject to the satisfaction of the conditions precedent set forth in Section 2 below, effective as of December 28, 2007 the Credit Agreement shall be and hereby is amended as follows:

1.1. The definition of *"Indebtedness for Borrowed Money"* appearing in Section 5.1 of the Credit Agreement shall be and hereby is amended in its entirety and as so amended shall read as follows:

> *"Indebtedness for Borrowed Money"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities or mandatory redeemable Preferred Stock), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business which are not more than ninety (90) days past due), (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such

indebtedness, (d) all Capitalized Lease Obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, and (f) all Synthetic Lease Obligations.

1.2.  The definitions of *"Swap Termination Value"* and *"Swaps"* appearing in Section 5.1 of the Credit Agreement are hereby deleted in their entireties and all such references to such terms in the Credit Agreement or the other Loan Documents shall be deemed of have no further force or effect.

SECTION 2.    CONDITIONS PRECEDENT.

This Amendment shall become effective upon the execution and delivery hereof by the Borrowers, the Required Lenders, the Guarantors and the Administrative Agent shall have executed and delivered this Amendment.

SECTION 3.    REPRESENTATIONS.

In order to induce the Lenders to execute and deliver this Amendment, the Borrowers hereby represent to the Lenders that as of the date hereof (a) the representations and warranties set forth in Section 6 of the Credit Agreement are true and correct (except that the representations contained in Section 6.5 shall be deemed to refer to the most recent financial statements of the Borrowers delivered to the Administrative Agent) and that any other representations and warranties which relate to a specific date are true and correct as of such date and (b) no Default or Event of Default has occurred and is continuing under the Credit Agreement or shall result after giving effect to this Amendment.

SECTION 4.    MISCELLANEOUS.

4.1.  The Borrowers heretofore executed and delivered to the Administrative Agent the Security Agreement and certain other Collateral Documents. The Borrowers hereby acknowledge and agree that the Liens created and provided for by the Collateral Documents continue to secure, among other things, the Obligations arising under the Credit Agreement as amended hereby; and the Collateral Documents and the rights and remedies of the Administrative Agent thereunder, the obligations of the Borrowers thereunder, and the Liens created and provided for thereunder remain in full force and effect and shall not be affected, impaired or discharged hereby. Nothing herein contained shall in any manner affect or impair the priority of the liens and security interests created and provided for by the Collateral Documents as to the indebtedness which would be secured thereby prior to giving effect to this Amendment.

4.2.  Except as specifically amended herein, the Credit Agreement shall continue in full force and effect in accordance with its original terms. Reference to this specific Amendment need not be made in the Credit Agreement, the Notes, or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made

pursuant to or with respect to the Credit Agreement, any reference in any of such items to the Credit Agreement being sufficient to refer to the Credit Agreement as amended hereby.

4.3.   The Borrowers agree to pay on demand all costs and expenses of or incurred by the Administrative Agent in connection with the negotiation, preparation, execution and delivery of this Amendment, including the fees and expenses of counsel for the Administrative Agent.

4.4.   This Amendment may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement. Any of the parties hereto may execute this Amendment by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original. Delivery of a counterpart hereof by facsimile transmission or by e-mail transmission of an Adobe portable document format file (also known as a "PDF" file) shall be effective as delivery of a manually executed counterpart hereof. This Amendment shall be governed by the internal laws of the State of Illinois.

This First Amendment to Amended and Restated Credit Agreement is entered into as of the date and year first above written.

*"BORROWERS"*

SK FOODS, L.P.

By: SK PM Corp.
   Its: General Partner

By _____
Name _MARK M. McCormick_
Title _EVP_

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
Name _MARK M. McCormick_
Title _EVP_

*"GUARANTORS"*

SK FOODS, LLC

By _____
Name _MARK M. McCormick_
Title _EVP_

1

*"LENDERS"*

BANK OF MONTREAL, in its individual capacity
    as Administrative Agent, L/C Issuer, Swing
    Line Lender and as a Lender

By _____
    Name:  Betzaida Erdelyi
    Title:   Director

2

U.S. BANK NATIONAL ASSOCIATION, as a
Lender

By _____
Name ___John Flian___
Title ___VP___

4

BANK OF THE WEST, as a Lender

By _____
Name        John DeRuiter
Title       SVP and Manager

5

WELLS FARGO BANK, N.A., as a Lender

By _____

Name   PATRICK BISHOP

Title   VICE PRESIDENT

6

EXHIBIT 1(B)

April 25, 2008

SK Foods, L.P.
P.O. Box 160
Lemoore, California 93245

Attention:    Scott Salyer
              Mark McCormick

        Re:                        Limited Waiver

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Credit Agreement (as amended, the *"Credit Agreement"*) dated as of September 28, 2007, among SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.) (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"* and, each individually, a *"Borrower"*), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Bank of Montreal, as Administrative Agent (Bank of Montreal being referred to in such capacity herein as the *"Agent"*).  All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Credit Agreement.

SK Foods has disclosed to the Agent and the Lenders that a search warrant (the *"Warrant"*) was executed on or about April 16, 2008 by the Federal Bureau of Investigation with respect to certain property of the Borrowers, their Subsidiaries and Affiliates and certain officers of the Borrowers and their Subsidiaries.  Due to the execution of the Warrants, the Borrowers are unable to satisfy all of the conditions precedent to each Credit Event set forth in Section 7.1 of the Credit Agreement and the Lenders are not obligated to honor any additional requests for Borrowings under the Credit Agreement.

Notwithstanding the foregoing, the Borrowers have requested that the Lenders waive the Borrowers' failure to comply with Section 7.1(a) of the Credit Agreement, solely to the extent that such failure is due to the execution of the Warrant, in order to permit the Borrowers to obtain additional loans and advances under the Credit Agreement.

Accordingly, the Lenders hereby waive compliance with Section 7.1(a) of the Credit Agreement, solely to the extent that such failure is due to the execution of the Warrant, during the period from and including the date hereof through and including May 25, 2008 (the *"Waiver Period"*); *provided, however,* that the foregoing waiver shall be effective only to the extent that (i) on or prior to May 2, 2008, the Borrowers deliver to the Agent and the Lenders updated financial projections for the Borrowers and their Subsidiaries, including a consolidated and consolidating balance sheet and consolidated and consolidating statements of income, retained earnings and cash flows of the Borrower and their Subsidiaries for each calendar month ending

Waiver
1627843

on or after the date hereof through and including June 30, 2009 and for the fiscal years ending June 30, 2010 and June 30, 2011, together with a thirteen (13) week cash flow forecast which shall include, but not be limited to, projected availability under the Borrowing Base and material account payable requests, (ii) the Borrower shall promptly advise the Agent and the Lenders of any material events with respect to any customer or supplier contracts in effect as of the date hereof, (iii) no further action is commenced against the Borrowers or any Subsidiary in respect of, or arising out of, the Warrant, and (iv) no Default or Event of Default shall occur.

Please be advised that the Lenders have not waived any defaults that may now or hereafter exist under the Credit Agreement or the other Loan Documents or the requirement that the Borrowers hereafter satisfy the conditions precedent to Credit Events set forth in Section 7.1 (except the failure to satisfy Section 7.1(a) solely as a result of the execution of the Warrant during the Waiver Period as set forth above), and the Agent and the Lenders expressly reserve all of their rights and remedies with respect to any and all defaults that may now exist or hereafter occur under the Credit Agreement.

This letter agreement shall be effective upon the execution hereof by the Borrowers, the Guarantors, the Agent and the Required Lenders.

This letter agreement is limited to the matters expressly set forth herein and all other terms and conditions of the Credit Agreement and the other Loan Documents shall stand and remain unchanged and in full force and effect.

This letter agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

This letter agreement may executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

Very truly yours,

BANK OF MONTREAL, in its capacity as
    Administrative Agent and L/C Issuer

By _____
    Name  ~~BETZAIDA ERDELYI~~
    Title  ~~DIRECTOR~~

*"LENDERS"*

BMO CAPITAL MARKETS FINANCING, INC.

By _____
    Name  ~~BETZAIDA ERDELYI~~
    Title  ~~DIRECTOR~~

LASALLE BANK NATIONAL ASSOCIATION

By _____
    Name _____
    Title _____

U.S. BANK NATIONAL ASSOCIATION

By _____
    Name _____
    Title _____

BANK OF THE WEST

By _____
    Name _____
    Title _____

This letter agreement may executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

Very truly yours,

BANK OF MONTREAL, in its capacity as
    Administrative Agent and L/C Issuer

By
    Name _____
    Title _____

*"LENDERS"*

BMO CAPITAL MARKETS FINANCING, INC.

By
    Name _____
    Title _____

LASALLE BANK NATIONAL ASSOCIATION

By
    Name _____
    Title _____

U.S. BANK NATIONAL ASSOCIATION

By
    Name *Elizabeth C Hungerald*
    Title *Vice President*

BANK OF THE WEST

By
    Name _____
    Title _____

This letter agreement may executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

Very truly yours,

BANK OF MONTREAL, in its capacity as
    Administrative Agent and L/C Issuer

By
    Name _____
    Title _____

*"LENDERS"*

BMO CAPITAL MARKETS FINANCING, INC.

By
    Name _____
    Title _____

LaSALLE BANK NATIONAL ASSOCIATION

By
    Name _____
    Title _____

U.S. BANK NATIONAL ASSOCIATION

By
    Name _____
    Title _____

BANK OF THE WEST

By _John DeRuiter_
    Name _____John DeRuiter_____
    Title _____Senior Vice President and Manager__

SK Foods, L.P.
April 25, 2008
Page -4-

WELLS FARGO BANK, N.A.

By

Name    Patrick Bishop
Title    Vice President

Accepted and Agreed to this _25_ day of April, 2008.

*"BORROWERS"*

SK FOODS, L.P.

By:  SK PM Corp.
  Its:  General Partner

    By _____
    Name _____
    Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

    By _____
    Name _____
    Title _____

*"GUARANTORS"*

SK FOODS, LLC

    By _____
    Name _____
    Title _____



# Exhibit 1(c)

July 15, 2008

SK Foods, L.P.
P.O. Box 160
Lemoore, California 93245

Attention:     Scott Salyer
               Mark McCormick
               Shondale Seymour

        Re:                         Limited Waiver

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Amended and Restated Credit Agreement (as amended, the *"Credit Agreement"*) dated as of September 28, 2007, among SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.) (*"Colusa Canning"* and, together with SK Foods, the "Borrowers" and, each individually, a *"Borrower"*), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Bank of Montreal, as Administrative Agent (Bank of Montreal being referred to in such capacity herein as the *"Agent"*), (ii) that certain Limited Waiver dated as of April 25, 2008 (the *"April Waiver"*), among the Borrowers, the Guarantors, the Lenders and the Agent and (iii) that certain Limited Waiver dated as of June 30, 2008 (the *"June Waiver"*; and, together with the April Waiver, the *"Prior Waivers"*), among the Borrowers, the Guarantors, the Lenders and the Agent. All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Credit Agreement or the Prior Waivers, respectively.

As described in the Prior Waivers, SK Foods has disclosed to the Agent and the Lenders that a search warrant (the "Warrant") was executed on or about April 16, 2008 by the Federal Bureau of Investigation with respect to certain property of the Borrowers, their Subsidiaries and Affiliates and certain officers of the Borrowers and their Subsidiaries. Due to the execution of the Warrants, the Borrowers are unable to satisfy all of the conditions precedent to each Credit Event set forth in Section 7.1 of the Credit Agreement and the Lenders are not obligated to honor any additional requests for Borrowings under the Credit Agreement.

Notwithstanding the foregoing, the Borrowers requested that the Lenders waive the Borrowers' failure to comply with Section 7.1(a) of the Credit Agreement, solely to the extent that such failure is due to the execution of the Warrant, in order to permit the Borrowers to obtain additional loans and advances under the Credit Agreement.

