FILED
May 11, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001824650

132

MARC A. LEVINSON (State Bar No. 57613)
JEFFERY D. HERMANN (State Bar No. 90445)
STACY E. DON (State Bar No. 226737)
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall
Sacramento, CA 95814-4497
Telephone: 916-447-9200
Facsimile: 916-329-4900
malevinson@orrick.com
jhermann@orrick.com
sdon@orrick.com

JAMES E. SPIOTTO (*Pro hac vice application pending*)
ANN ACKER (*Pro hac vice application pending*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL 60603
Telephone: (312) 845-3000
Facsimile: (312) 516-1900
spiotto@chapman.com
acker@chapman. com

Attorneys for Bank of Montreal

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P. a California Limited Partnership, | RAL – 19 |
| Debtor. | Chapter 11 |

EXHIBIT 1 TO DECLARATION OF LAWRENCE A. MIZERA IN SUPPORT OF JOINDER OF BANK OF MONTREAL IN THE DEBTOR'S MOTION FOR ORDER AUTHORIZING APPOINTMENT OF CHAPTER 11 TRUSTEE

EXHIBIT 1 TO DECLARATION OF
LAWRENCE A. MIZERA

# EXHIBIT 1

Exhibit 1 - Page 1 of 131

AMENDED AND RESTATED CREDIT AGREEMENT

DATED AS OF SEPTEMBER 28, 2007

AMONG

SK FOODS, L.P.,
RHM INDUSTRIAL/SPECIALTY FOODS, INC.,

THE GUARANTORS FROM TIME TO TIME PARTIES HERETO,

THE LENDERS FROM TIME TO TIME PARTIES HERETO,

BANK OF MONTREAL
as Administrative Agent

AND

LASALLE BANK, NATIONAL ASSOCIATION,
as Syndication Agent

BMO CAPITAL MARKETS and LASALLE BANK, NATIONAL ASSOCIATION,
as Joint Lead Arrangers and Joint Book Runners

2302245.01.23.B.doc
1627843

**Exhibit 1 - Page 2 of 131**

## TABLE OF CONTENTS

SECTION                        HEADING                        PAGE

SECTION 1.     THE CREDIT FACILITIES ................................................................ 1

Section 1.1.    Term Loan Commitments ................................................ 1
Section 1.2.    Revolving Credit Commitments ..................................... 2
Section 1.3.    Letters of Credit ............................................................. 2
Section 1.4.    Applicable Interest Rates ............................................... 5
Section 1.5.    Minimum Borrowing Amounts; Maximum Eurodollar Loans ................ 7
Section 1.6.    Manner of Borrowing Loans and Designating Applicable
                   Interest Rates ......................................................... 7
Section 1.7.    Interest Periods ............................................................. 9
Section 1.8.    Maturity of Loans ......................................................... 10
Section 1.9.    Prepayments .................................................................. 11
Section 1.10.   Default Rate .................................................................. 14
Section 1.11.   Evidence of Indebtedness .............................................. 14
Section 1.12.   Funding Indemnity ........................................................ 15
Section 1.13.   Commitment Terminations ............................................ 16
Section 1.14.   Substitution of Lenders ................................................. 16
Section 1.15.   Swing Loans .................................................................. 16
Section 1.15.   Swing Loans .................................................................. 16
Section 1.16.   Appointment of SK Foods as Agent for Colusa Canning ...... 18

SECTION 2.     FEES ........................................................................................ 18

Section 2.1.    Fees ................................................................................ 18

SECTION 3.     PLACE AND APPLICATION OF PAYMENTS .................................. 19

Section 3.1.    Place and Application of Payments ................................ 19
Section 3.2.    Account Debit ................................................................ 20

SECTION 4.     GUARANTIES AND COLLATERAL .............................................. 21

Section 4.1.    Guaranties ..................................................................... 21
Section 4.2.    Collateral ....................................................................... 21
Section 4.3.    Liens on Real Property .................................................. 21
Section 4.4.    Further Assurances ........................................................ 22

SECTION 5.     DEFINITIONS; INTERPRETATION ............................................... 22

Section 5.1.    Definitions ..................................................................... 22
Section 5.2.    Interpretation ................................................................ 40
Section 5.3.    Change in Accounting Principles ................................... 41

SECTION 6.     REPRESENTATIONS AND WARRANTIES ..................................... 41

**Exhibit 1 - Page 3 of 131**

Section 6.1. Organization and Qualification.................................................41
Section 6.2. Subsidiaries.................................................................................41
Section 6.3. Authority and Validity of Obligations.....................................42
Section 6.4. Use of Proceeds; Margin Stock................................................42
Section 6.5. Financial Reports.........................................................................43
Section 6.6. No Material Adverse Change......................................................43
Section 6.7. Full Disclosure...........................................................................43
Section 6.8. Trademarks, Franchises, and Licenses......................................43
Section 6.9. Governmental Authority and Licensing...................................43
Section 6.10. Good Title..................................................................................44
Section 6.11. Litigation and Other Controversies...........................................44
Section 6.12. Taxes..........................................................................................44
Section 6.13. Approvals....................................................................................44
Section 6.14. Affiliate Transactions................................................................44
Section 6.15. Investment Company..................................................................44
Section 6.16. ERISA.........................................................................................44
Section 6.17. Compliance with Laws..............................................................45
Section 6.18. Other Agreements......................................................................45
Section 6.19. Solvency.....................................................................................45
Section 6.20. No Default...................................................................................46
Section 6.21. Federal Food Security Act.........................................................46

SECTION 7. CONDITIONS PRECEDENT.........................................................46

Section 7.1. All Credit Events.........................................................................46
Section 7.2. Initial Credit Event.....................................................................47

SECTION 8. COVENANTS.................................................................................50

Section 8.1. Maintenance of Business............................................................50
Section 8.2. Maintenance of Properties.........................................................50
Section 8.3. Taxes and Assessments..............................................................50
Section 8.4. Insurance.....................................................................................50
Section 8.5. Financial Reports.........................................................................51
Section 8.6. Inspection...................................................................................53
Section 8.7. Borrowings and Guaranties........................................................53
Section 8.8. Liens............................................................................................54
Section 8.9. Investments, Acquisitions, Loans and Advances......................55
Section 8.10. Mergers, Consolidations and Sales...........................................56
Section 8.11. Maintenance of Subsidiaries......................................................56
Section 8.12. Dividends and Certain Other Restricted Payments...................56
Section 8.13. ERISA.........................................................................................57
Section 8.14. Compliance with Laws..............................................................57
Section 8.15. Burdensome Contracts with Affiliates......................................58
Section 8.16. No Changes in Fiscal Year........................................................58
Section 8.17. Formation of Subsidiaries.........................................................58
Section 8.18. Change in the Nature of Business.............................................58

**Exhibit 1 - Page 4 of 131**

Section 8.19.    Use of Proceeds ................................................................. 59
Section 8.20.    No Restrictions .................................................................. 59
Section 8.21.    Subordinated Debt ............................................................. 59
Section 8.22.    Financial Covenants .......................................................... 59
Section 8.23.    Transactions with Affiliates ............................................. 61
Section 8.24.    Line of Business ................................................................ 62
Section 8.25. Required Hedging ................................................................. 62
Section 8.26.    Deposit Accounts .............................................................. 62
Section 8.27.    Patriot Act ......................................................................... 62
Section 8.28.    Post-Closing Covenants .................................................... 62
Section 8.29.    Disposition of Foreign Subsidiaries ................................ 63
Section 8.30.    Affiliate Payables .............................................................. 63

SECTION 9.       EVENTS OF DEFAULT AND REMEDIES ................................ 63

Section 9.1.     Events of Default ............................................................... 63
Section 9.2.     Non-Bankruptcy Defaults ................................................. 65
Section 9.3.     Bankruptcy Defaults ......................................................... 66
Section 9.4.     Collateral for Undrawn Letters of Credit ........................ 66
Section 9.5.     Notice of Default ............................................................... 67
Section 9.6.     Expenses ............................................................................. 67

SECTION 10.      CHANGE IN CIRCUMSTANCES ............................................ 67

Section 10.1.    Change of Law ................................................................... 67
Section 10.2.    Unavailability of Deposits or Inability to Ascertain, or
                 Inadequacy of, LIBOR ...................................................... 67
Section 10.3.    Increased Cost and Reduced Return ................................. 68
Section 10.4.    Lending Offices .................................................................. 69
Section 10.5.    Discretion of Lender as to Manner of Funding ................ 69

SECTION 11.      THE ADMINISTRATIVE AGENT ............................................ 70

Section 11.1.    Appointment and Authorization of Administrative Agent ...... 70
Section 11.2.    Administrative Agent and its Affiliates ............................ 70
Section 11.3.    Action by Administrative Agent ....................................... 70
Section 11.4.    Consultation with Experts ................................................ 71
Section 11.5.    Liability of Administrative Agent; Credit Decision .......... 71
Section 11.6.    Indemnity ........................................................................... 72
Section 11.7.    Resignation of Administrative Agent and Successor
                 Administrative Agent ....................................................... 72
Section 11.8.    L/C Issuer, Swing Line Lender. ........................................ 72
Section 11.9.    Hedging Liability and Funds Transfer and Deposit Account
                 Liability Arrangements .................................................... 73
Section 11.10.   Designation of Additional Agents ..................................... 73
Section 11.11.   Authorization to Release or Subordinate or Limit Liens ...... 73
Section 11.12.   Authorization to Enter into, and Enforcement of, the
                 Collateral Documents ....................................................... 74

**Exhibit 1 - Page 5 of 131**

| Section 12. | The Guarantees | 74 |
| --- | --- | --- |
| Section 12.1. | The Guarantees | 74 |
| Section 12.2. | Guarantee Unconditional | 75 |
| Section 12.3. | Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances | 76 |
| Section 12.4. | Subrogation | 76 |
| Section 12.5. | Waivers | 76 |
| Section 12.6. | Limit on Recovery | 76 |
| Section 12.7. | Stay of Acceleration | 76 |
| Section 12.8. | Benefit to Guarantors | 77 |
| Section 12.9. | Guarantor Covenants | 77 |
| | | |
| Section 13. | Miscellaneous | 77 |
| Section 13.1. | Withholding Taxes | 77 |
| Section 13.2. | No Waiver, Cumulative Remedies | 78 |
| Section 13.3. | Non-Business Days | 78 |
| Section 13.4. | Documentary Taxes | 79 |
| Section 13.5. | Survival of Representations | 79 |
| Section 13.6. | Survival of Indemnities | 79 |
| Section 13.7. | Sharing of Set-Off | 79 |
| Section 13.8. | Notices | 79 |
| Section 13.9. | Counterparts | 80 |
| Section 13.10. | Successors and Assigns | 80 |
| Section 13.11. | Participants | 80 |
| Section 13.12. | Assignments | 81 |
| Section 13.13. | Amendments | 83 |
| Section 13.14. | Headings | 84 |
| Section 13.15. | Costs and Expenses; Indemnification | 84 |
| Section 13.16. | Set-off | 85 |
| Section 13.17. | Entire Agreement | 86 |
| Section 13.18. | Governing Law | 86 |
| Section 13.19. | Severability of Provisions | 86 |
| Section 13.20. | Excess Interest | 86 |
| Section 13.21. | Construction | 87 |
| Section 13.22. | Lender's and L/C Issuer's Obligations Several | 87 |
| Section 13.23. | Submission to Jurisdiction; Waiver of Jury Trial | 87 |
| Section 13.24. | USA Patriot Act | 87 |
| Section 13.25. | Confidentiality | 88 |
| Section 13.26. | Equalization of Loans and Commitments | 88 |
| Section 13.27. | Amendment and Restatement | 89 |
| Section 13.28. | Removal of Lenders and Assignment of Interests | 89 |
| | | |
| Signature Page | | S-1 |

**Exhibit 1 - Page 6 of 131**

| | | |
|---|---|---|
| EXHIBIT A | — | Notice of Payment Request |
| EXHIBIT B | — | Notice of Borrowing |
| EXHIBIT C | — | Notice of Continuation/Conversion |
| EXHIBIT D-1 | — | Term Note |
| EXHIBIT D-2 | — | Revolving Note |
| EXHIBIT D-3 | — | Swing Note |
| EXHIBIT E | — | Borrowing Base Certificate |
| EXHIBIT F | — | Compliance Certificate |
| EXHIBIT G | — | Additional Guarantor Supplement |
| EXHIBIT H | — | Assignment and Acceptance |
| SCHEDULE 1 | — | Commitments |
| SCHEDULE 1.3 | — | Existing Letters of Credit |
| SCHEDULE 5.1(a) | — | EBITDA Adjustments |
| SCHEDULE 5.1(b) | — | Subordinated Debt |
| SCHEDULE 6.2 | — | Subsidiaries |
| SCHEDULE 8.7 | — | Intercompany Loans and Advances |

**Exhibit 1 - Page 7 of 131**

## AMENDED AND RESTATED CREDIT AGREEMENT

This Amended and Restated Credit Agreement is entered into as of September 28, 2007, by and among SK Foods, L.P., a California limited partnership ("*SK Foods*"), RHM Industrial/Specialty Foods, Inc. (d/b/a Colusa County Canning Co.), a California corporation ("*Colusa Canning*," and, together with SK Foods, the "*Borrowers*," and, individually, a "*Borrower*"), the direct and indirect Subsidiaries of the Borrowers from time to time party to this Agreement, as Guarantors, the several financial institutions from time to time party to this Agreement, as Lenders, and Bank of Montreal, as Administrative Agent as provided herein. All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in Section 5.1 hereof.

## PRELIMINARY STATEMENT

A. The Borrowers, the Guarantors, the Lenders and Bank of Montreal, as Administrative Agent, are currently party to that certain Credit Agreement dated as of November 1, 2006 (as amended, modified or supplemented prior to the date hereof, the "*Original Credit Agreement*").

B. The Borrowers hereby request that certain amendments be made to the Original Credit Agreement and, for the sake of clarity and convenience, that the Original Credit Agreement be restated as so amended.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and subject to the terms and conditions hereof and on the basis of the representations and warranties herein set forth, the Borrowers, the Guarantors, the Lenders, and the Administrative Agent, hereby agree that upon satisfaction of the conditions precedent to the initial Credit Event hereinafter set forth, the Original Credit Agreement and all of the Exhibits and Schedules thereto shall be amended and as so amended shall be restated in their entirety (but shall not constitute a novation) to read as follows:

SECTION 1.    THE CREDIT FACILITIES.

*Section 1.1.    Term Loan Commitments.* Subject to the terms and conditions hereof, each Lender, by its acceptance hereof, severally agrees to make a loan (individually a "*Term Loan*" and collectively for all the Lenders the "*Term Loans*") in U.S. Dollars to the Borrowers in the amount of such Lender's Term Loan Commitment. The Term Loans shall be advanced in a single Borrowing on the Closing Date and shall be made ratably by the Lenders in proportion to their respective Term Loan Percentages, at which time the Term Loan Commitments shall expire. As provided in Section 1.6(a) hereof, the Borrowers may elect that the Term Loans be outstanding as Base Rate Loans or Eurodollar Loans. No amount repaid or prepaid on any Term Loan may be borrowed again.

**Exhibit 1 - Page 8 of 131**

Section 1.2. *Revolving Credit Commitments.* Subject to the terms and conditions hereof, each Lender, by its acceptance hereof, severally agrees to make a loan or loans (individually a *"Revolving Loan"* and collectively the *"Revolving Loans"*) in U.S. Dollars to the Borrowers from time to time on a revolving basis up to the amount of such Lender's Revolving Credit Commitment, subject to any reductions thereof pursuant to the terms hereof, before the Revolving Credit Termination Date. The sum of the aggregate principal amount of Revolving Loans, Swing Loans, and L/C Obligations at any time outstanding shall not exceed the lesser of (i) the Revolving Credit Commitments in effect at such time and (ii) the Borrowing Base as then determined and computed. Each Borrowing of Revolving Loans shall be made ratably by the Lenders in proportion to their respective Revolver Percentages. As provided in Section 1.6(a) hereof, the Borrowers may elect that each Borrowing of Revolving Loans be either Base Rate Loans or Eurodollar Loans. Revolving Loans may be repaid and the principal amount thereof reborrowed before the Revolving Credit Termination Date, subject to the terms and conditions hereof.

Section 1.3. *Letters of Credit.* (a) *General Terms.* Subject to the terms and conditions hereof, as part of the Revolving Credit, the L/C Issuer shall issue standby and commercial letters of credit (each a *"Letter of Credit"*) for the account of a Borrower in an aggregate undrawn face amount up to the L/C Sublimit. Each Letter of Credit shall be issued by the L/C Issuer, but each Lender shall be obligated to reimburse the L/C Issuer for such Lender's Revolver Percentage of the amount of each drawing thereunder and, accordingly, each Letter of Credit shall constitute usage of the Revolving Credit Commitment of each Lender pro rata in an amount equal to its Revolver Percentage of the L/C Obligations then outstanding. The parties hereto hereby acknowledge and agree that each of the letters of credit set forth on Schedule 1.3 hereto shall constitute Letters of Credit for all purposes of this Agreement.

(b) *Applications.* At any time before the Revolving Credit Termination Date, the L/C Issuer shall, at the request of any Borrower, issue one or more Letters of Credit in U.S. Dollars, in a form satisfactory to the L/C Issuer, with expiration dates no later than the earlier of 12 months from the date of issuance (or which are cancelable not later than 12 months from the date of issuance and each renewal) or 30 days prior to the Revolving Credit Termination Date, in an aggregate face amount as set forth above, upon the receipt of an application duly executed by the applicable Borrower for the relevant Letter of Credit in the form then customarily prescribed by the L/C Issuer for the Letter of Credit requested (each an *"Application"*). Notwithstanding anything contained in any Application to the contrary: (i) the Borrowers shall pay fees in connection with each Letter of Credit as set forth in Section 2.1 hereof, (ii) except as otherwise provided in Section 1.9(b) hereof, before the occurrence of an Event of Default, the L/C Issuer will not call for the funding by the Borrowers of any amount under a Letter of Credit before being presented with a drawing thereunder, and (iii) if the L/C Issuer is not timely reimbursed for the amount of any drawing under a Letter of Credit on the date such drawing is paid, the Borrowers' joint and several obligation to reimburse the L/C Issuer for the amount of such drawing shall bear interest (which the Borrowers hereby promise to pay) from and after the date such drawing is paid at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect (computed on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed). If the L/C Issuer issues any Letter of Credit with an expiration date that is automatically extended

-2-

**Exhibit 1 - Page 9 of 131**

unless the L/C Issuer gives notice that the expiration date will not so extend beyond its then scheduled expiration date, unless the Required Lenders instruct the L/C Issuer otherwise, the L/C Issuer will give such notice of non-renewal before the time necessary to prevent such automatic extension if before such required notice date: (i) the expiration date of such Letter of Credit if so extended would be after the Revolving Credit Termination Date, (ii) the Revolving Credit Commitments have been terminated, or (iii) a Default or an Event of Default exists and the Administrative Agent, at the request or with the consent of the Required Lenders, has given the L/C Issuer instructions not to so permit the extension of the expiration date of such Letter of Credit. The L/C Issuer agrees to issue amendments to the Letter(s) of Credit increasing the amount, or extending the expiration date, thereof at the request of the Borrowers subject to the conditions of Section 7 hereof and the other terms of this Section 1.3.

(c) *The Reimbursement Obligations.* Subject to Section 1.3(b) hereof, the obligation of the Borrowers to reimburse the L/C Issuer for all drawings under a Letter of Credit (a *"Reimbursement Obligation"*) shall be governed by the Application related to such Letter of Credit, except that reimbursement shall be made by no later than 12:00 Noon (Chicago time) on the date when each drawing is to be paid if the Borrowers have been informed of such drawing by the L/C Issuer on or before 11:30 a.m. (Chicago time) on the date when such drawing is to be paid or, if notice of such drawing is given to the Borrowers after 11:30 a.m. (Chicago time) on the date when such drawing is to be paid, by the end of such day, in immediately available funds at the Administrative Agent's principal office in Chicago, Illinois or such other office as the Administrative Agent may designate in writing to the Borrowers (who shall thereafter cause to be distributed to the L/C Issuer such amount(s) in like funds). If the Borrowers do not make any such reimbursement payment on the date due and the Participating Lenders fund their participations therein in the manner set forth in Section 1.3(d) below, then all payments thereafter received by the Administrative Agent in discharge of any of the relevant Reimbursement Obligations shall be distributed in accordance with Section 1.3(d) below.

(d) *Obligations Absolute.* The Borrowers' obligation to reimburse L/C Obligations as provided in subsection (c) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement and the relevant Application under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the L/C Issuer under a Letter of Credit against presentation of a draft or other document that does not strictly comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrowers' obligations hereunder. None of the Administrative Agent, the Lenders, or the L/C Issuer shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of

-3-

**Exhibit 1 - Page 10 of 131**

technical terms or any consequence arising from causes beyond the control of the L/C Issuer; *provided* that the foregoing shall not be construed to excuse the L/C Issuer from liability to the Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by the Borrowers that are caused by the L/C Issuer 's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the L/C Issuer (as finally determined by a court of competent jurisdiction), the L/C Issuer shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the L/C Issuer may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(e) *The Participating Interests.* Each Lender (other than the Lender acting as L/C Issuer in issuing the relevant Letter of Credit), by its acceptance hereof, severally agrees to purchase from the L/C Issuer, and the L/C Issuer hereby agrees to sell to each such Lender (a *"Participating Lender"*), an undivided percentage participating interest (a *"Participating Interest"*), to the extent of its Revolver Percentage, in each Letter of Credit issued by, and each Reimbursement Obligation owed to, the L/C Issuer. Upon any failure by the Borrowers to pay any Reimbursement Obligation at the time required on the date the related drawing is to be paid, as set forth in Section 1.3(c) above, or if the L/C Issuer is required at any time to return to the Borrowers or to a trustee, receiver, liquidator, custodian or other Person any portion of any payment of any Reimbursement Obligation, each Participating Lender shall, not later than the Business Day it receives a certificate in the form of Exhibit A hereto from the L/C Issuer (with a copy to the Administrative Agent) to such effect, if such certificate is received before 1:00 p.m. (Chicago time), or not later than 1:00 p.m. (Chicago time) the following Business Day, if such certificate is received after such time, pay to the Administrative Agent for the account of the L/C Issuer an amount equal to such Participating Lender's Revolver Percentage of such unpaid or recaptured Reimbursement Obligation together with interest on such amount accrued from the date the related payment was made by the L/C Issuer to the date of such payment by such Participating Lender at a rate per annum equal to: (i) from the date the related payment was made by the L/C Issuer to the date 2 Business Days after payment by such Participating Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date 2 Business Days after the date such payment is due from such Participating Lender to the date such payment is made by such Participating Lender, the Base Rate in effect for each such day. Each such Participating Lender shall thereafter be entitled to receive its Revolver Percentage of each payment received in respect of the relevant Reimbursement Obligation and of interest paid thereon, with the L/C Issuer retaining its Revolver Percentage thereof as a Lender hereunder. The several obligations of the Participating Lenders to the L/C Issuer under this Section 1.2 shall be absolute, irrevocable, and unconditional under any and all circumstances whatsoever and shall not be subject to any set-off, counterclaim or defense to payment which any Participating Lender may have or have had against a Borrower, the L/C Issuer, the Administrative Agent, any Lender or any other Person whatsoever. Without limiting the generality of the foregoing, such

-4-

**Exhibit 1 - Page 11 of 131**

obligations shall not be affected by any Default or Event of Default or by any reduction or termination of any Commitment of any Lender, and each payment by a Participating Lender under this Section 1.3 shall be made without any offset, abatement, withholding or reduction whatsoever.

(f) *Indemnification.* The Participating Lenders shall, to the extent of their respective Revolver Percentages, indemnify the L/C Issuer (to the extent not reimbursed by the Borrowers) against any cost, expense (including reasonable counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from the L/C Issuer's gross negligence or willful misconduct) that the L/C Issuer may suffer or incur in connection with any Letter of Credit issued by it. The obligations of the Participating Lenders under this Section 1.3(e) and all other parts of this Section 1.3 shall survive termination of this Agreement and of all Applications, Letters of Credit, and all drafts and other documents presented in connection with drawings thereunder.

(g) *Manner of Requesting a Letter of Credit.* The Borrowers shall provide at least five (5) Business Days' advance written notice to the Administrative Agent of each request for the issuance of a Letter of Credit, such notice in each case to be accompanied by an Application for such Letter of Credit properly completed and executed by a Borrower and, in the case of an extension or an increase in the amount of a Letter of Credit, a written request therefor, in a form acceptable to the Administrative Agent and the L/C Issuer, in each case, together with the fees called for by this Agreement. The Administrative Agent shall promptly notify the L/C Issuer of the Administrative Agent's receipt of each such notice and the L/C Issuer shall promptly notify the Administrative Agent and the Lenders of the issuance of the Letter of Credit so requested.

(h) *Replacement of the L/C Issuer.* The L/C Issuer may be replaced at any time by written agreement among the Borrowers, the Administrative Agent, the replaced L/C Issuer and the successor L/C Issuer. The Administrative Agent shall notify the Lenders of any such replacement of the L/C Issuer. At the time any such replacement shall become effective, the Borrowers shall pay all unpaid fees accrued for the account of the replaced L/C Issuer. From and after the effective date of any such replacement (i) the successor L/C Issuer shall have all the rights and obligations of the L/C Issuer under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "L/C Issuer " shall be deemed to refer to such successor or to any previous L/C Issuer, or to such successor and all previous L/C Issuers, as the context shall require. After the replacement of a L/C Issuer hereunder, the replaced L/C Issuer shall remain a party hereto and shall continue to have all the rights and obligations of a L/C Issuer under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

*Section 1.4. Applicable Interest Rates.* (a) *Base Rate Loans.* Each Base Rate Loan made or maintained by a Lender shall bear interest during each Interest Period it is outstanding (computed on the basis of a year of 365 or 366 days, as the case may be, and the actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced or continued, or created by conversion from a Eurodollar Loan, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus the

-5-

**Exhibit 1 - Page 12 of 131**

Base Rate from time to time in effect, payable on the last day of its Interest Period and at maturity (whether by acceleration or otherwise).

"*Base Rate*" means for any day the greater of: (i) the rate of interest announced or otherwise established by the Administrative Agent from time to time as its prime commercial rate, or its equivalent, for U.S. Dollar loans to borrowers located in the United States as in effect on such day, with any change in the Base Rate resulting from a change in said prime commercial rate to be effective as of the date of the relevant change in said prime commercial rate (it being acknowledged and agreed that such rate may not be the Administrative Agent's best or lowest rate) and (ii) the sum of (x) the rate determined by the Administrative Agent to be the average (rounded upward, if necessary, to the next higher 1/100 of 1%) of the rates per annum quoted to the Administrative Agent at approximately 10:00 a.m. (Chicago time) (or as soon thereafter as is practicable) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) by two or more Federal funds brokers selected by the Administrative Agent for sale to the Administrative Agent at face value of Federal funds in the secondary market in an amount equal or comparable to the principal amount owed to the Administrative Agent for which such rate is being determined, *plus* (y) 1/2 of 1%.

(b)  *Eurodollar Loans.*  Each Eurodollar Loan made or maintained by a Lender shall bear interest during each Interest Period it is outstanding (computed on the basis of a year of 360 days and actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced or continued, or created by conversion from a Base Rate Loan, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus the Adjusted LIBOR applicable for such Interest Period, payable on the last day of the Interest Period and at maturity (whether by acceleration or otherwise), and, if the applicable Interest Period is longer than three months, on each day occurring every three months after the commencement of such Interest Period.

"*Adjusted LIBOR*" means, for any Borrowing of Eurodollar Loans, a rate per annum determined in accordance with the following formula:

$$\text{Adjusted LIBOR} \quad = \quad \frac{\text{LIBOR}}{1 - \text{Eurodollar Reserve Percentage}}$$

"*Eurodollar Reserve Percentage*" means, for any Borrowing of Eurodollar Loans, the daily average for the applicable Interest Period of the maximum rate, expressed as a decimal, at which reserves (including, without limitation, any supplemental, marginal, and emergency reserves) are imposed during such Interest Period by the Board of Governors of the Federal Reserve System (or any successor) on "*eurocurrency liabilities*", as defined in such Board's Regulation D (or in respect of any other category of liabilities that includes deposits by reference to which the interest rate on Eurodollar Loans is determined or any category of extensions of credit or other assets that include loans by non-United States offices of any Lender to United States residents), subject to any amendments of such reserve requirement by such Board or its successor, taking into account any transitional adjustments thereto.  For purposes of this definition, the Eurodollar Loans shall be deemed to be "*eurocurrency liabilities*" as defined in

**Exhibit 1 - Page 13 of 131**

Regulation D without benefit or credit for any prorations, exemptions or offsets under Regulation D.

"*LIBOR*" means, for an Interest Period for a Borrowing of Eurodollar Loans, (a) the LIBOR Index Rate for such Interest Period, if such rate is available, and (b) if the LIBOR Index Rate cannot be determined, the arithmetic average of the rates of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits in U.S. Dollars in immediately available funds are offered to the Administrative Agent at 11:00 a.m. (London, England time) 2 Business Days before the beginning of such Interest Period by 3 or more major banks in the interbank eurodollar market selected by the Administrative Agent for delivery on the first day of and for a period equal to such Interest Period and in an amount equal or comparable to the principal amount of the Eurodollar Loan scheduled to be made by the Administrative Agent as part of such Borrowing.

"*LIBOR Index Rate*" means, for any Interest Period, the rate per annum (rounded upwards, if necessary, to the next higher one hundred-thousandth of a percentage point) for deposits in U.S. Dollars for a period equal to such Interest Period, which appears on the LIBOR01 Page as of 11:00 a.m. (London, England time) on the day 2 Business Days before the commencement of such Interest Period.

"*LIBOR01 Page*" means the display designated as "*Reuters LIBOR01 Page*" (or such other page as may replace LIBOR01 Page on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits).

(c) *Rate Determinations*. The Administrative Agent shall determine each interest rate applicable to the Loans and the Reimbursement Obligations hereunder, and its determination thereof shall be conclusive and binding except in the case of manifest error.

