FILED
May 11, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001825528

**29 Pages**

**WINSTON & STRAWN LLP**
Richard A. Lapping (SBN: 107496)
rlapping@winston.com
John D. Fredericks (SBN: 168309)
jfredericks@winston.com
Justin E. Rawlins (SBN: 209915)
jrawlins@winston.com
Marcus O. Colabianchi (SBN: 208698)
mcolabianchi@winston.com
101 California Street, 39th Floor
San Francisco, CA 94111-5802
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

Proposed Reorganization Attorneys for Debtors
SK FOODS, L.P., a California limited
partnership, et al.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California limited partnership, et al.[1],<br><br>        Debtors. | **Case No. 09-29162-D-11**<br><br>Chapter 11<br><br>**DC No. RAL-21**<br><br>**DEBTORS' MOTION FOR APPROVAL OF BIDDING PROCEDURES AND FORMS OF NOTICE IN CONNECTION WITH THE DEBTORS' GOING-CONCERN SALE OF SUBSTANTIALLY ALL OPERATING ASSETS PURSUANT TO 11 U.S.C. § 363 AND RELATED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS PURSUANT TO 11 U.S.C. § 365**<br><br>**Date:** **[TBD]**<br>**Time:** **[TBD]**<br>**Place:** **Courtroom 34**<br>        **501 I Street**<br>        **Sacramento, CA 95814**<br>**Judge:** **Hon. Robert S. Bardwil** |

---

[1] The Debtors in these proceedings are: SK Foods, L.P., a California limited partnership, and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co.

12444

# TABLE OF CONTENTS

**Page**

**I. JURISDICTION** ...................................................................................................2

**II. BACKGROUND** .................................................................................................2

    **A.**     The Debtors' Bankruptcy Filing ...........................................................2

    **B.**     The Debtors' Business ..........................................................................2

    **C.**     Primary Objective of These Proceedings:  Sale Prior to July 1st ..........4

    **D.**     Sale Process and Chanin Retention........................................................4

**III. RELIEF REQUESTED** ......................................................................................5

    **A.**     Bidding Procedures ...............................................................................6

    **B.**     Stalking Horse Bidder Protections .......................................................17

    **C.**     Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates..............18

    **D.**     Cure Amount Notices and Related Procedures.....................................19

**IV. DISCUSSION** ....................................................................................................21

    **A.**     The Proposed Bidding Procedures (Including the Stalking Horse Bidder Protections) Are Fair, Reasonable, and in the Best Interests of the Debtors' Estates ..............21

    **B.**     The Debtors Should Be Authorized to Offer Stalking Horse Bidder Protections to Induce Qualified Bidders to Make Qualified Bids for the Property...............23

**V. NOTICE** .............................................................................................................25

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

i

# TABLE OF AUTHORITIES

Page(s)

CASES

Calpine Corp v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),
181 F.3d 527 (3d Cir. 1999)...................................................................24

In re 995 Fifth Ave. Assocs., L.P.,
96 B.R. 24 (Bankr. S.D.N.Y. 1989)......................................................23

In re America West Airlines, Inc.,
166 B.R. 908 (Bankr. D. Ariz. 1994)....................................................24

In re APP Plus, Inc.,
223 B.R. 870 (Bankr. E.D.N.Y. 1998)..................................................24

In re Bethlehem Steel Corp.,
2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. 2003)...................................24

In re Hupp Indus.,
140 B.R. 191 (Bankr. N.D. Ohio 1992).................................................23

In re Johns-Manville Corp.,
60 B.R. 612 (Bankr. S.D.N.Y. 1986).....................................................22

In re Quintex Entertainment, Inc.,
950 F.2d 1492 (9th Cir. 1991)...............................................................22

In re S.N.A. Nut Company,
186 B.R. 98 (Bankr. N.D. Ill. 1995)......................................................22

Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re
Integrated Resources, Inc.),
147 B.R. 650 (S.D.N.Y. 1992)..........................................................22, 23

Summit Land Co. v. Allen (In re Summit Land Co.),
13 B.R. 310 (Bankr. D. Utah 1981)......................................................22


STATUTES

28 U.S.C. §§ 157 and 1334.......................................................................2

28 U.S.C. § 157(b)(2)................................................................................2

28 U.S.C. §§ 1408 and 1409.....................................................................2

Bankruptcy Code Section 363...........................................................4, 14, 24

Bankruptcy Code Section 363(b)................................................................22

Bankruptcy Code Section 363(k)..........................................................9, 16

Bankruptcy Code Section 365(k)................................................................21

Bankruptcy Code Sections 1107(a) and 1108.............................................2

Bankruptcy Code Section 1109....................................................................10

United States Code title 11 Sections 105(a), 363, and 365.....................1, 2

**OTHER AUTHORITIES**

3 Collier on Bankruptcy § 363.03[7] (15th ed. 2002)................................24

Federal Rules of Bankruptcy Procedure:

Rules 2002 ...........................................................................................1, 2, 18

Rule 2002(l) ................................................................................................19

Rule 6004 ......................................................................................1, 2, 22

Rule 6004(f)(1) ...........................................................................................22

Rule 6006 ................................................................................................1, 2

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

SK Foods, LP, a California limited partnership ("SK LP"), and RHM Industrial/Specialty Foods Inc., a California corporation, d/b/a Colusa County Canning Co. ("RHM"), debtors and debtors in possession herein (collectively, the "Debtors"), hereby move this Court pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order: (a) approving bidding procedures (the "Bidding Procedures") in connection with the going-concern sale (the "Sale") of substantially all of the Debtors' assets (the "Property") (including authorizing and scheduling an auction (the "Auction") in connection with the Sale); (b) approving procedures pursuant to which the Debtors may become obligated, in connection with the Debtors' entry into an asset purchase agreement with a third party prior to the Auction, to pay a break-up fee to such third party, to reimburse such third party's reasonable out-of-pocket expenses, and to provide other customary "stalking horse" overbid protections (collectively, the "Stalking Horse Bidder Protections"), in each case in accordance with the terms and conditions of such asset purchase agreement; (c) scheduling a hearing to consider approval of the Sale (the "Sale Hearing") and approving the form and manner of notices of the proposed Sale, the Bidding Procedures, the Auction, and the Sale Hearing; and (d) approving the procedures to determine and the form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the executory contracts and unexpired leases to be assumed by the applicable Debtor and assigned to the purchaser of the Debtors' assets (collectively, the "Assigned Contracts") in connection with the Sale. In support of this Motion, the Debtors rely on the Declaration of Lisa Crist filed and served in connection with the Debtors' chapter 11 petitions and first-day motions, the Declaration of Brent C. Williams filed concurrently herewith (the "Williams Declaration") and on such other and further evidence as may be filed and served prior to, or presented during the hearing on, the Motion. In further support of this Motion, the Debtors respectfully represent as follows:

