Debra I. Grassgreen (CA Bar No. 169978)
Miriam Khatiblou (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010

E-mail:dgrassgreen@pszjlaw.com
       mkhatiblou@pszjlaw.com

Attorneys for Kraft Global Foods, Inc.

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA
# SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California Limited Partnership,<br><br>　　　　　　　　　Debtor.<br><br>In re:<br><br>RHM INDUSTRIAL/SPECIALTY FOODS, INC., a California Corporation, d/b/a Colusa County Canning Co.,<br><br>　　　　　　　　　Debtor | Case No.: 09-29162-D-11<br><br>Chapter 11<br><br>DCN RAL- 21<br><br>Date:　June 19, 2009<br>Time:　10:00 AM<br>Place:　U. S. Bankruptcy Court<br>　　　　Courtroom 33, 6th Floor<br>　　　　501 I Street<br>　　　　Sacramento, CA<br>Judge:　Honorable Thomas C. Holman |

**KRAFT FOODS' OBJECTION TO (1) DEBTORS' NOTICE OF CURE AMOUNTS FOR POSSIBLE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND (2) MOTION FOR AUTHORIZATION TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

Creditor Kraft Global Foods, Inc. ("Kraft") hereby objects (the "Objection") to the *Notice of Cure Amounts For Possible Assumption, Sale and Assignment of Certain Unexpired Leases and Executory Contracts and Sale Hearing* ("Notice") and *Motion For Authorization To Assume and Assign Executory Contracts And Unexpired Leases In Connection with the Sale of Substantially all of the Debtors' Assets* ("Motion") filed by the chapter 11 trustee (the "Trustee") for SK Foods, L.P. and RHM Industrial/Specialty Foods Inc. (collectively, the "Debtors").

1

The Objection is based on the memorandum of points and authorities set forth hereinbelow, the supporting declaration of Darrell J. Graham (the "Graham Declaration") and the legal argument presented at the hearing on the Objection.

## I.

## INTRODUCTION

Kraft objects to the Notice and Motion on the grounds that the Trustee identified Contract No. 20149, dated 7/21/08 (the "Contract"), as an "Assigned Contract"[1] with a cure amount of zero although the Contract is in default and Kraft has unliquidated claims under the Contract. Kraft has numerous claims against the Debtors arising from their bribery and other dishonest acts which tainted all contracts between the parties in effect between 2004 and 2008. Accordingly, the Trustee cannot assume the Contract and assign it to an unidentified buyer absent cure of the outstanding default or adequate assurance that the Trustee will promptly cure the outstanding default. The Trustee made no such showing. In addition, the Trustee has not identified the proposed purchaser or provided any evidence of adequate assurance of future performance under the Contract.

Since 2003, Kraft has purchased approximately 230 millions of pounds of tomato products from the Debtors. However, Kraft has recently discovered that between 2004 and 2008, the Debtors had conspired to bribe the purchasing managers of their various customers, including Kraft's purchasing manager, to purchase tomato products from the Debtors in greater quantities and at higher prices than what would have been paid in the absence of the bribery conspiracy. In addition, the Debtors misbranded and misidentified products that it sold to Kraft to indicate that the products were of a higher quality than they actually were thereby causing Kraft to pay a higher price for inferior goods. Over the course of the last five years, and as a result of the Debtors' illegal and dishonest schemes, Kraft has paid, or agreed to pay, considerably higher prices for the Debtors' products which in turn, allowed the Debtors to earn millions of dollars in illegal profits. As a result, in order to cure the outstanding default under the Contract, the Trustee must compensate Kraft for its losses as a result of the Debtors' misconduct.

---

[1] The Trustee identified the "Assigned Contracts" on Exhibit A to the Notice.

50184-001\DOCS_SF:65898.1

# II.

# FACTUAL BACKGROUND

**A.     The Contracts And Kraft's Claims.**

1. Kraft and SK Foods have entered into the following contracts for the purchase of tomato related products,[2] including the Contract (No. 20149), during the period of time that SK Foods admitted to bribing Kraft's employee, mislabeling products that were sold to Kraft and engaging in the other dishonest acts specified herein:

| Contract No. | Date |
|---|---|
| 0000011741 | 8/1/2004 |
| 0000014040 | 7/25/2005 |
| 0000016238 | 7/7/2006 |
| 0000016243 | 7/7/2006 |
| 0000018256 | 7/10/07 |
| 0000018325 | 7/31/07 |
| 0500003476 | 8/29/2007 |
| 0000020071 | 7/3/2008 |
| 0000020077 | 7/8/2008 |
| 0500003861 | 7/8/2008 |
| 0000020149 | 7/21/2008 |
| 0500003908 | 8/8/2008 |
| 0000021129 | 2/4/2009 |

2. The Contract at issue in this Objection involves Kraft's agreement to purchase and SK Foods' agreement to sell, 2 million pounds of tomato products to Kraft at a certain price. To the best of Kraft's knowledge, SF Foods has not delivered the products to Kraft as required under the Contract.

