**FILED**

June 16, 2009

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0001898020

# 61 Pages

Debra I. Grassgreen (CA Bar No. 169978)
Miriam Khatiblou (CA Bar No. 178584)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
Telephone: 415/263-7000
Facsimile: 415/263-7010

E-mail:dgrassgreen@pszjlaw.com
        mkhatiblou@pszjlaw.com

Attorneys for Kraft Global Foods, Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California Limited Partnership,<br><br>                    Debtor.<br><br>In re:<br><br>RHM INDUSTRIAL/SPECIALTY FOODS, INC., a California Corporation, d/b/a Colusa County Canning Co.,<br><br>                    Debtor | Case No.: 09-29162-D-11<br><br>Chapter 11<br><br>DCN RAL – 23<br><br>Date:    June 19, 2009<br>Time:   10:00 AM<br>Place:  U. S. Bankruptcy Court<br>          Courtroom 33, 6th Floor<br>          501 I Street<br>          Sacramento, CA<br>Judge:  Honorable Thomas C. Holman |

### EXHIBIT A TO D TO DECLARATION OF DARRELL J. GRAHAM IN SUPPORT OF KRAFT FOODS' OBJECTION TO DEBTOR'S NOTICE OF CURE AMOUNTS FOR POSSIBLE ASSUMPTION, SALE AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS

| Exhibit | Document | Page Numbers |
|---------|----------|--------------|
| A | Redacted copy of the Contract | 2 - 3 |
| B | Plea and Cooperation Agreement of Randall Rahal | 4 - 32 |
| C | Plea and Cooperation Agreement of Robert Watson | 33 – 44 |
| D | Plea and Cooperation Agreement of Jennifer Lou Dahlman | 45 - 61 |

6/12/09 12:29:27
User: HCDSA002

Kraft Foods, Inc.
Contract Report

Report No.KDB284
Page: 16
Entity: COREEX

## CONTRACT HEADER

| Contract # / Ver. Title | ST Vendor | TY Buyer | Contract Date | Version Start Date | End Date | Vendor Terms | Freight Terms | FOB Code | Ship Via | Purchasing Old Coordntar Contract # |
|---|---|---|---|---|---|---|---|---|---|---|
| C000023149  3 VEGETABLES - TOMATOE AC 980764  SK FOODS  Q 37 SCOTT MANI  7/21/09  7/21/09  5/08/08 023 NET 45 DYS 01 COLLECT  02 ORIGIN  A4 PER CONSIG MANY OVER? 000001:6192 | | | | | | | | | | |

### ITEM DETAIL

| Resource | Description | Cls Subc Plant Pri | Sol Effect Date | Stores UOM Conv. Factor | NKC Pro Warehouse | Commit Qty/ Break Qty | Unit Price/ Break Price | End Date | SK | Future Date | Order Vendor | : of Bus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 040016784000.00 VEG DRSSA TOMATOES | | 75  EE  200 | 7/21/08 LB | 1.000000 | Corporate GA Chantaigh QA Little Chu | 2,000,000.000000 | | 13 13 13 | | | 73378: 73378: | |

### ITEM HISTORY

| Resource | Description | UM Warehouse | Commitment Qty/ Value | Actual Qty/ Value | Balance Qty/ Value | Received Qty/ Value | Invoiced Qty/ Value |
|---|---|---|---|---|---|---|---|
| 040016784000000 VEG TOTT600 TOMATOES | | LB  Corporate | | | | | |
| | | GA Champaign | | | | | |
| | | QA Little Chu | | | | | |
| 040016784000400 VEG DRSSA TOMATOES | | LB  Corporate | 2,000,000.000000 | | 2,000,000.000000 | | |
| | | GA Champaign | | | | | |
| | | QA Little Chu | | | | | |

### SPECIAL CHARGES

| Charge Description | Warehouse | Resource | Description | Qty Mod Basee Mbs | Variable | Effect Date | Unit Price | UOM | Amount |
|---|---|---|---|---|---|---|---|---|---|
| Freight | ALL | | | Y | Y | 7/01/07 | | | |
| Pallet Charge | ALL | | | Y | Y | 7/01/07 | | | |

### COMMENTS

| Type | Seq Text |
|---|---|
| | 1 ******* 2008 PRODUCTION ******* |
| | 2 SPECIFICATION(S) REFERENCED ABOVE |
| | 3 PREVIOUSLY FURNISHED TO AND ACCEPTED |
| | 4 BY SUPPLIER, BILL ANY UNSHIPPED |
| | 4 PRODUCT THAT REMAINS ON KRAFT'S 2008 |
| | 5 TOMATO CROP CONTRACTS AS OF JULY 1,2009 |
| | 6 THE MATERIAL CODE NUMBER(S) MUST APPEAR |
| | 6 ALL BILL AND HOLD INVOICES WILL BE ISSD |
| | 7 ON ALL CONTAINERS, INVOICES AND |
| | 7 FOR PAYMENT WITHIN 15 DAYS, AT WHICH |
| | 8 CORRESPONDENCE. |
| | 8 TIME TITLE OF PRODUCT IS TRANSFERRED TO |
| | 9 |
| | 9 KRAFT AND NO STORAGE CHARGES WILL BE |
| | 10 SELLER IS TO NOTIFY PLANTS AND BUYER |
| | 10 CHARGED AND SK FOODS TO SHIP TOMATO |
| | 11 IMMEDIATELY OF AN INTERRUPTION IN |
| | 11 PRODUCTS PER KRAFT FACILITY RELEASES. |
| | 12 PRODUCTION WHICH MAY AFFECT OR DELAY |
| | 13 SHIPMENTS. |
| | 13 07/22/08 VERN2 issued to to correct |
| | 14 resource code error as per email from |
| | 15 CERTIFICATE OF ANALYSIS: PRIOR TO |

EXHIBIT A

2

Kraft/SK 17

Kraft Foods, Inc.
Contract Report

# CONTRACT HEADER

| Contract# / Ver. Title | ST Vendor | TV Buyer | Contract Date | Start Date | End Date | Version Date | Vendor Terms | Freight Terms | FOB Code | Ship Via | Purchasing Coordinatr | Old Contract # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0000020149    3 VEGETABLES - TOMATOE AC 940764    SK FOODS | Q 37 SCOTT MANI | 7/21/08 | 7/21/08 | | 9/08/08 | 023 NET 45 DYS 01 COLLECT | COLLECT | 02 ORIGIN | R4 PER CONSIG MARY OVERT | 0000018192 |

C O M M E N T S

| Type | Seq Text |
|---|---|
| | 15 Scott Manion dated 07/22/09. SM/SGL |
| | 16 ACCEPTANCE OF EACH SHIPMENT. VENDOR MUST |
| | 16 ............................................ |
| | 17 SUBMIT A CERTIFICATE OF ANALYSIS TO |
| | 17 ............................................ |
| | 18 RECEIVING PLANT SHOWING ACTUAL ANALYSIS |
| | 18 9/8/08 - VERSION #3 COORDINATOR |
| | 19 OF MATERIAL SHIPPED. |
| | 19 RESPONSIBILITIES CHANGED TO M. OVERTON. |
| | 20 |
| | 20 ............................................ |
| | 21 KRAFT TO RETURN BINS QUARTERLY OR PAY |
| | 22 $60.00/BIN FOR NEW BINS PURCHASED BY |
| | 23 SK FOODS. |
| | 25 PLEASE SIGN AND RETURN THE ACCEPTANCE |
| | 26 COPY TO BUYER WITHIN (5) BUSINESS DAYS. |

EXHIBIT A

3

Kraft/SK18

1 McGREGOR W. SCOTT
  United States Attorney
2 BENJAMIN B. WAGNER
  SEAN C. FLYNN
3 Assistant U.S. Attorneys
  501 "I" Street, Suite 10-100
4 Sacramento, California 95814
  Telephone: (916) 554-2700
5
  DEBORAH A. GARZA
6 Acting Assistant Attorney General
  BARBARA NELSON
7 RICHARD COHEN
  LARA KROOP
8 Trial Attorneys
9 U.S. Department of Justice
  Antitrust Division
10 450 Golden Gate Avenue, Room 10-0101
  San Francisco, CA 94102
11 Telephone: (415) 436-6660

12

13

14            IN THE UNITED STATES DISTRICT COURT

15          FOR THE EASTERN DISTRICT OF CALIFORNIA

16

17 UNITED STATES OF AMERICA,          )
                                      )
18                    Plaintiff,      )      No.
                                      )
19        v.                          )
                                      )
20                                    )      PLEA and COOPERATION AGREEMENT
   RANDALL LEE RAHAL,                 )
21                                    )
                      Defendant.      )
22 _____)

23

24                         I.

25                    INTRODUCTION

26    A.   Scope of Agreement:   The Information to be filed in this

27 case charges the defendant, Randall Lee Rahal ("Rahal"), with

28

                              1

conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d); money laundering in violation of 18 U.S.C. § 1957; and participating in, and aiding and abetting a conspiracy to suppress and eliminate competition by allocating contracts, fixing prices, and rigging bids in unreasonable restraint of interstate trade and commerce, in violation of the Sherman Act, 15 U.S.C. § 1, and 18 U.S.C. § 2. This document contains the complete Plea and Cooperation Agreement between the United States Attorney's Office for the Eastern District of California and the United States Department of Justice, Antitrust Division (the "government"), and the defendant regarding this case. This Plea and Cooperation Agreement is limited to the United States Attorney's Office for the Eastern District of California and the United States Department of Justice, Antitrust Division, and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

**B. Court Not a Party:** The Court is not a party to this Plea and Cooperation Agreement. Sentencing is a matter solely within the discretion of the Court, the Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this Plea and Cooperation Agreement. If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that

2

EXHIBIT B

reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this Plea and Cooperation Agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.

