

FILED

OCT - 9 2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

***POSTED ON WEBSITE***
***NOT FOR PUBLICATION***

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re: | ) | Case No. 09-29162-D-11 |
| | ) | |
| SK FOODS, L.P., | ) | Docket Control No. MSS-2 |
| | ) | |
| Debtor. | ) | |
| ——————————————————— | ) | |
| In re: | ) | Case No. 09-29161-D-11 |
| | ) | |
| RHM INDUSTRIAL/SPECIALTY FOODS, | ) | Docket Control No. MSS-2 |
| INC., | ) | |
| | ) | DATE:  September 29, 2009 |
| Debtor. | ) | TIME:  10:00 a.m. |
| | ) | DEPT:  D |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

### I. Introduction

SS Farms, LLC; SSC Farming, LLC; SSC Farming 1, LLC; SSC Farming 2, LLC (collectively the "Farm Entities"); and Scott Salyer ("Salyer") have brought a Motion to Remove Trustee and Disqualify Counsel for Trustee; For Protective Order Striking Complaint and Excluding Evidence Taken in Violation of Moving Parties' Constitutional and Common Law Rights and In Violation of Ethical Standards, Docket Control No. MSS-2 (the "Motion" or "Motion to Remove Trustee").

The Motion is opposed by the chapter 11 trustee in this case, Bradley D. Sharp (the "trustee"), the United States Trustee, and the Official Committee of Unsecured Creditors in

this case.  In addition, the trustee has brought an Amended Counter-Motion for an Order Authorizing the Trustee's Continued Possession of and Review of Information in His Possession and Which Relates to Non-Debtor Entities (the "Amended Counter-Motion" or "Counter-Motion").  The Counter-Motion is opposed by Salyer and the Farm Entities.

For the reasons set forth below, the court will deny the Motion and grant in part the Counter-Motion.

## II. Background

SK Foods, L.P. ("SK Foods"), and RHM Industrial/Specialty Foods, Inc. ("RHM" and, together with SK Foods, the "debtors") are processors of tomato products.  According to Salyer and the Farm Entities, Salyer and his related entities, directly or indirectly, own SK Foods, and the Farm Entities are owned, directly or indirectly, by Salyer and/or his children.

On May 5, 2009, certain creditors filed involuntary chapter 11 petitions against the debtors as Case Nos. 09-28955 and 09-28956.[1]  Two days later, the debtors filed voluntary chapter 11 petitions.  On June 18, 2009, the court substantively consolidated the SK Foods involuntary and voluntary cases and the RHM involuntary and voluntary cases.

The same day the debtors filed their voluntary petitions, they also filed a motion in each case for the appointment of a chapter 11 trustee.  The motions were granted, and the United States Trustee's appointment of Mr. Sharp as chapter 11 trustee

---

1.  Unless otherwise indicated, all Code, chapter, section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

in each case was approved by order dated May 18, 2009.  By orders
dated July 15, 2009, the court authorized the trustee to employ
the firm of Schnader Harrison Segal & Lewis, LLP, as his counsel
in each case.

     Shortly after his appointment, the trustee took possession
of the debtors' books and records and those of related entities,
including Salyer and the Farm Entities, that kept their books and
records on SK Foods' premises and in its computers.  The trustee
then filed a motion and an adversary complaint in the SK Foods
case that ultimately triggered the filing by Salyer and the Farm
Entities of the Motion to Remove Trustee.  First, on June 9,
2009, the trustee filed a motion for an order determining that
certain wastewater discharge agreements between one or the other
of the debtors, on the one hand, and one or another of the Farm
Entities, on the other hand, were executory as of the
commencement of the cases, and therefore, subject to assumption
or rejection by the trustee (the "Wastewater Motion").[2]  On June
12, 2009, the trustee filed an adversary complaint seeking to
substantively consolidate a large number of entities allegedly
owned and controlled by Salyer, including the Farm Entities, and
the assets of those entities into the debtors' bankruptcy estates
("the Adversary Complaint").[3]

/ / /

---

     2.  Chapter 11 Trustee's Motion for Order Determining that
Wastewater Discharge Agreements with Related Parties Constitute
"Executory Contracts" for Purposes of 11 U.S.C. §365, filed June
9, 2009.

     3.  Adversary Complaint for (1) Substantive Consolidation
(2) Declaratory Relief (3) Recovery of Fraudulent Transfers,
filed June 12, 2009, and assigned Adv. No. 09-2342.

