Case 09-29162  Filed 06/04/10  Doc 1826



*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FILED
JUN - 4 2010
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., | Docket Control No. LR-3 |
| Debtor. | Date: May 26, 2010<br>Time: 10:00 a.m.<br>Dept: D |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

<u>MEMORANDUM DECISION</u>

On April 20, 2010, Chase Equipment Finance, Inc. ("Chase") filed a request for allowance of an administrative claim in the amount of $492,759.34, which is opposed by the chapter 11[1] trustee in this case, Bradley D. Sharp (the "trustee"). For the reasons set forth below, the court will grant Chase's request but allow the trustee to present evidence as to the appropriate amount of the claim.

I.  THE POSITIONS OF THE PARTIES

Chase asserts an administrative claim for the estate's use of tomato processing equipment Chase had leased to the debtor in this case, SK Foods, L.P., prior to the commencement of the case, equipment that was later transferred to Olam West Coast, Inc.

---

1. Unless otherwise indicated, all Code, chapter, section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

("Olam") as part of the trustee's sale of the debtor's business operations. The trustee contends that (1) the so-called leases were not true leases, but rather, financing arrangements, and thus, that Chase is not entitled to an administrative rent claim in any amount, (2) if the court construes the leases to be true leases, Chase has not met its burden of proving the extent to which the estate used the equipment, and (3) that the estate used only a small portion of the equipment for a short period of time, and that further proceedings would be required to determine an appropriate claim for such use. Chase replies that the trustee is judicially estopped from denying that the leases are true leases and that the estate's use of the equipment in its operations and in the sale of the debtor's business constituted an actual and necessary expense of preserving the estate on account of which Chase has an administrative claim.[2]

## II. ANALYSIS

This court has jurisdiction over the request pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). The request is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### A. Judicial Estoppel

> Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. Rissetto v. Plumbers & Steamers Local 343, 94 F.3d 597, 600-601 (9th Cir. 1996); Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990). This court invokes judicial estoppel not only to prevent a party from

---

2. As discussed below, the court finds it unnecessary to determine whether the agreements in question were true leases or disguised security agreements. Thus, the court uses the term "leases" herein to describe the agreements or contracts in question.

>gaining an advantage by taking inconsistent positions, but also because of "general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings," and to "protect against a litigant playing fast and loose with the courts." Russell, 893 F.2d at 1037.

Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001).

There are three non-exclusive factors a court may consider in determining whether to apply judicial estoppel: (1) whether the "party's later position was clearly inconsistent with its earlier position," (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled,'" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Hamilton, 270 F.2d at 782-83, quoting New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).

In the Ninth Circuit, application of judicial estoppel requires a finding that "the court relied on, or 'accepted,' the party's previous inconsistent position." Hamilton, 270 F.2d at 783, citing Interstate Fire & Casualty Co. v. Underwriters at Lloyd's, London, 139 F.3d 1234, 1239 (9th Cir. 1998); Masayesva v. Hale, 118 F.3d 1371, 1382 (9th Cir. 1997).

The court will address these three questions to determine whether the trustee should be estopped from espousing his present position that Chase's agreements with the debtor were disguised secured transactions rather than true leases.

- 3 -

1. <u>Earlier Contrary Position Accepted by the Court</u>

Chase begins with the schedules filed in this case.[3] The trustee listed on the G-schedule most of the debtor's agreements with Chase Equipment Leasing, Inc., and its predecessor, Bank One Leasing Corporation. Specifically, he listed various leases and lease amendments, identifying them by date and/or "lease schedule number;" namely, Lease Schedule Nos. 1000119253, 1000128455, 1000129904, and 1000126293. He also listed a "Loan and Security Agreement," as Loan No. 1000119526, and in a later document, he added a second "Loan Agreement," No. 1000118109.[4] In other words, he identified in total four "lease schedules" and two "loan agreements."[5] Lease Schedule Nos. 1000119253, 1000128455, 1000129904, and 1000126293 are the agreements under which Chase now asserts an administrative claim.

