FILED

October 20, 2010

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003015892

**155 PAGES**

Gregory C. Nuti (CSBN 151754)
gnuti@schnader.com
Kevin W. Coleman (CSBN 168538)
kcoleman@schnader.com
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785

Attorneys for Chapter 11 Trustee, Bradley D. Sharp

SCHNADER HARRISON SEGAL & LEWIS LLP
750 9TH STREET, N.W
SUITE 550
WASHINGTON, DC 20001-4534
202-419-4200

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., a California limited partnership, | Chapter 11 |
| Debtor. | **DC No. SH-76** |
| In re : | Case No. 09-29161-D-11 |
| RHM INDUSTRIAL/SPECIALTY FOODS, INC., a California Corporation, d/b/a Colusa County Canning Co., | Chapter 11 |
| Debtor. | **SUPPLEMENTAL DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF MOTION TO APPROVE COMPROMISE OF CONTROVERSY BETWEEN TRUSTEE AND BANK OF MONTREAL AS AGENT FOR SECURED LENDERS PURSUANT TO FEDERAL RULE OF BANKRUPTCY 9019** |
| | Date: October 27, 2010<br>Time: 10:00 a.m.<br>Place: Courtroom 34<br>501 I Street, 6th Floor<br>Sacramento, CA 95814<br>Judge: Hon. Robert S. Bardwil |

SCHNADER HARRISON SEGAL & LEWIS LLP
750 9TH STREET, N.W
SUITE 550
WASHINGTON, DC 20001-4534
202-419-4200

I, Bradley D. Sharp, declare:

1.     I submit this declaration (the "Declaration") in my capacity as the duly appointed and acting Chapter 11 Trustee (when referring to myself in such capacity, the "Trustee") of SK Foods, L.P. ("SK Foods") and RHM Industrial/Specialty Foods, Inc., d/b/a Colusa County Canning Co. ("RHM," collectively, the "Debtors") in support of my Motion to Approve Compromise of Controversy between Trustee and Bank of Montreal as Agent and the BMO Secured Lenders (collectively "BMO") (the "Motion") and in support of the supplemental filing of documents in response to the objections to the motion filed by Scott Salyer, individually and as Trustee of the Scott Salyer Revocable Trust, the Scott Salyer Revocable Trust, SK PM Corp., SK Foods, LLC, SKF Canning, LLC, Blackstone Ranch Corporation, Monterey Peninsula Farms, LLC, Salyer Management Company, LLC, SK Farms Services, LLC, SK Frozen Foods, LLC, SS Farms, LLC, SSC Farming, LLC, SSC Farms I, LLC, SSC Farms II, LLC, SSC Farms III, LLC, SKF Aviation, LLC, and CSSS, LP d/b/a Central Valley Shippers (collectively, the "Objecting Parties").

2.     Except as otherwise noted, I make this Declaration based upon my own personal knowledge.  If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

3.     I have significant experience serving as a trustee in Chapter 11 cases, including analyzing, litigating, and resolving administrative claims, priority, secured and unsecured claims.

4.     In connection with the Settlement Agreement with BMO, I agreed to transfer certain rights and claims to BMO to be credited against BMO's Super Priority Claim ("Assigned Rights").  Because the Assigned Rights consist mainly of litigation claims, I cannot offer the specifics of my analysis without disclosing privileged information or providing information that may tend to damage or undermine their value.  However, in arriving at an aggregate value of the Assigned Rights, I considered the following issues:

- **Salyer Breach of Fiduciary Duty Litigation**:  Scott Salyer is a collection risk given his current situation, yet has exhibited a willingness to engage in endless litigation making prosecution of the claim expensive.  Allied World Insurance has

2

filed a complaint to rescind for fraud the only known insurance that might cover this claim.  The Estate may be susceptible to an *in pari delicto* defense.  Prosecution of this claim may be stayed by the District Court as it does overlap with criminal issues.

- **Claims Against Accountants**:  The Estate may be susceptible to an *in pari delicto* defense.  Damages to the Estate, if any, are difficult to quantify.

- **Sanctions**:     It is impossible to predict the outcome of this aspect of the Drum Line litigation.  To be clear, this rights is limited to recoveries attributed to sanctions and does not include any recoveries on account of avoidance of the transferred equipment.  I believe it to be improvident to discussion further my estimation of this claim given that the issue is pending before this Court.

- **IRS and State Tax Avoidance Actions:**  I have filed claims against the IRS seeking avoidance of $4.8 million in payments made by SK Foods on behalf of Scott Salyer, Stephanie Salyer and Caroline Salyer.  I have also asserted claims against Stephanie and Caroline Salyer to the extent they received refunds.  I have refrained from naming Scott Salyer, who also received refunds, due to the stay imposed by the District Court.  It is unknown whether the IRS's liability will be diminished by the amount of the refunds.  The individual defendants may be collection risks.  It is anticipated that the parties will vigorously defend the matter.  I also have similar claims in lesser amounts against the state taxing authorities that have yet to be filed.

- **New Zealand Claims:**  A New Zealand receiver has sold the companies in New Zealand for a price that will not provide any return to unsecured creditors.  Therefore, these claims have no value.

5.     Although I have agreed to transfer the Assigned Rights to BMO to be applied to its claims, I have retained significant assets that may provide a material return to unsecured creditors.  For example, I will continue to pursue substantive consolidation for the benefit of the

SCHNADER HARRISON SEGAL & LEWIS LLP
750 9TH STREET, N.W
SUITE 550
WASHINGTON, DC 20001-4534
202-419-4200

Estate. Certain defendants in that action have disclosed to the District Court that they own real property with almost $11 million in equity.

6. I have also retained for the Estate the Australia Claims, which include a AU $17 million inter-company claim, plus claims to ownership of the equity in those companies. The Australian Receiver has sold those companies for approximately AU $90 million, which is sufficient to pay all creditors in full (including the Estate's intercompany claim) *and* provide a return to equity in the amount of approximately AU $40 million. Therefore, these claims alone total AU $57 million. The Australian dollar is currently trading at .98 per U.S. dollar. Therefore, the Australia Claims are potentially worth $56 million.

7. As set forth above, I negotiated to keep the Australia Claims for the Estate while transferring the New Zealand Claims to BMO. This was consistent with the agreement previously presented through the proposed Chapter 11 Plan. In the mean time, the Receiver in New Zealand sold the New Zealand entities for an amount only sufficient to pay its secured creditors; no distribution is anticipated for unsecured creditors. Thus, BMO's rights to the New Zealand Claims turned out to be worthless. BMO thus far has not tried to renegotiate this aspect of the Settlement Agreement.

8. Attached hereto as **Exhibit A** is the "Declaration of Bradley D. Sharp In Support of Motion to Approve Sale of Real Property Commonly Known As 4000 Westlake Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal" ("Sharp Decl. to Sale Motion"), in which Exhibit C to the Sharp Decl. to Sale Motion is a true and correct copy of the Preliminary Title Report on the Tahoe property. The Preliminary Title Report evidences the deeds of trust and previous transfers of title on the Tahoe property. The Preliminary Title Report on the Tahoe property was previously filed with the Court through the Sharp Decl. to Sale Motion at Docket No. 1039, and therefore has been fully available for public access by the parties or the Court.

9. Attached hereto as **Exhibit B** is the "Declaration of Shondale Seymour In Support of Chapter 11 Trustee's Motion for Order Determining That Wastewater Discharge Agreements with Related Parties Constitute 'Executory Contracts' for Purposes of 11 U.S.C. §365"

SCHNADER HARRISON SEGAL & LEWIS LLP
750 9TH STREET, N.W
SUITE 550
WASHINGTON, DC 20001-4534
202-419-4200

SCHNADER HARRISON SEGAL & LEWIS LLP
750 9TH STREET, N.W
SUITE 550
WASHINGTON, DC 20001-4534
202-419-4200

("Seymour Decl."), in which Exhibits A through C of the Seymour Decl. encompass true and correct copies of three agreements that allowed the Debtors to discharge large quantities of wastewater onto various parcels of land owned by SSC Farming, LLC, SSC Farms I, LLC, and SSC Farms II, LLC (the "Wastewater Agreements"). The Wastewater Agreements were previously filed with the Court through the Seymour Decl. at Docket No. 206, and therefore have been fully available for access by the parties or the Court.

10. Attached hereto as **Exhibit C** is a true and correct copy of the FTI/Chanin analysis prepared in early April 2009 by FTI Consulting, Inc. ("FTI") and Duff & Phelps/Chanin Partners ("Chanin"), which FTI and Chanin presented to the Agent and the BMO Secured Lenders.

11. The Amended & Restated Credit Agreement dated as of September 28, 2007 (as heretofore amended, the "Credit Agreement") and the related Credit Agreement documents were previously filed with the Court through the "Declaration of Lawrence A. Mizera in Support of Joinder of Bank of Montreal in the Debtor's Motion for Order Authorizing Appointment of Chapter 11 Trustee" ("Mizera Decl.") and accompanying exhibits, at Docket Nos. 57 through 68, and therefore have been fully available for public access by the parties or the Court. As the Credit Agreement and related Credit Agreement documents are extensively voluminous, these documents are not attached hereto and can be viewed via PACER.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of October 2010, in Los Angeles, California.


/s/ *Bradley D. Sharp*
Bradley D. Sharp

# EXHIBIT A

**54 PAGES**

1  Gregory C. Nuti (CSBN 151754)
2  Kevin W. Coleman (CSBN 168538)
   Melissa S. Lor (CSBN 245515)
3  SCHNADER HARRISON SEGAL & LEWIS LLP
   One Montgomery Street, Suite 2200
4  San Francisco, California 94104-5501
   Telephone: 415-364-6700
5  Facsimile: 415-364-6785
   gnuti@schnader.com
6  kcoleman@schnader.com
   mlor@schnader.com
7
8  Attorneys for Bradley D. Sharp,
   Chapter 11 Trustee
9

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., a California limited partnership, | Chapter 11 |
| Debtor. | DC No. SH-36 |
| In re : | Case No. 09-29161-D-11 |
| RHM INDUSTRIAL/SPECIALTY FOODS, INC., a California Corporation, d/b/a Colusa County Canning Co., | Chapter 11 |
| Debtor. | DC No. SH-36 |
| | **DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF MOTION TO APPROVE SALE OF REAL PROPERTY COMMONLY KNOWN AS 4000 WESTLAKE BLVD., UNIT #14, HOMEWOOD, CALIFORNIA, FREE AND CLEAR OF LIEN OF BANK OF MONTREAL** |
| | Date: December 16, 2009 |
| | Time: 10:00 a.m. |
| | Place: Courtroom 34 |
| | 501 I Street, 6th Floor |
| | Sacramento, CA |
| | Judge: Hon. Robert Bardwil |

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE: 415-364-6700
FACSIMILE: 415-364-6785

I, Bradley D. Sharp, hereby declare:

1.     I am the duly appointed and acting chapter 11 trustee for SK Foods, L.P., a California limited partnership, and RHM Industrial/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. (collectively, the "Debtors"). I have personal knowledge of the facts of this declaration, and if called as a witness, I could and would testify competently to these facts.

2.     This declaration is being filed in support of the motion (the "Motion") filed herewith to approve the sale of real property commonly known as 4000 West Lake Boulevard, Unit #14, Homewood, CA 96141 (the "Property") on an as-is, where-is basis, without any warranties or representations, free and clear of all liens and interests, with such liens and interests to attach to the net sale proceeds, to Michael F. Roizen and Nancy J. Roizen and/or Assignee (the "Buyers"), for $2,960,000.00, or to any qualified overbidder (the "sale").

3.     Attached hereto as <u>Exhibit A</u> is a true and correct copy of the proposed counter-offer/purchase agreement and amendment (the "Purchase and Sale Agreement") for the Property to the Buyers, subject to Bankruptcy Court approval and overbid.

4.     After payment of brokers' commission, homeowners' association dues, escrow charges and other closing costs, I estimate net sale proceeds of $2,737,992.99 for the estate. Attached as <u>Exhibit B</u> is the estimate of net sale proceeds.

5.     Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Preliminary Title Report dated September 21, 2009.

6.     According to the Title Report, the liens and claims of record against the Property consist of the following items:

(a)     A deed of trust against the Property in favor of SK Foods, L.P. to secure an indebtedness of $1,350,000.00, dated August 21, 2008 and recorded in Placer County on November 4, 2008, as no. 2008-0085788-00 of the official records ("SK Foods, L.P. Lien");

(b)     Another deed of trust against the Property in favor of SK Foods, L.P. to secure an indebtedness of $1,360,000.00, dated August 21, 2008 and recorded in Placer County on November 4, 2008, as no. 2008-0085790 of the official records ("SK Foods, L.P. Lien"); and

2

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
TELEPHONE 415-364-6700
FACSIMILE 415-364-6785

1          (c)      A deed of trust against the Property in favor of the Bank of Montreal to

2 secure a line of credit in the amount of $125,000,000.00, dated March 24, 2009 and recorded in

3 Placer County on March 26, 2009 as no. 2009-0024080-00 of the official records ("Bank of

4 Montreal Lien").

5         7.      On behalf of the Debtors, I will execute reconveyances of the two SK Foods, L.P.

6 Liens.

7         8.      As to the Bank of Montreal Lien, I propose to sell the Property free and clear of

8 all liens and interests, with lien amount attaching to the net proceeds of sale, subject to the costs

9 of sale delineated in the Motion, with the same force, effect, validity, and priority that it has with

10 respect to the Property.

11         9.      I have read the within Motion to sell the Property, which my counsel prepared on

12 my behalf. I believe that sale of the Property for $2,960,000.00, subject to overbid, is a fair price

13 based upon evaluation and advice from the real estate brokers..

14        10.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the overbid form for

15 prospective overbidders to fill out and execute. A copy of the overbid form is also attached to

16 the Notice.

17        11.      The Buyers were procured as a result of marketing efforts through my brokers,

18 after arms-length negotiations.

19        12.      I have no independent knowledge or familiarity with the Buyers, and I am advised

20 that the Buyers have no connection with the Debtors or anyone else associated with this estate or

21 the administration of the estate.

22        13.      The $2,960,000.00 price is the highest and best offer I have received on the

23 Property. Barring receipt of an overbid, I therefore believe in my business judgment that the

24 proposed sale is in the best interests of the estate and its creditors, and should be approved.

25 / / /

26 / / /

27 / / /

28 / / /

DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF MOTION TO APPROVE SALE OF REAL PROPERTY OF ESTATE

1    I declare under the penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct.

3        Executed this 16th day of November, 2009 at Los Angeles, California.

4                                        /s/    Bradley D. Sharp
5                                        Bradley D. Sharp

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA  94104-5501
TELEPHONE 415-364-6700
FACSIMILE 415-364-6785

DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF MOTION TO APPROVE SALE OF REAL PROPERTY OF ESTATE
PHDATA 3251440_1

**Exhibit A**

## COUNTER-OFFER

This agreement ("Agreement" or "Counter-Offer") is intended to set forth the terms and conditions of a contract for the purchase by and sale to Michael F. Roizen and Nancy J. Roizen (the "Buyer") from Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for SK Foods, L.P., a California limited partnership, et al., (the "Seller"), of the real property commonly known as 4000 W. Lake Blvd, Unit #14, Homewood, California (the "Property"). When executed below, this Agreement will constitute conclusive evidence and the exclusive terms and conditions of the contract for such purchase and sale (the "Sale") of the Property and will supersede and replace in its entirety the Residential Purchase Agreement and Joint Escrow Instructions dated August 29, 2009 and Counter-Offer #2 dated September 25, 2009 (the "Offer"), and any oral or written negotiations since then.

PURCHASE PRICE; DEPOSIT; ESCROW. The purchase price for the Property shall be $3,050,000 ("Purchase Price"). Buyer shall make an initial deposit of $91,500 (the "Initial Deposit") in the form of cashier's check or wire transfer made payable and delivered to Nettie Becker Escrow within two (2) business days of acceptance of this Counter-Offer by Buyer, Seller's execution of the Affirmation Agreement in the form attached hereto as Exhibit "A", and Buyer's receipt of a copy of the fully executed Counter-Offer and the Affirmation Agreement.

Buyer shall deliver to the Trustee, within three (3) days of mutual agreement upon this Counter-Offer, proof of committed funds available to Buyer sufficient to enable Buyer to consummate the acquisition contemplated herein, which proof shall be in the form of a letter of credit; loan commitment or other form acceptable to the Trustee in the Trustee's sole discretion. In the event that either (i) Buyer fails timely to provide any such proof, or (ii) the Trustee determines, in the Trustee's sole discretion, that any proof of funds provided to Trustee by Buyer is unacceptable, the Trustee shall have the right, at the Trustee's option, to provide written notice to Buyer that this Counter-Offer is terminated. In the event that the Trustee exercises such termination right, this Counter-Offer shall terminate effective as of the date of Trustee's written notice to Buyer, whereupon the Initial Deposit (if theretofore deposited with the Escrow Holder) shall be returned to Buyer and Buyer and Trustee shall each be relieved of any further obligation hereunder.

Escrow instructions corresponding to the terms of this Agreement shall be provided by the Escrow Holder and signed by the parties within five (5) business days of the date of Buyer's and Seller's receipt of said escrow instructions. Buyer and Seller shall deposit such documents and instruments with the Escrow Holder as and when reasonably required to complete the sale. Buyer shall be free to assign this Agreement to another person or entity ("Assignee") subject to Seller's prior review and written approval (which approval Seller may grant or withhold in its sole discretion), but Buyer shall remain liable hereunder, together with such Assignee, in the event that such Assignee fails to perform any of Buyer's obligations hereunder.

1.     BUYER'S DUE DILIGENCE AND FINANCING; CANCELLATION RIGHT. Buyer shall have seventeen (17) calender days from the date of execution hereof to perform, complete, and satisfy all contingencies, inspections, investigations, tests and reviews of reports, and to complete all due diligence which the Buyer desires for this Sale of the Property, including, but not limited to, obtaining any required financing, and performing and completing any geological, soil, structural, environmental, or other tests, inspections, and investigations desire by Buyer. Buyer may, not later than the end of that

245416X

period, give Seller written notice of Buyer's election to withdraw from this Agreement because of Buyer's inability to complete or dissatisfaction with the results of any of those matters ("Notice of Cancellation"), in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit. If Buyer fails to give such Notice of Cancellation as within such period, all such contingencies shall be automatically removed as set forth in Paragraph 4 and Buyer's obligation to proceed shall be non-contingent except as provided herein for, (i) Buyer's review of a preliminary report and underlying documents respecting the title to the Property (as set forth in Paragraph 2), and (ii) Bankruptcy Court approval of this Agreement and the Sale (including as set forth in Paragraph 6).

2.    TITLE; TITLE INSURANCE. Within three (3) business days after acceptance of this Counter Offer, Lawyers Title Company (the "Title Company") will be instructed to provide a preliminary report of the condition of title to the Property, including copies of underlying documents referred to in Schedule B thereof, for Buyer's review. Buyer may, not later than the end of the period in Paragraph 2, or until three (3) days after receipt of the preliminary report and underlying documents, whichever occurs later, in which to give Seller written notice ("Notice of Title Disapproval") that Buyer disapproves the condition of title with respect to a material matter(s) that interfere with the use of the Property for the purpose for which it is currently used or intended to be used. Such notice must refer to the specific exception(s) in Schedule B of the preliminary report and the specific underlying document(s) which are the basis for Buyer's disapproval. Within five (5) business days after receipt of such notice, Seller may, in Seller's sole discretion, either (i) cancel this Agreement and the sale, in which event Buyer's and Seller's obligations under this Agreement shall be terminated and Buyer shall receive a full refund of Buyer's deposit, or (ii) elect to correct the item(s) that were disapproved by Buyer, in which event the sale shall proceed. Seller may correct such item by any means that will result in the Title Company either removing the disapproved exception(s) from the preliminary report or providing title insurance coverage by endorsement against such exception(s). At the close of the sale, Seller shall convey and Buyer shall accept title to the Property as shown in Schedule B of the preliminary report, subject to any corrections as in this paragraph above, free and clear of all monetary liens, subject to the terms of the within contract. Seller shall pay the costs of a CLTA Standard Owner's policy of title insurance.

3.    REMOVAL OF CONTINGENCIES; CLOSING; COURT CONFIRMATION; DELIVERY OF POSSESSION. If Buyer does not give Seller written Notice of Cancellation as and when provided in Paragraph 1, or Notice of Title Disapproval as and when provided in Paragraph 2, Buyer's silence shall be deemed acceptance and Buyer shall be deemed to have satisfied and removed all of Buyer's contingencies and to proceed with the Sale/ Seller shall then file a motion with the Bankruptcy Court to confirm this sale. Upon such removal of contingencies, Buyer shall be unconditionally obligated to proceed with the sale, subject only to Bankruptcy Court confirmation as set forth below. If the Bankruptcy Court confirms the sale to Buyer, the closing shall take place as soon as practicable after entry of the order approving the sale, but no later than the first business day after eleven (11) calendar days following the entry of such order unless a longer period is required on Seller's part in the course of bankruptcy administration; provided, however, in no event shall the Sale close, if at all, later than November 15, 2009. The closing shall occur on the date the deed transferring the Property to Buyer is recorded with the County Recorder where the Property is located. Occupancy shall be delivered to Buyer upon Escrow Holder's confirmation of recording.

4.    BANKRUPTCY SALE. Buyer acknowledges that Seller is a Trustee appointed to

Page 2 of 9   subject only to the issuance of the CLTA Standard Owner's policy of title insurance as described in Section 2.

245416X

Buyer's Initials        Buyer's Initials        Seller's Initials

administer the above referenced bankruptcy estate, and is a party to this Agreement solely in that capacity. Seller and Brokers and agents have not and will not determine the condition or fitness for use of the Property for any particular purpose. The sale shall be "as is," "where is," "with all faults," and with no warranty by or recourse whatsoever to Seller or Brokers or agents herein. Transfer of the Property shall be by Quit Claim Deed. All parties acknowledge that Seller is a party to this Agreement solely in the capacity as Trustee of the above referenced bankruptcy estate and that in the event of any default in the performance of any of Seller's obligations under the Offer (as modified hereby) or in the event that any other claim is asserted against the Seller, Trustee or the estate in connection with this transaction, the Trustee shall in no event have any personal liability whatsoever (whether in his individual capacity or otherwise), it being expressly understood and agreed that Buyer's sole recourse, if any, in such event shall be to the assets of such estate.

5. TAXES; PRORATIONS; COSTS OF SALE. All real property taxes and assessments for the current tax year shown in the current County Tax Bill shall be prorated between Seller and Buyer and charged as of the closing date to the applicable accounts of Seller and Buyer. The sale shall be free and clear of any homeowner's association assessments and all real property taxes (other than those prorated as provided above) enforceable against the Property through the closing date of the sale. Escrow fees shall be split between Buyer and Seller in the manner customary in the County where the Property is located. Seller shall pay any real property transfer tax. Seller shall pay the cost of a Natural Hazard Disclosure Report, from a vendor selected by Seller, to be furnished to Buyer through escrow. Buyer shall pay and have sole responsibility for compliance with any requirements imposed on the Property or this sale by any governmental agency(ies), including compliance with any applicable governmental retrofit requirements. Buyer shall pay the cost of recording the deed. Buyer and Seller shall each pay their own expenses of every other type except as specifically provided in this Agreement.

6. BANKRUPTCY COURT APPROVAL; OVERBIDDING. The sale is subject to notice to creditors, approval by the Bankruptcy Court, and higher and better bids received by Seller through and including the Bankruptcy Court hearing to confirm the sale. Payment of any and all real estate brokers' commissions is also subject to notice to creditors and approval by the Bankruptcy Court. Buyer acknowledges and agrees that Seller may not seek to obtain the Bankruptcy Court's approval if Seller has determined that it would be in the best interest of the bankruptcy estate not to do so.

7. BROKERS. Seller is represented Coldwell Banker and Keller Williams. Buyer is represented by Coldwell Banker Northern California. Subject to Bankruptcy Court approval, Seller will pay a real estate broker's commission aggregating 5% of net sales price of the Property to the Brokers as follows: 1.25% to Coldwell Banker, 1.25% to Keller Williams and 2.5% to Coldwell Banker Northern California in connection with the closing of this sale. All such Brokers and agents are collectively referred to herein as the "Brokers." No commission or compensation shall be due or payable to Brokers in connection with this Agreement or sale except from the cash proceeds of an actual Sale of the Property that closes to Buyer. Buyer hereby represents and warrants that, other than the Brokers, Buyer has not dealt with any broker, finder or other person entitled to any fee, commission or other compensation in connection with the Sale and Buyer shall indemnify, defend and protect and hold Seller and the related bankruptcy estate harmless of, from and against any claims, demands, actions, causes of action, losses, liabilities and costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as Seller may suffer or incur in the event that any claims for any such fees, commissions or other compensation of

Page 3 of 9



any kind are hereafter asserted.

8. **MATERIAL CHANGE OF CONDITION.** In the event of any material change in the condition of the Property after the date of acceptance of this Counter-Offer, if Buyer demands repair of any resulting actual damage to the Property, Seller may, at Seller's sole option: (a) elect to terminate this Agreement, in which event Buyer's and Seller's obligations to buy or sell shall terminate and the full Deposit shall be refunded to Buyer; or (b) make required repairs at the bankruptcy estate's expense; or (c) assign any insurance proceeds for the damage to the Property to Buyer as of the close of the sale; or (d) credit the cost of such repairs to Buyer through escrow, it being agreed that in the event that Seller elects and complies with subpart 9(b), (c) or (d), Buyer's obligation to proceed with the Sale shall be unaffected by any such material change in the condition of the Property.

9. **REMEDY FOR BUYER'S OR SELLER'S FAILURE TO CLOSE.** Buyer's sole remedy in the event that the sale fails to close as a result of Seller's inability or failure to close for any reason, including but not limited to the reason of failure to obtain approval of the sale by the Bankruptcy Court, shall be the mutual release of Buyer's and Seller's obligations to buy or sell and a full refund of the Deposit (plus any increased thereof by Buyer). In the event Buyer fails to close the sale for any reason other than Seller's default, after Buyer's contingencies have been removed as under Paragraphs 2 and 3, Buyer's Deposit (plus any increase, thereof by Buyer) shall be paid over to Seller and retained by Seller as liquidated damages without further legal action. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than three percent of the Purchase Price. This provision shall apply equally to the Deposit (and any increase, thereof by Buyer).

_[signature]_ [Buyer's Initials]

10. **BANKRUPTCY COURT JURISDICTION.** The U.S. Bankruptcy Court for the Eastern District of California shall have sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement and Buyer hereby consents and submits to such exclusive jurisdiction. This Agreement shall be interpreted and enforced pursuant to the laws of the United States of America including the Bankruptcy Code, Title 11, United States Code.

11. **"AS-IS," "WHERE-IS" CONDITION; NO WARRANTIES.** Buyer acknowledges and agrees that, to the maximum extent permitted by law, the sale contemplated by this Agreement is made "as-is," "where-is," and "with all faults," except as specifically provided in this Agreement. Seller and Brokers and agents herein have not made, do not make, and specifically negate and disclaim any representations, warranties, promises, covenants, agreements, or guaranties of any kind or character whatsoever, whether express or implied, oral or written, concerning or respecting (i) value of the Property; (ii) income to be derived from the Property; (iii) suitability of the Property, or lack thereof for any activity or use which Buyer may intend to conduct thereon, including any possibilities or limitations for future development; (iv) habitability, merchantability, marketability, profitability, or fitness for a particular purpose, of the Property, or lack thereof; (v) manner, quality, state of repair, or lack of repair of the

Page 4 of 9

245416X

Property; (vi) nature, quality, or condition of the Property, or any portion, system, or component thereof, including without limitation, water, soil, and geology; (vii) compliance of the Property or its operation, or lack thereof, with any laws, ordinances, regulations, rules, or orders of any applicable governmental authority or body; (viii) manner or quality of engineering, design, construction or materials, if any, incorporated into the Property; (ix) compliance or lack of compliance with any land use, building and safety, or other laws, ordinances, regulations, rules, orders, or other requirements imposed or enforced by any governmental or non-governmental body, including without limitation the Americans with Disabilities Act of 1990; (x) the presence or absence at, on, under, or adjacent to the Property, of materials described as "hazardous substances, hazardous materials, or toxic substances" or by similar terms under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S. Code §§9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S. Code §§1801, et seq.), the Resource Conservation and Recovery Act (42 U.S. Code §§6901, et seq.), the Toxic Substance Control Act (15 U.S. Code §2601; et seq.), the Clean Water Act (33 U.S. Code §1251, et seq.), California Health and Safety Code §25117 or 25316), or other statutes and laws, all as amended and including all regulations issued thereunder; (xi) the content, completeness or accuracy of any Due Diligence materials or Preliminary Report regarding Title to the Property; (xii) the conformity or lack of conformity of the improvements to any plans or specifications for the Property, including any plans and specifications that may have been or may be provided to Buyer; (xiii) the conformity or lack of conformity of the Property to past, current, or future applicable zoning or building requirements; (xiv) any deficiency of any undershoring, drainage, or other aspects, systems, or components of or affecting the Property; (xv) the fact, if applicable, that all or a portion of the Property may be located on or near any natural hazard zone as determined by any governmental agency or body; (xvi) the existence of vested land use, zoning, or building entitlements affecting the Property or any other property; or (xvii) any other matter. Without in any manner limiting the foregoing, Buyer hereby acknowledges and agrees that (i) Seller's Broker, has provided (and will hereafter provide) to Buyer various materials and information relating to the Property, including, without limitation, information and materials relating to the condition of the Property, and (ii) all such materials and information so provided to Buyer by Seller's Broker shall, for all purposes of this Agreement, be deemed to have been disclosed to Buyer by the Seller, as well.

12. **BROKERS.** Brokers and agents herein have not and will not perform any inspections, investigations, or due diligence on behalf of Buyer unless otherwise specified herein. Buyer is informed that Buyer must arrange for any inspections and investigations desired by Buyer utilizing suitable third party professionals selected and compensated by Buyer. In no event shall Seller have any liability or responsibility for any representation, warranty, statement made, or information furnished by Brokers or agents herein, or any other person or entity, concerning the Property, this Agreement, or any other matter, unless expressly set forth in writing and signed personally by Seller.

