FILED
November 17, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003082826

22 Pages

STEVEN H. FELDERSTEIN, State Bar No. 056978
PAUL J. PASCUZZI, State Bar No. 148810
TANIA M. MOYRON, State Bar No. 235736
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA  95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
sfelderstein@ffwplaw.com
ppascuzzi@ffwplaw.com
tmoyron@ffwplaw.com

MALCOLM S. SEGAL, State Bar No.  075481
SEGAL & KIRBY
770 L Street, Suite 1440
Sacramento, California  95814
Telephone:  (916) 441-0828
Facsimile:  (916) 446-6003
msegal@segalandkirby.com

Attorneys for Scott Salyer, individually and as
Trustee of the Scott Salyer Revocable Trust, and the
Scott Salyer Revocable Trust

*Please see continuation page for a complete list of the moving parties and their respective counsel.*

## UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California limited partnership, et al.,<br><br>            Debtors. | CASE NO.: 09-29162-D-11<br>Chapter 11<br><br>DCN:  SH-76<br><br>Date:  December 6, 2010<br>Time:  9:30 a.m.<br>Place:  Courtroom 34<br>       501 I Street, 6th Floor<br>       Sacramento, CA  95814<br>Judge: Hon.  Robert S. Bardwil |

**DECLARATION OF JOHN P. BRINCKO IN SUPPORT OF SUPPLEMENTAL OBJECTION TO MOTION TO APPROVE COMPROMISE BETWEEN TRUSTEE AND BANK OF MONTREAL AS AGENT FOR SECURED LENDERS PURSUANT TO FEDERAL RULE OF BANKRUPTCY 9019**

**CONTINUATION SHEET:  PARTIES**

**AND THEIR RESPECTIVE COUNSEL**

| | |
|---|---|
| STEVEN H. FELDERSTEIN, State Bar No. 056978<br>PAUL J. PASCUZZI, State Bar No.  148810<br>TANIA M. MOYRON, State Bar No. 235736<br>FELDERSTEIN FITZGERALD WILLOUGHBY & PASCUZZI LLP<br>400 Capitol Mall, Suite 1450<br>Sacramento, California  95814<br>Telephone:  (916) 329-7400<br>Facsimile:  (916) 329-7435<br>sfelderstein@ffwplaw.com<br>ppascuzzi@ffwplaw.com<br>tmoyron@ffwplaw.com<br><br>Counsel for Scott Salyer, individually and as trustee of the Scott Salyer Revocable Trust, and the Scott Salyer Revocable Trust | ANDREA M. MILLER, State Bar No.  88992<br>NAGELEY MEREDITH & MILLER, INC.<br>8001 Folsom Boulevard, Suite 100<br>Sacramento, California  95826<br>Telephone:  (916) 386-8292<br>Facsimile:  (916) 386-8952<br>amiller@nmlaw.com<br><br>Counsel for SK PM Corp., SK Foods, LLC, SKF Canning, LLC, Blackstone Ranch Corporation, Monterey Peninsula Farms, LLC, Salyer Management Company, LLC, SK Farms Services, LLC, SK Frozen Foods, LLC, SS Farms, LLC, SSC Farming, LLC, SSC Farms I, LLC, SSC Farms II, LLC, SSC Farms III, LLC, SKF Aviation, LLC, and CSSS, LP d/b/a Central Valley Shippers |
| MALCOLM S. SEGAL, State Bar No. 075481<br>SEGAL & KIRBY<br>770 L Street, Suite 1440<br>Sacramento, California  95814<br>Telephone:  (916) 441-0828<br>Facsimile:  (916) 446-6003<br>msegal@segalandkirby.com<br><br>Counsel for Scott Salyer, individually and as trustee of the Scott Salyer Revocable Trust, and the Scott Salyer Revocable Trust | |

I, John P. Brincko, declare:

1.    I have personal knowledge of the facts stated herein. I can testify that said facts are true and correct:

### Qualifications

2.    I am President of the Sitrick Brincko Group, a subsidiary of Resources Connection, Inc. Sitrick Brincko Group, LLC is an international consulting firm specializing in turnaround and restructuring services, crisis communications, and public relations. I graduated from the Bernard Baruch School of Public & Business Administration of the City University of New York with a B.B.A. in Accounting. I was a Certified Public Accountant in New York State from 1969 through 1978. My professional resume, which describes my business experience, professional standing, and education, is attached hereto as Exhibit 1.

