FILED
November 24, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0003098502

**8 PAGES**
Gregory C. Nuti (CSBN 151754)
Kevin W. Coleman (CSBN 168538)
Melissa S. Lor (CSBN 245515)
SCHNADER HARRISON SEGAL & LEWIS LLP
One Montgomery Street, Suite 2200
San Francisco, California 94104-5501
Telephone: 415-364-6700
Facsimile: 415-364-6785
gnuti@schnader.com
kcoleman@schnader.com
mlor@schnader.com

Attorneys for Bradley D. Sharp,
Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>SK FOODS, L.P., a California limited partnership,<br><br>Debtor. | Case No. 09-29162-D-11<br>(Substantively Consolidated)<br>Chapter 11<br><br>DC No. SH-76 |
| In re :<br><br>RHM INDUSTRIAL/SPECIALTY FOODS, INC., a California Corporation, d/b/a Colusa County Canning Co.,<br><br>Debtor. | Case No. 09-29161-D-11<br>(Substantively Consolidated)<br>Chapter 11<br><br>DC No. SH-76<br><br>**REPLY TO SUPPLEMENTAL OBJECTIONS TO COMPROMISE BETWEEN TRUSTEE AND BMO AS AGENT PURSUANT TO FEDERAL RULE OF BANKRUPTCY 9019**<br><br>Date: December 6, 2010<br>Time: 9:30 a.m.<br>Place: Courtroom 34<br>      501 I Street, 6th Floor<br>      Sacramento, CA 95814<br>Judge: Hon. Robert S. Bardwil |

Reply ISO Motion to Approve Compromise    PHDATA 3343450_1

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
415-364-6700

## I. INTRODUCTION

The Objecting Parties[1] are not concerned about what is in the best-interests of the Estate. They are concerned about what is in the best interest of Scott Salyer. The Trustee's settlement with BMO clears a path to potential recoveries from, among other things, the substantive consolidation litigation and the claims against the Australian Entities. It is no secret that the Trustee's success in this case will be to Scott Salyer detriment. Thus, the Objecting Parties are merely playing the role of spoiler, without suggesting a better alternative.

The Objecting Parties argue that the Settlement Agreement falls below the lowest range of reasonableness because the BMO and the Trustee are not applying the correct legal standard for valuing a Section 507(b) claim, they overvalued the Collateral and failed to take into consideration other factors that may have contributed to its diminution in value. The Objecting Parties, however, ignore the fact that the legal standard for measuring a Section 507(b) claim is a matter of significant legal controversy which has not been resolved in the Ninth Circuit. Indeed, the Objecting Parties' arguments and the contrary positions taken by BMO starkly illustrate that in the absence of the Settlement Agreement, the Estate would be forced to litigate complex legal and factual disputes where the outcome is subject to substantial uncertainty.

The Objecting Parties also argue that the Settlement Agreements is a *sub rosa* plan and it renders the Estate administratively insolvent. Finally, the Objecting Parties claim an unsubstantiated conflict of interest renders the advice received by the Trustee flawed. None of these arguments withstand scrutiny.

//
//
//
//

---

[1] All terms not otherwise defined herein shall have the meaning as defined in the Motion and its supporting pleadings.

1

## II. ARGUMENT
### A. The Applicable Legal Standards for Determining A Superpriority Claim Are Subject to Dispute

The Objecting Parties argue that the value of BMO's Collateral as of the date of the Petition was "overstated". They assert BMO's interest "should be valued as if the Lenders were forced to foreclose its interests in, and liquidate, the collateral." They cite several cases that suggest the proper value of a secured lender's collateral as of the date of the petition should be a "liquidation" value. *In re Modern Warehouse, Inc.* 74 B.R. 173, 177 (Bankr. W.D. Mo. 1987)("the value to be protected is 'liquidation' value….the same value as if he had the collateral in his hands to liquidate as of the commencement of the proceedings…"); *In re Ralar Distributors, Inc,* 166 B.R. 3, 7 (Bankr. D. Mass. 1994) (The value relevant for adequate protection purposes, however, is not book value. It is liquidation value realizable by the creditor.").