Accordingly, the Lenders hereby waive compliance with Section 7.1(a) of the Credit Agreement, solely to the extent that such failure is due to the execution of the Warrant; *provided, however,* that the foregoing extension and waiver shall be effective only to the extent that (i) on

2465805.01.01.B.doc
1627843

or prior to July 15, 2008, the Borrowers deliver to the Agent and the Lenders the financial statements for the Borrowers' fiscal month ended May 31, 2008 as required by Section 8.5(b) of the Credit Agreement, (ii) no further action is commenced against the Borrowers or any Subsidiary in respect of, or arising out of, the Warrant, and (iii) no Default or Event of Default shall occur.

Please be advised that the Lenders have not waived any defaults that may now or hereafter exist under the Credit Agreement or the other Loan Documents or the requirement that the Borrowers hereafter satisfy the conditions precedent to Credit Events set forth in Section 7.1 (except the failure to satisfy Section 7.1(a) solely as a result of the execution of the Warrant during the Waiver Period as set forth above), and the Agent and the Lenders expressly reserve all of their rights and remedies with respect to any and all defaults that may now exist or hereafter occur under the Credit Agreement.

This letter agreement shall be effective upon the execution hereof by the Borrowers, the Guarantors, the Agent and the Required Lenders.

This letter agreement is limited to the matters expressly set forth herein and all other terms and conditions of the Credit Agreement and the other Loan Documents shall stand and remain unchanged and in full force and effect.

This letter agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

This letter agreement may executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

Very truly yours,

BANK OF MONTREAL, in its capacity as
Administrative Agent and L/C Issuer

By _Betzaida Erdelyi_

Name    **BETZAIDA ERDELYI** _____

Title    **DIRECTOR** _____

"LENDERS"

BMO CAPITAL MARKETS FINANCING, INC.

By _Betzaida Erdelyi_

Name    **BETZAIDA ERDELYI** _____

Title    **DIRECTOR** _____

LASALLE BANK NATIONAL ASSOCIATION

By _____

Name _____

Title _____

U.S. BANK NATIONAL ASSOCIATION

By _____

Name _____

Title _____

BANK OF THE WEST

By _____

Name _____

Title _____

This letter agreement may executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

Very truly yours,

BANK OF MONTREAL, in its capacity as
    Administrative Agent and L/C Issuer

By
    Name  _____
    Title   _____

*"LENDERS"*

BMO CAPITAL MARKETS FINANCING, INC.

By
    Name  _____
    Title   _____

LASALLE BANK NATIONAL ASSOCIATION

By
    Name  _____
    Title   _____

U.S. BANK NATIONAL ASSOCIATION

By
    Name  _____
    Title   _____

BANK OF THE WEST

By  *Bryant Elkins*
    Name    Bryant Elkins
    Title    Vice President

SK Foods, L.P.
July 15, 2008
Page -4-

WELLS FARGO BANK, N.A.

By

Name    Patrick Bishop
Title    Vice President

Accepted and Agreed to this 15th day of July, 2008.

*"BORROWERS"*

SK FOODS, L.P.

By: SK PM Corp.
   Its: General Partner

By _____
Name *MARK M. McCormick*
Title *EVP & TREASURER*

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
Name *MARK M. McCormick*
Title *EVP & TREASURER*

*"GUARANTORS"*

SK FOODS, LLC

By _____
Name *MARK M. McCormick*
Title *EVP & TREASURER*

# EXHIBIT 1(D)

August 31, 2008

SK Foods, L.P.
P.O. Box 160
Lemoore, California 93245

Attention:     Mark McCormick
               Shondale Seymour

      Re:                    Waiver Re:  Financial Statements

Ladies and Gentlemen:

Reference is hereby made to that certain Amended and Restated Credit Agreement (as amended, the *"Credit Agreement"*) dated as of September 28, 2007, among SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.) (*"Colusa Canning"* and, together with SK Foods, the "Borrowers" and, each individually, a *"Borrower"*), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Bank of Montreal, as Administrative Agent (Bank of Montreal being referred to in such capacity herein as the *"Agent"*).  All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Credit Agreement.

The Borrowers failed to the deliver the financial statements and Compliance Certificate for the fiscal month ended June 30, 2008 on or prior to August 15, 2008 as required by Sections 8.5(b) and 8.5(i), respectively, of the Credit Agreement.  The Borrowers failure to so comply with Sections 8.5(b) and 8.5(i) of the Credit Agreement constitutes an Event of Default under Section 9.1(b) of the Credit Agreement (the *"Reporting Defaults"*).  The Borrowers hereby request that the Lenders waive the Reporting Defaults.

Accordingly, the Lenders hereby waive the Reporting Defaults; *provided, however,* that the foregoing extension and waiver shall be effective only to the extent that no other Default or Event of Default shall occur.

Please be advised that, except as expressly set forth above and as set forth in any waiver executed and delivered by the Required Lenders prior to the date hereof, the Lenders have not waived any defaults that may now or hereafter exist under the Credit Agreement or the other Loan Documents or the requirement that the Borrowers hereafter satisfy the conditions precedent to Credit Events set forth in Section 7.1 of the Credit Agreement, and the Agent and the Lenders expressly reserve all of their rights and remedies with respect to any and all defaults that may now exist or hereafter occur under the Credit Agreement.

This letter agreement shall be effective upon the execution hereof by the Borrowers, the Guarantors, the Agent and the Required Lenders.

In addition, the Borrowers have informed the Administrative Agent that it has engaged Stoughton Davidson Accountancy Corporation, a firm of independent public accountants, to prepare the financial statements and audit report required by Section 8.5(c) of the Credit Agreement.  Accordingly, the Lenders hereby consent to the Borrowers' retention of Stoughton Davidson Accountancy Corporation as independent public accountants for purposes of Section 8.5(c) and all other provisions of the Credit Agreement.

This letter agreement is limited to the matters expressly set forth herein and all other terms and conditions of the Credit Agreement and the other Loan Documents shall stand and remain unchanged and in full force and effect.

This letter agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

SK Foods, L.P.
August 3_, 2008
Page -3-

      This letter agreement may be executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

                Very truly yours,

                BANK OF MONTREAL, in its capacity as
                    Administrative Agent and L/C Issuer

By _____
    Name ____ BETZAIDA ERDELYI ____
    Title _____ DIRECTOR _____

*"LENDERS"*

BMO CAPITAL MARKETS FINANCING, INC.

By _____
    Name ____ BETZAIDA ERDELYI ____
    Title _____ DIRECTOR _____

LASALLE BANK NATIONAL ASSOCIATION

By _____
    Name _____
    Title _____

U.S. BANK NATIONAL ASSOCIATION

By _____
    Name _____
    Title _____

BANK OF THE WEST

By _____
    Name _____
    Title _____

This letter agreement may be executed by different parties on different counterparts, all of which when taken together shall constitute a single instrument.

Very truly yours,

BANK OF MONTREAL, in its capacity as
    Administrative Agent and L/C Issuer

By
    Name _____
    Title _____

*"LENDERS"*

BMO CAPITAL MARKETS FINANCING, INC.

By
    Name _____
    Title _____

LASALLE BANK NATIONAL ASSOCIATION

By
    Name _____
    Title _____

U.S. BANK NATIONAL ASSOCIATION

By
    Name _____
    Title _____

BANK OF THE WEST

By *Bryant Elkins*
    Name *Bryant Elkins*
    Title *Vice President*

SK Foods, L.P.
August *31*, 2008
Page -4-

WELLS FARGO BANK, N.A.

By _____
            Patrick Bishop
            Vice President

SK Foods, L.P.
August __, 2008
Page -5-

Accepted and Agreed to this $3\frac{1}{st}$ day of August, 2008.

"*BORROWERS*"

SK FOODS, L.P.

By: SK PM Corp.
   Its: General Partner

By _____
Name _____
Title EVP 3 TREASURER

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
Name MARK MCCORMICK
Title EVP 3 TREASURY

"*GUARANTORS*"

SK FOODS, LLC

By _____
Name MARK MCCORMICK
Title EVP 3 TREASURER

# EXHIBIT 1(E)

## SECOND AMENDMENT TO AMENDED AND RESTATED CREDIT AGREEMENT

This Second Amendment to Amended and Restated Credit Agreement (herein, the *"Amendment"*) is entered into as of September 15, 2008, among SK Foods, L.P., a California limited partnership (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.), a California corporation (*"Colusa Canning,"* and, together with SK Foods, the *"Borrowers,"* and, individually, a *"Borrower"*), the direct and indirect Subsidiaries of the Borrowers from time to time party to this Agreement, as Guarantors (the *"Guarantors"*), the several financial institutions from time to time party to the Credit Agreement (as defined below), as Lenders (the *"Lenders"*), and Bank of Montreal, as Administrative Agent (the *"Administrative Agent"*).

### PRELIMINARY STATEMENTS

A.    The Borrowers, the Guarantors, the Lenders and the Administrative Agent entered into that certain Amended and Restated Credit Agreement, dated as of September 28, 2007, as amended by that First Amendment to Amended and Restated Credit Agreement dated as of February 1, 2008 (as so amended, the *"Credit Agreement"*). All capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.

B.    The Borrower has requested that (i) the Lenders consent to an increase in the aggregate Revolving Credit Commitments (the *"Revolving Commitment Increase"*), to be effected by the addition of a Temporary Excess Facility to be provided by one or more of the existing Lenders and (ii) the Lenders make certain other amendments to the Credit Agreement, and the Lenders are willing to do so under the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1.    AMENDMENTS.

Subject to the satisfaction of the conditions precedent set forth in Section 3 below, the Credit Agreement shall be and hereby is amended as follows:

1.1.    Section 1.2 of the Credit Agreement shall be amended and restated in its entirety to read as follows:

> *Section 1.2.    Revolving Credit Commitment.* (i) Subject to the terms and conditions hereof, each Lender, by its acceptance hereof, severally agrees to make a loan or loans (individually a *"Revolving Loan"* and collectively the *"Revolving Loans"*) in U.S. Dollars to the Borrowers from time to time on a revolving basis up to the amount of such Lender's Revolving Credit Commitment, subject to any reductions thereof pursuant to the

terms hereof, before the Revolving Credit Termination Date. The sum of the aggregate principal amount of Revolving Loans (excluding any Temporary Excess Loans), Swing Loans, and L/C Obligations at any time outstanding shall not exceed the lesser of (a) the Revolving Credit Commitments (excluding the portion thereof constituting Temporary Excess Commitments) in effect at such time and (b) the Borrowing Base as then determined and computed. Each Borrowing of Revolving Loans shall be made ratably by the Lenders in proportion to their respective Revolver Percentages. As provided in Section 1.6(a) hereof, the Borrower may elect that each Borrowing of Revolving Loans be either Base Rate Loans or Eurodollar Loans. Revolving Loans may be repaid and the principal amount thereof reborrowed before the Revolving Credit Termination Date, subject to the terms and conditions hereof.

(ii)    Notwithstanding anything contained in Section 1.2(i) above to the contrary, if at the time of any request for a Revolving Loan the aggregate principal amount of Revolving Loans, Swing Loans and L/C Obligations would exceed the Revolving Credit Commitments (excluding the portion thereof constituting Temporary Excess Commitments), each Lender that provides a Temporary Excess Commitment (and only those Lenders providing a Temporary Excess Commitment) shall make a Revolving Loan in an amount equal to such Lender's Temporary Excess Percentage (a *"Temporary Excess Loan"*) of the requested principal amount of such Revolving Loan.