*Section 1.5. Minimum Borrowing Amounts; Maximum Eurodollar Loans*. Each Borrowing of Base Rate Loans advanced under a Credit shall be in an amount not less than $500,000 or such greater amount which is an integral multiple of $100,000. Each Borrowing of Eurodollar Loans advanced, continued or converted under a Credit shall be in an amount equal to $1,000,000 or such greater amount which is an integral multiple of $100,000. Without the Administrative Agent's consent, there shall not be more than eight (8) Borrowings of Eurodollar Loans outstanding hereunder at any one time.

*Section 1.6. Manner of Borrowing Loans and Designating Applicable Interest Rates*. (a) *Notice to the Administrative Agent*. The Borrower requesting a Borrowing shall give notice to the Administrative Agent by no later than 12:00 Noon (Chicago time): (i) at least 3 Business Days before the date on which such Borrower requests the Lenders to advance a Borrowing of Eurodollar Loans and (ii) on the date such Borrower requests the Lenders to advance a Borrowing of Base Rate Loans. The Loans included in each Borrowing shall bear interest initially at the type of rate specified in such notice of a new Borrowing. Thereafter, subject to the terms and conditions hereof, such Borrower may from time to time elect to change or continue the type of interest rate borne by each Borrowing or, subject to the minimum amount

**Exhibit 1 - Page 14 of 131**

requirement for each outstanding Borrowing set forth in Section 1.5 hereof, a portion thereof, as follows: (i) if such Borrowing is of Eurodollar Loans, on the last day of the Interest Period applicable thereto, such Borrower may continue part or all of such Borrowing as Eurodollar Loans or convert part or all of such Borrowing into Base Rate Loans or (ii) if such Borrowing is of Base Rate Loans, on any Business Day, such Borrower may convert all or part of such Borrowing into Eurodollar Loans for an Interest Period or Interest Periods specified by such Borrower. The Borrowers shall give all such notices requesting the advance, continuation or conversion of a Borrowing to the Administrative Agent by telephone or telecopy (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing), substantially in the form attached hereto as Exhibit B (Notice of Borrowing) or Exhibit C (Notice of Continuation/Conversion), as applicable, or in such other form acceptable to the Administrative Agent. Notice of the continuation of a Borrowing of Eurodollar Loans for an additional Interest Period or of the conversion of part or all of a Borrowing of Base Rate Loans into Eurodollar Loans must be given by no later than 12:00 Noon (Chicago time) at least 3 Business Days before the date of the requested continuation or conversion. All such notices concerning the advance, continuation or conversion of a Borrowing shall specify the date of the requested advance, continuation or conversion of a Borrowing (which shall be a Business Day), the amount of the requested Borrowing to be advanced, continued or converted, the type of Loans to comprise such new, continued or converted Borrowing and, if such Borrowing is to be comprised of Eurodollar Loans, the Interest Period applicable thereto. Each Borrower agrees that the Administrative Agent may rely on any such telephonic or telecopy notice given by any person the Administrative Agent in good faith believes is an Authorized Representative without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if the Administrative Agent has acted in reliance thereon.

(b) *Notice to the Lenders*. The Administrative Agent shall give prompt telephonic or telecopy notice to each Lender of any notice from a Borrower received pursuant to Section 1.6(a) above and, if such notice requests the Lenders to make Eurodollar Loans, the Administrative Agent shall give notice to the applicable Borrower and each Lender by like means of the interest rate applicable thereto promptly after the Administrative Agent has made such determination.

(c) *Borrowers' Failure to Notify; Automatic Continuations and Conversions*. Any outstanding Borrowing of Base Rate Loans shall automatically be continued for an additional Interest Period on the last day of its then current Interest Period unless the applicable Borrower has notified the Administrative Agent within the period required by Section 1.6(a) that such Borrower intends to convert such Borrowing, subject to Section 7.1 hereof, into a Borrowing of Eurodollar Loans or such Borrowing is prepaid in accordance with Section 1.9(a). If such Borrower fails to give notice pursuant to Section 1.6(a) above of the continuation or conversion of any outstanding principal amount of a Borrowing of Eurodollar Loans before the last day of its then current Interest Period within the period required by Section 1.6(a) or, whether or not such notice has been given, one or more of the conditions set forth in Section 7.1 for the continuation or conversion of a Borrowing of Eurodollar Loans would not be satisfied, and such Borrowing is not prepaid in accordance with Section 1.9(a), such Borrowing shall automatically be converted into a Borrowing of Base Rate Loans. In the event the applicable Borrower fails to give notice pursuant to Section 1.6(a) above of a Borrowing equal to the amount of a

-8-

**Exhibit 1 - Page 15 of 131**

Reimbursement Obligation and has not notified the Administrative Agent by 12:00 Noon (Chicago time) on the day such Reimbursement Obligation becomes due that it intends to repay such Reimbursement Obligation through funds not borrowed under this Agreement, such Borrower shall be deemed to have requested a Borrowing of Base Rate Loans under the Revolving Credit (or, at the option of the Administrative Agent, under the Swing Line) on such day in the amount of the Reimbursement Obligation then due, which Borrowing shall be applied to pay the Reimbursement Obligation then due.

(d) *Disbursement of Loans*. Not later than 1:00 p.m. (Chicago time) on the date of any requested advance of a new Borrowing, subject to Section 7 hereof, each Lender shall make available its Loan comprising part of such Borrowing in funds immediately available at the principal office of the Administrative Agent in Chicago, Illinois. The Administrative Agent shall make the proceeds of each new Borrowing available to the applicable Borrower at the Administrative Agent's principal office in Chicago, Illinois, by depositing such proceeds to the credit of such Borrower's operating account maintained with an Affiliate of the Administrative Agent or as such Borrower and the Administrative Agent may otherwise agree.

(e) *Administrative Agent Reliance on Lender Funding*. Unless the Administrative Agent shall have been notified by a Lender prior to (or, in the case of a Borrowing of Base Rate Loans, by 1:00 p.m. (Chicago time) on) the date on which such Lender is scheduled to make payment to the Administrative Agent of the proceeds of a Loan (which notice shall be effective upon receipt) that such Lender does not intend to make such payment, the Administrative Agent may assume that such Lender has made such payment when due and the Administrative Agent may in reliance upon such assumption (but shall not be required to) make available to the Borrowers the proceeds of the Loan to be made by such Lender and, if any Lender has not in fact made such payment to the Administrative Agent, such Lender shall, on demand, pay to the Administrative Agent the amount made available to the Borrowers attributable to such Lender together with interest thereon in respect of each day during the period commencing on the date such amount was made available to the Borrowers and ending on (but excluding) the date such Lender pays such amount to the Administrative Agent at a rate per annum equal to: (i) from the date the related advance was made by the Administrative Agent to the date 2 Business Days after payment by such Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date 2 Business Days after the date such payment is due from such Lender to the date such payment is made by such Lender, the Base Rate in effect for each such day. If such amount is not received from such Lender by the Administrative Agent immediately upon demand, the Borrowers will, on demand, repay to the Administrative Agent the proceeds of the Loan attributable to such Lender with interest thereon at a rate per annum equal to the interest rate applicable to the relevant Loan, but without such payment being considered a payment or prepayment of a Loan under Section 1.12 hereof so that the Borrowers will have no liability under such Section with respect to such payment.

Section 1.7.    *Interest Periods*. As provided in Section 1.6(a) and 1.15 hereof, at the time of each request to advance, continue or create by conversion a Borrowing of Eurodollar Loans or Swing Loans, the Borrowers shall select an Interest Period applicable to such Loans from among the available options. The term *"Interest Period"* means the period commencing on the date a Borrowing of Loans is advanced, continued or created by conversion and ending: (a) in the case

**Exhibit 1 - Page 16 of 131**

of Base Rate Loans and Swing Loans, on the last day of the month in which such Borrowing is advanced, continued or created by conversion (or on the last day of the following month if such Loan is advanced, continued or created by conversion on the last day of a month) and (b) in the case of a Eurodollar Loan, 1, 2, 3 or 6 months thereafter; *provided, however,* that:

    (i)    any Interest Period for a Borrowing of Revolving Loans or Swing Loans consisting of Base Rate Loans that otherwise would end after the Revolving Credit Termination Date shall end on the Revolving Credit Termination Date;

    (ii)    no Interest Period with respect to any portion of the Revolving Loans or Swing Loans shall extend beyond the Revolving Credit Termination Date;

    (iii)    no Interest Period with respect to any portion of the Term Loans consisting of Eurodollar Loans shall extend beyond a date on which the Borrowers are required to make a scheduled payment of principal on the Term Loans unless the sum of (a) the aggregate principal amount of Term Loans that are Base Rate Loans *plus* (b) the aggregate principal amount of Term Loans that are Eurodollar Loans with Interest Periods expiring on or before such date equals or exceeds the principal amount to be paid on the Term Loans on such payment date;

    (iv)    whenever the last day of any Interest Period would otherwise be a day that is not a Business Day, the last day of such Interest Period shall be extended to the next succeeding Business Day, *provided* that, if such extension would cause the last day of an Interest Period for a Borrowing of Eurodollar Loans to occur in the following calendar month, the last day of such Interest Period shall be the immediately preceding Business Day; and

    (v)    for purposes of determining an Interest Period for a Borrowing of Base Rate Loans or Eurodollar Loans, a month means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month; *provided, however,* that if there is no numerically corresponding day in the month in which such an Interest Period is to end or if such an Interest Period begins on the last Business Day of a calendar month, then such Interest Period shall end on the last Business Day of the calendar month in which such Interest Period is to end.

    Section 1.8.    *Maturity of Loans.* The Borrowers shall make principal payments on the Term Loans in installments on the last day of each March, June, September and December in each year, commencing with the calendar quarter ending March 31, 2008, with the amount of each such principal installment to equal the amount set forth in Column B below shown opposite of the relevant due date as set forth in Column A below:

| COLUMN A | COLUMN B |
|---|---|
| PAYMENT DATE | SCHEDULED PRINCIPAL PAYMENT ON TERM LOANS |
| 03/31/08 | $1,250,000 |

**Exhibit 1 - Page 17 of 131**

| COLUMN A | COLUMN B |
|---|---|
| PAYMENT DATE | SCHEDULED PRINCIPAL PAYMENT ON TERM LOANS |
| 06/30/08 | $1,250,000 |
| 09/30/08 | $1,250,000 |
| 12/31/08 | $1,250,000 |
| 03/31/09 | $1,250,000 |
| 06/30/09 | $1,250,000 |
| 09/30/09 | $1,250,000 |
| 12/31/09 | $1,250,000 |
| 03/31/10 | $1,250,000 |
| 06/30/10 | $1,250,000 |
| 09/30/10 | $1,250,000 |
| 12/31/10 | $1,250,000 |
| 03/31/11 | $1,250,000 |
| 06/30/11 | $1,250,000 |
| 09/30/11 | $1,250,000 |
| 12/31/11 | $1,250,000 |
| 03/31/12 | $1,250,000 |
| 06/30/12 | $1,250,000 |
| 09/30/12 | $1,250,000 |
| 12/31/12 | $1,250,000 |
| 03/31/13 | $1,250,000 |
| 06/30/13 | $1,250,000 |
| 09/27/13 | $72,500,000 |

, it being agreed that the final payment of both principal and interest not sooner paid on the Term Loans shall be due and payable on September 27, 2013, the final maturity thereof. Each such principal payment shall be applied to the Lenders holding the Term Loans pro rata based upon their Term Loan Percentages.

(b) *Revolving Loans and Swing Loans.* Each Revolving Loan and Swing Loan, both for principal and interest not sooner paid, shall mature and become due and payable by the Borrowers on the Revolving Credit Termination Date.

*Section 1.9. Prepayments.* (a) *Optional.* The Borrowers may prepay in whole or in part (but, if in part, then: (i) if such Borrowing is of Base Rate Loans, in an amount not less than $500,000, (ii) if such Borrowing is of Eurodollar Loans, in an amount not less than $1,000,000, and (iii) in each case, in an amount such that the minimum amount required for a Borrowing

Exhibit 1 - Page 18 of 131

pursuant to Sections 1.5 and 1.15 hereof remains outstanding) any Borrowing of Eurodollar Loans at any time upon 3 Business Days prior notice by the Borrowers to the Administrative Agent or, in the case of a Borrowing of Base Rate Loans, notice delivered by the Borrowers to the Administrative Agent no later than 10:00 a.m. (Chicago time) on the date of prepayment (or, in any case, such shorter period of time then agreed to by the Administrative Agent), such prepayment to be made by the payment of the principal amount to be prepaid and, in the case of any Term Loans or Eurodollar Loans or Swing Loans, accrued interest thereon to the date fixed for prepayment plus any amounts due the Lenders under Section 1.12 hereof.

(b) *Mandatory.* (i) If any Borrower or Subsidiary shall at any time or from time to time make or agree to make a Disposition or shall suffer an Event of Loss with respect to any Property, then the Borrowers shall promptly notify the Administrative Agent of such proposed Disposition or Event of Loss (including the amount of the estimated Net Cash Proceeds to be received by such Borrower or Subsidiary in respect thereof) and, promptly upon receipt by such Borrower or Subsidiary of the Net Cash Proceeds of such Disposition or Event of Loss, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of the amount of all such Net Cash Proceeds; *provided* that (x) so long as no Default or Event of Default then exists, this subsection shall not require any such prepayment with respect to Net Cash Proceeds received on account of an Event of Loss so long as such Net Cash Proceeds are applied to replace or restore the relevant Property in accordance with the relevant Collateral Documents, (y) this subsection shall not require any such prepayment with respect to Net Cash Proceeds received on account of Dispositions during any fiscal year of the Borrowers not exceeding $2,000,000 in the aggregate so long as no Default or Event of Default then exists, and (z) in the case of any Disposition not covered by clause (y) above, so long as no Default or Event of Default then exists, if the Borrowers state in their notice of such event that the relevant Borrower or Subsidiary intends to reinvest, within 180 days of the applicable Disposition, the Net Cash Proceeds thereof in assets similar to the assets which were subject to such Disposition, then the Borrowers shall not be required to make a mandatory prepayment under this subsection in respect of such Net Cash Proceeds to the extent such Net Cash Proceeds are actually reinvested in such similar assets with such 180-day period. Promptly after the end of such 180-day period, the Borrowers shall notify the Administrative Agent whether such Borrower or Subsidiary has reinvested such Net Cash Proceeds in such similar assets, and, to the extent such Net Cash Proceeds have not been so reinvested, the Borrowers shall promptly prepay the Obligations in the amount of such Net Cash Proceeds not so reinvested. The amount of each such prepayment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Credit. If the Administrative Agent or the Required Lenders so request, all proceeds of such Disposition or Event of Loss shall be deposited with the Administrative Agent (or its agent) and held by it in the Collateral Account. So long as no Default or Event of Default exists, the Administrative Agent is authorized to disburse amounts representing such proceeds from the Collateral Account to or at the Borrowers' direction for application to or reimbursement for the costs of replacing, rebuilding or restoring such Property.

(ii) If after the Closing Date any Borrower or Subsidiary shall issue new equity securities (whether membership units, partnership interests or otherwise), the Borrowers shall promptly notify the Administrative Agent of the estimated Net Cash Proceeds of such issuance to be received by or for the account of such Borrower or Subsidiary in respect thereof. Promptly

**Exhibit 1 - Page 19 of 131**

upon receipt by such Borrower or Subsidiary of Net Cash Proceeds of such issuance, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds. The amount of each such prepayment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Credit. The Borrowers acknowledge that their performance hereunder shall not limit the rights and remedies of the Lenders for any breach of Section 8.11 or Section 9.1(i) hereof or any other terms of the Loan Documents.

(iii)    If after the Closing Date any Borrower or Subsidiary shall issue any Indebtedness for Borrowed Money, other than Indebtedness for Borrowed Money permitted by Section 8.7(a), (b), (c), (d), (e) and (h) hereof, the Borrowers shall promptly notify the Administrative Agent of the estimated Net Cash Proceeds of such issuance to be received by or for the account of such Borrower or Subsidiary in respect thereof. Promptly upon receipt by such Borrower or Subsidiary of Net Cash Proceeds of such issuance, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds. The amount of each such prepayment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Credit. The Borrowers acknowledge that their performance hereunder shall not limit the rights and remedies of the Lenders for any breach of Section 8.7 hereof or any other terms of the Loan Documents.

(iv)    Within 120 days after the end of each fiscal year of the Borrowers (commencing with the first fiscal year ending June 30, 2008), the Borrowers shall prepay the Obligations by an amount equal to the ECF Prepayment Percentage of Excess Cash Flow of Borrowers and their Subsidiaries for the most recently completed fiscal year of the Borrowers. The amount of each such prepayment shall be applied, subject to Section 1.9(b)(v) below, first to the outstanding Term Loans until paid in full and then to the Revolving Credit.

(v)    The Borrowers shall, on each date the Revolving Credit Commitments are reduced pursuant to Section 1.13 hereof, prepay the Revolving Loans, Swing Loans, and, if necessary, prefund the L/C Obligations by the amount, if any, necessary to reduce the sum of the aggregate principal amount of Revolving Loans, Swing Loans, and L/C Obligations then outstanding to the amount to which the Revolving Credit Commitments have been so reduced.

(vi)    If at any time the sum of the unpaid principal balance of the Revolving Loans, Swing Loans, and the L/C Obligations then outstanding shall be in excess of the Borrowing Base as then determined and computed, the Borrowers shall immediately and without notice or demand pay over the amount of the excess to the Administrative Agent for the account of the Lenders as and for a mandatory prepayment on such Obligations, with each such prepayment first to be applied to the Revolving Loans and Swing Loans until payment in full thereof with any remaining balance to be held by the Administrative Agent in the Collateral Account as security for the Obligations owing with respect to the Letters of Credit.

(vii)    Unless the Borrowers otherwise direct, prepayments of Loans under this Section 1.9(b) shall be applied first to Borrowings of Base Rate Loans until payment in full thereof with any balance applied to Borrowings of Eurodollar Loans in the order in which their Interest Periods expire. Each prepayment of Loans under this Section 1.9(b) shall be made by

Exhibit 1 - Page 20 of 131

the payment of the principal amount to be prepaid and, in the case of any Term Loans or Eurodollar Loans or Swing Loans, accrued interest thereon to the date of prepayment together with any amounts due the Lenders under Section 1.12 hereof. Each prefunding of L/C Obligations shall be made in accordance with Section 9.4 hereof.

(c)   Any amount of Revolving Loans and Swing Loans paid or prepaid before the Revolving Credit Termination Date may, subject to the terms and conditions of this Agreement, be borrowed, repaid and borrowed again. No amount of the Term Loans paid or prepaid may be reborrowed, and, in the case of any partial prepayment, such prepayment shall be applied to the remaining amortization payments on the relevant Loans in the reverse order of maturity.

Section 1.10.   Default Rate.   Notwithstanding anything to the contrary contained herein, while any Event of Default exists or after acceleration, the Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of all Loans and Reimbursement Obligations, and letter of credit fees at a rate per annum equal to:

(a)   for any Base Rate Loan or any Swing Loan bearing interest based on the Base Rate, the sum of 2.0% plus the Applicable Margin plus the Base Rate from time to time in effect;

(b)   for any Eurodollar Loan, the sum of 2.0% plus the rate of interest in effect thereon at the time of such default until the end of the Interest Period applicable thereto and, thereafter, at a rate per annum equal to the sum of 2.0% plus the Applicable Margin for Base Rate Loans plus the Base Rate from time to time in effect;

(c)   for any Reimbursement Obligation, the sum of 2.0% plus the amounts due under Section 1.3 with respect to such Reimbursement Obligation; and

(d)   for any Letter of Credit, the sum of 2.0% plus the letter of credit fee due under Section 2.1 with respect to such Letter of Credit;

provided, however, that in the absence of acceleration, any adjustments pursuant to this Section shall be made at the election of the Administrative Agent, acting at the request or with the consent of the Required Lenders, with written notice to the Borrowers. While any Event of Default exists or after acceleration, interest shall be paid on demand of the Administrative Agent at the request or with the consent of the Required Lenders.

Section 1.11.   Evidence of Indebtedness.   (a) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)   The Administrative Agent shall also maintain accounts in which it will record (i) the amount of each Loan made hereunder, the type thereof and the Interest Period with respect thereto, (ii) the amount of any principal or interest due and payable or to become due and

-14-

**Exhibit 1 - Page 21 of 131**

payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrowers and each Lender's share thereof.

(c)     The entries maintained in the accounts maintained pursuant to paragraphs (a) and (b) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded: *provided, however,* that the failure of the Administrative Agent or any Lender to maintain such accounts or any error therein shall not in any manner effect the obligation of the Borrowers to repay the Obligations in accordance with their terms.

(d)     Any Lender may request that its Loans be evidenced by a promissory note or notes in the forms of Exhibit D-1 (in the case of its Term Loan and referred to herein as a *"Term Note"*), D-2 (in the case of its Revolving Loans and referred to herein as a *"Revolving Note"*), or D-3 (in the case of its Swing Loans and referred to herein as a *"Swing Note"*), as applicable (the Term Notes, Revolving Notes, and Swing Note being hereinafter referred to collectively as the "Notes" and individually as a *"Note"*). In such event, the Borrowers shall prepare, execute and deliver to such Lender a Note payable to the order of such Lender in the amount of the relevant Term Loan, Commitment, or Swing Line Sublimit, as applicable. Thereafter, the Loans evidenced by such Note or Notes and interest thereon shall at all times (including after any assignment pursuant to Section 13.12) be represented by one or more Notes payable to the order of the payee named therein or any assignee pursuant to Section 13.12, except to the extent that any such Lender or assignee subsequently returns any such Note for cancellation and requests that such Loans once again be evidenced as described in subsections (a) and (b) above.

*Section 1.12.    Funding Indemnity.* If any Lender shall incur any loss, cost or expense (including, without limitation, any loss of profit, and any loss, cost or expense incurred by reason of the liquidation or re-employment of deposits or other funds acquired by such Lender to fund or maintain any Eurodollar Loan or Swing Loan or the relending or reinvesting of such deposits or amounts paid or prepaid to such Lender) as a result of:

(a)     any payment, prepayment or conversion of a Eurodollar Loan or Swing Loan on a date other than the last day of its Interest Period,

(b)     any failure (because of a failure to meet the conditions of Section 7 or otherwise) by any Borrower to borrow or continue a Eurodollar Loan or Swing Loan, or to convert a Base Rate Loan into a Eurodollar Loan or Swing Loan on the date specified in a notice given pursuant to Section 1.6(a) or 1.15 hereof,

(c)     any failure by any Borrower to make any payment of principal on any Eurodollar Loan or Swing Loan when due (whether by acceleration or otherwise), or

(d)     any acceleration of the maturity of a Eurodollar Loan or Swing Loan as a result of the occurrence of any Event of Default hereunder,

then, upon the demand of such Lender, the Borrowers shall pay to such Lender such amount as will reimburse such Lender for such loss, cost or expense. If any Lender makes such a claim for compensation, it shall provide to the Borrowers, with a copy to the Administrative Agent, a

**Exhibit 1 - Page 22 of 131**

certificate setting forth the amount of such loss, cost or expense in reasonable detail and the amounts shown on such certificate shall be conclusive if reasonably determined.

Section 1.13.   Commitment Terminations. (a) Optional Revolving Credit Terminations. The Borrowers shall have the right at any time and from time to time, upon five (5) Business Days prior written notice to the Administrative Agent (or such shorter period of time agreed to by the Administrative Agent), to terminate the Revolving Credit Commitments without premium or penalty and in whole or in part, any partial termination to be (i) in an amount not less than $2,500,000 and (ii) allocated ratably among the Lenders in proportion to their respective Revolver Percentages, provided that the Revolving Credit Commitments may not be reduced to an amount less than the sum of the aggregate principal amount of Revolving Loans, Swing Loans, and L/C Obligations then outstanding.  Any termination of the Revolving Credit Commitments below the L/C Sublimit or the Swing Line Sublimit then in effect shall reduce the L/C Sublimit and Swing Line Sublimit, as applicable, by a like amount.  The Administrative Agent shall give prompt notice to each Lender of any such termination of the Revolving Credit Commitments.

(b)   Any termination of the Commitments pursuant to this Section 1.13 may not be reinstated.

Section 1.14.   Substitution of Lenders. In the event (a) any Borrower receives a claim from any Lender for compensation under Section 10.3 or 13.1 hereof, (b) any Borrower receives notice from any Lender of any illegality pursuant to Section 10.1 hereof, (c) any Lender is in default in any material respect with respect to its obligations under the Loan Documents, or (d) a Lender fails to consent to an amendment or waiver requested under Section 13.13 hereof at a time when the Required Lenders have approved such amendment or waiver (any such Lender referred to in clause (a), (b), (c), or (d) above being hereinafter referred to as an "Affected Lender"), the Borrowers may, in addition to any other rights the Borrowers may have hereunder or under applicable law, require, at its expense, any such Affected Lender to assign, at par plus accrued interest and fees, without recourse, all of its interest, rights, and obligations hereunder (including all of its Commitments and the Loans and participation interests in Letters of Credit and other amounts at any time owing to it hereunder and the other Loan Documents) to a commercial bank or other financial institution specified by the Borrowers, provided that (i) such assignment shall not conflict with or violate any law, rule or regulation or order of any court or other governmental authority, (ii) the Borrowers shall have received the written consent of the Administrative Agent, which consent shall not be unreasonably withheld, to such assignment, (iii) the Borrowers shall have paid to the Affected Lender all monies (together with amounts due such Affected Lender under Section 1.12 hereof as if the Loans owing to it were prepaid rather than assigned) other than such principal owing to it hereunder, and (iv) the assignment is entered into in accordance with the other requirements of Section 13.12 hereof (provided any assignment fees and reimbursable expenses due thereunder shall be paid by the Borrowers).

Section 1.15.   Swing Loans. (a) Generally. Subject to the terms and conditions hereof, as part of the Revolving Credit, the Swing Line Lender may, in its discretion, make loans in U.S. Dollars to any Borrower under the Swing Line (individually a "Swing Loan" and collectively the "Swing Loans") which shall not in the aggregate at any time outstanding exceed

-16-

Exhibit 1 - Page 23 of 131

the Swing Line Sublimit. Swing Loans may be availed of from time to time and borrowings thereunder may be repaid and used again during the period ending on the Revolving Credit Termination Date. Each Swing Loan shall be in a minimum amount of $250,000 or such greater amount which is an integral multiple of $100,000.

(b) *Interest on Swing Loans*. Each Swing Loan shall bear interest until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Base Rate plus the Applicable Margin for Base Rate Loans under the Revolving Credit as from time to time in effect (computed on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days elapsed). Interest on each Swing Loan shall be due and payable on the last day of its Interest Period and at maturity (whether by acceleration or otherwise).

(c) *Requests for Swing Loans*. The Borrower requesting a Swing Loan shall give the Administrative Agent prior notice (which may be written or oral) no later than 12:00 Noon (Chicago time) on the date upon which such Borrower requests that any Swing Loan be made, of the amount and date of such Swing Loan, and, if applicable, the Interest Period requested therefor. The Administrative Agent shall promptly advise the Swing Line Lender of any such notice received from such Borrower. Subject to the terms and conditions hereof, the proceeds of each Swing Loan extended to the Borrowers shall be deposited or otherwise wire transferred to such Borrower's operating account maintained with the Administrative Agent or one of its Affiliates or as such Borrower, the Administrative Agent, and the Swing Line Lender may otherwise agree. Anything contained in the foregoing to the contrary notwithstanding, the undertaking of the Swing Line Lender to make Swing Loans shall be subject to all of the terms and conditions of this Agreement (provided that the Swing Line Lender shall be entitled to assume that the conditions precedent to an advance of any Swing Loan have been satisfied unless notified to the contrary by the Administrative Agent or the Required Lenders).

(d) *Refunding Loans*. In its sole and absolute discretion, the Swing Line Lender may at any time, on behalf of the Borrowers (which hereby irrevocably authorizes the Swing Line Lender to act on its behalf for such purpose) and with notice to the Borrowers and the Administrative Agent, request each Lender to make a Revolving Loan in the form of a Base Rate Loan in an amount equal to such Lender's Revolver Percentage of the amount of the Swing Loans outstanding on the date such notice is given. Unless an Event of Default described in Section 9.1(j) or 9.1(k) exists with respect to any Borrower, regardless of the existence of any other Event of Default, each Lender shall make the proceeds of its requested Revolving Loan available to the Administrative Agent for the account of the Swing Line Lender, in immediately available funds, at the Administrative Agent's office in Chicago, Illinois (or such other location designated by the Administrative Agent), before 12:00 Noon (Chicago time) on the Business Day following the day such notice is given. The Administrative Agent shall promptly remit the proceeds of such Borrowing to the Swing Line Lender to repay the outstanding Swing Loans.

(e) *Participations*. If any Lender refuses or otherwise fails to make a Revolving Loan when requested by the Swing Line Lender pursuant to Section 1.15(d) above (because an Event of Default described in Section 9.1(j) or 9.1(k) exists with respect to any Borrower or otherwise), such Lender will, by the time and in the manner such Revolving Loan was to have been funded to the Swing Line Lender, purchase from the Swing Line Lender an undivided participating

**Exhibit 1 - Page 24 of 131**

interest in the outstanding Swing Loans in an amount equal to its Revolver Percentage of the aggregate principal amount of Swing Loans that were to have been repaid with such Revolving Loans. Each Lender that so purchases a participation in a Swing Loan shall thereafter be entitled to receive its Revolver Percentage of each payment of principal received on the Swing Loan and of interest received thereon accruing from the date such Lender funded to the Swing Line Lender its participation in such Loan. The several obligations of the Lenders under this Section shall be absolute, irrevocable, and unconditional under any and all circumstances whatsoever and shall not be subject to any set-off, counterclaim or defense to payment which any Lender may have or have had against any Borrower, any other Lender, or any other Person whatsoever. Without limiting the generality of the foregoing, such obligations shall not be affected by any Default or Event of Default or by any reduction or termination of the Commitments of any Lender, and each payment made by a Lender under this Section shall be made without any offset, abatement, withholding, or reduction whatsoever.

Section 1.16. *Appointment of SK Foods as Agent for Colusa Canning.* Colusa Canning hereby irrevocably appoints SK Foods as its agent hereunder to make requests on Colusa Canning's behalf under Section 1 hereof for Borrowings, to request on Colusa Canning's behalf Letters of Credit and to execute all Applications therefor, and to take any other action contemplated by the Loan Documents with respect to the credit extended hereunder to such Colusa Canning.