# I.

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

# II.

## BACKGROUND

### A.     The Debtors' Bankruptcy Filing

2.     On May 7, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in these chapter 11 cases (the "Cases").

### B.     The Debtors' Business

3.     The Debtors, and certain of their non-debtor affiliates engaged in support activities, comprise a leading, California-based processor of tomato and vegetable products for food manufacturers and finished products for foodservice marketers and retail.  They offer USDA-approved processing facilities, flexible scheduling, efficient operations and industry-leading personnel.

4.     Each of the Debtors' corporate headquarters is in Monterey, California.  The Debtors own and operate two processing plants elsewhere in California.  The Lemoore facility ("Lemoore Plant"), owned and operated by SK LP, is in the heart of California's fertile San Joaquin Valley, one of the world's most productive farming regions.  A primary advantage of this plant is its close proximity to tomato fields, shortening the time it takes to harvest and process tomatoes and ensuring quality.  The RHM facility, commonly known as Colusa County Canning ("Colusa Plant"), is located in Williams, California, in the Sacramento Valley, an area recognized for growing

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

premium tomatoes. This facility, which is owned by RHM and operated by SK LP, is situated on 50 acres, close to the tomato fields on Interstate 5. With two premium facilities in Northern California located in major farming regions, the Debtors are afforded easy access to crops and transportation to market.

5.     The Debtors' capabilities at the plants are significant. By way of example, in 2008, the Debtors processed close to 1.3 million tons of tomatoes and more than 175 million pounds of tomato paste. The Debtors also produced at the Lemoore Plant alone over 2.2 million cases of retail products such as salsa, pasta sauce and diced tomatoes in glass, cans and plastic containers. At the Colusa Plant, the Debtors produced over 2.5 million cases of enchilada sauce and 5.5 million cases of canned tomato products in 2008.

6.     The work performed at each processing plant is to produce and pack tomato ingredients and products in industrial drums and bins and produce and pack ready-to-use tomatoes in cans and glass containers. As tomatoes are seasonal, the Debtors' business cycle is also largely seasonal.

7.     Each May and June, the Debtors spend significant funds and energy preparing for the tomato packing season. During that time, the Debtors will sell old inventory, and repair and replace equipment. Accounts payable will grow significantly, and reach their peak, at this time of year. These expenses are crucial, however. During this time the Debtors have approximately 460 employees assisting in ongoing production, sales, shipment and operations.

8.     The tomato packing season commences on July 1st and typically lasts through September. During the pack, tomatoes will be brought to the plants in bulk, to be unloaded, washed, sorted, chopped, heated, and sterilized. During the tomato packing season, the plants are often running twenty-four hours a day, seven days a week. During that time, the Debtors employ approximately 1,600 workers to assist in the pack.

9.     At the end of the packing season, temporary workers depart, accounts receivable peak, and the Debtors continue with their secondary, year-round business of remanufacturing tomato paste to enhance items such as ketchup, tomato sauce, and salsa.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

C.    **Primary Objective of These Proceedings:  Sale Prior to July 1st**

10.    The Debtors' primary objective in these chapter 11 proceedings is to facilitate the sale of the Debtors' operations as a going concern prior to commencement of the tomato packing season on July 1st.  In order to meet this objective, the Debtors are seeking approval of bidding procedures that contemplate an auction and hearing to approve a sale of substantially all of the Debtors' assets in late June.  The Debtors' goal is to close the sale and transfer control and possession of the operations to a buyer with the financial wherewithal to fund operations at the Lemoore Plant and the Colusa Plant throughout the tomato packing season.

11.    The Debtors currently do not have financing, or reasonable prospects of financing, to fund operations throughout the tomato packing season.  A sale of the assets in June is imperative to preserve the jobs, grower contracts, customer contracts, and the community of interests dependent on the continued operation of the Debtors' plants.

D.    **Sale Process and Chanin Retention**

12.    On March 23, 2009, the Debtors retained Chanin Capital Partners, LLC, and its affiliate, Duff & Phelps Securities, LLC (collectively, "Chanin") as their investment banker and M&A advisor, and since that date Chanin has been actively engaged in identifying and contacting potential purchasers, organizing the sale process, assisting potential bidders in the conduct of due diligence, and conducting other activities designed to maximize the value of the Property.

13.    Since its retention by the Debtors, Chanin has engaged in over a month of discussions and negotiations with potential purchasers for the Debtors' Property.  As part of this process, Chanin has identified and contacted approximately thirty-two (32) parties and received twenty-five (25) executed non-disclosure agreements from potential purchasers.  Given the specialized nature of the Debtors' business and operating environment, Chanin has targeted parties generally falling into the following categories: (a) food companies with either a focus in tomato processing or private label manufacturing, (b) private equity firms with a focus on distressed transactions and a history of working with food and/or agriculture related companies to target (including parties having prior experience with asset sales under section 363 of the Bankruptcy

Code).  After receiving preliminary expressions of interest, Chanin supervised the creation of a virtual data room, and has coordinated extensive due diligence with a number of interested parties.

14.     Chanin has advised the Debtors that a sale of the Debtors' businesses prior to the commencement of the tomato packing season, on or about July 1, 2009, has the greatest chance of maximizing their value to the Debtors' estates.  Starting now, and building up to the date on which tomato deliveries begin, the Debtors' business requires that significant funds be expended for maintenance and repair so that the two plants are ready to run constantly through the packing season.  In addition, the Debtors must identify, hire and train a significant number of seasonal employees who must swing into action as soon as the tomatoes begin to arrive.  Potential purchasers have informed Chanin and the Debtors that they need to own the plants by the commencement of the packing season in order to stand behind the plants' finished products with their customers.  Further, potential purchasers want, and will pay for, the benefit of the revenue stream and annual sales for the pack that will commence at the beginning of July.