3. Kraft believes that other contracts between the parties may also be deemed executory contracts under Section 365, including but not limited to, contract number 3476, dated August 29, 2007, contract number 3861, dated July 8, 2008, and contract number 3908, dated August 8, 2008. To the extent that the Trustee seeks to assign any of these contracts, the Trustee must first comply with Section 365(b)(1) and cure all existing defaults and provide adequate assurance of future performance.

---

[2] Due to the proprietary nature of the information contained in the Contracts, Kraft is unwilling at this time to attach copies of all of the contracts to this Objection other than a redacted copy of the Contract.

3

50184-001\DOCS_SF:65898.1

4. Kraft's claims against the Debtors arise out of and relate to, the Debtors' misconduct and include: (1) breach of contract; (2) commercial bribery;[3] (3) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS Section 505/1); (4) common law fraud; (5) inducement of breach of fiduciary duty and tortious interference with contract; (6) civil conspiracy; (7) violations of the Sherman Act (15 U.S.C. Section 1); and (8) violations of the Robinson Patman Act (15 U.S.C. Section 13).

---

[3] The measure of damages for commercial bribery is the profit earned by the tortfeasor. See, *Williams Electronics Games, Inc. v. Garrity,* 366 F.3d 569, 576 (7th Cir. 2004)("commercial bribery is a deliberate tort, and one way to deter it is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act."); *Hill v. Names & Addresses, Inc.,* 212 Ill.App.3d 1065, 571 N.E.2d 1085, 1098 (1st Dist., 1991)(constructive trust imposed to take away profit from tortfeasor).

4

50184-001\DOCS_SF:65898.1

5. Kraft estimates that the Debtors have obtained illegal profits from Kraft in connection with all of the contracts identified above, in an amount of no less than $10 million dollars. This figure does not include the $1.6 million that Kraft overpaid in connection with the acts alleged in paragraph 16 below and the $46,621 in losses incurred in connection with the Debtors' intentional mislabeling of products as set forth in paragraphs 19-21. Kraft is informed and believes that the losses incurred in connection with the mislabeling exceeds $46,621.

6. While Kraft has sustained considerable damages as a result of the Debtors' dishonest actions, the exact cure amount due under the Contract cannot be determined at this time. Rather, Kraft's damage claims must be either liquidated pursuant to a judicial proceeding or a stipulation with the Trustee. However, in light of the Trustee's admonition in the Notice that any "Counterparty" to an Assigned Contract will be "forever barred from objecting to the Cure Cost" and from asserting "any additional cure or other amounts with respect to such Assigned Contracts" unless objections were filed by June 16, 2009, Kraft has asserted its unliquidated cure claims relating to the Contract as well as all damage claims (that it is presently aware of) relating to its other contracts with the Debtors that were in existence between 2004 and 2009.[4]

B. **The Bribery**

7. The following information was obtained from the Plea and Cooperation Agreement of Randall Rahal ("Rahal"), dated December 2008 ("Rahal Plea"), a former employee of SK Foods, L.P. ("SK Foods"). A copy of the Rahul Plea is attached to the Graham Declaration as Exhibit B.

8. Kraft has recently learned that since at least January 2004 through at least April 2008, Rahal worked on behalf of SK Foods to sell bulk tomato products to large corporate customers, such as Kraft. During this time Rahal, on behalf of SK Foods, paid bribes to the purchasing agents of its customers to ensure that these customers purchased tomato products from SK Foods rather than from its competitors and/or to insure a higher price for such products. By receiving these bribes for their own personal benefit, the purchasing managers for SK Foods' customer-companies acted in their own personal interest rather than in the interest of their

---

[4] Kraft reserves the right to assert additional facts and claims against the Debtors relating to the Contract or other contracts that were in existence between the parties.

50184-001\DOCS_SF:65898.1

employers. Therefore, those purchasing managers and SK Foods deprived the customer- companies of the honest services of their own employees.

9.  In the Rahal Plea, Rahal stated that Scott Salyer, who is the CEO of SK Foods, knew about and consented to Rahal's use of bribes to obtain orders for SK Foods. Moreover, SK Foods was the direct beneficiary of the bribery scheme.

10. The following information is obtained from the Plea and Cooperation Agreement of Robert Watson ("Watson") a former purchasing agent for Kraft (the "Watson Plea"). A copy of Watson Plea is attached to the Graham Declaration as Exhibit C.

11. From at least January 2004 until April 2008, Watson served as a purchasing agent for Kraft. Watson had the authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of tomato-based products and other food products from various processors.