### DEFENDANT'S OBLIGATIONS

**A. Waiver of Indictment and Guilty Plea:** The defendant will waive indictment by grand jury, waive venue, and plead guilty to a three-count Information, substantially in the form attached hereto as **Exhibit B**, charging him with conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d); money laundering in violation of 18 U.S.C. § 1957; and price fixing in violation of 15 U.S.C. § 1. The defendant agrees that he is in fact guilty of those charges and that the facts set forth in the Factual Basis attached hereto as Exhibit A are true and accurate.

**B. Restitution:** The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. If such restitution is ordered, payment should be by cashier's or certified check made payable to the Clerk of the Court. The defendant understands that this Plea and Cooperation Agreement is voidable by the government if he fails to pay the restitution as ordered by the Court. Defendant further agrees that he will not

3

seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**C. Special Assessment:** The defendant agrees to pay a special assessment of $300 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

**D. Agreement to Cooperate:** The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this Agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

4

If the defendant commits any crimes or if any of the defendant's statements or testimony prove to be knowingly false, misleading, or materially incomplete, or if the defendant otherwise violates this Plea and Cooperation Agreement in any way, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. The determination whether the defendant has violated the Plea and Cooperation Agreement will be under a preponderance of the evidence standard. If the defendant violates the Plea and Cooperation Agreement, he shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to perjury, false statements, and obstruction of justice. Because disclosures pursuant to this Agreement will constitute a waiver of the Fifth Amendment privilege against compulsory self-incrimination, any such prosecution may be premised on statements and/or information provided by the defendant. Moreover, any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this Agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of any such prosecutions. The defendant agrees to waive all defenses based on the statute of limitations or delay of prosecution with respect to any prosecutions that are not time-

5

barred as of the date of this Agreement.

If it is determined that the defendant has violated any provision of this Agreement or if the defendant successfully moves to withdraw his plea:  (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this Agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this Agreement, or any leads derived therefrom, should be suppressed.  By signing this Agreement, the defendant waives any and all rights in the foregoing respects.

**E.  Civil Forfeiture:**  The defendant agrees to sign a Stipulation for Final Judgment of Forfeiture in the pending civil action, <u>U.S. v. Approximately $415,000.00 in U.S. Currency seized from Sun National Bank, et al.</u>, 2:08-CV-01899-GEB-GGH, forfeiting to the United States all of his and Intramark USA, Inc.'s ("Intramark") right, title, and interest in the defendant funds.  This stipulation must be signed at least seven days prior to sentencing.

**F.  Payment of Fine:**  The defendant agrees to pay a criminal

6

fine if so ordered. The government's recommendation with respect to any such criminal fine is set forth in Section III.D of this Plea and Cooperation Agreement.

## III.

## THE GOVERNMENT'S OBLIGATIONS

**A. Incarceration Range:** The government will recommend that the defendant be sentenced to the bottom of the applicable guideline range for his offense as determined by the United States Probation Office.

**B. Acceptance of Responsibility:** The government agrees that a three-level reduction in defendant's offense level for his full and clear demonstration of acceptance of responsibility is appropriate under U.S.S.G. § 3E1.1, will not oppose such a reduction and will so move under § 3E1.1(b), so long as the defendant pleads guilty, meets with and assists the probation officer in the preparation of the pre-sentence report, is truthful and candid with the probation officer and the Court, and does not otherwise engage in conduct that constitutes obstruction of justice within the meaning of U.S.S.G. § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

**C. Reduction of Sentence for Cooperation:** The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced to reflect his substantial assistance to the government in the investigation and prosecution of

7

others, pursuant to U.S.S.G. § 5K1.1.  The defendant understands that he must comply with paragraph II(D) of this Plea and Cooperation Agreement.  The defendant understands that the government's recommended reduction in his sentence will depend upon the level of assistance the government determines that the defendant has provided.  The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court.

Other than as set forth above, the government agrees that any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable guideline range in his case, pursuant to U.S.S.G. § 1B1.8.

**D.  Fine:**  The government agrees to recommend that any criminal fine imposed on the defendant be no higher than the midpoint of the applicable fine range, given the defendant's offense level and sentencing range.

**E.  Other Considerations:** To the extent the defendant enters a guilty plea and is sentenced on Counts One, Two and Three of the Information to be filed in this matter, the government, to include the United States Attorney's Office for the District of New Jersey, will not initiate any further criminal charges against the defendant arising out of the same facts and circumstances as the instant charges.

/ / / /

8

# IV.

## ELEMENTS OF THE OFFENSE

With respect to Count One of the Information to be filed in this matter, which charges the defendant with conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), at trial the government would have to prove beyond a reasonable doubt the following elements:

First, that certain leaders, employees and associates of SK Foods, L.P., and its related corporate entities ("SK Foods"), a manufacturer and marketer of bulk tomato and other food products with principal places of business in Monterey, Williams, Ripon, and Lemoore, California, constituted an enterprise, that is, a legal entity, a partnership or group of individuals associated in fact;

Second, that SK Foods was engaged in interstate commerce;

Third, that no later than January 2004 and continuing through at least April 2008, there was an agreement between two or more persons employed by or associated with SK Foods to conduct SK Foods' affairs through a "pattern of racketeering activity" as defined by Title 18, United States Code, Section 1961(a) & (5), namely, multiple acts indictable under Title 18, United States Code, Sections 1341, 1343 and 1346; N.J. STAT. ANN. § 2C:21-10 (2008); CAL. PENAL CODE § 641.3 (2008); and TEX. PENAL CODE § 32.43 (2008), the last of which was to occur within ten years after the commission of a

9

prior such act;

Fourth, the defendant was employed by or associated with SK Foods; and

Fifth, the defendant joined in the illegal agreement referenced above, knowing of its object and intending to help accomplish it.

With respect to Count Two of the Information to be filed in this matter, which charges the defendant with money laundering in violation of 18 U.S.C. § 1957, at trial the government would have to prove beyond a reasonable doubt the following elements:

First, that the defendant knowingly engaged in a monetary transaction;

Second, that the defendant knew the transaction involved criminally derived property;

Third, that the property had a value greater than $10,000;

Fourth, that the property was, in fact, derived from specific acts otherwise indictable under Title 18, United States Code, Sections 1341, 1343 and 1346; N.J. STAT. ANN. § 2C:21-10 (2008); CAL. PENAL CODE § 641.3 (2008); and TEX. PENAL CODE § 32.43 (2008); and

Fifth, that the transaction occurred in the United States.

With respect to Count Three of the Information to be filed in this matter, which charges the defendant with price fixing in violation of 15 U.S.C. § 1 and aiding and abetting in violation of 18 U.S.C. § 2, at trial the government would have to prove beyond a reasonable doubt the following elements:

10

First, that the defendant entered into or aided and abetted a conspiracy;

Second, that the conspiracy was an unreasonable restraint of trade; and

Third, that the conspiracy was in or affected interstate commerce in the United States.

## V.

## MAXIMUM SENTENCE

**A. Maximum Penalty:** With respect to Count One of the Information to be filed in this matter, which charges the defendant with conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), the maximum sentence that the Court can impose is twenty years of incarceration; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; a three-year period of supervised release; and a special assessment of $100.

With respect to Count Two of the Information to be filed in this matter which charges the defendant with money laundering in violation of 18 U.S.C. § 1957, the maximum sentence that the Court can impose is ten years of incarceration, a fine of $250,000 or twice the amount of the criminally derived property involved in the transaction, a three-year period of supervised release, and a special assessment of $100.

11

With respect to Count Three of the Information to be filed in this matter, which charges the defendant with price fixing in violation of 15 U.S.C. § 1 and aiding and abetting in violation of 18 U.S.C. § 2, the maximum sentence the Court can impose is ten years incarceration; a fine in an amount equal to the greatest of (1) $1,000,000, (2) twice the gross pecuniary gain the conspirators derived from the crime, or (3) twice the gross pecuniary loss caused to the victims of the crime by the conspirators; a three-year period of supervised release; and a special assessment of $100.

**B. Violations of Supervised Release:** The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two additional years of imprisonment.

## VI.

### SENTENCING DETERMINATION

**A. Statutory Authority:** The defendant understands that the Court must consult the Federal Sentencing Guidelines (as promulgated by the Sentencing Commission pursuant to the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as modified by United States v. Booker and United States v. Fanfan, 543 U.S. 220, 125 S.Ct. 738 (2005)) and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline

12

sentencing range for this case pursuant to the Sentencing Guidelines. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B. Stipulations Affecting Guidelines Calculations:** The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate and agree to the following:

**1. Offense Level for Racketeering Conspiracy Count:**

**a. Applicable Guidelines Section:** With respect to the charge of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), pursuant to U.S.S.G. § 2E1.1 the defendant's base offense level is the greater of 19 or the offense level applicable to the underlying racketeering activity. In this instance, the guidelines sections applicable to the underlying racketeering activity committed by the defendant are U.S.S.G. §§ 2B4.1 and 2B1.1. Because

13

the guidelines section resulting in the highest offense level is §
2B4.1, and loss amounts under §§ 2B4.1 and 2B1.1 group, the offense
level for the underlying racketeering activity is determined under §
2B4.1.

     **b.  Offense Level Under § 2B4.1:**  The offense level
applicable to the underlying racketeering activity related to the
defendant's commercial bribery and honest services fraud, and mail
fraud is calculated as follows:

        ● **Base Offense Level Under § 2B4.1:** Pursuant
to § 2B4.1, the base offense level is 8.

        ● **Specific Offense Characteristics:** Pursuant
to § 2B4.1(b)(1), the parties agree that at an evidentiary hearing
the government is currently in a position to prove that the amount
of loss attributable to the commercial bribery and honest services
fraud committed by the defendant, and relevant conduct, and the loss
attributable to the mail fraud, is greater than $400,000, but less
than $1,000,000.  Consequently, the base offense level is increased
by 14.

        ● **Adjusted Offense Level Under § 2B4.1:**  As a
result of the foregoing stipulations, the adjusted offense level
applicable to the underlying racketeering activity related to the
defendant's commercial bribery and honest services fraud, and mail
fraud is 22.