- 3 -

1    On August 7, 2009, Salyer and the Farm Entities filed the
2  Motion to Remove Trustee.  They allege that Salyer's and the Farm
3  Entities' files and records are confidential vis-à-vis the
4  trustee and in many instances protected by the attorney-client
5  privilege or the work product doctrine.  They allege further that
6  the trustee's and his counsel's actions with respect to the files
7  and records of Salyer and the Farm Entities violated and continue
8  to violate their privacy rights under the California Constitution
9  and the Fourth Amendment to the United States Constitution and,
10 as to the trustee's counsel, the California Rules of Professional
11 Conduct, and constitute conversion.  Accordingly, Salyer and the
12 Farm Entities ask the court to remove the trustee, disqualify his
13 counsel, dismiss the Adversary Complaint, exclude from evidence
14 documents the trustee allegedly unlawfully obtained, and require
15 the trustee and his counsel to account for every record they
16 accessed.

17    On September 1, 2009, the trustee filed the Amended Counter-
18 Motion, in which he alleges that Salyer and the Farm Entities'
19 actions are inconsistent with the maintenance of a privacy
20 interest or privilege in their records vis-à-vis the debtors and
21 the trustee.  The trustee therefore requests an order confirming
22 his authority to possess and control the records in question.

23    The court has reviewed the parties' respective memoranda of
24 points and authorities, oppositions, supporting declarations,
25 exhibits, and replies, with regard to both the Motion and the
26 Counter-Motion.  The court heard oral argument on September 29,
27 2009.

28 / / /

- 4 -

1   Preliminarily, the court has considered Salyer and the Farm

2   Entities' separate statements of material disputed facts, filed

3   in connection with both the Motion and the Counter-Motion, and

4   their objections to the admission of certain evidence.  The court

5   has not found it necessary for purposes of this decision to

6   determine any of the allegedly disputed facts or to rely on any

7   of the challenged evidence.  Thus, an evidentiary hearing is not

8   necessary.  For purposes of this decision, and on the basis that

9   it is not necessary that the court rely on the challenged

10  evidence, the court sustains the objections to evidence.

11                         III. Analysis

12      This court has jurisdiction over the Motion pursuant to 28

13  U.S.C. §§ 1334 and 157(b)(1).  The Motion is a core proceeding

14  under 28 U.S.C. § 157(b)(2)(A).

15  A. Standards for Removing a Trustee

16      "The court, after notice and a hearing, may remove a trustee

17  . . . for cause."  § 324(a).  The Bankruptcy Code does not define

18  "cause," but it is "well-established that 'cause' may include

19  trustee incompetence, violation of the trustee's fiduciary

20  duties, misconduct or failure to perform the trustee's duties, or

21  lack of disinterestedness or holding an interest adverse to the

22  estate."  In re AFI Holding, Inc., 355 B.R. 139, 148 (9th Cir.

23  BAP 2006), aff'd and adopted, 530 F.3d 832 (9th Cir. 2008).  A

24  party seeking removal must set forth and prove specific facts

25  supporting cause.  Id.

26      A trustee is the legal representative and fiduciary of the

27  bankruptcy estate.  Id. at 147.  His or her primary role is to

28  marshal and sell assets so that their value may be distributed to

                            - 5 -

1  creditors.  Id. at 148.  To that end, a trustee has an

2  affirmative duty to investigate the debtor's financial affairs.

3  11 U.S.C. §§ 704(4), 1106(a)(3).  The trustee at all times must

4  act without regard to his own interests or those of any

5  particular creditor, AFI Holding, 355 B.R. at 147, 148, and must

6  act with "that measure of care and diligence that an ordinary

7  prudent person would exercise under similar circumstances."  In

8  re Rigden, 795 F.2d 727, 730 (9th Cir. 1986).

9      The Farm Entities do not allege that the trustee violated

10  his fiduciary duties.[4]  Their claim for removal is instead

11  predicated on his alleged misconduct with respect to their

12  personal and business records, which they allege violated their

13  state constitutional right of privacy (Article I, section 1 of

14  the California Constitution), their rights under the Fourth

15  Amendment to the United States Constitution, and their rights

16  under the attorney-client privilege and the attorney work product

17  doctrine.