The trustee's decision to list these agreements on the G-schedule rather than the D-schedule is not particularly significant in light of the disclaimer included with the schedules:

> Certain of the agreements listed on Schedule G may be in the nature of conditional sales agreements or secured financings. The presence of a contract or

---

[3]. The schedules and statement of financial affairs in this case were filed by the trustee rather than the debtor, pursuant to §§ 521 and 1106(a)(2).

[4]. <u>See</u> Exhibits A-B to Chapter 11 Trustee's Motion for Authorization to Assume and Assign Executory Contracts and Unexpired Leases in Connection With the Sale of Substantially All of the Debtors' Assets, filed June 15, 2009, Exhibit A, p. 23.

[5]. These appear to correspond with the "four equipment operating leases and two capital leases" with Chase the debtor had earlier identified. <u>See</u> Declaration of Lisa Crist in Support of Chapter 11 Petitions and First Day Pleadings, filed May 8, 2009, ¶25.

- 4 -

Case 09-29162   Filed 06/04/10   Doc 1826

>agreement on Schedule G does not constitute an admission that such contract or agreement is an executory contract or unexpired lease.[6]

However, the distinction made in the G-schedule listings between lease schedules and loan agreements and especially the language of the disclaimer itself clearly support a finding that the issue of leases versus secured transactions was or should have been on the trustee's radar screen.

In fact, the question was addressed directly early on. On June 11, 2009, apparently in response to concerns raised by the proposed purchaser, Olam, Chase's counsel wrote to the trustee's special counsel and financial advisors, presenting an analysis of the issue and concluding that the lease schedules were true leases rather than disguised secured transactions.

On June 15, 2009, the trustee filed two motions -- to approve the sale of the assets of the debtor's business as a going concern (the "Sale Motion") and to approve the assumption and assignment to the proposed buyer of specifically enumerated executory contracts and unexpired leases, including the Chase agreements identified as Lease Schedule Nos. 1000119253, 1000128455, 1000129904, and 1000126293 and Loan Nos. 1000119526 and 1000118109 (the "Assumption Motion"). The Sale Motion expressly addressed the issue of leases versus disguised secured transactions, although not specifically in connection with the Chase agreements:

/ / /

---

6. Schedules of Assets and Liabilities for SK Foods, L.P., a California limited partnership, filed June 5, 2009, Global Notes and Statement of Limitations, Methodology and Disclaimer Regarding Schedules and Statements, ¶4(h).

- 5 -

> To the extent the equipment is the subject of a true lease, the underlying lease will require assumption and assignment to the Buyer. The separate Assumption Motion filed by the Chapter 11 Trustee identifies those unexpired leases and executory contracts that the Successful Bidder has identified to be assumed and assigned as part of the Sale. It is contemplated that any equipment lessors to unexpired leases that are included as an Assumed Contract will support the assignment to the Buyer. The Chapter 11 Trustee intends to sell free and clear of any equipment liens representing disguised conditional sales contracts. The Chapter 11 Trustee further anticipates that the creditors will consent to the Sale (allowing the sale to occur pursuant to Section 363(f)(2)). In the absence of such consent, the Chapter 11 Trustee may sell free and clear of any equipment liens pursuant to Section 363(f)(3) (purchase price exceeds the value of the liens) or Section 363(f)(1) (as noted above).[7]

In support of the Sale Motion, the trustee declared, "The terms of the Purchase Agreement anticipate that the Sale will be conditioned upon the assumption and assignment of certain executory contracts and unexpired leases of the Debtors and certain Related Parties," and identified a list filed as Exhibit A, _including_ the four Chase lease schedules and the two Chase loans agreements, as "a list of the Assumed Contracts which may be assumed and assigned as part of the Sale."[8] In support of the Assumption Motion, the trustee declared, "In my opinion, the contracts listed in Exhibit A to the Assumption Motion will benefit the estate and the overall sale process."[9]

---

7. Chapter 11 Trustee's Motion for Order Approving Going Concern Sale of Substantially All Operating Assets Pursuant to 11 U.S.C. § 363, filed June 15, 2009, ¶44.