13. **OPPORTUNITY TO INSPECT; BUYER'S SOLE RELIANCE.** Buyer represents, warrants, acknowledges, and agrees that Buyer has been given the opportunity to inspect and investigate the Property and all other facts and circumstances deemed by Buyer relevant and significant, and to review information and documentation affecting the Property. In

245416X

deciding to proceed with the sale, Buyer is relying solely on Buyer's own inspections and investigation of the Property (including by any outside professionals whom Buyer has elected to engage for such services) and review of such information and documentation, and not on any information provided or to be provided by Seller. Buyer further acknowledges and agrees that any information made available to Buyer or provided or to be provided by or on behalf of Seller with respect to the Property was obtained from a variety of sources and that neither Seller nor the Brokers and agents herein nor any other person has made or makes any representations as to the accuracy or completeness of such information. Buyer hereby fully and irrevocably releases all such sources and preparers of information and documentation affecting the Property which were retained or engaged by Seller or Brokers or agents from any and all claims that Buyer may now or hereafter have against such sources and preparers of information, for any costs, expenses, losses, liabilities, damages, demands, actions, or causes of action arising from any such information or documentation. NEITHER SELLER NOR BROKERS HAVE PROVIDED OR WILL PROVIDE ANY LEGAL OR TAX ADVICE TO BUYER. Buyer is informed that Buyer must obtain any such advice, if desired by Buyer, from independent professionals selected and engaged by Buyer.

14. PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS.

A. BUYER SHALL CONDUCT THOROUGH PHYSICAL, GEOLOGICAL, PEST CONTROL, AND ENVIRONMENTAL INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS MAY BE DETERMINED BY BUYER, THROUGH QUALIFIED PROFESSIONALS SELECTED BY BUYER. Seller and Brokers and agents herein strongly recommend that Buyer fully exercise and not waive such inspections and investigations.

B. Buyer shall select and employ, at Buyer's expense, a licensed engineer(s), architect(s), contractor(s), geologist(s), pest control licensee(s), environmental consultant(s), or other qualified professional(s) to make inspection(s) and investigations of the Property, including, but not limited to, (i) its general structure, plumbing, heating, air conditioning (if any), electrical system, built-in appliances, cesspool/sewer/septic system, well, roof, soils, foundation, mechanical systems, pool, spa, related equipment and filters, sprinklers, and those other matters affecting the desirability of the Property (all if and only to the extent any such structures, systems, and components are presently a part of the Property); (ii) any actual or potential wood destroying pests or other conditions damaging to the Property or any portion thereof; (iii) environmental hazards, substances, products, or conditions, including without limitation, asbestos, formaldehyde, lead, lead-based paint, contaminated soil or water, fuel, chemical storage tanks, hazardous waste, electromagnetic fields, and radon gas, any of which may constitute a health risk; (iv) the presence or absence of any required governmental permits, inspections, applications, approvals, and certificates of occupancy, and compliance or lack of compliance with building codes and laws applicable to the Property; (v) plans and specifications for the Property; (vi) all applicable zoning, municipal, county, state, and federal, including those affecting the past, current, or any future use of the Property; (vii) deed restrictions and other matters of public record which may govern, restrict, condition, or prohibit the use, alteration, or development of the Property; and (viii) generally, without limitation, any and all other items and matters of whatsoever nature, character, or description, which Buyer deems material to Buyer's

Page 6 of 9

245416X

interests, in, on, or affecting the Property; and to approve or disapprove said inspection within the period and in the manner set forth in Paragraph 2.

C.      In the event Buyer is dissatisfied with the results of such inspection(s), Buyer may give written Notice of Cancellation to Seller strictly as and within the time provided in Paragraph 2. Buyer's failure to give such notice as and within the period specified therein shall conclusively be deemed Buyer's satisfaction and removal of such contingency and Buyer's election to proceed with the Sale.

15.      **COMPLETE AGREEMENT; NO OTHER REPRESENTATIONS OR WARRANTIES.** Seller shall not be liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property or the operation thereof, furnished by any real estate broker, agent, employee, contractor, or other person. Buyer further acknowledges and agrees Seller has no obligations to make repairs, replacements or improvements except as may otherwise be expressly stated herein. Without limiting any other provision hereof, Buyer represents, warrants and covenants to Seller that, except for Seller's express representations and warranties specified in this Agreement, Buyer is relying solely upon Buyer's own investigation of the Property.

16.      **WRITTEN AFFIRMATION OF SELLER REQUIRED.** Buyer understands that Seller may continue to receive and respond to other offers on the Property and may be making several Counter-Offers concurrently containing the same or different terms. This Counter-Offer shall not be binding until accepted by Buyer and executed by Buyer and Seller on the signature page below; and then approved by Seller, in Seller's sole discretion, in the form of the Seller's Affirmation of Agreement attached hereto as Exhibit "A" which, if so executed by Seller, will constitute Seller's agreement that Seller will sell the Property to Buyer, subject to Bankruptcy Court approval, the rights of any overbidding parties, and the terms and conditions of this Agreement. Buyer further acknowledges that it would be imprudent and unrealistic to rely upon the expectation of entering into a binding agreement regarding the subject matter of this Counter-Offer prior to receipt of Seller's Affirmation of Agreement, and further represents to Seller that any efforts to complete due diligence, to negotiate or obtain financing, or to perform any of the obligations provided herein shall not be considered as evidence of binding intent without Seller's Affirmation of Agreement, and understands that BUYER'S ACCEPTANCE HEREOF SHALL HAVE NO FORCE OR EFFECT PRIOR TO BUYER'S RECEIPT OF SUCH AFFIRMATION OF AGREEMENT SIGNED BY SELLER.

17.      **ATTORNEYS' FEES.** In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

245416X

18. **EXPIRATION OF COUNTER-OFFER.** This Counter-Offer shall expire if not accepted by Buyer by delivering a copy hereof, fully signed and initialed by Buyer, to Seller on or before close of business on October 1, 2009. Such acceptance shall nevertheless be subject to Paragraph 16.

AGREED AND ACCEPTED:

"BUYER"

Dated: 9/30/09

By: Michael F. Roizen and Nancy J. Roizen

_____

_____

"SELLER" (subject to Paragraph 16)

Dated: 9/29/2009

By: _____

Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for SK Foods, L.P. a California limited partnership, et al.

245416X

**EXHIBIT "A"**

SELLER'S AFFIRMATION OF AGREEMENT

Seller hereby acknowledges Buyer's acceptance of the foregoing Counter-Offer and affirmatively agrees to sell the Property to Buyer on the terms and conditions of the foregoing Agreement, but subject to Bankruptcy Court approval and rights any of overbidders. Seller shall revoke any other outstanding Counter-Offers made to other prospective buyers or make the same subject and subordinate to this agreement.

"SELLER"

Dated: _10 - 1 - 09_

By: _____

Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for SK Foods, L.P., a California limited partnership, et al.

245416X

Addendum to contract for 4000 West Lake, FDL #14

1. During the inspection and due diligence period we have become aware of at least 2 very large additional assessments (apparently waiting until this unit is sold so they can collect the money from 22 rather than 21 or 20 owners) planned for repairs and necessary upkeep or structural necessities at FDL, and a third or fourth assessment that seems not be accounted for in the usual processes for nearby roof replacement and other repair necessities at FDL.

2. During the inspection period it was discovered that significant window hardware is missing for windows where the original manufacturer has ceased operations necessitating expensive customized parts be made to ensure seals and operation of the windows.

3. During Inspections significant additional resources and total replacement of some current systems and maybe much of duct work were deemed necessary to make heating, cooling and several other systems operational.

4. To account for these additional undisclosed costs, we will remove all contingencies but with a reduced sale price of $2.925 million, representing a reduction of a portion of anticipated immediate needs, costs, and imminent assessments.

Sincerely yours,   Michael F and Nancy J Roizen     October 23rd, 2009

Addendum to contract for 4000 West Lake FDL #14

1. During the inspection and due diligence period we have become aware of at least 2 very large additional assessments (apparently waiting until this unit is sold so they can collect the money from 22 rather than 21 or 20 owner's) planned for repairs and necessary upkeep or structural necessities at FDL and a third or fourth assessment that seems not be accounted for in the usual processes for nearby roof replacement and other repair necessities at FDL.

2. During the inspection period it was discovered that significant window hardware is missing for windows where the original manufacturer has ceased operations necessitating expensive customized parts be made to ensure seals and operation of the windows.

3. During Inspections significant additional resources and total replacement of some current systems and maybe much of duct work were deemed necessary to make heating, cooling and several other systems operational.

4. To account for these additional undisclosed costs, we will remove all contingencies but with a reduced sale price of $2.960 million, representing a reduction of a portion of anticipated immediate needs, costs, and imminent assessments.

Sincerely yours, Michael F and Nancy J Roizen    October 23rd, 2009 with revision requested of October 28th, 2009

AMENDED ESCROW INSTRUCTIONS

Property Address:     4000 West Lake Boulevard Unit 14  Homewood, CA  96141

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS
FOLLOWS:

(1)     The parties are aware and acknowledge that the purchase price has been reduced from
$3,050,000.00 to **$2,960,000.00,** for subject property.  Escrow Holder is therefore authorized and
instructed to instruct **Lawyers Title Company** to issue a CLTA policy of title insurance with a
liability of **$2,960,000.00** NOT $3,050,000.00 as previously instructed.

(2)     The Documentary Transfer Tax on the Quitclaim Deed is hereby amended to be in the amount of
**$3,256.00,** rather than $3,355.00 as previously stated, and same shall be paid at the close of
escrow from funds held in Seller's account.

(3)     Buyer hereby removes and approves all of Buyer's contingencies in this escrow.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.


**SELLERS:**                                                    **BUYERS:**

Bradley D. Sharp, solely in his capacity as Chapter            _____
11 Trustee for the Bankruptcy of SK Foods, L.P.               Michael F. Roizen

BY:_____                            _____
    Bradley D. Sharp, solely in his capacity as               Nancy J. Roizen
    Chapter 11 Trustee

Antonia Delgado
Escrow Officer

AMENDED ESCROW INSTRUCTIONS

Property Address:     4000 West Lake Boulevard Unit 14  Homewood, CA  96141

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS
FOLLOWS:

(1)     The parties are aware and acknowledge that the purchase price has been reduced from
$3,050,000.00 to $2,960,000.00, for subject property. Escrow Holder is therefore authorized and
instructed to instruct **Lawyers Title Company** to issue a CLTA policy of title insurance with a
liability of $2,960,000.00 NOT $3,050,000.00 as previously instructed.

(2)     The Documentary Transfer Tax on the Quitclaim Deed is hereby amended to be in the amount of
$3,256.00, rather than $3,355.00 as previously stated, and same shall be paid at the close of
escrow from funds held in Seller's account.

(3)     Buyer hereby removes and approves all of Buyer's contingencies in this escrow.

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**                                                        **BUYERS:**

Bradley D. Sharp, solely in his capacity as Chapter     _____
11 Trustee for the Bankruptcy of SK Foods, L.P.        Michael F. Roizen

BY: _____                          _____
Bradley D. Sharp, solely in his capacity as             Nancy J. Roizen
Chapter 11 Trustee



301 North Canon Drive • Beverly Hills, CA 90210
Phone:  (310) 275-4042 • Fax:  (310) 275-1219

Date:  October 14, 2009
Escrow No.:  026660-AD

AMENDED ESCROW INSTRUCTIONS

Property Address:    4000 West Lake Boulevard Unit 14  Homewood, CA  96141

THE ABOVE NUMBERED ESCROW IS HEREBY AMENDED AND/OR SUPPLEMENTED AS
FOLLOWS:

The Buyer's Inspection Contingency date is hereby extended to **October 24, 2009.**

ALL OTHER TERMS AND CONDITIONS TO REMAIN THE SAME.

**SELLERS:**                                    **BUYERS:**

Bradley D. Sharp, solely in his capacity as Chapter
11 Trustee for the Bankruptcy of SK Foods, L.P.          Michael F. Roizen

BY: _____          _____
     Bradley D. Sharp, solely in his capacity as         Nancy J. Roizen
     Chapter 11 Trustee



Antonia Delgado
Escrow Officer

Date: **October 29, 2009**
Escrow No.:    026660-AD

Property Address:    4000 West Lake Boulevard Unit 14 Homewood, CA 96141

## _REVISED_ INSTRUCTIONS TO PAY COMMISSION
### THESE COMMISSION INSTRUCTIONS SUPERCEDE AND CANCEL COMMISSION INSTRUCTIONS DATED OCTOBER 6, 2009.

At the close of your above-numbered escrow, you are authorized and instructed to pay the following:

| | | |
|---|---|---|
| Pay Commission to | Coldwell Banker<br>5450 Lincoln Blvd.<br>Playa Vista, CA  90094<br>Agent:  Bill Friedman | $37,000.00 |
| Pay Commission to | Keller Williams<br>10059 Palisades Drive, No. 1<br>Trucke, CA  96161<br>Agent:  Anita Noble | $37,000.00 |
| Pay Commission to | Coldwell Banker Northern<br>California<br>PO Box 123<br>Tahoe City, CA  96145<br>Agent:  Bruce Ells | $74,000.00 |

TOTAL COMMISSION                                $148,000.00

This instruction irrevocably assigns the above stated commission to the above named Broker(s).  This instruction may not be amended or revoked without the written consent of the Broker(s) hereinabove named.

### SELLERS:

Bradley D. Sharp, solely in his capacity as Chapter
11 Trustee for the Bankruptcy of SK Foods, L.P.

BY: _____
      Bradley D. Sharp, solely in his capacity as
      Chapter 11 Trustee



301 North Canon Drive • Beverly Hills, CA 90210
Phone:  (310) 275-4042 • Fax:  (310) 275-1219

Buyer will hand NETTIE BECKER ESCROW, INC.
initial deposit in the amount of _____ 91,500.00
Buyer will WIRE TRANSFER or hand you a CASHIER'S CHECK Payable to
Nettie Becker Escrow, Inc. THREE BUSINESS DAYS PRIOR TO THE CLOSE OF
ESCROW DATE PLUS ANY CLOSING COSTS AND/OR ADJUSTMENTS_____ 2,958,500.00

**Total Consideration**_____ **$3,050,000.00**

Close of escrow to be **ELEVEN (11) DAYS AFTER THE ENTRY IN BANKRUPTCY COURT DOCKET, OF THE ORDER CONFIRMING SALE BUT IN NO EVENT LATER THAN NOVEMBER 15, 2009** (or sooner, if mutually agreed in writing).

Buyer shall hand you or cause to be handed you $3,050,000.00, $91,500.00 of which has been deposited by Buyer. The balance of funds due, plus any closing costs and/or prorations shall be deposited THREE (3) business days prior to close of escrow in form of a locally clearing cashier's check or one business day prior to closing via federal wire transfer.

BUYER UNDERSTANDS AND AGREES THAT ANY AND ALL DEPOSITS MADE TO ESCROW, OTHER THAN VIA CASHIER'S CHECK OR WIRE TRANSFER, REQUIRE THAT FUNDS HAVE CLEARED (I.E., A COPY OF THE CANCELLED CHECK FRONT AND BACK AND/OR BANK STATEMENT). BUYER HEREBY AGREES TO FURNISH SUCH PROOF PRIOR TO THE CLOSE OF ESCROW. ALL OTHER FUNDS SUCH AS PERSONAL, CORPORATE OR PARTNERSHIP CHECKS AND DRAFTS ARE SUBJECT TO MANDATORY HOLDING PERIODS WHICH MAY CAUSE MATERIAL DELAYS IN DISBURSEMENT OF FUNDS IN THIS ESCROW. IN ORDER TO AVOID DELAYS, ALL FUNDINGS SHOULD BE WIRE TRANSFERRED. OUTGOING WIRE TRANSFERS WILL NOT BE AUTHORIZED UNTIL CONFIRMATION OF THE RESPECTIVE INCOMING WIRE TRANSFER OR OF AVAILABILITY OF DEPOSITED CHECKS.

Seller will hand you a **QUITCLAIM DEED**, and Buyer and Seller will deliver to you all additional funds and documents required of them, respectively, to enable you to comply with these instructions, all of which you are authorized to use or deliver provided all provisions and conditions of this escrow have been complied with before the date set forth above, and you hold in this escrow money and documents deliverable under these instructions and can obtain a standard CLTA Standard Owners policy of title insurance from Lawyers Title Company in the issuing title company's usual form and with the title company's usual exceptions, with a liability of $3,050,000.00, covering real property in the City of **Homewood** in the County of **Placer**, State of **California**, vis:

LEGAL DESCRIPTION TO BE PROVIDED BY INSURING TITLE COMPANY. Seller's execution of the Quitclaim Deed and Buyer's approval of the Preliminary Title Report shall constitute full approval thereof.

Buyer and Seller state that the property is commonly known as: 4000 W. Lake Blvd., Unit #14, Homewood, CA 96141 No verification of said address shall be required of Escrow Holder and Escrow Holder shall have no responsibility nor liability regarding same.

**SHOWING TITLE VESTED IN:** Michael F. Roizen and Nancy J. Roizen (exact vesting to be furnished in writing as soon as possible to provide for the drawing of necessary documents)

**SUBJECT ONLY TO:**

(1)   All General and special Taxes for the fiscal year 2009 and 2010, including bonds, special assessments and personal property taxes, if any, assessed against former owner, and/or supplemental taxes assessed pursuant to the provisions of Chapter 498, Statutes of 1983 of the State of California. (Change of Ownership will affect the

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.

Michael F. Roizen

BY: _____
     Bradley D. Sharp, solely in his capacity as Chapter 11
     Trustee

Nancy J. Roizen



Date: October 1, 2009        Escrow No.: 026660-AD

Page 2 of 5: Additional Instructions made a part of previous pages as fully incorporated therein.

taxes to be paid. A Supplemental Tax Bill will be issued and BUYER accepts all responsibility for all additional taxes due because of said reassessment. TAX BILLS ISSUED AFTER THE CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYERS AND SELLERS.)

(2)     Covenants, conditions, restrictions, reservations, rights, rights of way, and easements, and any oil, gas, or mineral reservations now of record, if any.

**THIS ESCROW IS ESTABLISHED FOR THE PURPOSE OF IMPLEMENTING THE TERMS AND PROVISIONS OF THAT CERTAIN NINE (9) PAGE COUNTER OFFER, dated as of SEPTEMBER 30, 2009 (hereinafter referred to as the "Agreement"), by and between Bradley D. Sharp, solely in his capacity as Chapter 11 Trustee for the Bankruptcy of SK Foods, L.P. as Seller (hereinafter "Seller"), and Michael F. Roizen and Nancy J. Roizen as Buyer (hereinafter "Buyer"). BUYER AND SELLER ACKNOWLEDGE THAT THE ACCEPTANCE DATE OF THIS ESCROW IS SEPTEMBER 30, 2009. THE FOREGOING AGREEMENT TOGETHER WITH OTHER MUTUAL INSTRUCTIONS ARE MADE A PART HEREOF.**

These escrow instructions are not intended to alter, modify or supersede the Agreement unless specifically stated herein and only to the extent necessary to conform to the practices and governing regulations of Escrow Holder. In the event of a conflict between these instructions as prepared by Escrow Holder and the Agreement, as to the rights, duties and obligations of the parties to this escrow, the Agreement shall prevail and control; however, as to the duties, rights and obligations of Escrow Holder, these escrow instructions shall be deemed to prevail and control.

Escrow Holder shall perform only those acts and duties which fall under the purview of escrow as practiced in this geographical area and as permitted under the rules and regulations of the California Department of Corporations governing their escrow licensees. Any provisions of the Agreement which consist primarily of agreements between Buyer and Seller regarding matters or occurrences that do not fall within the ordinary or customary duties or functions of an Escrow Holder, including but not limited to post-closing adjustments (if any), or which constitute warranties or representations from one party to another, shall not be considered to be a part of these Escrow Instructions and Escrow Holder shall not be concerned with nor liable for same in any way whatsoever, whether or not such provisions are specifically enumerated in the following instructions as matters of memorandum or matters with which Escrow Holder shall specifically not be concerned; these items include but are not limited to:

Seller is aware that interest on the existing loan(s) does not stop accruing at close of escrow, but continues until the actual day of receipt of the payoff by Lender. Seller is aware that interest will accrue through weekends and holidays. Seller is aware he/she/they are responsible for payment of all of such interest and will indemnify and hold Escrow Holder harmless in connection with the payment of such interest.

**MAKE THE FOLLOWING PRORATIONS, ADJUSTMENTS AND CHARGES:** Prorate as of Close of Escrow
      Real Property Taxes as of Close of Escrow. (See item #18 of General Provisions)

(3)     Charge to Seller and pay from funds held for Seller's account in this escrow:

     a.     Policy of title insurance.
     b.     Documentary Transfer Tax in the amount of $3,355.00.
     c.     Pay broker's commission, if any, as authorized by Seller by separate instructions attached hereto and made a part hereof.
     d.     Regardless of consummation of this escrow, Seller agrees to pay on demand charges and expenses incurred by you for Seller, including offset statements and beneficiary statements and/or demands, filling in, notarizing and recording any documents necessary on Seller's part, transfer of the insurance if pro-rated, and Seller's portion of escrow fee as charged.
     e.     The amount of any bond or assessment which is now a lien.
     f.     Payments on Mello-roos and other Special Assessment bond and assessments which are now a lien shall be paid current by Seller; payments that are not yet due shall be assumed by Buyer without credit toward the purchase price.

(4)     Charge to Buyer and pay from funds held for Buyer's account in this escrow:

     a.     Regardless of consummation of this escrow, Buyer agrees to pay on demand charges and expenses incurred by you for Buyer, including recording deed, mortgage clause on insurance, filling in, notarizing and recording Trust Deed and other documents necessary on Buyer's part, and Buyer's portion of escrow fee as charged.
     b.     If the Seller is the beneficiary of any Note and Trust Deed created herein, you are instructed to order "H" type tax service for the terms of the loan and to record a Request for Notice in favor of Seller.
     c.     Insurance premium on new policy to be obtained by Buyer if Buyer causes same to be deposited into escrow for payment.

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.
                       Michael F. Roizen

BY: _____
     Bradley D. Sharp, solely in his capacity as Chapter 11     Nancy J. Roizen
     Trustee

Date: October 1, 2009

Escrow No.: 026660-AD

Page 3 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

**OTHER COSTS:**

a.    **SELLER** shall pay for zone disclosure reports, if any to be issued by Property ID.

**ALL CONTINGENCIES IN THIS ESCROW SHALL BE REMOVED BY THE PASSIVE METHOD, WHICH SILENCE DEEMS APPROVAL.**

(5)    Buyer hereby acknowledges that compliance with all applicable city ordinances shall be handled <u>OUTSIDE OF ESCROW</u> and that Escrow Holder is hereby held free and harmless from any/all liability and/or responsibility in connection therewith.  If local ordinance requires that the property be brought in compliance with minimum retrofitting standards including but not limited to energy conservation, smoke detectors, seismic automatic gas shut-off valve, water heater bracing and/or low-flush toilet standards as a condition of sale or transfer, Buyer shall comply with and pay for these requirements. Buyer hereby relieves Nettie Becker Escrow, Inc., Real Estate Brokers and their agents, and Seller of any and all liability in connection therewith.

(6)    Buyer waives the right to be presented with a report of Resident Property Records issued by the City of Homewood on the subject property at the close of escrow.  Should Buyer request said Report it shall be buyer's responsibility to order said report <u>OUTSIDE OF ESCROW</u>. Further, it shall be buyer's responsibility to comply with any city ordinance regarding same as buyer is purchasing the property in AS IS condition. Buyer instructs Escrow Holder not to be concerned with said report and parties indemnify and holds Escrow Holder harmless with respect to same.

(7)    Buyer hereby waives the requirements of a professional termite inspection of the subject property.  Buyer is aware that no termite inspection report or termite certificate of completion shall be provided through this escrow.  Buyer acknowledge that there may be termite infestation in the property not known to or discovered by the Seller and Brokers and therefore not disclosed to Buyer, and/all of which might be discovered in a professional termite inspection.  Buyer hereby indemnifies an holds harmless Seller, Brokers, and Escrow Holder, herein from any costs, expense, damage, or liability, including attorney's fees, incurred by Buyer as a result of not having a professional termite inspection of subject property and completing this transaction without said inspection report or completion certificate.

(8)    Buyer is aware that Seller states that Seller is exempt from completing any instrument, affidavit, statement or instruction reasonably necessary to comply with federal (FIRPTA) and California withholding law, if required. Buyer hereby holds Seller, Brokers and their Agents, and Escrow Holder free and harmless from any and all liability and/or responsibility in connection therewith.

(9)    Buyer and Seller shall deliver these signed Escrow Instructions to Escrow Holder within five (5) business days from receipt of same.

**DEED WILL PROVIDE:**  "After recordation, mail deed and tax statement to the following address: **address to be provided by Buyer through escrow.**

The parties herein are aware that prior to close of escrow and recordation of any documents, we must be able to confirm that any check deposited with us for closing has been paid by the issuing institution so that we can comply with the requirements of AB 512 and the Department of Corporations regulations prohibiting us from closing escrow and disbursing funds at closing to Sellers, Brokers, Lenders, Title Companies and others if any if those funds are "uncollected" at the time of closing, despite what your bank or savings institution may tell you, a stop payment may be placed on a Cashier's Check or Savings & Loan Check.

In the event this escrow does not record at 8:00 A.M., but does not record during the same calendar day as a "Special Recording" at a later hour, the undersigned Seller acknowledges that funds may not be available for disbursement until the following business day, therefore, Seller will continue paying interest on such loans until they are so paid, unless Escrow Holder receives <u>written instructions to the contrary</u>, should recordation at 8:00 A.M. not be available. Escrow Holder shall proceed with the consummation and recordation of this transaction as such "Special Recording".

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.

Michael F. Roizen

BY: _____
        Bradley D. Sharp, solely in his capacity as Chapter 11
        Trustee

Nancy J. Roizen

Date: October 1, 2009                                    Escrow No.: 026660-AD

Page 4 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

## GENERAL PROVISIONS

**YOU ARE FURTHER INSTRUCTED AS FOLLOWS:**

1.     Time is of the essence with these and all additional amended instructions. If this escrow is not in condition to close on or before the date specified for the close of escrow, any party who has fully complied with his instructions may demand in writing the return of his money, documents and/or property provided said document is received subsequent to the date designated as close of escrow and prior to any transmission by you of irrevocable authority to record any instrument provided for herein. Upon receipt of such demand, you shall mail copies to all other parties at their respective addresses shown in the escrow instructions and the party receiving notice shall have five (5) days from mailing date within which to comply. Should the parties fail to comply, Escrow Holder is authorized to, at Escrow Holder's sole discretion, interplead all funds. If no such demand is made, you are to close the escrow as soon as the conditions (except as to time) have been met.

2.     You shall make payments to or for, or deliver documents to or for any party only if in your exclusive judgement such payment or delivery may be made without you incurring any liability, and you shall have no obligation to pay any costs or charges for the account of any party hereto, except from funds deposited by the party to be charged. As a condition to close of escrow, you may require that all interested parties approve in writing the final documents and instruments to be delivered hereunder. All disbursements are to be made by your check, and you are to deliver all checks and documents to the parties entitled thereto. You may use regular mail to the parties' respective addresses shown herein. Recordation of any instrument delivered through this escrow, if necessary or proper in the issuance of the requested policy of title insurance, is authorized. Instruct the county recorder to mail recorded instruments to the parties entitled thereto.

3.     Deposit all funds in connection with this transaction in an "Escrow Fund Account" with any local bank without liability for interest.

4.     If any party to these instructions applies for a loan on the property which is the subject of this escrow, you are authorized to furnish the prospective lender any information it requests concerning this escrow.

5.     Order title search immediately.  Unless otherwise indicated, you are authorized to obtain a policy of title insurance through any title insurance company authorized to do business in the county in which the above described property is located.

6.     Execute on behalf of the parties hereto assignments of interest in any insurance policy to be assigned to Buyer herein and forward said assignments upon close of escrow to either the agent or the insurance company, at your option, requesting the insurer to consent to such transfer, to make such other additions or corrections specifically required, if any, and to forward such policies to the parties entitled thereto. Execution and forwarding of such form assignments are your only responsibility in connection with any insurance policies called for in this escrow. Seller warrants, and you may assume, the premiums on any such policies being assigned herein have been paid in full, and that the policies have not been hypothecated and are assignable.

7.     Seller authorizes you, out of the proceeds accruing to Seller, to pay, at the close of escrow, all brokers' commissions hereinafter authorized by Seller, as well as any encumbrances necessary to place title in condition called for in these instructions including any prepayment penalty charged.

8.     The parties hereto, jointly and severally, agree to pay all costs, damages, judgements and expenses, including reasonable attorney's fees suffered or incurred by you in connection with or arising out of this escrow. You shall have a first lien on the property and papers held under this escrow for such compensation and expenses.

9.     If conflicting demands are made or notices served upon you with respect to this escrow, the parties hereto agree that you shall be entitled to refuse to comply with any such claim or demand and to withhold and stop all further proceedings in and performance of this escrow so long as such disagreement shall continue. In doing, you shall not be or become liable for damages or interest to the undersigned or any person. You shall be entitled to continue so to retain and refuse to act until:

   a.   The rights of the adverse claimants have been finally adjudicated in a court assuming and having jurisdiction of the parties and/or the money, papers, and property involved herein or affected hereby; and/or

   b.   All difference shall have been adjusted by mutual agreement, and you shall have been notified thereof in writing signed by all the persons interested.

10.    You are authorized to deliver copies of all instructions and closing statements in this escrow to the real estate broker, any lender, lender's agent, FHA or VA, upon their request.

11.    This escrow affords no protection against possible claims under conditional sales contracts, if any, affecting the property acquired or any fixtures or equipment in connection therewith.

12.    Buyer and/or Seller authorize Escrow Holder to disclose information as required by State or federal law.

13.    The parties to this escrow have satisfied themselves outside of escrow that the transaction covered by this escrow is not in violation of the Subdivision Map Act or any other law regulating land division or any State of Federal usury laws, and you as Escrow Holder, are relieved of all responsibility and/or liability in connection therewith, and are not to be concerned with the enforcement of said laws.

14.    You act hereunder as a depository only and are not responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any instrument deposited with you hereunder, or with respect to form or execution of the same, or the identity, authority, or rights of any person executing or depositing the same.  You are neither a party to, nor bound by, any agreement which may be deposited under, evidenced by, or arise out of this escrow.

15.    You shall have no responsibility of notifying any of the parties to this escrow of any sale, resale, loan, exchange, or other transaction involving any property herein described or of any profit realized by any person, firm or corporation (broker, agent and parties to this and/or other escrow included) on connection therewith, regardless of the fact that such transaction(s) may be handled by you in this escrow or in any other escrow.

16.    Buyer acknowledges that it is Buyers responsibility to obtain fire insurance on subject property.  Escrow Holder shall have no obligation and/or liability in connection with the issuance of fire insurance.

17.    In the event Buyer obtains new fire insurance and causes same to be deposited into escrow, Buyer instructs Escrow Holder to pay fire insurance premium to agent of insurance company at the close of escrow from funds handed you by said Buyer.