3.    During the course of my career, I have overseen the restructuring of more than fifty companies and have handled restructurings both in and outside bankruptcy proceedings. My work at those companies has included performing liquidation, financial, and restructuring analyses and testifying as a financial expert in a broad range of matters, including testimony regarding valuation of business assets, liquidation analyses, business plan feasibility, litigation damage assessments, intellectual property values and damages, and debtor-in-possession financing, in a number of United States Bankruptcy Courts. I have provided written and/or oral testimony as an expert in connection with liquidation analyses and business valuations and viability in the following bankruptcy cases: In re Spansion, Inc., Case No. 09-10690-KJC (Bankr. D. Del.); In re Barneys, Inc., Case No. 96-40113-CB (Bankr. S.D.N.Y.); In re Knudsen Foods, Inc., 86-17344-BR (Bankr. C.D. Cal.); In re Foremost Dairies, Inc., 86-14505-BR (Bankr. C.D. Cal.); In re Copeland's Enterprises, Inc., 06-10853-MFW (Bankr. D. Del.); and In re STR, Inc. aka Strouds, 00-03552-RB (Bankr. D. Del.), to name just a few.

4.    I have provided turnaround, crisis management, and bankruptcy services to companies and their constituents, including secured and unsecured creditors, federal and state fiduciaries, and other interested parties. My work experience include serving as President and CEO of CalComp Technology, Inc., a publicly held subsidiary of Lockheed Martin Corporation;

1

President and COO for Barneys New York, the specialty retain chain; CEO for Sahlen Associates and its subsidiary, Globe Securities, at one time the third largest security services company in the nation; President and CEO of Sun World International, a worldwide marketer of fresh fruits and vegetables; CEO of Knudsen Foods, a $2 billion food services company; President, CEO and Board member of Consolidated Freightways, a $2 billion transportation company; CEO of Strouds, the Linen Company, a publicly traded company.  I have also served as bankruptcy trustee, CEO, and/or CRO for companies under Chapter 11 protection, including Spansion, Inc., the leading flash memory chip supplier for phone, auto, camera, and TV applications; National Consumer Mortgage, which was involved in a major Ponzi scheme; Metabolife International, the diet supplement manufacturer; Franchise Pictures, a major motion picture production company; and, Copeland's Sports, a West Coast chain of sporting goods stores.

5.     I have served as a court-appointed receiver and a Chapter 11 trustee in a variety of industries.  Specifically, I have served as a court-appointed receiver for manufacturing and real estate companies, and I have served as a Chapter 11 trustee in the consumer products and mortgage industries.  I have also served as a financial and restructuring advisor to numerous agribusinesses companies such as Beatrice Foods, Sunkist and Del Monte; and I have been involved with major tomato growing and packing operations and with most major agricultural products grown in California.

### Scope of Assignment

6.     I was engaged by the Objecting Parties[1] to analyze the value of the Lenders' Prepetition Collateral in order to determine the extent, if any, of the diminution of  the value of that Prepetition Collateral during the pendency of, and due to the imposition of the automatic stay in this Chapter 11 bankruptcy.  The purpose of this exercise was to establish the amount of any super priority claim of the Lenders pursuant to section 507(b) of the Bankruptcy Code due to the diminution in value of the Lenders' Prepetition Collateral.  With that goal in mind, I employed two

---

[1] Capitalized terms used but not otherwise defined in this declaration shall have the meanings ascribed to them in the Supplemental Objection.

DECLARATION OF JOHN P. BRINCKO IN SUPPORT OF SUPPLEMENTAL OBJECTION

approaches which I will detail further below: first, a liquidation value analysis of the Lenders' Prepetition Collateral as of the Petition Date to compare against the actual and anticipated recoveries in the liquidation of the Debtors' estates, and second, a review of the postpetition cash disbursements to identify those disbursements that were (a) incurred as a necessary cost of liquidating the Lenders' Prepetition Collateral; (b) converted into other forms of collateral; and/or (c) used to acquire or create new postpetition replacement collateral.

### Liquidation Value Analysis

7.      In order to ascertain the extent of the diminution of the Lenders' Prepetition Collateral, I prepared a liquidation value analysis of the Lenders' Prepetition Collateral as of the Petition Date (the "Liquidation Analysis"), which I believe to be the proper methodology to value a super priority claim under section 507(b) of the Bankruptcy Code.  A summary chart setting forth the results of my Liquidation Analysis and the assumptions underlying such analysis are attached hereto as <u>Exhibits 2</u> and <u>3</u>, respectively.  Based on my experience and the materials I have reviewed to date, I believe the assumptions to be reasonable under the circumstances.