However, the Objecting Parties completely ignore contrary authority, including recent Fifth Circuit authority, that holds the proper measure of a creditor's diminution claim includes 100% of cash collateral used post-petition and that the secured creditor's collateral should be given a fair market value as of the petition date. *Scotia Development, LLC v. Pacific Lumber Co. ( In re SCOPAC),* 2010 U.S. App. LEXIS 21564 (5th Cir. Oct.19, 2010) ("*Scotia*"); *see also In re Carpet Center Leasing Co., Inc.,* 991 F.2d 682, 689 (11th Cir. 1993) (lender secured by tractor trailers established super-priority claim by comparing "Blue-Book" value of collateral in good condition on petition date with proceeds received through liquidation); *In re Wilson-Seafresh, Inc.,* 263 B.R. 624, 626 (Bankr. N.D. Fla., 2001) (valuing accounts receivable collateral at fair market value as of the petition date for purposes of calculating decline in value for § 507(b) purposes); *In re California Devices, Inc.*, 126 B.R. 82 (Bankr. N.D. Cal. 1991) (super-priority granted to over-secured creditor – based upon scheduled value of assets – for full amount of secured claim less proceeds received through liquidation of collateral). The Trustee does not endorse the foregoing authorities, but he cannot close his eyes to the risk that this Court or a reviewing court would follow them should he be required to litigate the amount of BMO's asserted super-priority claim.

SCHNADER HARRISON SEGAL & LEWIS LLP
ONE MONTGOMERY STREET, SUITE 2200
SAN FRANCISCO, CALIFORNIA 94104-5501
415-364-6700

In *Scotia*, the Fifth Circuit held that the secured creditors were entitled to a 507(b) superpriority claim equal to amount of cash collateral used post petition by the Debtors. In reaching this result, the court cited to the cash collateral orders that acknowledged that proceeds from prepetition collateral constituted cash collateral and provided a replacement lien "to the extent of the post-petition diminution of its interests in the Prepetition Collateral and the Cash Collateral." *Id.* at *20. Thus, the secured creditors were granted a continuing lien in the proceeds of its prepetition collateral and were entitled to a 507(b) claim to the extent cash collateral was used to operate the business and pay post petition professional fees. *Id.* at 21-24.

BMO is entitled to similar protections under this Court's Cash Collateral Order. BMO was found to have a prepetition security interest in the Prepetition Collateral and its proceeds. *See* Cash Collateral Order, p.3, ¶ D. BMO was also granted a superpriority replacement lien to the extent of the diminution in value of its Cash Collateral. Cash Collateral Order, p. 5, 1(a)[2]; p. 8, ¶ 5. Therefore, under the reasoning of *Scotia*, BMO would undoubtedly argue it is entitled to a superpriority claim equal to at least $26 million[3] on account of the use of cash collateral alone before considering the post petition diminution of the operating assets.

Further, as to the operating assets, contrary to the authorities cited by the Objecting Parties, the *Scotia* court suggested that fair market value of the collateral as of the date of the petition may be the proper starting point in determining a claim under 507(b):

> The bankruptcy court's first error, they assert, was to compare the timberland's foreclosure value at the petition date to its fair-market value at the date of confirmation, which had the effect of obscuring the decline in the value of the property. An asset's foreclosure value is typically lower than its fair-market value. *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 958 (1997) (explaining that fair-market value is "generally higher than what a secured creditor could realize pursuing . . . foreclosure . . . ."). In general, when valuing a secured claim under 11 U.S.C. § 506(a)(1), fair-market value is the appropriate measure. *Id.* at 965.

---

[2] There is a typographical error in the order. The paragraph should be 3(a).

[3] *See* Exhibit B to Declaration of Stan Speer In Support of the Motion to Approve Settlement Between Chapter 11 Trustee and The Agent. Although the Trustee contends this amount is overstated by approximately $2 million because it includes PACA Claims which are arguably senior to BMO's interest.

3
Reply ISO Motion to Approve Compromise  PHDATA 3343450_1

*Scotia*, at *25. The court went on to find no error as the lower court had in fact considered fair market value as of the petition date. *Id.*

What may be concluded from the above discussion is that the legal landscape for determining the proper methodology in calculating a super-priority claim is uneven, and there is no definitive Ninth Circuit authority on the issue. Therefore, in canvassing the issues, the Trustee must consider the potential that either this Court or a subsequent court upon appeal, will follow *Scotia*. The uncertainty supports the Trustee's decision to enter into the Settlement Agreement and avoid protracted litigation in a complicated area of law[4].

### B. The Value of BMO's Prepetition Collateral Is Subject to Dispute

The Objecting Parties argue that methodology used by BMO to value its Collateral is flawed and offer expert testimony to counter the Chanin Report. Supp. Obj,. pp. 12-13. In essence, the Objecting Parties argue that in "canvassing the issues" the Court should ignore the Chanin report, accept Mr. Brincko's "expert" opinion as the last word on the subject and deny approval of the Settlement Agreement. Unfortunately, resolution of these issues it is not that simple.