(iii)    The sum of the aggregate principal amount of Temporary Excess Loans at any one time outstanding shall not exceed the Temporary Excess Loan Commitments in effect at such time. The sum of the aggregate principal amount of Revolving Loans (including all Temporary Excess Loans), Swing Loans and L/C Obligations shall in no event exceed the lesser of (a) the Revolving Credit Commitments (including the Temporary Excess Commitments) in effect at such time and (b) the Borrowing Base as then determined and computed.

(iv)    Except as set forth in Section 1.2(ii) and Section 3.1 hereof, Temporary Excess Loans shall be treated as Revolving Loans for all purposes of this Credit Agreement and the other Loan Documents, and except as otherwise indicated herein, Revolving Credit Commitments shall be deemed to include the Temporary Excess Commitments.

-2-

(v)     Except as set forth in Section 3.1, all payments and collections received on account of the outstanding Revolving Loans (whether as a result of Section 1.9 or otherwise) shall first be applied to all Temporary Excess Loans until paid in full and then to the Revolving Loans which are not Temporary Excess Loans.

1.2.     Section 1.8(a) of the Credit Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

Section 1.8.     Maturity of Loans. The Borrowers shall make principal payments on the Term Loans in installments on the last day of each March, June, September and December in each year, commencing with the calendar quarter ending March 31, 2008, with the amount of each such principal installment to equal the amount set forth in Column B below shown opposite of the relevant due date as set forth in Column A below:

| COLUMN A | COLUMN B |
|---|---|
| PAYMENT DATE | SCHEDULED PRINCIPAL PAYMENT ON TERM LOANS |
| 03/31/08 | $1,250,000 |
| 06/30/08 | $1,250,000 |
| 09/30/08 | $1,250,000 |
| 12/31/08 | $1,250,000 |
| 03/31/09 | $2,500,000 |
| 06/30/09 | $2,500,000 |
| 07/15/09 | $90,000,000 |

, it being agreed that the final payment of both principal and interest not sooner paid on the Term Loans shall be due and payable on July 15, 2009, the final maturity thereof. Each such principal payment shall be applied to the Lenders holding the Term Loans pro rata based upon their Term Loan Percentages.

1.3.     Section 2 of the Credit Agreement is hereby amended by adding thereto a new Section 2.1(e) which reads as follows:

(e) Facility Usage Fee. The Borrowers shall pay to the Administrative Agent for the ratable account of the Lenders in accordance with their Percentages a usage fee (the "Facility Usage Fee") at the rate per annum equal to the Usage Fee Rate (computed on the basis of a year of 365 or 366 days, as the case

-3-

may be, and the actual number of days elapsed) on the average daily outstanding amount of all Loans. The Facility Usage Fee shall accrue (commencing on December 31, 2008) during the term of this Agreement and be payable in full on the Revolving Credit Termination Date, unless on or prior to such date the Commitments shall have been terminated in their entireties and all Obligations shall have been paid in full. In the event that the Commitments are terminated and all Obligations are paid in full on or prior to the Revolving Credit Termination Date, the Lenders hereby agree that the Borrowers' shall not be required to pay any accrued and unpaid Facility Usage Fee amounts and this Section 2.1(e) shall be deemed of no further force or effect.

1.4.   The second paragraph in Section 3.1 of the Credit Agreement shall be amended and restated to read in its entirety as follows:

Anything contained herein to the contrary notwithstanding (including, without limitation, Section 1.9(b) hereof), all payments and collections received in respect of the Obligations and all proceeds of the Collateral received, in each instance, by the Administrative Agent or any of the Lenders after acceleration or the final maturity of the Obligations or termination of the Commitments as a result of an Event of Default shall be remitted to the Administrative Agent and distributed as follows:

(a)   first, to the payment of any outstanding costs and expenses reasonably incurred by any Lender and all costs and expenses incurred by the Administrative Agent, and any security trustee therefor, in each case in connection with monitoring, verifying, protecting, preserving or enforcing the Liens on the Collateral, in protecting, preserving or enforcing rights under the Loan Documents, and in any event including all costs and expenses of a character which the Borrower has agreed to pay to the Lenders under Section 9.6 or the Administrative Agent under Section 13.15 hereof (such funds to be retained by the Administrative Agent for its own account unless it has previously been reimbursed for such costs and expenses by the Lenders, in which event such amounts shall be remitted to the Lenders to reimburse them for payments theretofore made to the Administrative Agent);

(b)   second, to the payment of any outstanding interest and fees due under the Loan Documents to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

-4-

(c)     third, to the payment of principal on the Temporary Excess Loans to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(d)     fourth, to the payment of principal on the Loans (other than Temporary Excess Loans), unpaid Reimbursement Obligations, together with amounts to be held by the Administrative Agent as collateral security for any outstanding L/C Obligations pursuant to Section 9.4 hereof (until the Administrative Agent is holding an amount of cash equal to the then outstanding amount of all such L/C Obligations), and Hedging Liability, the aggregate amount paid to, or held as collateral security for, the Lenders and, in the case of Hedging Liability, their Affiliates to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(e)     fifth, to the payment of all other unpaid Obligations and all other indebtedness, obligations, and liabilities of the Borrower and its Subsidiaries secured by the Loan Documents (including, without limitation, Funds Transfer and Deposit Account Liability) to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof; and

(f)     finally, to the Borrower or whoever else may be lawfully entitled thereto.

1.5.     The following defined terms appearing in Section 5.1 of the Credit Agreement are hereby amended in their entireties and as so amended shall be restated to read as follows:

"*Applicable Margin*" means, with respect to Loans, Reimbursement Obligations, and the commitment fees and letter of credit fees payable under Section 2.1 hereof, until the first Pricing Date, the rates per annum shown opposite Level IV below, and thereafter from one Pricing Date to the next the Applicable Margin means the rates per annum determined in accordance with the following schedule:

| LEVEL | LEVERAGE RATIO FOR SUCH PRICING DATE | APPLICABLE MARGIN FOR BASE RATE LOANS UNDER REVOLVING CREDIT AND REIMBURSEMENT OBLIGATIONS SHALL BE: | APPLICABLE MARGIN FOR EURODOLLAR LOANS UNDER REVOLVING CREDIT, AND LETTER OF CREDIT FEE SHALL BE: | APPLICABLE MARGIN FOR BASE RATE LOANS UNDER TERM CREDIT SHALL BE: | APPLICABLE MARGIN FOR EURODOLLAR LOANS UNDER TERM CREDIT SHALL BE: | APPLICABLE MARGIN FOR COMMITMENT/ FACILITY FEE SHALL BE |
| --- | --- | --- | --- | --- | --- | --- |

-5-

| LEVEL | LEVERAGE RATIO FOR SUCH PRICING DATE | APPLICABLE MARGIN FOR BASE RATE LOANS UNDER REVOLVING CREDIT AND REIMBURSEMENT OBLIGATIONS SHALL BE: | APPLICABLE MARGIN FOR EURODOLLAR LOANS UNDER REVOLVING CREDIT, AND LETTER OF CREDIT FEE SHALL BE: | APPLICABLE MARGIN FOR BASE RATE LOANS UNDER TERM CREDIT SHALL BE: | APPLICABLE MARGIN FOR EURODOLLAR LOANS UNDER TERM CREDIT SHALL BE: | APPLICABLE MARGIN FOR COMMITMENT/ FACILITY FEE SHALL BE |
|---|---|---|---|---|---|---|
| IV | Greater than or equal to 4.50 to 1.0 | 1.50% | 3.00% | 1.75% | 3.25% | 0.50% |
| III | Less than 4.50 to 1.0 but greater than or equal to 3.50 to 1.0 | 1.25% | 2.75% | 1.50% | 3.00% | 0.45% |
| II | Less than 3.50 to 1.0, but greater than or equal to 2.50 to 1.0 | 1.00% | 2.50% | 1.25% | 2.75% | 0.40% |
| I | Less than 2.50 to 1.0 | 0.875% | 2.375% | 1.125% | 2.625% | 0.35% |

For purposes hereof, the term *"Pricing Date"* means, for any fiscal quarter of the Borrowers ending on or after December 31, 2007, the date on which the Administrative Agent is in receipt of the Borrowers' most recent financial statements (and in the case of the year-end financial statements, audit report) for the fiscal quarter then ended, pursuant to Section 8.5 hereof. The Applicable Margin shall be established based on the Leverage Ratio for the most recently completed fiscal quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If the Borrowers have not delivered its financial statements by the date such financial statements and audit report are required to be delivered under Section 8.5 hereof, until such financial statements and audit report are delivered, the Applicable Margin shall be the highest Applicable Margin (*i.e.*, Level IV shall apply). If the Borrowers subsequently deliver such financial statements before the next Pricing Date, the Applicable Margin established by such late delivered financial statements shall take effect from the date of delivery until the next Pricing Date. In all other circumstances, the Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the fiscal year covered by such financial statements until the next Pricing Date. Each

determination of the Applicable Margin made by the Administrative Agent in accordance with the foregoing shall be conclusive and binding on the Borrowers and the Lenders if reasonably determined.

Upon the occurrence of an Event of Default under Section 9.1(b) hereof (with respect to the covenants set forth in Section 8.22 hereof), the Applicable Margin shall be the highest possible margin (Level IV shall apply) whether or not the Required Lenders have waived such Event of Default and the Applicable Margin shall be applicable from the end of such period through and including the next period the Borrowers demonstrate compliance with Section 8.22 and such Event of Default has been waived, if the same is waived.

"*Revolving Credit Commitment*" means, as to any Lender, the obligation of such Lender to make Revolving Loans and to participate in Swing Loans and Letters of Credit issued for the account of the Borrowers hereunder in an aggregate principal or face amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1 attached hereto and made a part hereof, as the same may be reduced or modified at any time or from time to time pursuant to the terms hereof. The Borrowers and the Lenders acknowledge and agree that the Revolving Credit Commitments (exclusive of the Temporary Excess Commitments) of the Lenders aggregate an amount equal to the sum of (x) (i) $100,000,000 during the period from and including July 1, 2008 through and including February 28, 2009, (ii) $90,000,000 during the period from and including March 1, 2009 through and including April 30, 2009 and (iii) $55,000,000 from and after May 1, 2009 and (y) at all times prior to the Temporary Excess Credit Termination Date, the Temporary Excess Commitment.

"*Revolving Credit Termination Date*" means (i) with respect to all Revolving Loans other than Temporary Excess Loans, July 15, 2009, and (ii) with respect to Temporary Excess Loans, the Temporary Excess Credit Termination Date, or, in each case, such earlier date on which the Revolving Credit Commitments are terminated in whole pursuant to Section 1.13, 9.2 or 9.3 hereof.

"*Unused Revolving Credit Commitments*" means, at any time, the difference between (i) the sum of Revolving Credit Commitments and Temporary Excess Commitments then in effect and (ii) the aggregate outstanding principal amount of Revolving

-7-

Loans and L/C Obligations, *provided* that Swing Loans outstanding from time to time shall be deemed to reduce the Unused Revolving Credit Commitment of the Administrative Agent for purposes of computing the commitment fee under Section 2.1(a) hereof.

1.6.    Clause (e) of the defined term *"EBITDA"* appearing in Section 5.1 of the Credit Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

(e) such other adjustments approved by the Required Lenders in their sole discretion.

1.7.    The defined term *"Excess Cash Flow"* appearing in Section 5.1 of the Credit Agreement is hereby amended by adding the following sentence at the end thereof:

Notwithstanding anything contained herein to the contrary, solely for purposes of calculating Excess Cash Flow, the Borrowers shall calculate EBITDA without giving effect to any legal fees and legal expenses incurred in connection with any pending investigation, litigation or similar matter involving the Borrowers.

1.8.    The definition of *"Loan"* appearing in Section 5.1 of the Credit Agreement shall be amended by inserting the phrase *"Temporary Excess Loan"* immediately after the phrase *"Revolving Loan"* in the first line thereof.