SECTION 2.    FEES.

Section 2.1. *Fees.* (a) *Revolving Credit Commitment Fee.* The Borrowers shall pay to the Administrative Agent for the ratable account of the Lenders in accordance with their Revolver Percentages a commitment fee at the rate per annum equal to the Applicable Margin (computed on the basis of a year of 365 or 366 days, as the case may be, and the actual number of days elapsed) on the average daily Unused Revolving Credit Commitments. Such commitment fee shall be payable quarterly in arrears on the last day of each March, June, September and December in each year (commencing on the first such date occurring after the date hereof) and on the Revolving Credit Termination Date, unless the Revolving Credit Commitments are terminated in whole on an earlier date, in which event the commitment fee for the period to the date of such termination in whole shall be paid on the date of such termination.

(b) *Letter of Credit Fees.* On the date of issuance or extension, or increase in the amount, of any Letter of Credit pursuant to Section 1.3 hereof, the Borrowers shall pay to the L/C Issuer for its own account a fronting fee equal to 0.125% of the face amount of (or of the increase in the face amount of) such Letter of Credit. Quarterly in arrears, on the last day of each March, June, September and December, commencing on the first such date occurring after the date hereof, the Borrowers shall pay to the Administrative Agent, for the ratable benefit of the Lenders in accordance with their Revolver Percentages, a letter of credit fee at a rate per annum equal to the Applicable Margin (computed on the basis of a year of 360 days and the actual number of days elapsed) in effect during each day of such quarter applied to the daily average face amount of Letters of Credit outstanding during such quarter. In addition, the Borrowers shall pay to the L/C Issuer for its own account the L/C Issuer's standard issuance, drawing,

-18-

**Exhibit 1 - Page 25 of 131**

negotiation, amendment, assignment, and other administrative fees for each Letter of Credit as established by the L/C Issuer from time to time.

(c)    *Administrative Agent Fees.*  The Borrowers shall pay to the Administrative Agent, for its own use and benefit, the annual fees agreed to among the Administrative Agent and the Borrowers in a mandate letter dated August 24, 2007, as supplemented or as otherwise agreed to in writing between them.

(d)    *Audit Fees.*  The Borrowers shall pay to the Administrative Agent for its own use and benefit charges for audits of the Collateral performed by the Administrative Agent or its agents or representatives in such amounts as the Administrative Agent may from time to time request (the Administrative Agent acknowledging and agreeing that such charges shall be computed in the same manner as it at the time customarily uses for the assessment of charges for similar collateral audits); *provided, however,* that in the absence of any Default and Event of Default, the Borrowers shall not be required to pay the Administrative Agent for more than one (1) such audit per calendar year.

SECTION 3.    PLACE AND APPLICATION OF PAYMENTS.

*Section 3.1.    Place and Application of Payments.*  All payments of principal of and interest on the Loans and the Reimbursement Obligations, and of all other Obligations payable by the Borrowers under this Agreement and the other Loan Documents, shall be made by the Borrowers to the Administrative Agent by no later than 12:00 Noon (Chicago time) on the due date thereof at the office of the Administrative Agent in Chicago, Illinois (or such other location as the Administrative Agent may designate to the Borrowers) for the benefit of the Lender or Lenders entitled thereto.  Any payments received after such time shall be deemed to have been received by the Administrative Agent on the next Business Day.  All such payments shall be made in U.S. Dollars, in immediately available funds at the place of payment, in each case without set-off or counterclaim.  The Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest on Loans and on Reimbursement Obligations in which the Lenders have purchased Participating Interests ratably to the Lenders and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  If the Administrative Agent causes amounts to be distributed to the Lenders in reliance upon the assumption that the Borrowers will make a scheduled payment and such scheduled payment is not so made, each Lender shall, on demand, repay to the Administrative Agent the amount distributed to such Lender together with interest thereon in respect of each day during the period commencing on the date such amount was distributed to such Lender and ending on (but excluding) the date such Lender repays such amount to the Administrative Agent, at a rate per annum equal to:  (i) from the date the distribution was made to the date 2 Business Days after payment by such Lender is due hereunder, the Federal Funds Rate for each such day and (ii) from the date 2 Business Days after the date such payment is due from such Lender to the date such payment is made by such Lender, the Base Rate in effect for each such day.

Anything contained herein to the contrary notwithstanding (including, without limitation, Section 1.9(b) hereof), all payments and collections received in respect of the Obligations and all

**Exhibit 1 - Page 26 of 131**

proceeds of the Collateral received, in each instance, by the Administrative Agent or any of the Lenders after acceleration or the final maturity of the Obligations or termination of the Commitments as a result of an Event of Default shall be remitted to the Administrative Agent and distributed as follows:

(a)    first, to the payment of any outstanding costs and expenses incurred by the Administrative Agent, and any security trustee therefor, in monitoring, verifying, protecting, preserving or enforcing the Liens on the Collateral, in protecting, preserving or enforcing rights under the Loan Documents, and in any event including all costs and expenses of a character which the Borrowers have agreed to pay the Administrative Agent under Section 13.15 hereof (such funds to be retained by the Administrative Agent for its own account unless it has previously been reimbursed for such costs and expenses by the Lenders, in which event such amounts shall be remitted to the Lenders to reimburse them for payments theretofore made to the Administrative Agent);

(b)    second, to the payment of any outstanding interest and fees due under the Loan Documents to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(c)    third, to the payment of principal on the Loans, unpaid Reimbursement Obligations, together with amounts to be held by the Administrative Agent as collateral security for any outstanding L/C Obligations pursuant to Section 9.4 hereof (until the Administrative Agent is holding an amount of cash equal to the then outstanding amount of all such L/C Obligations), and Hedging Liability, the aggregate amount paid to, or held as collateral security for, the Lenders and, in the case of Hedging Liability, their Affiliates to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof;

(d)    fourth, to the payment of all other unpaid Obligations and all other indebtedness, obligations, and liabilities of the Borrowers and their Subsidiaries secured by the Loan Documents (including, without limitation, Funds Transfer and Deposit Account Liability) to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof; and

(e)    finally, to the Borrowers or whoever else may be lawfully entitled thereto.

*Section 3.2.    Account Debit.*    Each Borrower hereby irrevocably authorizes the Administrative Agent to charge any of such Borrower's deposit accounts maintained with the Administrative Agent for the amounts from time to time necessary to pay any then due Obligations; *provided* that such Borrower acknowledges and agrees that the Administrative Agent shall not be under an obligation to do so and the Administrative Agent shall not incur any liability to such Borrower or any other Person for the Administrative Agent's failure to do so.

-20-

**Exhibit 1 - Page 27 of 131**

SECTION 4.        GUARANTIES AND COLLATERAL.

Section 4.1.    Guaranties.  The payment and performance of the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability shall at all times be guaranteed by each direct and indirect Domestic Subsidiary of each Borrower (individually a *"Guarantor"* and collectively the *"Guarantors"*) pursuant to Section 12 hereof or pursuant to one or more guaranty agreements in form and substance acceptable to the Administrative Agent, as the same may be amended, modified or supplemented from time to time (individually a *"Guaranty"* and collectively the *"Guaranties"*).

Section 4.2.    Collateral.  The Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest (i) of each Borrower and Guarantor in the capital stock and other equity interests of each Domestic Subsidiary and (ii) in all of each Borrower's and Guarantor's accounts, chattel paper, instruments, documents, general intangibles, letter-of-credit rights, supporting obligations, deposit accounts, investment property, inventory and farm products, equipment, fixtures, commercial tort claims, real estate and certain other Property, whether now owned or hereafter acquired or arising, and all proceeds thereof; *provided however,* that: (i) until a Default or Event of Default has occurred and is continuing and thereafter until otherwise required by the Administrative Agent or the Required Lenders, Liens on local petty cash accounts and other deposit accounts (excluding payroll accounts) maintained by the Borrowers and the Guarantors in proximity to their operations need not be perfected provided that the total amount on deposit at any one time in any such individual account not so perfected shall not exceed $250,000 for any period in excess of ten (10) consecutive calendar days in any calendar year and Liens on payroll accounts maintained by the Borrowers and the Guarantors need not be perfected provided the total amount on deposit at any time does not exceed the current amount of their payroll obligations, (ii) until a Default or Event of Default has occurred and is continuing and thereafter until otherwise required by the Administrative Agent or the Required Lenders, Liens on vehicles which are subject to a certificate of title law need not be perfected provided that the total value of such property at any one time not so perfected shall not exceed $750,000 in the aggregate and (iii) Liens on the Voting Stock of Foreign Subsidiaries shall not be perfected unless perfection is required by the Administrative Agent or the Required Lenders during the existence of any Event of Default.  Each Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Administrative Agent for the benefit of the holders of the Obligations, the Hedging Liability, and the Funds Transfer and Deposit Account Liability and shall be valid and perfected first priority Liens subject, however, to the proviso appearing at the end of the preceding sentence and to Liens permitted by Section 8.8 hereof, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Administrative Agent.

Section 4.3.    Liens on Real Property.  In the event that any Borrower or Guarantor owns or hereafter acquires any real property (other than the real property owned by SK Foods as of the Closing Date located in Homewood, California and Lanai, Hawaii), such Borrower shall, or shall cause such Guarantor to, execute and deliver to the Administrative Agent a mortgage or deed of trust acceptable in form and substance to the Administrative Agent for the purpose of granting to the Administrative Agent (or a security trustee therefor) a Lien on such real property to secure

-21-

**Exhibit 1 - Page 28 of 131**

the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability, shall pay all taxes, costs, and expenses incurred by the Administrative Agent in recording such mortgage or deed of trust, and shall supply to the Administrative Agent at the Borrowers' cost and expense a survey, environmental report, hazard insurance policy, appraisal report, and a mortgagee's policy of title insurance from a title insurer acceptable to the Administrative Agent insuring the validity of such mortgage or deed of trust and its status as a first Lien (subject to Liens permitted by this Agreement) on the real property encumbered thereby and such other instrument, documents, certificates, and opinions reasonably required by the Administrative Agent in connection therewith.

Section 4.4. *Further Assurances.* Each Borrower agrees that it shall, and shall cause each Guarantor to, from time to time at the request of the Administrative Agent or the Required Lenders, execute and deliver such documents and do such acts and things as the Administrative Agent or the Required Lenders may reasonably request in order to provide for or perfect or protect such Liens on the Collateral. In the event any Borrower or Guarantor forms or acquires any other Subsidiary after the date hereof, each Borrower shall, in the event such Subsidiary is a Domestic Subsidiary, promptly upon such formation or acquisition cause such newly formed or acquired Subsidiary to execute a Guaranty and such Collateral Documents as the Administrative Agent may then require, and each Borrower shall also deliver to the Administrative Agent, or cause such Subsidiary to deliver to the Administrative Agent, at such Borrower's cost and expense, such other instruments, documents, certificates, and opinions reasonably required by the Administrative Agent in connection therewith.

SECTION 5.    DEFINITIONS; INTERPRETATION.

Section 5.1. *Definitions.* The following terms when used herein shall have the following meanings:

*"Account Debtor"* means any Person obligated to make payment on any Receivable.

*"Adjusted LIBOR"* is defined in Section 1.4(b) hereof.

*"Administrative Agent"* means Bank of Montreal and any successor pursuant to Section 11.7 hereof.

*"Administrative Questionnaire"* means an Administrative Questionnaire in a form supplied by the Administrative Agent.

*"Affiliate"* means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person. A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise.

-22-

**Exhibit 1 - Page 29 of 131**

*"Agreement"* means this Credit Agreement, as the same may be amended, modified, restated or supplemented from time to time pursuant to the terms hereof.

*"Applicable Margin"* means, with respect to Loans, Reimbursement Obligations, and the commitment fees and letter of credit fees payable under Section 2.1 hereof, until the first Pricing Date, the rates per annum shown opposite Level IV below, and thereafter from one Pricing Date to the next the Applicable Margin means the rates per annum determined in accordance with the following schedule:

| Level | Leverage Ratio for Such Pricing Date | Applicable Margin for Base Rate Loans under Revolving Credit and Reimbursement Obligations Shall Be: | Applicable Margin for Eurodollar Loans under Revolving Credit, and Letter of Credit Fee Shall Be: | Applicable Margin for Base Rate Loans under Term Credit Shall Be: | Applicable Margin for Eurodollar Loans Under Term Credit Shall Be: | Applicable Margin for Commitment/ Facility Fee Shall Be: |
|---|---|---|---|---|---|---|
| IV | Greater than or equal to 4.50 to 1.0 | 0.50% | 2.00% | 0.75% | 2.25% | 0.40% |
| III | Less than 4.50 to 1.0 but greater than or equal to 3.50 to 1.0 | 0.25% | 1.75% | 0.50% | 2.00% | 0.35% |
| II | Less than 3.50 to 1.0, but greater than or equal to 2.50 to 1.0 | 0.00% | 1.50% | 0.25% | 1.75% | 0.30% |
| I | Less than 2.50 to 1.0 | 0.00% | 1.375% | 0.125% | 1.625% | 0.25% |

For purposes hereof, the term *"Pricing Date"* means, for any fiscal quarter of the Borrowers ending on or after December 31, 2007, the date on which the Administrative Agent is in receipt of the Borrowers' most recent financial statements (and in the case of the year-end financial statements, audit report) for the fiscal quarter then ended, pursuant to Section 8.5 hereof. The Applicable Margin shall be established based on the Leverage Ratio for the most recently completed fiscal quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If the Borrowers have not delivered its financial statements by the date such financial statements and audit report are required to be delivered under Section 8.5 hereof, until such financial statements and audit report are delivered, the Applicable Margin shall be the highest Applicable Margin (*i.e.,* Level IV shall apply). If the Borrowers subsequently deliver such financial statements before the next Pricing Date, the Applicable Margin established by such late delivered financial statements shall take effect from the date of delivery until the next Pricing Date. In all other circumstances, the Applicable Margin established by such

**Exhibit 1 - Page 30 of 131**

financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the fiscal year covered by such financial statements until the next Pricing Date. Each determination of the Applicable Margin made by the Administrative Agent in accordance with the foregoing shall be conclusive and binding on the Borrowers and the Lenders if reasonably determined.

Upon the occurrence of an Event of Default under Section 9.1(b) hereof (with respect to the covenants set forth in Section 8.22 hereof), the Applicable Margin shall be the highest possible margin (Level IV shall apply) whether or not the Required Lenders have waived such Event of Default and the Applicable Margin shall be applicable from the end of such period through and including the next period the Borrowers demonstrate compliance with Section 8.22.

*"Application"* is defined in Section 1.2(b) hereof.

*"Approved Fund"* means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

*"Assignment and Acceptance"* means an assignment and acceptance entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 13.12 hereof), and accepted by the Administrative Agent, in substantially the form of Exhibit H or any other form approved by the Administrative Agent.

*"Authorized Representative"* means those persons shown on the list of officers provided by the Borrowers pursuant to Section 7.2 hereof or on any update of any such list provided by the Borrowers to the Administrative Agent, or any further or different officers of the Borrowers so named by any Authorized Representative of the Borrowers in a written notice to the Administrative Agent.

*"Base Rate"* is defined in Section 1.4(a) hereof.

*"Base Rate Loan"* means a Loan bearing interest at a rate specified in Section 1.4(a) hereof.

*"Borrower"* or *"Borrowers"* is defined in the introductory paragraph of this Agreement.

*"Borrowing"* means the total of Loans of a single type advanced, continued for an additional Interest Period, or converted from a different type into such type by the Lenders under a Credit on a single date and, in the case of Eurodollar Loans, for a single Interest Period. Borrowings of Loans are made and maintained ratably from each of the Lenders under a Credit according to their Percentages of such Credit. A Borrowing is *"advanced"* on the day Lenders advance funds comprising such Borrowing to a Borrower, is *"continued"* on the date a new Interest Period for the same type of Loans commences for such Borrowing, and is *"converted"* when such Borrowing is changed from one type of Loans to the other, all as determined pursuant to Section 1.6 hereof. Borrowings of Swing Loans are made by the Administrative Agent in accordance with the procedures set forth in Section 1.15 hereof.

**Exhibit 1 - Page 31 of 131**

*"Borrowing Base"* means, as of any time it is to be determined, the sum of :

(a)     85% of the then outstanding unpaid amount of Eligible Receivables; *plus*

(b)     70% of the value (computed at the lower of market or cost using the first-in/first-out method of inventory valuation applied in accordance with GAAP) of Eligible Inventory; *minus*

(c)     100% of the aggregate amount of outstanding Secured Grower Payables;

*provided* that (i) the Administrative Agent shall have the right to impose reserves against the Borrowing Base from time to time in the exercise of its reasonable credit judgment and (ii) the Borrowing Base shall be computed only as against and on so much of such Collateral as is included on the Borrowing Base Certificates furnished from time to time by the Borrowers pursuant to this Agreement and, if required by the Administrative Agent or the Required Lenders pursuant to any of the terms hereof or any Collateral Document, as verified by such other evidence reasonably required to be furnished to the Administrative Agent or the Required Lenders pursuant hereto or pursuant to any such Collateral Document.

*"Borrowing Base Certificate"* means the certificate in the form of Exhibit E hereto, or in such other form acceptable to the Administrative Agent, to be delivered to the Administrative Agent and the Lenders pursuant to Sections 7.2 and 8.5 hereof.

*"Business Day"* means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Chicago, Illinois, and, if the applicable Business Day relates to the advance or continuation of, or conversion into, or payment of a Eurodollar Loan, on which banks are dealing in U.S. Dollar deposits in the interbank eurodollar market in London, England and Nassau, Bahamas.

*"Capital Expenditures"* means, with respect to any Person for any period, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and improvements) which should be capitalized on the balance sheet of such Person in accordance with GAAP.

*"Capital Lease"* means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

*"Capitalized Lease Obligation"* means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, U.S.C. §§9601 *et. seq.*, and any future amendments.

-25-

**Exhibit 1 - Page 32 of 131**

"*Change of Control*" means Scott Salyer (or one or more trusts created for his spouse or lineal descendants for which he is trustee) ceases at any time and for any reason to have legal and beneficial ownership of 100% of the Voting Stock (or other equity interest) of the Borrowers and have legal and beneficial ownership of 100% of the Voting Stock of each partner of the Borrowers, as applicable.

"*Closing Date*" means the date of this Agreement or such later Business Day upon which each condition described in Section 7.2 shall be satisfied or waived in a manner acceptable to the Administrative Agent in its discretion.

"*Code*" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Collateral*" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Administrative Agent, or any security trustee therefor, by the Collateral Documents.

"*Collateral Account*" is defined in Section 9.4 hereof.

"*Collateral Documents*" means the Mortgages, the Security Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Obligations, the Hedging Liability, and the Funds Transfer and Deposit Account Liability or any part thereof.

"*Colusa Canning*" is defined in the introductory paragraph of this Agreement.

"*Commitments*" means the Revolving Credit Commitments and the Term Loan Commitments.

"*Compliance Certificate*" is defined in Section 8.5 hereof.

"*Controlled Group*" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"*Credit*" means any of the Revolving Credit or the Swing Line or the Term Credit.

"*Credit Event*" means the advancing of any Loan, the continuation of or conversion into a Eurodollar Loan, or the issuance of, or extension of the expiration date or increase in the amount of, any Letter of Credit.

"*Default*" means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"*Disposition*" means the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under Sections 8.10(a) or 8.10(b) hereof.

-26-

**Exhibit 1 - Page 33 of 131**

"*Domestic Subsidiary*" means each direct and indirect Subsidiary of a Borrower which is organized under the laws of the United States of America or any state thereof.

"*EBITDA*" means, with reference to any period, Net Income for such period *plus* all amounts deducted in arriving at such Net Income amount in respect of (a) Interest Expense for such period, *plus* (b) federal, state, and local income taxes for such period, *plus* (c) depreciation of fixed assets and amortization of intangible assets for such period, *plus* (d) the adjustments set forth on Schedule 5.1(a) for such period, *plus* (e) such other adjustments approved by the Administrative Agent in its sole discretion.

"*ECF Prepayment Percentage*" means 75%; *provided that* so long as no Event of Default shall have occurred and be continuing such percentage shall be permanently reduced to (i) 50% at such time the Leverage Ratio as demonstrated by the financial statements of the Borrowers submitted pursuant to Section 8.5 hereof has been less than 3.5 to 1.0 for two (2) consecutive fiscal quarters of the Borrowers and (ii) 0% at such time as the Leverage Ratio as demonstrated by the financial statements of the Borrowers submitted pursuant to Section 8.5 hereof has been less than 2.5 to 1.0 for two (2) consecutive fiscal quarters of the Borrowers.

"*Eligible Assignee*" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by (i) the Administrative Agent, (ii) in the case of any assignment of a Revolving Credit Commitment, the L/C Issuer, and (iii) unless an Event of Default has occurred and is continuing, each Borrower (each such approval not to be unreasonably withheld or delayed); *provided* that notwithstanding the foregoing, "*Eligible Assignee*" shall not include any Borrower or Guarantor or any of such Borrower's or Guarantor's Affiliates or Subsidiaries.

"*Eligible Inventory*" shall mean any Inventory of any Borrower or Guarantor in which the Administrative Agent has a first priority perfected security interest, which the Administrative Agent in its sole judgment deems to be acceptable for inclusion in the Borrowing Base, and which complies with each of the following requirements:

      (a)    It consists of any processed raw commodity that is packaged and includes bulk tomato paste, bulk diced tomatoes, bulk purees and diced vegetables that would be substantially composed of peppers, chilies or onions, in each case which are not deemed to be out-of-condition or otherwise unmerchantable by the Administrative Agent or any governmental agency or any department or division thereof having regulatory authority over the Borrowers or Guarantors, as applicable, or any of its assessors activities;

      (b)    it is packaged in a manner suitable for sale to the public and substantially conforms to the Borrowers' advertised or represented specifications, is able to be sold in the ordinary course of business and has not been determined by the Administrative Agent to be unacceptable due to age, type, variety, quality, quantity, or location;

      (c)    all representations and warranties of the Borrowers or Guarantors, as applicable, in the Loan Documents are true and correct with respect thereto;

**Exhibit 1 - Page 34 of 131**

(d)     it has been identified to the Administrative Agent in the manner prescribed by the Administrative Agent pursuant to the Security Agreement;

(e)     it is located at a location in the United States of America disclosed to and approved by the Administrative Agent, and any Person (other than a Borrower) owning or controlling such location shall have waived all right, title and interest in and to such Inventory in a manner satisfactory to the Administrative Agent;

(f)     if it is evidenced by a negotiable warehouse receipt or other negotiable document of title, such receipt or document of title has been endorsed in blank or to the order of the Administrative Agent and has been delivered to the Administrative Agent or its trustee or bailee;

(g)     is less than four (4) years old; and

(h)     is otherwise deemed to be Eligible Inventory in the reasonable judgment of the Administrative Agent (it being acknowledged and agreed that with 5 Business Days prior written notice any Inventory or categories thereof of any Borrower or Guarantor may be deemed ineligible by the Administrative Agent acting in is reasonable judgment).

*"Eligible Receivables"* shall mean any Receivable of any Borrower or Guarantor in which the Administrative Agent has a first priority perfected security interest which the Administrative Agent in its sole judgment deems to be acceptable for inclusion in the Borrowing Base, and which complies with each of the following requirements:

(a)     it arises out of a bona fide sale of Inventory which has been delivered, or is in the process of being delivered, to the Account Debtor on said Receivable in the ordinary course of business on ordinary trade terms;

(b)     is payable in U.S. Dollars and the Account Debtor on such Receivable is located within the United States of America or, if such right has arisen out of the sale of such goods shipped to, or out of the rendition of services to, an Account Debtor located in any other country, such right is either (i) secured by a valid and irrevocable transferable letter of credit issued by a lender reasonably acceptable to the Administrative Agent for the full amount thereof or (ii) secured by an insurance policy issued by EXIM Bank or any other insurer satisfactory to the Administrative Agent (which in any event shall insure not less than ninety percent (90%) of the face amount of such Receivable and shall be subject to such deductions as are acceptable to the Administrative Agent), and in each case which has been assigned or transferred to the Administrative Agent in a manner acceptable to the Administrative Agent;

(c)     is the valid, binding and legally enforceable obligation of the Account Debtor obligated thereon and such Account Debtor is not (i) a Subsidiary or an Affiliate of any Borrower, (ii) a shareholder, director, officer or employee of any Borrower or Subsidiary, (iii) the United States of America, or any state or political subdivision

**Exhibit 1 - Page 35 of 131**

thereof, or any department, agency or instrumentality of any of the foregoing, unless the Assignment of Claims Act or any similar state or local statute, as the case may be, is complied with to the satisfaction of the Administrative Agent, (iv) a debtor under any proceeding under the United States Bankruptcy Code, as amended, or any other comparable bankruptcy or insolvency law, or (v) an assignor for the benefit of creditors;

(d)     is not evidenced by an instrument or chattel paper unless the same has been endorsed and delivered to the Administrative Agent;

(e)     is an asset of such Person to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of the Administrative Agent free and clear of any other Liens (other than Liens permitted by Section 8.8(a) or (b) hereof arising by operation of law which are subordinate to the Liens in favor of the Administrative Agent);

(f)     is not subject to any counterclaim or defense asserted by the Account Debtor or subject to any offset or contra account payable to the Account Debtor (unless the amount of such Receivable is net of such contra account established to the reasonable satisfaction of the Administrative Agent);

(g)     no surety bond was required or given in connection with said Receivable or the contract or purchase order out of which the same arose;

(h)     all representations and warranties of the Borrowers or Guarantors, as applicable, in the Loan Documents are true and correct with respect thereto;

(i)     it has been identified to the Administrative Agent in the manner required by the Administrative Agent;

(j)     it is evidenced by an invoice dated not later than the date of shipment to the Account Debtor thereunder;

(k)     it is net of any credit or allowance given by a Borrower or Guarantor, as applicable, to such Account Debtor;

(l)     it is not owing by an Account Debtor who shall have failed to pay fifty percent (50%) or more of the balance owing of any other Receivable within the applicable period set forth in subsection (m) below or has become insolvent or is the subject of any bankruptcy, arrangement, reorganization proceedings or other proceedings for relief of debtors;

(m)     it has not remained unpaid in whole or in part for a period of (i) 180 days following the invoice date thereof with respect to Receivables owed by Red Gold, Inc., ConAgra Frozen Foods, Inc., ConAgra Grocery Products Company, General Mills and Nestlé USA and (ii) 90 days following the invoice date thereof with respect to all other Receivables;

**Exhibit 1 - Page 36 of 131**

(n)     it does not arise from a sale to an Account Debtor on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment or any other repurchase or return basis; *provided* that this clause (n) shall not exclude Receivables that arise from the sale to an Account Debtor on a bill-and-hold basis to the extent such Receivables are outstanding 60 days or less; and

(o)     is otherwise deemed to be an Eligible Receivable in the reasonable judgment of the Administrative Agent (it being acknowledged and agreed that with 5 Business Days prior written notice any Receivable of any Borrower or Guarantor may be deemed ineligible by the Administrative Agent acting in its reasonable judgment).

*"Environmental Claim"* means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (a) pursuant to, or in connection with an actual or alleged violation of, any Environmental Law, (b) in connection with any Hazardous Material, (c) from any abatement, removal, remedial, corrective or response action in connection with a Hazardous Material, Environmental Law or order of a governmental authority or (d) from any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

*"Environmental Law"* means any current or future Legal Requirement pertaining to (a) the protection of health, safety and the indoor or outdoor environment, (b) the conservation, management or use of natural resources and wildlife, (c) the protection or use of surface water or groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (e) pollution (including any Release to air, land, surface water or groundwater), and any amendment, rule, regulation, order or directive issued thereunder.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

*"Eurodollar Loan"* means a Loan bearing interest at the rate specified in Section 1.4(b) hereof.

*"Eurodollar Reserve Percentage"* is defined in Section 1.3(b) hereof.

*"Event of Default"* means any event or condition identified as such in Section 9.1 hereof.

*"Event of Loss"* means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property or (b) any condemnation, seizure, or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

*"Excess Availability"* means, as of any time the same is to be determined, the amount (if any) by which (a) the lesser of the Borrowing Base as then determined and computed or the

**Exhibit 1 - Page 37 of 131**

Revolving Credit Commitment as then in effect exceeds (b) the aggregate principal amount of Revolving Loans, Swing Loans, and L/C Obligations then outstanding.

"*Excess Cash Flow*" means, with respect to any period, the amount (if any) by which (a) EBITDA (but determined for such purposes without giving effect to any extraordinary gains or losses) during such period exceeds (b) the sum of (i) Interest Expense payable in cash during such period, *plus* (ii) federal, state and local income taxes payable in cash during such period (including, without duplication, Tax Distributions permitted by Section 8.12(i) hereof), *plus* (iii) the aggregate amount of payments by the Borrowers and their Subsidiaries during such period in respect of all principal on all Indebtedness of Borrowed Money (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment, acceleration or otherwise, but excluding payments made under the Revolving Credit and excluding prepayments of the Term Loans made under Section 1.9(b) hereof), *plus* (iv) the aggregate amount of Capital Expenditures made by the Borrowers and their Subsidiaries during such period to the extent permitted by this Agreement and not financed with proceeds of Indebtedness for Borrowed Money (but excluding credit extended under the Revolving Credit), *plus* (v) any increases in non-debt, non-cash working capital of the Borrowers and their Subsidiaries for such period, *minus* (vi) any decreases in non-debt, non-cash working capital of the Borrowers and their Subsidiaries for such period.

"*Federal Funds Rate*" means the fluctuating interest rate per annum described in part (x) of clause (ii) of the definition of Base Rate appearing in Section 1.4(a) hereof.

"*Fixed Charges*" means, with reference to any period, the sum of (a) all payments of principal made or to be made during such period with respect to Indebtedness for Borrowed Money of the Borrowers and their Subsidiaries, (b) Interest Expense paid or payable in cash for such period, (c) federal, state, and local income taxes paid or payable by the Borrowers and their Subsidiaries during such period and (d) all distributions permitted by Section 8.12 hereof paid or payable in cash by the Borrowers and their Subsidiaries during such period (excluding the aggregate $4,000,000 distribution made by SK Foods to one or more of its partners for tax planning purposes in January, 2007).

"*Foreign Subsidiary*" means each Subsidiary of a Borrower that is not a Domestic Subsidiary.