15.     In light of these concerns, the Bidding Procedures have been developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Property.

### III.

### RELIEF REQUESTED

16.     By this Motion, the Debtors respectfully request entry of an order (a) approving the Bidding Procedures in connection with the Sale of substantially all of the Debtors' Property (including authorizing and scheduling the Auction in connection with the Sale); (b) approving the procedures pursuant to which the Debtors may seek authority from this Court to become obligated, in connection with the Debtors' entering into an asset purchase agreement with a third party prior to the Auction, with respect to the Stalking Horse Bidder Protections, in each case in accordance with the terms and conditions of such asset purchase agreement; (c) scheduling the Sale Hearing and approving the form and manner of notices of the proposed Sale, the Bidding Procedures, the Auction and the Sale Hearing; and (d) approving the procedures to determine and the

form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the Assigned Contracts in connection with the Sale.

**A.    Bidding Procedures**

17.    The Debtors desire to receive the greatest value arising from the Sale. While the Debtors have undertaken significant efforts to market and sell the Property prior to filing for bankruptcy protection, in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any declination in value, the Debtors believe that it is imperative that they promptly move forward with approval and implementation of the Bidding Procedures. The Bidding Procedures were developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Debtors' Property. Moreover, the Bidding Procedures reflect the Debtors' objective of conducting the Auction in a controlled, yet fair and open fashion that promotes interest in the Property by financially capable, motivated bidders who are likely to close a transaction.

18.    Accordingly, the Debtors propose the following Bidding Procedures to govern the Sale of the Debtors' Property:

(i)    Sale Process. The Debtors have retained Chanin to assist the Debtors in conducting the Sale of substantially all of the Debtors' assets. Chanin is an experienced and highly regarded investment bank with expertise in the sale of agricultural enterprises and distressed business assets. Chanin was formally retained by the Debtors on March 23, 2009, and since that date has been actively engaged in identifying and contacting potential purchasers, organizing the sale process, assisting potential bidders in the conduct of due diligence, and conducting other activities designed to maximize the value of the Property.

(ii)    Bidding Process. The Debtors[2] shall, in the exercise of their business judgment, with the assistance of Chanin and after consultation with the Bank of Montreal, as

---

[2] Shortly prior to filing this Motion, the Debtors requested the appointment of a chapter 11 trustee in these Cases. Accordingly, as used below, the terms "Debtor" and "Debtors" may be deemed to include any chapter 11 trustee appointed herein.

Administrative Agent (in such capacity, "<u>Agent</u>") for the lenders under the Debtors' senior secured revolving credit and term loan facilities (the "<u>Secured Lenders</u>"):

       (a)     determine the remaining steps to be completed (including the timing in respect of such steps) for the marketing and sale of the Property;

       (b)     determine whether any person is a Qualified Bidder (as defined below);

       (c)     determine whether a Qualified Bidder has made a Qualified Bid (as defined below); and

       (d)     negotiate any offer set forth in a Qualified Bid (collectively, the "<u>Bidding Process</u>").

     (iii)    <u>Confidentiality; Qualified Bidders</u>.  Before participating in the Bidding Process, each interested party must deliver to the Debtors an executed confidentiality agreement (the "<u>Confidentiality Agreement</u>") in form and substance satisfactory to the Debtors.  Upon its delivery of the Confidentiality Agreement and the Good Faith Deposit described below, such bidder shall become a "<u>Qualified Bidder</u>".

     (iv)    <u>Property Addressed in Bidding Process</u>.  Based upon information obtained in the Bidding Process, the Debtors, in consultation with the Agent, will determine whether to seek an agreement for the sale of all of the Property to a single purchaser, or for the sale of Property associated with the Lemoore Plant and Property associated with the Colusa Plant to two separate purchasers, as more particularly described below.

     (v)    <u>Qualified Bid</u>.  A letter of intent received from a Qualified Bidder will constitute a "<u>Qualified Bid</u>" only if such letter of intent:

       (a)     is supported by all of the Qualified Bid Documents delivered on or before the Bid Deadline (each as defined below);

       (b)     meets all of the Qualified Bid Requirements (as defined below); and

       (c)     is accompanied by the Good Faith Deposit (as defined below).

     (vi)    <u>Qualified Bid Documents and Bid Deadline</u>.  In order to participate in the Bidding Process, each Qualified Bidder must deliver the following documents (collectively, the

"<u>Qualifying Bid Documents</u>") to the Debtors, the Debtors' financial and legal advisors, and the Agent by no later than 5:00 p.m., Pacific Time, on June 9, 2009 (the "<u>Bid Deadline</u>"):

      (a)    a written offer in the form described below, stating that: (I) such Qualified Bidder offers to purchase all or substantially all of the Property associated with the Lemoore Plant, the Colusa Plant, or both; and (II) such Qualified Bidder's offer is irrevocable and shall remain open until the earlier of (x) the closing of a sale pursuant to a Qualified Bid, and (y) June 29, 2009, or such later date as may be required under the Bidding Procedures;

      (b)    (I) the most current audited and latest unaudited financial statements (the "<u>Financial Information</u>") of such Qualified Bidder, or (II) if the Qualified Bidder is an entity formed for the purpose of purchasing the subject Property then: (x) the Financial Information of the equity holder(s) of the Qualified Bidder, or such other form of financial disclosure acceptable to the Debtors and the Agent; and (y) the written commitment of such equity holder(s) to be responsible for the Qualified Bidder's obligations in connection with the purchase of the subject Property, or (III) such other documents and information acceptable to the Debtors and the Agent which evidences the Qualified Bidder's ability to consummate the purchase transaction contemplated in its offer, including adequate assurance of future performance under the Assigned Contracts; and

      (c)    written disclosure of any connections or agreements between such Qualified Bidder and the Debtors, or their respective affiliates and insiders.