12. In the normal course, Kraft and Watson received bids for the sale of tomato-based products from processors to Kraft by way of what was intended to be a secret and competitive bidding process. In performing these functions, Watson owed Kraft a duty of honest services and Kraft's policies and procedures prohibited Watson from engaging in any self-dealing.

13. From 2004 through 2008, Watson purchased tomato based products for Kraft from SK Foods through Rahal.

14. Starting on January 19, 2004 and through April 2008, Watson received personal bribe payments from Rahal, on behalf of SK Foods. During that period, Rahal paid Watson approximately $158,000 in bribes and in exchange, Watson agreed to, and did, ensure that Kraft purchased processed tomato and other products from SK Foods rather than from SK Foods' competitors. In addition, in return for the bribes, Watson provided SK Foods with information that allowed SK Foods to sell processed tomato products to Kraft at inflated prices. Rahal's bribe payments to Watson were made with the knowledge and encouragement of SK Foods, including Scott Salyer, SK Foods' CEO.

50184-001\DOCS_SF:65898.1

15. In return for the thousands of dollars in bribes that Watson received from Rahal and SK Foods between 2004 and 2008, Watson made sure that Kraft purchased approximately 230 million pounds of tomato product at elevated prices, causing a substantial loss to Kraft.

16. Kraft is informed and believes that as part of the bribery scheme, in or about May of 2008, SK Foods claimed that Watson prematurely released SK Foods from having to supply 12 million pounds of tomato products to Kraft at $.365/LB that SK Foods was contractually obligated to supply. SK Foods' failure to supply this product forced Kraft to acquire the shortfall from another source. However, through the conspiracy between Watson and SK Foods, this alternative source became SK Foods itself, but the product was purchased from a different product lot and at a much higher price. Ultimately, Kraft was forced to pay $.50/LB for the 12 million pounds of product. Thus, as a direct result of SK Foods' fraudulent conduct, Kraft overpaid SK Foods the sum of $1.62 million.

17. Watson, Rahal and SK Foods' actions were in direct contravention of the conflict of interest policies set forth in the Kraft Code of Conduct for Compliance and Integrity, and were intended to, and did deprive Kraft of its right to Watson's honest services.

C. **The Intentional Mislabeling of Product**

18. SK Foods also mislabeled the products it sold to Kraft in order to charge Kraft higher prices for lower quality products. The following information was obtained from the Plea and Cooperation Agreement of Jennifer Lou Dahlman ("Dahlman"), a former SK Foods employee (the "Dahlman Plea"). A copy of the Dahlman Plea is attached to the Graham Declaration as Exhibit D.

19. Since November 1993, Dahlman has been employed by SK Foods in a variety of positions, most recently as a Reports and Business Analyst. Dahlman assisted in managing SK Foods' inventory of processed tomato and other food products, and arranged for the shipment of those food products to SK Foods' customers across the United States. Dahlman, at the direction of senior leaders and directors of SK Foods, regularly and knowingly caused the falsification of the various grading factors and data contained on the bills of lading, invoices and bin labels.

20. For example, during 2007, SK Foods experienced a period during which it was unable to provide an adequate supply of processed tomato paste containing 31% NTSS in order to

50184-001\DOCS_SF:65898.1

meet its contractual obligations to certain customers, including Kraft. In an attempt to alleviate the shortage, a senior leader of SK Foods contacted a competing manufacturer of processed tomato products in February 2007, and arranged to purchase approximately 3.4 million pounds of processed tomato product containing lower NTSS concentrations of 26% and 28%. The product purchased from the competitor did not meet the specifications contained in certain of SK Foods' existing contracts, and was adulterated and unsalable in the United States due to excessive mold content. In order to conceal its inferior quality, and at the direction of certain leaders and directors of SK Foods, Dahlman misbranded the product by causing the falsification of certain customer-bound quality control documents so that they incorrectly reflected the product as uniformly containing 31% NTSS tomato paste and a mold count at or below 40%. Furthermore, at the direction of certain leaders and directors of SK Foods, Dahlman subsequently caused the adulterated and misbranded tomato product, and the accompanying falsified documentation, to be shipped to Kraft in 2007.

21. Dahlman's actions were made with the specific intent to defraud and mislead Kraft. As a result, Kraft paid SK Foods approximately $46,621 for the adulterated and misbranded tomato paste.

22. SK Foods never advised Kraft of any mislabeling.

23. Under Kraft's contracts, SK Foods warranted that "all goods will: (a) fully comply with all of our specifications . . . which are made part of this order. . . ."

24. Kraft's contracts also expressly required SK Foods to notify Kraft "immediately if [SK Foods] learns of anything that may indicate a quality, safety or labeling problem with the goods . . . ."