     **c.  Racketeering Conspiracy Count Offense Level:**  As

14

a result of the foregoing stipulations, the adjusted offense level
for the racketeering conspiracy count is a level 22.

### 2. Offense Level for Money Laundering Count:

**a. Base Offense Level:** Pursuant to U.S.S.G. §
2S1.1(a)(1) the defendant's base offense level with respect to the
money laundering charge is 22, since that is the offense level for
the underlying offense from which the laundered funds were derived.

**b. Specific Offense Characteristics:** Pursuant to
U.S.S.G. § 2S1.1(b)(2)(A), because the defendant is pleading guilty
to conduct criminalized by 18 U.S.C. § 1957, the base offense level
is increased by 1 level.

**c. Money Laundering Count Offense Level:** As a result
of the foregoing stipulations, the adjusted offense level for the
money laundering count is 23.

### 3. Offense Level for Violations of the Sherman Act:

**a. Base Offense Level:** Pursuant to U.S.S.G. §
2R1.1(a) the defendant's base offense level with respect to Count
Three is 12.

**b. Specific Offense Characteristics:** Because the
defendant's conduct involved participation in an agreement to submit
non-competitive bids, the base offense level is increased by 1 level
pursuant to U.S.S.G. § 2R1.1(b)(1). Pursuant to U.S.S.G. §
2R1.1(b)(2), because the volume of commerce attributable to the
defendant is greater than $10,000,000, but less than $40,000,000,

15

the base offense level is increased by an additional 4 levels.

**c. Sherman Act Count Offense Level:** As a result of the foregoing stipulations, the adjusted offense level with respect to Count Three is 17.

**4. Application of Multiple Count Rules in Chapter Three:** Pursuant to U.S.S.G. § 3D1.2(d), the offenses covered in Counts One through Three of the Information to be filed in this case merge for grouping purposes, resulting in an offense level of 23.

**5. Aggravating Role in Offense:** Because the defendant served as a manager or supervisor with respect to the criminal activity charged, and that activity involved five or more participants and was otherwise extensive, defendant's offense level is increased by 3 levels.

**6. Total Offense Level:** Pursuant to the foregoing stipulations, defendant's total offense level is 26.

**7. Acceptance of Responsibility:** Pursuant to § 3E1.1 and as described in more detail in paragraph III(B) above, the defendant's total offense level is decreased by three levels because of his acceptance of responsibility. The Adjusted Total Offense Level is therefore 23.

**8. Criminal History:** The parties agree that the defendant's criminal history is to be determined by United States Probation.

**9. Departures or Other Enhancements or Reductions:** The

16

parties stipulate and agree that they will not seek or argue in

support of any other specific offense characteristics, Chapter Three

adjustments or cross-references, other than those contemplated in

the foregoing stipulations. Both parties stipulate and agree not to

move for, or argue in support of, any departure from the Sentencing

Guidelines, or any deviance or variance from the Sentencing

Guidelines under <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct.

738 (2005), except: (1) pursuant to U.S.S.G. § 5K1.1; and (2) to

account for the defendant's health condition at the time of

sentencing. If either party breaches this provision, the other

party shall be relieved of all of its obligations under this Plea

and Cooperation Agreement.

**VII.**

**WAIVERS**

**A. Waiver of Constitutional Rights:** The defendant understands

that by pleading guilty he is waiving the following constitutional

rights: (a) to plead not guilty and to persist in that plea if

already made; (b) to be tried by a jury; (c) to be assisted at trial

by an attorney, who would be appointed if necessary; (d) to subpoena

witnesses to testify on his behalf; (e) to confront and cross-

examine witnesses against him; and (f) not to be compelled to

incriminate himself.

**B. Waiver of Appeal and Collateral Attack:** The defendant

understands that the law gives him a right to appeal his conviction

17

and sentence. He agrees as part of his plea, however, to give up the right to appeal the conviction and the right to appeal any aspect of the sentence imposed in this case so long as his sentence is no longer than the top of the Sentencing Guidelines range determined by the Court consistent with the stipulations set forth above about the Sentencing Guidelines variables.

Regardless of the sentence he receives, the defendant also gives up any right he may have to bring a post-appeal attack on his conviction or his sentence. He specifically agrees not to file a motion under 28 U.S.C. § 2255 or § 2241 attacking his conviction or sentence.

If the defendant ever attempts to vacate his plea, dismiss the underlying charges, or reduce or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this Plea and Cooperation Agreement; and (3) to file any new charges that would otherwise be barred by this Plea and Cooperation Agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By signing this Plea and Cooperation Agreement, the defendant agrees to waive any objections, motions, and defenses he might have to the government's decision. In particular, he agrees not to raise any objections based on the passage of time with

18

respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

**C. Waiver of Attorneys' Fees and Costs:** The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations.

## VIII.

### ENTIRE PLEA AND COOPERATION AGREEMENT

Other than this Plea and Cooperation Agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

19

## APPROVALS AND SIGNATURES

**A.  Defense Counsel:**  I have read this Plea and Cooperation Agreement and have discussed it fully with my client.  The Plea and Cooperation Agreement accurately and completely sets forth the entirety of the agreement, and I have no reason to believe that my client's plea of guilty should not be entered.

DATED:  _____12/9/08_____          _____
                                  CHRISTOPHER D. ADAMS
                                  ALAN SILBER
                                  DAVID W. DRATMAN
                                  Attorneys for Defendant

**B.  Defendant:**  I have read this Plea and Cooperation Agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this Plea and Cooperation Agreement.  In addition, no one has threatened or forced me in any way to enter into this Plea and Cooperation Agreement.  Finally, I am satisfied with the representation of my attorney in this case.

DATED:  _____12/9/08_____          _____
                                  RANDALL LEE RAHAL, Defendant

20

**C. Attorney for United States:** I accept and agree to this Plea and Cooperation Agreement on behalf of the government.

DATED: 12/16/08

McGREGOR W. SCOTT
United States Attorney

By: [signature] Benjamin Wagner
BENJAMIN B. WAGNER
SEAN C. FLYNN
Assistant U.S. Attorneys

DEBORAH A. GARZA
Acting Asst. Attorney General

By: [signature] Benjamin Wagner for
BARBARA NELSON
RICHARD COHEN
LARA KROOP
Trial Attorneys
U.S. Department of Justice
Antitrust Division

21

## EXHIBIT "A"
### Factual Basis for Plea

At trial, the government would prove the following facts beyond a reasonable doubt:

Since 1990, Randall Rahal ("Rahal") has served as the president of Intramark USA, Inc. ("Intramark"), a New Jersey based company that holds itself out as a wholesaler of food ingredients, including tomato products, and an importer of juice concentrates. Since at least 1993 until April 2008, Rahal was an agent of, a partner of, or was associated with SK Foods, L.P., a limited partnership with principal places of business in Monterey, California, and Williams, Ripon, and Lemoore, California, in the Eastern District of California. SK Foods, L.P., and its related corporate entities ("SK Foods") is a grower and processor of tomato products and other food products, for sale to food product manufacturers, food service distributors and marketers, and retail outlets. Rahal acted as a kind of advisor and supervisor for SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from SK Foods employees. Since at least 2004 until April 2008, Rahal formally served on SK Foods' board of directors. SK Foods, including Rahal and other of its leaders, employees and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is a legal entity that was engaged in, and whose activities affected, interstate and foreign commerce.

Through Intramark, Rahal served as a broker for SK Foods. In that capacity, Rahal oversaw among other things the negotiation of contracts between SK Foods and many of its customers, such as Kraft Foods, Inc. ("Kraft"), ConAgra Foods, Inc. ("ConAgra"), B&G Foods, Inc. ("B&G") and Frito-Lay, Inc. ("Frito-Lay").

## The Racketeering Conspiracy

Beginning no later than January 2004 and continuing until at least April 2008, there was an agreement between Rahal and other leaders, employees and associates of SK Foods to conduct SK Foods' business and affairs through a pattern of racketeering activity in the Eastern District of California and elsewhere. Specifically, Rahal, on behalf of SK Foods, routinely paid bribes to the purchasing agents of many of SK Foods' customers in order to ensure that those customers purchased tomato-based products, and other products, from SK Foods rather than from its competitors. In other instances, Rahal paid bribes to purchasing agents so that those agents would provide bidding and other proprietary information from SK Foods' competitors. Between January 2004 and April 2008, Rahal,

22

with the knowledge, and in some instances at the direction of certain leaders of SK Foods, paid bribes in this fashion to certain purchasing agents of, among others, Kraft, B&G and Frito-Lay, in violation of applicable state bribery laws, and 18 U.S.C. §§ 1341, 1343 and 1346.

In addition to the bribery of its customers' purchasing agents, between January 2004 and April 2008, SK Foods, with the assistance of Rahal, constructed and transmitted to its customers fraudulent financial and business information with the goal of inducing those customers to do business with, and release funds to SK Foods. For example, as part of a scheme to defraud ConAgra in June 2007, Rahal arranged for SK Foods to fabricate and backdate an invoice between SK Foods and Hatch Foods ("Hatch"), a ConAgra competitor (without Hatch's knowledge), which reflected a false and inflated price paid by Hatch for tomato product from SK Foods. The fraudulent invoice, which falsely reflected that SK Foods was charging Hatch for canned tomato product at a rate 39% higher than it actually was, was transmitted to ConAgra in an effort to ensure ConAgra signed a three-year contract for tomato paste with SK Foods, at a price of approximately $74,570,000.

Furthermore, between 2004 and April 2008, SK Foods, with the assistance of Rahal, knowingly and routinely sold processed tomato product to customers that did not meet customer specifications and falsified both internal documentation, and customer-bound product labels, quality control documents, bills of lading, and "Certificates of Analysis" ("COA"), in order to make it appear as if the processed tomato product shipped to customers was compliant with contract requirements. SK Foods' falsification of documentation involved various misstatements to its customers concerning both the quality and content of the product. This practice of providing customers with noncompliant and mis-marked product was done with knowledge and at the direction of Rahal and other leaders of SK Foods, and was in violation of 18 U.S.C. § 1341.