18  B. Standards for Evaluating Privacy, Privilege, Conversion Claims

19      The elements of a claim for violation of the California

20  constitutional right of privacy are "(1) a legally protected

21  privacy interest; (2) a reasonable expectation of privacy in the

22  circumstances; and (3) conduct by defendant constituting a

23  serious invasion of privacy."  Hill v. National Collegiate

24  Athletic Assn., 7 Cal. 4th 1, 39-40 (1994).  The first element is

25  a question of law; the latter two, mixed questions of law and

26  fact.  Id. at 40.  "If the undisputed material facts show no

27

28      4.  For ease of reference, this and subsequent references to
the Farm Entities will, unless otherwise noted, include Salyer.

reasonable expectation of privacy or an insubstantial impact on privacy interests, the question of invasion [of the right of privacy] may be adjudicated as a matter of law." Id.

Similarly, "the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." Skinner v. Railway Executives' Ass'n., 489 U.S. 602, 619 (1989). "What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" Id., quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985).

The party charging a violation of the Fourth Amendment "must show that he had a reasonable expectation of privacy in the place searched." United States v. Heckenkamp, 482 F.3d 1142, 1146 (2007), citing Rakas v. Illinois, 439 U.S. 128, 143 (1978). "An individual has a reasonable expectation of privacy if he can 'demonstrate a subjective expectation that his activities would be private, and he [can] show that his expectation was one that society is prepared to recognize as reasonable.'" Heckenkamp, 482 F.3d at 1146, citing United States v. Bautista, 362 F.3d 584, 589 (9th Cir. 2004).

Among the factors the court may consider are

> the [individual's] possessory interest in the property searched or seized, see United States v. Broadhurst, 805 F.2d 849, 852 n.2 (9th Cir. 1986), the measures taken by the defendant to insure privacy, see id., whether the materials are in a container labeled as being private, see id., and the presence or absence of a right to exclude others from access, see Bautista, 362 F.3d at 589.

Heckenkamp, 482 F.3d at 1146.

/ / /

- 7 -

1    The right of privacy, under both the California Constitution

2  and the Fourth Amendment, may be waived by consent.  <u>Hill</u>, 7 Cal.

3  4th at 26 (California Constitution); <u>Schneckloth v. Bustamonte</u>,

4  412 U.S. 218, 222 (1973) (Fourth Amendment).

5    The attorney-client privilege may be waived by voluntary

6  disclosure, <u>United States v. Plache</u>, 913 F.2d 1375, 1379 (9th

7  Cir. 1990), citing <u>Clady v. County of Los Angeles</u>, 770 F.2d 1421,

8  1433 (9th Cir. 1985).  The party asserting the privilege must

9  prove he or she has not waived it.  <u>Weil v. Investment/</u>

10 <u>Indicators, Research & Mgmt., Inc.</u>, 647 F.2d 18, 25 (9th Cir.

11 1981).  <u>Id.</u>  "Because it impedes full and free discovery of the

12 truth, the attorney-client privilege is strictly construed."

13 <u>Id.</u> at 24.

14    Waiver of the privilege may be express or implied.  <u>In re</u>

15 <u>Oracle Securities Litigation</u>, 2005 U.S. Dist. LEXIS 46931, *21

16 (N.D. Cal. 2005).  "An express waiver occurs when a party

17 discloses privileged information to a third party who is not

18 bound by the privilege, or otherwise shows disregard for the

19 privilege by making the information public."  <u>Id.</u>[5]

20    An 'express' waiver need not be effectuated by words or
     accompanied by the litigant's subjective intent.
21    [Citation] Rather, the privilege may be waived by the
     client's . . . actions, even if the disclosure that
22    gave rise to the waiver was inadvertent.

23 <u>Bittaker</u>, 331 F.3d at 720, n.4.  Like the attorney-client

24 privilege, the protection of the attorney work product rule may

25

26    5.  By contrast, "[a]n implied waiver arises where a party
     asserts a claim that places at issue privileged matter" (<u>id.</u> at
27    719), such as where a client puts his or her attorney's
     performance at issue during the course of litigation.  <u>See</u>
28 <u>Bittaker v. Woodford</u>, 331 F.3d 715, 719-20 (9th Cir. 2003).

- 8 -

1  be waived.  Oracle at *18, citing United States v. Salsedo, 607

2  F.2d 318, 320 (9th Cir. 1979).

3      Finally, the court looks to state law to determine whether a

4  conversion has occurred.  Petralia v. Jercich (In re Jercich),

5  238 F.3d 1202, 1206 n.16 (9th Cir. 2001), citing In re Bailey,

6  197 F.3d 997, 1000 (9th Cir. 1999).  The elements of a conversion

7  in California are (1) the plaintiff's ownership or right to

8  possession of property; (2) the defendant's conversion by a

9  wrongful act or disposition of property rights; and (3) damages.