8. Declaration of Bradley D. Sharp in Support of "Chapter 11 Trustee's Motion for Order Approving Going Concern Sale of Substantially All Operating Assets Pursuant to 11 U.S.C. § 363," filed June 15, 2009, ¶8.

9. Declaration of Bradley D. Sharp in Support of "Chapter (continued...)

1  On June 16, 2009, Chase opposed both motions on the ground
2  of the trustee's failure to list and propose payment of the
3  amounts necessary to cure existing defaults under the lease
4  schedules.  Chase also objected to the sale of its collateral
5  unless its loans would be paid in full.

6  On or about June 19, 2009, the trustee, Chase, and the Bank
7  of Montreal, as administrative agent for the debtor's primary
8  secured lenders, entered into an Agreement Re Purchase of
9  Equipment and Allocation of Proceeds of Sale (the "Proceeds
10 Agreement"), in which the parties agreed that (1) Chase would
11 transfer to Olam "the equipment leased by Chase to Debtors under
12 the following leases (collectively, the '<u>Chase Equipment</u>') [Lease
13 Schedule Nos. 1000119253, 1000128455, 1000129904, and
14 1000126293]," (2) Chase would transfer to Olam "the collateral
15 securing the following loan agreements (collectively, the '<u>Chase
16 Collateral</u>'): . . . (Loan 1000119526), and . . . (Loan
17 1000118109)," and (3) in exchange for these transfers, Chase
18 would be paid at least $5,000,000 from the proceeds of the sale
19 to Olam.[10]

20 The Proceeds Agreement also provided, at ¶4:

21 > Chase's claims against the Debtors' bankruptcy estates
>  shall not be reduced or affected by this Agreement,
22 > except such claims shall be reduced to the extent of
>  the proceeds of the Chase Equipment and the Chase

---

24  9.(...continued)
   11 Trustee's Motion for Authorization to Assume and Assign
25 Executory Contracts and Unexpired Leases in Connection with the
   Sale of Substantially All of the Debtors' Assets," filed June 15,
26 2009, ¶13.

27  10.  <u>See</u> Order Approving Going Concern Sale of Substantially
   All Operating Assets Pursuant to 11 U.S.C. § 363, filed June 26,
28 2009 (the "Sale Order"), Exhibit A.

Collateral that Chase receives pursuant to this Agreement.

On June 26, 2009, by way of an order submitted by the trustee's special counsel with a copy of the Proceeds Agreement attached as an exhibit, the court approved the sale to Olam, authorized the trustee to perform his obligations under the Proceeds Agreement, and directed that the sale proceeds be used "first to pay Chase $5 million in accordance with the Proceeds Agreement . . . ." The order expressly states that its terms and provisions are binding on the trustee, among others.

In summary, the trustee submitted to the court a motion -- the Assumption Motion -- expressly identifying the Chase lease schedules as leases to be assumed by the trustee and assigned to the buyer, and another motion -- the Sale Motion -- explicitly discussing the question of true leases versus disguised conditional sales contracts, but without mentioning any of the Chase agreements as a subject of that issue. Four days later, the trustee entered into an agreement -- the Proceeds Agreement -- that explicitly referred to "the equipment leased by Chase to Debtors" and expressly distinguished that equipment from "the collateral securing [certain] loan agreements" between Chase and the debtors.