18.    You are to cause no examination to be made of state, county or city taxes and/or assessments, either real or personal, but are to base the adjustment exclusively on the fiscal year amounts shown on the preliminary title report to be obtained herein, including all items shown except personal property taxes and taxes on property not conveyed through this escrow. Seller agrees to pay, outside of escrow and before delinquency, all taxes on personal and/or real property not conveyed through this escrow, which appear as a lien on the property affected hereby and you are not to be concerned therewith. In the event that the Buyer received a supplemental tax bill after close of escrow, covering a period of time when Seller owned subject property, Buyer and Seller will make any necessary adjustments outside of escrow.

19.    These instructions may be executed in counterparts, each of which so executed shall be deemed an original, irrespective

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.                    _____
                                                               Michael F. Roizen

BY: _____
     Bradley D. Sharp, solely in his capacity as Chapter 11     _____
     Trustee                                                   Nancy J. Roizen

Date: October 1, 2009

Escrow No.: 026660-AD

Page 5 of 5: Additional instructions made a part of previous pages as fully incorporated therein.

of the date of its execution and delivery, and said counterparts together shall constitute one and the same instruments. Facsimile signatures shall be deemed original signatures.

20. All parties hereto understand and agree that these instructions, duly executed by the parties hereto, become effective only when they have been deposited with and accepted by you. You have the right to destroy these instructions and papers related to this escrow after five years from date of last activity.

21. No notice or demand shall be effective unless IN WRITING, no change of instructions shall be effective unless IN WRITING and SIGNED by all parties to this escrow. No such writings will be effective unless given to the escrow officer of Nettie Becker Escrow, Inc..

22. The opening date of escrow shall be deemed the date when Escrow Holder is in receipt of mutually executed escrow instructions.

23. CLOSE OF ESCROW MEANS THE DATE AND TIME THIS INSTRUMENT TO BE RECORDED HEREUNDER HAS BEEN RECORDED, MAKE ADJUSTMENTS ON THE BASIS OF A THIRTY DAY MONTH.

24. Escrow Holder is not responsible and/or liable for any omissions or irregularities in the escrow instructions, any amendments thereto and/or in the Purchase Contract or any other contract between the parties hereto.

25. In the event of the non-completion of this escrow for any reason whatsoever, including without limitation the cancellation or purported cancellation of the escrow by either party and notwithstanding the concurrence or non-concurrence by the other party with such cancellation, and the resultant obligation or advisability of the Escrow Holder to continue to hold undistributed the funds then on deposit in said escrow, then the Escrow Holder may at its option withdraw from said funds so held and pay to itself a holding fee of $25.00 for each calendar month, or fraction thereof, that said funds are retained in escrow, not exceeding, however, the whole of such withheld funds.

26. Nettie Becker Escrow, Inc. is licensed by the Department of Corporations, State of California: said license is dated March 15, 1979 and is numbered 9630602.

THE PARTIES ACKNOWLEDGE THAT THEY HAVE READ, UNDERSTOOD AND AGREED TO THE TERMS, PROVISIONS AND CONDITIONS CONTAINED ABOVE AND ON THE LAST PAGE HEREOF.

**SELLERS:**

Bradley D. Sharp, solely in his capacity as Chapter 11
Trustee for the Bankruptcy of SK Foods, L.P.

BY: _____
     Bradley D. Sharp, solely in his capacity as Chapter 11
     Trustee

**BUYERS:**

_____
Michael F. Roizen

_____
Nancy J. Roizen

**Exhibit B**

## SELLER'S ESTIMATED NET PROCEEDS

**PROPERTY:** 4000 West Lake Boulevard Unit 14
Homewood, CA 96141

**DATE:** November 3, 2009

**CLOSING DATE:**
**ESCROW NO.:** 026660-AD

**SELLER:** Bradley D. Sharp, solely in his capacity
as Chapter 11 Trustee for the
Bankruptcy of SK Foods, L.P.

| | DEBITS | CREDITS |
|---|---|---|
| **FINANCIAL CONSIDERATION** | | |
| Total Consideration | | 2,960,000.00 |
| | | |
| **PRORATIONS/ADJUSTMENTS** | | |
| Taxes at $16925.56/semi-annually from 11/13/2009 to 01/01/2010 | | 4,513.48 |
| HOA at $3800.00/monthly from 11/13/2009 to 12/01/2009 | | 2,280.00 |
| | | |
| **COMMISSION CHARGES** | | |
| Coldwell Banker | 37,000.00 | |
| Coldwell Banker Northern California | 74,000.00 | |
| Keller Williams | 37,000.00 | |
| | | |
| **H.O.A./MANAGEMENT** | | |
| Dues thru 11-30-09 to Fleur Du Lac Estates Association | 31,022.94 | |
| | | |
| **OTHER DEBITS/CREDITS** | | |
| Property I.D. Property Disclosure Report | 99.00 | |
| Archive ITI Escrow File Storage Fee | 25.00 | |
| | | |
| **TITLE/TAXES/RECORDING CHARGES - Lawyers Title Company** | | |
| Owners Title Policy Fee | 5,200.00 | |
| Sub Escrow Fee | 75.00 | |
| Title Company Wire Fee | 25.00 | |
| Miscellaneous Recording Fees | 100.00 | |
| Documentary Transfer Tax | 3,256.00 | |
| Delinquent Taxes | 19,123.53 | |
| 1st 1/2 Taxes 2009-10 | 16,925.56 | |
| Suppl 2008-09 Taxes | 358.46 | |
| | | |
| **ESCROW CHARGES - Nettie Becker Escrow, Inc.** | | |
| Escrow Fee | 4,440.00 | |
| Drawing Grant Deed | 75.00 | |
| Messenger Fee/FedEx Fee | 50.00 | |
| Wire Fee | 25.00 | |
| | | |
| Net Proceeds | 2,737,992.99 | |
| | | |
| **TOTAL** | $ 2,966,793.48 | $ 2,966,793.48 |

### THIS IS AN ESTIMATE ONLY AND FIGURES ARE SUBJECT TO CHANGE

Bradley D. Sharp, solely in his capacity as Chapter
11 Trustee for the Bankruptcy of SK Foods, L.P.

BY: _____
Bradley D. Sharp, solely in his capacity as
Chapter 11 Trustee



NETTIE BECKER
ESCROW, INC.

301 North Canon Drive • Beverly Hills, CA 90210
Phone: (310) 275-4042 • Fax: (310) 275-1219

**Exhibit C**



**Lawyers Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

NETTIE BECKER ESCROW
301 N CANNON DR
BEVERLY HILLS, CA 90210

Attn: ANTONIA DELGADO

Title Officer: Cindy Markovich/ Ralph Mason--(L)
email: TU05@ltic.com
Phone No.: (818) 252-6016
Fax No.: (818) 252-6018
File No.: 79050348

Your Reference No: 26660-ad

Property Address: 4000 West Lake Boulevard Unit 14, Homewood, California

## PRELIMINARY REPORT

Dated as of September 21, 2009 at 7:30 a.m.

In response to the above referenced application for a policy of title insurance, Lawyers Los Angeles hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Exhibit B attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B. Copies of the Policy forms should be read. They are available from the office which issued this report.

*Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered. It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.*

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

# SCHEDULE A

The form of policy of title insurance contemplated by this report is:

CLTA Homeowner's Policy of Title Insurance


The estate or interest in the land hereinafter described or referred to covered by this report is:

A CONDOMINIUM, as defined in Section 783 of the California Civil code, in fee


Title to said estate or interest at the date hereof is vested in:

SK Foods Limited Partnership, a California Limited partnership

The land referred to herein is situated in the County of Placer, State of California, and is described as follows:

### SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

# EXHIBIT "A"

All that certain real property situated in the County of Placer, State of California, described as follows:

PARCEL ONE:

An undivided 1/22nd interest in and to Lot 1 of "Amended Tract No. 248, Fleur Du Lac Estates" as shown and designated on the Map recorded February 22, 1980, in Book "M" of Maps, at Page 68 Official Records of Placer County.

Excepting therefrom Units 1 through 22 as shown on the Condominium Plan recorded in Book 2503 at Page 426 of Official Records

PARCEL TWO:

Unit 14 as shown on the Condominium Plan referred to in Parcel One.

Assessor's Parcel No.:  085-400-027

# SCHEDULE B – Section A

The following exceptions will appear in policies when providing standard coverage as outlined below:

1. (a)   Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records;  (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may asserted by persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a)   Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

# SCHEDULE B – Section B

At the date hereof Exceptions to coverage in addition to the printed exceptions and exclusions in said policy form would be as follows:

A.  Property taxes, including general and special taxes, personal property taxes, if any, and any assessments collected with taxes, to be levied for the fiscal year 2009 – 2010 which are a lien not yet payable.

B.  Property taxes, including general and special taxes, personal property taxes, if any, and any assessments collected with taxes, for the fiscal year 2009 - 2010.

| | |
|---|---|
| 1st Installment: | $16,925.56 This amount is valid until December 10, after which penalties apply |
| Penalty: | $1,692.55 Due with installment amount if paid after December 10 |
| 2nd Installment: | $16,925.56 This amount is valid until April 10, after which penalties apply |
| Penalty (including cost): | $1,712.55 Due with installment amount if paid after April 10 |
| Land Value | $1,240,000.00 |
| Improvement Value: | $1,860,000.00 |
| Exemption: | $0 |
| Code Area: | n/a |
| Assessment No.: | 085-400-027 |

C.  Supplemental taxes, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code, of the State of California, for the fiscal year 2008-2009.

| | |
|---|---|
| 1st Installment: | $179.23 |
| Penalty: | $17.92 |
| All due and payable | December 10, 2009, delinquent December 10, 2009 |
| 2nd Installment: | $179.23 |
| Penalty: | $27.92 |
| All due and payable | April 10, 2010, delinquent April 10, 2010 |
| Supplemental Bill No: | 085-400-027 |

D.  Said property has been declared Tax-Defaulted for non-payment of delinquent property taxes for the fiscal year 2008 - 2009.

Amount to redeem by October 31, 2009 for the above-stated year (and subsequent years, if any) is $18,879.72.

Amount to redeem by November 30, 2009 for the above-stated year (and subsequent years, if any) is $19,123.53.

E.  Supplemental or escaped assessments of property taxes, if any, assessed pursuant to the Revenue and Taxation Code of the State of California.

1.  Any taxes, assessments or charges levied by the following agency.   Amounts due, if any may be ascertained by contacting the agency.

Tahoe-Truckee Sanitation Agency:    530 587-2525
Tahoe City Public Utility District:    530 583-3796

2.  Claims or rights of the public, State of California and the United States of America to any portion of said land which is claimed to have been at the time below the highest water line of Lake Tahoe.

3. Any change in the location the high water line of Lake Tahoe due to the right of the United States of America to raise and lower the level of Lake Tahoe.

4. Any adverse claim based upon the assertion that:

   (a) Said land or any part thereof is now or at any time has been below the highest of the high watermarks of the river hereinafter mentioned, in the event the boundary of said river has been artificially raised or is now or at any time has been below the high watermark, if said river is in its natural state.
   (b) Some portion of said land has been created by artificial means or has accreted to such portion so created.
   (c) Some portion of said land has been brought within the boundaries thereof by an avulsive movement of the river, or has been formed by accretion to any such portion.
   Name of Lake:                        Lake Tahoe

5. Any rights in favor of the public which may exist on said land if said land or portions thereof were at any time used by the public.

6. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:          Henry J. Kaiser Company
   Purpose:             Light, Air, Unobstructed view
   Recorded:            March 15, 1962, Book 911 Page 60 of Official Records
   Affects:             as set forth in said document.

7. All easements, offers and dedications as shown on the Official Map,

   Tract of:            Amended Tract No. 248 – Fleur Declaration Lac Estates

8. Covenants, conditions and restrictions as set forth in the document
   Recorded:            March 27, 1981, Book 2371, Page 261 of Official Records

   This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

9. Covenants, conditions and restrictions as set forth in the document
   Recorded:            June 8, 1981, Book 2398, Page 155 of Official Records

   This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

10. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:         Sierra Pacific Power Company
    Purpose:            Electrical and communication facilities
    Recorded:           February 17, 1983, Book 2565, Page 245 of Official Records
    Affects:            common area

11. Easement, for ingress, egress, pipeline, or public utilities, and incidental purposes, as disclosed by instruments of record, affecting only the "Common Area."

12. The matters contained in a document entitled **"Encroachment Agreement "** recorded June 26, 1985, Book 2841 Page 535 of Official Records.

    Reference is made to said document for full particulars.

13. A declaration of covenants, conditions and restrictions which, among other things, may contain or provide for easements; liens and the subordination thereof; and restrictions on partition and severability of component interest.

    Recorded:          June 5, 2006, as Instrument No. 2006-0060218 of Official Records

    NOTE: This exception omits any covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that the covenant, condition or restriction (a) is not in violation of state or federal law, (b) is exempt under 42 U.S.C. Section 3607 or (c) relates to a handicap but does not discriminate against handicapped people.

    Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

    Said instrument also provides for the levy of assessments, the liens of which are stated to be subordinate to the lien of a first mortgage or first deed of trust made in good faith and for value.

14. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

    | | |
    |---|---|
    | Amount: | $1,350,000.00 |
    | Dated: | August 21, 2008 |
    | Trustor: | Gerard Rose, trustee of the CGS 2007 Trust |
    | Trustee: | Stewart Title of Sacramento, a California Corporation |
    | Beneficiary: | SK Foods Limited Partnership, a California Limited Partnership |
    | Recorded: | November 4, 2008 as Instrument No. 2008-0085788-00 of Official Records |
    | Loan No.: | not set out |

    If the above-mentioned deed of trust has been paid, or will be paid prior to or at close of escrow, this Company will require the original note, deed of trust and signed request for reconveyance, or the executed full reconveyance for said deed of trust, prior to closing. Any demand(s) for payoff and/or request(s) for full/partial reconveyance, must be executed by all beneficiaries or their successors in interest and their spouses, if married. In the event said beneficiaries/assignees are represented by an agent, proof of agency must be submitted along with the demand(s) and/or request(s) for full/partial reconveyance. To avoid delays please submit all documents to the Company at least one week prior to closing. If you cannot obtain these documents, please contact us.

15. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

    | | |
    |---|---|
    | Amount: | $1,360,000.00 |
    | Dated: | August 21, 2008 |
    | Trustor: | Gerard Rose, trustee of the SAS 2007 Trust |
    | Trustee: | Stewart Title of Sacramento, a California Corporation |
    | Beneficiary: | SK Foods, Limited Partnership a California Limited Partnership |
    | Recorded: | November 4, 2008 as Instrument No. 2008-0085790 of Official Records |
    | Loan No.: | not set out |

    If the above-mentioned deed of trust has been paid, or will be paid prior to or at close of escrow, this Company will require the original note, deed of trust and signed request for reconveyance, or the executed full reconveyance for said deed of trust, prior to closing. Any demand(s) for payoff and/or request(s) for full/partial reconveyance, must be executed by all beneficiaries or their successors in interest and their spouses, if married. In the event said beneficiaries/assignees are represented by an agent, proof of agency must be submitted along with the demand(s) and/or request(s) for full/partial reconveyance. To avoid delays please submit all documents to the Company at least one week prior to closing. If you cannot obtain these documents, please contact us.

16. A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

| | |
|---|---|
| Amount: | $125,000,000.00 |
| Dated: | March 24, 2009 |
| Trustor: | SK Foods Limited Partnership, a California Limited Partnership |
| Trustee: | First American Title Company, a California Corporation |
| Beneficiary: | Bank of Montreal, a Canadian chartered bank |
| Recorded: | March 26, 2009 as Instrument No. 2009-0024080-00 of Official Records |
| Loan No.: | not set out |

Said deed of trust recites that it secures a line of credit. If the line of credit is to be paid off in this transaction, this Company will require that the written demand for payment state that the line of credit has been frozen and that the demand is not subject to increase for any additional advances or draws. Accordingly, it is recommended that any request for a payoff demand statement advise the beneficiary of our requirement, and that the request be accompanied by: the borrower's written request to freeze the line of credit, the surrender of any unused checks or drafts, and anything else that may be required by the lender in order to issue an unconditional demand.

**END OF SCHEDULE B EXCEPTIONS**

**PLEASE REFER TO THE "NOTES AND REQUIREMENTS SECTION" WHICH FOLLOWS FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION**

# REQUIREMENTS SECTION:

Req. No. 1:  The Company will require a statement of information from the parties named below in order to complete this report, based on the effect of documents, proceedings, liens, decrees, or other matters which do not specifically describe said land, but which, if any do exist, may affect the title or impose liens or encumbrances thereon.

Parties:  Buyers and/or Sellers

Req. No. 2:  The Company will require that it be provided with the following with respect to the California limited liability company named below:
A.      A copy of its operating agreement and any amendments thereto;
B.      A certified copy of its articles of organization (LLC-1), any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles or organization (LLC-10); and
C.      A copy of the current Statement of Information form (LLC-12) filed with the Secretary of State.

Limited Liability Company:      SK Foods Limited Partnership

Req. No. 3:  The Company will require that it be furnished a written statement from the Homeowners' Association of which said property owner is a member, which will provide that all liens, charges and/or assessments levied on said land have been paid.  Said statement should provide clearance up to and including the time of closing.  In order to avoid unnecessary delays at the time of closing, we ask that you obtain and forward said statement at your earliest convenience.

# INFORMATIONAL NOTES SECTION

**Note No. 1:** The information on the attached plat is provided for your convenience as a guide to the general location of the subject property. The accuracy of this plat is not guaranteed, nor is it a part of any policy, report or guarantee to which it may be attached.

**Note No. 2:** California Insurance code section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement. Funds deposited with the company by wire transfer may be disbursed upon receipt. Funds deposited with the company via cashier's check or teller's check drawn on a California based bank may be disbursed on the next business day after the day of deposit. If funds are deposited with the company by other methods, recording and/or disbursement may be delayed. All escrow and sub-escrow funds received by the company will be deposited with other escrow funds in one or more non-interest bearing escrow accounts of the company in a financial institution selected by the company. The company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with such financial institution, and the company shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by the company. Those benefits may include, without limitation, credits allowed by such financial institution on loans to the company or its parent company and earnings on investments made with the proceeds of such loans, accounting, reporting and other services and products of such financial institution. Such benefits shall be deemed additional compensation of the company for its services in connection with the escrow or sub-escrow.

## WIRING INSTRUCTIONS FOR THIS OFFICE ARE:

**Comerica Bank**
**2321 Rosecrans Ave, 5th floor**
**El Segundo, CA 90245-4903**

**ABA # 121137522**
**CREDIT TO: Lawyers Los Angeles**
**ACCOUNT #: 1893992436**

**RE:  79050348**

### PLEASE INDICATE Lawyers Los Angeles TITLE ORDER NUMBER

**Note No. 3:** The charges which the company will make for next day messenger services (i.e. Federal Express, UPS, DHL, Airborne, Express mail, etc.) are $15.00 per letter, standard overnight service, and $25.00 for larger size packages and/or priority delivery services. Such charges include the cost of such messenger service and the company's expenses for arranging such messenger service and its overhead and profit. Special messenger services will be billed at the cost of such services. There will be no additional charge for pick-up or delivery of packages via the company's regularly scheduled messenger runs.

**Note No. 4:** None of the items shown in this report will cause the Company to decline to attach CLTA Endorsement Form 100 to an ALTA Loan Policy, when issued.

Note No. 5: The following information will be included in the CLTA Form 116 or ALTA Form 22-06 Endorsement to be issued pursuant to this order:

There is located on said land:   a condominium
Known as: 4000 West Lake Boulevard Unit 14, Homewood, California

Note No. 6: The only conveyances affecting said land, which recorded within 24 months of the date of this report, are as follows

| | |
|---|---|
| Grantor: | SK Foods Limited Partnership, a California Limited Partnership |
| Grantee: | Gerard Rose, Trustee of the CGS 2007 Trust, an undivided 50% interest |
| Recorded: | November 4, 2008 as Instrument No. 2008-0085787 of Official Records |

Note No. 7: The only conveyances affecting said land, which recorded within 24 months of the date of this report, are as follows

| | |
|---|---|
| Grantor: | SK Foods Limited Partnership, a California Limited Partnership |
| Grantee: | Gerard Rose, Trustee of the SAS 2007 Trust an undivided 50% interest |
| Recorded: | November 4, 2008 as Instrument No. 2008-0085789-00 of Official Records |

Note No. 8: The only conveyances affecting said land, which recorded within 24 months of the date of this report, are as follows

| | |
|---|---|
| Grantor: | Gerard Rose, trustee of the SAS 2007 Trust and Gerard Rose, trustee of the CGS 2007 Trust |
| Grantee: | SK Foods Limited Partnership, a California Limited Partnership |
| Recorded: | March 5, 2009 as Instrument No. 2009-0017658-00 |

Note No. 9: The charge for a policy of title insurance, when issued through this title order, will be based on the short-term rate.

Note No. 10: THIS COMPANY REQUIRES CURRENT BENEFICIARY DEMANDS PRIOR TO CLOSING. If the demand is expired and a current demand cannot be obtained, our requirements will be as follows:

(a)     If this Company accepts a verbal update on the demand, we may hold an amount equal to one monthly mortgage payment. This hold will be in addition to the verbal hold the lender may have stipulated.

(b)     If this Company cannot obtain a verbal update on the demand, we will either pay off the expired demand, or wait for the amended demand, at our discretion.

(c)     All payoff figures are verified at closing. If the customer's last payment was made within 15 days of closing, our Payoff Department may hold one month's payment to insure check has cleared the bank (unless a copy of the cancelled check is provided, in which case there will be no hold).

Processor: sv
Date Typed: October 13, 2009

**Exhibit B (Revised 11-17-06)**

## CALIFORNIA LAND TITLE ASSOCIATION
## STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy; or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10/22/03)
## ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:

   a. building
   b. zoning
   c. Land use
   d. improvements on the Land
   e. Land division
   f. environmental protection

   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This

Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:
   a. a notice of exercising the right appears in the Public Records at the Policy Date; or
   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
- For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| **Covered Risk 14:** | 1% of Policy Amount or $2,500 (whichever is less) | $10,000 |
| **Covered Risk 15:** | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| **Covered Risk 16:** | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| **Covered Risk 18:** | 1% of Policy Amount or $2,500 (whichever is less) | $5,000 |

## AMERICAN LAND TITLE ASSOCIATION
## RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
## EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   - land use
   - improvements on the land
   - land division
   - environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   - a notice of exercising the right appears in the public records on the Policy Date
   - the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks:
   - that are created, allowed, or agreed to by you
   - that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
   - that result in no loss to you
   - that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
4. Failure to pay value for your title.
5. Lack of a right:
   - to any land outside the area specifically described and referred to in Item 3 of Schedule A
     OR
   - in streets, alleys, or waterways that touch your land
   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

## AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)
## WITH ALTA ENDORSEMENT-FORM 1 COVERAGE
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or

a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine or equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA LOAN POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      (i) the occupancy, use, or enjoyment of the Land;
      (ii) the character, dimensions, or location of any improvement erected on the Land;
      (iii) the subdivision of land; or
      (iv) environmental protection;
      or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

## AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

(a) to timely record the instrument of transfer; or
(b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA OWNER'S POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that s notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or

   (e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.

6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.

7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.

8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:

   (a) The time of the advance; or

   (b) The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.

9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.



Order No.: 79050348

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Companies**
CTC – Chicago Title Company
CLTC – Commonwealth Land Title Company
FNTC – Fidelity National Title Company
FNTCCA – Fidelity National Title Company of California
LTC – Lawyers Title Company
TTCC – Ticor Title Company of California

**FNF Underwriters**
CTIC – Chicago Title Insurance Co.
CLTIC – Commonwealth Land Title Insurance Co.
FNTIC – Fidelity National Title Insurance Co.
SUTIC – Security Union Title Insurance Co.
LTIC – Lawyers Title Insurance Corp.
TTIC – Ticor Title Insurance Co.
TTIFL – Ticor Title Insurance Co. of Florida

## Available Discounts

**CREDIT FOR PRELIMINARY TITLE REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (CTIC, FNTIC, SUTIC, TTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 - 36 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**SENIOR CITIZENS RATE (SUTIC)**
Owner's or loan title insurance policies purchased by persons 55 years of age or older in connection with the financing, refinancing, sale or purchase of their primary residence may be charged at a rate of 90% of Basic Insurance Rate Table.

**FEE REDUCTION SETTLEMENT PROGRAM (CTC, CTIC, CLTC, CLTIC, FNTC, FNTCCA, FNTIC, LTC, LTIC, SUTIC, TTCC, TTIC)**
Eligible customers shall receive a $20.00 reduction in their title and/or escrow fees charged by the Company for each eligible transaction in accordance with the terms of the Final Judgments entered in The People of the State of California.

**DISASTER LOANS (CTIC, CLTIC, FNTIC, LTIC, SUTIC, TTIC, TTIFL)**

The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC, TTIC, TTIFL)**

On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 32% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

**CHURCHES OR CHARITABLE NON-PROFITABLE ORGANIZATIONS (SUTIC)**

Where established custom dictates that charges for owners and/or lenders insurance be paid for by churches, charitable or like eleemosynary non-profit organizations on property dedicated to church or charitable use, the following charge may be applied: 50% of the Basic Insurance Rate Table, applicable for the type of coverage requested.

**SHORT TERM RATE (SUTIC)**

Unless expressly excluded herein, the Short Term Rate applies on orders placed within sixty (60) months of the date of prior CLTA or ALTA policy. Short Term Rate is applicable to policies of title insurance only and not to any other charges contained herein. The Short Term Rate may be applied to increased liability charges provided the reissued policy is issued within sixty (60) months. The short term rate is 64% to 100% of the appropriate title insurance rate depending on the type of coverage selected.

**SHORT TERM RATE (CTIC, TTIC, TTIFL)**

The Short Term Rate is a reduction of the charges shown in the Insurance Tables which is allowable only when the current order is placed within 60 months from the date of issuance of a prior CLTA or ALTA Form of Policy of any qualified title insurer and provided further that the grantor, borrower, lender, lessor or assignor is insured by or under the terms of a prior policy, or is the vested owner of the interest insured by said policy. The short term rate is 64% to 92% of the appropriate title insurance rate depending on the type of coverage selected.

**SHORT TERM RATE (CLTIC, FNTIC, LTIC)**

If there is an insured owner and an order for title insurance is placed within 5 years following the effective date of any prior policy of any title insurer, the charge will be 80% of the appropriate title insurance rate.

**EMPLOYEE RATE (CTC, CTIC, CLTC, CLTIC, FNTC, FNTCCA, FNTIC, LTC, LTIC, SUTIC, TTCC, TTIC)**

No charge shall be made to employees (including employees on approved retirement) of the Company or its underwritten, subsidiary or affiliated title companies for policies or escrow services in connection with financing, refinancing, sale or purchase of the employees' bonafide home property. Waiver of such charges is authorized only in connection with those costs which the employee would be obligated to pay, by established custom, as a party to the transaction.



**LAWYERS Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No: 79050348-TRN LA

# "Notice to Customers"
## (Involves Residential Real Property in California ONLY)

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do no have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must – prior to the close of the current transaction – inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company if the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you quality for a discount which is subject to other terms and conditions.

Name: _____

Address: _____

Telephone No: _____



**Lawyers Title**
INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

Order No: 79050348-TRN LA

---

# "Notice to Customers"
## (Involves Residential Real Property in California ONLY)

---

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do no have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must – prior to the close of the current transaction – inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company if the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you quality for a discount which is subject to other terms and conditions.


Name: _____

Address: _____

Telephone No: _____



65-40

POR. S.1/2 SEC. 35, T.15N, R16 E., M.D.B. & M.

Assessor's Map Bk.65-Pg.40
County of Placer, Calif.

IMPORTANT: This plat is not a survey, it is merely furnished as a convenience to locate the land in relation to adjoining streets and other lands, and not to guarantee dimensions, distances, bearings or acreage.

Description: Placer, CA Assessor Map 85.60 Page: 1 of 1
Order: PLX Comment:

 **Lawyers Title**

INSURANCE CORPORATION

Lawyers Title Company
7530 N. Glenoaks Blvd.
Burbank, CA 91504
Phone: (818) 767-2000
Fax: (818) 504-4937

## LINE OF CREDIT LETTER TO LENDER

Date: _____

To: _____

_____

_____

**Attention:** Payoff Department
**Subject:** Account/Loan No.: _____

Order No.: _____

Dear Sir or Madam:

We hereby request that the above referenced credit line account be frozen as of this date. Please release payoff information to Lawyers Los Angeles because you will be receiving payment in full shortly, either through a sale or refinance of the secured property. We agree not to request any advances on this account on or after the date of this letter.

We, also agree to indemnify, hold harmless and reimburse Lawyers Los Angeles for any loss it may sustain by reason of not holding funds for Additional Advances on lines of credit.

Upon receipt of payoff, please close credit line account.

Sincerely,

_____

_____

*(All Owners/Sellers/Borrowers must sign)*

ESCROW NOTE: This letter must be sent to the lender directly at the time the demand is requested to insure that the account is frozen at the time of closing.

**DT4A**

**Exhibit D**

# BINDING OFFER TO PURCHASE REAL PROPERTY

The undersigned ("Offeror") hereby offers (the "Offer") to purchase from Bradley D. Sharp (the "Trustee"), solely in his capacity as the the chapter 11 trustee for the estate of SK Foods, L.P., a California limited partnership, and RHM Industry/Specialty Foods, Inc., a California corporation, d/b/a Colusa County Canning Co. (collectively, the "Debtors"), the real property commonly known as 4000 West Lake Boulevard, Unit #14, Homewood, CA 96141 (the "Property") on the identical terms as described in the *Motion of Chapter 11 Trustee to Approve Sale and Overbid Procedures for Real Property Commonly Known as 4000 West Lake Blvd., Unit #14, Homewood, California, Free and Clear of Lien of Bank of Montreal* (the "Motion"), filed on November __, 2009, in the Debtor's pending bankruptcy case, except that the offer price for the Property shall be $_____ in cash.

There are no contingencies to this Offer whatsoever, including inspection, due diligence or financing contingencies. The sale is subject to acceptance by the Trustee, approval by the Bankruptcy Court of the sale and overbid procedures at the hearing on December 16, 2009 or as continued therefrom, in Courtroom 34 of Honorable Robert S. Bardwil, United States Bankruptcy Judge, located at 501 I Street, 6th Floor, Sacramento, California.