8.      The financial data and material I employed in preparing my Liquidation Analysis was obtained from the Debtors' schedule of assets and liabilities and monthly operating reports, the Court's final cash collateral order, and various other public filings made in this case.  Based on my expert knowledge and experience in liquidating assets in similar circumstances, I determined that the range of value the Lenders could expect to receive if they had foreclosed upon and liquidated their collateral as of the Petition Date is between $52.5 million and $69.5 million (the "Lenders Net Liquidation Recovery").  I arrived at this value by first calculating the sum of estimated recoveries that could have reasonably been obtained in liquidating the Debtors' property, which ranged from $62.9 million to $79.9 million.  The specific, estimated recovery rate for each asset type is listed on Exhibit 2, and, I believe, each falls within a reasonable range for such assets and the circumstances of a hypothetical foreclosure by the Lenders.  I then subtracted from that amount: (i) estimated costs incurred in winding down the Debtors' business operations, and (ii) amounts paid or set aside

1  to satisfy claims senior to those held by the Lenders.  In this case, the estimated wind down costs
2  and required priority payments totaled $10.4 million.

3      9.    Having determined the reasonable range of values for the Lender's Net Liquidation
4  Recovery, in order to arrive at the potential diminution in value of the Lenders' Prepetition
5  Collateral during the pendency of the bankruptcy proceedings, I subtracted from this range the
6  $67.3 million which the Lenders have already collected to date as well as estimated additional net
7  recoveries (assuming no settlement with the Lenders) for remaining assets of between $3.2 million
8  and $8.4 million.  The result is an estimated total recovery to the Lenders of $70.5 million to $75.7
9  million.  This analysis actually yields net recoveries for the Lenders in excess of liquidation value
10  of between $6.2 million and $18.0 million.  As such, the Lenders will receive more than the value
11  of their Prepetition Collateral.  Therefore, I have concluded that the Lenders' Prepetition Collateral
12  did not diminish in value during the case and thus such an analysis cannot support a super priority
13  claim on behalf of the Lenders.

14                          **Cash Disbursements Analysis**

15      10.    Secondly, in order to determine the extent, if any, to which the Lenders' Prepetition
16  Collateral has been diminished through the use of their Cash Collateral in the bankruptcy cases, I
17  have analyzed the use and consumption of the Lenders' Cash Collateral during the pendency of the
18  bankruptcy cases and compared this amount with the amounts that would have been consumed by
19  the Lenders if they chose to exercise their rights to foreclose and liquidate the assets—i.e., a non-
20  bankruptcy scenario.  Based on my experience, secured creditors in the Lenders' position would
21  have employed a receivership process to sell the Lenders' collateral.  Specifically, the Lenders
22  would have concluded that disposing of their collateral in a manner that allowed a buyer or buyers
23  to continue to operate the underlying business as a going concern would result in the highest
24  recovery on such collateral.  The Lenders would employ a receivership to accomplish this goal
25  because lenders would be highly reluctant to continue to operate the business as a lenders-in-
26  possession, and a receiver would insulate lenders from any exposure for operating the business
27  directly, pending a sale.  For these reasons, a disposition of the collateral outside of bankruptcy
28  court would not be fundamentally different than the disposition that occurred in this case.

                                    4

11.    In performing this analysis, therefore, I reviewed the Debtors' postpetition cash disbursements and identified those disbursements that were (a) incurred as a cost of liquidating the Lender's collateral; (b) converted into other forms of collateral; and/or (c) used to acquire or create new postpetition replacement collateral (the "Cash Disbursements Analysis").  I have also reviewed Stan Speer's declaration as well as his deposition testimony regarding same.

12.    In connection with this analysis, I reviewed the fee and expense statements filed by the Trustee and its professionals, the proposed settlement agreement with the Bank of Montreal (the "BMO Settlement Agreement"), as well as the materials I considered in preparing my Liquidation Analysis.  In some instances, it was difficult to determine the work performed from the fee statements.  In those cases, I did not attribute such fees as a benefit to the Lenders or a cost of collection of collateral.  Nonetheless, I consider those determinations preliminary, and subject to further review upon better information.  A summary chart setting forth the results of my review professional fees and expenses is attached hereto as Exhibit 4.