There is no doubt that BMO will question Mr. Brincko's qualifications as an expert, his methodology and the reasonableness of his conclusions. This of course will require further written discovery and depositions. The Objecting Parties will then counter with written discovery and depositions concerning Chanin's expertise, methodology and the reasonableness of its conclusions. And before you know it, the Estate is caught up in a protracted discovery process and evidentiary hearing that Rule 9019 was intended to avoid (i.e., no necessity of a "mini-trial"), and that well established law holds the Court need not pursue. *See In re Depoister,* 36 F.3d 582 (7th Cir. 1994.) (full blown evidentiary hearing is not necessary in a compromise motion); *In re Blair,* 538 F.2d 849, 851 (9th Cir. 1976) (same).

---

[4] Section 507(b) has been called a "prism in the fog." *In re Ralar Distributors, Inc.,* 166 B.R. 3, 4 (Bankr. Mass. 1994), *citing In re Callister,* 15 Bankr. 521, 526 (Bankr. D. Utah (1981).

4
Reply ISO Motion to Approve Compromise     PHDATA 3343450_1

The only thing that Mr. Brincko's declaration proves is that litigation with the BMO over the amount of its Superpriority Claim would be complicated, expensive and time consuming. Thus, Mr. Brincko's declaration actually provides support for the Trustee's decision[5].

The Objecting Parties also claim that the Trustee failed to consider whether BMO's claimed diminution in value could have existed outside the bankruptcy process and whether 100% of the use of cash collateral used can be attributed to BMO's Superpriority Claim. Supp. Opp., p. 13, line 16 - p.14, line 2. Both of these issues are directly addressed by the Trustee in the Motion and his supporting declaration. *See* Memorandum of Points and Authorities In Support of Motion to Approve Compromise, pp. 13-15, filed September 29, 2010 [Docket No. 2351]; Declaration of Bradley Sharp In Support of Motion, ¶¶32-35, filed September 29, 2010 [Docket No. 2350]. And as to the latter issue, the 5th Circuit in *Scotia* awarded the secured creditor a superpriority claim equal to 100% of the cash collateral used to pay administrative expenses without any deductions or credits for amounts spent on the secured creditor's behalf.

The Trustee readily acknowledges that he could create a factual dispute over the proper amount of BMO's Superpriority Claim. But contrary to the Objecting Parties' arguments, the Trustee did consider the pros and cons of litigating the issues and properly decided that the Settlement Agreement was in the best interest of the Estate.

C.  **The Settlement Is Not a *Sub Rosa* Plan**

The Objecting Parties repeat the claim that the Settlement Agreement is a *sub rosa* plan. They quarrel that "the BMO Settlement contains countless elements which are rightfully reserved by the Bankruptcy Code to a plan of reorganization." Supp. Opp., p. 18, lines 19-20. Yet, they then fail to analyze the characteristics of a *sub rosa* plan as discussed in the cases cited to any of the "countless elements" of the Settlement Agreement that are rightfully reserved for a plan.

---

[5] The Trustee does not object to the Court considering Mr. Brincko's declaration for the purpose of showing that there is a factual dispute over the value of BMO's collateral as of the date of the Petition. However, the Trustee does not concede that Mr. Brincko is qualified to provide expert testimony or that his conclusions and methodology are correct.

As set forth in the Trustee's Reply In Support of Motion To Approve Compromise Between Trustee and BMO As Agent Pursuant to Federal Rule of Bankruptcy 9019, filed October 20, 2010 ("Reply"), the Settlement Agreement does not contain elements of a *sub rosa* when analyzed under the criteria set forth in the authorities cited by the Objecting Parties[6].

D. **The Settlement Agreement Does Not Render The Estate Administratively Insolvent.**

The Objecting Parties take the position that the Settlement Agreement renders the Estate administratively insolvent because the Trustee "*gives no assurances* there will be sufficient post-settlement assets to satisfy administrative claims." Supp. Opp., p.19, lines 22-23 (emphasis added). The Objecting Parties are asking the Trustee to guarantee success on his claims which is neither prudent nor required under the law.

The Objecting Parties argue that because BMO's ultimate deficiency claim cannot be determined, it is unclear whether the Settlement Agreement benefits unsecured creditors. Supp. Opp., p.20, lines 9-12. The Objecting Parties ignore the terms of the Settlement Agreement.