1.9.    The definition of *"Percentage"* appearing in Section 5.1 of the Credit Agreement shall be amended by inserting the phrase *"Temporary Excess Percentage"* immediately after the phrase *"Revolver Percentage"* in the first line thereof.

1.10.    The definition of *"Revolver Percentage"* appearing in Section 5.1 of the Credit Agreement shall be and hereby is amended by inserting the parenthetical *"(other than the Temporary Excess Commitments)"* immediately after the phrase *"Revolving Credit Commitments"* in the second line thereof.

1.11.    Section 5.1 of the Credit Agreement shall be further amended by adding the following new definitions, each in their appropriate alphabetical order to read in their entirety as follows:

*"Extraordinary Expenses"* means any payments made the Borrowers or their Subsidiaries outside the ordinary course of their respective businesses in settlement, discharge or satisfaction of any pending investigation, litigation or similar proceedings against the Borrowers or their Subsidiaries

-8-

"*Temporary Excess Loan*" is defined in Section 1.2(ii) hereof.

"*Temporary Excess Commitment*" means, as to any Lender, the obligation of such Lender to make Temporary Excess Loans in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1 attached hereto and made a part hereof, as the same may be reduced or modified at any time or from time to time pursuant to the terms hereof. The Borrower and the Lenders acknowledge and agree that the Temporary Excess Commitments of the Lenders aggregate an amount equal to (i) $25,000,000 during the period from and including September 15, 2008 through and including the close of business on March 1, 2009 and (ii) $0.00 at all times thereafter.

"*Temporary Excess Credit Termination Date*" means March 1, 2009.

"*Temporary Excess Percentage*" means, for each Lender, the percentage of the aggregate Temporary Excess Commitments represented by such Lender's Temporary Excess Commitment or, if the Temporary Excess Commitments have been terminated, the percentage held by such Lender of the aggregate principal amount of all Temporary Excess Loans then outstanding.

"*Usage Fee Rate*" means, for the purposes of Section 2.1(e), (i) from and including December 31, 2008 through and including March 30, 2009, 1.00%, (ii) from and including March 31, 2009 through and including June 29, 2009, 2.00% and (iii) from and including June 30, 2009 and thereafter, 3.00%.

1.12.    Section 8.5(a) of the Credit Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

(a)    as soon as available, and in any event within 5 days after the last day of each calendar week, a Borrowing Base Certificate showing the computation of the Borrowing Base in reasonable detail as of the close of business on the last day of such calendar week, together with an accounts receivable and accounts payable aging and reasonable detail supporting the inventory valuations included in the computation of the Borrowing Base, prepared by the Borrowers and certified to by its chief financial officer or another officer of the Borrowers acceptable to the Administrative Agent;

-9-

1.13.    Section 8.22(a) of the Credit Agreement is hereby amended in its entirety and as so amended shall be restated to read as follows:

(a) *Leverage Ratio.* As of the last day of each fiscal quarter of the Borrowers ending during the relevant period set forth below, the Borrowers shall not permit the Leverage Ratio to be greater than the corresponding ratio set forth opposite such period:

| PERIOD(S) ENDING | LEVERAGE RATIO SHALL NOT BE GREATER THAN: |
|---|---|
| From the Closing Date through and including the fiscal quarter ending on December 31, 2007 | 5.25 to 1.0 |
| From the fiscal quarter ending on January 1, 2008 through and including September 30, 2008 | 5.00 to 1.0 |
| From the fiscal quarter ending on October 1, 2008 through and including March 31, 2009 | 5.25 to 1.0 |
| From the fiscal quarter ending on April 1, 2009 through and including each fiscal quarter ending thereafter | 4.75 to 1.0 |

; *provided,* that for purposes of calculating the principal amount of Revolving Loans outstanding as of the date of determination of the Leverage Ratio, the principal amount of the Revolving Loans deemed to be outstanding shall be equal to the average of the outstanding principal amount of the Revolving Loans as the end of each day occurring in the most recent 365 or 366 (as the case may be) day period ending on the date of such calculation; *provided, however,* with respect to the relevant period set forth below, the principal amount of Revolving Loans for such periods shall be:

| MONTH ENDING | AVERAGE BALANCE |
|---|---|
| July 31, 2007 | $17,215,108.55 |
| August 31, 2007 | $34,894,637.19 |
| September 30, 2007 | $61,517,435 |

1.14.    The Credit Agreement is hereby amended by adding thereto new Sections 8.31 and 8.32 which reads as follows:

-10-

Section 8.31. *Extraordinary Expense Pro Forma Test.* The Borrowers shall not, and shall not permit any Subsidiary to, pay, or enter into any agreement providing for a binding commitment with respect to the payment of, any Extraordinary Expenses unless not less than five (5) Business Days prior to the making of any such payment, or the execution and delivery of any agreement evidencing such binding commitment, the Borrowers deliver to the Administrative Agent and the Lenders a certificate of an Authorized Representative of SK Foods, in the form attached hereto as Exhibit I, evidencing that the ratio of (i) EBITDA for the twelve calendar month period most recently ended prior to the date of such payment (or execution and delivery of the agreement evidencing such payment) (the *"Test Period"*) less Capital Expenditures not financed with Indebtedness for Borrowed Money permitted by Section 8.7(b) hereof during such Test Period to (ii) the sum of (x) Fixed Charges made during such Test Period, plus (y) the aggregate amount of such Extraordinary Expenses (calculated as if the entire amount of such payment was paid on the last day of the most recently ended calendar month), shall not be less than 1.35 to 1.0.

Section 8.32. *2009 Grower Contracts.* On or prior to March 31, 2009, the Borrowers shall have delivered evidence reasonably satisfactory to the Administrative Agent of fully-executed grower contracts, each of which shall be in full force and effect, providing for the purchase by the Borrowers of not less than 90% of the Borrowers' raw product requirements for the 2009 crop year.

1.15.    Schedule 1 to the Credit Agreement entitled *"Commitments"* is hereby amended in its entirety and as so amended shall be restated to read as set forth on Schedule 1 hereto entitled *"Revolving Credit Commitments"* and *"Temporary Excess Commitments".*

1.16.    The Credit Agreement is hereby amended by adding thereto a new Exhibit I in the form attached to this Amendment as Exhibit I.

SECTION 2.    CONFIDENTIALITY AGREEMENTS.

Each of the Lenders executed and delivered a Confidentiality Agreement dated as of September 2, 2008 (each, a *"Supplemental Confidentiality Agreement"*), relating to Non-Public Information (as defined the Supplemental Confidentiality Agreement) delivered by the Borrowers at the bank group meeting on September 2, 2008. By its execution hereof, the Borrowers hereby confirm and agree that notwithstanding anything contained in the Supplemental Confidentiality Agreements to the contrary, nothing shall be deemed to prohibit any Lender from disclosing the Non-Public Information for any purpose permitted by Section 13.25 of the Credit Agreement.

-11-

Section 3.    Conditions Precedent.

This Amendment shall become effective upon the satisfaction of each of the following conditions precedent:

3.1.    The Borrowers, the Required Lenders, the Guarantors and the Administrative Agent shall have executed and delivered this Amendment.

3.2.    The Borrowers shall have paid to the Administrative Agent an amendment fee for the ratable benefit of each Lender executing this Amendment in an amount equal to 0.25% of the sum of (i) such Lender's Revolving Credit Commitment (without giving effect to any increase in such Lender's Revolving Credit Commitment in the form of a Temporary Excess Commitment) and (ii) the outstanding principal amount of such Lender's Term Loans.

3.3.    The Borrowers shall have paid to the Administrative Agent an upfront fee for the ratable benefit of each Lender providing a Temporary Excess Commitment pursuant to this Amendment in an amount equal to 0.50% of such Lender's Temporary Excess Commitment.

3.4.    The Borrowers shall have paid to the Administrative Agent for its own account all fees required to be paid by the terms of the Agent Fee Letter dated as of even date herewith between the Borrowers and the Administrative Agent.

3.5.    The Borrowers shall have paid to the Administrative Agent such other fees, if any, as may be required pursuant to the terms of any fee letter executed and delivered in connection with this Amendment.

3.6.    The Administrative Agent shall have received for each Lender copies of resolutions of each Borrower's Board of Directors (or similar governing body) authorizing the execution, delivery and performance of this Amendment, and the consummation of the transactions contemplated hereby, together with specimen signatures of the persons authorized to execute such documents on each Borrower's behalf, all certified in each instance by its Secretary or Assistant Secretary.

3.7.    The Administrative Agent shall have received the supplements to the Mortgages in form and substance satisfactory to the Administrative Agent, duly executed by the Borrowers.

3.8.    The Administrative Agent shall have received for each Lender copies of the certificates of good standing for each Borrower (dated no earlier than 30 days prior to the date hereof) from the office of the secretary of the state of its incorporation or organization and of each state in which it is qualified to do business as a foreign corporation or organization.

3.9.    The Administrative Agent shall have received the written opinion of counsel to the Borrowers, in form and substance reasonably satisfactory to the Administrative Agent.

-12-

SECTION 4.        POST-CLOSING CONDITIONS.

Not later than 45 days following the date of this Amendment, the Borrowers shall deliver to the Administrative Agent date down endorsements for existing title insurance policies, or a binding commitment therefor, in form and substance acceptable to the Administrative Agent from a title insurance company acceptable to the Administrative Agent insuring the Lien of the Mortgages (as supplemented by the supplements referred to in Section 3.7 above) to be valid first priority Liens subject to no defects or objections which are unacceptable to the Administrative Agent, together with such endorsements as the Administrative Agent may require.

SECTION 5.        REPRESENTATIONS.

In order to induce the Lenders to execute and deliver this Amendment, the Borrowers hereby represent to the Lenders that as of the date hereof (a) except to the extent waived pursuant that certain Waiver Letter dated as of July 15, 2008, by and among the Borrowers, the Lenders and the Administrative Agent, the representations and warranties set forth in Section 6 of the Credit Agreement are true and correct (except that the representations contained in Section 6.5 shall be deemed to refer to the most recent financial statements of the Borrowers delivered to the Administrative Agent) and that any other representations and warranties which relate to a specific date are true and correct as of such date and (b) no Default or Event of Default has occurred and is continuing under the Credit Agreement or shall result after giving effect to this Amendment.

SECTION 6.        MISCELLANEOUS.

6.1.    The Borrowers heretofore executed and delivered to the Administrative Agent the Security Agreement and certain other Collateral Documents. The Borrowers hereby acknowledge and agree that the Liens created and provided for by the Collateral Documents continue to secure, among other things, the Obligations arising under the Credit Agreement as amended hereby; and the Collateral Documents and the rights and remedies of the Administrative Agent thereunder, the obligations of the Borrowers thereunder, and the Liens created and provided for thereunder remain in full force and effect and shall not be affected, impaired or discharged hereby.  Nothing herein contained shall in any manner affect or impair the priority of the liens and security interests created and provided for by the Collateral Documents as to the indebtedness which would be secured thereby prior to giving effect to this Amendment.

6.2.    Except as specifically amended herein, the Credit Agreement shall continue in full force and effect in accordance with its original terms.  Reference to this specific Amendment need not be made in the Credit Agreement, the Notes, or any other instrument or document executed in connection therewith, or in any certificate, letter or communication issued or made pursuant to or with respect to the Credit Agreement, any reference in any of such items to the Credit Agreement being sufficient to refer to the Credit Agreement as amended hereby.

6.3.    The Borrowers agree to pay on demand all costs and expenses of or incurred by the Administrative Agent and the Lenders in connection with the negotiation, preparation, execution

-13-

and delivery of this Amendment, including the fees and expenses of counsel for the Administrative Agent and the Lenders.