"*Fund*" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*Funds Transfer and Deposit Account Liability*" means the liability of any Borrower or Guarantor owing to any Funds Transfer Lender, arising out of (a) the execution or processing of electronic transfers of funds by automatic clearing house transfer, wire transfer or otherwise to or from deposit accounts of any Borrower and/or Guarantor now or hereafter maintained with any Funds Transfer Lender, (b) the acceptance for deposit or the honoring for payment of any check, draft or other item with respect to any such deposit accounts, and (c) any other deposit,

**Exhibit 1 - Page 38 of 131**

disbursement, and cash management services afforded to any Borrower or Guarantor by any Funds Transfer Lender.

*"Funds Transfer Lender"* means any Person that is a Lender, or an Affiliate of a Lender, at the time it enters into any agreement with the Borrower or any Guarantor with respect to Funds Transfer and Deposit Account Liability.

*"GAAP"* means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

*"Guarantor"* and *"Guarantors"* each is defined in Section 4.1 hereof.

*"Guaranty"* and *"Guaranties"* each is defined in Section 4.1 hereof.

*"Hazardous Material"* means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant or material which is hazardous or toxic, and includes, without limitation, (a) asbestos, polychlorinated biphenyls and petroleum (including crude oil or any fraction thereof) and (b) any material classified or regulated as "hazardous" or "toxic" or words of like import pursuant to an Environmental Law.

*"Hazardous Material Activity"* means any activity, event or occurrence involving a Hazardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

*"Hedging Lender"* means any Person that is a Lender, or an Affiliate of a Lender, at the time it enters into any agreement with the Borrower or any Guarantor with respect to Hedging Liability.

*"Hedging Liability"* means the liability of any Borrower or Guarantor to any Hedging Lender, in respect of any interest rate, foreign currency, and/or commodity swap, exchange, cap, collar, floor, forward, future or option agreement, or any other similar interest rate, currency or commodity hedging arrangement, as such Borrower or Guarantor, as the case may be, may from time to time enter into with any one or more of the Hedging Lenders.

*"Indebtedness for Borrowed Money"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities or mandatory redeemable Preferred Stock), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business which are not more than ninety (90) days past due), (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness,

**Exhibit 1 - Page 39 of 131**

(d) all Capitalized Lease Obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, (f) all Synthetic Lease Obligations and (g) the aggregate Swap Termination Value of all Swaps.

*"Interest Expense"* means, with reference to any period, the sum of all interest charges (including imputed interest charges with respect to Capitalized Lease Obligations and Synthetic Lease Obligations and all amortization of debt discount and expense) of the Borrowers and their Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

*"Interest Period"* is defined in Section 1.7 hereof.

*"Interest Rate Hedging Arrangement"* means any interest rate swaps, interest rate caps, interest rate collars or other interest rate hedging arrangement.

*"Inventory"* means all raw materials, work in process, finished goods, and goods held for sale or lease or furnished under contracts or service in which any Borrower or Guarantor now has or hereafter acquires any right.

*"JPMorgan Agreements"* means and includes that certain Master Lease Agreement dated as of June 5, 1997 between SK Foods and JPMorgan Chase Bank N.A., together with any addenda, amendments and modifications thereto (the "1997 SK Foods Master Lease"); Lease Schedule Nos. 1000105855, 1000105872, 1000117639 and 1000119253 to the 1997 SK Foods Master Lease together with any addenda, amendments and modifications thereto; Master Lease Agreement dated as of June 14, 2005 between SK Foods and JPMorgan Chase Bank N.A., together with any addenda, amendments and modifications thereto (the "2005 SK Foods Master Lease"); Lease Schedule Nos. 1000126293, 1000128455 and 1000129904 to the 2005 SK Foods Master Lease together with any addenda, amendments and modifications thereto; Business Purpose Promissory Note dated December 22, 2003 (For Loan No. 1000118109), the Loan Agreement dated as of December 23, 2003 between SK Foods and JPMorgan Chase Bank N.A., the Pledge Security Agreement dated as of December 23, 2003 between Colusa Canning and JPMorgan Chase Bank N.A., the Corporate Guaranty dated as of December 22, 2003 by Colusa Canning in favor of JPMorgan Chase Bank N.A. together with any addenda, amendments and modifications to any of the foregoing; Business Purpose Promissory Note dated June 15, 2004 (For Loan No. 1000119526), the Loan and Security Agreement dated as of June 15, 2004 between SK Foods and JPMorgan Chase Bank N.A. , the Corporate Guaranty dated as of June 15, 2004 by Colusa Canning in favor of JPMorgan Chase Bank N.A., together with any addenda, amendments and modifications to any of the foregoing.

*"Lease Rentals"* means for any Person, with respect to any period, the aggregate fixed amounts payable by such Person under any Operating Lease during such period.

*"L/C Issuer"* means the Administrative Agent and/or its Affiliates, or any other Lender requested by a Borrower and approved by the Administrative Agent in its sole discretion with respect to any Letter of Credit.

**Exhibit 1 - Page 40 of 131**

*"L/C Obligations"* means the aggregate undrawn face amounts of all outstanding Letters of Credit and all unpaid Reimbursement Obligations.

*"L/C Sublimit"* means $5,000,000, as reduced pursuant to the terms hereof.

*"Legal Requirement"* means any treaty, convention, statute, law, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any governmental authority, whether federal, state, or local.

*"Lenders"* means and includes Bank of Montreal and the other financial institutions from time to time party to this Agreement, including each assignee Lender pursuant to Section 13.12 hereof.

*"Lending Office"* is defined in Section 10.4 hereof.

*"Letter of Credit"* is defined in Section 1.3(a) hereof.

*"Leverage Ratio"* means, as of the last day of any fiscal quarter of the Borrowers, the ratio of (i) Total Funded Debt less Subordinated Debt of the Borrowers and their Subsidiaries as of the last day of such fiscal quarter to (ii) EBITDA of the Borrowers and their Subsidiaries for the period of four fiscal quarters then ended.

*"LIBOR"* is defined in Section 1.4(b) hereof.

*"Lien"* means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

*"Loan"* means any Revolving Loan, Swing Loan or Term Loan, whether outstanding as a Base Rate Loan or Eurodollar Loan or otherwise, each of which is a *"type"* of Loan hereunder.

*"Loan Documents"* means this Agreement, the Notes, the Applications, the Collateral Documents, the Guaranties, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property, condition (financial or otherwise) or prospects of any Borrower or of the Borrowers and their Subsidiaries taken as a whole, (b) a material impairment of the ability of any Borrower or Subsidiary to perform its material obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against any Borrower or Subsidiary of any Loan Document or the rights and remedies of the Administrative Agent and the Lenders thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

*"Moody's"* means Moody's Investors Service, Inc.

**Exhibit 1 - Page 41 of 131**

*"Mortgages"* means, collectively, (i) that certain Deed of Trust and Security Agreement with Assignment of Rents dated as of November 1, 2006 from SK Foods in favor of the Administrative Agent and recorded in the Kings County, California Recorder of Deed on November 3, 2006 as Document No. 0632757, as the same may be amended, modified, supplemented or restated from time to time, (ii) that certain Deed of Trust and Security Agreement with Assignment of Rents dated as of May 17, 2007 from Colusa Canning in favor of the Administrative Agent and recorded in the Colusa County, California Recorder of Deeds on May 21, 2007 as Document No. 2007-002918, as the same may be amended, modified, supplemented or restated from time to time, and (iii) any other mortgages or deeds of trust delivered to the Administrative Agent pursuant to Section 4.3 hereof, as the same may be amended, modified, supplemented or restated from time to time.

*"Net Cash Proceeds"* means, as applicable, (a) with respect to any Disposition by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of (i) reasonable direct costs relating to such Disposition and (ii) sale, use or other transactional taxes paid or payable by such Person as a direct result of such Disposition, (b) with respect to any Event of Loss of a Person, cash and cash equivalent proceeds received by or for such Person's account (whether as a result of payments made under any applicable insurance policy therefor or in connection with condemnation proceedings or otherwise), net of reasonable direct costs incurred in connection with the collection of such proceeds, awards or other payments, and (c) with respect to any offering of equity securities of a Person or the issuance of any Indebtedness for Borrowed Money by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

*"Net Income"* means, with reference to any period, the net income (or net loss) of the Borrowers and their Subsidiaries for such period computed on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from Net Income (a) the net income (or net loss) of any Person accrued prior to the date it becomes a Subsidiary of, or has merged into or consolidated with, a Borrower or another Subsidiary, and (b) the net income (or net loss) of any Person (other than a Subsidiary) in which any Borrower or Subsidiary has an equity interest in, except to the extent of the amount of dividends or other distributions actually paid to any Borrower or Subsidiary during such period.

*"Note"* and *"Notes"* each is defined in Section 1.11 hereof.

*"Obligations"* means all obligations of the Borrowers to pay principal and interest on the Loans, all Reimbursement Obligations owing under the Applications, all fees and charges payable hereunder, and all other payment obligations of the Borrowers or any of their Subsidiaries arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

*"Operating Lease"* means any lease of Property other than a Capital Lease.

*"Participating Interest"* is defined in Section 1.3(d) hereof.

**Exhibit 1 - Page 42 of 131**

*"Participating Lender"* is defined in Section 1.3(d) hereof.

*"PBGC"* means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

*"Percentage"* means for any Lender its Revolver Percentage or Term Loan Percentage, as applicable; and where the term *"Percentage"* is applied on an aggregate basis (including, without limitation, Section 11.6 hereof), such aggregate percentage shall be calculated by aggregating the separate components of the Revolver Percentage and Term Loan Percentage, and expressing such components on a single percentage basis.

*"Person"* means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

*"Plan"* means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

*"Preferred Stock"* means any class of capital stock of a Person that is preferred over any other class of capital stock (or similar equity interests) of such Person as to the payment of dividends or the payment of any amount upon liquidation or dissolution of such Person.

*"Premises"* means the real property owned or leased by any Borrower or Subsidiary, including without limitation the real property and improvements thereon owned by any Borrower or Subsidiary subject to the Lien of the Mortgages or any other Collateral Documents.

*"Property"* means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its subsidiaries under GAAP.

*"RCRA"* means the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§6901 *et seq.*, and any future amendments.

*"Receivables"* means all rights to the payment of a monetary obligation, now or hereafter owing to any Borrower or Guarantor, evidenced by accounts, instruments, chattel paper, or general intangibles.

*"Release"* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migration, dumping, or disposing into the indoor or outdoor environment, including, without limitation, the abandonment or discarding of barrels,

**Exhibit 1 - Page 43 of 131**

drums, containers, tanks or other receptacles containing or previously containing any Hazardous Material.

"*Reimbursement Obligation*" is defined in Section 1.2(c) hereof.

"*Required Lenders*" means, as of the date of determination thereof, Lenders whose outstanding Loans and interests in Letters of Credit and Unused Revolving Credit Commitments constitute more than 50% of the sum of the total outstanding Loans, interests in Letters of Credit, and Unused Revolving Credit Commitments of the Lenders and, in the event that at such time there are 5 or more Lenders party to this Agreement, at least 3 Lenders; *provided*, for purposes of this definition, any Loans, interests in Letters of Credits, and Unused Revolving Credit Commitments of an Affiliate of a Lender shall be deemed Loans, interests in Letters of Credit and Unused Revolving Credit Commitments of such Lender.

"*Revolver Percentage*" means, for each Lender, the percentage of the Revolving Credit Commitments represented by such Lender's Revolving Credit Commitment or, if the Revolving Credit Commitments have been terminated, the percentage held by such Lender (including through participation interests in Reimbursement Obligations) of the aggregate principal amount of all Revolving Loans and L/C Obligations then outstanding.

"*Revolving Credit*" means the credit facility for making Revolving Loans and issuing Letters of Credit described in Sections 1.2 and 1.3 hereof.

"*Revolving Credit Commitment*" means, as to any Lender, the obligation of such Lender to make Revolving Loans and to participate in Swing Loans and Letters of Credit issued for the account of the Borrowers hereunder in an aggregate principal or face amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1 attached hereto and made a part hereof, as the same may be reduced or modified at any time or from time to time pursuant to the terms hereof. The Borrowers and the Lenders acknowledge and agree that the Revolving Credit Commitments of the Lenders aggregate an amount equal to (i) $100,000,000 during the period from and including July 1 through and including February 28 or February 29, as the case may be, of each calendar year and (ii) $50,000,000 during the period from and including March 1 through and including June 30 of each calendar year.

"*Revolving Credit Termination Date*" means September 27, 2012, or such earlier date on which the Revolving Credit Commitments are terminated in whole pursuant to Section 1.13, 9.2 or 9.3 hereof.

"*Revolving Loan*" is defined in Section 1.2 hereof and, as so defined, includes a Base Rate Loan or a Eurodollar Loan, each of which is a "*type*" of Revolving Loan hereunder.

"*Revolving Note*" is defined in Section 1.11 hereof.

"*S&P*" means Standard & Poor's Ratings Services Group, a division of The McGraw-Hill Companies, Inc.

**Exhibit 1 - Page 44 of 131**

*"Secured Grower Payables"* shall mean all amounts owed from time to time to (i) producers, suppliers, sellers and their agents of agricultural products on account of the purchase price of agricultural products or services if the Administrative Agent reasonably determines that such Person is entitled to the benefits of any grower's lien, statutory trust or similar security arrangements to secure the payment of the amount of any amounts owed to such Person and (ii) warehouseman or other storage facilities in connection with the storage of Eligible Inventory to the extent such warehouseman or other storage facilities have not waived their right, title and interest in such Eligible Inventory.

*"Security Agreement"* means that certain Amended and Restated Security Agreement dated the date of this Agreement among the Borrowers, the Guarantors and the Administrative Agent, as the same may be amended, modified, supplemented or restated from time to time.

*"SK Foods"* is defined in the introductory paragraph of this Agreement.

*"Subordinated Debt"* means Indebtedness for Borrowed Money of the Borrowers owing to one or more of their Affiliates and listed on Schedule 5.1(b) hereof, which Indebtedness for Borrowed Money shall be subordinated to the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability pursuant to subordination agreements in form and substance satisfactory to the Administrative Agent and the Required Lenders.

*"Subsidiary"* means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization. Unless otherwise expressly noted herein, the term *"Subsidiary"* means a Subsidiary of a Borrower or of any of its direct or indirect Subsidiaries; *provided, however,* that for purposes of this Agreement, Subsidiaries shall not include Foreign Subsidiaries of the Borrowers existing on the date hereof.

*"Swap Termination Value"* means, in respect of any one or more Swaps, after taking into account the effect of any legally enforceable netting agreement relating to such Swaps, (a) for any date on or after the date such Swaps have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amounts(s) determined as the mark-to-market values(s) for such Swaps, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap contracts.

*"Swaps"* means, with respect to any Person, payment obligations with respect to interest rate swaps, currency swaps and similar obligations obligating such person to make payments, whether periodically or upon the happening of a contingency. For these purposes, the amount of the obligation under any Swap shall be the amount determined in respect thereof as of the end of the then most recently ended fiscal quarter based on the assumption that such Swap had terminated at the end of such fiscal quarter.

**Exhibit 1 - Page 45 of 131**

"*Swing Line*" means the credit facility for making one or more Swing Loans described in Section 1.15 hereof.

"*Swing Line Lender*" means Bank of Montreal, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"*Swing Line Sublimit*" means $5,000,000, as reduced pursuant to the terms hereof.

"*Swing Loan*" and "*Swing Loans*" each is defined in Section 1.15 hereof.

"*Swing Note*" is defined in Section 1.11 hereof.

"*Synthetic Lease*" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"*Synthetic Lease Obligations*" means, for any Person, the amount of liability shown on the balance sheet of such Person in respect of a Synthetic Lease assuming such Synthetic Lease was accounted for as a Capital Lease as determined in accordance with GAAP.

"*Tax Distribution*" means, as of the time of determination thereof, any distributions by the Borrowers to any of its partners or shareholders, as applicable, which (i) with respect to quarterly estimated tax payments due in each calendar year, shall be equal to the amount of the quarterly estimated tax payment actually made by each such partner or shareholder with respect to income of such Borrower allocated to each such partner or shareholder and (ii) with respect to tax payments made with income tax returns filed for a full calendar year, shall be equal to the actual income tax liability of such partner or shareholder for such calendar year *minus* the aggregate amount previously distributed to such partner or shareholder for such calendar year with respect to income of such Borrower allocated to such partner or shareholder.

"*Term Credit*" means the credit facility for the Term Loans described in Section 1.1 hereof.

"*Term Loan*" is defined in Section 1.1 hereof and, as so defined, includes a Base Rate Loan or a Eurodollar Loan, each of which is a "*type*" of Term Loan hereunder.

"*Term Loan Commitment*" means, as to any Lender, the obligation of such Lender to make its Term Loan on the Closing Date in the principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 1 attached hereto and made a part hereof. The Borrowers and the Lenders acknowledge and agree that the Term Loan Commitments of the Lenders aggregate $100,000,000 on the date hereof.

"*Term Loan Percentage*" means, for each Lender, the percentage of the Term Loan Commitments represented by such Lender's Term Loan Commitment or, if the Term Loan

Commitments have been terminated or have expired, the percentage held by such Lender of the aggregate principal amount of all Term Loans then outstanding.

*"Term Note"* is defined in Section 1.11 hereof.

*"Total Funded Debt"* means, at any time the same is to be determined, the sum (but without duplication) of (a) all Indebtedness for Borrowed Money of the Borrowers and their Subsidiaries at such, and (b) all Indebtedness for Borrowed Money of any other Person which is directly or indirectly guaranteed by any Borrower or Subsidiary or which any Borrower or Subsidiary has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which any Borrower or Subsidiary has otherwise assured a creditor against loss.

*"Unfunded Vested Liabilities"* means, for any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

*"Unused Revolving Credit Commitments"* means, at any time, the difference between the Revolving Credit Commitments then in effect and the aggregate outstanding principal amount of Revolving Loans and L/C Obligations, *provided* that Swing Loans outstanding from time to time shall be deemed to reduce the Unused Revolving Credit Commitment of the Administrative Agent for purposes of computing the commitment fee under Section 2.1(a) hereof.

*"U.S. Dollars"* and *"$"* each means the lawful currency of the United States of America.

*"Voting Stock"* of any Person means capital stock or other equity interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than stock or other equity interests having such power only by reason of the happening of a contingency.

*"Welfare Plan"* means a "welfare plan" as defined in Section 3(1) of ERISA.

*"Wholly-owned Subsidiary"* means a Subsidiary of which all of the issued and outstanding shares of capital stock (other than directors' qualifying shares as required by law) or other equity interests are owned by a Borrower and/or one or more Wholly-owned Subsidiaries within the meaning of this definition.

Section 5.2.   *Interpretation.* The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined. The words *"hereof"*, *"herein"*, and *"hereunder"* and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to time of day herein are references to Chicago, Illinois, time unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this

**Exhibit 1 - Page 47 of 131**

Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement.

Section 5.3.    *Change in Accounting Principles.*  If, after the date of this Agreement, there shall occur any change in GAAP from those used in the preparation of the financial statements referred to in Section 6.5 hereof and such change shall result in a change in the method of calculation of any financial covenant, standard or term found in this Agreement, either the Borrowers or the Required Lenders may by notice to the Lenders and the Borrowers, respectively, require that the Lenders and the Borrowers negotiate in good faith to amend such covenants, standards, and terms so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Borrowers and their Subsidiaries shall be the same as if such change had not been made.  No delay by the Borrowers or the Required Lenders in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant, standard, or term is amended in accordance with this Section 5.3, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles.  Without limiting the generality of the foregoing, the Borrowers shall neither be deemed to be in compliance with any financial covenant hereunder nor out of compliance with any financial covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

SECTION 6.      REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants to the Administrative Agent, the L/C Issuer and the Lenders as follows:

Section 6.1.    *Organization and Qualification.*  Each Borrower is duly organized, validly existing, and in good standing as a corporation or limited partnership (as applicable) under the laws of the State of California, has full and adequate power to own its Property and conduct its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except where the failure to do so would not have a Material Adverse Effect.

Section 6.2.    *Subsidiaries.*  Each Subsidiary is duly organized, validly existing, and in good standing under the laws of the jurisdiction in which it is organized, has full and adequate power to own its Property and conduct its business as now conducted, and is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except where the failure to do so would not have a Material Adverse Effect. Schedule 6.2 hereto identifies each Subsidiary (including without limitation each Foreign Subsidiary), the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by the Borrowers and the other Subsidiaries and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of

-41-

**Exhibit 1 - Page 48 of 131**

each class issued and outstanding. All of the outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and nonassessable and all such shares and other equity interests indicated on Schedule 6.2 as owned by a Borrower or another Subsidiary are owned, beneficially and of record, by such Borrower or such Subsidiary free and clear of all Liens other than the Liens granted in favor of the Administrative Agent pursuant to the Collateral Documents. There are no outstanding commitments or other obligations of any Subsidiary to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Subsidiary.

Section 6.3. *Authority and Validity of Obligations.* Each Borrower has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for, to issue its Notes (if applicable) in evidence thereof, to grant to the Administrative Agent the Liens described in the Collateral Documents executed by such Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it. Each Subsidiary has full right and authority to enter into the Loan Documents executed by it, to guarantee the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability, to grant to the Administrative Agent the Liens described in the Collateral Documents executed by such Person, and to perform all of its obligations under the Loan Documents executed by it. The Loan Documents delivered by the Borrowers and their Subsidiaries have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of the Borrowers and their Subsidiaries enforceable against them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by any Borrower or Subsidiary of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon any Borrower or Subsidiary or any provision of the organizational documents (*e.g.*, charter, certificate or articles of incorporation and by-laws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of any Borrower or Subsidiary, (b) contravene or constitute a default under any covenant, indenture or agreement of or affecting any Borrower or Subsidiary or any of their Property, in each case where such contravention or default, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (c) result in the creation or imposition of any Lien on any Property of any Borrower or Subsidiary other than the Liens granted in favor of the Administrative Agent pursuant to the Collateral Documents.

Section 6.4. *Use of Proceeds; Margin Stock.* The Borrowers shall use the proceeds of the Term Loans and the Revolving Credit to refinance existing indebtedness, to finance Capital Expenditures, for its general working capital purposes and for such other legal and proper purposes as are consistent with all applicable laws. No Borrower or Subsidiary is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of

**Exhibit 1 - Page 49 of 131**

purchasing or carrying any such margin stock. Margin stock (as hereinabove defined) constitutes less than 25% of the assets of the Borrowers and their Subsidiaries which are subject to any limitation on sale, pledge or other restriction hereunder.

Section 6.5. *Financial Reports.* The consolidated balance sheet of the Borrowers and their Subsidiaries as at October 31, 2006, and the related consolidated statements of income, retained earnings and cash flows of the Borrowers and their Subsidiaries for the fiscal year then ended, and accompanying notes thereto, which financial statements are accompanied by the audit report of Moss Adams, independent public accountants, and the unaudited interim consolidated balance sheet of the Borrowers and their Subsidiaries as at June 30, 2007, and the related consolidated statements of income, retained earnings and cash flows of the Borrowers and their Subsidiaries for the eight (8) months then ended, heretofore furnished to the Administrative Agent and the Lenders, fairly present the consolidated financial condition of the Borrowers and their Subsidiaries as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis. No Borrower or Subsidiary has contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 8.5 hereof.

Section 6.6. *No Material Adverse Change.* Since October 31, 2006, there has been no change in the condition (financial or otherwise) or business prospects of any Borrower or Subsidiary except those occurring in the ordinary course of business, none of which individually or in the aggregate have been materially adverse.

Section 6.7. *Full Disclosure.* The statements and information furnished to the Administrative Agent and the Lenders in connection with the negotiation of this Agreement and the other Loan Documents and the commitments by the Lenders to provide all or part of the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein not misleading, the Administrative Agent and the Lenders acknowledging that as to any projections furnished to the Administrative Agent and the Lenders, the Borrowers only represent that the same were prepared on the basis of information and estimates the Borrowers believed to be reasonable.

Section 6.8. *Trademarks, Franchises, and Licenses.* The Borrowers and their Subsidiaries own, possess, or have the right to use all necessary patents, licenses, franchises, trademarks, trade names, trade styles, copyrights, trade secrets, know how, and confidential commercial and proprietary information to conduct their businesses as now conducted, without known conflict with any patent, license, franchise, trademark, trade name, trade style, copyright or other proprietary right of any other Person.

Section 6.9. *Governmental Authority and Licensing.* The Borrowers and their Subsidiaries have received all licenses, permits, and approvals of all federal, state, and local governmental authorities, if any, necessary to conduct their businesses, in each case where the failure to obtain or maintain the same could reasonably be expected to have a Material Adverse Effect. No investigation or proceeding which, if adversely determined, could reasonably be

**Exhibit 1 - Page 50 of 131**

expected to result in revocation or denial of any material license, permit or approval is pending or, to the knowledge of any Borrower, threatened.

Section 6.10.    Good Title. The Borrowers and their Subsidiaries have good and defensible title (or valid leasehold interests) to their assets as reflected on the most recent consolidated balance sheet of the Borrowers and their Subsidiaries furnished to the Administrative Agent and the Lenders (except for sales of assets in the ordinary course of business), subject to no Liens other than such thereof as are permitted by Section 8.8 hereof.

Section 6.11.    Litigation and Other Controversies. There is no litigation or governmental or arbitration proceeding or labor controversy pending, nor to the knowledge of any Borrower threatened, against any Borrower or Subsidiary or any of their Property which if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 6.12.    Taxes. All tax returns required to be filed by any Borrower or Subsidiary in any jurisdiction have, in fact, been filed, and all taxes, assessments, fees, and other governmental charges upon any Borrower or Subsidiary or upon any of its Property, income or franchises, which are shown to be due and payable in such returns, have been paid. No Borrower knows of any proposed additional tax assessment against it or its Subsidiaries for which adequate provisions in accordance with GAAP have not been made on their accounts. Adequate provisions in accordance with GAAP for taxes on the books of the Borrowers and each Subsidiary have been made for all open years, and for its current fiscal period.

Section 6.13.    Approvals. No authorization, consent, license or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by any Borrower or Subsidiary of any Loan Document.

Section 6.14.    Affiliate Transactions. No Borrower or Subsidiary is a party to any contracts or agreements with any of its Affiliates on terms and conditions which are less favorable to such Borrower or Subsidiary than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 6.15.    Investment Company. No Borrower or any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 6.16.    ERISA. Each Borrower and each other member of its Controlled Group has fulfilled its obligations under the minimum funding standards of and is in compliance in all material respects with ERISA and the Code to the extent applicable to it and has not incurred any liability to the PBGC or a Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. No Borrower or Subsidiary has any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in article 6 of Title I of ERISA.

**Exhibit 1 - Page 51 of 131**

*Section 6.17.   Compliance with Laws.*  (a)  The Borrowers and their Subsidiaries are in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to their Property or business operations (including, without limitation, the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), where any such non-compliance, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(b)   Without limiting the representations and warranties set forth in Section 6.17(a) above, except for such matters, individually or in the aggregate, which could not reasonably be expected to result in a Material Adverse Effect, each Borrower represents and warrants that: (i) the Borrowers and their Subsidiaries, and each of the Premises, comply in all material respects with all applicable Environmental Laws; (ii) the Borrowers and their Subsidiaries have obtained all governmental approvals required for their operations and each of the Premises by any applicable Environmental Law; (iii) the Borrowers and their Subsidiaries have not, and no Borrower has knowledge of any other Person who has, caused any Release, threatened Release or disposal of any Hazardous Material at, on, about, or off any of the Premises in any material quantity and, to the knowledge of any Borrower, none of the Premises are adversely affected by any Release, threatened Release or disposal of a Hazardous Material originating or emanating from any other property; (iv) none of the Premises contain and have contained any: (1) underground storage tank, (2) material amounts of asbestos containing building material, (3) landfills or dumps, (4) hazardous waste management facility as defined pursuant to RCRA or any comparable state law, or (5) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law; (v) the Borrowers and their Subsidiaries have not used a material quantity of any Hazardous Material and have conducted no Hazardous Material Activity at any of the Premises; (vi) the Borrowers and their Subsidiaries have no material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (vii) the Borrowers and their Subsidiaries are not subject to, have no notice or knowledge of and are not required to give any notice of any Environmental Claim involving any Borrower or Subsidiary or any of the Premises, and there are no conditions or occurrences at any of the Premises which could reasonably be anticipated to form the basis for an Environmental Claim against any Borrower or Subsidiary or such Premises; (viii) none of the Premises are subject to any, and no Borrower has knowledge of any imminent restriction on the ownership, occupancy, use or transferability of the Premises in connection with any (1) Environmental Law or (2) Release, threatened Release or disposal of a Hazardous Material; and (ix) there are no conditions or circumstances at any of the Premises which pose an unreasonable risk to the environment or the health or safety of Persons.

*Section 6.18.   Other Agreements.*  No Borrower or Subsidiary is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, which default if uncured could reasonably be expected to have a Material Adverse Effect.

*Section 6.19.   Solvency.*  The Borrowers and their Subsidiaries are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage.

-45-

**Exhibit 1 - Page 52 of 131**

*Section 6.20.    No Default.*  No Default or Event of Default has occurred and is continuing.

*Section 6.21.    Federal Food Security Act.*  The Borrowers and the Guarantors have received no notice given pursuant to Section 1324(e)(1) or (3) of the Federal Food Security Act and there has not been filed any financing statement or notice, purportedly in compliance with the provisions of the Federal Food Security Act, purporting to perfect a security interest in farm products purchased by any Borrower or Guarantor in favor of a secured creditor of the seller of such farm products.  The Borrowers and the Guarantors have registered, pursuant to Section 1324(c)(2)(D) of the Federal Food Security Act, with the Secretary of State of each State in which are produced farm products purchased by any Borrower or Guarantor, respectively, and which has established or hereafter establishes a central filing system, as a buyer of farm products produced in such State; and each such registration is in full force and effect.

SECTION 7.    CONDITIONS PRECEDENT.