    (vii)   <u>Qualified Bid Requirements</u>.  In addition, a bid shall be considered a Qualified Bid only if it satisfies the following requirements (collectively, the "<u>Qualified Bid Requirements</u>"):

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(a) such bid may not be conditioned upon the Qualified Bidder's financing requirements;

(b) such bid must contemplate closing the Sale by not later than June 29, 2009 (subject to the Court's entry of an order on or prior to that date approving the Bidding Procedures);

(c) such bid may not be subject to confirmatory due diligence by the Qualified Bidder;

(d) such bid must set forth and allocate the proposed consideration to be provided in exchange for any current assets of the Debtors (including, without limitation, inventory, accounts receivable, prepaid expenses and deposits) that such bidder seeks to acquire

(e) Absent consent of the Debtors, the Secured Lenders, and any official committee of unsecured creditors (the "Committee") appointed in the Cases, the consideration payable under such bid (other than the assumption of liabilities) shall be all cash; and

(f) if such bid (other than a credit bid pursuant to Section 363(k) of the Bankruptcy Code) is on terms different than the Stalking Horse Purchase Agreement (as defined below), the bidder shall submit to the Debtors and the Agent (I) a detailed description of the differences, and (II) a proposed form of asset purchase agreement marked to show the differences between its proposed asset purchase agreement and the Stalking Horse Purchase Agreement.

(viii) Good Faith Deposits. Except for any credit bidder under section 363(k) of the Bankruptcy Code, all Qualified Bidders (including, without limitation, any Stalking Horse Bidder) must, in order to become a Qualified Bidder, remit via wire transfer, no later than the Bid Deadline, to an interest-bearing escrow account of the Debtors at Harris Bank N.A., subject to the lien of the Agent (the "Escrow Account"), an amount equal to ten percent (10%) of the proposed cash portion of the purchase price set forth in such bid (the "Good Faith Deposit").

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(ix) <u>Due Diligence by Debtors and Agent; Qualification Disputes</u>.  The financial and legal advisors (collectively, "<u>Advisors</u>") of the Debtors and the Agent shall be entitled to due diligence from each Qualified Bidder upon execution of a confidentiality agreement in form and substance reasonably equivalent to the Confidentiality Agreement.  Notwithstanding any other provision herein, failure by a Qualified Bidder to comply with and provide satisfactory responses to the reasonable due diligence requests and requests for information by the Advisors shall be a basis for the Debtors or the Agent to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

Any party in interest (as described in Section 1109 of the Bankruptcy Code), other than a bidder, shall have standing to challenge any prospective bidder's compliance with the Qualified Bidder and Qualified Bid requirements, and may move the Bankruptcy Court for an order waiving any such requirements if such waiver is in the best interest of the bankruptcy estates.  No bidder shall have standing to challenge another prospective bidder's compliance with such qualification requirements or raise arguments concerning the relative value or certainty of a competing bid.  Any dispute regarding a prospective bidder's compliance with the qualification requirements shall be resolved by the Bankruptcy Court at or prior to the auction.

(x) <u>Negotiation of Stalking Horse Purchase Agreement</u>.  At any time on or before May 25, 2009 (or such later date as the Debtors may reasonably determine), the Debtors may, with the approval of the Agent, enter into (a) a single asset purchase agreement ("<u>Stalking Horse Purchase Agreement</u>") with a single Qualified Bidder ("<u>Stalking Horse Bidder</u>") with respect to all or substantially all of the Property, or (b) separate Stalking Horse Purchase Agreement(s) with separate Stalking Horse Bidder(s) as to the Property associated with the Lemoore Plant and/or the Property associated with the Colusa Plant (each a "<u>Stalking Horse Bid</u>").  Any and all Stalking Horse Purchase Agreements shall be subject to the approval of this Court in accordance with these Bidding Procedures.  Any Qualified Bidder seeking to be selected as a Stalking Horse Bidder must submit a bid that complies with the requirements for a Qualified Bid.

Promptly upon execution of any Stalking Horse Purchase Agreement, the Debtors shall file a copy of such Stalking Horse Purchase Agreement with the Court.  If appropriate

(notwithstanding the relief requested in this Motion), the Debtors shall seek expedited approval from the Court of the Stalking Horse Bidder Protections granted in the Stalking Horse Purchase Agreement. The Debtors hereby request that the Court schedule a hearing to consider approval of such Stalking Horse Bidder Protections at the earliest date and time convenient for the Court.

(xi) <u>Auction Process</u>. The Stalking Horse Bid shall be subject to the Debtors' right to accept a superior bid made at the Auction, subject to applicable Stalking Horse Bidder Protections. To the extent the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Bid, the Debtors will, unless otherwise ordered by the Court, conduct an Auction with respect to the subject Property. Such Auction will commence at 9:00 a.m., Pacific Time, on June 18, 2009, at a location to be determined, or at such later time and at such other place as shall be reasonably acceptable to the Debtors and the Agent, or as is otherwise approved by the Court and of which the Debtors shall notify all Qualified Bidders and all other persons entitled to attend the Auction.

Except as otherwise directed by the Court, only the Debtors, the Agent and Secured Lenders, Qualified Bidders, the United States Trustee, the Committee, and such other persons expressly invited by the Debtors or the Agent, in each case with their respective advisors, will be entitled to attend, participate and be heard at the Auction.

(xii) <u>Auction Overbid Protections</u>. The Debtors anticipate that the Stalking Horse Purchase Agreement will provide that the initial overbid of the Stalking Horse Bid (the "<u>Initial Overbid</u>") will be in an amount that is greater than or equal to the sum of --

(a) the aggregate amount of (A) the purchase price set forth in the Stalking Horse Purchase Agreement, (B) the Break-up Fee (as defined below); (C) the maximum amount of the Expense Reimbursement (as defined below), and (D) the applicable Overbid Increment (as defined below); <u>plus</u>

(b) the value to the Debtors of the assumption of any assumed liabilities; <u>plus</u>

(c) all other consideration to the Debtors under the Stalking Horse Purchase Agreement; <u>minus</u>

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

(d)     all other obligations to be satisfied by the Debtors under the Stalking Horse Purchase Agreement

(collectively, the "Stalking Horse Bidder Protections").  Thereafter, each subsequent overbid (the "Subsequent Overbids" and, collectively with the Initial Overbid, each an "Overbid") shall be in increments of not less than the applicable Overbid Increment.