## V.

## ARGUMENT

A. **The Trustee Must Cure All Defaults Prior to Assuming Any Contract.**

Where there has been a default in an executory contract, a trustee may not assume the contract unless it (A) cures or provides adequate assurance that it will promptly cure the default; (B) compensates or provides adequate assurance that it will promptly compensate other parties to the contract for pecuniary losses; and (C) provides adequate assurance of future performance under

the contract. 11 U.S.C. § 365(b)(1); In re Windmill Farms, Inc., 841 F.2d 1467, 1473 (9th Cir. 1988).

The Trustee incorrectly set forth the amount of the cure under the Contract at zero. As noted above, Kraft has numerous claims against the Debtors relating to their bribery and other dishonest acts which entitle Kraft to substantial damages. However, without an agreement with the Trustee regarding the amount of Kraft's damages or an order of the Court liquidating Kraft's claims, Kraft is unable at this time to specify the amount of its pecuniary loss. At this early stage of this bankruptcy proceeding, Kraft has not had sufficient time to meet and confer with the Trustee to calculate Kraft's cure related claims or seek an order of the court liquidating its claims. Despite this however, the Trustee may not assume the Contract until the cure amounts are properly liquidated and paid.

B.  **The Trustee Must Provide Sufficient Information To Kraft To Allow It To Determine Adequate Assurance of Future Performance By Any Proposed Assignee of The Contract.**

The Trustee may not assume and assign the Contract unless there is adequate assurance of future performance under the Contract. 11 U.S.C. Section 365(b)(1)(C). The Trustee has failed to provide any information to Kraft regarding the identity of the purchaser(s) that would enable Kraft to evaluate, or this Court to make a finding that the assignee will be able to fully perform under the Contract on a going forward basis.

Courts require a specific factual showing through competent evidence to determine whether adequate assurance of future performance has been provided. See e.g., Matter of Haute Cuisine, Inc., 58 B.R. 390 (Bankr. M.D. Fla. 1986) (even though experts presented cash flow projections, court found that insufficient documentary evidence had been presented). Without any information about the proposed purchaser, the Trustee cannot meet his burden of providing adequate assurance of future performance under the Contract.

As of June 15, 2009, the Trustee had not provided any information regarding the identity of the purchaser and the purchaser's ability to provide adequate assurance of future performance under any executory contract. The bid procedures established by the Trustee required that "Qualified Bidders" file with the Bankruptcy written disclosures by June 9, 2009. None have been filed and

9

50184-001\DOCS_SF:65898.1

the Trustee has not submitted <u>any</u> evidence of adequate assurance of future performance. Yet, in the Motion, the Trustee argues that "any entity that qualifies as a Qualified Bidder will have demonstrated the wherewithal to perform going forward" ("Motion, pg. 7, lines 17-18) and as such adequate assurance should be <u>presumed to have been provided to the contracting parties</u>, such as Kraft. While certain potential purchasers may have presented evidence to the Trustee of their financial ability to perform on a going forward basis, none of the necessary information has been provided to Kraft or this Court which is a necessary prerequisite to any assumption or assignment of the Contract. Kraft has requested from Trustee's counsel information about the proposed purchaser and such information has not been provided as of the date of this Objection.

Considering that the deadline to object to the Notice is June 16, 2009, and considering that Kraft has not received any information regarding the purchaser's ability to perform under any of the contracts that the Trustee seeks to assume and assign, Kraft contends that the auction sale and assumption schedule is unreasonably short and denies Kraft due process. Fundamental concepts of due process require that "notice be reasonably calculated to apprise interested parties of the pendency of the action and to afford them an opportunity to present objections." <u>Mullane vs. Central Hanover Bank & Trust Co</u>., 339 U.S. 306, 314 (1950).

Kraft should be provided with the necessary financial information to determine adequate assurance of future performance for any proposed purchasers as required by the Bankruptcy Code and sufficient time to evaluate that information. Presenting the information for the first time at the Sale Hearing as proposed by the Trustee is not appropriate. Until sufficient information of adequate assurance of future performance is provided, Kraft reserves its rights under Section 365 to object to the proposed assignee of the Contract and the sufficiency of the adequate assurance information provided.

## VI.
## CONCLUSION

For the foregoing reasons, Kraft requests that its Objection be sustained and that the Trustee be precluded from assuming or assigning the Contract unless the Trustee complies with his obligations under Section 365(b)(1).

50184-001\DOCS_SF:65898.1

Respectfully Submitted,

Dated: June 16, 2009

PACHULSKI STANG ZIEHL & JONES LLP

By  */s/ Debra Grassgreen*
Debra Grassgreen
Miriam Khatiblou
Attorneys for Kraft Global Foods, Inc.