Rahal and his co-conspirators at SK Foods conspired, among other things, to commit the following predicate offenses:

**Racketeering Act #1: Honest Services Mail Fraud and Commercial Bribery with Respect to B&G Foods, Inc.**

B&G is a multinational manufacturer, seller and distributor of various food products with a principal place of business in Parsippany, New Jersey. B&G is a regular customer of SK Foods with respect to tomato-based products, and other products. Between January 2004 and April 2008, Bribe Recipient #1 served as a purchasing manager at B&G, working out of the company's Parsippany,

23

New Jersey headquarters. In that capacity, Bribe Recipient #1 was vested with the authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of certain food products from processors, such as SK Foods. In performing these functions, Bribe Recipient #1 owed a duty of honest services to B&G.

In May 2007, SK Foods and B&G entered into a "cost-plus" contract whereby SK Foods agreed to sell B&G 13,000,000 pounds of chile and jalapeno peppers at a price of $0.22 per pound. Subsequent to entering into the agreement, and at the direction of another leader of SK Foods, Rahal and Bribe Recipient #1 agreed to increase the price per pound that B&G would pay SK Foods under the agreement. Rahal and another leader of SK Foods further agreed that they would provide Bribe Recipient #1 with a fictitious justification for the increased contract price, namely that SK Foods was experiencing increased agricultural costs in connection with the peppers, and that Bribe Recipient #1 would provide this justification to his employers.

As a result of Rahal, the other leader of SK Foods, and Bribe Recipient #1's actions, the contract price for the sale of the first 6,500,000 pounds of peppers to B&G was increased to $0.25 per pound. The contract price for the remaining 6,500,000 pounds of peppers was increased to $0.285 per pound.

In exchange for his efforts in helping to secure the pepper contract between SK Foods and B&G, as well as its price, Rahal promised Bribe Recipient #1 a personal bribe payment in the approximate amount of $65,000 – equating to $.005 per pound on the entire contract. On July 12, 2007, in an intercepted wire communication, Rahal confirmed the amount of the bribe payment with Bribe Recipient #1.

On or about December 12, 2007, Rahal directed a check in the amount of $9,689.80 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #1's wife, via United States mail, in partial satisfaction of the agreed to bribe payment. Between January 2004 and April 2008, Bribe Recipient #1 received at least $14,698.80 in bribe payments from Rahal. One such additional bribe payment occurred on or about July 11, 2007. On that date, Rahal directed a check in the amount of $2,000 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #1's wife, via United States mail. Assisted by Rahal, Bribe Recipient #1's actions violated a duty of fidelity owed to B&G, which is outlined in Section 2 of B&G Foods, Inc.'s Code of Business Conduct and Ethics. Such conduct violated 18 U.S.C. §§ 1341 and 1346, and N.J. STAT. ANN. § 2C:21-10.

24

**Racketeering Act #2:  Honest Services Mail Fraud with Respect to Kraft Foods**

Kraft is a multinational food company with a principal place of business in Northfield, Illinois.  Kraft is a regular customer of SK Foods with respect to tomato paste and other tomato-based products. From at least January 2004 until April 2008, Bribe Recipient #2 served as a purchasing manager for Kraft, working out of the company's Northfield, Illinois headquarters.  In that capacity, Bribe Recipient #2 was vested with the authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of certain food products from various processors, such as SK Foods.  In performing these functions, Bribe Recipient #2 owed a duty of honest services to Kraft.

In the normal course, Kraft and Bribe Recipient #2 received bids for the sale of tomato-based products from processors to Kraft by way of what was intended to be a secret and competitive bidding process.  As part of a scheme to defraud Kraft of its right to Bribe Recipient #2's honest services and to secure contracts with Kraft for the sale of tomato products at elevated prices, beginning in 2004 Rahal began making bribe payments to Bribe Recipient #2 on behalf of SK Foods.

As part of the scheme to defraud Kraft, between January 2004 and April 2008, Rahal paid Bribe Recipient #2 approximately $158,000 in bribes on behalf of SK Foods in order secure Kraft's business, and to induce Bribe Recipient #2 to provide SK Foods with certain proprietary information of SK Foods' competitors.  These bribe payments were made with the knowledge and encouragement of other leaders and employees of SK Foods.  For example, in a recorded telephone conversation on April 14, 2008, another leader of SK Foods and Rahal discussed how Rahal had just made personal bribe payments to Bribe Recipient #2 totaling $24,000.  Later in that same conversation, the other leader of SK Foods expressed concern to Rahal that SK Foods was not getting a maximum value for its bribes to Bribe Recipient #2.

One such payment occurred on or about January 19, 2006.  On that date, Rahal directed a check in the amount of $10,000.00 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #2 in Wheeling, Illinois, via United States mail.  On July 25, 2007, Rahal subsequently directed a second check in the amount of $17,252.78 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #2, via United States mail.

As a result of Rahal's bribe payments to Bribe Recipient #2,

between 2004 and 2008 SK Foods was able to secure contracts for the sale of approximately 230 million pounds of tomato product to Kraft at elevated prices, causing a substantial loss to Kraft Foods.

Rahal and Bribe Recipient #2's actions were in direct contravention of the conflict of interest policies set forth in Kraft Foods Code of Conduct for Compliance and Integrity, and were intended to, and did deprive Kraft of its right to Bribe Recipient #2's honest services. Such conduct violated 18 U.S.C. §§ 1341 and 1346.

## Racketeering Act #3: Honest Services Mail Fraud with Respect to Frito-Lay

Frito-Lay is a multinational food company with a principal place of business in Plano, Texas. Frito-Lay is a regular customer of SK Foods with respect to tomato-based products, and various other food products. From at least January 2004 until April 2008, Bribe Recipient #3 served as a purchasing manager for Frito-Lay, working out of the company's Plano, Texas headquarters. In that capacity, Bribe Recipient #3 was vested with the authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of certain food products from various processors, such as SK Foods. In performing these functions, Bribe Recipient #3 owed a duty of honest services to Frito-Lay.

In the normal course, Frito-Lay and Bribe Recipient #3 received bids for the sale of tomato-based products from processors to Frito-Lay by way of what was intended to be a competitive bidding process. As part of a scheme to defraud Frito-Lay of its right to Bribe Recipient #3's honest services and to secure contracts with Frito-Lay for the sale of tomato products at elevated prices, beginning in 1998, Rahal began making bribe payments to Bribe Recipient #3 on behalf of SK Foods.

As part of the scheme to defraud Frito-Lay, between January 2004 and April 2008, Rahal with the knowledge and encouragement of other leaders and employees of SK Foods, paid approximately $81,000 in bribes on behalf of SK Foods in order secure Frito-Lay's business. One such payment occurred on or about September 7, 2006. On that date Rahal directed a check in the amount of $4,000.00 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #3 in Dallas, Texas, via United States mail. On March 26, 2008, Rahal subsequently directed a check in the amount of $5,722.94 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #3 in Dallas, Texas, via United States mail.

As a result of Rahal's bribe payments to Bribe Recipient #3,

26

between 2004 and 2008, SK Foods was able to secure contracts for the sale of tomato and other food products to Frito-Lay at elevated prices, causing a substantial loss to Frito-Lay.

Rahal and Bribe Recipient #3's actions were in direct contravention of the conflict of interest policies set forth in Frito-Lay's Code of Conduct, and were intended to, and did deprive Frito-Lay of its right to Bribe Recipient #3's honest services. Such conduct violated 18 U.S.C. §§ 1341 and 1346, and TEX. PENAL CODE § 32.43.

**Racketeering Act #4:  Mail Fraud (Mislabeled Product) with Respect to Kraft Foods**

The market price of processed tomato product is based in large part on the percentage of Natural Tomato Soluble Solids (NTSS) that the product contains.  In the normal course, processed tomato product with a higher concentration of tomato solids costs more on the open market than tomato product with a lesser concentration. Customers frequently specify an NTSS concentration in their contracts with manufacturers such as SK Foods.  Customers will also often specify acceptable levels of other tomato product characteristics such as the product's pH, mold content, acidity and viscosity.

During 2007, SK Foods experienced a period during which it was unable to produce an adequate supply of processed tomato paste containing 31% NTSS (Natural Tomato Soluble Solids) in order to meet its contractual obligations to certain customers, including Kraft. In an attempt to alleviate the shortage, a leader of SK Foods contacted a competing manufacturer of processed tomato products in February 2007, and arranged to purchase approximately 3,400,000 pounds of processed tomato product containing lower NTSS concentrations of 26% and 28%.

As the product purchased from the competitor did not meet the specifications contained in certain of SK Foods' existing contracts, in order to conceal the inferior quality of the product, and as part of a scheme to defraud Kraft, Rahal and another leader of SK Foods directed certain SK Foods employees to falsify both internal and customer-bound documentation so that it incorrectly reflected the product as containing 31% NTSS tomato paste.  The same documentation was also altered so that it reflected a significantly lower mold content than what the product actually contained.  The processed tomato product and the accompanying altered documentation were ultimately shipped, during the spring of 2007, via interstate carrier from SK Foods' facilities in the Eastern District of California to Kraft's facilities in other states.  One such shipment

27

occurred on or about April 12, 2007. On that date, SK Foods shipped tomato product, accompanied by among other things, a bill of lading, which falsely identified the shipment as containing 31% NTSS tomato paste, from its facilities in the Eastern District of California to Kraft in Darien, Wisconsin. A copy of the falsified bill of lading was also transmitted on or about April 12, 2007, via United States mail, to a separate Kraft address in San Antonio, Texas. Copies of the altered documentation were provided to Rahal and Intramark, via facsimile, in the District of New Jersey. At the time it was shipped, Rahal and executives at SK Foods knew the documentation was false with respect to the processed tomato product's NTSS level, a fact that was material to Kraft's decision to pay SK Foods for the product.