10  Farmers Ins. Exchange v. Zerin, 53 Cal. App. 4th 445, 451 (1997).

11      However, "a plaintiff in a conversion action must also prove

12  that it did not consent to the defendant's exercise of dominion."

13  Bank of New York v. Fremont General Corp., 523 F.3d 902, 914 (9th

14  Cir. 2008), citing Farrington v. A. Teichert & Son, Inc., 59 Cal.

15  App. 2d 468, 474 (1943) ["there can be no conversion where an

16  owner either expressly or impliedly assents to or ratifies the

17  taking, use or disposition of his property."].

18  C. Discussion

19      The Farm Entities rely primarily on In re Truck-A-Way, 300

20  B.R. 31 (E.D. Cal. 2003), in which an attorney for a chapter 7

21  trustee obtained an ex parte order purportedly authorizing him to

22  enter and search certain residences located outside the district

23  and to seize items that were property of the estate.  The

24  attorney used intimidation by way of the presence of armed deputy

25  U.S. Marshals to gain entrance to a private residence over the

26  objection of its occupants, a mother with her two small children.

27  The resulting search encompassed a bedroom and included dressers

28  and other personal belongings.  The attorney seized the titles to

- 9 -

two vehicles and a key for a storage locker, from which he seized
boxes of documents.  The court, noting that the attorney's
actions were "unlike anything to come before this court," 300
B.R. at 35, disqualified counsel.  Id. at 40.

    The Truck-A-Way case is inapposite here.  Indeed, its facts
are so glaringly different from those in the case at hand that
the Farm Entities' need to rely on it undercuts their argument.

    No one is alleged to have forcibly entered a private
residence or any other premises to which the trustee did not
lawfully have access. Instead, pursuant to his duty to
investigate the debtors' affairs, see § 1106(a)(3), the trustee
took control over the debtors' business records at SK Foods'
business premises and on SK Foods' computers.[6]

_____

    6.  The Farm Entities' heavy reliance on United States v.
Comprehensive Drug Testing, Inc., 2009 U.S. App. LEXIS 19119 (9th
Cir. 2009), is similarly flawed.  That case concerned the
government's execution of a warrant for electronic records of
steroid drug testing on professional baseball players, and its
seizure of records of persons, baseball players and others, other
than those named in the warrant.  That case lacked the element of
ownership and control, present in this case, between those named
in the warrant and the third parties whose records were also
searched.  Further, the case did not implicate bankruptcy
considerations in any way, or a trustee's duties under the Code,
and the search and seizure took place at premises at which the
government agents otherwise had no right to access.  Finally, the
question of waiver, as discussed below, was not in play in
Comprehensive Drug Testing.

    The bankruptcy cases cited by the Farm Entities, In re White
House Decorating Co., 607 F.2d 907 (10th Cir. 1979); In re
Skinner, 336 B.R. 316 (Bankr. N.D. Ohio 2005); United States v.
Patrick, 916 F. Supp. 567 (N.D. W.Va. 1996); and In re Asia
Global Crossing, Ltd. 322 B.R. 247 (Bankr. S.D.N.Y. 2005), either
do not stand for the propositions for which they are cited (White
House Decorating) or are inapposite (Skinner - whether a trustee
may search a non-debtor's residence; Patrick - whether a trustee
may consent to government's search in criminal case of non-debtor
premises; Asia Global Crossing - whether waiver occurred by
                                              (continued...)

- 10 -

1. Storage of and Access to Paper and Electronic Records

As it happened, most of the Farm Entities' paper records, including financial, legal, and business records, were located at SK Foods' places of business or in storage units under SK Foods' control. Declaration of Shondale Seymour in Support of Opposition to the Motion to Remove Trustee, filed August 19, 2009 ("Seymour Decl."), ¶¶4, 8, 9.

Similarly, the debtors' and the Farm Entities' electronic records were stored on computer systems at SK Foods' premises -- before June 2008, on an AAS Enterprise system or in Lotus or Excel workbooks owned and maintained by the debtors, Seymour Decl. ¶15, and after June 2008, on Microsoft Dynamics Axapta ("DAX") software.  Id. at ¶16.  Both the e-mail system and the DAX systems servers were used collectively by SK Foods and the Farm Entities.  Declaration of John Matthew Gallegly in Support of Opposition to the Amended Counter-Motion ("Gallegly Decl.") ¶¶6, 7.  Although access to records stored on these servers was restricted, id. at ¶¶9,10, Dan Kline, SK Foods' Vice President of Information Technology, and his staff had access to all these records.  Kline Declaration in Support of Opposition to Motion to Remove Trustee, filed August 19, 2009, ¶8.[7]

In short, virtually all electronic documents relating to the debtors and the other Salyer entities, including the Farm Entities, were stored on computer systems maintained by SK Foods,

---

6.(...continued)
virtue of corporate e-mail policy).