Finally, the trustee submitted the Proceeds Agreement to the court as an attachment to his proposed order approving the sale, an order that he proposed would be binding on himself and others. At no time, either in response to Chase's opposition to the Sale and Assumption Motions or otherwise, did the trustee raise with the court the possibility that the agreements referred to as

1  Lease Schedule Nos. 1000119253, 1000128455, 1000129904, and
2  1000126293 might be disguised secured transactions.

3     The court concludes that the trustee earlier took a position
4  contrary to his present position and that he succeeded in
5  obtaining the court's reliance on and acceptance of that earlier
6  position, as set forth in the Sale Motion, the Assumption Motion,
7  the Sale Order, and the Proceeds Agreement, when the court
8  approved the sale to Olam.[11]

9     It is irrelevant that the trustee and Chase ultimately
10 presented a united position on the Sale and Assumption Motions,
11 and that the court was therefore not called upon to decide on the
12 merits the question whether the Chase agreements were true leases
13 or disguised financing arrangements. In the Ninth Circuit, "a
14 favorable settlement constitutes the success required" for the
15 application of judicial estoppel. Rissetto, 94 F.3d at 605.[12]

16 2. Unfair Advantage / Unfair Detriment

17    The court also concludes that the trustee would derive an
18 unfair advantage and impose an unfair detriment on Chase if he is

---

11. The court gives no weight to Chase's arguments concerning the e-mails exchanged between its counsel and the trustee's counsel after the sale, to the stipulation for an extension of time for Chase to file its request for an administrative claim, or to the Shondale Seymour declarations filed April 1, 2010 and April 12, 2010, because it does not appear the trustee's position in any of these has been accepted or acted upon by the court.

12. See, e.g., Hay v. First Interstate Bank of Kalispell, N. A., 978 F.2d 555 (9th Cir. 1992), in which a chapter 11 debtor in possession obtained bankruptcy court approval of its settlement of a particular creditor's secured claim and later obtained confirmation of a plan of reorganization. The court held the debtor estopped from later pursuing claims against that creditor that had not been disclosed to the bankruptcy court. 978 F.2d at 557.

1  not estopped from claiming the leases were really secured
2  transactions.
3         In Heritage Hotel Ltd. Partnership I v. Valley Bank (In re
4  Heritage Hotel Partnership I), 160 B.R. 374 (9th Cir. BAP 1993),
5  the Ninth Circuit Bankruptcy Appellate Panel affirmed the
6  bankruptcy court's ruling that a revested chapter 11 debtor was
7  estopped from prosecuting lender liability claims not disclosed
8  in its bankruptcy schedules, disclosure statement, or plan of
9  reorganization.  160 B.R. at 379.  In assessing the issue of
10 detriment to the party defending against the claims, the Panel
11 observed,

>     the confirmed plan was the product of settlement
>     agreements between the parties in which both sides knew
>     the facts which could have given rise to a lender
>     liability claim and both sides gave something up in
>     exchange for the approval of the plan.  Valley
>     compromised its position and reasonably relied on
>     representations made by Heritage [the debtor]. . . .
>     The obvious prejudice is in Valley's reliance on
>     statements in the plan which would lead Valley to
>     reasonably believe that Heritage would pay its claim,
>     not sue them for lender liability.

18 Heritage Hotel, 160 B.R. at 379.
19        Similarly, in this case, both sides must be held to have
20 given something up in exchange for what they received as a result
21 of the Proceeds Agreement and the conclusion of the sale.
22 Obviously, Chase's rights as a lessor under § 365 differed
23 greatly from those it might have asserted as a secured creditor
24 under § 363(f);[13] in entering into the Proceeds Agreement, Chase
25 gave up the right to assert whatever protections and remedies may
26 have been available to it under § 363(f).  Now that the equipment

---

    13.  See In re Pacific Express, Inc., 780 F.2d 1482, 1487
n.5 (9th Cir. 1986).

- 10 -

is gone, and with it whatever rights Chase may have had as a secured creditor, the court concludes that the trustee, having gained the benefit of concluding the sale without further opposition from Chase, gave up the right to take the diametrically opposite position that the leases were actually secured transactions.