Offeror further understands that the sale is "as is" and "where is", with no warranty or recourse whatsoever. Offeror has completed all due diligence which Offeror believes to be required to purchase the Property and has not relied upon any statement or representation from the Trustee, his attorneys, his real estate brokers or other agents. Any necessary testing or repairs, including without limitation those for termite damage or retrofitting required by any governmental entity, shall be the sole responsibility of the Offeror, at Offeror's sole expense.

Offeror is providing herewith a cashiers check in the sum of $91,500.00 for the Property bid upon, made payable to "Bradley D. Sharp, Chapter 11 Trustee", which shall be credited to the sale price. The deposit shall be non-refundable in the event that the Court confirms the sale to the Offeror but Offeror breaches his obligations under this Offer, in which event the Trustee shall be free to sell the Property to another. Offeror's sole remedy in the event that the Trustee is unable to close the sale shall be a return of the deposit in full. If the Offeror performs in full under the terms of this Offer, but the Court confirms the sale of the Property to another, Offeror's deposit shall be refundable in full.

Offeror agrees to substitute into escrow no. 026660-AD at Nettie Becker Escrow, Inc. or enter into a new escrow upon identical terms and conditions except as to price. Offeror acknowledges having obtained a copy of the listing agreement, those escrow instructions and the Motion, all of which are incorporated herein by this reference, and understands all of their terms.

A commission of 2.5% of the sale price shall be payable to Offeror's real estate broker, subject to approval of the Bankruptcy Court, but only upon closing of the sale to Offeror.

[signature page attached]

Dated: _____

_____
(Name of offeror)

_____
(street address)

_____
(city, state, zip code)

_____
(telephone number)

_____
(signature of authorized agent
of offeror, if applicable)

_____
(name and title of agent of offeror,
if applicable)

_____
(name of real estate brokerage
of offeror)

_____
(name of real estate agent
of offeror)

_____
(telephone no. of real estate
agent of offeror)

2

**EXHIBIT B**

FILED

June 09, 2009

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0001881454

1  **50 Pages**
   Gregory C. Nuti (CSBN 151753)
2  Kevin W. Coleman (CSBN 168538)
   SCHNADER HARRISON SEGAL & LEWIS LLP
3  One Montgomery Street, Suite 2200
   San Francisco, CA 94104-5501
4  Telephone: 415-364-6700
   Facsimile: 415-364-6785
5
   Proposed Attorneys for Bradley D. Sharp,
6  Chapter 11 Trustee

7

8                    UNITED STATES BANKRUPTCY COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                        SACRAMENTO DIVISION

11                                          Case No. 09-29162-D-11

12  In re:                                  Chapter 11

13  **SK FOODS, L.P., a California**         **DC No: SH5**
    **limited partnership, et al.,**
14                                          Case No. 09-29161-D-11
                Debtors.
15                                          Chapter 11
    In re :
16                                          **DC No: SH5**
    RHM INDUSTRIAL/SPECIALTY
17  FOODS, INC., a California               **DECLARATION OF SHONDALE**
    Corporation, d/b/a Colusa County        **SEYMOUR IN SUPPORT OF**
18  Canning Co.,                            **CHAPTER 11 TRUSTEE'S MOTION**
                                            **FOR ORDER DETERMINING THAT**
19                Debtor.                   **WASTEWATER DISCHARGE**
                                            **AGREEMENTS WITH RELATED**
20                                          **PARTIES CONSTITUTE**
                                            **"EXECUTORY CONTRACTS" FOR**
21                                          **PURPOSES OF 11 U.S.C. §365**

22                                          *Motion to Shorten Time Filed*
                                            Date:    [to be set]
23                                          Time:
                                            Place:   Courtroom 34
24                                                   501 I Street
                                                     Sacramento, CA 95814
25                                          Judge:   Hon. Robert S. Bardwil

26  ///

27  ///

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

1

SCHRADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

I, Shondale Seymour, declare:

1.     I am the Chief Financial Officer of SK Foods, L.P. ("SK Foods") and RHM Industrial /Specialty Foods, Inc. ("RHM", and collectively with SK Foods, the "Debtors"), and I have held this position since June 2008. From June 2008 through April 2009, I also served as CFO for certain of the Debtors' affiliates that are owned and/or controlled by Scott Salyer – Blackstone Ranch Corp., SS Farms, LLC, and SSC Farming, LLC. From November 2006 through June 2008, I served as a consultant providing special project accounting services to SK Foods and certain of its affiliates, including SSC Farming, LLC.   In addition, I provided accounting assistance from April 2005 through November 2005 specifically for the Debtors, SK Foods and RHM. As CFO, I was involved in financial management, financial planning, and record keeping. Until his departure in April 2009, I also worked closely with Mark McCormick, former Executive Vice President and Treasurer of the SK Foods Group. During his tenure, Mr. McCormick was primarily responsible for maintaining the financial records of Salyer-owned affiliates engaged in farming activities, which included SS Farms, LLC, SSC Farming, LLC, SSC Farms I, LLC, and SSC Farms II, LLC. As part of my job responsibilities, I am a duly authorized custodian of emails, books, records, files and other documents kept in the ordinary course of the Debtors' business which relate to its assets, liabilities, and transactions with affiliates and unrelated parties. Except as otherwise noted, I make this declaration based upon my own personal knowledge. If called as a witness, I could and would competently testify hereto.

2.     In the ordinary course of business, staff in the Debtors' accounting department acting under my direction are charged *inter alia* with the responsibility of contemporaneously recording the receipts and disbursements of cash from the Debtors' accounts, and invoices received from related and unrelated parties. Because the Debtors operations are intertwined to a large extent with those of other affiliates, and because individuals within the Debtors' accounting department also perform accounting functions for certain of the non-Debtor affiliated companies, I have become familiar with many aspects of the financial affairs of both the Debtors and the affiliated companies that are owned and controlled by Scott Salyer, the Debtors' former CEO. In

2

1  preparing this declaration, I have reviewed the financial records maintained by the Debtors, and

2  can confirm that such records reflect and are the basis for the factual statements contained herein

3  with respect to the Debtors' transactions with the Wastewater Affiliates.

4       3.    Prior to the filing of the Debtors' bankruptcy case, the Debtors were parties to

5  three agreements that allowed the Debtors to discharge large quantities of wastewater generated

6  in their operations.  The agreements (the "Discharge Agreements") are attached hereto as

7  **Exhibits A** through **C**, and are identified as:

8           a.    Discharge Agreement dated May 1, 2008 between
   SK Foods, LP and SSC Farming, LLC.

9

10          b.    Discharge Agreement dated May 1, 2008 between
   RHM and SSC Farms I, LLC.

11          c.    Discharge Agreement dated May 1, 2008 between
   RHM and SSC Farms II, LLC.

12

13      4.    The counter-parties to the Discharge Agreements are three limited liability

14 companies in which Scott Salyer serves as the manager – SSC Farming, LLC, SSC Farms I,

15 LLC, and SSC Farms, II, LLC (collectively, the "Wastewater Affiliates").  The Debtors, the

16 Wastewater Affiliates, and the other Salyer-affiliates were all owned, directly or indirectly by

17 Scott Salyer and his two daughters.  Many of the Salyer-owned entities, including the

18 Wastewater Affiliates, provided products or services exclusively to the Debtors.  They shared

19 senior management and staff.  As noted above, accounting functions for the Wastewater

20 Affiliates were performed by the same individuals that handled the Debtors' accounting

21 activities.

22      5.    The parcels upon which the Debtors' wastewater is discharged were acquired by

23 the Wastewater Affiliates in 2005 and 2007.

24      6.    The Discharge Agreements permit the Debtors to discharge wastewater on the

25 various parcels of land in exchange for payment of an annual fee due on or before January 1 of

26 each year.

27 //

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

3

7. The Salyer-affiliates' did not deal with each other at arm's length. Money was transferred back and forth between the Salyer-affiliates when an affiliate needed money, not necessarily when it was due under a contract or when the affiliate provided some goods or services to the Debtors. Payment of inter-company obligations was frequently deferred and "caught-up" at various intervals, often at the end of a tax year.

8. Consistent with the pattern that existed throughout the Salyer-affiliated companies, the Debtors' payments to the Wastewater Affiliates were made on an *ad hoc* basis. A spreadsheet I prepared recapping the invoice issue dates and payment dates for all payments due for discharge of wastewater from 2007 through the present is attached hereto as **Exhibit D**.

9. Although the Debtors had been discharging wastewater on the land for several years, the Debtors initially made no payments to the Wastewater Affiliates specifically for wastewater discharge. The non-payment was discovered in August 2008 in the course of auditing SK Foods' books for the fiscal year that ended on June 30, 2008.

10. When the non-payment was discovered, Ann Backman, an employee of SK Foods that was acting on behalf of the Wastewater Affiliates, generated three invoices (one covering each parcel) for wastewater discharge that had occurred over the entire year running from May 2007 through April 2008. Although issued in August 2008, these invoices were back-dated to July 1, 2008.

11. In August 2008, Ms. Backman (again, acting on behalf of the Wastewater Affiliates) issued invoices pro-rating the annual discharge fee into monthly installments. These invoices billed each month separately for the period May to August 2008. These invoices were not issued or paid on a regular schedule. For example, the invoices for September 2008 were issued on September 30, 2008, and the invoices for October 2008 were issued merely one day later, on October 1, 2008. The invoices for November 2008 were issued approximately six weeks later - on December 17, 2008. The invoices for December 2008 were issued on January 21, 2009. Invoices for the first four months of 2009 were not issued until April 9, 2009.

12. The invoices for the 2007/08 "catch up" payment and the May to August 2008 wastewater discharge fees were paid on November 1, 2008. Invoices for monthly pro-rated

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

4

1 amounts for September through November 2008 wastewater discharge were paid on December
2 30, 2008.

3     13.     The invoices issued on January 21, 2009 for December 2008 wastewater
4 discharge and the invoices issued on April 9, 2009 for January through April wastewater
5 discharge remained unpaid as of May 8, 2009, the date the Debtors' bankruptcy cases were filed.
6 However, the payment history between the Debtors and the Wastewater Affiliates indicates that
7 payment frequently occurred several months after a period of use and an invoice was issued. In
8 fact, absent a particular need for cash by a payee, a common practice among the Salyer-affiliated
9 companies was to delay payments until June 30 and December 31 of each year, which coincide
10 with the end of the Debtors' fiscal year end and certain affiliates' tax years.

11     14.     Attached hereto as **Exhibit E** is a true and correct copy of a letter dated April 17,
12 2009 sent on behalf of a trust under which Scott Salyer's daughters are beneficiaries ("Salyer
13 Daughters' Trust"). The April 17, 2009 letter is maintained by SK Foods in the regular course of
14 its business.

15     15.     I am informed and believe that Scott Salyer has also taken the position that the
16 Discharge Agreements are not executory agreements due to the purported termination of such
17 agreements on April 17, 2009.

18     I declare under penalty of perjury under the laws of the United States of America and the
19 State of California that the foregoing is true and correct to the best of my knowledge and belief.
20 Executed this 9th day of June 2009, at Lemoore, California.

21

22             /s/ Shondale Seymour
             Shondale Seymour

23

24

25

26

27

28

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CA 94104-5501
TELEPHONE: 415-364-6700

5

EXHIBIT A

**DISCHARGE AGREEMENT**

THIS DISCHARGE AGREEMENT ("**Agreement**") dated this First day of May, 2008, by and between SK FOODS, L. P., a California limited partnership ("**Operator**"), and SSC FARMS I, LLC, a California limited liability company ("**Owner**").

In consideration of the mutual covenants set forth herein between the parties, the parties hereto agree as follows:

1.   Purpose.

   A.   Operator desires to acquire the right to dispose of wastewater resulting from Owner's tomato paste processing plant on the Land (as defined below).

   B.   Owner desires to grant this right to Operator pursuant to the provisions of this instrument.

2.   Use of Real Property.   Owner hereby grants to Operator, on the terms and conditions set forth in this Agreement, the right to utilize approximately ( 352.36 ) acres of real property situated in the County of Kings, State of California and more particularly described in **Exhibit A**, which is attached hereto and made a part hereof ("**Land**") for the use set forth in Section 5. Owner retains all other rights related to use and ownership of the Land including but not limited to conducting farming and related operations on the Land and using Operator's waste water for such uses so long a such use does not interfere with Operator's use.

3.   Term. The term ("**Term**") of this Agreement shall commence May 1, 2008, and shall terminate on April 30, 2018.

4.   Discharge Fee.

   A.   Discharge Fee.  An annual base discharge fee ("**Base Fee**") will be calculated at the rate of Four Hundred Dollars ($400.00) per acre per year, payable on or before January 1st of each calendar year.

   B.   Adjustment of Discharge Fee. Beginning with the Base Fee payable on May 1, 2011 and every three (3) years thereafter, the amount of the Base Fee payable by Operator under this Agreement shall be increased by fifteen percent (15%) over the previously applicable calculation of Base Fee.

C.    <u>Payment of Fee; Late Fee</u>. All discharge fees payable under this Agreement, including Base Fee, shall be payable without abatement, demand, deduction or set off, on or before each January 1st during the term of this Agreement at such place as Owner may designate in writing, with appropriate proration by percentage of the year, rounded up to the month, at the expiration or earlier termination of the Term of this Agreement. If Operator fails to make any rental or other payment within fifteen (15) days of the date it is due hereunder, a late charge equal to five percent (5%) of the amount of the payment due shall be assessed and shall be immediately due and collectible as additional rent hereunder for administrative rent costs and burdens.

D.    <u>Default Interest</u>. If any payment due to Owner under this Agreement is not received by Owner within five (5) days after such payment is due, Operator shall pay to Owner interest on the past due amount from the date due until paid at the rate of ten percent (10%) per annum (the "Default Rate").

5.    <u>Use</u>. Subject to the restrictions set forth in this Agreement, the Land shall be used by Operator exclusively for the discharge of wastewater from Owner's tomato processing operations, and other activities consistent with the zoning ordinances, regulations and laws of the County of Colusa, State of California and federal government.

6.    <u>Compliance with the Law</u>. In all its operations under this Agreement or on the Land, Operator shall, at its own expense, promptly comply with any and all laws, statutes, ordinances, permits, rules, regulations, requirements and orders whatsoever, present or future, of the national, state, county or municipal government or any other governmental jurisdiction (**collectively, the "Laws"**) which may in any way apply to the use, maintenance or occupation or other operation on the Land.

7.    <u>Restrictions on Use for Discharge of Wastewater and Monitoring</u>.

A.    <u>General Use Restrictions</u>. The parties agree that subject to the provisions of this Agreement, Operator shall have control over the use of Land as may be necessary to manage the discharge of wastewater from Operator's tomato processing operations, including, but not limited to, management and operation of the soil preparation, water discharge, water movement and other activities relating to Operator's discharge of process wastewater onto the Land. All such use by Operator shall be in accordance with the terms and conditions of this Agreement and in conformity with all applicable Laws in effect from time to time during the term of this Agreement.

B.    <u>Permit Compliance and Board Matters</u>. Operator must comply at all times with all of the terms, conditions and requirements of the California Regional Water Quality Control Board ("CRWQCB"), as amended or supplemented from time to time, and any permit regulating the discharge of wastewater on the Land (collectively, the "Permit") Operator shall be responsible for all costs and expenses in connection

with any and all Permit applications, processing and compliance. Owner shall have the right to participate in and comment to the CRWQCB or other governmental entities regarding Owner's discharge of wastewater on the Land, compliance with Permit requirements, or any proposed modification, renewal, revocation or replacement of the Permit.

        C.    <u>Permit Information Rights</u>.  Operator shall promptly provide Owner with copies of all documents submitted by Operator, its consultants and agents, to the CRWQCB, or any other governmental agency, in connection with the Permit.

        D.    <u>Discharge Meter</u>.  If requested by Owner, Operator shall install water meters in the wastewater conveyance system sufficient to record the daily discharge of wastewater on the Land. Water meter readings will be available by the 5th day of each month and will be provided to Owner upon the request of Owner.

        E.    <u>Owner Monitoring Rights</u>.  Owner may, at Owner's sole discretion, conduct specific monitoring or evaluation activities with respect to Operator's discharge of wastewater on the Land, or Operator's use thereof, to be performed by Owner or Owner's agents, including environmental specialists selected by Owner. Such monitoring and/or evaluation activities include, without limitation, the right to obtain independent samples from the Land for soil testing, air testing, production waste stream analysis and groundwater testing and the inspection of water conveyance facilities, meters, and appurtenances thereto. All monitoring shall be scheduled with Operator's prior consent and shall not interfere with Operator's use of the Land. Notwithstanding that Owner may monitor Operator's activities, Operator will respond only to inquiries and/or notices generated by applicable government agencies.

        8.    <u>Right of Entry by Owner</u>.  Owner and Owner's agents and assigns, shall have the right to enter the Land or any portion thereof, for the purpose of determining if all equipment subject to this Agreement is being maintained properly. Promptly after receiving a written notice from Owner itemizing reasonably required and/or customary maintenance and/or repair needs discovered by Owner during any such inspection, Operator shall perform such maintenance and make such repairs and replacements as are required under this Agreement. If Operator fails or neglects promptly to perform such maintenance or to make such repairs and replacements, then Owner, its agents and representatives shall have the right (but not the obligation) to enter the Land and, at Operator's expense, perform such maintenance and make such repairs and replacements and Owner, in so doing, shall not be liable for any inconvenience, disturbance, loss of business or other damage resulting to Operator therefrom. All expense incurred by Owner in connection with any such maintenance, repairs and replacements shall become supplemental rent due and payable within thirty (30) days after written notice of such expense from Owner.

        9.    <u>Owner's Representations and Warranties</u>.  Owner represents and warrants that Owner is the Owner and has title to the Land, and Owner and all persons

acting for and on behalf of Owner have the necessary authority to execute documents and otherwise consummate this transaction.

10. <u>Responsibility for Condition of Land</u>. The representations and warranties made by Owner in paragraph 9 above are applicable as of the date Operator takes possession of the Land and for all periods prior to Operator's possession of the entire Land. Owner shall indemnify, defend and hold Operator harmless from and against any and all claims, damages, liabilities, losses, costs, and attorneys fees which Operator incurs as a result of conditions existing on or before the date on which Operator takes possession of the Land whether caused by Owner, its predecessors, or otherwise.

Operator shall be responsible for any change in the condition of the Land which is caused by the acts or omissions of Operator after the date it takes possession of the Land. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs and attorneys fees which Operator incurs as a result of the acts or omissions of Operator after the date on which Operator takes possession of the Land.

11. Operator's Representations and Warranties. Operator represents, warrants and covenants as follows:

A. Operator's future operations on the Land will comply fully with all applicable Laws and the terms and conditions of the Permit.

B. Operator's discharge of wastewater on the Land shall not degrade the soil or groundwater quality of or underlying the Land.

C. Operator acknowledges that the Land have been used for agricultural purposes and as such various fertilizers, pesticides, herbicides, fungicides, rodenticides and other agricultural chemicals may have been used on or applied to the Land. Operator acknowledges that Owner makes no representation or warranty with respect to the condition of the Land.

D. Operator acknowledges that Owner has expressly advised Operator and that Operator has the opportunity to conduct its own investigation as to the condition of the Land, including as it relates to said agricultural chemicals and is relying solely on such investigation in leasing the Land.

12. <u>Utilities and Miscellaneous Expenses</u>. Operator shall be responsible for payment of any and all costs and assessments for water, utilities, and irrigation. Operator shall be responsible for and shall promptly pay for all labor, implements, tools, and any and all other materials and services of whatsoever kind or nature which may be used by the Operator on the Land and Owner shall not be liable for any part thereof.

13. <u>Repairs and Maintenance</u>. Operator shall care for and maintain both the

Land and the approaches to and appurtenances of the Land, including, but not limited to, all fences, trees, ditches, levees, buildings, pumps, pipelines, wells and roadways, and shall maintain them in the same order and condition in which received. Without limiting the foregoing, Operator shall maintain, repair and replace all fixtures, appurtenances and equipment.

14. <u>Improvements and Waste.</u>  Operator may not construct improvements on the Land, or make any alterations in any existing improvements without the prior written consent of Owner. Operator hereby acknowledges and agrees that upon the termination of this Agreement, Owner shall have the option to select which improvements placed upon the Land by Operator that Owner shall retain, which shall become the sole property of Owner and shall not be removed by Operator, and Operator shall remove all improvements not retained by Owner at Operator's sole cost and expense within thirty (30) days after receiving written notice from Owner identifying the improvements shall be retained and/or removed. Operator shall return the Land to the condition in which it existed prior to the Agreement subject only to any retained improvements.

Operator shall not commit or permit or suffer the commission of any waste on or to or permit or suffer any damage to be done on or to the Land, including the groundwater underlying the Land.

15. <u>Compliance with the Law.</u>  In all its operations under this Agreement or on the Land, Operator shall, at its own expense, promptly comply with any and all laws, ordinances, rules, regulations, requirements and orders whatsoever, present or future, of the national, state, county or municipal government or any other governmental jurisdiction which may in any way apply to the use, maintenance or occupation or other operation on the Land.

16. <u>Mechanic's Liens.</u>  Operator shall not allow or permit any liens to be filed against the Land, by reason of any work, labor, services or materials supplied or claimed to have been supplied at the request of Operator or anyone using the Land, or any part thereof, through or under Operator, and Operator shall indemnify and defend Owner and hold Owner harmless from such liens. If any such lien shall be filed against the Land, Operator shall cause the same to be discharged within thirty (30) days after actual notice of such filing by payment, deposit or bond. If Operator shall fail to discharge any such lien, Owner may, but shall not be obligated to, discharge the same, and any amount so paid or deposited by Operator and all expenses incurred by Owner, including reasonable attorney's fees, shall become immediately due and payable by Operator to Owner together with interest thereon at the Default Rate (as defined in Section 4D above).

17. <u>Use of Wells, Pumps and Ditch or Canal Water.</u>  Operator shall be entitled to exclusive use of wells, pumps and ditch and canal water on the Land during the term of this Agreement.  Operator shall keep the pumps and wells in good operating condition.  Owner does not warrant, represent or guaranty the quantity or quality of the

water available for use by Operator.

18.  **Taxes and Liens.**  Operator agrees to timely pay and discharge all taxes or assessments levied or assessed against any improvements and personal property put or placed by Operator on or in the Land and to allow no liens or encumbrances to be placed or remain against its property on the Land or against the Land insofar as such liens or encumbrances may be asserted by reason of Operator's acts or occupation or use of said Land.

19.  **Insurance.**  Operator shall, at its own expense, carry at all times during the Term of this Agreement, procure and maintain in full force and effect the following types of insurance, in at least the amounts and forms specified below:

A.  Insurance Coverage. (a) Worker's compensation insurance in any amount required to comply with law; (b) Commercial General Liability insurance insuring against liability for bodily injury and property damage occurring on the Land. This insurance shall be written on an occurrence basis and have a single limit per occurrence of not less than One Million and 00/100 Dollars ($1,000,000.00) for all bodily injury and property damage liability claims and shall include the following endorsements: (i) deleting any employee exclusion on personal injury coverage; (ii) including coverage for injuries to or caused by employees; and (iii) providing for blanket contractual liability coverage (including Operator's indemnity obligations contained in this Agreement). All such insurance: (i) shall be primary and non-contributory; (ii) shall provide for severability of interests; (iii) shall provide that an act or omission of one of the insureds shall not reduce or void coverage to any other insureds; and (iv) shall afford coverage for all claims based on acts, omissions, injury or damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period; and (c) Property Damage Liability insurance in the amount of $1,000,000.00, all of which policy proceeds shall be used for the repair or replacement of the property damaged or destroyed.

B.  **Form of Insurance.**  All policies of insurance required of Operator herein shall be issued by insurance companies with a general policy holder's rating of not less than "A-" and a financial rating of not less than Class "VIII", as rated in the most current available "Best's Key Rating Guide", and which are admitted to do business in the State of California. All such policies, except for the Workers' Compensation coverage, shall name Owner, and such other persons or entities as Owner may from time to time designate, as an additional insured and Operator shall provide to Owner an additional insured endorsement certificate. Thereafter, copies of renewal policies or certificates thereof shall be delivered to Owner upon Owner's receipt from the insurer. All policies of insurance delivered to Owner must contain a provision that the company writing the policy will give to Owner thirty (30) days' prior written notice of any cancellation or lapse, and the effective date of any reduction in the amounts of insurance, and ten (10) days prior written notice of any cancellation for non-payment.

20. **Indemnification.** Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs, and attorneys fees which Owner incurs as a result of conditions existing on the Land on or before the date on which Operator takes possession of the Land, or as a result of any act or omission of Operator or the Preexisting Operators, or breach of this Agreement by Operator after the date Operator takes possession of the Land. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs and attorneys fees which Owner incurs as a result of the acts or omissions of Operator after the date on which Operator takes possession of the Land.

21. **Surrender Upon Termination.** Whenever the Land shall cease to be subject to this Agreement by lapse of time, termination or otherwise, Operator shall promptly and peacefully surrender up the possession of all such lands and all improvements thereon to the Owner in as nearly their original condition as may be practicable considering Operator's improvements thereon and reasonable use thereof (subject to Section 10 above), and if requested by Owner, shall duly and promptly execute, acknowledge and deliver to Owner a good, sufficient and recordable quitclaim deed covering all rights of Owner in and to such lands.

22. **Holding Over.** In the event Operator holds over and remains in possession of the Land or any part thereof after expiration of this Agreement, without the express written consent of Owner, such holding over shall be construed to be a tenancy for month-to-month only with rent payable at the times and in the amounts specified by Owner. Such tenancy shall be subject to all the terms and conditions of this Agreement. If Owner does not consent to Operator holding over and Operator fails to surrender the Land upon expiration of this Agreement despite written demand to do so by Owner, Operator shall indemnify and defend Owner and hold Owner harmless from all loss, cost or liability, including without limitation, any claims made by any succeeding operator founded on or resulting from such failure to surrender and all costs of restoring Owner's possession of the Land, including all attorneys' fees and court costs, and other costs of litigation.

23. **Assignment.** Operator shall not assign this Agreement or any interest therein, or any rights under it, or any right or privilege appurtenant to the Land, or permit another person to occupy or use the entire or any portion of the Land, without Owner's prior written consent, which shall not be unreasonably withheld. Notwithstanding any assignment, Operator shall remain liable for all of Operator's obligations hereunder. In each case, assignment shall further be conditioned upon the assignee expressly assuming the obligations of Operator hereunder.

24. <u>Time is of the Essence</u>.  Time is hereby expressly declared to be of the essence of this Agreement and of each and every provision hereof, and each such provision is hereby made and declared to be the material, necessary and essential part of this Agreement.

25. <u>Default</u>.  The occurrence of any one or more of the following events shall constitute a default hereunder:

(a)  The failure to pay any type of rent due under this Agreement, including any Base Fee or Additional Fee, or any other sum payable to Owner within 15 days of the due date.

(b)  The failure of either party to observe or perform any other covenant or provision of this Agreement, whether express or implied, required to be observed or performed by that party, when such failure shall continue for a period of fifteen (15) days after written notice thereof from the other party; provided, however, that such notice shall be in lieu of, and shall not be in addition to, any notice required under California Code of Civil Procedure Section 1161.

(c)  Abandonment of the Land by Operator for a continuous 180 day period.

(d)  Operator's application for or consent to the appointment of a receiver, trustee or liquidator of all or of a substantial portion of its assets; making a general assignment for the benefit of creditors; be adjudicated a bankrupt or becoming insolvent; filing a voluntary petition in bankruptcy or filing a petition or answer seeking reorganization or a rearrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of debtor; suffering or permitting to continue unstayed and in effect for ten (10) consecutive days any judgment, decree or order, entered by a court of competent jurisdiction, which approves the petition seeking reorganization of Operator or which appoints a receiver, trustee or liquidator of Operator for all or a part of any of its assets; and an attachment, execution or judicial seizure of all or substantially all of Operator's assets or of Operator's interest in this Agreement, which such seizure is not discharged within ten (10) days.

26. <u>Prevention or Performance</u>.  Should performance of the obligations of either party under this Agreement be prevented or delayed by act of God, war, insurrection, fire, flood, storm, strike, lockouts or by any law, regulation or order of any federal, state, county or municipal authority to the extent it is so prevented or delayed shall be excused.

27. <u>Notice</u>.  All notices or other communications hereunder shall be deemed to have been given when personally delivered, or at the time confirmed for delivery if by facsimile or express mail carrier, or seventy-two (72) hours after being mailed if by regular United States mail, postage prepaid to the address as follows:

| Operator | Owner |
|---|---|
| SK FOODS, L. P. | SSC FARMS I, LLC |
| P. O. Box 160 | 200 Sky Park Drive |
| Lemoore, CA 93245 | Monterey, CA 93940 |

Either party, Owner or Operator, may change their address for the purposes of this section by giving written notice of such change to the other party in the manner provided for herein.

28. <u>Attorney's Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees, costs and necessary disbursements in addition to any other reasonable relief to which he may be entitled. With respect to any suit, action or proceeding arising out of or related to this Agreement, or the documentation related hereto, the parties hereby submit to the jurisdiction and venue of the appropriate court in the County of Monterey, State of California for any proceeding arising hereunder.

29. <u>Sole and Only Agreement</u>. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to their rights and obligations relative to the Land. Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, orally or in writing, have been made by any party or anyone acting on behalf of any party as to the Land which are not embodied in the Purchase Agreement and this Agreement and no other agreement, statement or promises shall be valid or binding.

30. <u>Estoppel Certificates</u>. At any time and from time to time, within ten (10) business days after notice of request by either party, the other party shall execute, acknowledge, and deliver to the requesting party, or to such other recipient as the notice shall direct, a statement certifying that this Agreement is unmodified and in full force and effect as modified in the manner specified in the statement. The statement shall also state the dates to which the rent and any other charges have been paid in advance. The statement shall be such that it can be relied on by any auditor, creditor, commercial banker, and investment banker of either party and by any prospective purchaser or encumbrancer of the Land or Improvements or both or of all or any part or parts of Owner's or Operator's interests under this Agreement. Operator's failure to execute, acknowledge, and deliver, on request, the certified statement described herein within the specified time shall constitute acknowledgment by Operator to all persons entitled to rely on the statement that this Agreement is unmodified and in full force and effect and that the rent and other charges have been duly and fully paid up to and including the respective due dates immediately preceding the date of the notice of request and shall constitute a waiver, with respect to all persons entitled to rely on the statement, of any defaults that may exist before the date of the notice.

31. _Invalidity._  If any provision of this Agreement is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

32. _Successors and Assigns._  This Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

33. _Amendment._  No change, amendment or modification of this Agreement shall be valid unless it is in writing and signed by the parties hereto.

34. _Governing Law._  This Agreement shall be construed and governed pursuant to the laws of the State of California, without reference to its conflict of laws provisions.