13.    With respect to the uses of Lenders' cash collateral described in Stan Speer's declaration and upon review of his testimony explaining such uses, it is easy for me to conclude that the uses of cash other than with respect to fees and expenses all benefited the Lenders.  For example, Mr. Speer attributes $11.2 million in postpetition (presale) operating costs to the diminution in value of the Lenders' Prepetition Collateral.  However, Mr. Speer concedes that these funds were consumed in the continued operation of the underlying business presale, which was essential to the consummation of the sale.  Indeed, embedded within that $11.2 million , was a disbursal of $2.5 million for new inventory.  In view of the fact that the Lenders obtained a replacement lien on that new inventory under the Court's cash collateral order, that $2.5 million postpetition expenditure prior to June 2009 most likely would have enhanced rather than reduced the Lenders' collateral.

14.    The other items similarly benefited the Lenders' realization upon their collateral.  Specifically, each of the wind down expenses, costs to collect accounts receivable and dispose of inventory and other runoff costs from operations would have been required of the Lenders' in any

DECLARATION OF JOHN P. BRINCKO IN SUPPORT OF SUPPLEMENTAL OBJECTION

1  scenario, including the liquidation of their collateral outside of bankruptcy, and certainly in

2  connection with a receivership.

3       15.    With respect to fees and expenses, my analysis was more detailed.  Based upon my

4  review of specific fee statements and analysis of the  tasks performed by various professionals, I

5  have determined that the majority of the expenses paid from the Cash Collateral were necessary in

6  order to effect the liquidation of the Prepetition Collateral.  As listed on Exhibit 4, I have

7  determined that approximately $7.6 million of the professional fees and expenses incurred in

8  connection with the Chapter 11 case were related to, incurred in connection with or necessary for

9  the collection and disposition of the Lenders' collateral.  For example, such fees and expenses were

10 incurred in connection with consummating the sale transaction, ensuring the continued operation of

11 the business pending the sale, and the following administrative tasks: filing monthly accounting

12 reports, retaining professionals and submitting fee statements on behalf of those professionals, all

13 of which would have also been required in connection with a receivership.  It is important to bear

14 in mind that these are fees and expenses "incurred," meaning that the Lenders retain the right to

15 complain that such amounts should not be "expended" from their collateral.

16      16.    These uses of collateral ignore the generation of new postpetition replacement

17 collateral, including, for example, between $900,000 and $1.4 million in potential preference

18 recoveries, which would have mitigated any use of collateral.  These figures lend further support to

19 my earlier conclusion, based independently on the Liquidation Analysis, that there was little, if any,

20 diminution in value of the Lenders' Prepetition Collateral.

21      If further information becomes available, I reserve the right to amend my declaration

22 accordingly.  I declare that under penalty of perjury under the laws of the United States of America

23 and the State of California that the foregoing is true and correct.

24      Executed this 17th day of November 2010 in Los Angeles, California.

25

26

27

28                                    John P. Brincko

                                      6

# EXHIBIT 1

# JOHN P. BRINCKO

530 Wilshire Blvd., Suite 201
Santa Monica, CA 90401
(310) 553-4523   (310) 553-6782 *fax*

BUSINESS EXPERIENCE:

| | |
|---|---|
| 11/2009 to Present | **President** <br> SITRICK BRINCKO GROUP, LLC <br> International Management and Communications Consultants |
| 1979 to 11/2009 | **President and Chief Executive Officer** <br> BRINCKO ASSOCIATES, INC. <br> International Management Consultants |
| 1976 to 1979 | **Senior Vice President, Chief Financial Officer and Acting Chief Operating Officer** <br> MAX FACTOR & CO. - Sales: $550 Million+ <br> Hollywood, CA <br><br> Report to CEO of multinational company involved in 38 countries. |
| 1973 to 1976 | **Corporate Controller** <br> AMERICAN HOME PRODUCTS CORPORATION - <br> Sales: $4 Billion+ <br> New York, NY |
| 1971 to 1973 | **Corrugated Division Chief Financial Officer** <br> $400 Million Sales; $185 Million Capital employed <br> INTERNATIONAL PAPER COMPANY - Sales: $5 Billion+ <br> New York, NY |
| *1965-1970* | ***Audit Supervisor*** <br> *PEAT, MARWICK, MITCHELL* <br> *New York, NY* |
| 1961-1965 | **Accounting Clerk** <br> Grey Advertising – Revenue $1.3 Billion <br> New York, NY |
| EDUCATION: | B.B.A. Accounting, January, 1965 - Bernard Baruch <br> School of Public & Business Administration, <br> City University of New York |

Exhibit 1

**John P. Brincko**

MAJOR CLIENT ASSIGNMENTS:

- Financial advisor, claims and expert witness consultant for the Claims Agent for Spansion Inc.  Sitrick Brincko Group was hired by Akin Gump Strauss Hauer & Field LLP, attorneys for the Claims Agent, to assist in the evaluation and resolution of disputed claims in excess of $1 billion and to evaluate and resolve certain avoidance actions, including acting as expert witness for Spansion in these actions.