The Estate receives a dollar for dollar credit for all assets transferred to BMO. The assets which comprise the BMO Distribution are assets subject to BMO's prepetition lien; these assets have no equity for the Estate[7]. The Estate gets a dollar for dollar credit for these assets. Settlement Agreement, ¶ 4. Similarly, under the revised Settlement Agreement, the Estate gets a dollar for dollar credit for all of BMO's recoveries on the Assigned Assets. *Id.* ¶¶ 3, 4. Therefore, BMO's deficiency claim will be calculated by subtracting all payments and recoveries received by BMO from the outstanding amounts owed under the Credit Agreement. In the meantime, the Estate avoids the administrative cost and risk of liquidating those assets. The fact that some of the assets to be applied against BMO's claims have not yet been liquidated does not

---

[6] The Trustee incorporates by this reference his previous arguments on the issue as contained in the Reply.

[7] Theoretically there could be equity for the Estate, but only in the event any one of the litigation claims comprising the BMO Distribution resulted in a net recovery in the range of $100 million. The likelihood of such a result appears to be very low.

prevent the Court from determining that the unsecured creditors benefit under the Settlement Agreement.

The Settlement Agreement does not render the Estate administratively insolvent. Absent the Settlement Agreement, BMO could demand payment of 100% of its Superpriority Claim before payment of both other administrative claims and unsecured creditors. Under the Settlement Agreement, BMO has agreed to subordinate its Super Priority Claim to ongoing administrative expenses of the Estate. Further, after the initial payment of $2.4 million, BMO has further subordinated its claim by agreeing that unsecured creditors share *at least* 20% of net proceeds from Estate Assets until the Super Priority Claim is paid in full. Settlement Agreement, ¶ 3. Contrary to the Objecting Parties' claims, the Settlement Agreement greatly decreases the potential for administrative insolvency.

The Debtors' Estate has always been "claim rich" but "cash poor". The Estate is not administratively insolvent just because its assets have yet to be reduced to cash. Thus far, BMO has agreed to allow the use of its Cash Collateral to administer the Estate, including the pursuit of unliquidated claims. Under the Settlement Agreement, BMO has put a limit on its funding of administrative costs which now requires the professionals of the Estate to share some risk in pursuing the claims on a going forward basis. The fact that the Trustee and his professionals agree to these terms is not only a no-risk benefit to the Estate and unsecured creditors, but a statement as to the potential value of the claims. However, the Trustee would be imprudent to guaranty results. The most that can be done is to put the Estate is the best position possible to maximize recoveries; the Settlement Agreement accomplishes this goal.

Finally, another aspect of the settlement that the Objecting Parties either ignore or overlook is that the Trustee has not agreed to a fixed percentage payment on BMO's deficiency claim; BMO will share pari pasu with all other unsecured creditors. Depending upon BMO's recovery on the BMO Distribution and Assigned Rights, BMO's deficiency claim may be less than 80% of the unsecured claims pool. In the previous version of the settlement as set forth in the proposed plan, BMO enjoyed a fixed percentage of cash available for unsecured creditors and did not share any risk of dilution.

Reply ISO Motion to Approve Compromise PHDATA 3343450_1

The Trustee need not provide liquidated amounts for BMO's claims in order for the Court to determine the benefits conferred on the unsecured creditors under the Settlement Agreement.

### E. The Trustee Did Not Receive Flawed Advice

Objecting Parties claim that the Trustee received flawed advice in entering into the Settlement Agreement based solely on the fact that attorneys in other Schnader offices represent members of the bank group on wholly unrelated matters. Contrary to the Objecting Parties' uniformed assertion, Trustee's counsel disclosed the concurrent representations and the issues it raised to the members of the bank group, to the Trustee, and the Court at the outset of this case. Schnader's employment application was approved without objection.[8] But even if in the face of prior disclosure Schnader's advice to the Trustee in this matter is suspect, the fact remains that the Creditors' Committee investigated the same claims as the Trustee and reached the same conclusions. The Committee is also endorsing the proposed settlement with BMO, which belies the argument that Trustee's counsel is somehow biased.

### III. CONCLUSION

The Trustee has met his burden of showing that the compromise is fair and equitable. The compromise is in the best interests of the estate, and its terms do not violate bankruptcy law. Any remaining objections should be overruled and the Motion granted.

Dated: November 24, 2010                    SCHNADER HARRISON SEGAL & LEWIS LLP

                                            /s/ *Gregory C. Nuti*
                                            Gregory C. Nuti
                                            Kevin W. Coleman
                                            Attorneys for Bradley D. Sharp, Chapter 11
                                            Trustee

---

[8] The same ostensible adversity of interest was present with the bank group in connection with the Plan, yet the Objecting Parties raised no objection to any impropriety associated with Schnader advising the Trustee in connection with the Plan. Hence, this argument should be deemed waived, or alternatively, disregarded as the tactical maneuver that it plainly is.