6.4.    This Amendment may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement. Any of the parties hereto may execute this Amendment by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original. Delivery of a counterpart hereof by facsimile transmission or by e-mail transmission of an Adobe portable document format file (also known as a "PDF" file) shall be effective as delivery of a manually executed counterpart hereof. This Amendment shall be governed by the internal laws of the State of Illinois.

-14-

This Second Amendment to Amended and Restated Credit Agreement is entered into as of the date and year first above written.

*"Borrowers"*

SK Foods, L.P.

By: SK PM Corp.
   Its: General Partner

By _____
Name _____
Title _____

RHM Industrial/Specialty Foods, Inc.

By _____
Name _____
Title _____

*"Guarantors"*

SK Foods, LLC

By _____
Name _____
Title _____

S-1

*"LENDERS"*

BANK OF MONTREAL, in its individual capacity
    as Administrative Agent, L/C Issuer and
    Swing Line Lender

By _____
    Name: ~~BETZAIDA ERDELYI~~
    Title: ~~DIRECTOR~~

BMO CAPITAL MARKETS FINANCING, INC., as a
    Lender

By _____
    Name: ~~BETZAIDA ERDELYI~~
    Title: ~~DIRECTOR~~

S-2

LaSalle Bank, National Association, as a
Lender

By _____
Name: Stephanie J. Slavkin
Title: Senior Vice President

U.S. BANK NATIONAL ASSOCIATION, as a
   Lender

By _____

   Name: Elizabeth C. Hengeveld
   Title Vice President

S-4

BANK OF THE WEST, as a Lender

By _Bryant Elkins_____
Name _Bryant Elkins_____
Title _Vice President_____

S-5

WELLS FARGO BANK, N.A., as a Lender

By     _Leonard Kam_____
Name   Leonard Kam
Title    Vice President

S-6

## SCHEDULE 1

### REVOLVING CREDIT COMMITMENTS

| NAME OF LENDER | REVOLVING CREDIT COMMITMENT (SEPTEMBER 15 - FEBRUARY 28) | REVOLVING CREDIT COMMITMENT (MARCH 1 - APRIL 30) | REVOLVING CREDIT COMMITMENT (MAY 1 - JULY 15) |
|---|---|---|---|
| BMO Capital Markets Financing, Inc. | 30,000,000 | 27,000,000 | 16,500,000 |
| LaSalle Bank, National Association | 22,500,000 | 20,250,000 | 12,375,000 |
| Wells Fargo Bank, N.A. | 22,500,000 | 20,250,000 | 12,375,000 |
| U.S. Bank National Association | 15,000,000 | 13,500,000 | 8,250,000 |
| Bank of the West | 10,000,000 | 9,000,000 | 5,500,000 |
| TOTAL | $100,000,000.00 | $90,000,000 | $55,000,000 |

### TEMPORARY EXCESS COMMITMENTS

| NAME OF LENDER | TEMPORARY EXCESS COMMITMENT |
|---|---|
| BMO Capital Markets Financing, Inc. | 13,125,000 |
| Wells Fargo Bank, N.A. | 5,625,000 |
| U.S. Bank National Association | 3,750,000 |
| Bank of the West | 2,500,000 |
| TOTAL | $25,000,000 |

**EXHIBIT I**

**EXTRAORDINARY EXPENSE CERTIFICATE**

To:    Bank of Montreal, as Administrative
Agent under, and the Lenders party to,
the Credit Agreement described below

    This Extraordinary Expense Certificate is furnished to the Administrative Agent and the Lenders pursuant to that certain Amended and Restated Credit Agreement dated as of September 28, 2007, among us (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*). Unless otherwise defined herein, the terms used in this Extraordinary Expense Certificate have the meanings ascribed thereto in the Credit Agreement.

    THE UNDERSIGNED HEREBY CERTIFIES THAT:

    1.    I am the duly elected _____ of SK Foods, L.P., acting in its capacity as a Borrower and as agent for RHM Industrial/Specialty Foods, Inc.

    2.    Pursuant to the terms of Section 8.31 of the Credit Agreement, the undersigned hereby notifies the Administrative Agent and the Lenders of its intention to **[enter into an agreement providing for a binding commitment to]** make payment (the *"Payment"*) of an Extraordinary Expense on _____, 20__. The aggregate amount of such Payment is $_____ and is payable as follows: _____.

    3.    After giving effect to the Payment (calculated as if the aggregate amount of such payment was paid in full on the last day of the most recently completed calendar month), the Borrowers are in compliance with Section 8.31 of the Credit Agreement.

    4.    The Schedule I hereto sets forth financial data and computations evidencing the Borrowers' compliance with Section 8.31 of the Credit Agreement, all of which computations are, to the best of my knowledge, true, complete and correct and have been made in accordance with Section 8.31 of the Credit Agreement.

    The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____ 20___.

SK FOODS, L.P.

By: SK PM Corp.
Its: General Partner

By _____
    Name _____
    Title _____

SK FOODS, L.P.
RHM INDUSTRIAL/SPECIALTY FOODS, INC.

EXTRAORDINARY EXPENSE CALCULATIONS
FOR AMENDED AND RESTATED CREDIT AGREEMENT
DATED AS OF SEPTEMBER 28, 2007

CALCULATIONS AS OF _____, _____

A.    Extraordinary Expense Ratio (Section 8.31)

| | | |
|---|---|---|
| 1. | Net Income for past 4 quarters | $_____ |
| 2. | Interest Expense for past 4 quarters | _____ |
| 3. | Income taxes for past 4 quarters | _____ |
| 4. | Depreciation and Amortization Expense for past 4 quarters | _____ |
| 5. | Adjustments per Schedule 5.1 | _____ |
| 6. | Sum of Lines A1, A2, A3, A4 and A5 (*"EBITDA"*) | _____ |
| 7. | Capital Expenditures | _____ |
| 8. | Line A6 minus Line A7 | _____ |
| 9. | Principal payments for past 4 quarters | _____ |
| 10. | Interest Expense for past 4 quarters | _____ |
| 11. | Income taxes for past 4 quarters | _____ |
| 12. | Distributions permitted by Section 8.12 hereof | _____ |
| 13. | Extraordinary Expense Payment | _____ |
| 14. | Sum of Lines A9, A10, A11, A12 and A13 | _____ |
| 15. | Ratio of Line A8 to Line A14 | _____:1.0 |
| 16. | Line A15 ratio must not be less than | 1.35:1.0 |
| 17. | The Borrowers are in compliance (circle yes or no) | yes/no |

-2-

EXHIBIT 1(F)

# FORBEARANCE AGREEMENT

This Forbearance Agreement (herein, the "Agreement") is made as of this 31st day of March, 2009, by and among SK Foods, L.P., a California limited partnership ("*SK Foods*"), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.), a California corporation ("*Colusa Canning*," and, together with SK Foods, the "*Borrowers*," and, individually, a "*Borrower*"), the direct and indirect Subsidiaries of the Borrowers from time to time party to this Agreement, as Guarantors, the several financial institutions from time to time party to this Agreement, as Lenders, and Bank of Montreal, a Canadian chartered bank acting through its Chicago branch, as Administrative Agent for the Lenders.

## RECITALS:

A.    The Lenders currently extend credit to the Borrowers on the terms and conditions set forth in that certain Amended and Restated Credit Agreement dated as of September 28, 2007, as amended, by and among the Borrowers, the Guarantors, the Lenders, and the Administrative Agent (the "*Credit Agreement*").

B.    The Borrowers failed to comply with (i) Section 8.5(a) (Borrowing Base Certificate) of the Credit Agreement as a result of their failure to deliver Borrowing Base Certificates for various calendar weeks ended on or after February 14, 2009, as required by Section 8.5(a) of the Credit Agreement, (ii) 8.5(b). (Financial Statements) and 8.5(i) (Compliance Certificate) of the Credit Agreement as a result of their failure to deliver the financial statements and Compliance Certificate for the fiscal month ended December 31, 2008 on or prior to February 15, 2009, January 31, 2009 on or prior to February 15, 2009 and February 28, 2009 on or prior to March 15, 2009, each as required by Sections 8.5(b) and 8.5(i), respectively, of the Credit Agreement; (iii) Section 1.2 of the Credit Agreement as a result of the Borrowers' failure to pay when due the amount necessary to reduce the outstanding amount of Revolving Loans, Swing Loans and L/C Obligations to $90,000,000 prior to March 1, 2009, and (iv) Sections 1.2 and 1.9(b)(iv) as a result of the Borrowers' failure to pay when due the amount necessary to reduce the outstanding amount of Revolving Loans, Swing Loans and L/C Obligations to an amount less than or equal to the Borrowing Base as most recently determined and computed. The Borrowers' failure to so comply with Sections 8.5(a), 8.5(b) and 8.5(i) of the Credit Agreement constitute Events of Default under Section 9.1(b) of the Credit Agreement (the "*Reporting Defaults*") and the Borrowers' failure to so comply with Sections 1.2 and 1.9(b)(vi) of the Credit Agreement constitute Event of Default under Section 9.1(a) of the Credit Agreement (the "*Mandatory Prepayment Defaults*", and together with the Reporting Defaults, collectively referred to herein as the "*Existing Defaults*").

C.    The Borrowers have also informed the Lenders that they will not have available funds necessary to pay (i) the Term Loan amortization payment due on March 31, 2009 and the Borrowers' failure to make such payment when due will constitute an Event of Default under Section 9.1(a) and (ii) the aggregate outstanding principal balance of the Revolving Loans, Swing Loans and L/C Obligations which will become due and owing on the date of this Agreement as described in Section 5 hereof (collectively, the "*Potential Defaults*" and, together with the Existing Defaults, the "*Subject Defaults*").

D.  The Lenders are not willing to waive the Existing Defaults.

E.  The Borrowers have advised the Lenders that the Borrowers intend to evaluate strategic options with respect to their debt and capital structure, including potential sales of all or a portion of the assets of the Borrowers, and the Borrowers have requested that the Lenders temporarily forbear from exercising certain rights and remedies under the Loan Documents and allow the Borrowers to use cash constituting proceeds of the Collateral securing the Obligations owing to the Lenders under the Credit Agreement and the other Loan Documents in order to afford the Borrowers the opportunity to do so.

G.  In order to accommodate the Borrowers' request, during and only during the period (the *"Standstill Period"*) beginning on the date of this Agreement and ending on April 3, 2009 (the *"Scheduled Standstill Expiration Date"*), the Lenders are willing to temporarily forbear from exercising certain rights and remedies available solely by reason of the Subject Defaults on the terms, conditions, and provisions contained in this Agreement and the Lenders are willing to release specified amounts of cash constituting proceeds of the Collateral under the control of the Administrative Agent on behalf of the Lenders in order to permit the Borrowers to fund certain working capital needs approved by the Administrative Agent and the Lenders.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  *Incorporation of Recitals; Defined Terms.* The Borrowers acknowledge that the Recitals set forth above are true and correct in all material respects. The defined terms in the Recitals set forth above are hereby incorporated into this Agreement by reference. All other capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.

2.  *Amounts Owing.* The Borrowers acknowledge and agree that, to the best of their knowledge, the principal amount of Loans and Letters of Credit as of March 31, 2009, is $186,958,319 ($95,000,000 in Term Loans, $89,119,440 in Revolving Loans, $0.00 in Swing Loans and $2,838,879 in Letters of Credit), and such amount (together with interest and fees thereon) is justly and truly owing by the Borrowers without defense, offset or counterclaim.