The obligation of each Lender to advance, continue or convert any Loan (other than the continuation of, or conversion into, a Base Rate Loan) or of the L/C Issuer to issue, extend the expiration date (including by not giving notice of non-renewal) of or increase the amount of any Letter of Credit under this Agreement, shall be subject to the following conditions precedent:

*Section 7.1.    All Credit Events.*  At the time of each Credit Event hereunder:

(a)    each of the representations and warranties set forth herein and in the other Loan Documents shall be and remain true and correct as of said time, except to the extent the same expressly relate to an earlier date;

(b)    no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Credit Event;

(c)    in the case of a Borrowing the Administrative Agent shall have received the notice required by Section 1.6 hereof, in the case of the issuance of any Letter of Credit the L/C Issuer shall have received a duly completed Application for such Letter of Credit together with any fees called for by Section 2.1 hereof, and, in the case of an extension or increase in the amount of a Letter of Credit, a written request therefor in a form acceptable to the L/C Issuer together with fees called for by Section 2.1 hereof; and

(d)    such Credit Event shall not violate any order, judgment or decree of any court or other authority or any provision of law or regulation applicable to the Administrative Agent, the L/C Issuer, or any Lender (including, without limitation, Regulation U of the Board of Governors of the Federal Reserve System) as then in effect.

Each request for a Borrowing hereunder and each request for the issuance of, increase in the amount of, or extension of the expiration date of, a Letter of Credit shall be deemed to be a representation and warranty by the Borrowers on the date on such Credit Event as to the facts specified in subsections (a) through (c), both inclusive, of this Section.

**Exhibit 1 - Page 53 of 131**

*Section 7.2.* *Initial Credit Event.* Before or concurrently with the initial Credit Event:

(a) the Administrative Agent shall have received for each Lender this Agreement duly executed by the Borrowers, the Guarantor, and the Lenders;

(b) the Administrative Agent shall have received for each Lender requesting a Note, such Lender's duly executed Notes of the Borrowers dated the date hereof and otherwise in compliance with the provisions of Section 1.11 hereof;

(c) the Administrative Agent shall have received the supplements to the Mortgages and the Security Agreement duly executed by the Borrowers and the Guarantor, together with (i) original stock certificates or other similar instruments or securities representing all of the issued and outstanding shares of capital stock or other equity interests in each Domestic Subsidiary as of the Closing Date, (ii) stock powers for the Collateral consisting of the stock or other equity interest in each Domestic Subsidiary executed in blank and undated, (iii) UCC financing statements to be filed against the Borrowers and the Guarantor, as debtor, in favor of the Administrative Agent, as secured party, (iv) patent, trademark, and copyright collateral agreements to the extent requested by the Administrative Agent, and (v) deposit account, securities account, and commodity account control agreements to the extent requested by the Administrative Agent;

(d) the Administrative Agent shall have received evidence of insurance required to be maintained under the Loan Documents, naming the Administrative Agent as mortgagee and lender's loss payee;

(e) the Administrative Agent shall have received for each Lender copies of each Borrower's and the Guarantor's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, certified in each instance by its Secretary or Assistant Secretary;

(f) the Administrative Agent shall have received for each Lender copies of resolutions of each Borrower's and the Guarantor's Board of Directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, together with specimen signatures of the persons authorized to execute such documents on each Borrower's and the Guarantor's behalf, all certified in each instance by its Secretary or Assistant Secretary;

(g) the Administrative Agent shall have received for each Lender copies of the certificates of good standing for each Borrower and the Guarantor (dated no earlier than 30 days prior to the date hereof) from the office of the secretary of the state of its incorporation or organization and of each state in which it is qualified to do business as a foreign corporation or organization;

(h) the Administrative Agent shall have received for each Lender a list of the Borrowers' Authorized Representatives;

**Exhibit 1 - Page 54 of 131**

(i) the Administrative Agent shall have received for itself and for the Lenders the initial fees called for by Section 2.1 hereof;

(j) the Administrative Agent shall have received a mortgagee's title insurance policy (or date down endorsements for existing title insurance policies), or a binding commitment therefor, in form and substance acceptable to the Administrative Agent from a title insurance company acceptable to the Administrative Agent insuring the Lien of the Mortgages to be valid first priority Liens subject to no defects or objections which are unacceptable to the Administrative Agent, together with such endorsements as the Administrative Agent may require;

(k) the Administrative Agent shall have received a survey in form and substance acceptable to the Administrative Agent prepared by a licensed surveyor on each parcel of real property subject to the Lien of the Mortgages, which survey shall also state whether or not any portion of the real property is in a federally designated flood hazard area;

(l) the Administrative Agent shall have received a report of an independent firm of environmental engineers acceptable to the Administrative Agent concerning the environmental hazards and matters with respect to the parcels of real property subject to the Lien of the Mortgages, together with a reliance letter thereon acceptable to the Administrative Agent;

(m) the Administrative Agent shall have received an appraisal report prepared for the Administrative Agent by a state certified appraiser selected by the Administrative Agent, which appraisal report describes the fair market value of the property subject to the Lien of the Mortgages and otherwise meets the requirements of applicable law for appraisals prepared for federally insured depository institutions;

(n) no Material Adverse Effect shall have occurred since October 31, 2006;

(o) the Administrative Agent shall have received financing statement, tax, and judgment lien search results against the Property of the Borrowers and the Guarantor evidencing the absence of Liens on its Property except as permitted by Section 8.8 hereof;

(p) the Administrative Agent shall have received for each Lender the favorable written opinion of counsel to the Borrowers and the Guarantor, in form and substance satisfactory to the Administrative Agent;

(q) SK Foods shall have delivered to the Administrative Agent a waiver of any existing defaults under the JPMorgan Agreements, such waiver to be in form and substance satisfactory to the Administrative Agent;

(r) the Administrative Agent shall have received pay-off and lien release letters from secured creditors of the Borrowers and each Subsidiary setting forth, among

-48-

**Exhibit 1 - Page 55 of 131**

other things, the total amount of indebtedness outstanding and owing to them (or outstanding letters of credit issued for the account of any Borrower or Subsidiary) and containing an undertaking to cause to be delivered to the Administrative Agent UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of each Borrower and Subsidiary, which pay-off and lien release letters shall be in form and substance acceptable to the Administrative Agent;

(s)   the Administrative Agent shall have received such evaluations and certifications as it may reasonably require (including (i) a Borrowing Base Certificate in the form attached hereto as Exhibit E containing calculations of the Borrowing Base after giving effect to the Initial Credit Event and (ii) a Compliance Certificate in the form of Exhibit F hereto showing (A) EBITDA for the 12 month period ended July 31, 2007, of at least $24,500,000 and (B) the Leverage Ratio for the twelve month period ended July 31, 2007, of not more than 5.25 to 1.00, each calculated as if the indebtedness incurred on the Closing Date were incurred on the first day of such 12-month period and on a *pro forma* basis after giving effect to the initial Credit Event);

(t)   Liens on the Collateral in favor of the Administrative Agent shall have been perfected in a manner satisfactory to Administrative Agent;

(u)   the Administrative Agent shall have received from the Borrowers an organizational chart evidencing the capital and organizational structure of the Borrowers and their Subsidiaries which structure shall be satisfactory to the Administrative Agent and the Lenders;

(v)   the Administrative Agent shall have completed its due diligence on the Borrowers and their Subsidiaries, including receipt of appraisals on the fixed assets of the Borrowers and their Subsidiaries in excess of current appraised values, which such appraisals shall be in form and substance acceptable to the Administrative Agent;

(w)   the Administrative Agent shall have received (i) audited financial statements of the Borrowers and their Subsidiaries for the period ended October 31, 2006, (ii) unaudited financial statements of the Borrowers and their Subsidiaries for the period ended June 30, 2007 and (iii) five year financial projections for the Borrowers and their Subsidiaries (including monthly financial projections for year one and quarterly financial projections for year two and year three), each in form and substance satisfactory to the Administrative Agent;

(x)   the Administrative Agent shall have received subordination agreements from the holders of the Subordinated Debt together with copies of all documents evidencing such Subordinated Debt, each such agreement and document to be in form and substance acceptable to the Administrative Agent;

(y)   after giving effect to the initial Credit Event, there shall be at least $10,000,000 in Unused Revolving Credit Commitments and Excess Availability,

Exhibit 1 - Page 56 of 131

provided, that accounts payables are at historically normal levels reasonably acceptable to the Administrative Agent; and

(z)     the Administrative Agent shall have received for the account of the Lenders such other agreements, instruments, documents, certificates, and opinions as the Administrative Agent may reasonably request.

SECTION 8.     COVENANTS.

Each Borrower agrees that, so long as any credit is available to or in use by any Borrower hereunder, except to the extent compliance in any case or cases is waived in writing pursuant to the terms of Section 13.13 hereof:

*Section 8.1.     Maintenance of Business.*   Each Borrower shall, and shall cause each Subsidiary to, preserve and maintain its existence.  Each Borrower shall, and shall cause each Subsidiary to, preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect.

*Section 8.2.     Maintenance of Properties.*   Each Borrower shall, and shall cause each Subsidiary to, maintain, preserve, and keep its property, plant, and equipment in good repair, working order and condition (ordinary wear and tear excepted), and shall from time to time make all needful and proper repairs, renewals, replacements, additions, and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained, except to the extent that, in the reasonable business judgment of such Person, any such Property is no longer necessary for the proper conduct of the business of such Person.

*Section 8.3.     Taxes and Assessments.*   Each Borrower shall duly pay and discharge, and shall cause each Subsidiary to duly pay and discharge, all taxes, rates, assessments, fees, and governmental charges upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

*Section 8.4.     Insurance.*   Each Borrower and Subsidiary will maintain insurance with insurers recognized as financially sound and reputable by prudent business persons in such forms and amounts and against such risks as is usually carried by companies engaged in similar business and owning similar Properties in the same general areas in which such Borrower or Subsidiary operates, but in any event in an amount not less than the amount included in the Borrowing Base on account of Eligible Inventory.  The Administrative Agent shall be named as mortgagee and lender's loss payee under any insurance policies which relate to the Borrowers.  Each Borrower and Subsidiary shall, at the Administrative Agent's request, provide copies to the Administrative Agent of all insurance policies and other material related thereto maintained by such Borrower or Subsidiary from time to time.

Exhibit 1 - Page 57 of 131

*Section 8.5.* *Financial Reports.* Each Borrower shall, and shall cause each Subsidiary to, maintain a standard system of accounting in accordance with GAAP and shall furnish to the Administrative Agent, each Lender and each of their duly authorized representatives such information respecting the business and financial condition of each Borrower and Subsidiary as the Administrative Agent or such Lender may reasonably request; and without any request, shall furnish to the Administrative Agent and the Lenders:

(a)   as soon as available, and in any event within 15 days after the last day of each calendar month, a Borrowing Base Certificate showing the computation of the Borrowing Base in reasonable detail as of the close of business on the last day of such month, together with an accounts receivable and accounts payable aging, prepared by the Borrowers and certified to by its chief financial officer or another officer of the Borrowers acceptable to the Administrative Agent;

(b)   as soon as available, and in any event within 45 days after the last day of each fiscal month of the Borrowers (commencing with the fiscal month ended August 31, 2007), duplicate copies of:

(i)   a consolidated balance sheet of the Borrowers and each of their Subsidiaries (other than SK Foods, LLC) as at the end of such month;

(ii)   consolidated statements of income and changes in equity of the Borrowers and each of their Subsidiaries (other than SK Foods, LLC), for such month and (in the case of the second through eleventh months) for the portion of the fiscal year ending with such month; and

(iii)   cash flows of the Borrowers and each of their Subsidiaries (other than SK Foods, LLC) for such month and (in the case of the second through eleventh months) for the portion of the fiscal year ending with such month;

setting forth in each case in comparative form the figures for the corresponding periods in the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP applicable to monthly financial statements generally;

(c)   as soon as available, and in any event within 105 days after the last day of each fiscal year of the Borrowers a copy of the consolidated and consolidating balance sheet of the Borrowers and their Subsidiaries as of the last day of the fiscal year then ended and the consolidated and consolidating statements of income, retained earnings, and cash flows of the Borrowers and their Subsidiaries for the fiscal year then ended, and accompanying notes and schedules thereto (including but not limited to schedules in the form of the monthly reports provided in accordance with clause (b) above), each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied by an unqualified opinion of Moss Adams or another firm of independent public accountants of recognized standing, selected by the Borrowers and reasonably satisfactory to the Administrative Agent and the Required Lenders, to the effect that the consolidated financial statements have been prepared in accordance with GAAP and

-51-

**Exhibit 1 - Page 58 of 131**

present fairly in accordance with GAAP the consolidated financial condition of the Borrowers and their Subsidiaries as of the close of such fiscal year and the results of their operations and cash flows for the fiscal year then ended and that an examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, such examination included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances;

(d)     within the period provided in subsection (c) above, the written statement of the accountants who certified the audit report thereby required that in the course of their audit they have obtained no knowledge of any Default or Event of Default, or, if such accountants have obtained knowledge of any such Default or Event of Default, they shall disclose in such statement the nature and period of the existence thereof;

(e)     promptly after receipt thereof, any additional written reports, management letters or other detailed information contained in writing concerning significant aspects of any Borrower's or Subsidiary's operations and financial affairs given to it by its independent public accountants;

(f)     as soon as available, and in any event within 60 days after the end of each fiscal year of the Borrowers, a copy of the Borrowers' consolidated budget for the next two fiscal years, such budget to show the Borrowers' projected consolidated revenues, expenses and balance sheet on a quarterly basis, such budget to be in reasonable detail prepared by the Borrowers and in form satisfactory to the Administrative Agent and the Required Lenders (which shall include a summary of all assumptions made in preparing such budget);

(g)     notice of any Change of Control;

(h)     promptly after knowledge thereof shall have come to the attention of any responsible officer of any Borrower, written notice of (i) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against any Borrower or Subsidiary or any of their Property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect, (ii) the occurrence of any Default or Event of Default hereunder and (iii) the occurrence or existence of any event or condition that would reasonably be expected to have a Material Adverse Effect; and

(i)     with each of the financial statements furnished to the Lenders pursuant to subsections (b) (for the months ending March, June, September and December of each year) and (c) above, a written certificate (a *"Compliance Certificate"*) in the form attached hereto as Exhibit F signed by the chief financial officer of the Borrowers or another officer of the Borrowers acceptable to the Administrative Agent to the effect that to the best of such officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying the action, if any, taken by any Borrower or Subsidiary

to remedy the same. Such certificate shall also set forth the calculations supporting such statements in respect of Section 8.22 hereof.

Section 8.6. *Inspection.* Each Borrower shall, and shall cause each Subsidiary to, permit the Administrative Agent, each Lender, and each of their duly authorized representatives and agents to visit and inspect any of its Property, corporate books, and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision each Borrower hereby authorizes such accountants to discuss with the Administrative Agent and such Lenders the finances and affairs of such Borrower and its Subsidiaries) at such reasonable times and intervals as the Administrative Agent or any such Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to the Borrowers and.

Section 8.7. *Borrowings and Guaranties.* Each Borrower shall not, nor shall it permit any Subsidiary to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or be or become liable as endorser, guarantor, surety or otherwise for any debt, obligation or undertaking of any other Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any other Person; *provided, however,* that the foregoing shall not restrict nor operate to prevent:

(a)    the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability of the Borrowers and their Subsidiaries owing to the Administrative Agent, the Lenders (and their Affiliates) the Funds Transfer Lenders and the Hedging Lenders;

(b)    purchase money indebtedness and Capitalized Lease Obligations of the Borrowers and their Subsidiaries owing to JPMorgan Chase Bank N.A. pursuant to the JPMorgan Agreements or any other financial institution acceptable to the Administrative Agent in an amount not to exceed $25,000,000 in the aggregate at any one time outstanding;

(c)    obligations of the Borrowers arising out of interest rate, foreign currency, and commodity hedging agreements entered into with financial institutions in the ordinary course of business;

(d)    endorsement of items for deposit or collection of commercial paper received in the ordinary course of business;

(e)    unsecured indebtedness owing by one Borrower to the other Borrower;

(f)    intercompany loans and advances set forth on Schedule 8.7 hereto;

-53-

Exhibit 1 - Page 60 of 131

(g)     the Subordinated Debt; and

(h)     Indebtedness for Borrowed Money of the Borrowers and their Subsidiaries not otherwise permitted by this Section in an amount not to exceed $2,500,000 in the aggregate at any one time outstanding *provided* that such Indebtedness for Borrowed Money is not secured by a Lien on any Property of the Borrowers or any of their Subsidiaries.

*Section 8.8.     Liens.* No Borrower shall, nor shall it permit any Subsidiary to, create, incur or permit to exist any Lien of any kind on any Property owned by any such Person; *provided, however,* that the foregoing shall not apply to nor operate to prevent:

(a)     Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges (other than Liens arising under ERISA), good faith cash deposits in connection with tenders, contracts or leases to which any Borrower or Subsidiary is a party or other cash deposits required to be made in the ordinary course of business, provided in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(b)     mechanics', workmen's, materialmen's, landlords', carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

(c)     the pledge of assets for the purpose of securing an appeal, stay or discharge in the course of any legal proceeding, *provided* that the aggregate amount of liabilities of the Borrowers and their Subsidiaries secured by a pledge of assets permitted under this subsection, including interest and penalties thereon, if any, shall not be in excess of $50,000 at any one time outstanding;

(d)     Liens on equipment of any Borrower or Subsidiary created solely for the purpose of securing indebtedness permitted by Section 8.7(b) hereof, representing or incurred to finance the purchase price of such Property, *provided* that no such Lien shall extend to or cover other Property of such Borrower or Subsidiary other than the respective Property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

(e)     any interest or title of a lessor under any operating lease; and

(f)     Liens granted in favor of the Administrative Agent pursuant to the Collateral Documents.

**Exhibit 1 - Page 61 of 131**

Section 8.9.    *Investments, Acquisitions, Loans and Advances.*  No Borrower shall, nor shall it permit any Subsidiary to, directly or indirectly, make, retain or have outstanding any investments (whether through purchase of stock or obligations or otherwise) in, or loans or advances to (other than for travel advances and other similar cash advances made to employees in the ordinary course of business), any other Person, or acquire all or any substantial part of the assets or business of any other Person or division thereof; *provided, however,* that the foregoing shall not apply to nor operate to prevent:

(a)    investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America, provided that any such obligations shall mature within one year of the date of issuance thereof;

(b)    investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof;

(c)    investments in certificates of deposit issued by any Lender or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)    investments in repurchase obligations with a term of not more than 7 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (c) above, provided all such agreements require physical delivery of the securities securing such repurchase agreement, except those delivered through the Federal Reserve Book Entry System;

(e)    investments in money market funds that invest solely, and which are restricted by their respective charters to invest solely, in investments of the type described in the immediately preceding subsections (a), (b), (c), and (d) above;

(f)    advances to the Fred Salyer Irrevocable Trust (the *"Trust"*) for the sole purpose of making scheduled premium payments on the whole life insurance policy issued by The Prudential Insurance Company of America and identified as Policy Number 79 759 734;

(g)    intercompany loans and advances set forth on Schedule 8.7 hereto;

(h)    unsecured intercompany loans and advances from any Subsidiary to a Borrower; and

(i)    other investments, loans, and advances in addition to those otherwise permitted by this Section in an amount not to exceed 1,000,000 in the aggregate at any one time outstanding.

In determining the amount of investments, acquisitions, loans, and advances permitted under this Section, investments and acquisitions shall always be taken at the original cost thereof

-55-

**Exhibit 1 - Page 62 of 131**

(regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

Section 8.10.    Mergers, Consolidations and Sales.  No Borrower shall, nor shall it permit any Subsidiary to, be a party to any merger or consolidation, or sell, transfer, lease or otherwise dispose of all or any part of its Property, including any disposition of Property as part of a sale and leaseback transaction, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable; provided, however, that so long as no Default or Event of Default exists (except as otherwise permitted by the Security Agreement) or would result therefrom this Section shall not apply to nor operate to prevent:

(a)    the sale or lease of inventory in the ordinary course of business;

(b)    the sale, transfer, lease or other disposition of Property of the Borrowers and their Subsidiaries to one another in the ordinary course of its business;

(c)    the merger of any Subsidiary with and into a Borrower or any other Subsidiary, provided that, in the case of any merger involving a Borrower (other than a merger of one Borrower with and into another Borrower) and a Subsidiary, the Borrower is the corporation surviving the merger;

(d)    the sale of the real property of SK Foods located in Homewood, California and Lanai, Hawaii, provided, that the Borrowers comply with Section 1.9(b)(i) hereof; and

(e)    the sale, transfer, lease or other disposition of Property of any Borrower or Subsidiary (including the disposition of any Property as part of a sale and leaseback transaction) aggregating for the Borrowers and their Subsidiaries not more than $2,000,000 during any fiscal year of the Borrowers.

Section 8.11.    Maintenance of Subsidiaries.   The Borrowers shall not assign, sell or transfer, nor shall they permit any Subsidiary to issue, assign, sell or transfer, any shares of capital stock or other equity interests of a Subsidiary; provided, however, that the foregoing shall not operate to prevent (a) Liens on the capital stock or other equity interests of Subsidiaries granted to the Administrative Agent pursuant to the Collateral Documents, and (b) the issuance, sale, and transfer to any person of any shares of capital stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary.

Section 8.12.    Dividends and Certain Other Restricted Payments.  No Borrower shall during any fiscal year (a) declare or pay any distributions to its partners or shareholders, as applicable, or (b) directly or indirectly purchase, redeem or otherwise acquire or retire any interest of any partner or shareholder in a Borrower; provided, however, that notwithstanding the foregoing: (i) for each annual fiscal period or part thereof ("Tax Year") in which a Borrower is a sub-chapter S corporation or partnership for federal income tax purposes, and so long as no Default or Event of Default has occurred and is continuing or would result from a Tax

-56-

**Exhibit 1 - Page 63 of 131**

Distribution, the Borrowers may make Tax Distributions; *provided* that in the event any Borrower has as of any date made Tax Distributions in excess of the amounts permitted hereunder, such Borrower shall reduce current and subsequent Tax Distributions by the amount of any such excess Tax Distributions; and (ii) the Borrowers may, in each fiscal year, make distributions (other than Tax Distributions) in an aggregate amount not to exceed 5% of the amount by which (x) the Borrowers' Net Income for the previous fiscal year exceeds (y) the amount of all Tax Distributions for the previous fiscal year, so long as no Default or Event of Default has occurred and is continuing or would result from such distribution; *provided, however*, that the aggregate $4,000,000 distribution made by SK Foods to one or more of its partners for tax planning purposes in January, 2007 shall be excluded for purposes of calculating compliance with this Section 8.12.

Section 8.13.    *ERISA.* The Borrowers shall, and shall cause each Subsidiary to, promptly pay and discharge all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed could reasonably be expected to result in the imposition of a Lien against any of its Property. The Borrowers shall, and shall cause each Subsidiary to, promptly notify the Administrative Agent and each Lender of: (a) the occurrence of any reportable event (as defined in ERISA) with respect to a Plan, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (c) its intention to terminate or withdraw from any Plan, and (d) the occurrence of any event with respect to any Plan which would result in the incurrence by any Borrower or Subsidiary of any material liability, fine or penalty, or any material increase in the contingent liability of any Borrower or Subsidiary with respect to any post-retirement Welfare Plan benefit.

Section 8.14.    *Compliance with Laws.* (a) The Borrowers will, and will cause each of their Subsidiaries to, comply in all material respects with all applicable laws, rules, regulations and orders, such compliance to include (without limitation) (a) the registration pursuant to the Federal Food Security Act of 1985, as amended, with the Secretary of State of each State in which are produced any farm products purchased by any Borrower and which has established a central filing system, as a buyer of farm products produced in such state, and the maintenance of each such registration, (b) compliance with all applicable rules and regulations promulgated by the United States Department of Agriculture and all similar applicable state rules and regulations, and (c) compliance with all rules and regulations promulgated pursuant to the Occupational Safety and Health Act of 1970, as amended.

(b)    Without limiting the agreements set forth in Section 8.14(a) above, the Borrowers shall, and shall cause each Subsidiary to, at all times, do the following to the extent the failure to do so, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect: (i) comply in all material respects with, and maintain each of the Premises in compliance in all material respects with, all applicable Environmental Laws; (ii) require that each tenant and subtenant, if any, of any of the Premises or any part thereof comply in all material respects with all applicable Environmental Laws; (iii) obtain and maintain in full force and effect all material governmental approvals required by any applicable Environmental Law for operations at each of the Premises; (iv) cure any material violation by it or at any of the Premises of applicable Environmental Laws; (v) not allow the presence or operation at any of the Premises of any (1) landfill or dump or (2) hazardous waste management facility or solid waste disposal facility

**Exhibit 1 - Page 64 of 131**

as defined pursuant to RCRA or any comparable state law; (vi) not manufacture, use, generate, transport, treat, store, release, dispose or handle any Hazardous Material at any of the Premises except in the ordinary course of its business and in *de minimis* amounts; (vii) within 10 Business Days notify the Administrative Agent in writing of and provide any reasonably requested documents upon learning of any of the following in connection with any Borrower or Subsidiary or any of the Premises: (1) any material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (2) any material Environmental Claim; (3) any material violation of an Environmental Law or material Release, threatened Release or disposal of a Hazardous Material; (4) any restriction on the ownership, occupancy, use or transferability arising pursuant to any (x) Release, threatened Release or disposal of a Hazardous Material or (y) Environmental Law; or (5) any environmental, natural resource, health or safety condition, which could reasonably be expected to have a Material Adverse Effect; (viii) conduct at its expense any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any material Release, threatened Release or disposal of a Hazardous Material as required by any applicable Environmental Law, (ix) abide by and observe any restrictions on the use of the Premises imposed by any governmental authority as set forth in a deed or other instrument affecting any Borrower's or Subsidiary's interest therein; (x) promptly provide or otherwise make available to the Administrative Agent any reasonably requested environmental record concerning the Premises which any Borrower or Subsidiary possesses or can reasonably obtain; and (xi) perform, satisfy, and implement any operation or maintenance actions required by any governmental authority or Environmental Law, or included in any no further action letter or covenant not to sue issued by any governmental authority under any Environmental Law.

Section 8.15.  *Burdensome Contracts with Affiliates.*  No Borrower shall, nor shall it permit any Subsidiary to, enter into any contract, agreement or business arrangement with any of its Affiliates on terms and conditions which are less favorable to such Borrower or Subsidiary than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other.

Section 8.16.  *No Changes in Fiscal Year.*  The fiscal year of the Borrowers and their Subsidiaries ends on June 30 of each year; and the Borrowers shall not, nor shall they permit any Subsidiary to, change its fiscal year from its present basis.

Section 8.17.  *Formation of Subsidiaries.*  Promptly upon the formation or acquisition of any Subsidiary, the Borrowers shall provide the Administrative Agent and the Lenders notice thereof and timely comply with the requirements of Section 4 hereof (at which time Schedule 6.2 shall be deemed amended to include reference to such Subsidiary).  No Borrower shall, nor shall it permit any Subsidiary to, form or acquire any Foreign Subsidiary.

Section 8.18.  *Change in the Nature of Business.*  No Borrower shall, nor shall it permit any Subsidiary to, engage in any business or activity if as a result the general nature of the business of any Borrower or Subsidiary would be changed in any material respect from the general nature of the business engaged in by it as of the Closing Date.

Exhibit 1 - Page 65 of 131

Section 8.19.   *Use of Proceeds*.  The Borrowers shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, Section 6.4 hereof.

Section 8.20.   *No Restrictions*.  Except as provided herein, no Borrower shall, nor shall it permit any Subsidiary to, directly or indirectly create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Borrower or Subsidiary to:  (a) pay dividends or make any other distribution on any Subsidiary's capital stock or other equity interests owned by any Borrower or any other Subsidiary, (b) pay any indebtedness owed to any Borrower or any other Subsidiary, (c) make loans or advances to any Borrower or any other Subsidiary, (d) transfer any of its Property to any Borrower or any other Subsidiary or (e) guarantee the Obligations and/or grant Liens on its assets to the Administrative Agent as required by the Loan Documents.

Section 8.21.   *Subordinated Debt*.  No Borrower shall, nor shall it permit any Subsidiary to, (a) amend or modify any of the terms or conditions relating to Subordinated Debt, (b) make any voluntary prepayment of Subordinated Debt or effect any voluntary redemption thereof, or (c) make any payment on account of Subordinated Debt which is prohibited under the terms of any instrument or agreement subordinating the same to the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability. Notwithstanding the foregoing, (i) the Borrowers may agree to a decrease in the interest rate applicable thereto or to a deferral of repayment of any of the principal of or interest on the Subordinated Debt beyond the current due dates therefor and (ii) may make principal payments of the Subordinated Debt set forth as Items 1 and 2 on Schedule 5.1(b) hereof to the extent that (x) immediately prior to, and after giving effect to, such payment, the Total Funded Debt/EBITDA Ratio is less than 2.50 to 1.0 and (y) no Default or Event of Default has occurred and is then continuing or would arise as a result thereof.