(xiii)     Bidding Increments.  Subject to the additional requirements for the Initial Overbid set forth above, each Overbid will be made in increments (the "Overbid Increment") of not less than (a) $300,000 higher than the immediately preceding bid if for all of the Property, (b) $200,000 higher than the immediately preceding bid if for the Lemoore Plant, and (c) $100,000 higher than the immediately preceding bid if for the Colusa Plant.  Each Overbid shall be, in the business judgment of the Debtors and the Agent, on substantially the same or better terms and conditions, taken as a whole, as those set forth in the Stalking Horse Bid, calculated on the basis of total consideration to the Debtors pursuant to such Overbid.

(xiv)     Bids for a Portion of the Property.  To the extent that any bid includes an offer to purchase only a portion of the Property (including, without limitation, a bid for the purchase of only the Lemoore Plant or only the Colusa Plant), the Debtors, with the approval of the Agent, will announce the manner in which the Debtors will conduct the Auction with respect to such bid relative to any bid for the purchase of all or substantially all of the Property.

(xv)     Further Requirements.  Any Qualified Bidder may elect to submit one or more bids at the Auction, provided that such bid satisfies the following requirements:

(a)     the bid must be on substantially the same or better terms and conditions as those set forth in the applicable Stalking Horse Purchase Agreement;

(b)     the bid must not include provisions for expense reimbursement, a break-up fee, or other provisions similar to the Stalking Horse Bidder Protections; and

(c)     the bid must otherwise satisfy the requirements of a Qualified Bid. The incremental value of any Overbid(s) submitted by the Stalking Horse

Bidder shall be "cash only" and shall not be deemed to include any credit with respect to the amount of the Break-up Fee or the Expense Reimbursement. No person, including, without limitation, any Stalking Horse Bidder, may object to any bid on the grounds that after deduction of the Break-up Fee or the Expense Reimbursement, such bid is not the highest and best bid.

(xvi) <u>Auction Procedures</u>. At the Auction, Qualified Bidders shall have the right to (i) submit further bid(s) on the conditions described above, along with a markup against the Stalking Horse Purchase Agreement, provided they participate in each round of bidding (i.e., in order to make further bids, the Qualified Bidder must participate in each round of bidding), and (ii) at any time, request that the Debtors announce, subject to any potential new bids, the then current highest or best bid and, to the extent any Qualified Bidder requests, use reasonable efforts to clarify any and all questions the Qualified Bidder may have regarding the Debtors' announcement of the then current highest or best bid.

(xvii) <u>Selection Criteria</u>. Upon conclusion of the Auction, the Debtors, in consultation with the Agent and the Committee, shall review the Qualified Bid(s) on the basis of, among other things, the following: (i) the amount of the Qualified Bid(s); (ii) the form of the proposed transaction (i.e. any improvement in the terms set forth in the Stalking Horse Purchase Agreement); (iii) the number, type and nature of any changes to the Stalking Horse Purchase Agreement; (iv) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors of such modifications or delay; (v) the likelihood of the bidder's ability to close a transaction and the timing thereof; and (vi) the net value provided to the Debtors, taking into account the Stalking Horse Bidder Protections, and such other aspects as determined by the Debtors, the Agent, and the Committee. Specifically, the Debtors may reject any Qualified Bid that the Debtors, after consultation with the Agent and the Committee, determine to be: (A) inadequate or insufficient; (B) not in conformity with the requirements of applicable law or these Bidding Procedures; or (C) contrary to the best interest of the Debtors, their estates and their creditors.

(xviii) <u>Selection of Successful Bid(s); Additional Deposits</u>. The Debtors, after consultation with the Committee and with the approval of the Agent, shall select the highest or otherwise best bid(s) with respect to the Property addressed thereby (each a "<u>Successful Bid</u>") in the

exercise of their business judgment and submit the Successful Bid(s) for approval by the Court pursuant to section 363 of the Bankruptcy Code. Within one (1) business day of being declared the maker of a Successful Bid (the "Successful Bidder"), the Successful Bidder shall make an additional deposit in cash (or other commercially reasonable cash equivalent) into the Escrow Account in a sum equal to ten percent (10%) of the Successful Bid, which additional deposit shall be non-refundable except as expressly provided below.

(xix)  Return of Good Faith Deposits. The Good Faith Deposits of all Qualified Bidders will be retained in the Escrow Account, and all Qualified Bids will remain open and irrevocable until the closing of a Sale with respect to the Property addressed by such Qualifying Bid; provided, however, that if no such closing occurs on or before July 3, 2009, then, except as otherwise provided below, the Debtors shall, within five business days after such date, return or cause to be returned each Good Faith Deposit to its respective Qualified Bidder.

(xx)  Backup Bids and Related Matters. In the event a declared Successful Bidder fails to timely perform any of its obligations as set forth above or pursuant to the Bankruptcy Court-approved definitive agreements executed by such Successful Bidder:

(a)  The declared Successful Bidder shall forfeit all deposits made to the Escrow Account without regard to the Debtors' ultimate damages occasioned by such failure; such deposits shall be applied to the Debtors' damages, if any, and shall not constitute liquidated damages; and, notwithstanding the foregoing, the Debtors and the bankruptcy estate shall retain all other rights, remedies, claims, counterclaims, and defenses, including the right to seek equitable or injunctive relief.

(b)  In the event that a Stalking Horse Bidder is not declared to be the Successful Bidder with respect to the assets addressed by such bid at the Sale Hearing (as defined below), it shall keep its final and highest bid open until and including July 3, 2009, and its deposit shall remain in the Escrow Account. If, subsequent to the Sale Hearing, the Stalking Horse Bidder is declared to be the Successful Bidder, it shall

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**Winston & Strawn LLP**
101 California Street
San Francisco, CA 94111-5802

1    be required to consummate the transaction represented by its final and

2    highest bid; provided, however, that it shall not be required to close

3    after July 3, 2009.  If the Stalking Horse Bidder is not declared the

4    Successful Bidder on or before July 3, 2009, its deposit shall be

5    returned within five business days thereafter.