As a result of SK Foods' scheme to defraud, Kraft unknowingly paid approximately 11% and 12% above market rate for the 28% and 26% NTSS processed tomato product, respectively, causing a loss to Kraft in the approximate amount of $136,020.

**Money Laundering**

On or about April 16, 2007, Rahal transmitted check number 7760 in the amount of $12,896.00 from Intramark's Sun National Bank account number XXXXXX5624 to Bribe Recipient #2 in Wheeling, Illinois, which was received, via United States mail. As Rahal well knew at the time of its transmission, the check represented the proceeds of acts otherwise indictable under Title 18, United States Code, Sections 1341 and 1346, specifically Rahal's and SK Foods' scheme to defraud Kraft of its right to Bribe Recipient #2's honest services with respect to the awarding of contracts for the purchase of tomato-based products. The issuance of the check on Intramark's Sun National Bank account constituted a violation of 18 U.S.C. § 1957.

**Violations of the Sherman Act**

Beginning at least as early as February 2006 and continuing until approximately April 2008, Rahal participated in and aided and abetted a conspiracy to fix prices, allocate contracts, and rig bids for processed tomato products, including tomato paste and diced tomatoes. The primary purpose of this conspiracy was to eliminate competition and fix the price of processed tomato products sold in the United States. During the relevant time, Rahal was the owner and president of Intramark USA Inc., a broker selling processed tomato products for itself and on behalf of others. Rahal and his co-conspirators reached agreement to fix the prices to be charged to customers in the United States for processed tomato products in the Eastern District of California and elsewhere. To carry out their

1   agreements, Rahal and his co-conspirators submitted artificially
2   inflated bids and price quotations.  Rahal also acted to assist in
    enforcing the agreements, by obtaining and distributing information
3   about prices offered by co-conspirators and competitors to the
    subject customers.  In at least one instance, a co-conspirator
4   withdrew a quote that did not comply with agreed-to prices after
    being confronted with information obtained by Rahal from the
5   customer.

6        During the relevant period, processed tomato products sold by
    one or more of the conspirators, as well as payment for such
7   products, traveled in interstate commerce.  The business activities
8   of the defendant and co-conspirators were within the flow of, and
    substantially affected, interstate trade and commerce.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

LAWRENCE G. BROWN
Acting United States Attorney
BENJAMIN B. WAGNER
SEAN C. FLYNN
Assistant U.S. Attorneys
501 "I" Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700



**FILED**

JAN 27 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   v.<br><br>ROBERT WATSON,<br><br>          Defendant. | No. CR S 09-0035-LKK<br><br><u>PLEA AGREEMENT</u> |

## I.

## INTRODUCTION

**A.  Scope of Agreement**:  The Information to be filed in this case charges the defendant, Robert Watson ("Watson"), with two counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.  This document contains the complete plea agreement between the United States Attorney's Office for the Eastern District of California (the "government") and the defendant regarding this case.  This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

1

EXHIBIT C
33

1    **B.   Court Not a Party:**  The Court is not a party to this plea
2    agreement.  Sentencing is a matter solely within the discretion of
3    the Court, the Court is under no obligation to accept any
4    recommendations made by the government, and the Court may in its
5    discretion impose any sentence it deems appropriate up to and
6    including the statutory maximum stated in this plea agreement.  If
7    the Court should impose any sentence up to the maximum established
8    by the statute, the defendant cannot, for that reason alone,
9    withdraw his guilty plea, and he will remain bound to fulfill all of
10   the obligations under this plea agreement.  The defendant
11   understands that neither the prosecutor, defense counsel, nor the
12   Court can make a binding prediction or promise regarding the
13   sentence he will receive.

14                                **II.**

15                        **DEFENDANT'S OBLIGATIONS**

16   **A.   Waiver of Indictment and Venue:**  The defendant will waive
17   indictment by grand jury, waive venue in the Northern District of
18   Illinois, and agree to proceed in the Eastern District of
19   California.  He consents to the filing of a two-count Information,
20   substantially in the form attached hereto as <u>Exhibit B</u>, charging him
21   with honest services mail fraud (2 counts) in violation of 18 U.S.C.
22   §§ 1341 and 1346.

23   **B.   Guilty Plea:**  The defendant will plead guilty to the
24   Information charging him with two counts of honest services mail
25   fraud.  The defendant agrees that he is in fact guilty of those
26   charges and that the facts set forth in the Factual Basis attached
27   hereto as <u>Exhibit A</u> are true and accurate.

28   **C.   Restitution:**  The Mandatory Victim Restitution Act requires

2

EXHIBIT C

34

the Court to order restitution to the victims of certain offenses. If such restitution is ordered, payment should be by cashier's or certified check made payable to the Clerk of the Court. Defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

D. **Special Assessment:** The defendant agrees to pay a special assessment of $200 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

**III.**

**THE GOVERNMENT'S OBLIGATIONS**

A. **Incarceration Range:** The government will recommend that the defendant be sentenced to the mid-point of the applicable guideline range for his offense as determined by the United States Probation Office.

B. **Acceptance of Responsibility:** If the United States Probation Office determines that a three-level reduction in defendant's offense level for his full and clear demonstration of acceptance of responsibility is appropriate under U.S.S.G. § 3E1.1, the government will not oppose such a reduction and will so move under § 3E1.1(b), so long as the defendant pleads guilty, meets with and assists the probation officer in the preparation of the pre-sentence report, is truthful and candid with the probation officer and the Court, and does not otherwise engage in conduct that constitutes obstruction of justice within the meaning of U.S.S.G. § 3C1.1, either in the preparation of the pre-sentence report or

3

EXHIBIT C

35

1 during the sentencing proceeding.

IV.

**ELEMENTS OF THE OFFENSE**

With respect to Counts One and Two of the Information to be filed in this matter, which charge the defendant with honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, at trial the government would have to prove beyond a reasonable doubt the following elements:

First, that the defendant knowingly made up a material scheme or plan to deprive his employer Kraft Foods, Inc. of its intangible right to the defendant's honest services;

Second, the defendant acted with the intent to deprive Kraft Foods, Inc. of its intangible right to the defendant's honest services; and

Third, the defendant used, or caused to someone to use, the mails to carry out or to attempt to carry out the scheme or plan.

V.

**MAXIMUM SENTENCE**

**A. Maximum Penalty:** With respect to Counts One and Two of the Information to be filed in this matter charging violations of 18 U.S.C. §§ 1341 and 1346, the maximum sentence that the Court can impose is twenty years of incarceration, a fine of $250,000, a three-year period of supervised release, and a special assessment of $100 on each count.

**B. Violations of Supervised Release:** The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up

4

EXHIBIT C
36

to three additional years of imprisonment.

VI.

**SENTENCING DETERMINATION**

A. **Statutory Authority:** The defendant understands that the Court must consult the Federal Sentencing Guidelines (as promulgated by the Sentencing Commission pursuant to the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as modified by <u>United States v. Booker</u> and <u>United States v. Fanfan</u>, 543 U.S. 220, 125 S.Ct. 738 (2005)) and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

B. **Stipulations Affecting Guidelines Calculations:** The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate and agree to the following:

1. **Base Offense Level:** The defendant's base offense level is eight pursuant to U.S.S.G. § 2B4.1.

5

EXHIBIT C

37

2. **Specific Offense Characteristics:** Pursuant to U.S.S.G. §§ 2B4.1(b)(1) and 2B1.1(b)(1), the parties agree that at an evidentiary hearing the government is currently in a position to prove that the amount of loss attributable to the honest services mail fraud committed by the defendant, and relevant conduct, is greater than $120,000, but less than $200,000. Consequently, the base offense level is increased by ten.

3. **Abuse of Trust:** The parties stipulate and agree that in committing the conduct alleged in Counts One and Two of the Information to be filed in this matter defendant abused a position of public or private trust. Consequently, there is a two level enhancement pursuant to U.S.S.G. § 3B1.3.

4. **Acceptance of Responsibility:** See paragraph III.B above.

5. **Total Offense Level:** Pursuant to the foregoing stipulations, and assuming the defendant accepts responsibility for his conduct under U.S.S.G. § 3E1.1, the defendant's total adjusted offense level is seventeen.

6. **Criminal History:** The parties agree that the defendant's criminal history is to be determined by United States Probation.

7. **Departures or Other Enhancements or Reductions:** The parties stipulate and agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments or cross-references, other than those contemplated in the foregoing stipulations. Both parties stipulate and agree not to move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or variance from the Sentencing

6

EXHIBIT C
38

Guidelines under <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005). If either party breaches this provision, the other party shall be relieved of all of its obligations under this plea agreement.

**VII.**

**WAIVERS**

**A. Waiver of Constitutional Rights:** The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

**B. Waiver of Appeal and Collateral Attack:** The defendant understands that the law gives him a right to appeal his conviction and sentence. He agrees as part of his plea, however, to give up the right to appeal the conviction and the right to appeal any aspect of the sentence imposed in this case so long as his sentence is no longer than the top of the Sentencing Guidelines range determined by the Court consistent with the stipulations set forth above about the Sentencing Guidelines variables.

Regardless of the sentence he receives, the defendant also gives up any right he may have to bring a post-appeal attack on his conviction or his sentence. He specifically agrees not to file a motion under 28 U.S.C. § 2255 or § 2241 attacking his conviction or sentence.

If the defendant ever attempts to vacate his plea, dismiss the

7

EXHIBIT C

39

underlying charges, or reduce or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses he might have to the government's decision. In particular, he agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

C. **Waiver of Attorneys' Fees and Costs:** The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations.

**VIII.**

**ENTIRE PLEA AGREEMENT**

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United

8

EXHIBIT C
40

States.