7.  "My staff and I had access to everything on the network, 24/7, 365 days a year to keep the network up and managed, and my responsibilities required me the access to review, organize and analyze files of the Salyer-Related Entities and Affiliates on a regular basis."  Id.

and the e-mail communications of all the companies were stored on
a server maintained by SK Foods.   Seymour Decl. §§17, 18.[8]

Shondale Seymour was the Chief Financial Officer of the
debtors, and between June 2008 and April 10, 2009, was also the
CFO of the Farm Entities.   As such, she was "involved in
financial management, financial planning, and record keeping."
Seymour Decl. ¶1.   With limited exception, all administrative and
operations support for the Farm Entities, including human
resources, administration, IT functions, and accounting, was
provided by SK Foods, through its resources and staff.   Id. ¶8.

Indeed, the Farm Entities concede that they "stored and
regularly accessed their financial, business, estate planning and
other personal documents at SK Foods, LP[,]" and that SK Foods'
personnel "performed accounting and record keeping services for
the Farm Entities," albeit with an allocation of expenses.
Points and Authorities in Support of Motion to Remove Trustee,
filed August 7, 2009 ("P. & A."), at 4.

The Farm Entities nevertheless insist that SK Foods'
employees knew the parties intended "to maintain a separateness
and privacy interest in the operating and stored records and
data; [and] that the information was confidential[.]"   Id. at 5.
To support this conclusion, the Farm Entities rely on the
testimony of John Matthew Gallegly, Information Technology
Consultant to Salyer American Fresh Foods and an employee of SK
Foods (and Scott Salyer's son-in-law), that internal security

---

8.   For purposes of this decision, the court finds it
irrelevant which entities paid for, owned, or leased which
systems.

- 12 -

procedures limited access to the records stored on the DAX

systems to particular users.  Gallegly Decl. ¶¶8-12.

However, more important is this testimony of Ms. Seymour,

not countered by the Farm Entities, which clearly shows that even

though there may have been certain limited restrictions, the

information was accessible by a number of people:

> At all times during my tenure with the Debtors and any
> and all of the Salyer-Related Entities and Affiliates,
> SK Foods' possession of, access to and review of the
> business records of these other entities was
> specifically approved by Scott Salyer or his designee
> on behalf of the Salyer-Related Entities and
> Affiliates.  Scott Salyer and Mark McCormick . . .
> authorized and instructed me and/or my staff to perform
> specific functions on behalf of these other entities on
> a regular basis.  These functions included, for
> example, the transfer of funds from one entity to
> another.  These tasks (in addition to the general
> responsibilities of handling all accounting) required
> my staff and me to access, review and often make
> entries into the business records of these other
> entities.  We did this in the daily course of our
> responsibilities and at the direction of the most
> senior management, and have been, at all times,
> authorized to do so. . . .  At no time during my tenure
> for the Debtors or for the Salyer-Related Entities or
> Affiliates was I ever advised that I was not to access
> or review business records of the other Salyer-Related
> Entities or Affiliates.  To the contrary, I was given
> responsibilities that required me to access, review and
> analyze those records on a regular basis.

Seymour Decl. ¶¶12, 14.

The court concludes that with the knowledge and acquiescence

of the management of the Farm Entities, and indeed with the

permission and at the direction of Scott Salyer, the personal,

legal, business, and financial records, both paper and

electronic, of Salyer and the Farm Entities were stored at the

premises of SK Foods, in storage units maintained by SK Foods, or

- 13 -

on computers at the premises of and maintained by SK Foods.[9]  The
court also concludes that with that same knowledge, acquiescence,
permission, and direction, these records were routinely accessed
and reviewed by employees of SK Foods.

2. The Justice Department Raid and the Retention of Counsel

     The court need not determine whether, as of April 2008, the
Farm Entities had a reasonable expectation of privacy concerning
their records stored at SK Foods' premises and on computers on
those premises.  At that time, representatives of "the Anti-Trust
Division of the [U.S.] Department of Justice and other federal
agents," with search warrants, raided the premises of SK Foods
and seized "an enormous volume of records and copied many other
documents and computers . . . ."  P. & A. at 5 n.3.