The court holds that judicial estoppel applies.[14] Thus, there is no need for the court to determine whether the lease schedules were true leases or disguised secured transactions. The trustee having staked out his position prior to the sale, the court will treat the leases as true leases for purposes of allowing Chase's administrative claim for the trustee's use of the equipment.

## B. Actual and Necessary Expense of Preserving the Estate

Section 503(b)(1)(A) affords administrative status to "the actual, necessary costs and expenses of preserving the estate . . . ." The burden of proof is on the claimant. Microsoft Corp. v. DAK Indus. (In re DAK Indus.), 66 F.3d 1091, 1094 (9th Cir. 1995).

> The Code does not specifically identify lease payments prior to the rejection of a true lease as recoverable administrative expenses, but where the debtor or trustee actually uses the leased property, the law is clear that the rent incurred is an allowable administrative expense. [Citations]. Where the debtor or trustee only uses a portion of the leased property, however, he must pay an administrative expense only for that portion of the property.

In re Thompson, 788 F.2d 560, 562 (9th Cir. 1986).

///

---

14. Thus the court need not reach Chase's quasi estoppel argument.

- 11 -

In In re Patient Education Media, Inc., 221 B.R. 97 (Bankr. S.D.N.Y. 1998), the debtor, a producer of educational video tapes, utilized a custom production set on a sound stage at the creditor's premises, for which the creditor charged a monthly storage fee. The debtor kept the set on the sound stage even during production down time, to avoid the costs of dismantling and storing it elsewhere and then setting it up to resume production. The debtor also wanted the set available "to impress potential investors." By the time the debtor filed its chapter 11 petition, it had ceased operations entirely but kept its production set on the creditor's sound stage post-petition to enhance its efforts to sell its remaining assets -- its intellectual property and the set itself.

The debtor countered the creditor's administrative claim for storage fees on the ground that use of the sound stage did not benefit the estate because the estate was ultimately unable to sell the set. However, in allowing the claim, the court found that the debtor

> knowingly and willingly used [the creditor's] property . . . to preserve and maximize the assets of the estate. [fn]  It continued to store its set on [the creditor's] premises--and hence, [the creditor] continued to render performance--using the entire sound stage for that purpose. The debtor thought that preservation of the set was necessary to the liquidation process, believing that it gave the company stature and maximized the possibility of a sale of its assets to another video producer.

221 B.R. at 102-03.

In this case, the trustee emphasized from the outset the seasonal nature of the debtor's business, the necessity of getting the business sold before the start of the tomato packing

- 12 -

season on July 1, and the frenetic activity that would commence on that date. "During the tomato packing season, the plants are often running twenty-four hours a day, seven days a week. During that time, the Debtors employ approximately 1,600 workers to assist in the pack." Sale Motion, ¶8.

The trustee's financial advisors advised him "that a sale of the facilities prior to the commencement of the tomato packing season, on or about July 1, 2009, has the greatest chance of maximizing value to the Debtors' estates." Id. at ¶13. Thus, the trustee informed the court:

> Starting now, and building up to the date on which tomato deliveries begin, the Debtors' business requires that significant funds be expended for maintenance and repair so that the two plants are ready to run constantly through the packing season. In addition, the Debtors must identify, hire and train a significant number of seasonal employees who must swing into action as soon as the tomatoes begin to arrive.[15]

Further,

> [t]he Debtors have no financing commitment for the packing season, and lack sufficient capital to act without financing. If a purchaser cannot step in by July 1, 2009, the pack is not likely to occur, and the value of each plant will decline rapidly, because the new owner will not receive the benefit of the pack that is the foundation for each Debtor's annual production.[16]

In these circumstances, the court finds that the very substantial equipment leased from Chase was an integral part of the business ultimately sold as a going concern to Olam. The

---

15. Id.

16. Declaration of Brent C. Williams in Support of "Chapter 11 Trustee's Motion for Order Approving Going Concern Sale of Substantially All Operating Assets Pursuant to 11 U.S.C. § 363," ¶8.