35. _Recordation._  The parties shall, at the request of either party, promptly execute and record a short form memorandum describing the Land and stating this Agreement's term, its commencement and termination dates, and other information that the parties mutually agree to include.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the day and in the year first set forth above.

Operator

SK FOODS, L. P., a California
limited partnership

By: _____
STEVE KING, Vice-President

Owner

SSC FARMS I, LLC

By: _____
MARK McCORMICK, Vice-President

EXHIBIT A

**PROPERTY DESCRIPTION AND MAP**


THAT CERTAIN REAL PROPERTY LOCATED IN THE COUNTY OF
KINGS, STATE OF CALIFORNIA, AS MORE PARTICULARLY DESCRIBED BELOW:

Assessor's Parcel Numbers:

26 - 020 - 012

26 - 020 - 013

EXHIBIT B

# DISCHARGE AGREEMENT

THIS DISCHARGE AGREEMENT ("**Agreement**") dated this First day of May, 2008, by and between SSC FARMING, LLC, a California limited liability company ("**Owner**"), and RHM Industrial/Specialty Foods, Inc., a California corporation doing business as Colusa County Canning Company ("**Operator**").

In consideration of the mutual covenants set forth herein between the parties, the parties hereto agree as follows:

1. <u>Purpose</u>.

    A.    Operator desires to acquire the right to dispose of wastewater resulting from Owner's tomato paste processing plant on the Land (as defined below).

    B.    Owner desires to grant this right to Operator pursuant to the provisions of this instrument.

2. <u>Use of Real Property</u>.  Owner hereby grants to Operator, on the terms and conditions set forth in this Agreement, the right to utilize approximately six hundred forty two and 81/100 (642.81) acres of real property situated in the County of Colusa, State of California and more particularly described in **Exhibit A**, which is attached hereto and made a part hereof ("**Land**") for the use set forth in Section 5.  Owner retains all other rights related to use and ownership of the Land including but not limited to conducting farming and related operations on the Land and using Operator's waste water for such uses so long a such use does not interfere with Operator's use.

3. <u>Term</u>.  The term **("Term")** of this Agreement shall commence May 1, 2008, and shall terminate on April 30, 2018.

4. <u>Discharge Fee</u>.

    A.    <u>Discharge Fee</u>.  An annual base discharge fee (**"Base Fee"**) will be calculated at the rate of Four Hundred Dollars ($400.00) per acre per year, payable on or before January 1st or each calendar year.

    B.    <u>Adjustment of Discharge Fee</u>.  Beginning with the Base Fee payable on May 1, 2011 and every three (3) years thereafter, the amount of the Base Fee payable by Operator under this Agreement shall be increased by fifteen percent (15%) over the previously applicable calculation of Base Fee.

C. **Payment of Fee; Late Fee**. All discharge fees payable under this Agreement, including Base Fee, shall be payable without abatement, demand, deduction or set off, on or before each January 1st during the term of this Agreement at such place as Owner may designate in writing, with appropriate proration by percentage of the year, rounded up to the month, at the expiration or earlier termination of the Term of this Agreement. If Operator fails to make any rental or other payment within fifteen (15) days of the date it is due hereunder, a late charge equal to five percent (5%) of the amount of the payment due shall be assessed and shall be immediately due and collectible as additional rent hereunder for administrative costs and burdens.

D. **Default Interest**. If any payment due to Owner under this Agreement is not received by Owner within five (5) days after such payment is due, Operator shall pay to Owner interest on the past due amount from the date due until paid at the rate of ten percent (10%) per annum (the "Default Rate").

5. **Use**. Subject to the restrictions set forth in this Agreement, the Land shall be used by Operator exclusively for the discharge of wastewater from Owner's tomato processing operations, and other activities consistent with the zoning ordinances, regulations and laws of the County of Colusa, State of California and federal government.

6. **Compliance with the Law**. In all its operations under this Agreement or on the Land, Operator shall, at its own expense, promptly comply with any and all laws, statutes, ordinances, permits, rules, regulations, requirements and orders whatsoever, present or future, of the national, state, county or municipal government or any other governmental jurisdiction (**collectively, the "Laws"**) which may in any way apply to the use, maintenance or occupation or other operation on the Land.

7. **Restrictions on Use for Discharge of Wastewater and Monitoring**.

A. **General Use Restrictions**. The parties agree that subject to the provisions of this Agreement, Operator shall have control over the use of Land as may be necessary to manage the discharge of wastewater from Operator's tomato processing operations, including, but not limited to, management and operation of the soil preparation, water discharge, water movement and other activities relating to Operator's discharge of process wastewater onto the Land. All such use by Operator shall be in accordance with the terms and conditions of this Agreement and in conformity with all applicable Laws in effect from time to time during the term of this Agreement.

B. **Permit Compliance and Board Matters**. Operator must comply at all times with all of the terms, conditions and requirements of the California Regional Water Quality Control Board ("CRWQCB"), as amended or supplemented from time to time, and any permit regulating the discharge of wastewater on the Land (collectively, the "Permit") Operator shall be responsible for all costs and expenses in connection with any and all Permit applications, processing and compliance. Owner shall have the right to participate in and comment to the CRWQCB or other governmental entities regarding Owner's discharge of wastewater on the Land, compliance with Permit requirements, or any proposed modification, renewal, revocation or replacement of the

Permit.

        C.    <u>Permit Information Rights</u>.  Operator shall promptly provide Owner with copies of all documents submitted by Operator, its consultants and agents, to the CRWQCB, or any other governmental agency, in connection with the Permit.

        D.    <u>Discharge Meter</u>.  If requested by Owner, Operator shall install water meters in the wastewater conveyance system sufficient to record the daily discharge of wastewater on the Land.  Water meter readings will be available by the 5th day of each month and will be provided to Owner upon the request of Owner.

E.  <u>Owner Monitoring Rights</u>.  Owner may, at Owner's sole discretion, conduct specific monitoring or evaluation activities with respect to Operator's discharge of wastewater on the Land, or Operator's use thereof, to be performed by Owner or Owner's agents, including environmental specialists selected by Owner.  Such monitoring and/or evaluation activities include, without limitation, the right to obtain independent samples from the Land for soil testing, air testing, production waste stream analysis and groundwater testing and the inspection of water conveyance facilities, meters, and appurtenances thereto. All monitoring shall be scheduled with Operator's prior consent and shall not interfere with Operator's use of the Land.  Notwithstanding that Owner may monitor Operator's activities, Operator will respond only to inquiries and/or notices generated by applicable government agencies.

        8.    <u>Right of Entry by Owner</u>.  Owner and Owner's agents and assigns, shall have the right to enter the Land or any portion thereof, for the purpose of determining if all equipment subject to this Agreement is being maintained properly.  Promptly after receiving a written notice from Owner itemizing reasonably required and/or customary maintenance and/or repair needs discovered by Owner during any such inspection, Operator shall perform such maintenance and make such repairs and replacements as are required under this Agreement.  If Operator fails or neglects promptly to perform such maintenance or to make such repairs and replacements, then Owner, its agents and representatives shall have the right (but not the obligation) to enter the Land and, at Operator's expense, perform such maintenance and make such repairs and replacements and Owner, in so doing, shall not be liable for any inconvenience, disturbance, loss of business or other damage resulting to Operator therefrom.  All expense incurred by Owner in connection with any such maintenance, repairs and replacements shall become supplemental rent due and payable within thirty (30) days after written notice of such expense from Owner.

        9.    <u>Owner's Representations and Warranties</u>.  Owner represents and warrants that Owner is the Owner and has title to the Land, and Operator and all persons acting for and on behalf of Owner have the necessary authority to execute documents and otherwise consummate this transaction.

        10.    <u>Responsibility for Condition of Land</u>.  The representations and warranties made by Owner in paragraph 9 above are applicable as of the date Operator takes possession of the Land and for all periods prior to Operator's possession of the entire Land.  Owner shall indemnify, defend and hold Operator harmless from and against any and all claims, damages, liabilities,

losses, costs, and attorneys fees which Operator incurs as a result of conditions existing on or before the date on which Operator takes possession of the Land whether caused by Owner, its predecessors, or otherwise.

Operator shall be responsible for any change in the condition of the Land which is caused by the acts or omissions of Operator after the date it takes possession of the Land. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs and attorneys fees which Operator incurs as a result of the acts or omissions of Operator after the date on which Operator takes possession of the Land.

11. **Operator's Representations and Warranties.** Operator represents, warrants and covenants as follows:

A. Operator's future operations on the Land will comply fully with all applicable Laws and the terms and conditions of the Permit.

B. Operator's discharge of wastewater on the Land shall not degrade the soil or groundwater quality of or underlying the Land.

C. Operator acknowledges that the Land have been used for agricultural purposes and as such various fertilizers, pesticides, herbicides, fungicides, rodenticides and other agricultural chemicals may have been used on or applied to the Land. Operator acknowledges that Owner makes no representation or warranty with respect to the condition of the Land.

D. Operator acknowledges that Owner has expressly advised Operator and that Operator has the opportunity to conduct its own investigation as to the condition of the Land, including as it relates to said agricultural chemicals and is relying solely on such investigation in leasing the Land.

12. **Utilities and Miscellaneous Expenses.** Operator shall be responsible for payment of any and all costs and assessments for water, utilities, and irrigation. Operator shall be responsible for and shall promptly pay for all labor, implements, tools, and any and all other materials and services of whatsoever kind or nature which may be used by the Operator on the Land and Owner shall not be liable for any part thereof.

13. **Repairs and Maintenance.** Operator shall care for and maintain both the Land and the approaches to and appurtenances of the Land, including, but not limited to, all fences, trees, ditches, levees, buildings, pumps, pipelines, wells and roadways, and shall maintain them in the same order and condition in which received. Without limiting the foregoing, Operator shall maintain, repair and replace all fixtures, appurtenances and equipment.

14. **Improvements and Waste.** Operator may not construct improvements on the Land, or make any alterations in any existing improvements without the prior written consent of Owner. Operator hereby acknowledges and agrees that upon the termination of this Agreement, Owner shall have the option to select which improvements placed upon the Land by Operator that Owner

shall retain, which shall become the sole property of Owner and shall not be removed by Operator, and Operator shall remove all improvements not retained by Owner at Operator's sole cost and expense within thirty (30) days after receiving written notice from Owner identifying the improvements shall be retained and/or removed. Operator shall return the Land to the condition in which it existed prior to the Agreement subject only to any retained improvements.

Operator shall not commit or permit or suffer the commission of any waste on or to or permit or suffer any damage to be done on or to the Land, including the groundwater underlying the Land.

15. <u>Compliance with the Law.</u> In all its operations under this Agreement or on the Land, Operator shall, at its own expense, promptly comply with any and all laws, ordinances, rules, regulations, requirements and orders whatsoever, present or future, of the national, state, county or municipal government or any other governmental jurisdiction which may in any way apply to the use, maintenance or occupation or other operation on the Land.

16. <u>Mechanic's Liens.</u> Operator shall not allow or permit any liens to be filed against the Land, by reason of any work, labor, services or materials supplied or claimed to have been supplied at the request of Operator or anyone using the Land, or any part thereof, through or under Operator, and Operator shall indemnify and defend Owner and hold Owner harmless from such liens. If any such lien shall be filed against the Land, Operator shall cause the same to be discharged within thirty (30) days after actual notice of such filing by payment, deposit or bond. If Operator shall fail to discharge any such lien, Owner may, but shall not be obligated to, discharge the same, and any amount so paid or deposited by Operator and all expenses incurred by Owner, including reasonable attorney's fees, shall become immediately due and payable by Operator to Owner together with interest thereon at the Default Rate (as defined in Section 4D above).

17. <u>Use of Wells, Pumps and Ditch or Canal Water.</u> Operator shall be entitled to exclusive use of wells, pumps and ditch and canal water on the Land during the term of this Agreement. Operator shall keep the pumps and wells in good operating condition. Owner does not warrant, represent or guaranty the quantity or quality of the water available for use by Operator.

18. <u>Taxes and Liens.</u> Operator agrees to timely pay and discharge all taxes or assessments levied or assessed against any improvements and personal property put or placed by Operator on or in the Land and to allow no liens or encumbrances to be placed or remain against its property on the Land or against the Land insofar as such liens or encumbrances may be asserted by reason of Operator's acts or occupation or use of said Land.

19. <u>Insurance.</u> Operator shall, at its own expense, carry at all times during the Term of this Agreement, procure and maintain in full force and effect the following types of insurance, in at least the amounts and forms specified below:

A. Insurance Coverage. (a) Worker's compensation insurance in any amount required to comply with law; (b) Commercial General Liability insurance insuring against liability

for bodily injury and property damage occurring on the Land. This insurance shall be written on an occurrence basis and have a single limit per occurrence of not less than One Million and 00/100 Dollars ($1,000,000.00) for all bodily injury and property damage liability claims and shall include the following endorsements: (i) deleting any employee exclusion on personal injury coverage; (ii) including coverage for injuries to or caused by employees; and (iii) providing for blanket contractual liability coverage (including Operator's indemnity obligations contained in this Agreement). All such insurance: (i) shall be primary and non-contributory; (ii) shall provide for severability of interests; (iii) shall provide that an act or omission of one of the insureds shall not reduce or void coverage to any other insureds; and (iv) shall afford coverage for all claims based on acts, omissions, injury or damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period; and (c) Property Damage Liability insurance in the amount of $1,000,000.00, all of which policy proceeds shall be used for the repair or replacement of the property damaged or destroyed.

B.   Form of Insurance. All policies of insurance required of Operator herein shall be issued by insurance companies with a general policy holder's rating of not less than "A-" and a financial rating of not less than Class "VIII", as rated in the most current available "Best's Key Rating Guide", and which are admitted to do business in the State of California. All such policies, except for the Workers' Compensation coverage, shall name Owner, and such other persons or entities as Owner may from time to time designate, as an additional insured and Operator shall provide to Owner an additional insured endorsement certificate. Thereafter, copies of renewal policies or certificates thereof shall be delivered to Owner upon Owner's receipt from the insurer. All policies of insurance delivered to Owner must contain a provision that the company writing the policy will give to Owner thirty (30) days' prior written notice of any cancellation or lapse, and the effective date of any reduction in the amounts of insurance, and ten (10) days prior written notice of any cancellation for non-payment.

20.   Indemnification. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs, and attorneys fees which Owner incurs as a result of conditions existing on the Land on or before the date on which Operator takes possession of the Land, or as a result of any act or omission of Operator or the Preexisting Operators, or breach of this Agreement by Operator after the date Operator takes possession of the Land. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs and attorneys fees which Owner incurs as a result of the acts or omissions of Operator after the date on which Operator takes possession of the Land.

21.   Surrender Upon Termination. Whenever the Land shall cease to be subject to this Agreement by lapse of time, termination or otherwise, Operator shall promptly and peacefully surrender up the possession of all such lands and all improvements thereon to the Owner in as nearly their original condition as may be practicable considering Operator's improvements thereon and reasonable use thereof (subject to Section 10 above), and if requested by Owner, shall duly and promptly execute, acknowledge and deliver to Owner a good, sufficient and recordable quitclaim deed covering all rights of Owner in and to such lands.

22.   Holding Over.  In the event Operator holds over and remains in possession of the Land or any part thereof after expiration of this Agreement, without the express written consent of Owner, such holding over shall be construed to be a tenancy for month-to-month only with rent payable at the times and in the amounts specified by Owner.  Such tenancy shall be subject to all the terms and conditions of this Agreement.  If Owner does not consent to Operator holding over and Operator fails to surrender the Land upon expiration of this Agreement despite written demand to do so by Owner, Operator shall indemnify and defend Owner and hold Owner harmless from all loss, cost or liability, including without limitation, any claims made by any succeeding operator founded on or resulting from such failure to surrender and all costs of restoring Owner's possession of the Land, including all attorneys' fees and court costs, and other costs of litigation.

23.   Assignment.  Operator shall not assign this Agreement or any interest therein, or any rights under it, or any right or privilege appurtenant to the Land, or permit another person to occupy or use the entire or any portion of the Land, without Owner's prior written consent, which shall not be unreasonably withheld.  Notwithstanding any assignment, Operator shall remain liable for all of Operator's obligations hereunder.  In each case, assignment shall further be conditioned upon the assignee expressly assuming the obligations of Operator hereunder.

24.   Time is of the Essence.  Time is hereby expressly declared to be of the essence of this Agreement and of each and every provision hereof, and each such provision is hereby made and declared to be the material, necessary and essential part of this Agreement.

25.   Default.  The occurrence of any one or more of the following events shall constitute a default hereunder:

(a)   The failure to pay any type of rent due under this Agreement, including any Base Fee or Additional Fee, or any other sum payable to Owner within 15 days of the due date.

(b)   The failure of either party to observe or perform any other covenant or provision of this Agreement, whether express or implied, required to be observed or performed by that party, when such failure shall continue for a period of fifteen (15) days after written notice thereof from the other party; provided, however, that such notice shall be in lieu of, and shall not be in addition to, any notice required under California Code of Civil Procedure Section 1161.

(c)   Abandonment of the Land by Operator for a continuous 180 day period.

(d)   Operator's application for or consent to the appointment of a receiver, trustee or liquidator of all or of a substantial portion of its assets; making a general assignment for the benefit of creditors; be adjudicated a bankrupt or becoming insolvent; filing a voluntary petition in bankruptcy or filing a petition or answer seeking reorganization or a rearrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of debtor; suffering or permitting to continue unstayed and in effect for ten (10) consecutive days

any judgment, decree or order, entered by a court of competent jurisdiction, which approves the petition seeking reorganization of Operator or which appoints a receiver, trustee or liquidator of Operator for all or a part of any of its assets; and an attachment, execution or judicial seizure of all or substantially all of Operator's assets or of Operator's interest in this Agreement, which such seizure is not discharged within ten (10) days.

26. <u>Prevention or Performance</u>. Should performance of the obligations of either party under this Agreement be prevented or delayed by act of God, war, insurrection, fire, flood, storm, strike, lockouts or by any law, regulation or order of any federal, state, county or municipal authority to the extent it is so prevented or delayed shall be excused.

27. <u>Notice</u>. All notices or other communications hereunder shall be deemed to have been given when personally delivered, or at the time confirmed for delivery if by facsimile or express mail carrier, or seventy-two (72) hours after being mailed if by regular United States mail, postage prepaid to the address as follows:

<u>Owner</u>

SSC FARMING, LLC
P. O. Box 160
Lemoore, CA 93245

<u>Operator</u>

RHM Industrial/Specialty Foods, Inc.,
dba Colusa County Canning Company
6229 Myers Road
Williams, CA  95987-9620

Either party, Owner or Operator, may change their address for the purposes of this section by giving written notice of such change to the other party in the manner provided for herein.

28. <u>Attorney's Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees, costs and necessary disbursements in addition to any other reasonable relief to which he may be entitled. With respect to any suit, action or proceeding arising out of or related to this Agreement, or the documentation related hereto, the parties hereby submit to the jurisdiction and venue of the appropriate court in the County of Monterey, State of California for any proceeding arising hereunder.

29. <u>Sole and Only Agreement</u>. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to their rights and obligations relative to the Land. Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, orally or in writing, have been made by any party or anyone acting on behalf of any party as to the Land which are not embodied in the Purchase Agreement and this Agreement and no other agreement, statement or promises shall be valid or binding.

30. <u>Estoppel Certificates</u>. At any time and from time to time, within ten (10) business days after notice of request by either party, the other party shall execute, acknowledge, and deliver to the requesting party, or to such other recipient as the notice shall direct, a statement

certifying that this Agreement is unmodified and in full force and effect as modified in the manner specified in the statement. The statement shall also state the dates to which the rent and any other charges have been paid in advance. The statement shall be such that it can be relied on by any auditor, creditor, commercial banker, and investment banker of either party and by any prospective purchaser or encumbrancer of the Land or Improvements or both or of all or any part or parts of Owner's or Operator's interests under this Agreement. Operator's failure to execute, acknowledge, and deliver, on request, the certified statement described herein within the specified time shall constitute acknowledgment by Operator to all persons entitled to rely on the statement that this Agreement is unmodified and in full force and effect and that the rent and other charges have been duly and fully paid up to and including the respective due dates immediately preceding the date of the notice of request and shall constitute a waiver, with respect to all persons entitled to rely on the statement, of any defaults that may exist before the date of the notice.

31.    Invalidity.  If any provision of this Agreement is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

32.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

33.    Amendment.  No change, amendment or modification of this Agreement shall be valid unless it is in writing and signed by the parties hereto.

34.    Governing Law.  This Agreement shall be construed and governed pursuant to the laws of the State of California, without reference to its conflict of laws provisions.

35.    Recordation.  The parties shall at the request of either party, promptly execute and record a short form memorandum describing the Land and stating this Agreement's term, its commencement and termination dates, and other information that the parties mutually agree to include.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the day and in the year first set forth above.

Owner

SSC FARMING, LLC, a California
limited liability company

By:
MARK M. McCORMICK, Vice-President

5-12-08

-AND-

<u>Operator</u>

RHM Industrial/Specialty Foods, Inc.,
a California corporation

By: _____

STEVEN KING, Vice-President

EXHIBIT A

**PROPERTY DESCRIPTION AND MAP**

      THAT CERTAIN REAL PROPERTY LOCATED IN THE COUNTY OF COLUSA, STATE OF CALIFORNIA, AS MORE PARTICULARLY DESCRIBED BELOW:

Assessor's Parcel Numbers:

         018-090-004

         018-090-008

         018-090-009

EXHIBIT C

**DISCHARGE AGREEMENT**

THIS DISCHARGE AGREEMENT ("**Agreement**") dated this First day of May, 2008, by and between SSC FARMS II, LLC, a California limited liability company ("**Owner**"), and SK FOODS, L. P., a California limited partnership ("**Operator**").

In consideration of the mutual covenants set forth herein between the parties, the parties hereto agree as follows:

1.      Purpose.

A.      Operator desires to acquire the right to dispose of wastewater resulting from Owner's food processing plant on the Land (as defined below).

B.      Owner desires to grant this right to Operator pursuant to the provisions of this instrument.

2.      Use of Real Property.   Owner hereby grants to Operator, on the terms and conditions set forth in this Agreement, the right to utilize approximately three hundred two and 87/100 (302.87) acres of real property situated in the County of Kings, State of California and more particularly described in **Exhibit A**, which is attached hereto and made a part hereof ("**Land**") for the use set forth in Section 5.  Owner retains all other rights related to use and ownership of the Land including but not limited to conducting farming and related operations on the Land and using Operator's waste water for such uses so long a such use does not interfere with Operator's use.

3.      Term.  The term **("Term")** of this Agreement shall commence May 1, 2008, and shall terminate on April 30, 2018.

4.      Discharge Fee.

A.      Discharge Fee.  An annual base discharge fee ("**Base Fee**") will be calculated at the rate of Four Hundred Dollars ($400.00) per acre per year, payable on or before January 1st or each calendar year.

B.      Adjustment of Discharge Fee.  Beginning with the Base Fee payable on May 1, 2011 and every three (3) years thereafter, the amount of the Base Fee payable by Operator under this Agreement shall be increased by fifteen percent (15%) over the previously applicable calculation of Base Fee.

C. <u>Payment of Fee; Late Fee</u>. All discharge fees payable under this Agreement, including Base Fee, shall be payable without abatement, demand, deduction or set off, on or before each January 1st during the term of this Agreement at such place as Owner may designate in writing, with appropriate proration by percentage of the year, rounded up to the month, at the expiration or earlier termination of the Term of this Agreement. If Operator fails to make any rental or other payment within fifteen (15) days of the date it is due hereunder, a late charge equal to five percent (5%) of the amount of the payment due shall be assessed and shall be immediately due and collectible as additional rent hereunder for administrative costs and burdens.

D. <u>Default Interest</u>. If any payment due to Owner under this Agreement is not received by Owner within five (5) days after such payment is due, Operator shall pay to Owner interest on the past due amount from the date due until paid at the rate of ten percent (10%) per annum (the "Default Rate").

5. <u>Use</u>. Subject to the restrictions set forth in this Agreement, the Land shall be used by Operator exclusively for the discharge of wastewater from Owner's tomato processing operations, and other activities consistent with the zoning ordinances, regulations and laws of the County of Colusa, State of California and federal government.

6. <u>Compliance with the Law</u>. In all its operations under this Agreement or on the Land, Operator shall, at its own expense, promptly comply with any and all laws, statutes, ordinances, permits, rules, regulations, requirements and orders whatsoever, present or future, of the national, state, county or municipal government or any other governmental jurisdiction (**collectively, the "Laws"**) which may in any way apply to the use, maintenance or occupation or other operation on the Land.

7. <u>Restrictions on Use for Discharge of Wastewater and Monitoring</u>.

A. <u>General Use Restrictions</u>. The parties agree that subject to the provisions of this Agreement, Operator shall have control over the use of Land as may be necessary to manage the discharge of wastewater from Operator's tomato processing operations, including, but not limited to, management and operation of the soil preparation, water discharge, water movement and other activities relating to Operator's discharge of process wastewater onto the Land. All such use by Operator shall be in accordance with the terms and conditions of this Agreement and in conformity with all applicable Laws in effect from time to time during the term of this Agreement.

B. <u>Permit Compliance and Board Matters</u>. Operator must comply at all times with all of the terms, conditions and requirements of the California Regional Water Quality Control Board ("CRWQCB"), as amended or supplemented from time to time, and any permit regulating the discharge of wastewater on the Land (collectively, the "Permit") Operator shall be responsible for all costs and expenses in connection

with any and all Permit applications, processing and compliance. Owner shall have the right to participate in and comment to the CRWQCB or other governmental entities regarding Owner's discharge of wastewater on the Land, compliance with Permit requirements, or any proposed modification, renewal, revocation or replacement of the Permit.

      C.    <u>Permit Information Rights</u>.  Operator shall promptly provide Owner with copies of all documents submitted by Operator, its consultants and agents, to the CRWQCB, or any other governmental agency, in connection with the Permit.

      D.    <u>Discharge Meter</u>.  If requested by Owner, Operator shall install water meters in the wastewater conveyance system sufficient to record the daily discharge of wastewater on the Land. Water meter readings will be available by the 5th day of each month and will be provided to Owner upon the request of Owner.

      E.    <u>Owner Monitoring Rights</u>.  Owner may, at Owner's sole discretion, conduct specific monitoring or evaluation activities with respect to Operator's discharge of wastewater on the Land, or Operator's use thereof, to be performed by Owner or Owner's agents, including environmental specialists selected by Owner. Such monitoring and/or evaluation activities include, without limitation, the right to obtain independent samples from the Land for soil testing, air testing, production waste stream analysis and groundwater testing and the inspection of water conveyance facilities, meters, and appurtenances thereto. All monitoring shall be scheduled with Operator's prior consent and shall not interfere with Operator's use of the Land. Notwithstanding that Owner may monitor Operator's activities, Operator will respond only to inquiries and/or notices generated by applicable government agencies.

      8.    <u>Right of Entry by Owner</u>.  Owner and Owner's agents and assigns, shall have the right to enter the Land or any portion thereof, for the purpose of determining if all equipment subject to this Agreement is being maintained properly. Promptly after receiving a written notice from Owner itemizing reasonably required and/or customary maintenance and/or repair needs discovered by Owner during any such inspection, Operator shall perform such maintenance and make such repairs and replacements as are required under this Agreement. If Operator fails or neglects promptly to perform such maintenance or to make such repairs and replacements, then Owner, its agents and representatives shall have the right (but not the obligation) to enter the Land and, at Operator's expense, perform such maintenance and make such repairs and replacements and Owner, in so doing, shall not be liable for any inconvenience, disturbance, loss of business or other damage resulting to Operator therefrom. All expense incurred by Owner in connection with any such maintenance, repairs and replacements shall become supplemental rent due and payable within thirty (30) days after written notice of such expense from Owner.

      9.    <u>Owner's Representations and Warranties</u>.  Owner represents and warrants that Owner is the Owner and has title to the Land, and Owner and all persons

acting for and on behalf of Owner have the necessary authority to execute documents and otherwise consummate this transaction.

10.   Responsibility for Condition of Land. The representations and warranties made by Owner in paragraph 9 above are applicable as of the date Operator takes possession of the Land and for all periods prior to Operator's possession of the entire Land. Owner shall indemnify, defend and hold Operator harmless from and against any and all claims, damages, liabilities, losses, costs, and attorneys fees which Operator incurs as a result of conditions existing on or before the date on which Operator takes possession of the Land whether caused by Owner, its predecessors, or otherwise.

Operator shall be responsible for any change in the condition of the Land which is caused by the acts or omissions of Operator after the date it takes possession of the Land. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs and attorneys fees which Operator incurs as a result of the acts or omissions of Operator after the date on which Operator takes possession of the Land.

11.   Operator's Representations and Warranties.   Operator represents, warrants and covenants as follows:

A.   Operator's future operations on the Land will comply fully with all applicable Laws and the terms and conditions of the Permit.

B.   Operator's discharge of wastewater on the Land shall not degrade the soil or groundwater quality of or underlying the Land.

C.   Operator acknowledges that the Land have been used for agricultural purposes and as such various fertilizers, pesticides, herbicides, fungicides, rodenticides and other agricultural chemicals may have been used on or applied to the Land. Operator acknowledges that Owner makes no representation or warranty with respect to the condition of the Land.

D.   Operator acknowledges that Owner has expressly advised Operator and that Operator has the opportunity to conduct its own investigation as to the condition of the Land, including as it relates to said agricultural chemicals and is relying solely on such investigation in leasing the Land.

12.   Utilities and Miscellaneous Expenses. Operator shall be responsible for payment of any and all costs and assessments for water, utilities, and irrigation. Operator shall be responsible for and shall promptly pay for all labor, implements, tools, and any and all other materials and services of whatsoever kind or nature which may be used by the Operator on the Land and Owner shall not be liable for any part thereof.

13.   Repairs and Maintenance. Operator shall care for and maintain both the

Land and the approaches to and appurtenances of the Land, including, but not limited to, all fences, trees, ditches, levees, buildings, pumps, pipelines, wells and roadways, and shall maintain them in the same order and condition in which received. Without limiting the foregoing, Operator shall maintain, repair and replace all fixtures, appurtenances and equipment.

14. <u>Improvements and Waste.</u> Operator may not construct improvements on the Land, or make any alterations in any existing improvements without the prior written consent of Owner. Operator hereby acknowledges and agrees that upon the termination of this Agreement, Owner shall have the option to select which improvements placed upon the Land by Operator that Owner shall retain, which shall become the sole property of Owner and shall not be removed by Operator, and Operator shall remove all improvements not retained by Owner at Operator's sole cost and expense within thirty (30) days after receiving written notice from Owner identifying the improvements shall be retained and/or removed. Operator shall return the Land to the condition in which it existed prior to the Agreement subject only to any retained improvements.