- Lead damages expert witness for major financial services company in $2 billion lawsuit before the American Arbitration Association ("AAA").  The lawsuit was filed by XYZ Corporation for fraud, breach of contract and malpractice/negligence.  The lawsuit stems from a major, collusive accounting fraud perpetrated by the management and key employees of XYZ Corporation.  I was retained by client's counsel to review the report submitted by XYZ's damages expert, and draft a report setting forth my opinions regarding the validity of their damages expert's analysis and opinions.  This case is ongoing and currently being tried before the AAA.

- Chief Restructuring Officer ("CRO") of Spansion Inc., the leading flash memory chip supplier for phone, auto, camera, and TV applications.  The company lost approximately $600 million in 2008 and filed for bankruptcy in March 2009.  I was responsible for all restructuring activities, evaluating the existing management team for a new CEO, and assisting in negotiating the plan of reorganization.  As a result of my efforts, the company is now profitable and has built a cash position from $30 million at the time of filing to over $300 million as of February 2010.  The company exited bankruptcy in May 2010.

- President and CEO of CalComp Technology, Inc., a publicly held subsidiary of Lockheed Martin.  I directed the sale and/or winding down of their worldwide operations with personnel recruited to assist this effort, resulting in significant cost savings exceeding a target developed by Lockheed Martin.

- President and COO of Barneys New York, the specialty retail chain.  Barneys had experienced questionable financial practices.  I restored credibility, negotiated new financing, recruited and developed a new senior management team, hired outside advisors, and performed a turnaround, which resulted in an exit from bankruptcy with new ownership.

- CEO of Sahlen Associates and its subsidiary, Globe Security, at one time the third largest security services company in the nation.  I was recruited by the Board of Directors after members of senior management were convicted of securities fraud.  I brought in a new management team to restore profitable operations, restated financial statements, and reconstructed financial and operational data.  My efforts resulted in a strategic sale to a competitor, Borg Warner Security.

- President and CEO of Sun World International, a worldwide marketer of fresh fruits and vegetables.  Sun World filed for bankruptcy as a result of the uncovering of significant

Exhibit 1

fraudulent operating and financial activities.  I brought in an entirely new management team, negotiated new financing, and turned the company around, resulting in significant profits and a subsequent sale.

- CEO of Knudsen Foods, a $2 billion food services company.  I directed all restructuring activities, brought in over 20 people to run the company after all the executives resigned, and managed turnaround efforts.  My tenure as CEO resulted in the sale of all the company's divisions with significant recoveries for unsecured creditors.  Most of these operations are currently divisions of Kraft Foods and Dean Foods.

- President and CEO of Consolidated Freightways, a $2 billion transportation company.  My tenure resulted in overachievement in asset sales and recoveries.

- CEO of Strouds, the Linen Company, a publicly traded company.  This engagement resulted in a successful restructuring and sale to an investor group and senior management.

- I have also served as bankruptcy trustee, CEO and/or CRO for other companies under Chapter 11 protection, including National Consumer Mortgage, which was involved in a major Ponzi scheme, Metabolife International, the diet supplement manufacturer, Franchise Pictures, a major motion picture production company, and Copeland's Sports, a West Coast chain of sporting goods stores.

Exhibit 1

**John P. Brincko**

---

**President**

On November 20, 2009, Brincko Associates merged with Sitrick & Company.  The merged entity, the Sitrick Brincko Group, was simultaneously acquired by Resources Connection.  John P. Brincko is now President of the Sitrick Brincko Group, a wholly-owned subsidiary of Resources Connection. Sitrick Brincko Group continues to specialize in the same services that Brincko Associates offered.

Mr. Brincko's background includes 34 years of executive, financial and operational management experience.  Since forming his firm in 1979, Mr. Brincko and his associates have provided personalized advisory and interim management services to financially troubled companies and their investors.  He has served as president and chief executive officer of over fifty companies, ranging in size from $50 million to over $2 billion.   His experience encompasses turnarounds, mergers and acquisitions, investment feasibility, cost reduction programs and divestitures. Brincko Associates has been named one of the top outstanding turnaround firms every year for the last 11 years by "Turnarounds & Workouts," an independent trade publication of the Beard Group, Inc.