3.  *Acknowledgment of Default(s).* The Existing Defaults constitute Events of Default under the Credit Agreement. The Borrowers acknowledge that, because of the Existing Defaults, the Lenders are permitted and entitled under Sections 7.1 and 9.2 of the Credit Agreement to decline to provide further credit to the Borrower, to terminate the Commitments, to accelerate the Obligations, to enforce Liens granted under the Collateral Documents, and to exercise any other rights or remedies that may be available under the Loan Documents or under applicable law. The Borrowers represent to the Administrative Agent and Lenders that, to the best of their knowledge, there are no Defaults or Events of Default other than the Subject Defaults.

4.  *Forbearance.* Unless and until a Standstill Termination occurs, except as set forth in Section 5 below, the Lenders will not accelerate the Obligations or enforce any of the Liens

-2-

granted under the Collateral Documents or, except as provided below, exercise any other rights or remedies available solely by reason of the Subject Defaults.

5. *Revolving Credit.* Upon the execution and delivery hereof, the Lenders hereby terminate the Revolving Credit Commitments (including without limitation the Swing Line Sublimit and the L/C Sublimit) in their entirety in accordance with the provisions of Section 9.2 of the Credit Agreement. In accordance with the terms of the Credit Agreement, upon such termination, the Borrowers shall have no further right to request any Borrowings or the issuance of any Letters of Credit, the Revolving Credit Termination Date shall occur, all Revolving Credit Loans and Swing Loans shall be immediately due and payable and the Lenders have the right to demand cash collateral for the full undrawn face amount of any outstanding Letters of Credit. Notwithstanding the foregoing, the Lenders hereby agree that they will not demand cash collateral as described in the preceding sentence during the Standstill Period.

6. *Principal Payments.* Except with respect to the Potential Defaults and the effect of the termination of the Revolving Credit Commitments described in Section 5 above, the Borrowers shall continue to pay all principal on the Loans and Reimbursement Obligations on all Letters of Credit when due, including, without limitation, the Borrowers shall continue to make all scheduled payments of principal on the Term Loans as and when due under the Credit Agreement.

7. *Interest and Fee Payments.* The Borrowers will keep interest and fees current on the Loans and Letters of Credit. As a result of the existence of the Existing Defaults, (a) no new Eurodollar Loans may be created and, at the expiration of the relevant Interest Periods, any outstanding Eurodollar Loans shall be converted into Base Rate Loans, and (b) pursuant to the terms of Section 1.10 of the Credit Agreement, from and after the date hereof, interest on all Loans, Reimbursement Obligations, and letter of credit fees due under Section 2.1 shall each be increased by 2.0% per annum.

8. *Additional Agreements.* The Borrowers further agree that:

(a) The Borrowers shall continue to retain and at all times thereafter maintain at its own cost and expense FTI Consulting to serve as a financial consultant to the Borrowers to evaluate the financial condition, operating performance, and business prospects, to assist the Borrowers in the timely preparation and delivery of cash flow forecasts, and to perform such other services as the Borrowers may require or the Administrative Agent and the Required Lenders may reasonably request. The Borrowers shall take reasonable steps to assure that FTI Consulting, as well as the officers, directors, management and employees of the Borrowers are available for discussion with the Administrative Agent and the Lenders from time to time as the Administrative Agent or any of the Lenders may request regarding the financial condition, operating performance, and business prospects of the Borrowers and their Subsidiaries.

(b) No later than Thursday of each calendar week (beginning April 2, 2009), the Borrowers shall provide to the Administrative Agent and the Lenders a current Borrowing Base certificate prepared as of the last day of the prior week, together with an

-3-

updated accounts receivable listing, a current accounts receivable and accounts payable aging report, and a cash flow report (reflecting actual cash receipts and cash disbursements of the Borrowers from the prior week, projected cash receipts and cash disbursements of the Borrowers for such week as reflected on the cash flow forecast attached hereto as Exhibit A, and any differences between actual cash receipts and cash disbursements and projected cash receipts and cash disbursements on a cumulative basis, prepared by FTI Consulting and in form and substance, and with such detail, as the Administrative Agent may request.

(c)     During the Standstill period, the Borrowers shall actively solicit proposals from strategic purchasers for purchases of all or a portion of the Borrowers' assets, and the Borrowers shall promptly advise the Administrative Agent and the Lenders of any purchase offer or letters of intent it receives. All financial information and reports on asset values furnished by the Borrowers, or on their behalf, to any such purchaser shall be concurrently furnished to the Administrative Agent and the Lenders.

(d)     The Borrowers acknowledge and agree that they are prohibited from making any payment on Subordinated Debt under the terms of the relevant subordination agreements as a result of the Existing Defaults.

(e)     To the extent not already completed, the Borrowers shall formally engage a chief restructuring officer and investment banker reasonably acceptable to the Lenders to, among other things, evaluate strategic options for a potential sale or restructuring of the Borrowers and actively market the Borrowers' business and assets to potential purchasers. The Borrowers shall at all times maintain the engagement of an investment banker satisfactory to the Lenders to perform the functions described in the preceding sentence. The Borrowers shall complete the appointment of an independent board of directors comprised of not less than 2 members. The Borrowers shall take reasonable steps to cause the chief restructuring officer, independent directors and investment banker to be available for discussions with the Administrative Agent and the Lenders from time to time as the Administrative Agent or any of the Lenders may request regarding the financial condition, operating performance, and business prospects of the Borrowers and their Subsidiaries.

9.     *Standstill Termination.* As used in this Agreement, *"Standstill Termination"* shall mean the occurrence of the Scheduled Standstill Expiration Date, or, if earlier, the occurrence of any one or more of the following events: (a) any Default or Event of Default under the Credit Agreement, in each case other than the Subject Defaults; (b) any failure by either Borrower for any reason to comply with any term, condition, or provision contained in this Agreement; (c) any representation made by the Borrowers in this Agreement or pursuant to it proves to be incorrect or misleading in any material respect when made; or (d) any Material Adverse Effect shall occur as determined in good faith by the Administrative Agent or the Required Lenders. The occurrence of any Standstill Termination shall be deemed an Event of Default under the Credit Agreement. Upon the occurrence of a Standstill Termination, the Standstill Period is automatically terminated and the Lenders are then permitted and entitled under Sections 7.1, 9.2, 9.3, and 9.4 of the Credit Agreement, among other things, to decline to provide additional credit

-4-

to the Borrowers, to permanently terminate the Commitments, to accelerate the Obligations, to require cash collateral for outstanding Letters of Credit, and to exercise any other rights and remedies that may be available under the Loan Documents or applicable law.

10.    *No Waiver and Reservation of Rights.*   The Borrowers acknowledge that the Lenders are not waiving the Subject Defaults, but are simply agreeing to forbear from exercising their rights with respect to the Subject Defaults to the extent expressly set forth in this Agreement. Without limiting the generality of the foregoing, the Borrowers acknowledge and agree that immediately upon expiration of the Standstill Period, the Administrative Agent and the Lenders have all of their rights and remedies with respect to the Subject Defaults to the same extent, and with the same force and effect, as if the forbearance had not occurred. The Borrowers will not assert and hereby forever waive any right to assert that the Administrative Agent or the Lenders are obligated in any way to continue beyond the Standstill Period to forbear from enforcing their rights or remedies or that the Administrative Agent and the Lenders are not entitled to act on the Subject Defaults after the occurrence of a Standstill Termination as if such default had just occurred and the Standstill Period had never existed. The Borrowers acknowledge that the Lenders have made no representations as to what actions, if any, the Lenders will take after the Standstill Period or upon the occurrence of any Standstill Termination, a Default or Event of Default, and the Lenders and the Administrative Agent must and do hereby specifically reserve any and all rights, remedies, and claims they have (after giving effect hereto) with respect to the Subject Defaults and each other Default or Event of Default that may occur.

11.    *Acknowledgement of Liens.*   The Borrowers hereby acknowledge and agree that the Obligations owing to the Administrative Agent and the Lenders arising out of or in any manner relating to the Loan Documents, as well as all Hedging Liability and Funds Transfer and Deposit Account Liability, shall continue to be secured by Liens on all assets and property of the Borrowers, including, without limitation, all accounts, chattel paper, instruments, documents, general intangibles, investment property, deposit accounts, inventory, equipment, fixtures, real estate, and certain other assets and properties of the Borrowers pursuant to the Loan Documents heretofore executed and delivered by the Borrowers, and nothing herein contained shall in any manner affect or impair the priority of the Liens created and provided for thereby as to the indebtedness, obligations, and liabilities which would be secured thereby prior to giving effect to this Agreement.

12.    *RELEASE.*   FOR VALUE RECEIVED, INCLUDING WITHOUT LIMITATION, THE AGREEMENTS OF THE LENDERS IN THIS AGREEMENT, THE BORROWERS HEREBY RELEASE THE ADMINISTRATIVE AGENT AND EACH LENDER, ITS CURRENT AND FORMER SHAREHOLDERS, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, AND PROFESSIONAL ADVISORS (COLLECTIVELY, THE *"RELEASED PARTIES"*) OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS OF EVERY KIND OR NATURE WHATSOEVER, BOTH IN LAW AND IN EQUITY, KNOWN OR UNKNOWN, WHICH EITHER BORROWER HAS OR EVER HAD AGAINST THE RELEASED PARTIES PRIOR TO, THROUGH, AND INCLUDING THIS DATE, INCLUDING, WITHOUT LIMITATION, THOSE ARISING OUT OF THE EXISTING FINANCING ARRANGEMENTS BETWEEN THE BORROWERS AND THE LENDERS, AND EACH BORROWER FURTHER ACKNOWLEDGES THAT, AS OF THE DATE

-5-

HEREOF, IT DOES NOT HAVE ANY COUNTERCLAIM, SET-OFF, OR DEFENSE AGAINST THE RELEASED PARTIES, EACH OF WHICH SUCH BORROWER HEREBY EXPRESSLY WAIVES.

13. *Loan Documents Remain Effective.* Except as expressly set forth in this Agreement, the Loan Documents and all of the obligations of the Borrowers thereunder, the rights and benefits of the Administrative Agent and Lenders thereunder, and the Liens created thereby remain in full force and effect. Without limiting the foregoing, the Borrowers agree to comply with all of the terms, conditions, and provisions of the Loan Documents except to the extent such compliance is irreconcilably inconsistent with the express provisions of this Agreement. This Agreement and the Loan Documents are intended by the Lenders as a final expression of their agreement and are intended as a complete and exclusive statement of the terms and conditions of that agreement.

14. *Fees and Expenses.* The Borrowers shall also pay on demand all fees and expenses (including attorneys' fees) incurred by the Administrative Agent and its counsel in connection with this Agreement and the other instruments and documents being executed and delivered in connection herewith and the transactions contemplated hereby (the Borrowers acknowledge that they will receive summary invoice(s) reflecting only the total amount then due and that such summary invoice(s) will not contain any narrative description of the services provided, and that delivery of such summary invoice(s) shall not in any way constitute a waiver of any right or privilege of the Administrative Agent and the Lenders associated with such invoice(s)).

15. *Conditions Precedent.* The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent: (a) the Borrowers, the Guarantor, the Administrative Agent, and the Required Lenders shall have executed and delivered this Agreement on or before the close of business on March 31, 2009, and (b) the payment of the current legal fees and expenses referred to in Section 14 above.

16. *Miscellaneous.* By its acceptance hereof, each Borrower hereby represents that it has the necessary power and authority to execute, deliver, and perform the undertakings contained herein, and that this Agreement constitutes the valid and binding obligation of such Borrower enforceable against it in accordance with its terms. Any provision of this Agreement held invalid, illegal, or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability without affecting the validity, legality, and enforceability of the remaining provision hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties hereto hereby acknowledge and agree that this Agreement shall constitute a Loan Document for all purposes of the Credit Agreement and the other Loan Documents. Unless otherwise expressly stated herein, the provisions of this Agreement shall survive the termination of the Standstill Period. This Agreement may be executed in counterparts and by different parties on separate counterpart signature pages, each of which constitutes an original and all of which taken together constitute one and the same instrument. Delivery of executed counterparts of this Agreement by telecopy shall be effective as an original. This Agreement shall be governed by Illinois law and shall be governed and interpreted on the same basis as the Credit Agreement.