Section 8.22.   *Financial Covenants*. (a) *Leverage Ratio*.  As of the last day of each fiscal quarter of the Borrowers ending during the relevant period set forth below, the Borrowers shall not permit the Leverage Ratio to be greater than the corresponding ratio set forth opposite such period:

| Period(s) Ending | Leverage Ratio Shall Not Be Greater Than: |
|---|---|
| From the Closing Date through and including the fiscal quarter ending on December 31, 2007 | 5.25 to 1.0 |
| From the fiscal quarter ending on January 1, 2008 through and including June 30, 2008 | 5.00 to 1.0 |
| From the fiscal quarter ending on July 1, 2008 through and including December 31, 2008 | 4.75 to 1.0 |
| From the fiscal quarter ending on January 1, | 4.50 to 1.0 |

-59-

**Exhibit 1 - Page 66 of 131**

| PERIOD(S) ENDING | LEVERAGE RATIO SHALL NOT BE GREATER THAN: |
|---|---|
| 2009 through and including June 30, 2009 | |
| July 1, 2009 through and including December 31, 2009 | 4.25 to 1.0 |
| January 1, 2010 through and including June 30, 2010 | 4.00 to 1.0 |
| July 1, 2010 through and including December 31, 2010 | 3.75 to 1.0 |
| January 1, 2011 and each fiscal quarter ending thereafter | 3.50 to 1.0 |

; *provided,* that for purposes of calculating the principal amount of Revolving Loans outstanding as of the date of determination of the Leverage Ratio, the principal amount of the Revolving Loans deemed to be outstanding shall be equal to the average of the outstanding principal amount of the Revolving Loans as the end of each day occurring in the most recent 365 or 366 (as the case may be) day period ending on the date of such calculation; *provided, however,* with respect to the relevant period set forth below, the principal amount of Revolving Loans for such periods shall be:

| MONTH ENDING | AVERAGE BALANCE |
|---|---|
| October 31, 2006 | $17,704,142.16 |
| November 30, 2006 | $12,045,196.81 |
| December 31, 2006 | $11,516,719.89 |
| January 31, 2007 | $10,360,058.89 |
| February 28, 2007 | $12,407,632.38 |
| March 31, 2007 | $10,525,612.08 |
| April 30, 2007 | $10,525,612.08 |
| May 31, 2007 | $10,587,755.88 |
| June 30, 2007 | $13,043,170.72 |
| July 31, 2007 | $17,215,108.55 |

**Exhibit 1 - Page 67 of 131**

| August 31, 2007 | $34,894,637.19 |
| September 30, 2007 | $61,517,435 |

(b)  *Fixed Charge Coverage Ratio.*  As of the last day of each fiscal quarter of the Borrowers ending during the relevant period set forth below, the Borrowers shall not permit the ratio of (i) EBITDA for the four fiscal quarters of the Borrower then ended less Capital Expenditures not financed with Indebtedness for Borrowed Money permitted by Section 8.7(b) hereof during the same four fiscal quarters (provided that for purposes of calculating compliance with this Section 8.22(b) for any period that includes the fiscal quarters ended December 31, 2006, March 31, 2007, June 30, 2007 or September 30, 2007, Capital Expenditures shall be deemed equal to $1,312,500 for each such fiscal quarter) to (ii) Fixed Charges for the same four fiscal quarters then ended to be less than the corresponding ratio set forth opposite below:

| PERIOD(S) ENDING | FIXED CHARGE COVERAGE RATIO SHALL NOT BE LESS THAN: |
|---|---|
| From the Closing Date through and including the fiscal quarter ending on June 30, 2008 | 1.20 to 1.0 |
| From the fiscal quarter ending on September 30, 2008 and each fiscal quarter ending thereafter | 1.25 to 1.0 |

(c)  *Capital Expenditures.*  No Borrower shall, nor shall it permit any of its Domestic Subsidiaries to, incur Capital Expenditures in an amount in excess of $7,500,000 in the aggregate during any fiscal year. Notwithstanding the foregoing, an amount equal to 75% of the aggregate unused portion of the Capital Expenditure allowance for any fiscal year may be carried forward to the immediately succeeding fiscal year only to be used in such fiscal year.

(d)  *Rentals.*  No Borrower shall, nor shall it permit any Subsidiary to, create, incur or suffer to exist obligations for Lease Rentals payable during any fiscal year of the Borrowers in excess of $6,000,000 in the aggregate for such fiscal year.

Section 8.23.  *Transactions with Affiliates.*  No Borrower shall, nor shall it permit any Subsidiary to, enter into directly or indirectly any transaction or group of related transactions (including without limitation the purchase, lease, sale or exchange of Property of any kind or the rendering of any service) with any Affiliate (other than as between a Borrower and a Subsidiary of such Borrower), except in the ordinary course and pursuant to the reasonable requirements of such Borrower's or Subsidiary's business and upon fair and reasonable terms no less favorable to such Borrower or Subsidiary than would be obtainable in a comparable arm's-length transaction with a Person not an Affiliate.

**Exhibit 1 - Page 68 of 131**

Section 8.24.    *Line of Business*.  The Borrowers will not and will not permit any Subsidiary to engage in any business if, as a result, the general nature of the business in which the Borrowers and each of their Subsidiaries, taken as a whole, would then be engaged would be substantially changed from the general nature of the business in which the Borrowers and each of their Subsidiaries, taken as a whole, are engaged on the date of this Agreement.

Section 8.25.    *Required Hedging*.  Not later than 60 days after the Closing Date, the Borrowers will enter into one or more interest rate hedging agreements with one or more financial institutions reasonably acceptable to the Administrative Agent, providing for a fixed rate of interest on a notional amount of at least 50% of the principal amount of the Term Loans scheduled to be outstanding for a minimum of three years after the Closing Date.

Section 8.26.    *Deposit Accounts*.  The Borrowers shall maintain all deposit accounts (other than those accounts set forth in Section 4.2 hereof) with the Administrative Agent, Harris N.A., any Lender hereunder or with other financial institutions selected by the Borrowers and reasonably acceptable to the Administrative Agent (which financial institutions have entered into reasonably acceptable account control agreements with the Administrative Agent relating to such accounts), pursuant to arrangements under which the balance of collected funds standing on deposit in such accounts maintained with such other financial institutions are transmitted to one or more collections accounts at the Administrative Agent, except to such accounts specifically set forth in Section 4.2 hereof.

Section 8.27.    *Patriot Act*.  Each Borrower shall (a) ensure, and cause each Subsidiary to ensure, that no Person who owns a controlling interest in or otherwise controls any Borrower or Subsidiary is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Asset Control (*"OFAC"*), the United States Department of Treasury, or included in any Executive Orders, (b) not to use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act (*"BSA"*) laws and regulations, as amended.

Section 8.28.    *Post-Closing Covenants*.  (a) Not later than 45 days after the Closing Date, the Borrowers shall deliver to the Administrative Agent and the Required Lenders a draft of the audited financial statements of the Borrowers for the fiscal year ended June 30, 2007 (together with a Compliance Certificate for such period) in form and substance required by Section 8.5(c) hereof and not later than 60 days after the Closing Date, the Borrowers shall deliver to the Administrative Agent and the Required Lenders the final audited financial statements of the Borrower for such fiscal year end, in form and substance required by Section 8.5(c) hereof.

(b)    Not later than 60 days after the Closing Date, the Borrowers shall deliver to the Administrative Agent fully executed warehouse agreements and landlord waivers for each location of the Collateral not owned by the Borrower and the Guarantor, each in form and substance satisfactory to the Administrative Agent, except with respect to any such location for which the Administrative Agent has imposed a reserve against the Borrowing Base.

**Exhibit 1 - Page 69 of 131**

(c)     Not later than 15 days after the Closing Date, the Borrowers shall deliver to the Administrative Agent a fully executed amendment to the JPMorgan Agreements in form and substance satisfactory to the Administrative Agent.

(d)     Not later than 15 days after the Closing Date, the Borrowers shall deliver to the Administrative Agent a date down endorsement with respect to the Lemoore, California Property which complies with the requirements of Section 7.2(j) hereof.

*Section 8.29.     Disposition of Foreign Subsidiaries.*  Upon disposition of any Foreign Subsidiary by SK Foods International (*"International"*), SK Foods shall cause International to apply the Net Cash Proceeds of such disposition to the repayment of outstanding intercompany indebtedness owing from International to SK Foods.  Upon receipt of any such Net Cash Proceeds by SK Foods, SK Foods shall immediately apply such proceeds as and for a mandatory prepayment of the Obligations in accordance with Section 1.9(b)(iii) hereof.

*Section 8.30.     Affiliate Payables.*  SK Foods shall not repay or otherwise retire any amounts set forth as *"Related party payables"* on its unaudited financial statements for the calendar month ended July 31, 2007 without the prior written consent of the Required Lenders.

SECTION 9.     EVENTS OF DEFAULT AND REMEDIES.

*Section 9.1.     Events of Default.*  Any one or more of the following shall constitute an *"Event of Default"* hereunder:

(a)     default in the payment when due of all or any part of the principal of or interest on any Note (whether at the stated maturity thereof or at any other time provided for in this Agreement) or of any Reimbursement Obligation or of any fee or other Obligation payable hereunder or under any other Loan Document;

(b)     default in the observance or performance of any covenant set forth in Sections 7.3, 8.1, 8.5, 8.7, 8.8, 8.9, 8.10, 8.11, 8.12, 8.15, 8.20, 8.21, 8.22, 8.24, 8.25, 8.26, 8.27, 8.28, 8.29 or 8.30 hereof or of any provision in any Loan Document dealing with the use, disposition or remittance of the proceeds of Collateral or requiring the maintenance of insurance thereon;

(c)     default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) written notice thereof is given to any Borrower by the Administrative Agent;

(d)     any representation or warranty made herein or in any other Loan Document or in any certificate furnished to the Administrative Agent or the Lenders pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any material respect as of the date of the issuance or making or deemed making thereof;

-63-

**Exhibit 1 - Page 70 of 131**

(e)     any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Administrative Agent in any Collateral purported to be covered thereby except as expressly permitted by the terms thereof, or any Subsidiary takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder;

(f)     default shall occur under any Indebtedness for Borrowed Money issued, assumed or guaranteed by any Borrower or Subsidiary aggregating in excess of $5,000,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise);

(g)     any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against any Borrower or Subsidiary, or against any of its Property, in an aggregate amount in excess of $250,000 (except to the extent fully covered by insurance pursuant to which the insurer has accepted liability therefor in writing), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days;

(h)     any Borrower or Subsidiary, or any member of its Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $250,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $250,000 (collectively, a *"Material Plan"*) shall be filed under Title IV of ERISA by any Borrower or Subsidiary, or any other member of its Controlled Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against any Borrower or Subsidiary, or any member of its Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated;

(i)     any Change of Control shall occur;

(j)     any Borrower or Subsidiary shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, or any analogous action is taken under any other applicable law relating to bankruptcy or insolvency, (ii) not pay, or admit in writing its inability to pay, its debts generally as they

-64-

**Exhibit 1 - Page 71 of 131**

become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, or institute any analogous action under any other applicable law to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 9.1(k) hereof; or

(k)      a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Borrower or Subsidiary, or any substantial part of any of its Property, or a proceeding described in Section 9.1(j)(v) shall be instituted against any Borrower or Subsidiary, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days; or

(l)      dissolution or termination of the existence of any Borrower or Subsidiary shall occur; or

(m)      Scott Salyer shall cease to act as Chief Executive Officer of SK Foods and be actively involved in the day-to-day management of any Borrower for a period in excess of 90 consecutive days and a successor acceptable to the Required Lenders has not been appointed Chief Executive Officer has not been appointed within such 90 day period;

(n)      any default or event of default shall occur under any Subordinated Debt; or

(o)      any subordination agreement delivered in connection with the Subordinated Debt shall for any reason not be or shall cease to be in full force and effect or is declared null and void, or any party thereto (other than the Administrative Agent) takes any action for the purpose of repudiating or rescinding such agreement or any of its obligations thereunder.

*Section 9.2.     Non-Bankruptcy Defaults.*  When any Event of Default other than those described in subsection (j) or (k) of Section 9.1 hereof has occurred and is continuing, the Administrative Agent shall, by written notice to the Borrowers:  (a) if so directed by the Required Lenders, terminate the remaining Commitments and all other obligations of the Lenders hereunder on the date stated in such notice (which may be the date thereof); (b) if so directed by the Required Lenders, declare the principal of and the accrued interest on all outstanding Loans to be forthwith due and payable and thereupon all outstanding Loans, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under the Loan Documents without further demand,

**Exhibit 1 - Page 72 of 131**

presentment, protest or notice of any kind; and (c) if so directed by the Required Lenders, demand that the Borrowers immediately pay to the Administrative Agent the full amount then available for drawing under each or any Letter of Credit, and the Borrowers agrees to immediately make such payment and acknowledges and agrees that the Lenders would not have an adequate remedy at law for failure by the Borrowers to honor any such demand and that the Administrative Agent, for the benefit of the Lenders, shall have the right to require the Borrowers to specifically perform such undertaking whether or not any drawings or other demands for payment have been made under any Letter of Credit. The Administrative Agent, after giving notice to the Borrowers pursuant to Section 9.1(c) or this Section 9.2, shall also promptly send a copy of such notice to the other Lenders, but the failure to do so shall not impair or annul the effect of such notice.

Section 9.3. *Bankruptcy Defaults.* When any Event of Default described in subsections (j) or (k) of Section 9.1 hereof has occurred and is continuing, then all outstanding Loans shall immediately become due and payable together with all other amounts payable under the Loan Documents without presentment, demand, protest or notice of any kind, the obligation of the Lenders to extend further credit pursuant to any of the terms hereof shall immediately terminate and the Borrowers shall immediately pay to the Administrative Agent the full amount then available for drawing under all outstanding Letters of Credit, the Borrowers acknowledging and agreeing that the Lenders would not have an adequate remedy at law for failure by the Borrowers to honor any such demand and that the Lenders, and the Administrative Agent on their behalf, shall have the right to require the Borrowers to specifically perform such undertaking whether or not any draws or other demands for payment have been made under any of the Letters of Credit.

Section 9.4. *Collateral for Undrawn Letters of Credit.* (a) If the prepayment of the amount available for drawing under any or all outstanding Letters of Credit is required under Section 1.9(b) or under Section 9.2 or 9.3 above, the Borrowers shall forthwith pay the amount required to be so prepaid, to be held by the Administrative Agent as provided in subsection (b) below.

(b) All amounts prepaid pursuant to subsection (a) above shall be held by the Administrative Agent in one or more separate collateral accounts (each such account, and the credit balances, properties, and any investments from time to time held therein, and any substitutions for such account, any certificate of deposit or other instrument evidencing any of the foregoing and all proceeds of and earnings on any of the foregoing being collectively called the *"Collateral Account"*) as security for, and for application by the Administrative Agent (to the extent available) to, the reimbursement of any payment under any Letter of Credit then or thereafter made by the Administrative Agent, and to the payment of the unpaid balance of all other Obligations (and to all Hedging Liability and Funds Transfer and Deposit Account Liability). The Collateral Account shall be held in the name of and subject to the exclusive dominion and control of the Administrative Agent for the benefit of the Administrative Agent, the Lenders, and the L/C Issuer. If and when requested by the Borrowers, the Administrative Agent shall invest funds held in the Collateral Account from time to time in direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America with a remaining maturity of one year or less, *provided* that the

Administrative Agent is irrevocably authorized to sell investments held in the Collateral Account when and as required to make payments out of the Collateral Account for application to amounts due and owing from the Borrowers to the L/C Issuer, the Administrative Agent or the Lenders; *provided, however,* that (i) if the Borrowers shall have made payment of all obligations referred to in subsection (a) above required under Section 1.9(b) hereof, at the request of the Borrowers the Administrative Agent shall release to the Borrowers amounts held in the Collateral Account so long as at the time of the release and after giving effect thereto no Default or Event of Default exists, and (ii) if the Borrowers shall have made payment of all obligations referred to in subsection (a) above required under Section 9.2 or 9.3 hereof, so long as no Letters of Credit, Commitments, Loans or other Obligations, Hedging Liability, or Funds Transfer and Deposit Account Liability remain outstanding, at the request of the Borrowers the Administrative Agent shall release to the Borrowers any remaining amounts held in the Collateral Account.

, *Section 9.5. Notice of Default.* The Administrative Agent shall give notice to the Borrowers under Section 9.1(c) hereof promptly upon being requested to do so by any Lender and shall thereupon notify all the Lenders thereof.

*Section 9.6. Expenses.* The Borrowers agree to pay to the Administrative Agent and each Lender, and any other holder of any Note outstanding hereunder, all costs and expenses reasonably incurred or paid by the Administrative Agent and such Lender or any such holder, including reasonable attorneys' fees and court costs, in connection with any Default or Event of Default hereunder or in connection with the enforcement of any of the Loan Documents (including all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving any Borrower or Subsidiary as a debtor thereunder).

SECTION 10.    CHANGE IN CIRCUMSTANCES.

*Section 10.1. Change of Law.* Notwithstanding any other provisions of this Agreement or any other Loan Document, if at any time any change in applicable law or regulation or in the interpretation thereof makes it unlawful for any Lender to make or continue to maintain any Eurodollar Loans or to perform its obligations as contemplated hereby, such Lender shall promptly give notice thereof to the Borrowers and such Lender's obligations to make or maintain Eurodollar Loans under this Agreement shall be suspended until it is no longer unlawful for such Lender to make or maintain Eurodollar Loans. The Borrowers shall prepay on demand the outstanding principal amount of any such affected Eurodollar Loans, together with all interest accrued thereon and all other amounts then due and payable to such Lender under this Agreement.

*Section 10.2. Unavailability of Deposits or Inability to Ascertain, or Inadequacy of, LIBOR.* If on or prior to the first day of any Interest Period for any Borrowing of Eurodollar Loans:

(a)    the Administrative Agent determines that deposits in U.S. Dollars (in the applicable amounts) are not being offered to it in the interbank eurodollar market for such Interest Period, or that by reason of circumstances affecting the interbank eurodollar

-67-

**Exhibit 1 - Page 74 of 131**

market adequate and reasonable means do not exist for ascertaining the applicable LIBOR, or

(b)     the Required Lenders advise the Administrative Agent that (i) LIBOR as determined by the Administrative Agent will not adequately and fairly reflect the cost to such Lenders of funding their Eurodollar Loans for such Interest Period or (ii) that the making or funding of Eurodollar Loans become impracticable,

then the Administrative Agent shall forthwith give notice thereof to the Borrowers and the Lenders, whereupon until the Administrative Agent notifies the Borrowers that the circumstances giving rise to such suspension no longer exist, the obligations of the Lenders to make Eurodollar Loans shall be suspended.

*Section 10.3.     Increased Cost and Reduced Return.* (a) If, on or after the date hereof, the adoption of any applicable law, rule or regulation, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its Lending Office) or the L/C Issuer with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency:

(i)     shall subject any Lender (or its Lending Office) or the L/C Issuer to any tax, duty or other charge with respect to its Eurodollar Loans, its Notes, its Letter(s) of Credit, or its participation in any thereof, any Reimbursement Obligations owed to it or its obligation to make Eurodollar Loans, issue a Letter of Credit, or to participate therein, or shall change the basis of taxation of payments to any Lender (or its Lending Office) or the L/C Issuer of the principal of or interest on its Eurodollar Loans, Letter(s) of Credit, or participations therein or any other amounts due under this Agreement or any other Loan Document in respect of its Eurodollar Loans, Letter(s) of Credit, any participation therein, any Reimbursement Obligations owed to it, or its obligation to make Eurodollar Loans, or issue a Letter of Credit, or acquire participations therein (except for changes in the rate of tax on the overall net income of such Lender or its Lending Office or the L/C Issuer imposed by the jurisdiction in which such Lender's or the L/C Issuer's principal executive office or Lending Office is located); or

(ii)     shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System, but excluding with respect to any Eurodollar Loans any such requirement included in an applicable Eurodollar Reserve Percentage) against assets of, deposits with or for the account of, or credit extended by, any Lender (or its Lending Office) or the L/C Issuer or shall impose on any Lender (or its Lending Office) or the L/C Issuer or on the interbank market any other condition affecting its Eurodollar Loans, its Notes, its Letter(s) of Credit, or its participation in any thereof, any Reimbursement Obligation owed to it, or its obligation to make Eurodollar Loans, or to issue a Letter of Credit, or to participate therein;

-68-

**Exhibit 1 - Page 75 of 131**

and the result of any of the foregoing is to increase the cost to such Lender (or its Lending Office) or the L/C Issuer of making or maintaining any Eurodollar Loan, issuing or maintaining a Letter of Credit, or participating therein, or to reduce the amount of any sum received or receivable by such Lender (or its Lending Office) or the L/C Issuer under this Agreement or under any other Loan Document with respect thereto, by an amount deemed by such Lender to be material, then, within 15 days after demand by such Lender (with a copy to the Administrative Agent), the Borrowers shall be obligated to pay to such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduction.

(b)  If, after the date hereof, any Lender or the Administrative Agent shall have determined that the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its Lending Office) or the L/C Issuer or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has had the effect of reducing the rate of return on such Lender's or L/C Issuer's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or the L/C Issuer or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or L/C Issuer's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender or the L/C Issuer to be material, then from time to time, within 15 days after demand by such Lender (with a copy to the Administrative Agent), the Borrowers shall pay to such Lender or the L/C Issuer, as applicable, such additional amount or amounts as will compensate such Lender for such reduction.

(c)  A certificate of a Lender or L/C Issuer claiming compensation under this Section 10.3 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive if reasonably determined. In determining such amount, such Lender or L/C Issuer may use any reasonable averaging and attribution methods.

*Section 10.4.  Lending Offices.*  Each Lender may, at its option, elect to make its Loans hereunder at the branch, office or affiliate specified on the appropriate signature page hereof (each a *"Lending Office"*) for each type of Loan available hereunder or at such other of its branches, offices or affiliates as it may from time to time elect and designate in a written notice to the Borrowers and the Administrative Agent. To the extent reasonably possible, a Lender shall designate an alternative branch or funding office with respect to its Eurodollar Loans to reduce any liability of a Borrower to such Lender under Section 10.3 hereof or to avoid the unavailability of Eurodollar Loans under Section 10.2 hereof, so long as such designation is not otherwise disadvantageous to the Lender.

*Section 10.5.  Discretion of Lender as to Manner of Funding.*  Notwithstanding any other provision of this Agreement, each Lender shall be entitled to fund and maintain its funding of all or any part of its Loans in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder with respect to Eurodollar Loans shall be made as if each Lender had actually funded and maintained each Eurodollar Loan through the

**Exhibit 1 - Page 76 of 131**

purchase of deposits in the interbank eurodollar market having a maturity corresponding to such Loan's Interest Period, and bearing an interest rate equal to LIBOR for such Interest Period.

SECTION 11.  THE ADMINISTRATIVE AGENT.

*Section 11.1.   Appointment and Authorization of Administrative Agent.*  Each Lender and L/C Issuer hereby appoints Bank of Montreal as the Administrative Agent under the Loan Documents and hereby authorizes the Administrative Agent to take such action as Administrative Agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto.  The Lenders and L/C Issuer expressly agree that the Administrative Agent is not acting as a fiduciary of the Lenders and L/C Issuer in respect of the Loan Documents, the Borrowers or otherwise, and nothing herein or in any of the other Loan Documents shall result in any duties or obligations on the Administrative Agent or any of the Lenders and L/C Issuer except as expressly set forth herein.

*Section 11.2.   Administrative Agent and its Affiliates.*  The Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise or refrain from exercising such rights and power as though it were not the Administrative Agent, and the Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Affiliate of the Borrower as if it were not the Administrative Agent under the Loan Documents.  The term *"Lender"* as used herein and in all other Loan Documents, unless the context otherwise clearly requires, includes the Administrative Agent in its individual capacity as a Lender (if applicable).

*Section 11.3.   Action by Administrative Agent.*  If the Administrative Agent receives from any Borrower a written notice of an Event of Default pursuant to Section 8.5 hereof, the Administrative Agent shall promptly give each of the Lenders and L/C Issuer written notice thereof.  The obligations of the Administrative Agent under the Loan Documents are only those expressly set forth therein.  Without limiting the generality of the foregoing, the Administrative Agent shall not be required to take any action hereunder with respect to any Default or Event of Default, except as expressly provided in Sections 9.2 and 9.5.  Upon the occurrence of an Event of Default, the Administrative Agent shall take such action to enforce its Lien on the Collateral and to preserve and protect the Collateral as may be directed by the Required Lenders.  Unless and until the Required Lenders give such direction, the Administrative Agent may (but shall not be obligated to) take or refrain from taking such actions as it deems appropriate and in the best interest of all the Lenders and L/C Issuer.  In no event, however, shall the Administrative Agent be required to take any action in violation of applicable law or of any provision of any Loan Document, and the Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder or under any other Loan Document unless it first receives any further assurances of its indemnification from the Lenders that it may require, including prepayment of any related expenses and any other protection it requires against any and all costs, expense, and liability which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall be entitled to assume that no Default or Event of Default exists unless notified in writing to the contrary by a Lender, the L/C Issuer or any Borrower.  In all

**Exhibit 1 - Page 77 of 131**

cases in which the Loan Documents do not require the Administrative Agent to take specific action, the Administrative Agent shall be fully justified in using its discretion in failing to take or in taking any action thereunder. Any instructions of the Required Lenders, or of any other group of Lenders called for under the specific provisions of the Loan Documents, shall be binding upon all the Lenders and the holders of the Obligations.

Section 11.4. *Consultation with Experts.* The Administrative Agent may consult with legal counsel, independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

Section 11.5. *Liability of Administrative Agent; Credit Decision.* Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or not taken by it in connection with the Loan Documents: (i) with the consent or at the request of the Required Lenders or, if required, all the Lenders, or (ii) in the absence of its own gross negligence or willful misconduct. Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify: (i) any statement, warranty or representation made in connection with this Agreement, any other Loan Document or any Credit Event; (ii) the performance or observance of any of the covenants or agreements of any Borrower or Subsidiary contained herein or in any other Loan Document; (iii) the satisfaction of any condition specified in Section 7 hereof, except receipt of items required to be delivered to the Administrative Agent; or (iv) the validity, effectiveness, genuineness, enforceability, perfection, value, worth or collectibility hereof or of any other Loan Document or of any other documents or writing furnished in connection with any Loan Document or of any Collateral; and the Administrative Agent makes no representation of any kind or character with respect to any such matter mentioned in this sentence. The Administrative Agent may execute any of its duties under any of the Loan Documents by or through employees, agents, and attorneys-in-fact and shall not be answerable to the Lenders, the L/C Issuer, the Borrowers, or any other Person for the default or misconduct of any such agents or attorneys-in-fact selected with reasonable care. The Administrative Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, other document or statement (whether written or oral) believed by it to be genuine or to be sent by the proper party or parties. In particular and without limiting any of the foregoing, the Administrative Agent shall have no responsibility for confirming the accuracy of any compliance certificate or other document or instrument received by it under the Loan Documents. The Administrative Agent may treat the payee of any Obligation as the holder thereof until written notice of transfer shall have been filed with the Administrative Agent signed by such payee in form satisfactory to the Administrative Agent. Each Lender and L/C Issuer acknowledges that it has independently and without reliance on the Administrative Agent or any other Lender or L/C Issuer, and based upon such information, investigations and inquiries as it deems appropriate, made its own credit analysis and decision to extend credit to the Borrowers in the manner set forth in the Loan Documents. It shall be the responsibility of each Lender to keep itself informed as to the creditworthiness of the Borrowers and their Subsidiaries, and the Administrative Agent shall have no liability to any Lender and L/C Issuer with respect thereto.

Exhibit 1 - Page 78 of 131

*Section 11.6. Indemnity.* The Lenders shall ratably, in accordance with their respective Percentages, indemnify and hold the Administrative Agent, and its directors, officers, employees, agents, and representatives harmless from and against any liabilities, losses, costs or expenses suffered or incurred by it under any Loan Document or in connection with the transactions contemplated thereby, regardless of when asserted or arising, except to the extent they are promptly reimbursed for the same by the Borrowers and except to the extent that any event giving rise to a claim was caused by the gross negligence or willful misconduct of the party seeking to be indemnified. The obligations of the Lenders under this Section shall survive termination of this Agreement. The Administrative Agent shall be entitled to offset amounts received for the account of a Lender under this Agreement against unpaid amounts due from such Lender to the Administrative Agent hereunder (whether as fundings of participations, indemnities or otherwise), but shall not be entitled to offset against amounts owed to the Administrative Agent by any Lender arising outside of this Agreement and the other Loan Documents.

*Section 11.7. Resignation of Administrative Agent and Successor Administrative Agent.* The Administrative Agent may resign at any time by giving written notice thereof to the Lenders, the L/C Issuer and the Borrowers. Upon any such resignation of the Administrative Agent, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving of notice of resignation then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which may be any Lender hereunder or any commercial bank organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of at least $200,000,000. Upon the acceptance of its appointment as the Administrative Agent hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights and duties of the retiring Administrative Agent under the Loan Documents, and the retiring Administrative Agent shall be discharged from its duties and obligations thereunder. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this Section 11 and all protective provisions of the other Loan Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent, but no successor Administrative Agent shall in any event be liable or responsible for any actions of its predecessor. If the Administrative Agent resigns and no successor is appointed, the rights and obligations of such Administrative Agent shall be automatically assumed by the Required Lenders and (i) the Borrowers shall be directed to make all payments due each Lender and L/C Issuer hereunder directly to such Lender and (ii) the Administrative Agent's rights in the Collateral Documents shall be assigned without representation, recourse or warranty to the Lenders and L/C Issuer as their interests may appear.

*Section 11.8. L/C Issuer, Swing Line Lender.* (a) The L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith. The L/C Issuer shall have all of the benefits and immunities (i) provided to the Administrative Agent in this Section 11 with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and the Applications pertaining to such Letters of Credit as fully as if the term "Administrative

-72-

**Exhibit 1 - Page 79 of 131**

Agent", as used in this Section 11, included the L/C Issuer with respect to such acts or omissions and (ii) as additionally provided in this Agreement with respect to such L/C Issuer.

(b) The Swing Line Lender shall act on behalf of the Lenders with respect to any Swing Line Loan issued by it and the documents associated therewith. The Swing Line Lender shall have all of the benefits and immunities (i) provided to the Administrative Agent in this Section 11 with respect to any acts taken or omissions suffered by the Swing Line Lender in connection with Swing Line Loans made by it as fully as if the term "Administrative Agent", as used in this Section 11, included the Swing Line Lender with respect to such acts or omissions and (ii) as additionally provided in this Agreement with respect to such Swing Line Lender.

*Section 11.9.     Hedging Liability and Funds Transfer and Deposit Account Liability Arrangements.* By virtue of a Lender's execution of this Agreement or an assignment agreement pursuant to Section 13.12 hereof, as the case may be, any Affiliate of such Lender with whom any Borrower or Guarantor has entered into an agreement creating Hedging Liability or Funds Transfer and Deposit Account Liability shall be deemed a Lender party hereto for purposes of any reference in a Loan Document to the parties for whom the Administrative Agent is acting, it being understood and agreed that the rights and benefits of such Affiliate under the Loan Documents consist exclusively of such Affiliate's right to share in payments and collections out of the Collateral and the Guaranties as more fully set forth in Section 3.1 hereof. In connection with any such distribution of payments and collections, the Administrative Agent shall be entitled to assume no amounts are due to any Lender or its Affiliate with respect to Hedging Liability or Funds Transfer and Deposit Account Liability unless such Lender has notified the Administrative Agent in writing of the amount of any such liability owed to it or its Affiliate prior to such distribution.

*Section 11.10.     Designation of Additional Agents.* The Administrative Agent shall have the continuing right, for purposes hereof, at any time and from time to time to designate one or more of the Lenders (and/or its or their Affiliates) as "syndication agents," "documentation agents," "book runners," "lead arrangers," "arrangers," or other designations for purposes hereto, but such designation shall have no substantive effect, and such Lenders and their Affiliates shall have no additional powers, duties or responsibilities as a result thereof.