6    (c)    The second-place bidder with respect to any Property shall keep its

7    final and highest bid open pending the closing of the transaction

8    incorporating the declared Successful Bid with respect to such

9    Property, and its deposit shall remain in the Escrow Account.

10    Upon the consummation of the transaction represented by the declared

11    Successful Bid, the deposit of such second-place bidder shall be

12    returned.  In the event that the transaction represented by the declared

13    Successful Bid is not consummated by June 29, 2009, the second-place

14    bidder shall, subject to subparagraph 18(xx)(d) immediately below, be

15    declared the Successful Bidder without further order of the Bankruptcy

16    Court, and such bidder shall be required to consummate the transaction

17    contemplated in its bid by July 3, 2009.  Any such replacement

18    Successful Bidder who fails to timely perform shall forfeit all deposits

19    made without regard to the Debtors' ultimate damages occasioned by

20    such failure; such deposits shall be applied to the Debtors' damages, if

21    any, and shall not constitute liquidated damages; and, notwithstanding

22    the foregoing, the Debtors and the bankruptcy estate shall retain all

23    other rights, remedies, claims, counterclaims, and defenses, including

24    the right to seek equitable or injunctive relief.

25    (d)    The Debtors, with the approval of the Agent and after consultation

26    with the Committee, may grant any declared Successful Bidder

27    additional time to perform and, to the extent necessary, extend the

28

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Closing Date; <u>provided</u>, however, that any extension beyond ten (10) days shall be pursuant to an order of the Bankruptcy Court.

(xxi)  <u>Addition to and/or Modification of Bidding Procedures</u>.  The Debtors shall have the right to adopt such other rules for the Bidding Process which, in the Debtors' business judgment after consultation with the Agent and the Committee, will better promote the goals of the Bidding Process and which are not inconsistent with any of the provisions of these Bidding Procedures, or of any order of the Court.

(xxii)  <u>Communications to Agent; Credit Bids</u>.  The Agent shall be provided with copies of all material communications between bidders and the Debtors (including professionals and other representatives of all such parties) with respect to bids on the Property.  The Bidding Procedures shall be without prejudice to the rights of the Secured Lenders to make a credit bid pursuant to Section 363(k) of the Bankruptcy Code, in combination with or without a non-credit bid. In the event that a sale to the Secured Lenders is consummated pursuant to a credit bid then, subject to the Agent's approval of the Stalking Horse Bid pursuant to subparagraph 18(x) above, the Break-Up Fee shall be payable just as with any other bidder; <u>provided</u>, however, that a credit bid shall not subject the Secured Lenders to the qualification requirements set forth in subparagraphs 18(vi), 18(vii), or 18(viii) above.

(xxiii)  <u>Cash Collateral</u>.  Prior to the hearing on this Motion, the Debtors will undertake to obtain the consent of the Secured Lenders to the use of their cash collateral for the payment of any Break-Up Fee.

19.    The Debtors submit that implementation of the Bidding Procedures will facilitate bidding for the Property and maximize its value for the benefit of the Debtors' estates and their creditors.  At this juncture, given the Debtors' liquidity constraints and the need to sell the Property on an expedited basis, the Debtors do not believe that approval of the Bidding Procedures will inhibit bidding on the Property.  On the contrary, the Debtors respectfully submit that approving the Bidding Procedures is in the best interest of the Debtors, their estates, and their creditors by providing a structure for all interested parties to formulate bids for the Property and participate in the sale process on an equal footing.  The Debtors believe that the failure to implement the Bidding

Procedures would jeopardize the Debtors' ability to maximize the value of their assets to the detriment of the Debtors' estates and creditors.

**B.  Stalking Horse Bidder Protections**

20.     In order to provide the Debtors with the flexibility to induce a Qualified Bidder to expend time and resources, and to procure the benefits of securing a Stalking Horse Bid, the Debtors submit that it is necessary to grant customary limited protections for a Stalking Horse Bidder in the form of a Break-Up Fee, Expense Reimbursement and the other Stalking Horse Bidder Protections.  The Debtors therefore request that, in recognition of the Stalking Horse Bidder's role in supporting a transaction, and to encourage interested parties to serve as a Stalking Horse Bidder:

a.      Break-Up Fee.  In the event a Stalking Horse Bidder is not the Successful Bidder with respect to the Property addressed by its Stalking Horse Bid, the Stalking Horse Bidder shall be entitled to receive from the Debtors' bankruptcy estates, upon the consummation of a transaction with respect to such Property by such other Successful Bidder, a cash payment of one and one-half percent (1.5%) of the Stalking Horse Bid (the "Break-Up Fee"); provided, that no Break-Up Fee shall be payable to the Stalking Horse Bidder if it overbids an Initial Overbid, or breaches its obligations under its Stalking Horse Bid without having its performance excused under the terms thereof.

b.      Expense Reimbursement.  The Stalking Horse Bidder shall be entitled to reimbursement of its actual and reasonable documented due diligence expenses up to a maximum of one-half of one percent (0.5%) of the value of the Stalking Horse Bid (the "Expense Reimbursement"); provided, that the aggregate amount of all Expense Reimbursements for all Stalking Horse Bidders shall be limited to Three Hundred Fifty Thousand Dollars ($350,000), allocated among Stalking Horse Bidders pro rata based upon the value of each Stalking Horse Bid.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

21.     As indicated above, promptly upon execution of any Stalking Horse Purchase Agreement, the Debtors shall file a copy of such Stalking Horse Purchase Agreement with the Court. To the extent that any proposed Stalking Horse Bidder Protections embodied in such Stalking Horse Purchase Agreement materially differ from the Stalking Horse Bidder Protections set forth in this Motion, the Debtors shall provide interested parties with notice clearly setting forth the terms of such proposed Stalking Horse Bidder Protections, and shall seek this Court's expedited approval thereof. Absent expedited Court review and approval of these core provisions of the Stalking Horse Purchase Agreement, the Debtors submit that the Sale may not result in the Debtors' obtaining the highest and best bid for its Property.