## IX.

### APPROVALS AND SIGNATURES

A. **Defense Counsel:** I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea agreement.

DATED: _1-27-09_ _____
THOMAS ORGAN
Attorney for Defendant

B. **Defendant:** I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

DATED: _1-22-09_ _____
ROBERT WATSON, Defendant

/ / / /

/ / / /

/ / / /

9

EXHIBIT C
41

1      **C. Attorney for United States:** I accept and agree to this

2  Plea Agreement on behalf of the government.

3

4  DATED: _January 27, 2009_       LAWRENCE G. BROWN

5                              Acting United States Attorney

6

7                         By: _____

8                         BENJAMIN B. WAGNER

                              SEAN C. FLYNN

9                         Assistant U.S. Attorneys

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

EXHIBIT C

### EXHIBIT "A"
#### Factual Basis for Plea

At trial, the government would prove the following facts beyond a reasonable doubt:

From at least January 2004 until April 2008, defendant Robert Watson ("Watson") served as Purchasing Manager for Kraft Foods, Inc. ("Kraft"), a multinational food company with a principal place of business and headquarters in Northfield, Illinois. In that capacity, Watson was vested with authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of tomato-based products and other food products from various processors. In the normal course, Kraft Foods and Watson received bids for the sale of tomato-based products from processors to Kraft by way of what was intended to be a secret and competitive bidding process. In performing these functions, Watson owed Kraft Foods a duty of honest services.

One company which routinely sold processed tomato products and other food products to Kraft was SK Foods, L.P., a limited partnership with principal places of business in Monterey, California, and in Williams, Ripon and Lemoore, California, in the Eastern District of California. SK Foods, L.P. and its related corporate entities ("SK Foods") is a grower and processor of tomato products and other food products, for sale to food product manufacturers, food service distributors and marketers, and retail outlets. In negotiating and entering into contracts between Kraft and SK Foods, Watson routinely dealt with Randall Rahal, a supervisor and Director of SK Foods, who also served as an SK Foods sales broker through his New Jersey-based food service company Intramark USA, Inc. ("Intramark").

As part of a scheme to defraud Kraft of its right to Watson's honest services, beginning in 2004 Watson began receiving personal bribe payments from Rahal, on behalf of SK Foods. Between January 2004 and April 2008, Rahal paid Watson approximately $158,000 in bribes on behalf of SK Foods. In return for the bribes, Watson agreed to, and did, ensure that Kraft Foods purchased processed tomato products and other products from SK Foods rather than from certain of SK Foods' competitors. In addition, in return for the bribes, Watson provided SK Foods with information that allowed SK Foods to sell processed tomato products to Kraft at inflated prices. Rahal's bribe payments to Watson were made with the knowledge and encouragement of other leaders and employees at SK Foods.

One such payment occurred on or about January 19, 2006. On that date, Watson accepted from Rahal a check in the amount of $10,000, which was drawn on Intramark's Sun National Bank account number XXXXXX5624. Watson received the check in Wheeling, Illinois, via United States mail. On July 25, 2007, Watson subsequently accepted from Rahal a second check in the amount of $17,252.78, which was drawn on Intramark's Sun National Bank account number XXXXXX5624. Watson received the check in Wheeling, Illinois, via United States mail.

11

EXHIBIT C
43

1    In return for Rahal and SK Foods' personal bribery payments,
2 between 2004 and 2008 Watson ensured that SK Foods secured contracts
  with Kraft for the sale of approximately 230 million pounds of
3 tomato product at elevated prices, causing a substantial loss to
  Kraft.

4    Watson, Rahal and SK Foods' actions were in direct
  contravention of the conflict of interest policies set forth in the
5 Kraft Foods Code of Conduct for Compliance and Integrity, and were
  intended to, and did deprive Kraft of its right to Watson's honest
6 services.  Such conduct violated 18 U.S.C. §§ 1341 and 1346, and 720
  ILL. COMP. STAT. 5/29A-2 (2008).

12

EXHIBIT C
44

1  LAWRENCE BROWN
   Acting United States Attorney
2  BENJAMIN B. WAGNER
   SEAN C. FLYNN
3  Assistant U.S. Attorneys
   501 "I" Street, Suite 10-100
4  Sacramento, California 95814
   Telephone: (916) 554-2700



FILED

FEB 18 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,　)<br>　　　　　　　　　　　　)<br>　　　　　　Plaintiff,　　)<br>　　　　　　　　　　　　)<br>　　v.　　　　　　　　　)<br>　　　　　　　　　　　　)<br>JENNIFER LOU DAHLMAN,　　)<br>　　　　　　　　　　　　)<br>　　　　　　Defendant.　　)<br>_____) | No. Cr. S 09-0062-LKK<br><br>PLEA AND COOPERATION AGREEMENT |

## I.

## INTRODUCTION

**A.  Scope of Agreement:**  The Information to be filed in this case charges the defendant, Jennifer Lou Dahlman ("Dahlman"), with causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).  This document contains the complete plea and cooperation agreement between the United States Attorney's Office for the Eastern District of California and the United States Department of Justice, Antitrust Division (the "government"), and the defendant regarding this case.  This plea and cooperation agreement is limited

1

EXHIBIT D
45

1  to the United States Attorney's Office for the Eastern District of
2  California and the United States Department of Justice, Antitrust
3  Division, and cannot bind any other federal, state, or local
4  prosecuting, administrative, or regulatory authorities.

5  **B. Court Not a Party:** The Court is not a party to this plea
6  and cooperation agreement. Sentencing is a matter solely within the
7  discretion of the Court, the Court is under no obligation to accept
8  any recommendations made by the government, and the Court may in its
9  discretion impose any sentence it deems appropriate up to and
10 including the statutory maximum stated in this plea and cooperation
11 agreement. If the Court should impose any sentence up to the
12 maximum established by the statute, the defendant cannot, for that
13 reason alone, withdraw her guilty plea, and she will remain bound to
14 fulfill all of the obligations under this plea and cooperation
15 agreement. The defendant understands that neither the prosecutor,
16 defense counsel, nor the Court can make a binding prediction or
17 promise regarding the sentence she will receive.

18                                    **II.**
19                          **DEFENDANT'S OBLIGATIONS**

20 **A. Waiver of Indictment and Guilty Plea:** The defendant will
21 waive indictment by grand jury, and plead guilty to a one-count
22 Information, substantially in the form attached hereto as <u>Exhibit B</u>,
23 charging her with causing the introduction or delivery for
24 introduction of adulterated and misbranded food into interstate
25 commerce with the intent to defraud and mislead in violation of 21
26 U.S.C. §§ 331(a) and 333(a)(2). The defendant agrees that she is in
27 fact guilty of that charge and that the facts set forth in the
28 Factual Basis attached hereto as <u>Exhibit A</u> are true and accurate.

2

1     **B. Restitution:** The Mandatory Victim Restitution Act requires
2 the Court to order restitution to the victims of certain offenses.
3 The parties recognize that United States Probation will make a
4 determination regarding the defendant's restitution obligation in
5 this matter, however, the parties reserve the right to present
6 evidence and arguments at the time of sentencing concerning the
7 applicability or amount of any court ordered restitution obligation.
8 If such restitution is ordered, payment should be by cashier's or
9 certified check made payable to the Clerk of the Court. The
10 defendant understands that this plea and cooperation agreement is
11 voidable by the government if she fails to pay the restitution as
12 ordered by the Court. Defendant further agrees that she will not
13 seek to discharge any restitution obligation or any part of such
14 obligation in any bankruptcy proceeding.

15     **C. Special Assessment:** The defendant agrees to pay a special
16 assessment of $100 at the time of sentencing by delivering a check
17 or money order payable to the United States District Court to the
18 United States Probation Office immediately before the sentencing
19 hearing.

20     **D. Agreement to Cooperate:** The defendant agrees to cooperate
21 fully with the government and any other federal, state, or local law
22 enforcement agency, as directed by the government. As used in this
23 plea and cooperation agreement, "cooperation" requires the
24 defendant: (1) to respond truthfully and completely to all
25 questions, whether in interviews, in correspondence, telephone
26 conversations, before a grand jury, or at any trial or other court
27 proceeding; (2) to attend all meetings, grand jury sessions, trials,
28 and other proceedings at which the defendant's presence is requested

3

1 by the government or compelled by subpoena or court order; (3) to
2 produce voluntarily any and all documents, records, or other
3 tangible evidence requested by the government; (4) not to
4 participate in any criminal activity while cooperating with the
5 government; and (5) to disclose to the government the existence and
6 status of all money, property, or assets, of any kind, derived from
7 or acquired as a result of, or used to facilitate the commission of,
8 the defendant's illegal activities or the illegal activities of any
9 conspirators.

10      If the defendant commits any crimes or if any of the
11 defendant's statements or testimony prove to be knowingly false,
12 misleading, or materially incomplete, or if the defendant otherwise
13 violates this plea and cooperation agreement in any way, the
14 government will no longer be bound by its representations to the
15 defendant concerning the limits on criminal prosecution and
16 sentencing as set forth herein.  The determination whether the
17 defendant has violated the plea and cooperation agreement will be
18 under a preponderance of the evidence standard.  If the defendant
19 violates the plea and cooperation agreement, she shall thereafter be
20 subject to prosecution for any federal criminal violation of which
21 the government has knowledge, including but not limited to perjury,
22 false statements, and obstruction of justice.  Because disclosures
23 pursuant to this plea and cooperation agreement will constitute a
24 waiver of the Fifth Amendment privilege against compulsory self-
25 incrimination, any such prosecution may be premised on statements
26 and/or information provided by the defendant.  Moreover, any
27 prosecutions that are not time-barred by the applicable statute of
28 limitations as of the date of this plea and cooperation agreement

4

1 may be commenced in accordance with this paragraph, notwithstanding
2 the expiration of the statute of limitations between the signing of
3 this plea and cooperation agreement and the commencement of any such
4 prosecutions.  The defendant agrees to waive all defenses based on
5 the statute of limitations or delay of prosecution with respect to
6 any prosecutions that are not time-barred as of the date of this
7 plea and cooperation agreement.