          [M]any of the employees were thereafter represented by
          counsel; counsel for SK Foods LP had been active at the
          corporate headquarters and at the facilities; [and]
          employees of the company had publically plead guilty to
          federal offenses as had employees of customers, . . . .

Id.[10]  The raid must have necessarily put on everyone's radar
screen the risk of storing Salyer and the Farm Entities'
documents and information on SK Foods' premises and computers and
the consequences of leaving possession in the hands of SK Foods.[11]

---

     9.  The court finds it unnecessary for purposes of this
decision to determine whether the records of Salyer and the Farm
Entities were maintained in locations within the SK Foods
premises or on its computers that were separate and apart from
the records of the debtors.

     10.  The logical inference is that Salyer personally
employed counsel, as he was, directly or indirectly, the owner of
the various companies, and as such, one of the primary targets,
if not the primary target, of the investigation.

     11.  The court does not mean to suggest that SK Foods is or
                                        (continued...)

- 14 -

1  The court cannot conjure a bigger red flag.

2      The raid was followed by a federal grand jury investigation
3  and criminal informations in which certain parties were charged
4  with mail fraud, wire fraud, bribery, and false and misleading
5  labeling of products.  The defendants have included certain
6  current and former employees of SK Foods.  There have also been a
7  number of class action and other lawsuits filed against SK Foods
8  and others.  See Declaration of Lisa Crist in Support of Chapter
9  11 Petitions and First Day Pleadings, filed May 8, 2009, at 10-
10 11.  The court makes no findings as to the level of involvement
11 of the Farm Entities in those proceedings; however, any
12 suggestion that Salyer, in his capacity as an individual and on
13 behalf of the Farm Entities, or others in charge of the Farm
14 Entities were not fully aware of what was going on would not be
15 credible.  Indeed, there is no such contention.

16     To put it generously, the Farm Entities skirt the issue as
17 to why, with knowledge of the risk attendant to leaving the
18 records at SK's premises, they did not simply remove them before
19 the chapter 11s were filed.  Instead, they devote their attention
20 to their post-petition demands that the trustee cease his review
21 of their records and return the records to them, and the
22 trustee's refusal to do so.  However, by the time the trustee was

24 11.(...continued)
25 is not a "third party" vis-à-vis the Farm Entities.  The court
   has no need at this time to determine whether either or both
26 debtors are third parties, or are one and the same as one or more
   of the Farm Entities for purposes of substantive consolidation or
27 for any other reason.  The Farm Entities contend that the
   trustee's position as regards the documents and records is based
28 on such an identity.  The court bases the present decision on
   other grounds.

- 15 -

appointed, the Farm Entities no longer could have had any
reasonable expectation of privacy as regards their records stored
at SK Foods and on its computers, and to whatever extent they
previously had such an expectation, they clearly waived it when,
over the course of a full year, they failed to take any steps
whatsoever to remove their documents from the possession and
control of SK Foods and failed to instruct employees of SK Foods,
including Shondale Seymour and Lisa Crist, to cease their review
of such records.    Seymour Decl. at ¶¶ 12, 14; Declaration of Lisa
Crist in Support of Response to the Motion to Remove Trustee,
filed August 19, 2009, at ¶¶ 13, 14.

Viewed in this light, the Farm Entities' contention that
they had no time to remove their records from the debtors'
possession because the bankruptcies were "abruptly initiated
involuntarily" by their lenders defies credibility.[12]   The Justice
Department raids preceded the filing of the involuntary petitions
by over a year.   The debtors retained the national law firm of
Winston & Strawn LLP in February 2009, three months prior to the
filings, to assist with preparation of the filings and sale of
the debtors' assets, and to assist in responding to the federal
criminal investigation.   Seymour Decl. at ¶29.   By the time of
the filings, Winston had "accumulated extensive knowledge of the
[d]ebtors' business and engaged in negotiations with parties in
interest" to such an extent that it had accrued fees and costs
totaling $1,436,500.   Declaration of Richard A. Lapping in
Support of Application for Authority to Employ Winston & Strawn

---

12. Reply in Support of Motion to Remove Trustee, filed
September 22, 2009 (the "Reply"), at 5 n.3.

LLP as Special Counsel to Chapter 11 Trustee, filed June 2, 2009, at ¶¶3(a), 5.