- 13 -

1  equipment enabled the trustee to present the plants to potential
2  purchasers in the best possible light; without it, a potential
3  purchaser almost certainly would have concluded it would be
4  impossible to locate and finance suitable replacement equipment,
5  physically transport and install it in the debtors' plants, and
6  hire and train the seasonal employees in the use of the equipment
7  so the plants would be ready for round-the-clock operations by
8  July 1.
9      It is also significant that the trustee himself presented
10 the assumption and assignment of a variety of leases, including
11 the Chase leases, as an integral part of the sale.  The court
12 concludes that the estate clearly benefited from having the
13 equipment on-site and available for transfer to Olam such that
14 Olam would be fully prepared for the start of the tomato pack.

**C.  Fair and Reasonable Value of the Equipment**

16     The amount of the allowable administrative claim is
17 determined "under an objective worth standard that measures the
18 fair and reasonable value of the lease," not the actual value or
19 benefit conferred on the debtor.  Thompson, 788 F.2d at 563.
20 "The rent reserved in the lease is presumptive evidence of fair
21 and reasonable value [citations], but the presumption may be
22 rebutted by demonstrating that the reasonable worth of the lease
23 differs from the actual contract rate, [citation]."  Id.
24     The court concludes that the Chase equipment as a whole was
25 an essential component of the going concern sale to Olam, and
26 thus, the court declines to count plastic bins and numbers of
27 days in use or to split hairs about the portions of the glass
28 line utilized for General Mills' order as opposed to ASF/La

Victoria's order. The court also rejects the trustee's argument that the estate did not use the majority of the equipment in May and June because the tomato processing operations remained idle. Any such conclusion is belied by the information presented by the trustee in support of his Sale Motion, as discussed above.

However, the court will give the trustee an opportunity to present evidence to overcome the presumption that the fair and reasonable value of the estate's use of the equipment was the amount of the rent reserved by the leases. The trustee will have 20 days from the date of this order in which to request an evidentiary hearing on this issue; if he does not, the court will enter an order allowing Chase an administrative claim in the amount it has requested.

### III. CONCLUSION

The court concludes that the trustee is judicially estopped from denying that Lease Schedule Nos. 1000119253, 1000128455, 1000129904, and 1000126293 are true leases, and thus, the court will grant Chase's request for an administrative rent claim. The court also concludes that the trustee knowingly and willingly used all the equipment that was the subject of those leases for the benefit of the estate, and thus, Chase will be allowed an administrative claim for the fair and reasonable rental value of all the equipment. As set forth above, the court will give the trustee an opportunity to establish that value in an evidentiary hearing if he does not agree that the rent reserved in the leases represents a fair and reasonable value.

/ / /

/ / /

Case 09-29162   Filed 06/04/10   Doc 1826

1  The court will enter an appropriate order.

Dated: __June 4__, 2010    /s/ Robert Bardwil
ROBERT S. BARDWIL
United States Bankruptcy Judge

- 16 -

**CERTIFICATE OF MAILING**

I, Andrea Lovgren, in the performance of my duties as Deputy Clerk to the Honorable Robert S. Bardwil, mailed, or caused to be mailed, by ordinary mail a true copy of the attached document to each of the parties listed below:

Gregory Nuti
Kevin Coleman
Schnader Harrison Segal & Lewis
One Montgomery Street, Suite 2200
San Francisco, CA 94104- 5501

Brent Gardner
Lewis and Roca, LLP
40 North Central Avenue
Phoenix, AZ 85004-4429

Jamie Dreher
Downey Brand, LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731

Marc Levinson
400 Capitol Mall, Suite 300
Sacramento, CA 95814

DATE: June 4, 2010

_____
Deputy Clerk