Operator shall not commit or permit or suffer the commission of any waste on or to or permit or suffer any damage to be done on or to the Land, including the groundwater underlying the Land.

15. <u>Compliance with the Law.</u> In all its operations under this Agreement or on the Land, Operator shall, at its own expense, promptly comply with any and all laws, ordinances, rules, regulations, requirements and orders whatsoever, present or future, of the national, state, county or municipal government or any other governmental jurisdiction which may in any way apply to the use, maintenance or occupation or other operation on the Land.

16. <u>Mechanic's Liens.</u> Operator shall not allow or permit any liens to be filed against the Land, by reason of any work, labor, services or materials supplied or claimed to have been supplied at the request of Operator or anyone using the Land, or any part thereof, through or under Operator, and Operator shall indemnify and defend Owner and hold Owner harmless from such liens. If any such lien shall be filed against the Land, Operator shall cause the same to be discharged within thirty (30) days after actual notice of such filing by payment, deposit or bond. If Operator shall fail to discharge any such lien, Owner may, but shall not be obligated to, discharge the same, and any amount so paid or deposited by Operator and all expenses incurred by Owner, including reasonable attorney's fees, shall become immediately due and payable by Operator to Owner together with interest thereon at the Default Rate (as defined in Section 4D above).

17. <u>Use of Wells, Pumps and Ditch or Canal Water.</u> Operator shall be entitled to exclusive use of wells, pumps and ditch and canal water on the Land during the term of this Agreement. Operator shall keep the pumps and wells in good operating condition. Owner does not warrant, represent or guaranty the quantity or quality of the

water available for use by Operator.

18.   Taxes and Liens.   Operator agrees to timely pay and discharge all taxes or assessments levied or assessed against any improvements and personal property put or placed by Operator on or in the Land and to allow no liens or encumbrances to be placed or remain against its property on the Land or against the Land insofar as such liens or encumbrances may be asserted by reason of Operator's acts or occupation or use of said Land.

19.   Insurance.   Operator shall, at its own expense, carry at all times during the Term of this Agreement, procure and maintain in full force and effect the following types of insurance, in at least the amounts and forms specified below:

A.   Insurance Coverage. (a) Worker's compensation insurance in any amount required to comply with law; (b) Commercial General Liability insurance insuring against liability for bodily injury and property damage occurring on the Land. This insurance shall be written on an occurrence basis and have a single limit per occurrence of not less than One Million and 00/100 Dollars ($1,000,000.00) for all bodily injury and property damage liability claims and shall include the following endorsements: (i) deleting any employee exclusion on personal injury coverage; (ii) including coverage for injuries to or caused by employees; and (iii) providing for blanket contractual liability coverage (including Operator's indemnity obligations contained in this Agreement).  All such insurance: (i) shall be primary and non-contributory; (ii) shall provide for severability of interests; (iii) shall provide that an act or omission of one of the insureds shall not reduce or void coverage to any other insureds; and (iv) shall afford coverage for all claims based on acts, omissions, injury or damage which occurred or arose (or the onset of which occurred or arose) in whole or in part during the policy period; and (c) Property Damage Liability insurance in the amount of $1,000,000.00, all of which policy proceeds shall be used for the repair or replacement of the property damaged or destroyed.

B.   Form of Insurance.  All policies of insurance required of Operator herein shall be issued by insurance companies with a general policy holder's rating of not less than "A-" and a financial rating of not less than Class "VIII", as rated in the most current available "Best's Key Rating Guide", and which are admitted to do business in the State of California.  All such policies, except for the Workers' Compensation coverage, shall name Owner, and such other persons or entities as Owner may from time to time designate, as an additional insured and Operator shall provide to Owner an additional insured endorsement certificate.  Thereafter, copies of renewal policies or certificates thereof shall be delivered to Owner upon Owner's receipt from the insurer. All policies of insurance delivered to Owner must contain a provision that the company writing the policy will give to Owner thirty (30) days' prior written notice of any cancellation or lapse, and the effective date of any reduction in the amounts of insurance, and ten (10) days prior written notice of any cancellation for non-payment.

20. <u>Indemnification</u>. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs, and attorneys fees which Owner incurs as a result of conditions existing on the Land on or before the date on which Operator takes possession of the Land, or as a result of any act or omission of Operator or the Preexisting Operators, or breach of this Agreement by Operator after the date Operator takes possession of the Land. Operator shall indemnify, defend and hold Owner harmless from and against any and all claims, damages, liabilities, losses, costs and attorneys fees which Owner incurs as a result of the acts or omissions of Operator after the date on which Operator takes possession of the Land.

21. <u>Surrender Upon Termination</u>. Whenever the Land shall cease to be subject to this Agreement by lapse of time, termination or otherwise, Operator shall promptly and peacefully surrender up the possession of all such lands and all improvements thereon to the Owner in as nearly their original condition as may be practicable considering Operator's improvements thereon and reasonable use thereof (subject to Section 10 above), and if requested by Owner, shall duly and promptly execute, acknowledge and deliver to Owner a good, sufficient and recordable quitclaim deed covering all rights of Owner in and to such lands.

22. <u>Holding Over</u>. In the event Operator holds over and remains in possession of the Land or any part thereof after expiration of this Agreement, without the express written consent of Owner, such holding over shall be construed to be a tenancy for month-to-month only with rent payable at the times and in the amounts specified by Owner. Such tenancy shall be subject to all the terms and conditions of this Agreement. If Owner does not consent to Operator holding over and Operator fails to surrender the Land upon expiration of this Agreement despite written demand to do so by Owner, Operator shall indemnify and defend Owner and hold Owner harmless from all loss, cost or liability, including without limitation, any claims made by any succeeding operator founded on or resulting from such failure to surrender and all costs of restoring Owner's possession of the Land, including all attorneys' fees and court costs, and other costs of litigation.

23. <u>Assignment</u>. Operator shall not assign this Agreement or any interest therein, or any rights under it, or any right or privilege appurtenant to the Land, or permit another person to occupy or use the entire or any portion of the Land, without Owner's prior written consent, which shall not be unreasonably withheld. Notwithstanding any assignment, Operator shall remain liable for all of Operator's obligations hereunder. In each case, assignment shall further be conditioned upon the assignee expressly assuming the obligations of Operator hereunder.

24. <u>Time is of the Essence</u>. Time is hereby expressly declared to be of the essence of this Agreement and of each and every provision hereof, and each such provision is hereby made and declared to be the material, necessary and essential part of this Agreement.

25. <u>Default</u>. The occurrence of any one or more of the following events shall constitute a default hereunder:

(a) The failure to pay any type of rent due under this Agreement, including any Base Fee or Additional Fee, or any other sum payable to Owner within 15 days of the due date.

(b) The failure of either party to observe or perform any other covenant or provision of this Agreement, whether express or implied, required to be observed or performed by that party, when such failure shall continue for a period of fifteen (15) days after written notice thereof from the other party; provided, however, that such notice shall be in lieu of, and shall not be in addition to, any notice required under California Code of Civil Procedure Section 1161.

(c) Abandonment of the Land by Operator for a continuous 180 day period.

(d) Operator's application for or consent to the appointment of a receiver, trustee or liquidator of all or of a substantial portion of its assets; making a general assignment for the benefit of creditors; be adjudicated a bankrupt or becoming insolvent; filing a voluntary petition in bankruptcy or filing a petition or answer seeking reorganization or a rearrangement with creditors or seeking to take advantage of any other law (whether federal or state) relating to relief of debtor; suffering or permitting to continue unstayed and in effect for ten (10) consecutive days any judgment, decree or order, entered by a court of competent jurisdiction, which approves the petition seeking reorganization of Operator or which appoints a receiver, trustee or liquidator of Operator for all or a part of any of its assets; and an attachment, execution or judicial seizure of all or substantially all of Operator's assets or of Operator's interest in this Agreement, which such seizure is not discharged within ten (10) days.

26. <u>Prevention or Performance</u>. Should performance of the obligations of either party under this Agreement be prevented or delayed by act of God, war, insurrection, fire, flood, storm, strike, lockouts or by any law, regulation or order of any federal, state, county or municipal authority to the extent it is so prevented or delayed shall be excused.

27. <u>Notice</u>. All notices or other communications hereunder shall be deemed to have been given when personally delivered, or at the time confirmed for delivery if by facsimile or express mail carrier, or seventy-two (72) hours after being mailed if by regular United States mail, postage prepaid to the address as follows:

any judgment, decree or order, entered by a court of competent jurisdiction, which approves the petition seeking reorganization of Operator or which appoints a receiver, trustee or liquidator of Operator for all or a part of any of its assets; and an attachment, execution or judicial seizure of all or substantially all of Operator's assets or of Operator's interest in this Agreement, which such seizure is not discharged within ten (10) days.

26. <u>Prevention or Performance</u>. Should performance of the obligations of either party under this Agreement be prevented or delayed by act of God, war, insurrection, fire, flood, storm, strike, lockouts or by any law, regulation or order of any federal, state, county or municipal authority to the extent it is so prevented or delayed shall be excused.

27. <u>Notice</u>. All notices or other communications hereunder shall be deemed to have been given when personally delivered, or at the time confirmed for delivery if by facsimile or express mail carrier, or seventy-two (72) hours after being mailed if by regular United States mail, postage prepaid to the address as follows:

<u>Owner</u>                              <u>Operator</u>

SSC FARMS II, LLC               SK FOODS, L. P.
200 Sky Park Drive              P. O. Box 160
Monterey, CA 93940              Lemoore, CA 93245

Either party, Owner or Operator, may change their address for the purposes of this section by giving written notice of such change to the other party in the manner provided for herein.

28. <u>Attorney's Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees, costs and necessary disbursements in addition to any other reasonable relief to which he may be entitled. With respect to any suit, action or proceeding arising out of or related to this Agreement, or the documentation related hereto, the parties hereby submit to the jurisdiction and venue of the appropriate court in the County of Monterey, State of California for any proceeding arising hereunder.

29. <u>Sole and Only Agreement</u>. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to their rights and obligations relative to the Land. Each party to this Agreement acknowledges that no representations, inducements, promises or agreements, orally or in writing, have been made by any party or anyone acting on behalf of any party as to the Land which are not embodied in the Purchase Agreement and this Agreement and no other agreement, statement or promises shall be valid or binding.

30. <u>Estoppel Certificates</u>. At any time and from time to time, within ten (10) business days after notice of request by either party, the other party shall execute, acknowledge, and deliver to the requesting party, or to such other recipient as the notice shall direct, a statement certifying that this Agreement is unmodified and in full force and effect as modified in the manner

specified in the statement. The statement shall also state the dates to which the Base Fee and any other charges have been paid in advance. The statement shall be such that it can be relied on by any auditor, creditor, commercial banker, and investment banker of either party and by any prospective purchaser or encumbrancer of the Land or Improvements or both or of all or any part or parts of Owner's or Operator's interests under this Agreement. Operator's failure to execute, acknowledge, and deliver, on request, the certified statement described herein within the specified time shall constitute acknowledgment by Operator to all persons entitled to rely on the statement that this Agreement is unmodified and in full force and effect and that the rent and other charges have been duly and fully paid up to and including the respective due dates immediately preceding the date of the notice of request and shall constitute a waiver, with respect to all persons entitled to rely on the statement, of any defaults that may exist before the date of the notice.

31.    Invalidity.  If any provision of this Agreement is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

32.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

33.    Amendment.  No change, amendment or modification of this Agreement shall be valid unless it is in writing and signed by the parties hereto.

34.    Governing Law.  This Agreement shall be construed and governed pursuant to the laws of the State of California, without reference to its conflict of laws provisions.

35.    Recordation.  The parties shall at the request of either party, promptly execute and record a short form memorandum describing the Land and stating this Agreement's term, its commencement and termination dates, and other information that the parties mutually agree to include.

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the day and in the year first set forth above.

Owner

SSC FARMS II, LLC, a California
limited liability company

By:

MARK M. McCORMICK, Vice-President

-AND-

Operator

SK FOODS, L. P., a California limited partnership

By:

STEVEN KING, Vice-President

EXHIBIT A

**PROPERTY DESCRIPTION AND MAP**

THAT CERTAIN REAL PROPERTY LOCATED IN THE COUNTY OF KINGS, STATE OF CALIFORNIA, AS MORE PARTICULARLY DESCRIBED BELOW:

Assessor's Parcel Numbers:

All or portions of:

026-020-014

EXHIBIT D

SK FOODS | Vendor transactions

Vendor account | Name

3400355 SSC Farms I - waste water

| Voucher | Date |
|---|---|
| APINV-00019556 | 7/1/2008 |
| APINV-00019557 | 7/1/2008 |
| APINV-00019558 | 7/1/2008 |
| APINV-00019559 | 7/1/2008 |
| APINV-00019560 | 8/1/2008 |
| APINV-00024617 | 9/30/2008 |
| APINV-00024618 | 10/1/2008 |
| APINV-00032299 | 12/17/2008 |
| APINV-00034232 | 1/21/2009 |
| APINV-00039628 | 4/9/2009 |
| APINV-00039629 | 4/9/2009 |
| APINV-00039630 | 4/9/2009 |
| APINV-00039631 | 4/9/2009 |
| APPAY-00005093 | 11/11/2008 |
| APPAY-00005832 | 12/30/2008 |
| GLV-000005547 | 6/30/2008 |
| GLV-000005550 | 6/30/2008 |
| GLV-000005553 | 6/30/2008 |
| GLV-000005691 | 7/1/2008 |
| GLV-000005694 | 7/1/2008 |
| GLV-000005697 | 7/1/2008 |
| Vendor account | 3400355 |

Vendor account | Name

3400356 SSC Farms II - waste water

| Voucher | Date |
|---|---|
| APINV-00019561 | 7/1/2008 |
| APINV-00019562 | 7/1/2008 |
| APINV-00019563 | 7/1/2008 |
| APINV-00019564 | 7/1/2008 |
| APINV-00019565 | 8/1/2008 |
| APINV-00024619 | 9/30/2008 |
| APINV-00024620 | 10/1/2008 |
| APINV-00032300 | 12/17/2008 |
| APINV-00034231 | 1/21/2009 |
| APINV-00039623 | 4/9/2009 |
| APINV-00039624 | 4/9/2009 |
| APINV-00039626 | 4/9/2009 |
| APINV-00039627 | 4/9/2009 |
| APPAY-00005094 | 11/11/2008 |
| APPAY-00005833 | 12/30/2008 |
| GLV-000005548 | 6/30/2008 |
| GLV-000005551 | 6/30/2008 |
| GLV-000005554 | 6/30/2008 |
| GLV-000005692 | 7/1/2008 |
| GLV-000005695 | 7/1/2008 |
| GLV-000005698 | 7/1/2008 |

SK FOODS | Vendor transactions

Voucher | Date

| Vendor account | | 3400356 |
| --- | --- | --- |
| Vendor account | Name | |
| 3400357 | SSC Farming - waste water | |
| Voucher | Date | |
| APINV-00019551 | 7/1/2008 | |
| APINV-00019552 | 7/1/2008 | |
| APINV-00019553 | 7/1/2008 | |
| APINV-00019554 | 7/1/2008 | |
| APINV-00019555 | 8/1/2008 | |
| APINV-00024621 | 9/30/2008 | |
| APINV-00024622 | 10/1/2008 | |
| APINV-00034233 | 1/21/2009 | |
| APINV-00034234 | 1/21/2009 | |
| APINV-00039618 | 4/9/2009 | |
| APINV-00039619 | 4/9/2009 | |
| APINV-00039620 | 4/9/2009 | |
| APINV-00039621 | 4/9/2009 | |
| APPAY-00005092 | 11/11/2008 | |
| APPAY-00005834 | 12/30/2008 | |
| GLV-000005549 | 6/30/2008 | |
| GLV-000005552 | 6/30/2008 | |
| GLV-000005555 | 6/30/2008 | |
| GLV-000005693 | 7/1/2008 | |
| GLV-000005696 | 7/1/2008 | |
| GLV-000005699 | 7/1/2008 | |
| Vendor account | 3400357 | |
| Grand Total | 1,352,753.00 | |

| Transaction text | Debit | Credit | Due |
|---|---|---|---|
| | | 0 | -140,944.00 | |
| WASTE WTR 5/07-4/08 | | 0 | -11,745.33 | |
| WASTE WTR 5/08 | | 0 | -11,745.33 | |
| WASTE WTR 6/08 | | 0 | -11,745.33 | |
| WASTE WTR 7/08 | | 0 | -11,745.33 | |
| WASTE WTR 8/08 | | 0 | -11,745.33 | |
| WASTE WTR SEPT 08 | | 0 | -11,745.33 | |
| WASTE WTR OCT 08 | | 0 | -11,745.33 | |
| Nov | | 0 | -11,745.33 | |
| Dec | | 0 | -11,745.33 | |
| Jan | | 0 | -11,745.33 | |
| Feb | | 0 | -11,745.33 | |
| Mar | | 0 | -11,745.33 | -58,726.65 |
| Apr | 187,925.32 | 0 | |
| | 35,235.99 | 0 | |
| 12-363 Rcrd Waste Water Discharge May 08 | 0 | -11,745.33 | |
| 12-365 Rcrd Waste Water Discharge June 2008 | 0 | -11,745.33 | |
| 12-365 Rcrd Annual Waste water discharge rent May 07-Apr 08 | 0 | -140,944.00 | |
| 12-363 Waste Water Disch Reversal | 11,745.33 | 0 | |
| 12-364 Waste Water Disch Reversal | 11,745.33 | 0 | |
| 12-365 Waste Water Discharge Rev | 140,944.00 | 0 | |
| | 387,595.97 | -446,322.62 | |

| Transaction text | Debit | Credit | Due |
|---|---|---|---|
| | | 0 | -121,148.00 | |
| WASTE WTR 5/07-4/08 | | 0 | -10,095.67 | |
| WASTE WTR 5/08 | | 0 | -10,095.67 | |
| WASTE WTR 6/08 | | 0 | -10,095.67 | |
| WASTE WTR 7/08 | | 0 | -10,095.67 | |
| WASTE WTR 8/08 | | 0 | -10,095.67 | |
| WASTE WTR SEPT 08 | | 0 | -10,095.67 | |
| WASTE WTR OCT 08 | | 0 | -10,095.67 | |
| Nov | | 0 | -10,095.67 | |
| Dec | | 0 | -10,095.67 | |
| Jan | | 0 | -10,095.67 | |
| Feb | | 0 | -10,095.67 | |
| Mar | | 0 | -10,095.67 | -50,478.35 |
| Apr | 161,530.68 | 0 | |
| | 30,287.01 | 0 | |
| 12-363 Rcrd Waste Water Discharge May 08 | 0 | -10,095.67 | |
| 12-365 Rcrd Waste water Discharge June 08 | 0 | -10,095.67 | |
| 12-365 Rcrd annual Waste water discharge rent May 07-Apr 08 | 0 | -121,148.00 | |
| 12-363 Waste Water Disch Reversal | 10,095.67 | 0 | |
| 12-364 Waste Water Disch Reversal | 10,095.67 | 0 | |
| 12-365 Waste Water Discharge Rev | 121,148.00 | 0 | |

| | Debit | Credit |
|---|---|---|
| Transaction text | | |

333,157.03  -383,635.38

| Transaction text | Debit | Credit | Due |
|---|---|---|---|
| WASTE WTR 5/07-4/08 | 0 | -237,000.00 | |
| WASTE WTR 5/08 | 0 | -19,750.00 | |
| WASTE WTR 6/08 | 0 | -19,750.00 | |
| WASTE WTR 7/08 | 0 | -19,750.00 | |
| WASTE WTR 8/08 | 0 | -19,750.00 | |
| WASTE WTR SEPT 08 | 0 | -19,750.00 | |
| WASTE WTR OCT 08 | 0 | -19,750.00 | |
| Nov | 0 | -19,750.00 | |
| Dec | 0 | -19,750.00 | |
| Jan | 0 | -19,750.00 | |
| Feb | 0 | -19,750.00 | |
| Mar | 0 | -19,750.00 | -118,500.00 |
| Apr | 316,000.00 | 0 | |
| | 39,500.00 | 0 | |
| 12-363 Rcrd Waste Water Discharge May 08 | 0 | -19,750.00 | |
| 12-365 Rcrd Waste water Discharge June | 0 | -19,750.00 | |
| 12-365 Rcrd annual Waste water discharge rent May 07-Apr 08 | 0 | -237,000.00 | |
| 12-363 Waste Water Disch Reversal | 19,750.00 | 0 | |
| 12-364 Waste Water Disch Reversal | 19,750.00 | 0 | |
| 12-365 Waste Water Discharge Rev | 237,000.00 | 0 | |
| | 632,000.00 | -750,500.00 | |
| | -1,580,458.00 | | -227,705.00 |

EXHIBIT E

April 17, 2009

Via Facsimile: 831-648-4005

Richard Lawrence
President, SK Foods
21 Lower Ragsdale
Monterey, CA 93940

Dear Mr. Lawrence:

I am writing on behalf of the Caroline and Stefanie Salyer trusts.

As you know, Scott Salyer met with Chapman & Cutter in Chicago earlier this week. The purpose of the meeting, as I understand it, was to work out some sort of accommodation with the Bank of Montreal. In the course of that meeting Scott was told by BMO's counsel that there were enforceable agreements in place which would allow wastewater to be discharged at the Lemoore and Colusa facilities in the event either of those facilities were sold to third parties. Mr. Salyer was apparently unaware of any such agreements, and he asked me to look into BMO's contention.

I have done so, and I have concluded that Mr. Spiotto is in error.

Copies of three so-called "discharge agreements" (the "Discharge Agreements") were made available to me this morning. On their face they show that two of the Agreements relating to the Lemoore facility were purportedly entered in May 2008 by and between SSC Farms I LLC and SK Foods LP (parcels 26-020-012 and 26-020-013) and between SS Farms II LLC and SK Foods LP (parcel 26-020-014. The third Agreement, relating to the Colusa facility, was purportedly entered in May 2008 by and between RHM Industrial/Specialty Foods, Inc. and SSC Farming LLC.

It is my understanding that both SSC Farms I and SSC Farms II are owned fifty percent by Mr. Salyer's Trust and

fifty percent by Caroline and Stefanie's Trusts, and that SSC Farming LLC is owned sixty percent by Mr. Salyer's Trust and forty percent by Caroline and Stefanie's Trust. It is also my understanding that neither Mr. Salyer (who is the trustee of his Trust) nor the trustees of the girl's trusts ever approved any such transaction on behalf of the trusts. Neither was there any resolution by the members of the SSC Farms and SSC Farming entities which authorized Mark McCormick, who signed the Discharge Agreements, to do so.

Given these facts, it is my opinion that the Discharge Agreements are invalid as a matter of law.

Furthermore, even if the Discharge Agreements had been valid at the outset, which they weren't, they would have been rendered invalid by the failure to make the payments called for by the Agreements. Under California law, a total failure of consideration results in a rescission without the need for a formal notice. See California Civil Code section 1689(b); and Orton v. Privett, 202 Cal 754, 757 (1927).

Finally, the specific terms of the Discharge Agreements makes it clear that they cannot be assigned. See paragraphs 23 (assignment), 24 (time is of the essence), and 25 (default) of each agreement, and that a bankruptcy discharge would void them in any case.

For all the foregoing reasons, the Agreements have all been rescinded by operation of law. To the extent they have not, please consider this a formal notice of rescission of all three agreements.

Very truly yours,

Robert J. Koontz

cc: Scott Salyer
    Gary Perry, Esq.

2

```
                         ***************************
                         ***   ERROR TX REPORT   ***
                         ***************************


           TX FUNCTION WAS NOT COMPLETED

           TX/RX NO              0079
           RECIPIENT ADDRESS     6484005
           DESTINATION ID
           ST. TIME              04/17 11:48
           TIME USE              00'00
           PAGES SENT            0
           RESULT                NG        # 0018 BUSY/NO SIGNAL
```

# ROBERT J. KOONTZ
### Attorney at Law
660 Camino Aguajito, #301

Tel: 831-644-9232          Monterey, CA 93921-6516          Fax: 831-649-5550

April 17, 2009

Via Facsimile: 831-648-4005

Richard Lawrence
President, SK Foods
21 Lower Ragsdale
Monterey, CA 93940

Dear Mr. Lawrence:

I am writing on behalf of the Caroline and Stefanie Salyer trusts.

As you know, Scott Salyer met with Chapman & Cutter in Chicago earlier this week. The purpose of the meeting, as I understand it, was to work out some sort of accommodation with the Bank of Montreal. In the course of that meeting Scott was told by BMO's counsel that there were enforceable agreements in place which would allow wastewater to be discharged at the Lemoore and Colusa facilities in the event either of those facilities were sold to third parties. Mr. Salyer was apparently unaware of any such agreements, and he asked me to look into BMO's contention.

I have done so, and I have concluded that Mr. Spiotto is in error.

# EXHIBIT C

CONFIDENTIAL

April 2009



# Interim Presentation to the Bank Group

## *Prepared for the Bank Lenders*



CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Table of Contents

| | | Page |
|---|---|---|
| I. | Executive Summary | 4 |
| II. | Current Liquidity | 13 |
| III. | Preliminary Valuation | 17 |
| IV. | Forced Liquidation Analysis | 25 |
| V. | Sales Process Update | 29 |
| | A. 363 Asset Sale Procedure Overview | 32 |
| | B. Potential Buyers | 37 |

CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Disclaimer

Chanin Capital Partners LLC / Duff & Phelps Securities ("CCP/DPS") has been engaged as financial advisor to SK Foods L.P. and RHM Industrials Specialty Foods Inc. ("SK Foods" or the "Company") in connection with certain transactions involving SK Foods. Part of CCP/DPS's engagement entails evaluating the Company's financial statements and financial projections and providing the Company's Board of Directors with relative valuation guidance based on alternative scenarios. In doing so, CCP/DPS has relied upon, and assumed the accuracy and completeness of, without any independent verification, the financial projections (the "Projections"), financial information, data, material and other information (collectively, the "Information") that is publicly available or has been furnished to CCP/DPS by or on behalf of SK Foods. CCP/DPS has assumed that all Information provided by the Company was prepared in good faith and on bases reflecting the best currently available judgments and estimates of the Company. CCP/DPS is not responsible for independently verifying the accuracy of the Information provided to CCP/DPS, nor is CCP/DPS liable for inaccuracies in any such Information. The Company's financial projections reflect numerous assumptions, including assumptions with respect to the future performance of the Company, the performance of the industry, general business and economic conditions and other matters, most of which are beyond the Company's control. Numerous factors may affect the future financial performance of the Company and the accuracy of the Projections. Therefore, the actual results achieved will vary from the Projections, and may vary substantially. No representations can be or are being made with respect to the accuracy of the Projections, nor the ability of the Company to achieve the projected results.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# I. Executive Summary



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Executive Summary

- Chanin Capital Partners/Duff & Phelps Securities (collectively known as "CCP/DPS") was retained effective March 23, 2009 by SK Foods L.P. and RHM Industrials Specialty Foods Inc. (collectively know as "SK Foods" or "Company"), to act as exclusive financial advisor in connection with any restructuring transaction or financing. The general terms of the engagement include the following:

  - Review and analyze the Company's business and financial condition;

  - Develop alternative transaction scenarios and lead the execution of the adopted transaction scenario;

  - Assist the Company and its other advisors in the preparation of projected financial projections and liquidity analysis, to be used as part of the transaction marketing process;

  - Assist in the development of a timeline associated with a transaction; and

  - Provide advice and support to management, the Board of SK Foods, the chief restructuring officer and other advisors when and as required.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Executive Summary – Scenario

- In connection with the analysis of alternative transaction scenarios, CCP/DPS, along with FTI Consulting ("FTI"), have developed certain valuation scenarios to reflect possible recoveries under two funding alternatives:

1. "Fund to Going Concern Sale Scenario" – Fund plant ramp-up expenditures and working capital needs in order to prepare the Lemoore and Williams plants for the 2009 pack (the "Pack").

2. "Immediate Forced Liquidation Scenario" – Fund wind-down cost in order to facilitate an immediate forced liquidation sale.

3. "Forced Liquidation Post-Stalking Horse Failure Scenario" – Fund plant ramp-up expenditures and working capital needs for approximately 4 weeks to obtain stalking horse bidder; then fund wind-down cost of a forced liquidation in the event no stalking horse agreement is reached.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Executive Summary – Methodology

- To help estimate the potential range of values associated with the funded scenario, CCP/DPS considered the following valuation methodologies; comparable company, precedent transaction, discounted cash flow ("DCF") and sum-of-the-parts.

  - Given the lack of long term financial projections, we determined that the DCF valuation approach was not appropriate in these circumstances.

  - Additionally, given the uncertainty surrounding the Company and its financials, the lack of truly comparable companies / precedent transactions, and the limited time frame, the analysis primarily relies upon the sum of the parts methodology and deemphasizes the comparable company and precedent transaction methodologies.

- This report also contains a liquidation analysis prepared by FTI and the Company. This scenario assumes wind-down funding in Chapter 11 and would involve selling fixed assets including real property on an unfunded Pack basis, essentially selling "dark" assets.

CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Executive Summary – Scenario Comparison

- The Fund to Going Concern Sale Scenario yields a significantly higher valuation than the forced liquidation scenario.