Currently, Mr. Brincko serves as CRO of Franchise Pictures, a motion picture production company which has released over seventy films.  He has served as CRO of Spansion Inc., the largest flash memory solution company in the world, and is assisting Spansion's Claims Agent in the evaluation and resolution of disputed claims in excess of $1 billion and certain avoidance actions.  He also has served as financial advisor to Special Devices, Inc. and was appointed Chapter 11 Trustee of National Consumer Mortgage and Metabolife International, Inc.   Mr. Brincko served as CEO to a leading consumer food company, and as President and CEO of Consolidated Freightways, an independent worldwide transportation and logistics company.  Mr. Brincko also served as CEO of CalComp Technology, a publicly traded subsidiary of Lockheed Martin, and CEO of Strouds, a publicly traded specialty bed, bath and linen retailer, which he sold to an investor group.  Mr. Brincko also served as President and CEO of Mossimo Inc., a NYSE-listed fashion apparel manufacturer and retailer. Furthermore, he was President and COO of Barneys New York, the $400 million retailer of upscale men's and women's clothing and accessories.

Prior to forming his own firm, Mr. Brincko was senior vice president, chief financial officer and acting chief operating officer of Max Factor.  He also held executive management positions with American Home Products, International Paper Company and Peat, Marwick, Mitchell.  Mr. Brincko was licensed as a certified public accountant in the state of New York from 1969 through 1978.

Mr. Brincko has testified in bankruptcy courts in Delaware, New York and California.

Exhibit 1

# EXHIBIT 2

**SK Foods L.P.**
**Liquidation Analysis as of Petition Date**
(in thousands)

| | Book Value as of Petition Date (1) | Estimated Recovery % | | Estimated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Cash | $12,885 | 100% | 100% | $12,885 | $12,885 |
| Gross Accounts Receivable (2) | $29,950 | 60% | 70% | $17,970 | $20,965 |
| Inventory (excludes packaging & bill & hold) (3) | $44,638 | 38% | 55% | $17,090 | $24,555 |
| | $87,473 | | | $47,945 | $58,405 |
| | | | | | |
| Fixed Assets (4) | $127,014 | 12% | 17% | $14,968 | $21,494 |
| Total | **$214,488** | **29%** | **37%** | **$62,913** | **$79,899** |
| | | | | | |
| Less Wind down and priority payments: | | | | | |
| PACA Collateral | | | | ($2,000) | ($2,000) |
| Letter of credit | | | | ($2,838) | ($2,838) |
| Wind down Costs | | | | ($5,560) | ($5,560) |
| Total | | | | ($10,398) | ($10,398) |
| **Net Recovery for secured lender after winddown expenses** | | | | **$52,515** | **$69,501** |
| | | | | | |
| **BMO Secured Lender Recoveries:** | | | | | |
| Recovered through September 2010 | | | | $67,269 | $67,269 |
| Estimated additional net recoveries assuming no settlement | | | | $3,219 | $8,442 |
| **Estimated total recoveries** | | | | **$70,488** | **$75,711** |
| | | | | | |
| **Recoveries in excess of liquidation value** | | | | **$17,973** | **$6,209** |

(1) Source:  Chapter 11 Schedules except for cash balance.   The starting cash balance is per the May 2009 MOR.

(2) The 60-70% range was used due to disputed AR and claimed rights of offsets,for example: Kraft Foods $4.3 million claim; B&G settlement of $1.6 million for a $3.5 receivable as of petition date; disputed $1.2 million receivable from Cedenco Australia.

(3) Used the same proportion of type of goods as listed in the first MOR in order to classify the inventory: 19% raw materials, 4% work-in-progress and 77% finished goods.  This analysis used the gross inventory amount as of the petition date and reduced it by the "bill and hold" inventory (inventory that had been sold but had not yet been shipped to the buyer).

(4) This analysis looked at the schedules and identified the book value of the fixed assets and, based on my past experience when liquidating manufacturing equipment, I  have calculated that the estimated recovery percentage would be between 10-15%.  This analysis shows an estimated recovery higher by $942K in the low to $1.2 million in the high range to the Chanin Forced Liquidation Analysis.

# EXHIBIT 3

**Liquidation Analysis Assumptions**

### I.  Cash

Cash is the actual cash balance as stated in the May 2009 Monthly Operating Report (the "MOR").  There was a discrepancy in the starting cash balance between the Chapter 11 Schedules and the MOR.  The Chapter 11 Schedules showed a starting cash balance of $14.4 million and the MOR showed a starting cash balance of $12.9 million.  My analysis used the $12.9 million amount.  The Trustee, Bradley Sharp, testified in his deposition of November 12, 2010 that the correct starting cash balance was $12.9 million.