-6-

[Signature Pages to Follow]

This Forbearance Agreement is entered into as of the date and year first above written.

*"BORROWERS"*

SK FOODS, L.P.

By: SK PM Corp.
Its: General Partner

By _____
Name _____
Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
Name _____
Title _____

*"GUARANTORS"*

SK FOODS, LLC

By _____
Name _____
Title _____

-7-

*"LENDERS"*

BANK OF MONTREAL, in its individual capacity
    as Administrative Agent, L/C Issuer and
    Swing Line Lender

By _____
   Name: _____Jason M. Clary_____
   Title: _____Vice President_____

BMO CAPITAL MARKETS FINANCING, INC., as a
    Lender

By _____
   Name: _____Jason M. Clary_____
   Title: _____Vice President_____

-9-

BANK OF AMERICA, N.A., as a Lender

By _____

Name _____

Title _____

-10-

U.S. BANK NATIONAL ASSOCIATION, as a
Lender

By _E. C. Hengeveld_

Name: Elizabeth C. Hengeveld
Title:   Vice President

BANK OF THE WEST, as a Lender

By _____

Name     J. Michael Roman
Title      Vice President

-12-

WELLS FARGO BANK, N.A., as a Lender

By _Leonard Kam_
Name  Leonard Kam
Title  Senior Vice President

EXHIBIT 1(G)

# FORBEARANCE AGREEMENT

This Forbearance Agreement (herein, the "Agreement") is made as of this 3rd day of April, 2009, by and among SK Foods, L.P., a California limited partnership (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.), a California corporation (*"Colusa Canning,"* and, together with SK Foods, the *"Borrowers,"* and, individually, a *"Borrower"*), the direct and indirect Subsidiaries of the Borrowers from time to time party to this Agreement, as Guarantors, the several financial institutions from time to time party to this Agreement, as Lenders, and Bank of Montreal, a Canadian chartered bank acting through its Chicago branch, as Administrative Agent for the Lenders.

## RECITALS:

A.    The Lenders currently extend credit to the Borrowers on the terms and conditions set forth in that certain Amended and Restated Credit Agreement dated as of September 28, 2007, as amended, by and among the Borrowers, the Guarantors, the Lenders, and the Administrative Agent (the *"Credit Agreement"*).

B.    The Borrowers failed to comply with (i) Section 8.5(a) (Borrowing Base Certificate) of the Credit Agreement as a result of their failure to deliver Borrowing Base Certificates for various calendar weeks ended on or after February 14, 2009, as required by Section 8.5(a) of the Credit Agreement, (ii) 8.5(b) (Financial Statements) and 8.5(i) (Compliance Certificate) of the Credit Agreement as a result of their failure to deliver the financial statements and Compliance Certificate for the fiscal month ended December 31, 2008 on or prior to February 15, 2009, January 31, 2009 on or prior to February 15, 2009 and February 28, 2009 on or prior to March 15, 2009, each as required by Sections 8.5(b) and 8.5(i), respectively, of the Credit Agreement; (iii) Section 1.2 of the Credit Agreement as a result of the Borrowers' failure to pay when due the amount necessary to reduce the outstanding amount of Revolving Loans, Swing Loans and L/C Obligations to $90,000,000 prior to March 1, 2009, (iv) Sections 1.2 and 1.9(b)(iv) as a result of the Borrowers' failure to pay when due the amount necessary to reduce the outstanding amount of Revolving Loans, Swing Loans and L/C Obligations to an amount less than or equal to the Borrowing Base as most recently determined and computed, (v) Section 1.8(a) of the Credit Agreement as a result of the Borrowers' failure to pay the Term Loan amortization payment due on March 31, 2009, and (vi) Section 1.8(b) of the Credit Agreement as a result of the Borrowers' failure to pay the outstanding principal balance of and interest on the Revolving Loans and Swing Loans on the Revolving Credit Termination Date which occurred on March 31, 2009. The Borrowers' failure to so comply with Sections 8.5(a), 8.5(b) and 8.5(i) of the Credit Agreement constitute Events of Default under Section 9.1(b) of the Credit Agreement (the *"Reporting Defaults"*), the Borrowers' failure to so comply with Sections 1.2 and 1.9(b)(vi) of the Credit Agreement constitute Events of Default under Section 9.1(a) of the Credit Agreement (the *"Mandatory Prepayment Defaults"*), and the Borrower's failure to so comply with Sections 1.8(a) and 1.8(b) of the Credit Agreement constitute Events of Default under Section 9.1(a) of the Credit Agreement (the *"Payment Defaults"*, and together with the Reporting Defaults and the Mandatory Prepayment Defaults, collectively referred to herein as the *"Existing Defaults"*).

C.    The Borrowers have also (i) failed to comply with Section 8.32 of the Credit Agreement as a result of their failure to deliver evidence reasonably satisfactory to the

Administrative Agent, on or prior to March 31, 2009, of fully-executed grower contracts, each of which shall be in full force and effect, providing for the purchase by the Borrowers of not less than 90% of the Borrowers' raw product requirements for the 2009 crop year and such failure will constitute an Event of Default under Section 9.1(c) of the Credit Agreement (if not cured within applicable time frames under Section 9.1(c) of the Credit Agreement) and (ii) informed the Lenders that they will not have available funds sufficient to pay the BMO Hedge Termination Payment (as hereinafter defined) on April 3, 2009, the due date therefor, and the failure to make such payment will constitute an Event of Default under Section 9.1(f) of the Credit Agreement (collectively, the *"Potential Defaults"* and, together with the Existing Defaults, the *"Subject Defaults"*).

D.    The Lenders are not willing to waive the Existing Defaults.

E.    The Borrowers have advised the Lenders that the Borrowers intend to evaluate strategic options with respect to their debt and capital structure, including potential sales of all or a portion of the assets of the Borrowers, and the Borrowers have requested that the Lenders temporarily forbear from exercising certain rights and remedies under the Loan Documents and allow the Borrowers to use cash constituting proceeds of the Collateral securing the Obligations owing to the Lenders under the Credit Agreement and the other Loan Documents in order to afford the Borrowers the opportunity to do so.

F.    In order to accommodate the Borrowers' request, during and only during the period (the *"Standstill Period"*) beginning on the date of this Agreement and ending on April 10, 2009 (the *"Scheduled Standstill Expiration Date"*), the Lenders are willing to temporarily forbear from exercising certain rights and remedies available solely by reason of the Subject Defaults on the terms, conditions, and provisions contained in this Agreement and the Lenders are willing to release specified amounts of cash constituting proceeds of the Collateral under the control of the Administrative Agent on behalf of the Lenders in order to permit the Borrowers to fund certain working capital needs approved by the Administrative Agent.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    *Incorporation of Recitals; Defined Terms.* The Borrowers acknowledge that the Recitals set forth above are true and correct in all material respects. The defined terms in the Recitals set forth above are hereby incorporated into this Agreement by reference. All other capitalized terms used herein without definition shall have the same meanings herein as such terms have in the Credit Agreement.

2.    *Amounts Owing.* The Borrowers acknowledge and agree that, to the best of their knowledge, the principal amount of Loans and Letters of Credit as of March 31, 2009, is $192,781,886 ($95,000,000 in Term Loans, $89,119,440 in Revolving Loans, $0.00 in Swing Loans, $2,838,879 in Letters of Credit and $5,823,567 in Hedging Liability), and such amount (together with interest and fees thereon) is justly and truly owing by the Borrowers without defense, offset or counterclaim.

-2-

3.  *Acknowledgment of Default(s)*. The Existing Defaults constitute Events of Default under the Credit Agreement. The Borrowers acknowledge that, because of the Existing Defaults, the Lenders are permitted and entitled under Sections 7.1 and 9.2 of the Credit Agreement to decline to provide further credit to the Borrower, to terminate the Commitments, to accelerate the Obligations, to enforce Liens granted under the Collateral Documents, and to exercise any other rights or remedies that may be available under the Loan Documents or under applicable law. The Borrowers represent to the Administrative Agent and Lenders that, to the best of their knowledge, there are no Defaults or Events of Default other than the Subject Defaults.

4.  *Forbearance*. Unless and until a Standstill Termination occurs, except as set forth in Section 5 below, the Lenders will not accelerate the Obligations or enforce any of the Liens granted under the Collateral Documents or exercise any other rights or remedies available solely by reason of the Subject Defaults.

5.  *BMO Hedge Termination Payment*. Bank of Montreal and SK Foods have terminated by written agreement that certain ISDA Master Agreement dated as of February 26, 2007 (such ISDA Master Agreement, together with the Schedule thereto, referred to herein as the *"BMO ISDA Agreement"*) and all Transactions (as defined in the BMO ISDA Agreement) thereunder, resulting in a termination payment owing by SK Foods to Bank of Montreal in an amount equal to $5,823,567 (the *"BMO Hedge Termination Payment"*). The BMO Hedge Termination Payment constitutes Hedging Liability for all purposes of the Credit Agreement and the other Loan Documents and the BMO Hedge Termination Payment shall bear interest until paid in full at the rates applicable to Term Loans under the Credit Agreement (including without limitation any margins or default rates applicable to such Term Loans).

6.  *Principal Payments*. Except with respect to the Existing Defaults, the Borrowers shall continue to pay all principal on the Loans and Reimbursement Obligations on all Letters of Credit when due, including, without limitation, the Borrowers shall continue to make all scheduled payments of principal on the Term Loans as and when due under the Credit Agreement.

7.  *Interest and Fee Payments*. The Borrowers will keep interest and fees current on the Loans and Letters of Credit. As a result of the existence of the Existing Defaults, (a) no new Eurodollar Loans may be created and, at the expiration of the relevant Interest Periods, any outstanding Eurodollar Loans shall be converted into Base Rate Loans, and (b) pursuant to the terms of Section 1.10 of the Credit Agreement interest on all Loans, Reimbursement Obligations, and letter of credit fees due under Section 2.1 shall continue to reflect the 2.0% per annum increase implemented pursuant to the Forbearance Agreement dated as of March 31, 2009 among the parties hereto.

8.  *Additional Agreements*. The Borrowers further agree that:

   (a)   The Borrowers shall continue to retain and at all times thereafter maintain at its own cost and expense FTI Consulting to serve as a financial consultant to the Borrowers to evaluate the financial condition, operating performance, and business prospects, to assist the Borrowers in the timely preparation and delivery of cash flow forecasts, and to perform such other services as the Borrowers may require or the

-3-

Administrative Agent and the Required Lenders may reasonably request. The Borrowers shall take reasonable steps to assure that FTI Consulting, as well as the officers, directors, management and employees of the Borrowers are available for discussion with the Administrative Agent and the Lenders from time to time as the Administrative Agent or any of the Lenders may request regarding the financial condition, operating performance, and business prospects of the Borrowers and their Subsidiaries.

(b)    No later than Thursday of each calendar week (beginning April 9, 2009), the Borrowers shall provide to the Administrative Agent and the Lenders a current Borrowing Base certificate prepared as of the last day of the prior week, together with an updated accounts receivable listing, a current accounts receivable and accounts payable aging report, and a cash flow report (reflecting actual cash receipts and cash disbursements of the Borrowers from the prior week, projected cash receipts and cash disbursements of the Borrowers for such week as reflected on the cash flow forecast attached hereto as Exhibit A, and any differences between actual cash receipts and cash disbursements and projected cash receipts and cash disbursements on a cumulative basis) prepared by FTI Consulting and in form and substance, and with such detail, as the Administrative Agent may request.