*Section 11.11.     Authorization to Release or Subordinate or Limit Liens.* The Administrative Agent is hereby irrevocably authorized by each of the Lenders and the L/C Issuer to (a) release any Lien covering any Collateral that is sold, transferred, or otherwise disposed of in accordance with the terms and conditions of this Agreement and the relevant Collateral Documents (including a sale, transfer, or disposition permitted by the terms of Section 8.10 hereof or which has otherwise been consented to in accordance with Section 13.13 hereof), (b) release or subordinate any Lien on Collateral consisting of goods financed with purchase money indebtedness or under a Capital Lease to the extent such purchase money indebtedness or Capitalized Lease Obligation, and the Lien securing the same, are permitted by Sections 8.7(b) and 8.8(d) hereof, and (c) reduce or limit the amount of the indebtedness secured by any particular item of Collateral to an amount not less than the estimated value thereof to the extent necessary to reduce mortgage registry, filing and similar tax.

**Exhibit 1 - Page 80 of 131**

*Section 11.12. Authorization to Enter into, and Enforcement of, the Collateral Documents .* The Administrative Agent is hereby irrevocably authorized by each of the Lenders and L/C Issuer to execute and deliver the Collateral Documents on behalf of each of the Lenders and their Affiliates and L/C Issuer and to take such action and exercise such powers under the Collateral Documents as the Administrative Agent considers appropriate, *provided* the Administrative Agent shall not amend the Collateral Documents unless such amendment is agreed to in writing by the Required Lenders. Each Lender and L/C Issuer acknowledges and agrees that it will be bound by the terms and conditions of the Collateral Documents upon the execution and delivery thereof by the Administrative Agent. Except as otherwise specifically provided for herein, no Lender (or its Affiliates) or L/C Issuer other than the Administrative Agent shall have the right to institute any suit, action or proceeding in equity or at law for the foreclosure or other realization upon any Collateral or for the execution of any trust or power in respect of the Collateral or for the appointment of a receiver or for the enforcement of any other remedy under the Collateral Documents; it being understood and intended that no one or more of the Lenders (or their Affiliates) shall have any right in any manner whatsoever to affect, disturb or prejudice the Lien of the Administrative Agent (or any security trustee therefor) under the Collateral Documents by its or their action or to enforce any right thereunder, and that all proceedings at law or in equity shall be instituted, had, and maintained by the Administrative Agent (or its security trustee) in the manner provided for in the relevant Collateral Documents for the benefit of the Lenders, the L/C Issuer and their Affiliates.

SECTION 12.    THE GUARANTEES.

*Section 12.1. The Guarantees.* To induce the Lenders to provide the credits described herein and in consideration of benefits expected to accrue to the Borrowers by reason of the Commitments and for other good and valuable consideration, receipt of which is hereby acknowledged, each Subsidiary party hereto (including any Subsidiary formed or acquired after the Closing Date executing an Additional Guarantor Supplement in the form attached hereto as Exhibit G or such other form acceptable to the Administrative Agent) hereby unconditionally and irrevocably guarantees jointly and severally to the Administrative Agent, the Lenders, the L/C Issuer and their Affiliates, the due and punctual payment of all present and future Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability, including, but not limited to, the due and punctual payment of principal of and interest on the Loans, the Reimbursement Obligations, and the due and punctual payment of all other Obligations now or hereafter owed by the Borrowers under the Loan Documents and the due and punctual payment of all Hedging Liability and Funds Transfer and Deposit Account Liability, in each case as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including interest which, but for the filing of a petition in bankruptcy, would otherwise accrue on any such indebtedness, obligation, or liability). In case of failure by any Borrower or other obligor punctually to pay any Obligations, Hedging Liability, or Funds Transfer and Deposit Account Liability guaranteed hereby, each Guarantor hereby unconditionally agrees to make such payment or to cause such payment to be made punctually as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, and as if such payment were made by any Borrower or such obligor.

**Exhibit 1 - Page 81 of 131**

*Section 12.2.   Guarantee Unconditional.*  The obligations of each Guarantor under this Section 12 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of a Borrower or other obligor or of any other guarantor under this Agreement or any other Loan Document or by operation of law or otherwise;

(b)    any modification or amendment of or supplement to this Agreement or any other Loan Document or any agreement relating to Hedging Liability or Funds Transfer and Deposit Account Liability;

(c)    any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, any Borrower or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of any Borrower or other obligor or of any other guarantor contained in any Loan Document;

(d)    the existence of any claim, set-off, or other rights which any Borrower or other obligor or any other guarantor may have at any time against the Administrative Agent, any Lender, the L/C Issuer or any other Person, whether or not arising in connection herewith;

(e)    any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against any Borrower or other obligor, any other guarantor, or any other Person or Property;

(f)    any application of any sums by whomsoever paid or howsoever realized to any obligation of any Borrower or other obligor, regardless of what obligations of the Borrowers or other obligor remain unpaid;

(g)    any invalidity or unenforceability relating to or against a Borrower or other obligor or any other guarantor for any reason of this Agreement or of any other Loan Document or any agreement relating to Hedging Liability or Funds Transfer and Deposit Account Liability or any provision of applicable law or regulation purporting to prohibit the payment by any Borrower or other obligor or any other guarantor of the principal of or interest on any Loan or any Reimbursement Obligation or any other amount payable under the Loan Documents or any agreement relating to Hedging Liability or Funds Transfer and Deposit Account Liability; or

(h)    any other act or omission to act or delay of any kind by the Administrative Agent, any Lender, or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of any Guarantor under this Section 12.

**Exhibit 1 - Page 82 of 131**

*Section 12.3. Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances.* Each Guarantor's obligations under this Section 12 shall remain in full force and effect until the Commitments are terminated, all Letters of Credit have expired, and the principal of and interest on the Loans and all other amounts payable by the Borrowers and the Guarantors under this Agreement and all other Loan Documents and, if then outstanding and unpaid, all Hedging Liability and Funds Transfer and Deposit Account Liability shall have been paid in full. If at any time any payment of the principal of or interest on any Loan or any Reimbursement Obligation or any other amount payable by the Borrowers or other obligor or any Guarantor under the Loan Documents or any agreement relating to Hedging Liability or Funds Transfer and Deposit Account Liability is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of any Borrower or other obligor or of any guarantor, or otherwise, each Guarantor's obligations under this Section 12 with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

*Section 12.4. Subrogation.* Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability shall have been paid in full subsequent to the termination of all the Commitments and expiration of all Letters of Credit. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to the later of (x) the payment in full of the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability and all other amounts payable by the Borrowers hereunder and the other Loan Documents and (y) the termination of the Commitments and expiration of all Letters of Credit, such amount shall be held in trust for the benefit of the Administrative Agent, the Lenders, and the L/C Issuer (and their Affiliates) and shall forthwith be paid to the Administrative Agent for the benefit of the Lenders and L/C Issuer (and their Affiliates) or be credited and applied upon the Obligations, Hedging Liability, and Funds Transfer and Deposit Account Liability, whether matured or unmatured, in accordance with the terms of this Agreement.

*Section 12.5. Waivers.* Each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Administrative Agent, any Lender, the L/C Issuer or any other Person against any Borrower or other obligor, another guarantor, or any other Person.

*Section 12.6. Limit on Recovery.* Notwithstanding any other provision hereof, the right of recovery against each Guarantor under this Section 12 shall not exceed $1.00 less than the lowest amount which would render such Guarantor's obligations under this Section 12 void or voidable under applicable law, including, without limitation, fraudulent conveyance law.

*Section 12.7. Stay of Acceleration.* If acceleration of the time for payment of any amount payable by a Borrower or other obligor under this Agreement or any other Loan Document, or under any agreement relating to Hedging Liability or Funds Transfer and Deposit Account Liability, is stayed upon the insolvency, bankruptcy or reorganization of such Borrower or such obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement or the other Loan Documents, or under any agreement relating to Hedging Liability or Funds

Exhibit 1 - Page 83 of 131

Transfer and Deposit Account Liability, shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the Administrative Agent made at the request of the Required Lenders.

Section 12.8. *Benefit to Guarantors.* The Borrowers and the Guarantors are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of the Borrowers has a direct impact on the success of each Guarantor. Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

Section 12.9. *Guarantor Covenants.* Each Guarantor shall take such action as the Borrowers are required by this Agreement to cause such Guarantor to take, and shall refrain from taking such action as the Borrowers are required by this Agreement to prohibit such Guarantor from taking.

SECTION 13.    MISCELLANEOUS.

Section 13.1. *Withholding Taxes.* (a) *Payments Free of Withholding.* Except as otherwise required by law and subject to Section 13.1(b) hereof, each payment by the Borrowers and the Guarantors under this Agreement or the other Loan Documents shall be made without withholding for or on account of any present or future taxes (other than overall net income taxes on the recipient) imposed by or within the jurisdiction in which such Borrower or Guarantor is domiciled, any jurisdiction from which such Borrower or Guarantor makes any payment, or (in each case) any political subdivision or taxing authority thereof or therein. If any such withholding is so required, such Borrower or Guarantor shall make the withholding, pay the amount withheld to the appropriate governmental authority before penalties attach thereto or interest accrues thereon, and forthwith pay such additional amount as may be necessary to ensure that the net amount actually received by each Lender, the L/C Issuer and the Administrative Agent free and clear of such taxes (including such taxes on such additional amount) is equal to the amount which that Lender, the L/C Issuer or the Administrative Agent (as the case may be) would have received had such withholding not been made. If the Administrative Agent, the L/C Issuer or any Lender pays any amount in respect of any such taxes, penalties or interest, such Borrower or Guarantor shall reimburse the Administrative Agent, the L/C Issuer or such Lender for that payment on demand in the currency in which such payment was made. If such Borrower or Guarantor pays any such taxes, penalties or interest, it shall deliver official tax receipts evidencing that payment or certified copies thereof to the Lender, the L/C Issuer or Administrative Agent on whose account such withholding was made (with a copy to the Administrative Agent if not the recipient of the original) on or before the thirtieth day after payment.

(b)    *U.S. Withholding Tax Exemptions.* Each Lender or L/C Issuer that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to the Borrowers and the Administrative Agent on or before the date the initial Credit Event is made hereunder or, if later, the date such financial institution becomes a Lender or L/C Issuer hereunder, two duly completed and signed copies of (i) either Form W-8 BEN (relating to such Lender or L/C Issuer and entitling it to a complete exemption from withholding under the Code on all amounts to be received by such Lender or L/C Issuer, including fees, pursuant to the Loan

**Exhibit 1 - Page 84 of 131**

Documents and the Obligations) or Form W-8 ECI (relating to all amounts to be received by such Lender or L/C Issuer, including fees, pursuant to the Loan Documents and the Obligations) of the United States Internal Revenue Service or (ii) solely if such Lender or L/C Issuer is claiming exemption from United States withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a Form W-8 BEN, or any successor form prescribed by the Internal Revenue Service, and a certificate representing that such Lender is not a bank for purposes of Section 881(c) of the Code, is not a 10-percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrowers and is not a controlled foreign corporation related to the Borrowers (within the meaning of Section 864(d)(4) of the Code). Thereafter and from time to time, each Lender shall submit to the Borrowers and the Administrative Agent such additional duly completed and signed copies of one or the other of such Forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) and such other certificates as may be (i) requested by any Borrower in a written notice, directly or through the Administrative Agent, to such Lender or L/C Issuer and (ii) required under then-current United States law or regulations to avoid or reduce United States withholding taxes on payments in respect of all amounts to be received by such Lender or L/C Issuer, including fees, pursuant to the Loan Documents or the Obligations. Upon the request of the Borrowers or the Administrative Agent, each Lender and L/C Issuer that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) shall submit to the Borrowers and the Administrative Agent a certificate to the effect that it is such a United States person.

(c) *Inability of Lender to Submit Forms.* If any Lender or L/C Issuer determines, as a result of any change in applicable law, regulation or treaty, or in any official application or interpretation thereof, that it is unable to submit to the Borrowers or the Administrative Agent any form or certificate that such Lender or L/C Issuer is obligated to submit pursuant to subsection (b) of this Section 13.1 or that such Lender or L/C Issuer is required to withdraw or cancel any such form or certificate previously submitted or any such form or certificate otherwise becomes ineffective or inaccurate, such Lender or L/C Issuer shall promptly notify the Borrowers and Administrative Agent of such fact and the Lender or L/C Issuer shall to that extent not be obligated to provide any such form or certificate and will be entitled to withdraw or cancel any affected form or certificate, as applicable.

*Section 13.2.* *No Waiver, Cumulative Remedies.* No delay or failure on the part of the Administrative Agent, the L/C Issuer, or any Lender or on the part of the holder or holders of any of the Obligations in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The rights and remedies hereunder of the Administrative Agent, the L/C Issuer, the Lenders and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

*Section 13.3.* *Non-Business Days.* If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable. In the case of any payment of principal falling due on a day which is not a Business Day, interest on such

**Exhibit 1 - Page 85 of 131**

principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

Section 13.4.    Documentary Taxes.    The Borrowers agree to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or any other Loan Document, including interest and penalties, in the event any such taxes are assessed, irrespective of when such assessment is made and whether or not any credit is then in use or available hereunder.

Section 13.5.    Survival of Representations.    All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

Section 13.6.    Survival of Indemnities.    All indemnities and other provisions relative to reimbursement to the Lenders and L/C Issuer of amounts sufficient to protect the yield of the Lenders and L/C Issuer with respect to the Loans and Letters of Credit, including, but not limited to, Sections 1.12, 10.3, and 13.15 hereof, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

Section 13.7.    Sharing of Set-Off.    Each Lender agrees with each other Lender a party hereto that if such Lender shall receive and retain any payment, whether by set-off or application of deposit balances or otherwise, on any of the Loans or Reimbursement Obligations in excess of its ratable share of payments on all such Obligations then outstanding to the Lenders, then such Lender shall purchase for cash at face value, but without recourse, ratably from each of the other Lenders such amount of the Loans or Reimbursement Obligations, or participations therein, held by each such other Lenders (or interest therein) as shall be necessary to cause such Lender to share such excess payment ratably with all the other Lenders; provided, however, that if any such purchase is made by any Lender, and if such excess payment or part thereof is thereafter recovered from such purchasing Lender, the related purchases from the other Lenders shall be rescinded ratably and the purchase price restored as to the portion of such excess payment so recovered, but without interest. For purposes of this Section, amounts owed to or recovered by the L/C Issuer in connection with Reimbursement Obligations in which Lenders have been required to fund their participation shall be treated as amounts owed to or recovered by the L/C Issuer as a Lender hereunder.

Section 13.8.    Notices.    Except as otherwise specified herein, all notices hereunder and under the other Loan Documents shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party at its address or telecopier number set forth below, or such other address or telecopier number as such party may hereafter specify by notice to the Administrative Agent and the Borrowers given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt. Notices under the Loan Documents to any Lender or L/C Issuer shall be addressed to its address or telecopier number set forth on its Administrative

Exhibit 1 - Page 86 of 131

Questionnaire; and notices under the Loans Documents to any Borrower, any Guarantor, the Administrative Agent or L/C Issuer shall be addressed to its respective address or telecopier number set forth below:

| to any Borrower or Guarantor: | to the Administrative Agent and L/C Issuer : |
|---|---|
| SK Foods, L.P. | Bank of Montreal |
| P.O. Box 160 | 115 South LaSalle Street |
| Lemoore, California 93245 | Chicago, Illinois 60603 |
| Attention: _____ | Attention:   Betsy Erdelyi |
| Telephone:   (559) 924-6535 | Telephone:   (312) 461-4049 |
| Telecopy:    (559) 924-0178 | Telecopy:    (312) 293-5041 |

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section or in the relevant Administrative Questionnaire and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, 5 days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section or on the signature pages hereof; provided that any notice given pursuant to Section 1 hereof shall be effective only upon receipt.

Section 13.9.   Counterparts.   This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, and all such counterparts taken together shall be deemed to constitute one and the same instrument.

Section 13.10.   Successors and Assigns.   This Agreement shall be binding upon the Borrowers and the Guarantors and their successors and assigns, and shall inure to the benefit of the Administrative Agent, the L/C Issuer and each of the Lenders and the benefit of their respective successors and assigns, including any subsequent holder of any of the Obligations. The Borrowers and the Guarantors may not assign any of their rights or obligations under any Loan Document without the written consent of all of the Lenders and, with respect to any Letter of Credit or the Application therefor, the L/C Issuer.

Section 13.11.   Participants.   Each Lender shall have the right at its own cost to grant participations (to be evidenced by one or more agreements or certificates of participation) in the Loans made and Reimbursement Obligations and/or Commitments held by such Lender at any time and from time to time to one or more other Persons; provided that no such participation shall relieve any Lender of any of its obligations under this Agreement, and, provided, further that no such participant shall have any rights under this Agreement except as provided in this Section, and the Administrative Agent shall have no obligation or responsibility to such participant. Any agreement pursuant to which such participation  is granted shall provide that the granting Lender shall retain the sole right and responsibility to enforce the obligations of the Borrowers under this Agreement and the other Loan Documents including, without limitation,

Exhibit 1 - Page 87 of 131

the right to approve any amendment, modification or waiver of any provision of the Loan Documents, except that such agreement may provide that such Lender will not agree to any modification, amendment or waiver of the Loan Documents that would reduce the amount of or postpone any fixed date for payment of any Obligation in which such participant has an interest. Any party to which such a participation has been granted shall have the benefits of Section 1.12 and Section 10.3 hereof. The Borrowers authorize each Lender to disclose to any participant or prospective participant under this Section any financial or other information pertaining to any Borrower or Subsidiary.

Section 13.12. *Assignments*. (a) Any Lender may at any time assign to one or more Eligible Assignees all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i) *Minimum Amounts*. (A) In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans and participation interest in L/C Obligations at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and (B) in any case not described in subsection (a)(i)(A) of this Section 13.12, the aggregate amount of the Commitment (which for this purpose includes Loans and participation interest in L/C Obligations outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans and participation interest in L/C Obligations of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Effective Date" is specified in the Assignment and Acceptance, as of the Effective Date) shall not be less than $3,000,000, in the case of any assignment in respect to the Revolving Credit, or $3,000,000, in the case of any assignment in respect of the Term Loans, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed);

(ii) *Proportionate Amounts*. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Credits on a non-*pro rata* basis.

(iii) *Required Consents*. No consent shall be required for any assignment except to the extent required by Section 13.12(a)(i)(B) and, in addition:

(a) the consent of the Borrowers (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(b)   the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) the Revolving Credit if such assignment is to a Person that is not a Lender with a Commitment in respect of such facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (ii) the Term Loans to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund;

(c)   the consent of the L/C Issuer (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure under one or more Letters of Credit (whether or not then outstanding); and

(d)   the consent of the Swing Line Lender (such consent not to be unreasonably withheld or delayed) shall be required for any assignment that increases the obligation of the assignee to participate in exposure in the Swing Line Loans (whether or not then outstanding).

(iv)   *Assignment and Acceptance.* The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500, and the assignee, if it is not a Lender (or an Affiliate of a Lender or an Approved Fund), shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)   *No Assignment to Borrowers.* No such assignment shall be made to any Borrower or any Affiliates or Subsidiaries of a Borrower.

(vi)   *No Assignment to Natural Persons.* No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 13.12(b) hereof, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 13.6 and 13.15 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.11 hereof.

(b)   *Register.* The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices in Chicago, Illinois, a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and

**Exhibit 1 - Page 89 of 131**

addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the *"Register"*). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any Borrower and Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)     Any Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any such pledge or grant to a Federal Reserve Bank, and this Section shall not apply to any such pledge or grant of a security interest; *provided* that no such pledge or grant of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or secured party for such Lender as a party hereto; *provided further, however,* the right of any such pledgee or grantee (other than any Federal Reserve Bank) to further transfer all or any portion of the rights pledged or granted to it, whether by means of foreclosure or otherwise, shall be at all times subject to the terms of this Agreement.

(d)     Notwithstanding anything to the contrary herein, if at any time the Swing Line Lender assigns all of its Revolving Credit Commitments and Revolving Loans pursuant to subsection (a) above, the Swing Line Lender may terminate the Swing Line. In the event of such termination of the Swing Line, the Borrowers shall be entitled to appoint another Lender to act as the successor Swing Line Lender hereunder (with such Lender's consent); *provided, however,* that the failure of the Borrowers to appoint a successor shall not affect the resignation of the Swing Line Lender. If the Swing Line Lender terminates the Swing Line, it shall retain all of the rights of the Swing Line Lender provided hereunder with respect to Swing Loans made by it and outstanding as of the effective date of such termination, including the right to require Lenders to make Revolving Loans or fund participations in outstanding Swing Loans pursuant to Section 1.15 hereof.

*Section 13.13.     Amendments.*  Any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by (a) the Borrowers, (b) the Required Lenders, and (c) if the rights or duties of the Administrative Agent, the L/C Issuer or Swing Line Lender are affected thereby, the Administrative Agent, such L/C Issuer or Swing Line Lender, as applicable; provided that:

(i)     no amendment or waiver pursuant to this Section 13.13 shall (A) increase any Commitment of any Lender without the consent of such Lender or (B) reduce the amount of or postpone the date for any scheduled payment of any principal of or interest on any Loan or of any Reimbursement Obligation or of any fee payable hereunder without the consent of the Lender to which such payment is owing or which has committed to make such Loan or Letter of Credit (or participate therein) hereunder;

(ii)     no amendment or waiver pursuant to this Section 13.13 shall, unless signed by each Lender, increase the aggregate Commitments of the Lenders, change the definitions of Revolving Credit Termination Date or Required Lenders, change the

Exhibit 1 - Page 90 of 131

provisions of Section 3.1 or this Section 13.13, release any material guarantor or any substantial part of the Collateral (except as otherwise provided for in the Loan Documents), or affect the number of Lenders required to take any action hereunder or under any other Loan Document; and

(iii)     no amendment to Section 12 hereof shall be made without the consent of the Guarantor(s) affected thereby.

As used herein, the term *"substantial"* shall mean Collateral having a book value in excess of 5% of the Borrowers' consolidated total assets as of the last day of the fiscal quarter of SK Foods most recently completed prior to the date of any such determination.

Section 13.14.    *Headings.* Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 13.15.    *Costs and Expenses; Indemnification.* (a) The Borrowers agree to pay all costs and expenses of the Administrative Agent in connection with the preparation, negotiation, syndication, and administration of the Loan Documents, including, without limitation, the reasonable fees and disbursements of counsel to the Administrative Agent, in connection with the preparation and execution of the Loan Documents, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with any fees and charges suffered or incurred by the Administrative Agent in connection with periodic fixed asset appraisals, collateral filing fees and lien searches. The Borrowers further agree to indemnify the Administrative Agent, the L/C Issuer, each Lender, and any security trustee therefor, and their respective directors, officers, employees, agents, financial advisors, and consultants (each such Person being called an *"Indemnitee"*) against all losses, claims, damages, penalties, judgments, liabilities, costs and expenses (including, without limitation, all reasonable fees and disbursements of counsel for any such Indemnitee and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any Loan or Letter of Credit, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification. The Borrowers, upon demand by the Administrative Agent, the L/C Issuer or a Lender at any time, shall reimburse the Administrative Agent, the L/C Issuer or such Lender for any legal or other expenses (including, without limitation, all reasonable fees and disbursements of counsel for any such Indemnitee) incurred in connection with investigating or defending against any of the foregoing (including any settlement costs relating to the foregoing) except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. To the extent permitted by applicable law, no Borrower or Guarantor shall assert, and each such Person hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or

**Exhibit 1 - Page 91 of 131**

Letter of Credit or the use of the proceeds thereof. The obligations of the Borrowers under this Section shall survive the termination of this Agreement.

(b)     The Borrowers unconditionally agree to forever indemnify, defend and hold harmless, and covenants not to sue for any claim for contribution against, each Indemnitee for any damages, costs, loss or expense, including without limitation, response, remedial or removal costs and all fees and disbursements of counsel to any such Indemnitee, arising out of any of the following: (i) any presence, release, threatened release or disposal of any hazardous or toxic substance or petroleum by any Borrower or Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any environmental law, whether federal, state, or local, and any regulations promulgated thereunder, by any Borrower or Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with any Borrower or Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by any Borrower or Subsidiary made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, except for damages arising from the willful misconduct or gross negligence of the party claiming indemnification. This indemnification shall survive the payment and satisfaction of all Obligations and the termination of this Agreement, and shall remain in force beyond the expiration of any applicable statute of limitations and payment or satisfaction in full of any single claim under this indemnification. This indemnification shall be binding upon the successors and assigns of the Borrowers and shall inure to the benefit of each Indemnitee and its successors and assigns.

*Section 13.16.    Set-off.* (a) In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, each Lender, the L/C Issuer and each subsequent holder of any Obligation is hereby authorized by each Borrower and Guarantor at any time or from time to time, without notice to the Borrowers or Guarantor or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts, and in whatever currency denominated) and any other indebtedness at any time held or owing by that Lender, the L/C Issuer or that subsequent holder to or for the credit or the account of such Borrower or Guarantor, whether or not matured, against and on account of the Obligations of such Borrower or Guarantor to that Lender, the L/C Issuer or that subsequent holder under the Loan Documents, including, but not limited to, all claims of any nature or description arising out of or connected with the Loan Documents, irrespective of whether or not (a) that Lender, the L/C Issuer or that subsequent holder shall have made any demand hereunder or (b) the principal of or the interest on the Loans and other amounts due hereunder shall have become due and payable pursuant to Section 9 and although said obligations and liabilities, or any of them, may be contingent or unmatured.

(b)     NOTWITHSTANDING THE FOREGOING SUBSECTION (a), AT ANY TIME THAT THE LOANS OR ANY OTHER OBLIGATION, FUNDS TRANSFER AND DEPOSIT ACCOUNT LIABILITY OR HEDGING LIABILITY SHALL BE SECURED BY REAL PROPERTY LOCATED IN CALIFORNIA, NO LENDER OR THE

**Exhibit 1 - Page 92 of 131**

L/C Issuer shall exercise a right of setoff, banker's lien or counterclaim or take any court or administrative action or institute any proceeding to enforce any provision of this Agreement or any Loan that is not taken by the Administrative Agent or Required Lenders or approved in writing by the Administrative Agent and Required Lenders if such setoff or action or proceeding would or might (pursuant to Sections 580a, 580b, 580d and 726 of the California Code of Civil Procedure or Section 2924 of the California Civil Code, if applicable, or otherwise) affect or impair the validity, priority or enforceability of the liens granted to the Administrative Agent pursuant to the Collateral Documents or the enforceability of the Loans and other Obligations, Funds Transfer and Deposit Account Liability, and Hedging Liability, and any attempted exercise by any Lender or L/C Issuer of any such right without obtaining such consent of the Administrative Agent shall be null and void. This subsection (b) shall be solely for the benefit of each of the Lenders and L/C Issuer hereunder.

Section 13.17.    *Entire Agreement*. The Loan Documents constitute the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 13.18.    *Governing Law*. This Agreement and the other Loan Documents (except as otherwise specified therein), and the rights and duties of the parties hereto, shall be construed and determined in accordance with the internal laws of the State of Illinois.

Section 13.19.    *Severability of Provisions*. Any provision of any Loan Document which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 13.20.    *Excess Interest*. Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other obligations outstanding under this Agreement or any other Loan Document (*"Excess Interest"*). If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) no Borrower or guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that the Administrative Agent or any Lender may have received hereunder shall, at the option of the Administrative Agent, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable law),

**Exhibit 1 - Page 93 of 131**

(ii) refunded to the Borrowers, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) no Borrower or guarantor or endorser shall have any action against the Administrative Agent or any Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any of Borrowers' Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Borrowers' Obligations shall remain at the Maximum Rate until the Lenders have received the amount of interest which such Lenders would have received during such period on the Borrowers' Obligations had the rate of interest not been limited to the Maximum Rate during such period.

Section 13.21.    *Construction.* The provisions of this Agreement relating to Subsidiaries shall only apply during such times as the Borrowers have one or more Subsidiaries. NOTHING CONTAINED HEREIN SHALL BE DEEMED OR CONSTRUED TO PERMIT ANY ACT OR OMISSION WHICH IS PROHIBITED BY THE TERMS OF ANY COLLATERAL DOCUMENT, THE COVENANTS AND AGREEMENTS CONTAINED HEREIN BEING IN ADDITION TO AND NOT IN SUBSTITUTION FOR THE COVENANTS AND AGREEMENTS CONTAINED IN THE COLLATERAL DOCUMENTS.

Section 13.22.    *Lender's and L/C Issuer's Obligations Several.* The obligations of the Lenders and L/C Issuer hereunder are several and not joint. Nothing contained in this Agreement and no action taken by the Lenders or L/C Issuer pursuant hereto shall be deemed to constitute the Lenders and L/C Issuer a partnership, association, joint venture or other entity.

Section 13.23.    *Submission to Jurisdiction; Waiver of Jury Trial.* The Borrowers and the Guarantors hereby submit to the nonexclusive jurisdiction of the United States District Court for the Northern District of Illinois and of any Illinois State court sitting in the City of Chicago for purposes of all legal proceedings arising out of or relating to this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby. The Borrowers and the Guarantors irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. THE BORROWERS, THE GUARANTORS, THE ADMINISTRATIVE AGENT, THE L/C ISSUER AND THE LENDERS HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

Section 13.24.    *USA Patriot Act.* Each Lender and L/C Issuer that is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the *"Act"*) hereby notifies the Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify, and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender or L/C Issuer to identify the Borrowers in accordance with the Act.

**Exhibit 1 - Page 94 of 131**

*Section 13.25. Confidentiality.* Each of the Administrative Agent, the Lenders, the Swing Line Lender and the L/C Issuer agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors to the extent any such Person has a need to know such Information (it being understood that the Persons to whom such disclosure is made will first be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower or Subsidiary and its obligations, (g) with the prior written consent of the Borrowers, (h) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Administrative Agent, any Lender, the Swing Line Lender or the L/C Issuer on a non-confidential basis from a source other than any Borrower or Subsidiary or any of their directors, officers, employees or agents, including accountants, legal counsel and other advisors, (i) to rating agencies if requested or required by such agencies in connection with a rating relating to the Loans or Commitments hereunder, or (j) to entities which compile and publish information about the syndicated loan market, *provided* that only basic information about the pricing and structure of the transaction evidenced hereby may be disclosed pursuant to this subsection (j). For purposes of this Section, *"Information"* means all information received from any Borrower or Subsidiary or from any other Person on behalf of any Borrower or Subsidiary relating to any Borrower or Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or the L/C Issuer on a non-confidential basis prior to disclosure by any Borrower or any of their Subsidiaries or from any other Person on behalf of any Borrower or Subsidiary.