### C.     Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates

22.     The Debtors seek to have the "Sale Hearing" scheduled for June 19, 2009, with an objection deadline for such Sale Hearing set for June 16, 2009 (the "Sale and Assignment Objection Deadline").

23.     Not later than three (3) court days after the entry of an Order approving the Bidding Procedures (the "Bidding Procedures Order"), the Debtors will cause notice of the Auction and the Sale Hearing, in a form substantially similar to the form filed contemporaneously herewith as Exhibit A (the "Auction and Sale Notice"), together with a copy of the Bidding Procedures Order, to be sent by first-class mail, postage-prepaid, to: (a) counsel to the Committee, or in the event no Committee is appointed, the creditors holding the 20 largest unsecured claims against each Debtor; (b) all entities that, to the knowledge of the Debtors, claim any interest in or lien on the Property, including, without limitation, the Agent; (c) all parties to potential Assigned Contracts (to the extent they have then been identified); (d) all governmental taxing authorities that have, or as a result of the sale of the Property may have, claims, contingent or otherwise, against the Debtors; (e) all parties that have filed requests for notice under Bankruptcy Rules 2002 and/or 9010(b); (f) the Office of the United States Trustee; and (g) to the extent practicable, all entities that have, within the past 12 months, expressed to the Debtors an interest in purchasing the Property.

24.     Not later than five (5) court days after the entry of the Bidding Procedures Order, the Debtors shall cause the Auction and Sale Notice to be published, pursuant to Bankruptcy

Rule 2002(l), in (a) The Sacramento Bee, (b) the Fresno Bee, and, (c) as determined by the Debtors, in the national edition of one of (i) the Wall Street Journal, (ii) the New York Times, or (iii) USA Today. Such publication notice shall constitute sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

25. The Debtors request that objections, if any, to the Sale of the Property must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court and be served so as to be received no later than the Sale and Assignment Objection Deadline on: (a) counsel to the Debtors; (b) counsel to each Stalking Horse Bidder; (c) counsel to the Committee, (d) counsel to the Agent; and (e) the Office of the United States Trustee. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the consummation of the Sale of the Property, including the transfer of the Property free and clear of any and all liens, claims, interests, and encumbrances (other than permitted encumbrances provided for expressly in the Stalking Horse Purchase Agreement or such other purchase agreement as may be entered into with the Successful Bidder).

26. The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of such adjournment before the Court or on the Court's calendar on the date scheduled for the hearing.

**D.    Cure Amount Notices and Related Procedures**

27. To facilitate the sale, assumption, and assignment of any Assigned Contracts, the Debtors will serve, not later than three (3) days after the entry of the Bidding Procedures Order, via first class mail, a notice (the "Cure Amount Notice"), in substantially the form filed contemporaneously herewith as Exhibit B, on each non-Debtor counterparty (each a "Counterparty") to a potential Assigned Contract. If the Stalking Horse Bidder is not the Successful Bidder, and such Successful Bidder seeks to have certain Assigned Contracts assumed or assigned as part of an alternative transaction, the Debtors will provide Financial Information for the Successful Bidder to all Counterparties to such Assigned Contracts immediately following the Auction via facsimile, Federal Express, or email.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

28.     The Debtors will attach to the Cure Amount Notice their calculation of the undisputed cure amounts that they believe must be paid to cure all defaults, if any, under each Assigned Contract (the "<u>Cure Costs</u>").  If no amount or "$0" is listed on the Cure Amount Notice, the Debtors believe that there is no Cure Cost with respect to such Assigned Contract.

29.     Unless the Counterparty to an Assigned Contract, on or before the Sale and Assignment Objection Deadline, files an objection (each a "<u>Cure Amount Objection</u>") with respect to its scheduled Cure Cost, and serves such objection on: (a) counsel to the Debtors; (b) counsel to each Stalking Horse Bidder; (c) counsel to the Committee, (d) counsel to the Agent; and (e) the Office of the United States Trustee, then (i) the Debtors may assume and assign such Assigned Contract to the Stalking Horse Bidder or the Successful Bidder, as applicable, (ii) such Counterparty shall be forever barred from objecting to the Cure Cost and from asserting any additional cure or other amounts with respect to such Assigned Contract, (iii) the Debtors shall be entitled to rely solely on the Cure Cost; and (iv) such Counterparty shall be forever barred and estopped from asserting or claiming against the Debtors, the Stalking Horse Bidder, or any other Successful Bidder or assignee of the relevant Assigned Contract, that any additional amounts are due or defaults exist under such Assigned Contract.  Each Cure Amount Objection must also set forth (x) the basis for the objection, (y) the amount the Counterparty asserts as the Cure Cost and the basis therefor, with specificity, and (z) documentation in support of the Counterparty's alternative calculation of the Cure Cost.

30.     In addition, Counterparties to any Assigned Contract must file and serve on the parties identified in paragraph 29 above, on or before the Sale and Assignment Objection Deadline, any objections to the adequate assurance of future performance under the Assigned Contract (if and as assumed).

31.     Hearings on Cure Amount Objections, and on any objections to the adequate assurance of future performance under Assigned Contracts, may be held (a) at the Sale Hearing, or (b) on such other date that the Debtors determine in their sole discretion or the Court directs; <u>provided</u>, however, that if the subject Assigned Contract is assumed and assigned, the Cure Cost asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

deposited and held in a segregated account by the Debtors pending further order of this Court or mutual agreement of the Debtors, the Successful Bidder, and the objecting Counterparty.

32. The Debtors' decision to assume and assign the Assigned Contract shall be subject to Court approval and consummation of the Sale. Absent consummation of the Sale, each of the Assigned Contracts shall neither be deemed assumed nor assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

33. Except to the extent otherwise provided in the Stalking Horse Purchase Agreement or such other purchase agreement as may be entered into with a Successful Bidder, subject to any prepetition cure payments, the assignee of any Assigned Contract will not be subject to any liability to the relevant Counterparty of such Assigned Contract that accrued or arose before the closing date of the Sale, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

# IV.

# DISCUSSION

**A. The Proposed Bidding Procedures (Including the Stalking Horse Bidder Protections) Are Fair, Reasonable, and in the Best Interests of the Debtors' Estates**

34. Section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 authorize a debtor to sell assets of the estate other than in the ordinary course of business after notice and a hearing. See, e.g., In re Quintex Entertainment, Inc., 950 F.2d 1492, 1495 (9th Cir. 1991). In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be conducted by private sale or public auction. See Fed R. Bankr. P. 6004(f)(1).