8     If it is determined that the defendant has violated any
9 provision of this plea and cooperation agreement or if the defendant
10 successfully moves to withdraw her plea:  (1) all statements made by
11 the defendant to the government or other designated law enforcement
12 agents, or any testimony given by the defendant before a grand jury
13 or other tribunal, whether before or after this plea and cooperation
14 agreement, shall be admissible in evidence in any criminal, civil,
15 or administrative proceedings hereafter brought against the
16 defendant; and (2) the defendant shall assert no claim under the
17 United States Constitution, any statute, Rule 11(f) of the Federal
18 Rules of Criminal Procedure, Rule 410 of the Federal Rules of
19 Evidence, or any other federal rule, that statements made by the
20 defendant before or after this plea and cooperation agreement, or
21 any leads derived therefrom, should be suppressed.  By signing this
22 plea and cooperation agreement, the defendant waives any and all
23 rights in the foregoing respects.

24                              III.

25                    **THE GOVERNMENT'S OBLIGATIONS**

26     **A.   Incarceration Range:**  The government will recommend that
27 the defendant be sentenced to the bottom of the applicable guideline
28 range for her offense as determined by the United States Probation

5

1  Office.

2  **B. Acceptance of Responsibility:** If the United States
3  Probation Office determines that a two level reduction in
4  defendant's offense level for her full and clear demonstration of
5  acceptance of responsibility is appropriate under U.S.S.G. § 3E1.1,
6  the government will not oppose such a reduction and will so move
7  under § 3E1.1(b), so long as the defendant pleads guilty, meets with
8  and assists the probation officer in the preparation of the pre-
9  sentence report, is truthful and candid with the probation officer
10 and the Court, and does not otherwise engage in conduct that
11 constitutes obstruction of justice within the meaning of U.S.S.G. §
12 3C1.1, either in the preparation of the pre-sentence report or
13 during the sentencing proceeding.

14 **C. Reduction of Sentence for Cooperation:** The government
15 agrees to recommend at the time of sentencing that the defendant's
16 sentence of imprisonment be reduced to reflect her substantial
17 assistance to the government in the investigation and prosecution of
18 others, pursuant to U.S.S.G. § 5K1.1. The defendant understands
19 that she must comply with paragraph II(D) of this plea and
20 cooperation agreement. The defendant understands that the
21 government's recommended reduction in her sentence will depend upon
22 the level of assistance the government determines that the defendant
23 has provided. The defendant further understands that a motion
24 pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not
25 binding on the Court.

26 If the government determines that the defendant has provided
27 further cooperation within one year following sentencing, the
28 government may move for a further reduction of her sentence pursuant

6

1 to Rule 35 of the Federal Rules of Criminal Procedure.

2    **D.   Limitation on Use of Information for Sentencing:**  Other
3 than as set forth above, the government agrees that any
4 incriminating information provided by the defendant during her
5 cooperation will not be used in determining the applicable guideline
6 range in his case, pursuant to U.S.S.G. § 1B1.8.

7    **E.   Fine:**  The government agrees to recommend that the criminal
8 fine imposed on the defendant, if any, be no higher than the bottom
9 of the applicable fine range, given the defendant's offense level
10 and sentencing range.

11                                    **IV.**

12                        **ELEMENTS OF THE OFFENSE**

13     With respect to the sole count of the Information to be filed
14 in this matter, which charges the defendant with causing the
15 introduction or delivery for introduction of adulterated and
16 misbranded food into interstate commerce with the intent to defraud
17 and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), at
18 trial the government would have to prove beyond a reasonable doubt
19 the following elements:

20     First, the defendant caused food to be introduced or delivered
21 for introduction into interstate commerce;

22     Second, the food was adulterated or misbranded; and

23     Third, the defendant acted with the intent to defraud or
24 mislead.

25                                     **V.**

26                           **MAXIMUM SENTENCE**

27    **A.   Maximum Penalty:**  With respect to the sole count of the
28 Information to be filed in this matter, which charges the defendant

                                      7

with causing the introduction or delivery for introduction of
adulterated and misbranded food into interstate commerce with the
intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a)
and 333(a)(2), the maximum sentence that the Court can impose is
three years incarceration, a fine of $10,000, a one-year period of
supervised release, and a special assessment of $100.

**B. Violations of Supervised Release:** The defendant
understands that if she violates a condition of supervised release
at any time during the term of supervised release, the Court may
revoke the term of supervised release and require the defendant to
serve up to one additional year of imprisonment.

**VI.**

**SENTENCING DETERMINATION**

**A. Statutory Authority:** The defendant understands that the
Court must consult the Federal Sentencing Guidelines (as promulgated
by the Sentencing Commission pursuant to the Sentencing Reform Act
of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as
modified by United States v. Booker and United States v. Fanfan,
543 U.S. 220, 125 S.Ct. 738 (2005)) and must take them into account
when determining a final sentence. The defendant understands that
the Court will determine a non-binding and advisory guideline
sentencing range for this case pursuant to the Sentencing
Guidelines. The defendant further understands that the Court will
consider whether there is a basis for departure from the guideline
sentencing range (either above or below the guideline sentencing
range) because there exists an aggravating or mitigating
circumstance of a kind, or to a degree, not adequately taken into
consideration by the Sentencing Commission in formulating the

8

Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B. Stipulations Affecting Guidelines Calculations:** The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate and agree to the following:

**1. Applicable Guidelines Section:** With respect to the charge of causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce with the intent to defraud and mislead, the applicable guidelines section is U.S.S.G. § 2N2.1. Because the defendant's causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce was intended to defraud others, however, § 2N2.1(c)(1) requires the application of U.S.S.G. § 2B1.1 to the offense conduct.

**2. Base Offense Level:** Pursuant to both U.S.S.G. §§ 2N2.1(a) and § 2B1.1, the defendant's base offense level is 6.

**3. Specific Offense Characteristic:** Pursuant to U.S.S.G. § 2B1.1(b)(1)(E), the parties agree that at an evidentiary hearing the government is currently in a position to prove, from evidence independent of that provided by the defendant, that the amount of loss attributable to the defendant's introduction of adulterated and misbranded food, and relevant conduct, is greater than $70,000, but less than $120,000. Consequently, the base offense level is increased by 8.

**4. Acceptance of Responsibility:** See paragraph III(B)

9

1  above.

2        **5.  Total Offense Level:**  Pursuant to the foregoing

3  stipulations, and assuming the defendant accepts responsibility for

4  her conduct under U.S.S.G. § 3E1.1, the defendant's total adjusted

5  offense level is 12.

6        **6.  Criminal History:**  The parties agree that the

7  defendant's criminal history is to be determined by United States

8  Probation.

9        **7.  Departures or Other Enhancements or Reductions:**  The

10  parties stipulate and agree that they will not seek or argue in

11  support of any other specific offense characteristics, Chapter Three

12  adjustments or cross-references, other than those contemplated in

13  the foregoing stipulations.  Other than a motion by the government

14  for a reduction in sentence pursuant to U.S.S.G. § 5K1.1, both

15  parties stipulate and agree that neither party will move for, or

16  argue in support of, any departure from the Sentencing Guidelines.

17  Furthermore, neither party will seek any deviance or variance from

18  the Sentencing Guidelines under 18 U.S.C. § 3553(a), <u>United States</u>

19  <u>v. Booker</u>, and <u>United States v. Fanfan</u>, 543 U.S. 220, 125 S.Ct. 738

20  (2005).  If either party breaches this provision, the other party

21  shall be relieved of all of its obligations under this plea and

22  cooperation agreement.

23                       **VII.**

24                   **WAIVERS**

25    **A.  Waiver of Constitutional Rights:**  The defendant understands

26  that by pleading guilty she is waiving the following constitutional

27  rights:  (a) to plead not guilty and to persist in that plea if

28  already made; (b) to be tried by a jury; (c) to be assisted at trial

10

by an attorney, who would be appointed if necessary; (d) to subpoena
witnesses to testify on her behalf; (e) to confront and cross-
examine witnesses against her; and (f) not to be compelled to
incriminate herself.

   **B.  Waiver of Appeal and Collateral Attack:**  The defendant
understands that the law gives her a right to appeal her conviction
and sentence.  She agrees as part of her plea, however, to give up
the right to appeal the conviction and the right to appeal any
aspect of the sentence imposed in this case so long as her sentence
is no longer than the top of the Sentencing Guidelines range
determined by the Court consistent with the stipulations set forth
above about the Sentencing Guidelines variables.

   With the same limitations that may apply to any appeal, the
defendant also gives up any right she may have to bring a post-
appeal attack on her conviction or her sentence.  She specifically
agrees not to file a motion under 28 U.S.C. § 2255 or § 2241
attacking her conviction or sentence so long as the Court imposes a
sentence no higher than the top of the guideline range determined by
the Court consistent with the stipulations set forth above about the
Sentencing Guidelines variables.

   If the defendant ever attempts to vacate her plea, dismiss the
underlying charges, or reduce or set aside her sentence on any of
the counts to which she is pleading guilty, other than as set forth
above in this section, the government shall have the right (1) to
prosecute the defendant on any of the counts to which she pleaded
guilty; (2) to reinstate any counts that may be dismissed pursuant
to this plea and cooperation agreement; and (3) to file any new
charges that would otherwise be barred by this plea and cooperation

11

EXHIBIT D
55

agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By signing this plea and cooperation agreement, the defendant agrees to waive any objections, motions, and defenses she might have to the government's decision. In particular, she agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

**C. Waiver of Attorneys' Fees and Costs:** The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations.

### VIII.

#### ENTIRE PLEA AND COOPERATION AGREEMENT

Other than this plea and cooperation agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

### IX.

#### APPROVALS AND SIGNATURES

**A. Defense Counsel:** I have read this plea and cooperation agreement and have discussed it fully with my client. The plea and cooperation agreement accurately and completely sets forth the

12

entirety of the agreement.  I concur in my client's decision to plead guilty as set forth in this plea  and cooperation agreement.

DATED: February 18, 2009

_____
ROBERT D. WILKINSON
Attorney for Defendant


**B.  Defendant:**  I have read this plea and cooperation agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this plea and cooperation agreement.  In addition, no one has threatened or forced me in any way to enter into this plea and cooperation agreement.  Finally, I am satisfied with the representation of my attorney in this case.