Finally, on April 10, 2009, almost a month prior to the filings, Salyer and certain of his entities retained the national law firm of Kasowitz, Benson, Torres & Friedman LLP.  Seymour Decl. at ¶31.  Attorneys at Kasowitz "had a great deal of interaction" with Richard Lapping, of Winston & Strawn, prior to the chapter 11 filings.  Supplementary Declaration of Donald J. Putterman in Support of Reply in Support of Motion to Remove Trustee, filed September 22, 2009, at ¶22.

On April 16, 2009, Donald J. Putterman, of the Kasowitz firm, sent a letter to the managing director of one of the debtors' lenders referencing the lenders' threat to file involuntary bankruptcy proceedings.  Affidavit of Lawrence Mizera, filed under seal on August 20, 2009, Ex. A.  The next day, an attorney for that lender responded to Mr. Putterman, stating:

> As you know, the Lenders are owed in excess of $190 million, certain proceeds of which, on information and belief, have been drained from the Borrowers [the debtors] to affiliated non-borrowers and for the personal benefit of related parties.

Affidavit of James Spiotto, filed under seal on August 20, 2009, Ex. A.

Thus, at least as early as April 17, 2009, Salyer's personal counsel was clearly on notice of the potential of involuntary bankruptcy proceedings and of the suspicion on the part of the debtors' major lenders that improper insider transfers had taken place.

/ / /

It is clear Salyer had sophisticated legal advice, knew of the contemplated chapter 11 filings, and knew the major lenders were suspicious of improper insider dealings.  At some point, he authorized the voluntary filings, then requested a chapter 11 trustee be appointed, and knew or certainly should have known a chapter 11 trustee is mandated to investigate the debtor's books and records, financial affairs, assets, liabilities, and dealings with others, especially insiders.[13]  In circumstances where the debtors' major lenders had already raised the prospect of inappropriate transfers, Salyer must have known a trustee's attention would be drawn to the records of all the related entities, not just those of the debtors.

In truth, the Farm Entities had endless opportunities to segregate and remove their records from the debtors' records before the debtors filed their voluntary petitions, but chose not to.  By the Farm Entities' own account, to do so would have been easy since their files were separately labeled.  P. & A. at 12.  Under all these circumstances, the trustee's taking control of all records located at the debtors' premises and on the debtors'

_____

13.   Not only did Salyer and his counsel contemplate the appointment of a chapter 11 trustee from the very beginning of these cases, they also had in mind the particular individual who was ultimately appointed.  In their motion, the debtors were complimentary of Mr. Sharp's background, experience, and effectiveness as a chapter 11 trustee, and expressly requested that the Office of the United States Trustee consider appointing him.  The Bank of Montreal indicates in its joinder in the motion to appoint a chapter 11 trustee, filed May 11, 2009, that Mr. Sharp "[had] already begun to familiarize himself with the operations of the [d]ebtors . . . ."  Salyer was clearly part of a very small group that hand-picked Mr. Sharp for this role.

- 18 -

electronic systems was not only foreseeable but to be expected.[14]

The Farm Entities attempt to put the onus on the trustee, charging him with searching through the documents to segregate and return those allegedly not belonging to the debtors, without himself reviewing their contents, or alternatively, with seeking instruction from the court as to how to perform his statutory duties.  Under the circumstances presented here, the court would not put the trustee in such an untenable position.

Also unavailing is the Farm Entities' argument that portions of the documents in question have nothing to do with the Wastewater Motion or the allegations in the Adversary Complaint. The scope of a trustee's duties and of his legitimate access to books and records is, of course, never limited by the subject matter of motions and adversary complaints already on file. Finally, the court rejects the Farm Entities' contention that the trustee should be precluded from using the documents or their contents against the Farm Entities.

In short, represented by counsel, the Farm Entities chose not to act.  In effect, the Farm Entities ask the court to shield them from the direct and clearly foreseeable consequences of their own ill thought-out and imprudent choices.  This the court

---

14.  "The absence of a right to exclude others from access to a situs is an important factor militating against a legitimate expectation of privacy."  Bautista, 362 F.3d at 589, citing Rawlings v. Kentucky, 448 U.S. 98, 105 (1980).  Thus, where a hotel guest's stay has run, he or she no longer has a legitimate expectation of privacy in the hotel room.  Bautista at 589.

Similarly, in this case, Salyer gave up the right of access to SK Foods' premises, including computers on those premises, when he authorized the debtors to request the appointment of a chapter 11 trustee.  With the right of access, he also gave up any reasonable expectation of privacy.