($ in thousands)

| | Fund to Going Concern Sale Scenario [1] | | Immediate Forced Liquidation Scenario [1] | | Forced Liquidation Post-Stalking Horse Failure Scenario [1] | |
|---|---|---|---|---|---|---|
| | Estimated Recovery | | Estimated Recovery | | Estimated Recovery | |
| | Low | High | Low | High | Low | High |
| Cash & Cash Equivalents | $ – | $ – | $ – | $ – | $ – | $ – |
| Trade Accounts Receivable, Net [1] | 14,474 | 16,404 | 16,830 | 21,038 | 16,526 | 20,658 |
| Inventory [1] | 19,864 | 23,175 | 24,367 | 32,345 | 20,709 | 27,489 |
| Lemoore Fixed Assets [2] | 36,840 | 51,774 | 6,761 | 9,015 | 6,761 | 9,015 |
| Williams Fixed Assets [2] | 20,000 | 25,000 | 3,927 | 7,854 | 3,927 | 7,854 |
| Other Fixed Assets | 117 | 183 | 117 | 183 | 117 | 183 |
| Hawaii and Lake Tahoe | 3,043 | 3,043 | 3,043 | 3,043 | 3,043 | 3,043 |
| Other LT Assets | 178 | 178 | 178 | 178 | 178 | 178 |
| Proceeds for Secured Claims | $94,515 | $119,756 | $55,223 | $73,655 | $51,262 | $68,420 |
| | | | | | | |
| Secured Claims [3] | | | | | | |
| Notes Payable - Banks [4] | $95,000 | $95,000 | $95,000 | $95,000 | $95,000 | $95,000 |
| Secured Bank Revolver [4] | 72,483 | 72,483 | 82,321 | 82,321 | 81,382 | 81,382 |
| Perishable Agriculture Commodities Act | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 |
| Drawn down Letter of Credit | 2,838 | 2,838 | 2,838 | 2,838 | 2,838 | 2,838 |
| Wind-down Costs [5] | – | – | 5,000 | 5,000 | 5,000 | 5,000 |
| Swap Cancellation [4] | 8,269 | 8,269 | 8,269 | 8,269 | 8,269 | 8,269 |
| Capital Leases [6] | 1,123 | 749 | 1,123 | 749 | 1,123 | 749 |
| Total Secured Claims [7] | $180,745 | $180,371 | $195,583 | $195,208 | $194,644 | $194,269 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Recovery - Secured Lender | 52% | 66% | 28% | 38% | 26% | 35% |
| Recovery Mid-point | 59% | | 33% | | 31% | |

Notes:
[1] Amounts reflect the projected balances for the respective dates for each scenario: 6/30/09, 4/12/09, 5/3/09.
[2] Net book values were allocated based on the individuals values assigned in the 2007 appraisal.
[3] Does not address additional bank group exposure risk.
[4] Amounts have been updated to reflect the projected balances for the respective dates for each scenario; assumes cash flow sweep.
[5] Forced liquidation scenario wind-down cost estimate per CCP.
[6] Estimated secured value; gross value of approximately $7.5 million.
[7] Secured claims exclude professional fees and administrative expenses.

8

CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Executive Summary – Preliminary Timeline & Milestones

### March

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

### April

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

### May

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

### June

| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

☐ Federal Reserve Holiday

| Week of | Event / Milestone |
|---|---|
| 3/22/2009 | Diligence meetings at Company |
| | Modeling/financial analysis (FTI/Chanin) |
| | Assemble list of strategic/financial buyers |
| | Commence work on Information Memorandum |
| 3/29/2009 | Set up data room; grant access to confid'd parties |
| | Meeting with board of directors and bank group |
| | Agreement on process |
| | Contact potential strategic/financial buyers and send CA's |
| | Continue work on Information Memorandum |
| 4/5/2009 | Complete Information Memorandum and send to potential buyers |
| | Arrange site visits for potential acquirors |
| | Develop and circulate draft bid procedures |
| 4/12/2009 | Management presentations for potential acquirors |
| | Complete bid procedures |
| | [Immediate Forced Liquidation] |
| 4/26/2009 | Identification of lead bidder |
| 5/3/2009 | Negotiation of APA with stalking horse bidder |
| | [Post-Stalking Horse Failure Liquidation] |

| Date | Event / Milestone |
|---|---|
| Time (T) 0 | Chapter 11 Filing |
| T+1 day | Motion to Approve Bidding Procedures/Sale |
| T+8 days | Hearing re Bidding Procedures |
| | Entry of Bidding Procedures Order (1) |
| T+15 days | Deadline to Send Notice of Assumption and Notice of Sale |
| T+25 days | Objection Deadline Contract Parties (10 days after notice of assumption) |
| T+29 days | General Deadline to Object (14 days after notice of sale) |
| T+30 days | Deadline to Submit Competing Bids, Deposits and Adequate Assurance Package (2-3 days before auction, 10 days before sale hearing) |
| T+31 days | Designation of Qualified Bids |
| T+32 or 33 days | Auction |
| T+36 or 37 days | Objection Deadline Contract Parties/Winning Bidder(s) Adequate Assurance |
| T+40 days | Sale Hearing |

(1) This deadline and all subsequent deadlines are dependent upon the court waiving the 10-day stay on the bidding procedures order and, as such, this deadline and all subsequent deadlines may be extended by 10 days.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

5

# Executive Summary – Scenario Comparison (cont'd)

- On an expected value basis, the probability of finding a stalking horse can be very low and still exceed the forced liquidation scenario, assuming the mid-points of the alternative scenario valuations.

**Percentage Recovery for Secured Claims**



- (59.3% X 8.7%) + (30.5% X 91.3%) = 33.0%

- Stalking horse probability indifference point = 8.7%



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

10

# Executive Summary – Sale Process

- Given the level of indebtedness in the Company, coupled with certain legal challenges, a sale of shares is unrealistic. Accordingly CCP/DPS, after consultation with management, the board and its advisors, focused on an asset transaction.

- To date 30 parties have been contacted, 20 NDAs have been executed and 5 parties have been scheduled for site visits. A status report on the contacted parties is included later in this report.

- Based on our review of potential asset values, in addition to feedback from potential buyers, we believe that any asset sale will have to be facilitated through a Section 363 sales process in Chapter 11. To this end, we have begun pursuing a stalking horse bidder. A discussion on the Section 363 sales process and associated timeline are included in the "Sales Process Update" section of this report.

CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Key Plant Sale Issues

- There are several issues to consider in the sale of the Williams and Lemoore plants:

  - There are operating leases on the books of the Lemoore plant for which the equipment resides at the Williams plant.

  - Wastewater for both plants is currently being pumped through pipes onto farms owned by affiliate Salyer entities. The facilities are only salable with wastewater options, but buyers may be unwilling / unable to sign agreements with Salyer entities for the wastewater needs.

    - This is a larger issue at Williams, as the municipal sewer could be used as a temporary solution at Lemoore.

  - Similarly, there are informal agreements in place between SK Foods and affiliate Salyer entities for the use of harvesting equipment.

  - General Mills ("GM") has been reimbursing SK Foods for capital expenditures related to certain projects, and installed certain of its own equipment in the Williams plant that were brought over from GM's Atwater facility.

    - As a result, GM has the right to enter the facility and appropriate these assets, or offer them to SK Foods at current fair market value, in which instance SK Foods would have 14 days to accept or reject that offer.

  - As a result, if SK Foods loses the GM business and GM decides to remove its equipment, the Williams plant would be severely handicapped, and there would be remediation costs to consider before the land could be sold as a real estate asset.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

CONFIDENTIAL

# II. Current Liquidity



CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

13

# Weekly Cash Flow Assumptions

- Sales and COGS Assumptions

  - Total sales from April 1 through June 30, 2009 are projected to be $46.7 million with margin estimated to be 9.0%.

- Inventory Assumptions

  - The value of unapplied inventory is excluded from inventory roll-forward.
  - Bill and hold inventory is estimated to be $10.4 million at June 30, 2009.

- Expenditures Assumptions

  - Personnel costs include salary and benefits for all employees at both the plant and corporate locations.
  - Production cost figures include ingredients, packaging, and supplies. These costs are assumed to be paid as incurred.

- Borrowing Base Assumptions

  - On-hand inventory excludes packaging, bill and hold, and unapplied overhead.
  - Accounts receivable figures exclude amounts that are past due greater than 90 days.
  - The inventory advance rate is 70% while the accounts receivable advance rate is 85%.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

14

# Summary Cash Flow – Weekly Cash Flow Projections(1)(2)



| ($000s) Week Ended | Proj 12-Apr | Proj 19-Apr | Proj 26-Apr | Proj 3-May | Proj 10-May | Proj 17-May | Proj 24-May | Proj 31-May | Proj 7-Jun | Proj 14-Jun | Proj 21-Jun | Proj 28-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Memo: Projected Sales** | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 | 3,026 | 2,816 | 2,816 | 2,816 | 2,816 |
| **Cash Receipts** | | | | | | | | | | | | |
| *Operating* | | | | | | | | | | | | |
| Trade Receipts | 1,757 | 4,020 | 3,918 | 3,803 | 5,694 | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 |
| Outstanding AR Catch-up | 1,430 | 300 | 300 | 795 | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | 3,187 | 4,320 | 4,218 | 4,598 | 5,694 | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 |
| **Total Cash Disbursements** | 3,184 | 4,254 | 3,937 | 4,007 | 2,957 | 2,045 | 2,696 | 2,731 | 4,202 | 2,202 | 3,634 | 2,344 |
| **Net Weekly Cash Increase/(Decrease)** | 3 | 66 | 282 | 591 | 2,737 | 2,166 | 1,514 | 1,479 | 8 | 823 | (609) | 682 |
| **Debt Summary** | | | | | | | | | | | | |
| Beginning Revolver Balance | 82,324 | 82,321 | 82,255 | 81,973 | 81,382 | 78,645 | 76,481 | 74,967 | 73,488 | 73,479 | 72,656 | 73,165 |
| Paydown | 3 | 66 | 282 | 591 | 2,737 | 2,165 | 1,514 | 1,479 | 8 | 823 | (509) | 682 |
| Adjustment | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Revolver Balance** | 82,321 | 82,255 | 81,973 | 81,382 | 78,645 | 76,481 | 74,967 | 73,488 | 73,479 | 72,656 | 73,165 | 72,483 |
| **Cash On Hand** | | | | | | | | | | | | |
| Beginning Cash | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Change in Cash | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Availability** | | | | | | | | | | | | |
| Gross Accounts Receivable | 28,050 | 27,941 | 27,932 | 27,544 | 24,876 | 23,692 | 22,507 | 21,323 | 19,929 | 19,719 | 19,508 | 19,298 |
| Less: Outstanding greater than 90 | 2,715 | 2,735 | 2,764 | 2,754 | 2,488 | 2,369 | 2,251 | 2,132 | 1,993 | 1,972 | 1,951 | 1,930 |
| Less: Other Ineligibles | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 | 2,007 |
| Net AR | 23,327 | 23,199 | 23,161 | 22,782 | 20,381 | 19,315 | 18,249 | 17,183 | 15,928 | 15,739 | 15,550 | 15,361 |
| Advance Rate | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Net AR | 19,828 | 19,719 | 19,687 | 19,365 | 17,324 | 16,418 | 15,512 | 14,606 | 13,539 | 13,378 | 13,218 | 13,057 |
| Inventory | 59,621 | 56,727 | 54,285 | 50,670 | 48,586 | 46,079 | 43,572 | 41,065 | 39,039 | 37,158 | 35,133 | 33,107 |
| Less: Ineligibles | 1,428 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 |
| Net Inventory | 58,193 | 55,695 | 53,223 | 49,638 | 47,554 | 45,047 | 42,540 | 40,033 | 38,007 | 36,127 | 34,101 | 32,075 |
| Advance Rate | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| | 40,735 | 38,987 | 37,256 | 34,747 | 33,288 | 31,533 | 29,778 | 28,023 | 26,605 | 25,289 | 23,870 | 22,452 |
| General Reserve | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 |
| **Total Availability** | 60,499 | 58,641 | 56,879 | 54,048 | 50,648 | 47,887 | 45,226 | 42,666 | 40,080 | 38,603 | 37,024 | 36,446 |
| **Maximum Availability** | 90,000 | 90,000 | 90,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 |
| Revolver | 82,321 | 82,255 | 81,973 | 81,382 | 78,645 | 76,481 | 74,967 | 73,488 | 73,479 | 72,656 | 73,165 | 72,483 |
| Outstanding LCs | 2,838 | 2,838 | 2,838 | 2,838 | 2,838 | 2,838 | 2,838 | 2,838 | 2,839 | 2,839 | 2,839 | 2,839 |
| | 85,159 | 85,093 | 84,811 | 84,220 | 81,483 | 79,319 | 77,805 | 76,326 | 76,318 | 75,495 | 76,004 | 75,322 |
| **Availability** | (24,669) | (26,462) | (27,932) | (30,172) | (30,935) | (31,432) | (32,679) | (33,761) | (36,238) | (36,892) | (38,980) | (39,877) |

(1) The projected cash flows herein assume approximately status quo operations, although the Company is in the process of gathering separate budgets for both restructuring-related and other expenses. The Company expects to develop a budget scenario assuming cuts to overhead and non-essential expenses. When this scenario is finished, the identified costs throughout the projection period may be expected to decline. At this point, it is not possible to determine whether such net budget cuts would be large enough, relative to the overall amounts at risk, to affect the scenario decision outlined on page 6.

(2) Assumes cash flow sweep.

CHANIN CAPITAL PARTNERS
a DuffePhelps Company

# Weekly Sales and Accounts Receivables(1)

CONFIDENTIAL

| ($000s) Week Ended | Proj 12-Apr | Proj 19-Apr | Proj 26-Apr | Proj 3-May | Proj 10-May | Proj 17-May | Proj 24-May | Proj 31-May | Proj 7-Jun | Proj 14-Jun | Proj 21-Jun | Proj 28-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Estimated Total Sales** | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 | 3,026 | 2,816 | 2,816 | 2,816 | 2,816 |
| **General Mills** | | | | | | | | | | | | |
| Sales | | | | | | | | | | | | |
| **General Mills AR Rollforward** | | | | | | | | | | | | |
| Beginning AR | 1,625 | 895 | 595 | 295 | - | - | - | - | - | - | - | - |
| Plus: Sales | | | | | | | | | | | | |
| Less: Cash Receipts | 730 | 300 | 300 | 295 | | | | | | | | |
| Less: Catch-up of Old AR | | | | | | | | | | | | |
| Less: Adjustments | | | | | | | | | | | | |
| Ending AR | 895 | 595 | 295 | - | - | - | - | - | - | - | - | - |
| **All Other AR** | | | | | | | | | | | | |
| Sales | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 | 3,026 | 2,816 | 2,816 | 2,816 | 2,816 |
| Beginning AR | 25,402 | 27,155 | 27,345 | 27,637 | 27,544 | 24,876 | 23,692 | 22,507 | 21,323 | 19,929 | 19,719 | 19,508 |
| Plus: Sales | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 | 3,026 | 2,816 | 2,816 | 2,816 | 2,816 |
| Less: Cash Receipts | 1,757 | 4,020 | 3,918 | 3,803 | 5,694 | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 |
| Less: Catch-up of Old AR | 700 | | | 500 | | | | | | | | |
| Less: Adjustments | | | | | | | | | | | | |
| Ending AR | 27,155 | 27,345 | 27,637 | 27,544 | 24,876 | 23,692 | 22,507 | 21,323 | 19,929 | 19,719 | 19,508 | 19,298 |
| **Total Outstanding AR** | 28,050 | 27,941 | 27,932 | 27,544 | 24,876 | 23,692 | 22,507 | 21,323 | 19,929 | 19,719 | 19,508 | 19,298 |
| Percentage of AR over 90 days | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Over 90 Outstanding ($s) | 2,715 | 2,735 | 2,764 | 2,754 | 2,488 | 2,369 | 2,251 | 2,132 | 1,993 | 1,972 | 1,951 | 1,930 |
| Days Sales Outstanding | 38.5 | 38.8 | 40.5 | 45.8 | 44.5 | 45.8 | 47.4 | 49.3 | 46.9 | 47.3 | 47.6 | 48.0 |
| **Margin** | | | | | | | | | | | | |
| Estimated Sales | 4,210 | 4,210 | 4,210 | 4,210 | 3,026 | 3,026 | 3,026 | 3,026 | 2,816 | 2,816 | 2,816 | 2,816 |
| Margin % | 5.0% | 9.0% | 8.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% | 9.0% |
| Margin $ | 210 | 379 | 379 | 379 | 272 | 272 | 272 | 272 | 253 | 253 | 253 | 253 |
| COGS | 3,999 | 3,831 | 3,831 | 3,831 | 2,753 | 2,753 | 2,753 | 2,753 | 2,562 | 2,562 | 2,562 | 2,562 |
| **Inventory Rollforward** | | | | | | | | | | | | |
| Beginning Inventory | 84,436 | 80,037 | 76,743 | 73,871 | 69,886 | 67,402 | 64,495 | 61,588 | 58,681 | 56,255 | 53,975 | 51,549 |
| Production & Purchases | 3,999 | 937 | 1,359 | 246 | 669 | 246 | 246 | 246 | 538 | 682 | 536 | 538 |
| Less: COGS | 3,999 | 3,831 | 3,831 | 3,831 | 2,753 | 2,753 | 2,753 | 2,753 | 2,562 | 2,562 | 2,562 | 2,562 |
| Less: Bill and Hold | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Adjustment | | | | | | | | | | | | |
| Ending Inventory | 80,037 | 76,743 | 73,871 | 69,886 | 67,402 | 64,495 | 61,588 | 58,681 | 56,255 | 53,975 | 51,549 | 49,123 |
| **Excluded from Borrowing Base** | | | | | | | | | | | | |
| Bill and Hold | 14,796 | 14,396 | 13,996 | 13,596 | 13,196 | 12,796 | 12,396 | 11,996 | 11,596 | 11,196 | 10,796 | 10,396 |
| Packaging | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 | 5,620 |
| | 20,416 | 20,016 | 19,616 | 19,216 | 18,816 | 18,416 | 18,016 | 17,616 | 17,216 | 16,816 | 16,416 | 16,016 |
| **Borrowing Base Inventory** | 59,621 | 56,727 | 54,255 | 50,670 | 48,586 | 46,079 | 43,572 | 41,065 | 39,039 | 37,158 | 35,133 | 33,107 |

(1) The projected cash flows herein assume approximately status quo operations, although the Company is in the process of gathering separate budgets for both restructuring-related and other expenses. The Company expects to develop a budget scenario assuming cuts to overhead and non-essential expenses. When this scenario is finished, the identified costs throughout the projection period may be expected to decline. At this point, it is not possible to determine whether such net budget cuts would be large enough, relative to the overall amounts at risk, to affect the scenario decision outlined on page 6.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# III. Preliminary Valuation

CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Valuation Overview

- To help assess the potential range of values associated with the funded scenario, CCP/DPS utilized the following valuation methodologies:

  1. Sum of the Parts, which comprises estimates of net proceeds from plant divestitures and real property, and net recoveries from working capital accounts, namely accounts receivables and inventory

  2. Public Comparables

  3. Precedent Transactions

  4. Discounted Cash Flow ("DCF")

- Given the nature of the industry the Company operates in, SK Foods' unique current situation, and the fact that it is privately-held, it is our opinion that the sum-of-the-parts methodology is most indicative of realizable value.

- Due to the Company's smaller size and specialized business operations, there is no "true" comparable company, hence making the comparable company valuation of limited relevance. Additionally, there is scarce financial information available for the precedent transactions analysis, undermining its value.

- Given the lack of long term financial projections, a DCF valuation is not appropriate.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

18

# Valuation Summary

- The range of enterprise values implied by the current business plan is indicated below.



19

# Sum of the Parts – Fund to Going Concern Sale Analysis Summary

- The following shows a sum of the parts valuation, which comprises estimates of net proceeds from plant divestitures and real property, and net recoveries from working capital accounts, namely accounts receivables and inventory.

| ($000's) | Preliminary Net Book Value | Estimated Recovery % | | Estimated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Cash & Cash Equivalents | $ – | 100% | 100% | $ – | $ – |
| Trade Accounts Receivable, Net [1] | 19,298 | 75% | 85% | 14,474 | 16,404 |
| Inventory [1] | 33,107 | 60% | 70% | 19,864 | 23,175 |
| Lemoore Fixed Assets [2] | 58,628 | 63% | 88% | 36,840 | 51,774 |
| Williams Fixed Assets [2] | 37,147 | 54% | 67% | 20,000 | 25,000 |
| Other Fixed Assets | 522 | 22% | 35% | 117 | 183 |
| Hawaii and Lake Tahoe | 3,043 | 100% | 100% | 3,043 | 3,043 |
| Other LT Assets | 25,621 | 1% | 1% | 178 | 178 |
| **Total Assets** | **$177,367** | **53%** | **68%** | **94,515** | **119,756** |
| | | | | | |
| Proceeds Available for Secured Claims | | | | 94,515 | 119,756 |
| | | | | | |
| Less: Secured Claims | | | | | |
| Notes Payable - Banks [1] | | | | 95,000 | 95,000 |
| Secured Bank Revolver [1] | | | | 72,483 | 72,483 |
| Perishable Agriculture Commodities Act | | | | 1,032 | 1,032 |
| Drawn down Letter of Credit | | | | 2,838 | 2,838 |
| Wind-down Costs | | | | – | – |
| Swap Cancellation [1] | | | | 8,269 | 8,269 |
| Capital Leases | | | | 1,123 | 749 |
| Total Secured Claims | | | | 180,745 | 180,371 |
| | | | | | |
| Proceeds Available for Administrative Expenses and Unsecured Creditors | | | | ($86,230) | ($60,615) |
| | | | | | |
| **Recovery - Secured Lender** | | | | **52%** | **66%** |

Notes:
[1] Projected balances as of June 30, 2009 to reflect fund to going concern scenario.
[2] Net book values were allocated based on the individuals values assigned in the 2007 appraisal.



C H A N I N   C A P I T A L   P A R T N E R S
A DuffePhelps Company

20

# Comparable Company Valuation [1]

- SK Foods' comparable company analysis, using low to mean multiples, suggests:

  - LTM revenue and LTM EBITDA multiple range of approximately 0.5x to 0.7x and 5.0x to 6.0x, respectively.

- Please note that CCP / DPS has applied a private company discount to the multiple range.

- The comparable companies analysis suggests:

  - A low to high range of approximately $53.1 to $220.4 million.

**COMPARABLE COMPANY REFERENCE RANGE**

*($ in millions)*

| Statistic | Amount | Multiple Range | Enterprise Value Range |
|---|---|---|---|
| FY 2008 Revenues | $268.4 | 0.5x - 0.7x | $134.2 - $187.9 |
| FY 2008 EBITDA | $36.7 | 5.0x - 6.0x | $183.7 - $220.4 |
| FY 2009P Revenues | $279.0 | 0.5x - 0.7x | $139.5 - $195.3 |
| FY 2009P EBITDA | ($2.0) | 5.0x - 6.0x | NM - NM |
| FY 2010P Revenues | $182.4 | 0.5x - 0.7x | $91.2 - $127.7 |
| FY 2010P EBITDA | $10.6 | 5.0x - 6.0x | $53.1 - $63.8 |
| **Total Enterprise Value Range** | | | **$53.1 - $220.4** |



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

21

(1) For illustrative purposes only due to the pending reinstatement of the 2008 results and lack of pro forma adjustments, and the preliminary nature of the 2009 and 2010 projections.

# Comparable Company Analysis

## OPERATING METRICS
(US$ in millions)

| Company | LTM Period | Revenue | EBITDA | LTM Capital Expenditures | EBITDA Margin | EBITDA-CapEx Margin | Rev. Growth (FT-O-FY) |
|---|---|---|---|---|---|---|---|
| Seneca Foods Corp. | 12/27/2008 | $1,231.1 | $70.5 | $20.9 | 5.7% | 4.0% | 5.5% |
| Treehouse Foods Inc. | 12/31/2008 | 1,500.7 | 146.9 | 20.5 | 9.8% | 6.1% | 29.6% |
| Ralcorp Holdings Inc. | 12/31/2008 | 3,141.9 | 370.1 | 70.6 | 11.8% | 9.5% | 26.5% |
| Del Monte Foods Co. | 1/25/2009 | 4,002.3 | 469.2 | 85.8 | 11.7% | 9.6% | 9.4% |
| Fresh Del Monte Produce Inc. | 12/28/2008 | 3,531.0 | 265.0 | 101.5 | 7.5% | 4.6% | 4.9% |
| Chiquita Brands International Inc. | 12/31/2008 | 3,609.4 | 163.5 | 63.0 | 4.5% | 2.8% | 4.2% |
| SunOpta Inc. | 12/31/2008 | 1,067.9 | 42.1 | (10.4) | 3.9% | 4.9% | 31.5% |
| HJ Heinz Co. | 1/28/2009 | 10,298.6 | 1,822.1 | 283.6 | 17.7% | 14.9% | 11.9% |
| ConAgra Foods, Inc. | 2/22/2009 | 12,542.7 | 1,388.4 | 449.7 | 11.1% | 7.5% | 10.2% |
| Campbell Soup Co. | 2/1/2009 | 7,967.0 | 1,494.0 | 306.0 | 18.8% | 14.9% | 8.3% |
| **Mean** | | **$4,512.2** | **$623.2** | **$142.6** | **10.2%** | **7.8%** | **14.2%** |
| **Median** | | **$3,570.2** | **$317.6** | **$78.2** | **10.4%** | **6.8%** | **9.8%** |

Source: Bloomberg, Reuters, Capital IQ.

## VALUATION METRICS
(US$ in millions, except stock price)

| Company | LTM Period | Stock Price 4/4/2009 | Market Cap | Net Debt | Par TEV | Net Debt / Par TEV | Par TEV / LTM Revenue | Par TEV / LTM EBITDA | Par TEV / FY2010E EBITDA | Par TEV / LTM EBITDA-CapEx | FY2010E EBITDA | LTM EBITDA-CapEx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Seneca Foods Corp. | 12/27/2008 | $22.76 | $172.8 | $299.2 | $472.0 | 63.4% | 0.4x | 6.7x | NA | NA | NA | 9.5x |
| Treehouse Foods Inc. | 12/31/2008 | 28.56 | 901.0 | 473.0 | 1,374.0 | 34.4% | 0.9x | 9.4x | 8.7x | 8.1x | 7.8x | 15.0x |
| Ralcorp Holdings Inc. | 12/31/2008 | 54.56 | 3,096.1 | 1,481.3 | 4,567.4 | 32.4% | 1.5x | 12.3x | 7.8x | 7.2x | 7.0x | 15.3x |
| Del Monte Foods Co. | 1/25/2009 | 7.77 | 1,536.5 | 1,689.3 | 3,225.8 | 52.4% | 0.8x | 6.9x | 7.2x | 6.4x | 5.4x | 9.6x |
| Fresh Del Monte Produce Inc. | 12/26/2008 | 17.01 | 1,081.0 | 485.2 | 1,566.2 | 31.0% | 0.4x | 5.9x | 5.4x | 5.6x | 5.1x | 9.8x |
| Chiquita Brands International Inc. | 12/31/2008 | 7.07 | 314.1 | 699.7 | 1,013.7 | 69.0% | 0.2x | 6.2x | 6.0x | 6.0x | 6.0x | 10.1x |
| SunOpta Inc. | 12/31/2008 | 1.76 | 113.5 | 153.9 | 267.4 | 57.6% | 0.2x | 6.4x | 5.5x | 5.5x | 5.1x | 5.1x |
| HJ Heinz Co. | 1/28/2009 | 34.48 | 10,948.5 | 4,941.9 | 15,890.4 | 30.9% | 1.5x | 8.6x | 8.8x | 8.6x | 8.4x | 10.2x |
| ConAgra Foods, Inc. | 2/22/2009 | 17.10 | 7,647.7 | 3,488.3 | 11,135.0 | 31.3% | 0.9x | 8.0x | 8.0x | 7.4x | 7.1x | 11.9x |
| Campbell Soup Co. | 2/1/2009 | 27.43 | 9,694.2 | 2,631.0 | 12,325.2 | 21.3% | 1.5x | 8.2x | 8.2x | 8.2x | NA | 10.4x |
| **Mean** | | | **$3,939.5** | **$1,624.3** | **$5,163.6** | **42.4%** | **0.8x** | **8.0x** | **7.5x** | **7.1x** | **6.8x** | **10.8x** |
| **Median** | | | **$1,508.7** | **$1,090.5** | **$2,369.0** | **33.5%** | **0.8x** | **8.0x** | **7.4x** | **7.2x** | **7.0x** | **10.5x** |

Source: Bloomberg, Reuters, Capital IQ.

## CREDIT METRICS
(US$ in millions)

| Company | LTM Period | Par Debt | Cash | Net Debt | Net Debt / Par TEV | Market Cap / Sales | Total Debt / EBITDA | Net Debt / EBITDA | EBITDA / Interest | EBITDA-CapEx / Interest |
|---|---|---|---|---|---|---|---|---|---|---|
| Seneca Foods Corp. | 12/27/2008 | $312.9 | $13.6 | $299.2 | 63.4% | 0.1x | 4.4x | 4.2x | 4.7x | 3.3x |
| Treehouse Foods Inc. | 12/31/2008 | 475.7 | 2.7 | 473.0 | 34.4% | 0.6x | 3.2x | 3.2x | 5.3x | 3.3x |
| Ralcorp Holdings Inc. | 12/31/2008 | 1,566.1 | 84.8 | 1,481.3 | 32.4% | 0.4x | 4.2x | 4.0x | 5.3x | 4.3x |
| Del Monte Foods Co. | 1/25/2009 | 1,701.8 | 12.5 | 1,689.3 | 52.4% | 0.4x | 3.6x | 3.6x | 3.5x | 4.3x |
| Fresh Del Monte Produce Inc. | 12/26/2008 | 512.8 | 27.6 | 485.2 | 31.0% | 0.3x | 1.9x | 1.8x | 18.3x | 11.3x |
| Chiquita Brands International Inc. | 12/31/2008 | 776.9 | 77.3 | 699.7 | 69.0% | 0.1x | 4.8x | 4.3x | 2.2x | 1.3x |
| SunOpta Inc. | 12/31/2008 | 178.7 | 24.8 | 153.9 | 57.6% | 0.1x | 4.2x | 3.7x | 2.7x | 3.4x |
| HJ Heinz Co. | 1/28/2009 | 5,532.9 | 690.9 | 4,941.9 | 30.9% | 1.1x | 3.0x | 2.7x | 5.4x | 4.6x |
| ConAgra Foods, Inc. | 2/22/2009 | 3,576.5 | 88.2 | 3,488.3 | 31.3% | 0.6x | 2.6x | 2.5x | 5.2x | 5.2x |
| Campbell Soup Co. | 2/1/2009 | 2,711.0 | 80.0 | 2,631.0 | 21.3% | 1.2x | 1.8x | 1.8x | 11.3x | 9.0x |
| **Mean** | | **$1,724.5** | **$110.2** | **$1,624.3** | **42.4%** | **0.5x** | **3.4x** | **3.2x** | **6.4x** | **4.8x** |
| **Median** | | **$1,121.5** | **$32.4** | **$1,090.5** | **33.5%** | **0.6x** | **3.4x** | **3.4x** | **5.2x** | **4.3x** |

Note: Stock prices as of 04/04/2009.
Source: Bloomberg, Reuters, Capital IQ.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Precedent Transactions Valuation [1]

- SK Foods' precedent transaction analysis, using low to mean transaction multiples, suggests:

  - Revenue and EBITDA multiple range of approximately 0.4x to 0.6x and 5.0x to 6.0x, respectively.

- Please note that CCP / DPS has applied a private company discount to the multiple range.

- The precedent transaction analysis yields an enterprise value range of approximately $53.1 to $220.4 million.