### II. Gross Accounts Receivable

The gross accounts receivable (the "AR") represents the AR balance of $29.9 million as of the Petition Date as shown in the Chapter 11 Schedules.  A range of recovery of 60% to 70% was used because of AR disputes and claimed rights of offsets from several of the payors.   It is my experience that in a liquidation scenario, it is common for there to be disputes with your customers due to pricing disputes, quality issues, etc.  Following are some examples of actual ongoing disputes related to this case:

> a. Kraft Foods is disputing a payment it made for $4.3 million, claiming that it was paid in error and the money was not owed.  They argue that they were overcharged for goods in the past and cite a specific example of overpricing totaling $1.62 million.  It is unlikely that the settlement with Kraft will be for the full amount.
>
> b. B&G showed a receivable of $3.5 million as of the Petition Date.  This receivable has been settled for $1.6 million.
>
> c. There is a $1.2 million receivable from Cedenco Australia that is disputed.

Due to these and other disputes, in the low case I estimate a recovery of $18 million and in the high case $21 million. These numbers reflect a slightly higher recovery than Mr. Speer's estimated range of $17.7 million to $20.1 million.

### III.  Inventory

I used the gross inventory as of the Petition Date as shown in the Schedules and reduced it by the "bill and hold" inventory.  Bill and hold inventory are goods that have been sold and paid for but have not yet been shipped.  Stan Speer also excluded the "bill and hold" inventory from his analysis, see Exhibit A to his declaration.  In addition, this type of inventory was excluded from the borrowing base calculation as ineligible inventory.

---

The inventory as shown in the Schedules did not differentiate between raw materials, work-in-progress and finished goods.  The first MOR broke down the inventory as 19% raw materials, 4% work-in-progress and 77% finished goods.  I have used this percentage to breakdown the inventory as of the Petition Date.[1]  For raw materials, I estimated a recovery range of 10-20%; for work-in-progress, I estimated a recovery of 0% and for finished goods, I estimated a recovery of 50-70%.  I used an average recovery range of 38% in the low case to 55% in the high.  This range is roughly consistent with the Chanin Forced Liquidation Analysis range of 41% to 54%, see page 27 of the Chanin report.  This calculates to an estimated recovery of $17.1 million in the low to $24.6 million in the high range.

The actual sales proceeds, after deducting what was identified by the Trustee in the MOR as direct costs related to inventory, such as additional purchases, direct labor and freight in, was $27 million.   It is important to note that the sale of inventory has been conducted over a longer period of time than would normally occur in a liquidation scenario.  This, coupled with the premiums that have been paid by some of the purchasers of the "bill and hold" inventory to receive delivery of such inventory from the Trustee, has translated to greater collections than would be the case in a forced liquidation.  But, there are charges claimed by Olam for storage and handling of the inventory that remained at the plants after the sale to Olam, which may offset that higher recovery.  Per letter from Olam dated July 2, 2010, Olam is claiming charges totaling $3.2 million for storage, handling, and bin charges.

The table below shows my analysis:

| Inventory Type | % | Amount | % Low | % High | Estimated Value Low | Estimated Value High |
|---|---|---|---|---|---|---|
| Raw Material | 19% | $10,495 | 10% | 20% | $1,049 | $2,099 |
| Work-in-progress | 4% | $2,063 | 0% | 0% | $0 | $0 |
| Finished Goods | 77% | $43,012 | 50% | 70% | $21,506 | $30,108 |
| Bill and Hold | | ($10,931) | 50% | 70% | ($5,466) | ($7,652) |
| | | $44,638 | | | $17,090 | $24,555 |
| | | | | | | |
| Over all % Recovery | | | | | 38% | 55% |
| | | | | | | |
| Chanin % in forced liquidation | | | | | 41% | 54% |
| Difference | | | | | -3% | 1% |

---

[1]     Bradley Sharp, the Trustee, stated in his deposition of November 12, 2010 that the initial MOR inventory breakdown percentage was a reasonable proxy as of the Petition Date.

### IV.  Fixed Assets

I have used the book value as of the Petition Date as shown in the Schedules as a starting point.  My assumption in a liquidation scenario is that the manufacturing equipment would be auctioned off piecemeal to the highest bidder.  It has been my experience that, when auctioning off manufacturing equipment in a forced liquidation scenario, the rate of recovery is generally within a range of 10% to 15%.

The real property would be sold separately and, because in a liquidation scenario the sale price must be low enough to attract buyers willing to make a quick purchase, I have estimated the recovery to be 25% in the low case to 50% in the high case.  This is a reasonable expectation since prospective buyers would need to deal with zoning issues, environmental issues and other issues associated with commercial property of this nature.