(c)    During the Standstill period, the Borrowers shall actively solicit proposals from strategic purchasers for purchases of all or a portion of the Borrowers' assets, and the Borrowers shall promptly advise the Administrative Agent and the Lenders of any purchase offer or letters of intent it receives. All financial information and reports on asset values furnished by the Borrowers, or on their behalf, to any such purchaser shall be concurrently furnished to the Administrative Agent and the Lenders.

(d)    The Borrowers acknowledge and agree that they are prohibited from making any payment on Subordinated Debt under the terms of the relevant subordination agreements as a result of the Existing Defaults.

(e)    Not later than 5:00 p.m. Central Standard Time on Tuesday, April 7, 2009 (*"Deadline"*), the Borrowers shall have delivered to the Administrative Agent:

(i)    satisfactory evidence that Steve Sebastian and Wes Smith have been formally appointed to the Board of Directors of each Borrower and have accepted such appointment; provided if Borrowers represent in writing to the Administrative Agent by the Deadline that after good faith effort the requirements of this subparagraph (e)(i) cannot be satisfied due to (y) the failure of the Borrowers to obtain a premium quote for D&O insurance or otherwise have D&O insurance effective as of the Deadline or (z) the Director and Interim Consultant Agreement for Wes Smith has not been finalized in a form acceptable to the Borrowers and the Administrative Agent and fully executed, then the Deadline for this request shall be extended to 5:00 p.m. Central Standard Time on April 9, 2009;

(ii)    copies of each of the deliverables described in paragraph 1 of that certain engagement letter dated March 23, 2009 among the Borrowers, Chanin

-4-

Capital Partners, LLC and Duff & Phelps Securities, LLC, including without limitation details of alternative transaction scenarios with associated time lines, costs, risks, and ranges of expected values (alternative scenarios will to include but are not be limited to (i) sale of assets (in and out of court), (ii) going concern sale pre-2009 pack, (iii) going concern sale post-2009 pack and (iv) analysis of orderly liquidation of the Borrowers, both inclusive and exclusive of a 2009 pack); and

(iii)    a four (4) week cash flow projection for the Borrowers (commencing with and including the calendar week ending April 12, 2009), reflecting projected cash receipts and cash disbursements of the Borrowers for each such week and projected cash receipts and cash disbursements on a cumulative basis, prepared by FTI Consulting and in form and substance, and with such detail, as the Administrative Agent may request.

9.    *Standstill Termination.* As used in this Agreement, *"Standstill Termination"* shall mean the occurrence of the Scheduled Standstill Expiration Date, or, if earlier, the occurrence of any one or more of the following events: (a) any Default or Event of Default under the Credit Agreement, in each case other than the Subject Defaults; (b) any failure by either Borrower for any reason to comply with any term, condition, or provision contained in this Agreement; (c) any representation made by the Borrowers in this Agreement or pursuant to it proves to be incorrect or misleading in any material respect when made; or (d) any Material Adverse Effect shall occur as determined in good faith by the Administrative Agent or the Required Lenders. The occurrence of any Standstill Termination shall be deemed an Event of Default under the Credit Agreement. Upon the occurrence of a Standstill Termination, the Standstill Period is automatically terminated and the Lenders are then permitted and entitled under Sections 7.1, 9.2, 9.3, and 9.4 of the Credit Agreement, among other things, to decline to provide additional credit to the Borrowers, to permanently terminate the Commitments, to accelerate the Obligations, to require cash collateral for outstanding Letters of Credit, and to exercise any other rights and remedies that may be available under the Loan Documents or applicable law.

10.    *No Waiver and Reservation of Rights.* The Borrowers acknowledge that the Lenders are not waiving the Subject Defaults, but are simply agreeing to forbear from exercising their rights with respect to the Subject Defaults to the extent expressly set forth in this Agreement. Without limiting the generality of the foregoing, the Borrowers acknowledge and agree that immediately upon expiration of the Standstill Period, the Administrative Agent and the Lenders have all of their rights and remedies with respect to the Subject Defaults to the same extent, and with the same force and effect, as if the forbearance had not occurred. The Borrowers will not assert and hereby forever waive any right to assert that the Administrative Agent or the Lenders are obligated in any way to continue beyond the Standstill Period to forbear from enforcing their rights or remedies or that the Administrative Agent and the Lenders are not entitled to act on the Subject Defaults after the occurrence of a Standstill Termination as if such default had just occurred and the Standstill Period had never existed. The Borrowers acknowledge that the Lenders have made no representations as to what actions, if any, the Lenders will take after the Standstill Period or upon the occurrence of any Standstill Termination, a Default or Event of Default, and the Lenders and the Administrative Agent must

-5-

and do hereby specifically reserve any and all rights, remedies, and claims they have (after giving effect hereto) with respect to the Subject Defaults and each other Default or Event of Default that may occur.

11. *Acknowledgement of Liens.* The Borrowers hereby acknowledge and agree that the Obligations owing to the Administrative Agent and the Lenders arising out of or in any manner relating to the Loan Documents, as well as all Hedging Liability and Funds Transfer and Deposit Account Liability, shall continue to be secured by Liens on all assets and property of the Borrowers, including, without limitation, all accounts, chattel paper, instruments, documents, general intangibles, investment property, deposit accounts, inventory, equipment, fixtures, real estate, and certain other assets and properties of the Borrowers pursuant to the Loan Documents heretofore executed and delivered by the Borrowers, and nothing herein contained shall in any manner affect or impair the priority of the Liens created and provided for thereby as to the indebtedness, obligations, and liabilities which would be secured thereby prior to giving effect to this Agreement.

12. *RELEASE.* FOR VALUE RECEIVED, INCLUDING WITHOUT LIMITATION, THE AGREEMENTS OF THE LENDERS IN THIS AGREEMENT, THE BORROWERS HEREBY RELEASE THE ADMINISTRATIVE AGENT AND EACH LENDER, ITS CURRENT AND FORMER SHAREHOLDERS, DIRECTORS, OFFICERS, AGENTS, EMPLOYEES, ATTORNEYS, CONSULTANTS, AND PROFESSIONAL ADVISORS (COLLECTIVELY, THE *"RELEASED PARTIES"*) OF AND FROM ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, CONTROVERSIES, ACTS AND OMISSIONS, LIABILITIES, AND OTHER CLAIMS OF EVERY KIND OR NATURE WHATSOEVER, BOTH IN LAW AND IN EQUITY, KNOWN OR UNKNOWN, WHICH EITHER BORROWER HAS OR EVER HAD AGAINST THE RELEASED PARTIES PRIOR TO, THROUGH, AND INCLUDING THIS DATE, INCLUDING, WITHOUT LIMITATION, THOSE ARISING OUT OF THE EXISTING FINANCING ARRANGEMENTS BETWEEN THE BORROWERS AND THE LENDERS, AND EACH BORROWER FURTHER ACKNOWLEDGES THAT, AS OF THE DATE HEREOF, IT DOES NOT HAVE ANY COUNTERCLAIM, SET-OFF, OR DEFENSE AGAINST THE RELEASED PARTIES, EACH OF WHICH SUCH BORROWER HEREBY EXPRESSLY WAIVES.

13. *Loan Documents Remain Effective.* Except as expressly set forth in this Agreement, the Loan Documents and all of the obligations of the Borrowers thereunder, the rights and benefits of the Administrative Agent and Lenders thereunder, and the Liens created thereby remain in full force and effect. Without limiting the foregoing, the Borrowers agree to comply with all of the terms, conditions, and provisions of the Loan Documents except to the extent such compliance is irreconcilably inconsistent with the express provisions of this Agreement. This Agreement and the Loan Documents are intended by the Lenders as a final expression of their agreement and are intended as a complete and exclusive statement of the terms and conditions of that agreement.

14. *Fees and Expenses.* The Borrowers shall also pay on demand all fees and expenses (including attorneys' fees) incurred by the Administrative Agent and its counsel in connection with this Agreement and the other instruments and documents being executed and delivered in connection herewith and the transactions contemplated hereby (the Borrowers acknowledge that they will receive summary invoice(s) reflecting only the total amount then due and that such summary invoice(s) will not contain any narrative description of the services provided, and that

-6-

delivery of such summary invoice(s) shall not in any way constitute a waiver of any right or privilege of the Administrative Agent and the Lenders associated with such invoice(s)).

15. *Conditions Precedent.* The effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent: (a) the Borrowers, the Guarantor, the Administrative Agent, and the Required Lenders shall have executed and delivered this Agreement on or before the close of business on April 6, 2009, (b) the payment of the current legal fees and expenses referred to in Section 14 above, (c) the Administrative Agent shall have received copies of all forensic related party work (including salaries, expense reimbursement, related company services, benefits received, etc.) completed to date by the Borrowers and reviewed by FTI Consulting and any other professionals engaged by the Borrowers for this purposes, (d) the Administrative Agent shall have received copies of all grower contracts into which the Borrowers have entered into with respect to the 2009 crop year, (e) the Administrative Agent shall have received copies of all documentation related to the appointment of Wes Smith, including but not limited to the scope of his duties and compensation arrangements, and (f) the Administrative Agent shall have received fully-executed copies of each of the non-reliance letter received by the Borrowers from Stoughton Davidson, the special scope audit letter between the Borrowers and Stoughton Davidson and any other management or auditor letters delivered to the Borrowers by Stoughton Davidson since November 1, 2008.

16. *Miscellaneous.* By its acceptance hereof, each Borrower hereby represents that it has the necessary power and authority to execute, deliver, and perform the undertakings contained herein, and that this Agreement constitutes the valid and binding obligation of such Borrower enforceable against it in accordance with its terms. Any provision of this Agreement held invalid, illegal, or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability without affecting the validity, legality, and enforceability of the remaining provision hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. The parties hereto hereby acknowledge and agree that this Agreement shall constitute a Loan Document for all purposes of the Credit Agreement and the other Loan Documents. Unless otherwise expressly stated herein, the provisions of this Agreement shall survive the termination of the Standstill Period. This Agreement may be executed in counterparts and by different parties on separate counterpart signature pages, each of which constitutes an original and all of which taken together constitute one and the same instrument. Delivery of executed counterparts of this Agreement by telecopy shall be effective as an original. This Agreement shall be governed by Illinois law and shall be governed and interpreted on the same basis as the Credit Agreement.

[SIGNATURE PAGES TO FOLLOW]

-7-

This Forbearance Agreement is entered into as of the date and year first above written.

*"BORROWERS"*

SK FOODS, L.P.

By: SK PM Corp.
   Its: General Partner

By _____
Name _____ Shordale Seymour
Title _____ CFO

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
Name _____ Shordale Seymour
Title _____ CFO

*"GUARANTORS"*

SK FOODS, LLC

By _____
Name _____ Shordale Seymour
Title _____ CFO

-8-

*"LENDERS"*

BANK OF MONTREAL, in its individual capacity
as Administrative Agent, L/C Issuer and
Swing Line Lender

By _____
    Name:    Jason M. Clary
    Title:     Vice President

BMO CAPITAL MARKETS FINANCING, INC., as a
Lender

By _____
    Name:    Jason M. Clary
    Title:     Vice President

-9-

BANK OF AMERICA, N.A., as a Lender

By _Philip Bab_____

Name _Philip Bab_____

Title _Vice President_____

-10-

U.S. BANK NATIONAL ASSOCIATION, as a
Lender

By _E C Hengeveld_

Name _E C Hengeveld_

Title _Vice President_

-11-

BANK OF THE WEST, as a Lender

By _J. Michael Roman_

Name _J. Michael Roman_

Title _Vice President_

-12-

WELLS FARGO BANK, N.A., as a Lender

By _____
Name   Leonard Kam
Title  Senior Vice President

-13-