*Section 13.26. Equalization of Loans and Commitments.* Upon the satisfaction of the conditions precedent set forth in Section 7.2 hereof, all loans and letters of credit outstanding under the Original Credit Agreement shall remain outstanding as the initial Borrowing of Loans and Letters of Credit under this Agreement and, in connection therewith, the Borrowers shall be deemed to have prepaid all outstanding Eurodollar Loans on the Closing Date. Each Lender who is currently a party to the Original Credit Agreement hereby agrees that the Borrowers shall not be required to pay any compensation due such Lender under Section 1.12 of the Original Credit Agreement as a result thereof. On the Closing Date, the Lenders each agree to make such purchases and sales of interests in the outstanding Loans and interests in outstanding Letters of Credit between themselves so that each Lender is then holding its relevant Percentage of outstanding Loans and L/C Obligations. Such purchases and sales shall be arranged through the Administrative Agent and each Lender hereby agrees to execute such further instruments and documents, if any, as the Administrative Agent may reasonably request in connection therewith.

-88-

**Exhibit 1 - Page 95 of 131**

*Section 13.27.  Amendment and Restatement.*  This Agreement amends and restates the Original Credit Agreement and is not intended to be or operate as a novation or an accord and satisfaction of the Original Credit Agreement or the Obligations of the Borrowers and the Guarantors evidenced or provided for thereunder.  Without limiting the generality of the foregoing, the Borrowers and the Guarantors agree that notwithstanding the execution and delivery of this Agreement and the Security Agreement, the Liens previously granted to the Administrative Agent pursuant to the Collateral Documents shall be and remain in full force and effect and that any rights and remedies of the Administrative Agent thereunder and obligations of the Borrowers and the Guarantors thereunder shall be and remain in full force and effect, shall not be affected, impaired or discharged thereby and shall secure all of the Borrowers' and the Guarantors' indebtedness, Obligations and liabilities to the Administrative Agent and the Lenders under the Original Credit Agreement as amended and restated hereby.  Nothing herein contained shall in any manner affect or impair the priority of the Liens created and provided for by the Collateral Documents as to the indebtedness, Obligations and liabilities that would be secured thereby prior to giving effect hereto.

*Section 13.28.  Removal of Lenders and Assignment of Interests.*  Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank International", New York Branch, as the Departing Lender, hereby agrees to sell and assign without representation, recourse, or warranty (except that the Departing Lender represents it has authority to execute and deliver this Agreement and sell its Obligations contemplated hereby, which Obligations are owned by the Departing Lender free and clear of all Liens), and upon the satisfaction of the conditions precedent set forth in Section 7.2 hereof the Lenders hereby agree to purchase, 100% of the Departing Lender's outstanding Obligations under the Original Credit Agreement and the Loan Documents (including, without limitation, all of the indebtedness evidenced by the Notes (if any) held by the Departing Lender, together with all of its interests in outstanding Letters of Credit) for a purchase price equal to the outstanding principal balance of Loans and accrued but unpaid interest and fees owed to the Departing Lender under the Original Credit Agreement as of the Closing Date, which purchase price shall be paid in immediately available funds on the Closing Date.  Such purchases and sales shall be arranged through the Administrative Agent and the Departing Lender hereby agrees to execute such further instruments and documents, if any, as the Administrative Agent may reasonably request in connection therewith.  Upon the execution and delivery of this Agreement by the Departing Lenders, the Lenders, and the Borrowers and the payment of the Obligations owing to the Departing Lender, the Departing Lender shall cease to be a Lender under the Credit Agreement and the other Loan Documents and (i) the Lenders shall have the rights of the Departing Lender thereunder subject to the terms and conditions hereof and (ii) the Departing Lender shall have relinquished its rights (other than rights to indemnification and reimbursements referred to in the Original Credit Agreement which survive the repayment of the Obligations owed to the Departing Lender in accordance with its terms, including Section 13.6 and 13.16 thereof) and be released from their obligations under the Original Credit Agreement.  The parties hereto agree that, except as provided for in the preceding sentence, all references in the Loan Documents to the Lenders or any Lender shall from and after the date hereof no longer include the Departing Lender.

[SIGNATURE PAGES TO FOLLOW]

**Exhibit 1 - Page 96 of 131**

This Amended and Restated Credit Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

*"BORROWERS"*

SK FOODS, L.P.

By:  SK PM Corp.
   Its:  General Partner

By  _____
   Name _____
   Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By  _____
   Name _____
   Title _____

*"GUARANTORS"*

SK FOODS, LLC

By  _____
   Name _____
   Title _____

S-1

**Exhibit 1 - Page 97 of 131**

*"LENDERS"*

BANK OF MONTREAL, in its individual capacity
    as Administrative Agent, L/C Issuer, Swing
    Line Lender and as a Lender

By _____
    Name:  C. Scott Place
    Title:   Director

**Exhibit 1 - Page 98 of 131**

LaSalle Bank, National Association, as a Lender

By _Dana Philbin_

Name _Dana Philbin_

Title _AVP_

Exhibit 1 - Page 99 of 131

U.S. BANK NATIONAL ASSOCIATION, as a Lender

By _____

Name _____ Clay Jackson _____

Title _____ SVP _____

**Exhibit 1 - Page 100 of 131**

BANK OF THE WEST, as a Lender

By _____
Name ___John DeRuiter___
Title ___Senior Vice President & Manager___

Exhibit 1 - Page 101 of 131

NOTICE OF PAYMENT REQUEST

[Date]

[Name of Lender]
[Address]

Attention:

Reference is made to the Amended and Restated Credit Agreement, dated as of September 28, 2007, among SK Foods, L.P. ("*SK Foods*"), RHM Industrial/Specialty Foods, Inc. ("*Colusa Canning*"; and together with SK Foods, the "*Borrowers*"), the Lenders party thereto, and Bank of Montreal, as Administrative Agent (as extended, renewed, amended or restated from time to time, the "*Credit Agreement*"). Capitalized terms used herein and not defined herein have the meanings assigned to them in the Credit Agreement. [The Borrowers have failed to pay its Reimbursement Obligation in the amount of $_____. Your Revolver Percentage of the unpaid Reimbursement Obligation is $_____] or [_____ has been required to return a payment by the Borrowers of a Reimbursement Obligation in the amount of $_____. Your Revolver Percentage of the returned Reimbursement Obligation is $_____.]

Very truly yours,

BANK OF MONTREAL, as L/C Issuer

By _____
    Name _____
    Title _____

Exhibit 1 - Page 102 of 131

## Exhibit B

## Notice of Borrowing

Date: _____, _____

To: Bank of Montreal, as Administrative Agent for the Lenders parties to the Amended and Restated Credit Agreement dated as of September 28, 2007 (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), among SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (*"Colusa Canning"*; and together with SK Foods, the *"Borrowers"*), certain Lenders which are signatories thereto, and Bank of Montreal, as Administrative Agent

Ladies and Gentlemen:

The undersigned, SK Foods, individually and as agent for Colusa Canning, refers to the Credit Agreement, the terms defined therein being used herein as therein defined, and hereby gives you notice irrevocably, pursuant to Section 1.6 of the Credit Agreement, of the Borrowing specified below:

1. Borrower: |SK Foods, L.P.| |RHM Industrial/Specialty Foods, Inc.|

2. The Business Day of the proposed Borrowing is _____, _____.

3. The aggregate amount of the proposed Borrowing is $_____.

4. The Borrowing is being advanced under the **[Revolving] [Term]** Credit.

5. The Borrowing is to be comprised of $_____ of **[Base Rate] [Eurodollar]** Loans.

**[6. The duration of the Interest Period for the Eurodollar Loans included in the Borrowing shall be _____ months.]**

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed Borrowing, before and after giving effect thereto and to the application of the proceeds therefrom:

(a) the representations and warranties of the Borrowers contained in Section 6 of the Credit Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date); and

**Exhibit 1 - Page 103 of 131**

(b)     no Default or Event of Default has occurred and is continuing or would result from such proposed Borrowing.

SK FOODS, L.P.

By: SK PM Corp.
  Its: General Partner

By _____
    Name_____
    Title_____

B-2

**Exhibit 1 - Page 104 of 131**

EXHIBIT C

## NOTICE OF CONTINUATION/CONVERSION

Date: _____, _____

To:   Bank of Montreal, as Administrative Agent for the Lenders parties to the Amended and Restated Credit Agreement dated as of September 28, 2007 (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*) among SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (*"Colusa Canning"*; and together with SK Foods, the *"Borrowers"*), certain Lenders which are signatories thereto, and Bank of Montreal, as Administrative Agent

Ladies and Gentlemen:

The undersigned, SK Foods, individually and as agent for Colusa Canning, refers to the Credit Agreement, the terms defined therein being used herein as therein defined, and hereby gives you notice irrevocably, pursuant to Section 1.6 of the Credit Agreement, of the **[conversion] [continuation]** of the Loans specified herein, that:

1.   The conversion/continuation Date is _____, _____.

2.   The aggregate amount of the **[Revolving] [Term]** Loans to be **[converted] [continued]** is $_____.

3.   The Loans are to be |converted into| |continued as| |Eurodollar| |Base Rate| Loans.

4.   **[If applicable:]** The duration of the Interest Period for the **[Revolving] [Term]** Loans included in the **[conversion] [continuation]** shall be _____ months.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the proposed conversion/continuation date, before and after giving effect thereto and to the application of the proceeds therefrom:

(a)   the representations and warranties of the Borrowers contained in Section 6 of the Credit Agreement are true and correct as though made on and as of such date (except to the extent such representations and warranties relate to an earlier date, in which case they are true and correct as of such date); *provided, however,* that this condition shall not apply to the conversion of an outstanding Eurodollar Loan to a Base Rate Loan; and

**Exhibit 1 - Page 105 of 131**

(b)     no Default or Event of Default has occurred and is continuing, or would result from such proposed **[conversion] [continuation]**.

SK Foods, L.P.

By:  SK PM Corp.
    Its:  General Partner


By _____
    Name _____
    Title _____

C-2

**Exhibit 1 - Page 106 of 131**

EXHIBIT D-1

TERM NOTE

September __, 2007

FOR VALUE RECEIVED, the undersigned, SK Foods, L.P., a California limited partnership ("*SK Foods*"), and RHM Industrial/Specialty Foods, Inc., a California corporation (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"*), hereby, jointly and severally promises to pay to the order of _____ (the *"Lender"*) at the principal office of Bank of Montreal, as Administrative Agent, in Chicago, Illinois, in immediately available funds, the aggregate unpaid principal amount of all Term Loans made or maintained by the Lender to the Borrowers pursuant to the Credit Agreement, in installments in the amounts called for by Section 1.8(a) of the Credit Agreement, together with interest on the principal amount of such Term Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is one of the Term Notes referred to in the Amended and Restated Credit Agreement dated as of September 28, 2007 among the Borrowers, the Guarantors party thereto, the Lenders party thereto, and Bank of Montreal, as Administrative Agent for the Lenders (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

**Exhibit 1 - Page 107 of 131**

Each Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

SK FOODS, L.P.

By: SK PM Corp.
   Its: General Partner

By _____
     Name _____
     Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
     Name _____
     Title _____

**REVOLVING NOTE**

September ___, 2007

FOR VALUE RECEIVED, the undersigned, SK Foods, L.P., a California limited partnership (*"SK Foods"*), and RHM Industrial/Specialty Foods, Inc., a California corporation (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"*), hereby, jointly and severally, promises to pay to the order of _____ (the *"Lender"*) on the Revolving Credit Termination Date of the hereinafter defined Credit Agreement, at the principal office of Bank of Montreal, as Administrative Agent, in Chicago, Illinois, in immediately available funds, the aggregate unpaid principal amount of all Revolving Loans made by the Lender to the Borrowers pursuant to the Credit Agreement, together with interest on the principal amount of each Revolving Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is one of the Revolving Notes referred to in the Amended and Restated Credit Agreement dated as of September 28, 2007, among the Borrowers, the Guarantors party thereto, the Lenders party thereto, and Bank of Montreal, as Administrative Agent for the Lenders (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

**Exhibit 1 - Page 109 of 131**

Each Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

SK FOODS, L.P.

By: SK PM Corp.
Its: General Partner

By _____
Name _____
Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
Name _____
Title _____

**Exhibit 1 - Page 110 of 131**

## SWING NOTE

U.S. $5,000,000                                      September _____, 2007

FOR VALUE RECEIVED, the undersigned, SK Foods, L.P., a California limited partnership (*"SK Foods"*) and RHM Industrial/Specialty Foods, Inc., a California corporation (*"Colusa Canning"* and, together with SK Foods, the *"Borrowers"*), hereby, jointly and severally, promises to pay to the order of _____ (the *"Lender"*) on the Revolving Credit Termination Date of the hereinafter defined Credit Agreement, at the principal office of Bank of Montreal, as Administrative Agent, in Chicago, Illinois, in immediately available funds, the principal sum of Five Million and No/100 Dollars ($5,000,000) or, if less, the aggregate unpaid principal amount of all Swing Loans made by the Lender to the Borrowers pursuant to the Credit Agreement, together with interest on the principal amount of each Swing Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is the Swing Note referred to in the Amended and Restated Credit Agreement dated as of September 28, 2007, among the Borrowers, the Guarantors party thereto, the Lenders party thereto, and Bank of Montreal, as Administrative Agent for the Lenders (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

Exhibit 1 - Page 111 of 131

Each Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

SK FOODS, L.P.

By:  SK PM Corp.
Its:  General Partner

By _____
     Name _____
     Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
     Name _____
     Title _____

Exhibit 1 - Page 112 of 131

**EXHIBIT E**

**SK FOODS, L.P.**
**RHM INDUSTRIAL/SPECIALTY FOODS, INC.**

**BORROWING BASE CERTIFICATE**

To:     Bank of Montreal, as Administrative
        Agent under, and the Lenders party to,
        the Credit Agreement described below.

Pursuant to the terms of the Amended and Restated Credit Agreement dated as of September 28, 2007, among us (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), we submit this Borrowing Base Certificate to you and certify that the information set forth below and on any attachments to this Certificate is true, correct and complete as of the date of this Certificate.

1.  Gross Accounts
    Receivables as of          _____                              $_____

2.  LESS:

    (a) Ineligible sales        _____

    (b) Owed by an account      _____
        debtor who is an
        Affiliate

    (c) Owned by an account     _____
        debtor who is in an
        insolvency or
        reorganization
        proceeding

    (d) Credits/allowances      _____

    (e) Unpaid more than        _____
        180/90 days from
        invoice date

    (f) Otherwise ineligible    _____                              _____

3.  LESS: Bill and Hold
    Receivables outstanding
    in excess of 60 days                                                   $_____

**Exhibit 1 - Page 113 of 131**

4.  Total Eligible Accounts
    Receivables (Line 1 less
    Line 2 less Line 3)                                          $_____

5.  Gross Eligible Inventory
    as of                                                        $_____

6.  LESS:

    (a) Finished Goods and        _____
        Raw Materials not
        located at approved
        locations

    (b) Obsolete, slow            _____
        moving, or not
        merchantable

    (c) Otherwise ineligible      _____              _____

7.  Total Eligible Inventory                                    $_____
        (Line 5 less Line 6)

8.  85% of Line 4
                                              $_____

9.  Plus 70% of Line 7                        $_____

10. Line 8 plus Line 9                        $_____

11. LESS: Secured Growers                     $_____
    Payables

12. LESS: Reserves                            $_____

13. Total Funds Available
    (Line 10 less Line 11 less
    Line 12) Limited to:            $_____           $_____

14. Revolving Credit
    Advances

    (a) Loans                     _____

    (b) Letters of Credit         _____

    (c) Total Outstandings                               $_____
        (Line 14(a) plus Line
        14(b)

E-2

**Exhibit 1 - Page 114 of 131**

15. Available Borrowing                  $_____
    Base Collateral (line 13
    minus line 14)

Dated as of this _____ day of _____.

             SK Foods, L.P., individually and as agent for
             RHM Industrial/Specialty Foods, Inc.

             By: SK PM Corp.
                Its: General Partner

             By _____
                Name _____
                Title _____

E-3

**Exhibit 1 - Page 115 of 131**

## SK FOODS, L.P.
## RHM INDUSTRIAL/SPECIALTY FOODS, INC.

### COMPLIANCE CERTIFICATE

To:     Bank of Montreal, as Administrative
        Agent under, and the Lenders party to,
        the Credit Agreement described below

This Compliance Certificate is furnished to the Administrative Agent and the Lenders pursuant to that certain Amended and Restated Credit Agreement dated as of September 28, 2007, among us (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*). Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings ascribed thereto in the Credit Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.     I am the duly elected _____ of SK Foods, L.P., acting in its capacity as a Borrower and as agent for RHM Industrial/Specialty Foods, Inc.;

2.     I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of the Borrowers and their Subsidiaries during the accounting period covered by the attached financial statements;

3.     The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Compliance Certificate, except as set forth below;

4.     The financial statements required by Section 8.5 of the Credit Agreement and being furnished to you concurrently with this Compliance Certificate are true, correct and complete as of the date and for the periods covered thereby; and

5.     The Schedule I hereto sets forth financial data and computations evidencing the Borrowers' compliance with certain covenants of the Credit Agreement, all of which data and computations are, to the best of my knowledge, true, complete and correct and have been made in accordance with the relevant Sections of the Credit Agreement.

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which the Borrowers have taken, is taking, or proposes to take with respect to each such condition or event:

**Exhibit 1 - Page 116 of 131**

_____

_____

_____

_____

The foregoing certifications, together with the computations set forth in Schedule I hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____ 20___.

SK Foods, L.P.

By: SK PM Corp.
   Its: General Partner


By _____
   Name _____
   Title _____

F-2

Exhibit 1 - Page 117 of 131

SK FOODS, L.P.
RHM INDUSTRIAL/SPECIALTY FOODS, INC.

COMPLIANCE CALCULATIONS
FOR AMENDED AND RESTATED CREDIT AGREEMENT
DATED AS OF SEPTEMBER 28, 2007

CALCULATIONS AS OF _____, _____

---

A.    Leverage Ratio (Section 8.22(a))

    1.    Total Funded Debt         $_____

    2.    Subordinated Debt         _____

    3.    Line A1 minus A2         _____

    4.    Net Income for past 4 quarters         _____

    5.    Interest Expense for past 4 quarters         _____

    6.    Income taxes for past 4 quarters         _____

    7.    Depreciation and Amortization Expense for past 4 quarters         _____

    8.    Adjustments per Schedule 5.1         _____

    9.    Sum of Lines A4, A5, A6, A7 and A8 (*"EBITDA"*)         _____

    10.    Ratio of Line A3 to A9         _____:1.0

    11.    Line A10 ratio must not exceed         _____:1.0

    12.    The Borrowers are in compliance (circle yes or no)         yes/no

B.    Fixed Charge Coverage Ratio (Section 8.22(b))

    1.    EBITDA (Line A9 above)         $_____

    2.    Capital Expenditures         _____

    3.    Line B1 minus Line B2         _____

    4.    Principal payments for past 4 quarters         _____

    5.    Interest Expense for past 4 quarters         _____

    6.    Income taxes for past 4 quarters         _____

    7.    Distributions permitted by Section 8.12 hereof         _____

**Exhibit 1 - Page 118 of 131**

8.       Sum of Lines B4, B5, B6, and B7            _____

9.       Ratio of Line B3 to Line B8                ____:1.0

10.     Line B9 ratio must not be less than          ____:1.0

11.     The Borrowers are in compliance (circle yes or no)      yes/no

C.     <u>Capital Expenditures (Section 8.22(c))</u>

     1.       Year-to-date Capital Expenditures          $_____

     2.       The Borrowers are in compliance (circle yes or no)      yes/no

D.     <u>Rentals (Section 8.22(d))</u>

     1.       Year-to-date Lease Rentals               $_____

     2.       Maximum permitted amount             $6,000,000

     3.       The Borrowers are in compliance (circle yes or no)      yes/no

ADDITIONAL GUARANTOR SUPPLEMENT

_____, ____

Bank of Montreal, as Administrative Agent for the
Lenders named in the Amended and Restated Credit
Agreement dated as of September 28, 2007, among
SK Foods, L.P. (*"SK Foods"*), RHM
Industrial/Specialty Foods, Inc. (*"Colusa
Canning"*; and together with SK Foods, the
*"Borrowers"*), the Guarantors referred to therein,
the Lenders from time to time party thereto, and the
Administrative Agent (as extended, renewed,
amended or restated from time to time, the *"Credit
Agreement"*)

Ladies and Gentlemen:

Reference is made to the Credit Agreement described above. Terms not defined herein
which are defined in the Credit Agreement shall have for the purposes hereof the meaning
provided therein.

The undersigned, **[name of Subsidiary Guarantor]**, a **[jurisdiction of incorporation or
organization]** hereby elects to be a *"Guarantor"* for all purposes of the Credit Agreement,
effective from the date hereof. The undersigned confirms that the representations and warranties
set forth in Section 6 of the Credit Agreement are true and correct as to the undersigned as of the
date hereof and the undersigned shall comply with each of the covenants set forth in Section 8 of
the Credit Agreement applicable to it.

Without limiting the generality of the foregoing, the undersigned hereby agrees to
perform all the obligations of a Guarantor under, and to be bound in all respects by the terms of,
the Credit Agreement, including without limitation Section 12 thereof, to the same extent and
with the same force and effect as if the undersigned were a signatory party thereto.

**Exhibit 1 - Page 120 of 131**

The undersigned acknowledges that this Agreement shall be effective upon its execution and delivery o by the undersigned to the Administrative Agent, and it shall not be necessary for the Administrative Agent or any Lender, or any of their Affiliates entitled to the benefits hereof, to execute this Agreement or any other acceptance hereof. This Agreement shall be construed in accordance with and governed by the internal laws of the State of Illinois.

Very truly yours,

[NAME OF SUBSIDIARY GUARANTOR]

By _____

    Name _____

    Title _____

Exhibit 1 - Page 121 of 131

## Assignment and Acceptance

Dated _____, _____

Reference is made to the Amended and Restated Credit Agreement dated as of September 28, 2007 (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*) among SK Foods, L.P. (*"SK Foods"*), RHM Industrial/Specialty Foods, Inc. (*"Colusa Canning"*; and together with SK Foods, the *"Borrowers"*), the Guarantors party thereto, the Lenders party thereto, and Bank of Montreal, as Administrative Agent for the Lenders (the *"Administrative Agent"*). Terms defined in the Credit Agreement are used herein with the same meaning.

_____ (the *"Assignor"*) and _____ (the *"Assignee"*) agree as follows:

1.    The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, the amount and specified percentage interest shown on Annex I hereto of the Assignor's rights and obligations under the Credit Agreement as of the Effective Date (as defined below), including, without limitation, the Assignor's Commitments as in effect on the Effective Date and the Loans, if any, owing to the Assignor on the Effective Date and the Assignor's Revolver Percentage of any outstanding L/C Obligations.

2.    The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim, lien, or encumbrance of any kind; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrowers or any Subsidiary or the performance or observance by the Borrowers or any Subsidiary of any of their respective obligations under the Credit Agreement or any other instrument or document furnished pursuant thereto.

3.    The Assignee (i) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered to the Lenders pursuant to Section 8.5(b) and (c) thereof and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Administrative Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit

Exhibit 1 - Page 122 of 131

Agreement; (iii) appoints and authorizes the Administrative Agent to take such action as Administrative Agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender; and (v) specifies as its lending office (and address for notices) the offices set forth on its Administrative Questionnaire.

4.    As consideration for the assignment and sale contemplated in Annex I hereof, the Assignee shall pay to the Assignor on the Effective Date in Federal funds the amount agreed upon between them. It is understood that commitment and/or letter of credit fees accrued to the Effective Date with respect to the interest assigned hereby are for the account of the Assignor and such fees accruing from and including the Effective Date are for the account of the Assignee. Each of the Assignor and the Assignee hereby agrees that if it receives any amount under the Credit Agreement which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

5.    The effective date for this Assignment and Acceptance shall be _____ (the *"Effective Date"*). Following the execution of this Assignment and Acceptance, it will be delivered to the Administrative Agent for acceptance and recording by the Administrative Agent and, if required, the Borrowers.

6.    Upon such acceptance and recording, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Credit Agreement.

7.    Upon such acceptance and recording, from and after the Effective Date, the Administrative Agent shall make all payments under the Credit Agreement in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Credit Agreement for periods prior to the Effective Date directly between themselves.

8.    In accordance with Section 13.12 of the Credit Agreement, the Assignor and the Assignee request and direct that the Administrative Agent prepare and cause the Borrowers to execute and deliver to the Assignee the relevant Notes payable to the Assignee in the amount of its Commitments and new Notes to the Assignor in the amount of its Commitments after giving effect to this assignment.

H-2

Exhibit 1 - Page 123 of 131

9.    This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of Illinois.

|Assignor Lender|

By _____
    Name _____
    Title _____

|Assignee Lender|

By _____
    Name _____
    Title _____

Lending office (and address for notices):

Accepted and consented this
_____ day of _____

SK FOODS, L.P.

    By  SK PM Corp.,
        its General Partner

By _____
    Name _____
    Title _____

RHM INDUSTRIAL/SPECIALTY FOODS, INC.

By _____
    Name _____
    Title _____

Accepted and consented to by the Administrative
  Agent and L/C Issuer this ____ day of _____

BANK OF MONTREAL, as
  Administrative Agent and L/C Issuer

By _____
    Name _____
    Title _____

H-3

Exhibit 1 - Page 124 of 131

The assignee hereby purchases and assumes from the assignor the following interest in and to all of the Assignor's rights and obligations under the Credit Agreement as of the effective date.

| FACILITY ASSIGNED | AGGREGATE COMMITMENT/LOANS FOR ALL LENDERS | AMOUNT OF COMMITMENT/LOANS ASSIGNED | PERCENTAGE ASSIGNED OF COMMITMENT/LOANS |
|---|---|---|---|
| Revolving Credit | $_____ | $_____ | $_____ |
| Term Loan | $_____ | $_____ | $_____ |

**Exhibit 1 - Page 125 of 131**

COMMITMENTS

| NAME OF LENDER | TERM LOAN COMMITMENT | REVOLVING CREDIT COMMITMENT (JULY 1 - FEBRUARY 28/29) | REVOLVING CREDIT COMMITMENT (MARCH 1 - JUNE 30) |
|---|---|---|---|
| Bank of Montreal | $43,500,000 | $43,500,000 | $21,750,000 |
| LaSalle Bank, National Association | $31,500,000 | $31,500,000 | $15,750,000 |
| U.S. Bank National Association | $15,000,000 | $15,000,000 | $7,500,000 |
| Bank of the West | $10,000,000 | $10,000,000 | $5,000,000 |
| TOTAL | $100,000,000.00 | $100,000,000 | $50,000,000 |

## TOTAL MAXIMUM COMMITMENTS

| | TOTAL |
|---|---|
| Bank of Montreal | $87,000,000 |
| LaSalle Bank, National Association | $63,000,000 |
| U.S. Bank National Association | $30,000,000 |
| Bank of the West | $20,000,000 |
| | $200,000,000 |

Exhibit 1 - Page 126 of 131

## SCHEDULE 1.3

### EXISTING LETTERS OF CREDIT

| L/C NUMBER | BENEFICIARY | ISSUE DATE | STATED AMOUNT |
|---|---|---|---|
| HACH82790OS | Royal Bank of Canada | 9/24/2007 | $2,838,879.00 |

**Exhibit 1 - Page 127 of 131**

## SCHEDULE 5.1(a)

## EBITDA ADJUSTMENTS

| FISCAL QUARTER ENDING | ADJUSTMENT |
|---|---|
| 9/30/07 | $1,727,500 |
| 12/31/07 | $1,670,000 |
| 3/31/08 | $1,557,500 |
| 6/30/08 | $65,000 |

**Exhibit 1 - Page 128 of 131**

**SUBORDINATED DEBT**

1.    The loan from Cedenco Australia Partnership to SK Foods evidenced by that certain Promissory Note dated October 31, 2003 in the original principal amount of $2,787,180.00.

2.    The loan from Cedenco Australia Partnership to SK Foods evidenced by that certain Promissory Note dated September 28, 2003 in the original principal amount of $2,712,800.00.

3.    The loan from Cedenco Foods, Ltd. to SK Foods evidenced by that certain Promissory Note dated October 31, 2003 in the original principal amount of $3,199,978.

## Schedule 6.2

### Subsidiaries

| Name | Jurisdiction of Incorporation | Percentage Ownership | Owner |
|------|------|------|------|
| SK Foods, LLC | Nevada | 99% | SK Foods, L.P. |
| | | 1% | Scott Salyer Revocable Trust |
| SK Foods Australia PTY LTD | Australia | 99.01% | SK Foods, L.P. |
| | | 0.99% | Scott Sayler Revocable Trust |
| SK Foods International | New Zealand | 100% | SK Foods, LLC |
| Cedenco Foods LTD | New Zealand | 100% | SK Foods International |
| Cedenco Australia Partnership | New Zealand | 50% | SK Foods Australia PTY LTD |
| | | 50% | Cedenco JV Australia Ltd. |
| Cedenco JV Australia Ltd. | Australia | 100% | SK Foods Australia PTY LTD |
| Sunrise Coast | New Zealand | 100% | Cedenco Foods LTD |
| Sunrise Coast | Japan | 100% | Cedenco Foods LTD |
| Mountain Carrots | New Zealand | 56% | SK Foods International |

**Exhibit 1 - Page 130 of 131**

## SCHEDULE 8.7

### INTERCOMPANY LOANS AND ADVANCES

1.  The loan from SK Foods to SK Foods Australia, Pty, Ltd. incurred on or before October 31, 2003 in an aggregate principal amount of approximately AU $15,000,000.

2.  The loan from SK Foods to SK Foods International incurred on or before October 31, 2003 in an aggregate outstanding principal amount not in excess of NZ $38,500,000.

**Exhibit 1 - Page 131 of 131**