35. Moreover, once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Company, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attached to a debtor's management decisions"). Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision making. See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor.

36. Here, the Debtors believe that their ability to select the highest and best bidder at an organized auction enhances and benefits the marketing process by providing a motivation for bidders to submit qualified bids with high market value. The Bidding Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates, their creditors, customers, and employees. The Bidding Procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bidding Procedures represents a sound exercise of the Debtors' business judgment.

37. The Debtors believe it is in the best interests of their estates, creditors, customers, and employees to commence an auction process immediately, as the Debtors have limited funding and resources, in order to maintain a core workforce and continuity in the Debtors' operations pending a sale of the Debtors' businesses as a going concern, calculated to maximize value for the Debtors' constituencies. While the Debtors have undertaken to reduce expenses and are in the process of stabilizing their business operations, it is unlikely that they will be able to continue operating beyond the period of the proposed bidding process without additional funding, which may or may not be available. In addition, the Sale provides a realistic means to continue providing service to the Debtors' customers with minimal interruption and inconvenience. Absent a Sale, the Debtors may be forced to cease certain operations and wind down their affairs, leaving customers scrambling to find alternative suppliers and employees scrambling to find future employment. For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of their creditors, customers, employees and other parties in interest is through a Sale pursuant to the Bidding Procedures.

**B.** **The Debtors Should Be Authorized to Offer Stalking Horse Bidder Protections to Induce Qualified Bidders to Make Qualified Bids for the Property**

38. Sellers of assets often employ bidding protections to encourage the making of bids. Break-up fees and other arrangements, such as those contemplated here, are "important tools to encourage bidding and to maximize the value of the debtor's assets." In re Integrated Resources, Inc., 147 B.R. at 659 (S.D.N.Y. 1992).

39. Historically, bankruptcy courts have approved bidding incentives similar to the Break-up Fee, Expense Reimbursement, and other overbid protections contemplated in connection with the Debtor's selection of a Stalking Horse Bidder under the "business judgment rule." See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); See also In re Integrates Resources, Inc., 147 B.R. at 657-58) (establishing three basic factors for determining whether to permit break-up fees in bankruptcy: (i) whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," (ii) whether the "fee hamper[s], rather than encourage[s], bidding," and (iii) whether the amount of the fee [is] unreasonable relative to [the] purchase price"); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) (identifying certain factors to be considered in determining the propriety of bid protections); But see, In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether (a) the break-up fee will chill the bidding and (b) the transaction as a whole will "[f]urther the diverse interests of the debtor, creditors and equity security holders alike").

40. "It has become increasingly common in Section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909 (S.D.N.Y. 2003), quoting 3 Collier on Bankruptcy § 363.03[7] (15th ed. 2002). Courts which limit or deny such break-up fees do so not because they lack statutory authority, but because they find the fee or amount is not in the best interests of the various parties and/or the estate. Id.; see also

In re APP Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y. 1998); Calpine Corp v. O'Brien Envtl. Energy,

Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999).

41.     The Debtors believe (a) that the Break-up Fee, Expense Reimbursement, and other Stalking Horse Bidder Protections are reasonable given the benefits to the estate of having a definitive agreement and the risk to the Stalking Horse Bidder that a third-party offer ultimately may be accepted and (b) that the Break-up Fee, Expense Reimbursement and other Stalking Horse Bidder Protections are necessary to preserve and enhance the value of the Debtors' estates.

42.     Specifically, the anticipated Break-up Fee, which will not exceed 1.5% of the purchase price under the Stalking Horse Purchase Agreement, is reasonable in light of the Stalking Horse Bidder's projected efforts and necessary to encourage the submission of Qualified Bids to initiate the auction process.

43.     The Expense Reimbursement is intended to cover the Stalking Horse Bidder's costs in conducting due diligence of the Debtors and the costs of negotiating and documenting the Stalking Horse Purchase Agreement.  The Stalking Horse Bid will serve as a floor for other bids and will induce other bids that otherwise would not have been made or would have otherwise been limited.  Thus, the Expense Reimbursement will be covered by the proceeds that will be realized from the alternative transaction with the higher and better bidder.  This provides an obvious benefit to the Debtors' estates.

44.     The other Stalking Horse Bidder Protections described herein are also appropriate under the circumstances.  They are modest minimum overbid requirements given the magnitude of the Debtors' Property and the scope of their business operations, and the Debtors do not believe that they will deter a serious competing bidder.  Consequently, the Debtors believe the Stalking Horse Bidder Protections are likewise in the best interests of the Debtors' estates.

45.     Absent authorization of the Stalking Horse Bidder Protections, the Debtors may lose the opportunity to obtain the highest and best offer for the Sale.  If the protections are not approved, a projected Stalking Horse Bidder may not commit to going forward with the Sale.  Accordingly, the Debtors request that the Court approve the Bidding Procedures and authorize the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

1   Debtors to offer the Stalking Horse Bidder Protections to the extent necessary to induce Qualified

2   Bidders to submit Qualified Bids for the Property.

**V.**

**NOTICE**

46.     The Debtors are serving notice of this Motion on (a) the Office of the United

States Trustee for the Eastern District of California; (b) those creditors holding the twenty largest

unsecured claims against each of the Debtors' estates; and (c) counsel for the Agent.   In light of the

nature of the relief requested, the Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that this Court enter an order,

substantially in the form filed contemporaneously herewith as Exhibit C, granting the relief

requested herein and such other and further relief as the Court deems appropriate.

Dated:  May 11, 2009                    WINSTON & STRAWN LLP


                                        By:   /s/ Richard A. Lapping
                                              Richard A. Lapping
                                              Proposed Attorneys for Debtors
                                              SK Foods, L.P. and RHM Industrial/
                                              Specialty Foods, Inc., d/b/a Colusa
                                              County Canning Co.

SF:249444.12

25