DATED: February 18, 2009

_____
JENNIFER LOU DAHLMAN, Defendant

**C.  Attorney for United States:**  I accept and agree to this plea and cooperation agreement on behalf of the government.

DATED: February 18, 2009

LAWRENCE G. BROWN
Acting United States Attorney


By: _____
BENJAMIN B. WAGNER
SEAN C. FLYNN
Assistant U.S. Attorneys

13

**EXHIBIT "A"**
**Factual Basis for Plea**

At trial, the government would prove the following facts beyond a reasonable doubt:

Since November 1993, Jennifer Lou Dahlman ("Dahlman") has been employed in a variety of positions, and most recently as a Reports and Business Analyst, by SK Foods, L.P., a limited partnership with principal places of business in Monterey, California, and Williams and Lemoore, California, in the Eastern District of California. SK Foods, L.P., and its related corporate entities ("SK Foods") is a grower and processor of tomato products and other food products, for sale to food product manufacturers, and food service distributors and marketers. Working out of SK Foods' Lemoore, California facility in the Eastern District of California, Dahlman assisted in managing SK Foods' inventory of processed tomato and other food products, and arranged for the shipment of those food products to SK Foods' customers across the United States.

In the normal course, the market price of processed tomato products fluctuates based on the percentage of Natural Tomato Soluble Solids ("NTSS") that the product contains (also known as the product's "Brix value"). Customers frequently specify a required NTSS concentration in their contracts with manufacturers such as SK Foods. Customers will also often specify acceptable levels of other processed tomato product characteristics such as the product's pH, mold content, color, acidity and viscosity (sometimes referred to as "Bostwick"), depending on the customer's intended finished product (i.e., ketchup, salsa, barbeque sauce, etc.).

Additionally, SK Foods is subject to the United States Standards for grades of tomato paste and puree as established by the United States Department of Agriculture ("USDA"). SK Foods is further subject to Title 21, Code of Federal Regulations, Section 110.110 through which the United States Food and Drug Administration ("FDA") has established maximum limits of natural or unavoidable defects in foods sold within the United States, which present no health hazard. The limits are set out as Food Defect Action Levels. The limits prescribed by the Food Defect Action Levels represent thresholds above which FDA will take enforcement action for the food products being "adulterated" pursuant to 21 U.S.C. § 342(a)(3). For example, FDA has set a Food Defect Action Level for mold in tomato paste; if the mold count (as measured using the Howard mold count method) of all of the subsamples of a lot of tomato paste are higher than 40%, the FDA considers that product adulterated and unfit for sale within the United States.

To that end, SK Foods is required to subject its processed tomato product to laboratory testing to ensure it complies both with applicable laws and regulations, and with customer specifications. In the normal course, SK Foods employees initially record the raw results of this testing process on handwritten lab result registers. The data is subsequently entered into a proprietary computer system owned and operated by SK Foods. When sent, many shipments of

14

1  processed tomato product by SK Foods that have been sold to a
   customer are accompanied by a Certificate of Analysis ("COA"), which
2  identifies the particular grading factors (i.e., pH, mold count,
   color, viscosity and NTSS) derived from the laboratory testing of
3  the product.  Additionally, SK Foods routinely affixes labels to the
   actual shipping containers carrying processed tomato product
4  destined for customers.  These container labels, along with the
   bills of lading and invoices accompanying a customer-bound shipment,
5  typically identify the NTSS level of the processed tomato paste.
   Often times, duplicate copies of the documents described above also
6  are faxed or mailed to SK Foods customers at the time of product
   shipment.
7
       Beginning in at least 2004, and continuing until April 2008, at
8  the direction of senior leaders and directors of SK Foods, it was a
   regular practice for Dahlman to knowingly cause the falsification of
9  the various grading factors and data contained on the COAs, bills of
   lading, invoices and bin labels (hereinafter, "quality control
10 documents") that accompanied customer-bound shipments of tomato
   product, which was produced, purchased and sold by SK Foods.
11 Specifically, Dahlman routinely caused the falsification of these
   documents so that they reflected mold count levels in SK Foods'
12 tomato product as being below the applicable Food Defect Action
   Level in many instances when, in fact, those levels were
13 significantly above the federal threshold.  In other instances,
   Dahlman caused the falsification of quality control documents so
14 that they reflected inflated NTSS levels that were higher than what
   the tomato product actually contained, as well as altered pH, color,
15 and viscosity values.  Dahlman subsequently caused the distribution
   of such product, along with the falsified quality control documents,
16 to certain of SK Foods' customers.  Dahlman also routinely caused
   duplicate copies of falsified quality control documents to be sent
17 and transmitted to SK Foods' customers via facsimile and United
   States mail at the time of shipment.
18
       Dahlman's actions described above were conducted at the express
19 instruction, direction and with the assistance of senior leaders and
   directors of SK Foods, and were intended to make it appear to SK
20 Foods' customers as if particular shipments of processed tomato
   product were compliant with USDA and FDA standards, and with
21 customer specifications, when in fact they were not.  Dahlman's
   conduct, and the conduct of certain leaders and directors of SK
22 Foods, was undertaken with the intent to defraud and mislead SK
   Foods' customers.  As a result of such conduct, adulterated and
23 misbranded processed tomato product was frequently introduced into
   interstate commerce, and SK Foods' customers were fraudulently
24 induced to pay for such product.

25     For example, during 2007, SK Foods experienced a period during
   which it was unable to provide an adequate supply of processed
26 tomato paste containing 31% NTSS (Natural Tomato Soluble Solids) in
   order to meet its contractual obligations to certain customers,
27 including Kraft Foods, Inc. ("Kraft").  In an attempt to alleviate
   the shortage, a senior leader of SK Foods contacted a competing
28 manufacturer of processed tomato products in February 2007, and

                                    15

1 arranged to purchase approximately 3,400,000 pounds of processed
tomato product containing lower NTSS concentrations of 26% and 28%.
2 The product purchased from the competitor was also classified as
"high mold," and uniformly contained mold counts significantly in
3 excess of 40%. During the course of purchasing the product, the
senior leader of SK Foods assured the owner of the competing company
4 that the product would be sold to customers outside the United
States.
5
      The product purchased from the competitor did not meet the
6 specifications contained in certain of SK Foods' existing contracts,
and was adulterated and unsaleable in the United States due to its
7 excessive mold content. In order to conceal its inferior quality,
and at the direction of certain leaders and directors of SK Foods,
8 Dahlman misbranded the product by causing the falsification of
certain customer-bound quality control documents so that they
9 incorrectly reflected the product as uniformly containing 31% NTSS
tomato paste and a mold count at or below 40%. Furthermore, at the
10 direction of certain leaders and directors of SK Foods, Dahlman
subsequently caused the adulterated and misbranded tomato product,
11 and the accompanying falsified documentation, to be shipped during
the spring of 2007, via interstate carrier, from SK Foods'
12 facilities in the Eastern District of California to Kraft's
facilities in other states. One such shipment occurred on or about
13 April 18, 2007. On that date, SK Foods shipped adulterated and
misbranded tomato product from its facilities in the Eastern
14 District of California to a Kraft facility in Darien, Wisconsin.
The product was accompanied by certain quality control documents,
15 which Dahlman caused to be falsified so that they misrepresented
that the shipment consisted of 31% NTSS tomato product with a mold
16 count range of 36-40%. In actuality, the shipment consisted of 26%
and 28% NTSS tomato product, which contained mold count levels
17 between 48% and 86%. Dahlman's actions were made with the specific
intent to defraud and mislead Kraft. As a result, Kraft paid SK
18 Foods approximately $46,621 for the adulterated and misbranded
tomato paste. The product did not constitute a health hazard.
19
      In addition to adulterated tomato product purchased by SK Foods
20 from other processors for resale, at the direction of certain
leaders and directors of SK Foods, Dahlman also routinely caused the
21 introduction into interstate commerce of adulterated and misbranded
tomato product that was manufactured by SK Foods at its own
22 facilities. Dahlman also frequently caused the falsification of
COAs and other customer-bound quality control documents so that they
23 represented SK Foods manufactured tomato product as containing mold
count levels at or below 40% when, in fact, those levels were
24 significantly above the applicable Food Defect Action Levels. By
way of example, between 2004 and 2008 Dahlman caused the
25 falsification of mold count levels relating to, and subsequently
caused the shipment of, adulterated tomato product manufactured by
26 SK Foods as identified in the table below. Certain of these
shipments were accompanied by falsified COAs.
27

28

16

| Customer | Date | Order # | Actual Mold Count | Falsified Mold Count | Product Origin | Shipping Destination | Pounds Shipped | Billed Amount |
|---|---|---|---|---|---|---|---|---|
| Nestle Frozen Foods | 11/23/04 | 39191 | 46 | 38 | E.D. of California | Utah | 26,233 | $ 7,762 |
| Barilla America, Inc. c/o Lidestri Foods, Inc. | 1/04/07 | 56350 | 52 | 38 | E.D. of California | New York | 25,644 | $ 6,155 |
| Better Baked Foods, Inc. | 12/09/04 | 39526 | 48 | 38 | E.D. of California | Pennsylvania | 2,904 | $ 842 |
| Carriage House Companies, Inc. | 11/01/07 | 63198 | 62 | 30 | E.D. of California | Kentucky | 28,891 | $7,873 |
| B&G Foods, Inc. | 1/21/08 | 65308 | 52 | 38 | E.D. of California | Maryland | 2,890 | $ 1,012 |
| ConAgra Foods | 10/18/07 | 63034 | 48 | 38 | E.D. of California | Ohio | 34,877 | $ 11,858 |
| Frito-Lay c/o Lidestri Foods, Inc. | 11/07/07 | 63067 | 52 | 40 | E.D. of California | New York | 37,603 | $ 12,033 |

Dahlman's conduct, as outlined above, violated 21 U.S.C. §§ 331(a) and 333(a)(2).

17