- 19 -

1 | will not do.

2 | IV. Conclusion

3 | Whether a party has a reasonable expectation of privacy is a
4 | context-specific inquiry. Leonel v. Am. Airlines, 400 F.3d 702,
5 | 712 (9th Cir. 2005). The question of consent is similarly to be
6 | determined based on the totality of the circumstances. Hill,
7 | 7 Cal. 4th at 102 n.15. Based on the facts of this case, the
8 | court finds that the Farm Entities had no reasonable expectation
9 | of privacy in records stored at the debtors' place of business,
10 | in their storage units, or on their electronic systems; or, in
11 | the alternative, that the Farm Entities have waived their
12 | reasonable privacy expectation in these records by not removing
13 | them before the bankruptcy filings. The court thus concludes
14 | that the trustee did not run afoul of the Fourth Amendment.[15]

15 | For the same reason, the court also finds that the Farm
16 | Entities, as against the debtors and the trustee, waived their
17 | right of privacy in the records at issue, and that the trustee
18 | did not convert the Farm Entities' records. See Kremen v. Cohen,
19 | 337 F.3d 1024, 1030 (9th Cir. 2003) (putative owner in conversion
20 | action must have established a legitimate claim to exclusivity).
21 | Finally, based on the Farm Entities' conduct and the
22 | analysis set forth above, the court finds that the Farm Entities
23 | waived the attorney-client privilege and their rights under the

24 |

25 | 15. Because the court finds the Farm Entities had no
reasonable expectation of privacy, it need not decide whether the
26 | Fourth Amendment binds a bankruptcy trustee. The court notes
that the cases are divided on this question. Cf. Truck-A-Way,
27 | 300 B.R. at 36-37 (trustee is so bound); In re Barman, 252 B.R.
403, 412-413 (Bankr. E.D. Mich. 2000) (same); In re Kerlo, 311
28 | B.R. 256 (Bankr. C.D. Cal. 2004) (trustee is not so bound).

1  work-product doctrine in the records at issue.[16]

2      Because the court is persuaded that the Trustee and his

3  counsel did not act improperly, it will deny the Farm Entities'

4  request to disqualify either.  The court will also deny the Farm

5  Entities' requests to dismiss the Adversary Complaint, to exclude

6  evidence obtained as a result of the trustee and his counsel's

7  review of their records, and to require the trustee to account

8  for the records he accessed.  The court will grant the Counter-

9  Motion, but only with respect to Salyer and the Farm Entities'

10  records, since only Salyer and the Farm Entities have had the

11  opportunity to oppose the Counter-Motion.

12      The court will issue an appropriate order.

13  Dated:  October  9 , 2009          *Robert Bardwil*

14                                    ROBERT S. BARDWIL
                                      United States Bankruptcy Judge

15

16

17

18

19

20  _____

21      16. The Farm Entities express concern about the costs
    presumably imposed by a rule whereby "separate businesses who
22  share administrative functions waive all property rights and
    privileges" when one such business files for bankruptcy.  Reply
23  at 15.  The better rule, according to the Farm Entities, is that
    such shared functions (and concomitant information-sharing) cease
24  once a bankruptcy is filed.

25      The court, though mindful of the Farm Entities' concern,
    does not agree that requiring parties with notice of a related
26  party's imminent bankruptcy filing to remove their records in
    order to avoid a finding of waiver will discourage shared
27  administrative arrangements.  In any event, the court's findings
    as expressed in this decision are limited to the facts of this
28  case.

1

**CERTIFICATE OF MAILING**

2     I, Andrea Lovgren, in the performance of my duties as Deputy
Clerk to the Honorable Robert S. Bardwil, mailed by ordinary mail
3  a true copy of the attached document to each of the parties
listed below:

4

Office of the US Trustee
5  501 "I" Street, Suite 7-500
Sacramento, CA 95814

6

Gregory Nuti
7  Schnader Harrison Segal & Lewis
One Montgomery Street, Suite 2200
8  San Francisco, CA 94104- 5501

9  Dale Ginter
Downey Brand, LLP
10  621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731

11

Donald Putterman
12  Kasowitz, Benson, Torres & Friedman
101 California Street, Suite 2050
13  San Francisco, CA 94111

14  Malcolm Segal
Segal & Kirby, LLP
15  770 L Street, 1440
Sacramento, CA 95814

16

DATE: October 9, 2009

17

18  _____
Deputy Clerk

19

20

21

22

23

24

25

26

27

28