## PRECEDENT TRANSACTION REFERENCE RANGE
($ in millions)

| Statistic | Amount | Multiple Range | Enterprise Value Range |
|---|---|---|---|
| FY 2008 Revenues | $268.4 | 0.4x - 0.6x | $107.3 - $161.0 |
| FY 2008 EBITDA | $36.7 | 5.0x - 6.0x | $183.7 - $220.4 |
| FY 2009P Revenues | $279.0 | 0.4x - 0.6x | $111.6 - $167.4 |
| FY 2009P EBITDA | ($2.0) | 5.0x - 6.0x | NM - NM |
| FY 2010P Revenues | $182.4 | 0.4x - 0.6x | $73.0 - $109.4 |
| FY 2010P EBITDA | $10.6 | 5.0x - 6.0x | $53.1 - $63.8 |
| **Total Enterprise Value Range** | | | **$53.1 - $220.4** |



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

(1) For illustrative purposes only due to the pending reinstatement of the 2008 results and lack of pro forma adjustments, and the preliminary nature of the 2009 and 2010 projections.

Precedent Transactions Analysis

| Date | Target Company | Buyer | Enterprise Value ($ mm) | EV/Revs | EV/EBITDA | Deal Value ($mm) |
|---|---|---|---|---|---|---|
| 2/27/09 | Omstead Foods Ltd (vegetable processing business) | Bonduelle Canada Inc | $28.1 | NA | NA | $28.0 |
| 2/24/09 | Family Tradition Foods Inc (Vegetable Business) | Bonduelle Canada Inc | NA | NA | NA | NA |
| 2/3/09 | Ceres Organic Inc | Mach One Corporation | $8.0 | NA | NA | $8.0 |
| 1/6/09 | Soya China Pte Ltd | Alpha Arizona Corp | $69.9 | NA | NA | $90.0 |
| 11/13/08 | The Herbal Garden Inc | RCAF 03 | NA | NA | NA | NA |
| 10/27/08 | Sabrosa Company | Tree Top Inc | NA | NA | NA | $76.0 |
| 9/23/08 | Dole France S.A.S; JP Fresh Limited | Compagnie Fruitiere | $76.0 | NA | NA | NA |
| 8/11/08 | Cushman Fruit Company Inc | Harry & David Holdings Inc | NA | NA | NA | $33.0 |
| 6/24/08 | Sunrise Growers-Frozsun | Sun Capital Partners Inc | $32.5 | NA | NA | $403.0 |
| 6/9/08 | Cenibana SA | Del Monte (Pinabana) Corp | $403.0 | NA | NA | $10.0 |
| 5/20/08 | Hawaii Pride LLC; Hawaiian Sweet Inc. | Calavo Growers, Inc. | $10.0 | NA | NA | $85.0 |
| 5/13/08 | Atlanta AG | Univeg Belgie NV | $85.0 | 0.1x | NA | $51.0 |
| 4/16/08 | HerbThyme Farms | GreenLine Foods Inc | $51.0 | NA | NA | $20.0 |
| 3/14/08 | GreenLeaf Inc (75.00% stake) | Oakville Produce Partners | $26.7 | NA | NA | NA |
| 3/4/08 | Europe's Best Inc | J. M. Smucker Company | NA | NA | NA | $1,146.0 |
| 1/18/08 | Performance Food Group Company | Vistar Corporation | $1,146.0 | 0.2x | 10.4x | NA |
| 1/17/08 | Taylor & Fulton Inc | Brian Turner, Jimmy Grainger and Ed Angrisani (Private Investors) | NA | NA | NA | NA |
| 12/13/07 | L & M Produce Company Inc | Coastal Sunbelt Produce Company | NA | NA | NA | NA |
| 12/10/07 | Grupo Herdez SAB de CV (Shares); Grupo Kuo SAB de CV | Herdez Del Fuerte S.A. de CV | NA | NA | NA | $14.0 |
| 10/18/07 | McCain Foods (Canada) | A. Lassonde Inc. | $13.8 | 0.4x | NA | NA |
| 10/1/07 | Verdelli Farms, Inc. | Fresh Express, Inc. | NA | NA | NA | NA |
| 7/16/07 | Aliments Carriere Inc (77.00% stake) | Bonduelle SA | NA | NA | NA | $50.0 |
| 6/8/07 | Wholesale Produce Supply Inc | Stone Arch Capital, LLC | $50.0 | NA | NA | $21.0 |
| 5/17/07 | Rader Farms Inc | The Inventure Group Inc | $20.7 | 0.8x | NA | NA |
| 5/15/07 | Congeladora del Rio SA de CV; Global Trading Inc | SunOpta Inc (formerly Stake Technology Ltd) | NA | NA | NA | NA |
| 5/3/07 | Creative Foods LLC | Kagome Co Ltd | NA | NA | NA | NA |
| 5/1/07 | Baxters Canada Inc | Baxters Canada Inc | $16.8 | 0.2x | NA | $17.0 |
| 4/28/07 | CanGro Foods Inc (Aylmer and Primo brand soup business) | Sun Capital Partners Japan KK | $32.9 | 0.2x | 6.3x | $33.0 |
| 2/23/07 | Tarami Co Ltd | Borg Produce Sales Inc | NA | NA | NA | NA |
| 1/31/07 | Bergosa S.A. | J & J Snack Foods Corp | NA | NA | NA | NA |
| 1/8/07 | Radar, Inc. | MCG Capital Corporation | $42.9 | 0.2x | 7.1x | $20.0 |
| 11/27/06 | Coastal Sunbelt Produce Company; East Coast Fresh Cuts, Inc. | Allen Canning Co. | NA | NA | NA | NA |
| 10/3/06 | Birds Eye Foods Inc (non-branded frozen vegetable business) | Dole Food Company, Inc | NA | NA | NA | $6.0 |
| 9/22/06 | JP Fresh Limited (55.00% stake) | The Riverside Company | $8.4 | 0.1x | NA | NA |
| 9/5/06 | GreenLine Foods Inc | Pro-Natura International | NA | NA | NA | NA |
| 8/24/06 | Biomarche SCRL | Hot House Growers Income Fund | NA | NA | NA | $45.0 |
| 8/18/06 | Village Farms LP | Seneca Foods Corporation | $45.0 | 0.5x | NA | $78.0 |
| 7/2/06 | Signature Fruit Company LLC | Horizon Milling G.P. | $78.0 | NA | NA | NA |
| | Smucker Foods of Canada Co. (foodservice and industrial businesses) | | | | | |
| 6/12/06 | Jon-Lin Foods | McClain Foods Limited | NA | NA | NA | NA |
| 5/3/06 | H.J. Heinz Company (European fresh prepared foods business) | The Hain Celestial Group Incorporation | NA | NA | NA | NA |

| | | | | EV/Revs | EV/EBITDA | |
|---|---|---|---|---|---|---|
| HIGH | | | | 0.8x | 10.4x | |
| LOW | | | | 0.1x | 6.3x | |
| MEAN | | | | 0.3x | 7.9x | |
| MEDIAN | | | | 0.2x | 7.1x | |



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

24

# IV. Forced Liquidation Analysis

CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Immediate Forced Liquidation Analysis Assumptions

- SK Foods and FTI prepared the following liquidation analysis as a comparison to any M&A transaction or going-concern reorganization.

- The recovery analysis was prepared assuming a forced liquidation.

- Source documents included the Company's draft December 31, 2008 trial balance, April 12, 2009 borrowing base certificate, and August 15, 2007 appraisal.

- Plant recovery estimates are based on indications of value from Asset Appraisals dated August 15, 2007 – forced liquidation was used as a base line value. The baseline value was adjusted for existing GM assets within the Williams plant, current market conditions, and existing waste water agreements.

- Other real assets owned by the Company have recoveries base estimated at their book value.

- Recoveries for accounts receivables and inventory are assumed at discounted borrowing base advance rates.

- Secured debts includes the following – Perishable Agricultural Commodities Act claims, outstanding senior secured term debt, revolver, assumed drawn letter of credits, estimated swap termination values, and estimated secured portion for capital leases.

- Wind-down costs are estimated to be within the range of $5.0 million.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Immediate Forced Liquidation Analysis Summary

| ($000s) | Preliminary Net Book Value as of 12/31/2008 | Estimated Recovery % Low | Estimated Recovery % High | Estimated Recovery $ Low | Estimated Recovery $ High |
|---|---|---|---|---|---|
| Cash & Cash Equivalents | $ - | 100% | 100% | $ - | $ - |
| Trade Accounts Receivable, Net [1] | 28,050 | 60% | 75% | 16,830 | 21,038 |
| Inventory [1] | 59,621 | 41% | 54% | 24,367 | 32,345 |
| Lemoore Fixed Assets [2] | 58,628 | 12% | 15% | 6,761 | 9,015 |
| Williams Fixed Assets [2] | 37,147 | 11% | 21% | 3,927 | 7,854 |
| Other Fixed Assets | 522 | 22% | 35% | 117 | 183 |
| Hawaii and Lake Tahoe | 3,043 | 100% | 100% | 3,043 | 3,043 |
| Other LT Assets | 25,621 | 1% | 1% | 178 | 178 |
| **Total Assets** | **$ 212,633** | **26%** | **35%** | **55,223** | **73,655** |
| Proceeds Available for Secured Claims | | | | 55,223 | 73,655 |
| Less: Secured Claims | | | | | |
| Notes Payable - Banks [1] | | | | 95,000 | 95,000 |
| Secured Bank Revolver [1], [3] | | | | 82,321 | 82,321 |
| Perishable Agriculture Commodities Act | | | | 1,032 | 1,032 |
| Draw Down of Letter of Credit | | | | 2,838 | 2,838 |
| Wind-down Costs [4] | | | | 5,000 | 5,000 |
| Swap Cancellation [1] | | | | 8,269 | 8,269 |
| Capital Leases [5] | | | | 1,123 | 749 |
| Total Secured Claims | | | | 195,583 | 196,208 |
| Proceeds Available for Administrative Expenses and Unsecured Creditors | | | | $ (140,359) | $ (121,553) |
| **Recovery - Secured Lender** | | | | **28%** | **38%** |

Notes:
[1] Amounts have been updated to reflect the balance as of April 12, 2009.
[2] Net book values were allocated based on the individuals values assigned in the 2007 appraisal.
[3] Revolver balance is shown net of cash on-hand - as of April 12, 2009.
[4] Estimate per CCP.
[5] Estimated Secured valued - gross value approximately $7.5 million.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Forced Liquidation Post-Stalking Horse Failure Analysis Summary

| ($000s) | Preliminary Net Book Value as of 12/31/2008 | Estimated Recovery % | | Estimated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Cash & Cash Equivalents | $ - | 100% | 100% | $ - | $ - |
| Trade Accounts Receivable, Net [1] | 27,544 | 60% | 75% | 16,526 | 20,658 |
| Inventory [1] | 50,670 | 41% | 54% | 20,709 | 27,489 |
| Lemoore Fixed Assets [2] | 58,628 | 12% | 15% | 6,761 | 9,015 |
| Williams Fixed Assets [2] | 37,147 | 11% | 21% | 3,927 | 7,854 |
| Other Fixed Assets | 522 | 22% | 35% | 117 | 183 |
| Hawaii and Lake Tahoe | 3,043 | 100% | 100% | 3,043 | 3,043 |
| Other LT Assets | 25,621 | 1% | 1% | 178 | 178 |
| **Total Assets** | **$ 203,176** | **25%** | **34%** | **51,262** | **68,420** |
| | | | | | |
| Proceeds Available for Secured Claims | | | | 51,262 | 68,420 |
| | | | | | |
| Less: Secured Claims | | | | | |
| Notes Payable – Banks [1] | | | | 95,000 | 95,000 |
| Secured Bank Revolver [1], [3] | | | | 81,382 | 81,382 |
| Perishable Agriculture Commodities Act | | | | 1,032 | 1,032 |
| Draw Down of Letter of Credit | | | | 2,838 | 2,838 |
| Wind-down Costs [4] | | | | 5,000 | 5,000 |
| Swap Cancellation [1] | | | | 8,269 | 8,269 |
| Capital Leases [5] | | | | 1,123 | 749 |
| Total Secured Claims | | | | 194,644 | 194,269 |
| | | | | | |
| Proceeds Available for Administrative Expenses and Unsecured Creditors | | | | $ (143,382) | $ (125,850) |
| | | | | | |
| **Recovery - Secured Lender** | | | | **26%** | **35%** |

Notes:
[1] Amounts have been updated to reflect the balance as of May 3, 2009.
[2] Net book values were allocated based on the individuals values assigned in the 2007 appraisal.
[3] Revolver balance is shown net of cash on-hand - as of May 3, 2009.
[4] Estimate per CCP.
[5] Estimated Secured valued - gross value approximately $7.5 million.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# V. Sales Process Update

**CHANIN CAPITAL PARTNERS**
A Duff&Phelps Company

# Sale Process Strategy

- Based on our review of the Company, discussions with management and its advisors, and initial feedback from potential buyers, we have identified the following likely divestiture scenarios:

  (1) Sale of the Williams and Lemoore plants separately. Working capital assets such as accounts receivables and inventory would be monetized. There would be wind-down costs associated with this strategy.

  (2) Sale of the Williams and Lemoore plants together. Working capital assets such as accounts receivables and inventory would be monetized. There would be wind-down costs associated with this strategy.

  (3) Sale of all corporate assets to one buyer, including working capital.

- Given the amount of secured bank debt relative to the asset values of the Company, along with other mitigating factors, a stock sale is highly unlikely.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Preliminary Timeline & Milestones

### March
| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

### April
| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

### May
| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

### June
| S | M | T | W | R | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

Federal Reserve Holiday

| Week of | Event / Milestone |
|---|---|
| 3/22/2009 | Diligence meetings at Company |
| | Modeling/financial analysis (FTI/Chanin) |
| | Assemble list of strategic/financial buyers |
| | Commence work on Information Memorandum |
| 3/29/2009 | Set up data room; grant access to confi'd parties |
| | Meeting with board of directors and bank group |
| | Agreement on process |
| | Contact potential strategic/financial buyers and send CA's |
| | Continue work on Information Memorandum |
| 4/5/2009 | Complete Information Memorandum and send to potential buyers |
| | Arrange site visits for potential acquirors |
| | Develop and circulate draft bid procedures |
| 4/12/2009 | Management presentations for potential acquirors |
| | Complete bid procedures |
| | [Immediate Forced Liquidation] |
| 4/26/2009 | Identification of lead bidder |
| 5/3/2009 | Negotiation of APA with stalking horse bidder |
| | [Post-Stalking Horse Failure Liquidation] |

| Date | Event / Milestone |
|---|---|
| Time (T) 0 | Chapter 11 Filing |
| T+1 day | Motion to Approve Bidding Procedures/Sale |
| T+8 days | Hearing re Bidding Procedures |
| | Entry of Bidding Procedures Order [1] |
| T+15 days | Deadline to Send Notice of Assumption and Notice of Sale |
| T+25 days | Objection Deadline Contract Parties (10 days after notice of assumption) |
| T+29 days | General Deadline to Object (14 days after notice of sale) |
| T+30 days | Deadline to Submit Competing Bids, Deposits and Adequate Assurance Package (2-3 days before auction, 10 days before sale hearing) |
| T+31 days | Designation of Qualified Bids |
| T+32 or 33 days | Auction |
| T+36 or 37 days | Objection Deadline Contract Parties/Winning Bidder(s) Adequate Assurance |
| T+40 days | Sale Hearing |

(1) This deadline and all subsequent deadlines are dependent upon the court waiving the 10-day stay on the bidding procedures order and, as such, this deadline and all subsequent deadlines may be extended by 10 days.

CHANIN CAPITAL PARTNERS
A DuffePhelps Company

31

# A. 363 Asset Sale Procedure Overview



**CHANIN CAPITAL PARTNERS**
A Duff&Phelps Company

32

# Selling and Acquiring Assets Through a Plan of Reorganization

- The sale of corporate assets under Section 363 of the Bankruptcy Code is often a key element of the bankruptcy process and the bankruptcy court approves the transaction that provides the highest and best value for the assets.

- Bankruptcy sales are designed to facilitate the estate's ready realization of value from its assets, while giving purchasers a degree of certainty that they will obtain clear title to an asset, without fear of reversal the following process is completed:

  - Purchaser funds estate distribution under Chapter 11;

  - Plan determines creditor recoveries and new capital structure; and

  - Purchaser and all other parties involved complete their respective parts required for completion.

- Assets can be sold "free and clear" of liens, claims, interests and possibly successor liability which generally remain with the Estate.

- In connection with a motion to sell assets, the Debtor will often propose a "stalking horse" asset purchase agreement along with bidding procedures, which govern the auction process.

  - A "stalking horse" is the first bidder to offer a binding commitment, without financing or due diligence contingencies, to acquire the assets.

  - To incentivize a "stalking horse" to set a floor value and conduct extensive due diligence, they generally are entitled to protections including a break-up fee, expense reimbursement and minimum overbid.

- To be considered a "qualified bidder" under the bidding procedures approved by the bankruptcy court, potential bidders have to submit a written bid to the Debtor in advance of the auction, execute an asset purchase agreement and demonstrate their financial capability to close the sale.



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS COMPANY

# Acquiring Assets as Part of a Plan of Reorganization

## Merits and Considerations (Sellers' Perspective)

### Merits

- "Free & clear" of liens and "interests"

- Transaction can be conducted quickly

- Insulation from fraudulent transfers

- No need for counterparty consent to assignment of most contract/leases

- Risk of overbidding due to court-supervised auction

- Ability to obtain releases in certain circumstances

- Bankruptcy court auction provides certainty and finality

### Considerations

- Distressed / value pricing

- Potential negative effects of chapter 11 on target's business

- Potential delay & uncertainty due to need for Court approval

- Buyers may find it hard to reach the level of comfort in their due diligence that they would in a healthy sale depending on how distressed the assets are.

- Tax loss carry-forwards may be wiped out in a transaction

- Multiple negotiations: Debtor, Committee's

CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Advantages and Disadvantages of a "Stalking Horse"

■ The principal advantage to having a stalking horse bidder is the comfort provided, particularly to a secured lender, of a price floor.

   • This assumes that the stalking horse will close the transaction.

   • To guard against the stalking horse bidder not closing the transaction, a sizable deposit should be received which is only refundable if: (I) the stalking horse is outbid, and (ii) the stalking horse does not bid after its stalking horse bid is exceeded by another bidder.

■ On the other hand, it appears that the tactical leverage provided the stalking horse has, in many cases, dissuaded other qualified bidders who might have bid more from even entering the auction.

   • There have been cases where other potential bidders choose not to participate rather than spend more time and effort trying to overcome the bidding advantages offered to the stalking horse.

   • For example, the bidding procedures and tight timeframe could favor the stalking horse and dissuade potential buyers from expressing an interest in the Debtor's assets or even attending the auction.

■ Considerations: It's important to consider whether: (i) the 363 sale is intended to merely confirm a sale to the logical buyer of the Company's assets or the potential successful bidder per a pre-filing auction process, or (ii) the 363 process is intended to result in a spirited auction of the debtor's business.

CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# 363 Asset Sale Illustrative Timeline



**Negotiate with "Stalking Horse"**

**Bidding Procedures Hearing**

**363 SALES AUCTION**

**Sales Hearing**

*CLOSING*

- Complete Buyers List (strategic/financial)
- Draft Teaser/CIM
- Fully Market Assets

File Sales/Bidding Procedures Motion

Receipt of Bids



**CHANIN CAPITAL PARTNERS**
A DUFF&PHELPS Company

36

# B. Potential Buyers

CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Marketing Process Status

- As of 4/8/09, 30 NDAs have been sent out to potential buyers and 20 have been executed.

  - Data room access has been given to those parties that have executed NDAs.

- 5 site visits have been scheduled:

  - Del Monte is scheduled to visit 4/2/09 – 4/3/09.

  - ConAgra is scheduled to visit Lemoore facility 4/7/09.

  - The Neil Jones Food Company is scheduled to visit 4/6/09 – 4/7/09.

  - Red Gold is scheduled to visit 4/6/09 – 4/7/09.

  - TreeHouse Foods is scheduled to visit the week of 4/13/09.

- On 3/27/09, the Company received a Letter of Intent from the growers with an offer of $50.0 million for the Lemoore plant.

CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Tier 1 Potential Buyers

| Company Name | Description | NDA Sent | Not Interested | Access to Data Room | Site Visit | Offer Received | D&P Comments |
|---|---|---|---|---|---|---|---|
| **Allen Canning**<br>305 East Main<br>P.O. Box 250<br>Siloam Springs, AR 72761<br>Phone: (479) 524-6431 | Strategic | x | | | | | - Sent NDA 3/29/09 |
| **Aurora Resurgence Management Partners LLC**<br>10877 Wilshire Blvd.<br>Suite 2100<br>Los Angeles CA 90024<br>Phone: 310-551-0101<br>Fax: 310-277-5591 | Financial | x | | x | | | - NDA sent 4/1/09<br>- NDA executed on 4/2/09 |
| **Bayside Capital**<br>1001 Brickell Bay Drive, 26th Floor<br>Miami FL 33131 | Financial | x | | x | | | - Interested and have looked at fruit companies in the past - BMO had approached them on the opportunity<br>- NDA sent on 3/30/09<br>- NDA executed on 4/2/09 |
| **Black Eagle Partners**<br>6905 Telegraph Road<br>Suite 205<br>Bloomfield Hills MI 48301<br>Phone: (303) 647-5348 | Financial | x | | | | | - NDA sent 3/30/09 |
| **ConAgra**<br>One ConAgra Drive<br>Omaha, NE 68102-5001<br>Phone: (402) 595-4000 | Strategic | x | | x | x | | - NDA executed on 3/25/09<br>- Sent facility information on 3/29/09<br>- Visit Lemoore facility on 4/7 |
| **Del Monte**<br>One Market @ The Landmark<br>San Francisco, CA 94105<br>Phone: (415) 247-3000<br>Fax: (415) 247-3565 | Strategic | x | | x | x | | - NDA executed on 3/26/09<br>- Sent facility information on 3/29/09<br>- Received diligence 3/30/09<br>- Site visit scheduled for 4/2-4/3 |
| **DiNapoli Capital Partners**<br>11726 San Vicente Blvd.<br>Suite 610<br>Los Angeles, CA 90049<br>Phone: 310-820-2820<br>Fax: 310-820-2840 | Financial | x | | x | | | - NDA sent 4/1/09<br>- NDA executed on 4/2/09 |
| **GI Partners**<br>2730 Sand Hill Road Suite 280<br>Lemoore, CA 93245<br>Phone: 650.233.3500<br>Fax: 650.233.3601 | Financial | x | | x | | | - NDA executed on 4/6/09 |

39



CHANIN CAPITAL PARTNERS
A Duff&Phelps Company

# Tier 1 Potential Buyers

| Company Name | Description | NDA Sent | Not Interested | Access to Data Room | Site Visit | Offer Received | D&P Comments |
|---|---|---|---|---|---|---|---|
| Growers A<br>564 Philan Circle<br>Lemoore, CA 93245 | Strategic | x | | | | x | - LOI Offer received 3/27/09- $50m for the Lemoore facility<br>- Possible involvement with Ingomar and Los Gatos |
| Growers B | Strategic | x | | | | | - DLA Piper representing the group of growers, requested NDA<br>- Executed 4/8 |
| Industrial Opportunity Partners<br>1603 Orrington Avenue<br>Suite 700<br>Evanston, IL 60201<br>Phone: 847-556-3460<br>Fax: 847-556-3461 | Financial | x | | x | | | - NDA sent 4/1/09<br>- NDA executed on 4/2/09 |
| LiDestri Foods, Inc.<br>815 W. Whitney Road<br>Fairport, NY 14450<br>Phone: 585-377-7700<br>Fax: 585-377-8150 | Strategic | x | | | | | - NDA sent 4/1/09<br>- Mark-up received 4/7/09 |
| Los Gatos Tomato Products<br>Woolfe Enterprises<br>PO Box 219<br>Huron, CA 93234<br>Phone: (559) 945-9292<br>Fax: (559) 945-2992 | Strategic | | | x | | | - NDA sent 4/6/09<br>- Executed NDA 4/7 |
| Monomoy Capital Partners, LP<br>142 West 57th Street<br>Seventeenth Floor<br>New York, NY 10019<br>Phone: (212) 699-4000<br>Fax: (212) 699-4010 | Financial | x | | x | | | - NDA sent 3/31/09<br>- NDA executed on 4/6/09 |
| The Neil Jones Food Company<br>1701 West 16th Street<br>Vancouver, WA 98666<br>Phone: 360-696-4356<br>Fax: 360-696-0050 | Strategic | x | | x | x | | - NDA sent 4/1/09<br>- NDA executed on 4/2/09<br>- Site visit; Williams 4/6, Lemoore 4/7 |
| Oaktree Capital Management, L.P.<br>333 South Grand Ave., 28th Floor<br>Los Angeles, CA 90071<br>Phone: (213) 830-6300<br>Fax: (213) 830-6293 | Financial | x | | x | | | - Executed NDA 4/1/09 |



CHANIN CAPITAL PARTNERS<br>A DuffPhelps Company

# Tier 1 Potential Buyers

| Company Name | Description | NDA Sent | Not Interested | Access to Data Room | Site Visit | Offer Received | D&P Comments |
|---|---|---|---|---|---|---|---|
| **Olam International**<br>#11-02, Suntec Tower 2,<br>9, Temasek Boulevard,<br>Singapore 038989<br>Tel +65 63-39-4100<br>Fax +65 63-39-9755 | Strategic | x | | x | | | - NDA executed between Mike McCormick (Duff does not have a copy)<br>- NDA executed on 4/6/09 |
| **Olympus Partners**<br>Metro Center One Station Place<br>Stamford, CT 06902<br>Phone: (203) 353-5900 | Financial | x | | | | | - NDA sent 4/6/09 |
| **Paine & Partners LLC**<br>950 Tower Lane<br>Suite 1150<br>Foster City, CA 94404<br>Phone: (650) 525-1200<br>Fax: (650) 525-1240 | Financial | | | x | | | - NDA sent 3/31/09<br>- NDA executed on 4/1/09 |
| **Platinum Equity, LLC**<br>360 North Crescent Drive South Building<br>Beverly Hills, CA 90210<br>Phone: 310-712-1850<br>Fax: 310-712-1848 | Financial | x | | x | | | - NDA sent 4/6/09<br>- NDA executed on 4/6/09 |
| **Prodos Capital Management LLC**<br>230 Park Avenue, Suite 1547<br>New York, NY 10169<br>Phone: 212-972-3619<br>Fax: 212-972-0010 | Financial | x | | x | | | - NDA sent 4/1/09<br>- NDA executed on 4/2/09 |
| **Red Gold, Inc.**<br>120 East Oak Street<br>Orestes, IN 46063<br>Phone: (765) 754-7527 | Strategic | x | | x | x | | - NDA executed on 3/31/09<br>- Received facility information on 3/31/09<br>- Site visits; Lemoore 4/6, Williams 4/7 |
| **Rio Bravo Tomato Company**<br>36889 Hwy 58<br>Buttonwillow, CA 93206<br>Phone: (661)764-9000 | Strategic | | | | | | - Conversation on 3/30, will respond by end of day with interest<br>- NDA sent on 3/30/09<br>- Will wait to pursue a transaction until after bankruptcy |
| **Sun Capital Partners**<br>11111 Santa Monica Boulevard<br>Suite 1050<br>Los Angeles, CA 90025 | Financial | x | | x | | | - Agreed upon NDA on 3/30/09<br>- Executed NDA received on 3/31/09 |



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

# Tier 1 Potential Buyers

| Company Name | Description | NDA Sent | Not Interested | Access to Data Room | Site Visit | Offer Received | D&P Comments |
|---|---|---|---|---|---|---|---|
| **San Pacific Products, Inc.**<br>7600 N. Ingram Ave., #135<br>Fresno, CA 93711<br>Phone: (559) 447-0844<br>Fax: (559) 447-0873 | Strategic | x | | x | | | - Discussed opportunity and NDA sent on 3/30/09<br>- Executed NDA received on 3/31/09<br>- Main interest is the Lemoore facility<br>- Facility information sent |
| **The Morning Star Company**<br>13448 Volta Road<br>Los Banos, Ca 93635<br>Phone: (209) 826-8000<br>Fax: (209) 826-8266 | Strategic | x | | | | | - Faxed NDA on 3/25/09<br>- Confirmed interest on 3/27/09 |
| **TreeHouse Foods**<br>Two Westbrook Corporate Center/Suite 1070<br>Westchester, IL 60154<br>Phone: (708) 483-1300 | Strategic | x | | x | x | | - Agreed upon NDA on 3/27/09<br>- Sent facility information on 3/30/09<br>- Site visit week of 4/13 |
| **Versa Capital Management**<br>Cira Centre<br>2929 Arch Street<br>Philadelphia PA 19104-2868<br>Phone: (215) 609-3400 | Financial | x | | x | | | - NDA sent 3/31/09<br>- Received executed NDA 4/1/09 |
| **Yucaipa Cos**<br>American Working Capital<br>70 West Madison Street<br>Suite 5720<br>Chicago IL 60602 | Financial | x | x | | | | - NDA sent 3/31/09 |
| **General Mills**<br>1 General Mills Blvd<br>Minneapolis MN 55426-1347<br>Phone: (763) 764-7600 | Strategic | | x | | | | - Initial discussions to purchase facility on 3/28/09<br>- Not interested in purchasing plant and moving volume from SK |
| **Golden Gate Capital**<br>One Embarcadero Center<br>39th Floor<br>San Francisco CA 94111 | Financial | | x | | | | - Passed on opportunity 3/27/09 |
| **HEICO Corporation**<br>5600 Three First National Plaza<br>Chicago IL 60602 | Financial | | x | | | | - Not interested |
| **Hitco Equity**<br>One Northbrook Place<br>5 Revere Drive, Suite 300<br>Northbrook IL 60062 | Financial | | x | | | | - Not interested |



CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company

42

# Tier 1 Potential Buyers

| Company Name | Description | NDA Sent | Not Interested | Access to Data Room | Site Visit | Offer Received | D&P Comments |
|---|---|---|---|---|---|---|---|
| Pacific Coast Producers<br>631 N. Cluff Avenue<br>Lodi, CA 95240<br>Phone: (209) 367-8000<br>Fax: (209) 367-1084 | Strategic | x | x | | | | - As a stand-alone transaction this is outside the company's capabilities and capital strategy |
| Seneca Foods Corporation,<br>3736 South Main Street<br>Marion, NY 14505<br>Phone: (315) 926-8100<br>Fax: (315) 926-8300 | Strategic | | x | | | | - Not interested |

CHANIN CAPITAL PARTNERS
A DUFF&PHELPS Company