I derived the recovery estimate for Other Fixed Assets largely because Other Fixed Assets consists almost entirely of computer software programs that would be difficult, if not impossible, to sell.

My analysis shows a higher recovery than the Chanin Forced Liquidation Sale Analysis, by $942K in the low case to $1.2 million in the high case.   The table below shows my analysis:

| Assests per Schedules | Book Value as of Petition Date | Estimated Recovery % | | Estimated Recovery $ | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Lemoore Real Property | $1,200 | 25% | 50% | $300 | $600 |
| Williams Real Property | $1,725 | 25% | 50% | $431 | $863 |
| Hawaii and Lake Tahoe | $4,484 | 70% | 75% | $3,139 | $3,363 |
| Lemoore Fixed Assets | $64,725 | 10% | 15% | $6,473 | $9,709 |
| Lemoore leased equipment | $5,681 | 0% | 0% | $0 | $0 |
| Williams Fixed Assets | $44,996 | 10% | 15% | $4,500 | $6,749 |
| Other Fixed Assets and L/T assets | $4,203 | 3% | 5% | $126 | $210 |
| Total Fixed Assets per Schedules | $127,014 | 12% | 17% | $14,968 | $21,494 |
| | | | | | |
| Per Chanin Forced liquidation | | | | $14,026 | $20,273 |
| | | | | | |
| Brincko Estimate versus Chanin Estimate for Fixed Assets in a Forced Liquidation | | | | $942 | $1,221 |

## V.  Wind-Down and Priority Payments:

The estimated recoveries have been reduced by the following amounts: PACA collateral for $2 million, Letter of Credit for $2.8 million as well as my estimation of wind-down costs $5.56 million.


## VI.  Estimated Additional Net Recoveries Assuming No Settlement

I have reviewed the actual recoveries to date and have estimated what might still be recovered.  As shown in the table below, both the low and the high cases show a higher recovery than my estimated liquidation valuation analysis, as of the Petition Date.   The table below shows my analysis:

|  | Estimated Recovery $ | |
| --- | --- | --- |
|  | Low | High |
| Actual recoveries through September 2010 | $67,269 | $67,269 |
| B&G Food - AR settlement | $1,600 | $1,600 |
| Hawaii Property (listed at $1.55 million) - estimated net recovery | $750 | $1,000 |
| Trade Receivables from Australia | $0 | $1,244 |
| Kraft Reserve | $0 | $2,694 |
| Refunds Split dollar life insurance | $0 | $635 |
| Olam Wastewater 2010 | $519 | $519 |
| Estimated Remaining Preference Recoveries | $750 | $1,250 |
| Estimated cost to recover amounts above | ($400) | ($500) |
| Estimated additional recoveries | $3,219 | $8,442 |
| Estimated Overall Recovery | $70,488 | $75,711 |
| Liquidation Value (low case from Exhibit 2) | $52,515 | $52,515 |
| Excess collections | $17,973 | $23,195 |
| Liquidation Value (high case from Exhibit 2) | $69,501 | $69,501 |
| Excess collections | $987 | $6,209 |

# EXHIBIT 4

**SK Foods L.P.**
**Summary of Review of Professional Fees**
**(in thousands)**

| Firm | Fee applications | Fees incurred in connection with liquidation of Lenders collateral | Fees incurred in connection with other matters including fees requiring further analysis |
|---|---|---|---|
| Schnader Harrison Segal & Lewis LLP (1) | $5,440 | $4,163 | $1,277 |
| Development Specialists, Inc. (1) | $1,894 | $1,300 | $594 |
| Winston & Strawn, LLP (1) | $1,348 | $1,109 | $240 |
| Downey Brand LLP (2) | $396 | $0 | $396 |
| Duff & Phelps and Chanin Partners (1) | $1,133 | $1,012 | $121 |
| Duncan Cotterill (1) | $30 | $0 | $30 |
| BMC Group, Inc. (2) | $358 | $0 | $358 |
| Eichstaedt & Deveraux (1) | $175 | $0 | $175 |
| McGrane Greenfield LLP (1) | $62 | $62 | $0 |
| US trustee fees (2) | $91 | $0 | $91 |
| | $10,926 | $7,646 | $3,281 |

(1) Reflects total of all fee applications submitted.   There are some discrepancies in the fee applications themselves.
    Thus the actual figures may vary slightly.
(2) Reflects paid and unpaid fees per September MOR report.