

FILED

DEC 1 3 2010

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., | Docket Control No. SH-76 |
| Debtor. | Date:  December 6, 2010<br>Time:  9:30 a.m.<br>Dept:  D |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

<u>MEMORANDUM DECISION</u>

On September 29, 2010, the chapter 11[1] trustee in this case, Bradley D. Sharp (the "trustee"), filed a Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to Federal Rule of Bankruptcy [Procedure] 9019 (the "Motion"). The initial hearing was continued to December 6, 2010 to allow the objecting parties to depose and then cross-examine the trustee and Stan Speer, who had signed declarations in support of the Motion, and to allow the parties to file supplemental briefs. For the reasons set forth below, the court will grant the Motion.

/ / /

/ / /

---

1. Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

I.  THE COMPROMISE

The major secured creditors in this case and the Bank of Montreal as their agent (the "BMO Secured Lenders" or "BMO") assert three claims against the estate -- a pre-petition secured claim, a post-petition super-priority claim in an amount substantially greater than $27,660,000 (the "SPC"), and a general unsecured claim.[2]  Under the compromise proposed by the trustee and supported by the Official Committee of Unsecured Creditors (the "Committee"), these claims would be determined and/or resolved as follows:

(1) the trustee would transfer a group of assets to BMO to be credited toward its pre-petition secured claim (the "BMO Distribution");

(2) the amount of the SPC would be fixed at $27,660,000, and the trustee would transfer a second group of assets to BMO that the parties agree would reduce the SPC by a minimum of $1,660,000; to the extent BMO realizes net recoveries from those assets in excess of $1,660,000, such net recoveries would be applied dollar for dollar against the SPC;

(3) on account of its remaining SPC, a maximum of $26,000,000, BMO would receive the first $2,393,900 from net proceeds of remaining assets of the estate[3] and 80% of any

---

2.  To be more precise, BMO has filed a pre-petition claim for approximately $195 million.  Depending on the values of the assets securing that claim, the claim is partially secured and partially unsecured.

3.  At the court's request, the trustee has provided a list of the assets that will remain in the estate following the compromise.  See Second Supplemental Declaration of Bradley D. Sharp in Support of Motion ("Second Sharp Dec."), Ex. C.

1  further net proceeds until the SPC has been paid in full; and

2      (4) upon payment in full of the SPC, BMO would have a

3  general unsecured claim for the amount remaining due after

4  application of all payments received on account of the BMO

5  Distribution and the SPC.  On account of this general unsecured

6  claim, BMO would share pro rata with other general unsecured

7  creditors.

8      The compromise also includes the trustee and the estate

9  releasing BMO from any and all claims.  Finally, the compromise

10 is contingent on the trustee obtaining approval of a separate

11 compromise with certain holders of unliquidated and disputed

12 claims against the estate, including Morning Star Packing

13 Company, Inc., and holders of claims against the debtor arising

14 from alleged bribery, price-fixing, product mislabeling, and

15 other tortious activities.

16          II.  THE POSITIONS OF THE PARTIES

17     The trustee contends the compromise is fair and equitable

18 under applicable Ninth Circuit standards.  The court agrees;

19 application of the relevant factors will be discussed below.

20     Scott Salyer ("Salyer"), president of SK PM Corp., general

21 partner of debtor SK Foods, L.P., together with various entities

22 related to Salyer (collectively, the "Salyer entities") oppose

23 the Motion.  They contend that (1) the compromise is really a sub

24 rosa plan that cannot be approved except through the plan

25 confirmation process, (2) the compromise entails the improper

26 transfer of bankruptcy causes of action and the abdication of the

27 trustee's duties, (3) the motion lacks adequate disclosure, and

28 (4) the trustee has not properly exercised his business judgment

- 3 -

1   in evaluating and agreeing to the compromise.

2       It is of note that no other parties have objected to the

3   compromise,[4] and that the Committee supports the compromise.

4                           III.   ANALYSIS

5       This court has jurisdiction over the request pursuant to 28

6   U.S.C. §§ 1334 and 157(b)(1).  The request is a core proceeding

7   under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).

8   **A.  Applicable Legal Standards**

9       "The law favors compromise and not litigation for its own

10  sake, and as long as the bankruptcy court amply considered the

11  various factors that determined the reasonableness of the

12  compromise, the court's decision must be affirmed."  In re A & C

13  Properties, 784 F.2d 1377, 1381 (9th Cir. 1986).  "Rather than an

14  exhaustive investigation or a mini-trial on the merits, the

15  bankruptcy court need only find that the settlement was

16  negotiated in good faith and is reasonable, fair and equitable."

17  Spirtos v. Ray (In re Spirtos), 2006 Bankr. LEXIS 4894 at *32

18  (9th Cir. BAP 2006).  The court's "proper role is 'to canvas the

19  issues and see whether the settlement falls below the lowest

20  point in the range of reasonableness.'"  Id., quoting In re

21  Pacific Gas & Elec. Co., 304 B.R. 395, 417 (Bankr. N.D. Cal.

22  2004).

23  **B.  The Compromise is Fair and Equitable**

24      Although the bankruptcy court has "great latitude in

25  approving compromise agreements," it may approve a compromise

26  only if it is "fair and equitable."  In re Woodson, 839 F.2d 610,

27  _____

28      4.  The firm of Trepel McGrane Greenfield LLP filed a
    limited objection, but later withdrew it.

                              - 4 -

620 (9th Cir. 1988), citing <u>A & C Properties</u>, 784 F.2d at 1381.

In making this determination, the court must consider:

> (a) The probability of success in the litigation; (b)
> the difficulties, if any, to be encountered in the
> matter of collection; (c) the complexity of the
> litigation involved, and the expense, inconvenience and
> delay necessarily attending it; (d) the paramount
> interest of the creditors and a proper deference to
> their reasonable views in the premises.

<u>Id.</u>

The potential litigation to be resolved by the compromise consists of (1) the estate's claims challenging the validity, enforceability, and priority of BMO's pre-petition lien, including both potential fraudulent transfer causes of action and other claims based on the pre-petition conduct of BMO, (2) challenges to the amount of BMO's super-priority claim, and (3) litigation over the estate's right to use cash collateral.  With regard to all three categories, the first, third, and fourth <u>A & C Properties</u> factors all weigh in favor of the compromise; the second -- likely difficulties in collecting -- is neutral.

Early in the case, Salyer brought to the trustee's attention a variety of grounds he asserted for contesting BMO's pre-petition liens and for asserting counterclaims against BMO. Salyer did not, however, in the 19 months this case has been pending, undertake any such challenges himself, despite the cash collateral order that gave all parties the right to do so.  The court takes this fact into account, along with the trustee's testimony detailing his independent investigation of Salyer's allegations against BMO and the trustee's conclusion that he

would be unlikely to prevail on any of these theories.[5]  The
Committee has also independently investigated BMO's security
interest, has taken no action to dispute it, and in fact supports
the compromise.

The Salyer entities also question, for a variety of reasons,
the trustee's conclusions regarding the diminution in value of
BMO's collateral and the corresponding amount of BMO's super-
priority claim.  Based in part on reports prepared pre-petition
by the debtor's financial advisors and on BMO's estimates of
amounts it has received to date and will likely receive through
the settlement, BMO contends the SPC is somewhere between $22
million and $59 million.  The trustee, whose testimony the court
finds candid and credible, has set forth at length in his
declaration the competing issues as between BMO and the estate,
including the various bankruptcy and non-bankruptcy factors that
may have played a role in driving down the value of the
collateral.

The court disagrees with the Salyer entities' argument that
the trustee's analysis of the factors affecting the amount of the
SPC was insufficient.[6]  The court need not determine the amount
of the SPC, only whether the compromise, on balance, falls below
the lowest point in the range of reasonableness.  The trustee has
managed to compromise the issue with BMO agreeing to value the

_____

5.  The Salyer entities' contention that the trustee did not
receive impartial legal advice on these issues is addressed
below.

6.  The court addresses below their new argument, raised
only after the initial hearing, that the valuation method relied
on by the trustee was incorrect.

- 6 -

SPC at the lowest end of its own range of values, such that the compromise reflects a highly beneficial outcome for the estate. As the trustee correctly points out, whether the numbers are accurate is less significant at this stage than the fact that BMO might reasonably be expected to rely on them in litigation; thus, it was appropriate for the trustee to consider them.  In any event, to litigate the SPC to conclusion would be a very complicated and costly endeavor.

Further, it is a significant benefit to creditors that the compromise allows the SPC to be paid over time rather than at plan confirmation, as would otherwise be required.  See 11 U.S.C. § 1129(a)(9)(A).  In addition, after the first $2,393,900 is paid to BMO, the compromise allows the estate to receive 20% of the liquidation proceeds before full payment of the SPC.

Finally, as regards the use of BMO's cash collateral, the Salyer entities contend the compromise simply maintains the status quo.  On the contrary, it adds certainty to the rights of the trustee and BMO and, absent the compromise, it is likely that BMO would not be as accommodating as it has been thus far.  BMO certainly would not consent to the use of its cash collateral if the trustee challenged its liens or the amount of its super-priority claim.  Under the circumstances of this case, it is likely the court would not permit the use of cash collateral over BMO's objection, and in any event, the compromise as proposed would avoid the cost of litigation for that purpose.

One of the most important factors in assessing this compromise as a whole is that virtually all that remains in the estate at this point is cash and litigation claims.  In this

situation, there certainly comes a point of diminishing returns because every dollar spent investigating or litigating is a dollar out of the pockets of creditors.  The trustee could easily spend hundreds of thousands of dollars and maybe millions seeking to reduce the SPC, with no guarantee he could reduce it at all.  In such circumstances, a trustee must make a reasonable decision as to how much to litigate and how much to investigate; the trustee has done so here.

Finally, the court concludes that the compromise serves the paramount interests of creditors and their reasonable views in the matter.  No parties other than the Salyer entities have opposed the compromise.  It is especially significant that the Committee, in the exercise of its fiduciary duty[7] and having participated in the discovery recently conducted by the Salyer entities with an eye toward assessing the compromise, has elected to support it.  In short, the compromise is well within the bounds of reasonableness and is fair and equitable.

## C.   The Compromise Is Not a Sub Rosa Plan

The concept of a sub rosa plan is generally traced since the enactment of the Bankruptcy Code to the decisions in In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983), and In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983).[8]  In Braniff, the doctrine was applied to deny approval of a sale of substantially all of the debtor's assets on the ground that the sale was so

_____

7.   See In re 3dfx Interactive, Inc., 2006 Bankr. LEXIS 1498, *15 (Bankr. N.D. Cal. 2006) ["A creditors' committee stands as a fiduciary to the class of creditors it represents."].

8.   A similar doctrine had evolved in cases decided under the Bankruptcy Act.  See Lionel Corp., 722 F.2d at 1067-69.

extensive as to leave almost nothing for the eventual plan of reorganization. Braniff, 700 F.2d at 940. In other words, the sale constituted a virtual plan of reorganization, but "without the safeguards of disclosure, voting and application of the confirmation standards." See In re Work Recovery, 202 B.R. 301, 303 (Bankr. D. Ariz. 1996), discussing Braniff.

Thus, "Braniff [. . .] stands for the proposition that the provisions of § 363 permitting a trustee to use, sell, or lease the assets do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan." In Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox, Co.), 250 F.3d 955, 960 (5th Cir. 2001).

However, the doctrine will not be applied, even to a sale of all or substantially all of the debtor's assets, where there is a "good business reason" to approve the sale. Lionel Corp., 722 F.2d at 1071. The Lionel court itemized the "salient factors" for consideration as including but not limited to:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

Id. In connection with a proposed lease transaction, another court focused on whether the transaction would deprive creditors of protections they would have if the transaction were proposed as part of the plan confirmation process. See Continental Air

- 9 -

1   Lines, Inc., 780 F.2d 1223, 1227-28 (5th Cir. 1986).

2        The concept of a sub rosa plan also arises in the context of

3   compromises proposed in advance of the plan confirmation process,

4   where its application is similarly limited.  For example, in In

5   re Cajun Electric Power Coop., Inc., 119 F.3d 349 (5th Cir.

6   1997), the unsecured trade creditors objected to a settlement

7   among the debtor, its major secured creditor, and its largest

8   unsecured creditor on the ground that the settlement was a sub

9   rosa plan.  The debtor argued that the settlement would remove a

10  major obstacle to its reorganization; namely, an unprofitable

11  nuclear plant and related litigation against the debtor's co-

12  owner of the plant, as well as lender liability claims against

13  the creditor that had funded the debtor's investment in the

14  plant.

15       The appellate court agreed with the debtor, finding that

16  although the settlement would remove from the estate $107 million

17  in cash, $20 million worth of transmission lines, and the

18  debtor's claims against its co-owner and lender, the settlement

19  would not dispose of all claims against the debtor, restrict

20  creditors' right to vote as they chose on a plan of

21  reorganization, or dispose of virtually all of the debtor's

22  assets.  Instead, the settlement would dispose of one asset --

23  the nuclear plant, "which is not so much the crown jewel of [the

24  debtor's] estate but its white elephant."  Cajun Electric, 119

25  F.3d at 355.  "The removal of [the nuclear plant] from the estate

26  will facilitate [the debtor's] reorganization, and will do so

27  without denigrating the rights of the unsecured trade creditors."

28  Id.

In <u>Motorola, Inc. v. Official Comm. of Unsecured Creditors</u>
<u>(In re Iridium Operating LLC)</u>, 478 F.3d 452 (2nd Cir. 2007),
during the course of the case, the debtor had entered into six
cash collateral stipulations with the consortium of its major
secured lenders that allowed the debtor to continue operating.
The unsecured creditors' committee had actively challenged the
validity of the lenders' pre-petition liens and had also obtained
court approval to pursue litigation against the debtor's parent
company, Motorola, for breach of contract, breach of fiduciary
duty, and avoidance of fraudulent conveyances.  Lacking
sufficient funds to pursue these ends, the debtor and the
committee eventually negotiated a settlement with the consortium
of secured lenders.

The settlement, reached approximately 17 months after the
case was commenced, had essentially three components.  First, it
determined that the creditors' liens were valid, unavoidable, and
not subject to defenses or counterclaims by the estate.  Second,
it divided the estate's remaining cash between the consortium of
secured lenders and a new entity created for the sole purpose of
funding the litigation against Motorola.  Third, it provided for
distribution of the proceeds of the litigation against Motorola
between the consortium and the estate, the estate's portion to be
distributed according to a future plan of reorganization.

The target of the remaining litigation, Motorola, asserting
claims of $1.3 billion, including an administrative claim of
almost $700 million, objected to the settlement, contending it
was a sub rosa plan.  The bankruptcy court, however, found a
proper business justification for the settlement, and the

- 11 -

appellate court affirmed.

> By allowing the Lenders to take $ 92.5 million and
> redirect another $ 37.5 million to the [litigation
> fund] in exchange for the Committee dropping the
> challenge to the liens, the Committee has cleared the
> way for implementation of a reorganization plan.  The
> Estate stands to gain significantly more from the
> action against Motorola than it might if it or the
> Committee were forced to fund the litigation themselves
> at some much later date.

Iridium Operating, 478 F.3d at 467.  Thus, the settlement was "'a

step towards possible confirmation of a plan of reorganization

and not an evasion of the plan confirmation process.'"  Id.,

quoting the bankruptcy court's decision.

     The court finds the facts of this case to be substantially

similar to those in Cajun Electric and Iridium Operating, and

like the courts in those cases, this court concludes that the

proposed compromise has a significant business justification and

is not an improper sub rosa plan.  First, it is significant that

no parties other than the Salyer entities, the targets of the

remaining litigation, have opposed the compromise.  In fact, the

Committee supports it, a fact that reflects a determination by

the Committee that the compromise is based on sound business

reasons and in the estate's best interest.

     Second, this case has evolved over a significant period of

time -- 19 months; thus, parties in interest have developed a

pretty clear understanding of the lay of the land -- the assets

of the estate and their values, the risks and benefits of

anticipated litigation, and the nature and extent of the estate's

liabilities.  The parties have had an extended opportunity to

conduct discovery on these issues.  In this regard, it is again

significant that the only parties opposing the compromise are

Salyer and his related entities.

Third, although the value of the assets being transferred proportionate to the value of the estate as a whole is a factor to be considered, the court finds it unnecessary to make this determination with a high degree of precision, primarily because many of the assets to be transferred to BMO, as well as those being retained by the estate, are claims in litigation or remaining to be litigated, the values of which are inherently difficult to assess.  Further, even in cases where all or substantially all of a debtor's assets are being transferred, a sale or compromise will be approved if the court finds a substantial business justification.  See Iridium Operating, 478 F.3d at 459 [71% of cash remaining in the estate was to be paid to secured lenders]; In re Torch Offshore, Inc., 327 B.R. 254, 258 (E.D. La. 2005) ["The fact that the sales encompass virtually all of the assets of the estate is not determinative, but one consideration in determining whether there is a business justification for the proposed sales."].

Fourth, although no disclosure statement has yet been approved, the court has no reason to believe the trustee is using the compromise to circumvent the disclosure, voting, and confirmation requirements of the plan process.  In fact, it is hard to imagine the trustee submitting a plan without first reaching a compromise with BMO.

The Salyer entities are correct that the compromise has certain features of a plan of reorganization -- it determines the validity and treatment of BMO's claims; it is contingent on approval of a compromise with the holders of unliquidated and

- 13 -

1   disputed claims, thus effectively determining their treatment as
2   well; it provides for the transfer of certain assets to BMO; and
3   it provides for distributions to BMO as a secured and super-
4   priority creditor.  With one exception -- with regard to the
5   separate compromise with the disputed creditors -- these were
6   also features of the compromises approved in Cajun Electric and
7   Iridium Operating, where significant business justifications
8   overcame these objections.  The court in Iridium Operating
9   emphasized that prior to the settlement, "[t]he Estate was . . .
10  poised to pursue complicated and expensive litigation on two
11  fronts [against the secured lenders and against Motorola].  But
12  the Estate had limited resources and would be gutted if the
13  Lenders successfully asserted their liens."  478 F.3d at 458.

14       The same is true here, where BMO asserts a lien on all pre-
15  petition assets and their proceeds and a replacement lien that
16  arguably covers all post-petition assets as well.  Thus, absent
17  the compromise, the estate's ability to pursue either the causes
18  of action being transferred to BMO or those being reserved by the
19  estate is doubtful at best.  As in Iridium Operating, if BMO were
20  ultimately to prevail in litigation over the validity of its
21  liens, the estate would be gutted.  And it is worth mentioning
22  again that the compromise removes a substantial hurdle for
23  confirming a plan in that it permits the SPC to be paid over
24  time, whereas BMO could otherwise demand payment in full at
25  confirmation.

26       Finally, unlike the compromise determined in Braniff to be a
27  sub rosa plan, the compromise in this case does not purport to
28  dictate the terms of any plan of reorganization or the way

- 14 -

1  creditors will vote.

2      For all these reasons, the compromise is not an
3  impermissible sub rosa plan.

4  **D.  The Compromise Does Not Contain Illegal Provisions**

5  **1.  The Compromise Does Not Transfer Assets Illegally**

6      According to the Salyer entities, the compromise violates
7  the rule that causes of action belonging to a bankruptcy estate
8  may be assigned to a creditor only through a plan of
9  reorganization or where the assignment will benefit creditors as
10  a whole.  They cite <u>Duckor Spradling & Metzger v. Baum Trust (In</u>
11  <u>re P.R.T.C., Inc.)</u>, 177 F.3d 774 (9th Cir. 1999), where the
12  assignment provided that proceeds of the causes of action
13  recovered by the assignee would be split 50/50 between the
14  assignee and the other creditors.  "Thus, [the assignee] is not
15  pursuing solely its own interest but, instead, the interest of
16  all creditors."  177 F.3d at 783.  The Salyer entities contend
17  the compromise in the present case cannot be approved because it
18  provides for the assignment of certain causes of action outright
19  to BMO, who would retain all recoveries for itself.

20      The argument overlooks the important point that a transfer
21  of a cause of action may be authorized where the estate as a
22  whole benefits in some way <u>other than</u> recovering a portion of the
23  proceeds of the transferred claims.  In other words, it is not
24  necessary that the benefit come from favorable results on the
25  transferred claims; instead, "the benefit may come from the
26  transfer of the claim itself through, for example, settlement
27  yielding a benefit to the unsecured creditors."  <u>Official Comm.</u>
28  <u>of Unsecured Creditors of Maxwell Newspapers v. Macmillan, Inc.</u>

- 15 -

(In re Maxwell Newspapers, Inc.), 189 B.R. 282, 287 (Bankr. S.D.N.Y. 1995).

Thus, in Maxwell Newspapers, the court approved the assignment of an avoidance action to a group of three creditors in exchange for their withdrawal of claims totaling $93 million. In this fashion, "the debtor was spared the litigation respecting the $93 million claims as well as the litigation regarding [the avoidance action], which, in and of itself, constituted benefit to an estate with sorely limited assets." Maxwell Newspapers, 189 B.R. at 288.

In In re Qualitech Steel Corp., 276 F.3d 245 (7th Cir. 2001), the bankruptcy court approved debtor-in-possession financing by a few of the debtor's original secured creditors (the "DIP financers") on terms that required the remaining secured creditors (the "old secured lenders") to subordinate their liens to the DIP financers' new lien. In exchange for such subordination, the court authorized the debtor to grant the old secured lenders a lien in the debtor's preference causes of action. When the old secured lenders later invoked their rights to those causes of action, the unsecured creditors objected on the ground that any recovery would go only to the old secured lenders and none would go to unsecured creditors. Thus, there would be no "benefit to the estate." The court disagreed.

> The potential to recover funds from preference recipients was put to use for the estate's benefit . . . when the bankruptcy court promised this value to the [old] secured lenders to compensate them for risk while new super-secured funds were raised and the assets were sold. . . . [T]he judge used the value of these assets to protect the secured creditors' position and thus facilitate what appeared to be the most productive course of action. . . .

> Having put the <u>prospect</u> of preference recoveries to
> work for the benefit of all creditors (including the
> unsecured creditors) <u>ex ante</u> by effectively selling
> them to the secured creditors in exchange for
> forbearance--and in the process facilitating a swift
> sale that was beneficial all around--the bankruptcy
> judge did not need to use them <u>ex post</u> a second time,
> for still another benefit to the estate . . . .

<u>Mellon Bank, N.A. v. Dick Corp.</u>, 351 F.3d 290, 293 (7th Cir. 2003), emphasis in original.

The same occurred here.  The use of BMO's cash collateral, in exchange for which BMO received a replacement lien on all assets of the estate, including causes of action, enabled the debtor in possession and then the trustee to operate the debtor's business long enough to sell it as a going concern, resulting in a benefit to the estate as a whole.[9]

The Ninth Circuit has not directly ruled on the issue presented in this case -- whether a trustee may, in advance of a plan of reorganization, assign avoidance claims to a secured creditor in partial satisfaction of a pre-petition secured claim or a post-petition super-priority claim.  However, the case law suggests the Ninth Circuit would agree with the reasoning of the <u>Maxwell Newspapers</u>, <u>Qualitech Steel</u>, and <u>Mellon Bank</u> cases.  In <u>In re Professional Inv. Properties</u>, 955 F.2d 623 (9th Cir. 1992), the trustee sold the estate's interest in proceeds of the sale of real property that had been subject to a claim of equitable lien. The holders of the alleged equitable lien then asserted that a

---

9.  The Salyer entities never opposed the motions for use of cash collateral; in fact, it was the debtor, as debtor in possession, with Salyer presumably still in charge, that brought the first motion to use cash collateral in exchange for the replacement lien.

1  trustee's avoidance powers are not transferable, and thus, that

2  the trustee's power to avoid their equitable lien under

3  § 544(a)(3) could not have been included in the sale of estate's

4  interest in the sale proceeds.

5      The Ninth Circuit held that the purchaser could assert the

6  trustee's strong-arm powers, 955 F.2d at 626, although there was

7  no indication he would be required to share the sale proceeds

8  with other creditors.

9       Here, the trustee sold the estate's claim to the
        proceeds from the sale of the property with the tacit
10      approval of the bankruptcy court. The court ordered
        the estate's interest in the appeal [regarding the
11      validity of the equitable lien] terminated and that all
        responsibility for the claim rested with [the
12      purchaser]. While [the purchaser] may be acting on his
        own, he does so with the apparent blessing of the
13      bankruptcy court and the trustee. Clearly, it was in
        the estate's interests to resolve its involvement in
14      the dispute.

15  Id.

16      In P.R.T.C., the estate lacked funds to pursue the only

17  significant assets of the estate -- certain avoidance claims.

18  The trustee rejected an offer from the primary target of the

19  avoidance claims (Braunstein) to purchase them for $50,000, and

20  instead proposed to assign them to the estate's largest creditor

21  (Baum), who would have complete control of the claims but would

22  split the net proceeds 50/50 with the estate. The bankruptcy

23  court approved the assignment and the Ninth Circuit affirmed,

24  focusing on significantly more than just the 50/50 split.

25          [W]hen determining whether an assignment benefits
        the remaining creditors, we consider the assignment in
26      light of the other options before the court. The
        bankruptcy court could have ordered the claims and
27      rights to remain a part of the estates. Under that
        option, the creditors would receive no benefit, because
28      the estates had insufficient funds to pursue those

- 18 -

1    claims and rights.

2          Similarly, the bankruptcy court could have ordered
     the trustees to abandon the assets.  Again, the
3    creditors would receive no benefit.

4          The bankruptcy court could have approved the sale
     of the claims and rights to Braunstein for $50,000.
5    However, the [claims] are rights that the estates would
     assert primarily against Braunstein and his affiliates.
6    In the circumstances, transferring the claims to
     Braunstein would have prevented the estates from
7    recovering any more than $50,000.  The trustees already
     had spent about $50,000 on bankruptcy administrative
8    costs.  Had the court approved the transfer to
     Braunstein, the creditors likely would receive no
9    benefit.

10         Finally, the bankruptcy court could have approved
     the transfer of the assets to Baum.  That option had
11   the potential to recover between $70,000 and $1 million
     for the remaining creditors, which would be sufficient
12   to satisfy at least some of the creditors' claims.
          . . .
13

14         Faced with these four options, the bankruptcy
     court properly approved the transfer to Baum.  Only
15   that option had the potential to provide the remaining
     creditors with any benefit.

16   P.R.T.C., 177 F.3d at 783, emphasis added.

17        In the present case, the absence of a 50/50 or other split

18   of the proceeds of causes of action being transferred to BMO is

19   not determinative.  In examining the proposed transfers in light

20   of the other options available, it is significant that no party

21   has presented an alternative that would benefit the estate more

22   than the BMO compromise.  Keeping the causes of action in the

23   estate would have little, if any, value because of BMO's claim of

24   a replacement lien in all cash and other assets of the estate;

25   the estate would thus have no free cash with which to litigate

26   the claims.  No party has come forward wishing to purchase the

27   claims or to fund their prosecution in exchange for a percentage

28   of the proceeds.

1    Thus, the court concludes that the compromise provides the
2    necessary benefit to the estate to support the transfer of the
3    avoidance causes of action to BMO. The compromise will free up
4    cash to fund litigation remaining in the estate; it will free the
5    estate of expensive and time-consuming litigation over the
6    validity and amounts of BMO's claims; it will allow a plan to be
7    confirmed without the need to immediately pay BMO's super-
8    priority claim, which it contends is between $22 million and $59
9    million; and it will free up for unsecured creditors 20% of the
10   proceeds of assets remaining in the estate after the first
11   $2,393,900. In contrast, absent the compromise, the SPC would
12   need to be paid in full before unsecured creditors would receive
13   anything. The compromise thus provides a direct benefit to
14   creditors as a whole and maximizes their potential distribution.
15       In this regard, the court considers as significant the
16   Australia claims, which the estate will retain under the BMO
17   compromise. The claims appear to have been liquidated by the
18   Australian receiver such that the trustee projects a recovery of
19   between $16 million and $49 million. The trustee states that the
20   BMO compromise was reached before the Australia claims were
21   liquidated; absent the compromise, BMO would assert liens in the
22   Australia claims. The compromise will preserve these claims and
23   their proceeds as assets of the estate.
24   2.   The Compromise Does Not Entail Abdication of Trustee Duties
25       The Salyer entities take issue with paragraph 5 of the
26   settlement agreement documenting the compromise, which requires
27   the trustee to make detailed reports to BMO and to obtain its
28   prior approval of any action regarding the disposition of estate

assets, employment and compensation of professionals, operating budgets, major decisions regarding the prosecution or release of claims, pending compromises, and "any and all other material matters and decisions made by the Trustee."  Second Sharp Dec., Ex. A.  If BMO does not approve the proposed action, the trustee must seek court approval, including in his request an objective statement of his and BMO's respective positions on the matter.

The court rejects the Salyer entities' contention that the provision is unduly vague.  Further, there is nothing here that would require the trustee to abdicate his responsibilities to creditors and nothing that would restrict the exercise of his independent business judgment.  Prior to confirmation of a plan, at least, the trustee will need court approval of these types of actions anyway, and thereafter, the requirement of BMO's consent or court approval of matters that would clearly affect BMO's interests in its cash collateral and remaining estate assets is not unreasonable.  In addition, the trustee and BMO have a unity of interest in maximizing the value of the assets to be liquidated by the estate.

**E.   The Motion Contains Sufficient Disclosure**

The Salyer entities complain that the trustee has not made sufficient disclosures to justify the compromise.[10]  It appears they would require him to <u>prove</u> (1) the amount of BMO's unsecured

---

10.   The Salyer entities originally argued in support of this proposition that the trustee's $1,660,000 valuation of the assets to be transferred on account of the SPC was unreasonably low considering that the trustee has allegedly already incurred fees of $2,700,000 in pursuing those same assets.  This issue has been removed from the equation by the parties' agreement that the $1,660,000 is only a minimum and that net recoveries over $1,660,000 will be credited dollar for dollar.

1 deficiency claim and the extent to which it will dilute the
2 recovery of other unsecured creditors, (2) that the estate will
3 be administratively solvent following the compromise, and (3)
4 that he will be able to propose a plan that meets the
5 confirmation requirements, including feasibility, the best
6 interest of creditors test, and the absolute priority rule.   In
7 short, they contend, "without requiring the Trustee to rigorously
8 test the content and effect of the [compromise], bald approval
9 will leave the estates with no assurance that a plan may ever be
10 proposed, much less consummated."[11]

11      The answer is clear.  This level of disclosure would require
12 the very sort of investigation and proof, with attendant costs
13 and delays, that compromises are meant to avoid.  In short, given
14 the Salyer entities' objections to the trustee's valuation
15 estimates up to this point, it would require litigation.  In this
16 case in particular, given that BMO has a replacement lien in
17 virtually all remaining assets, it is simply not cost effective
18 or feasible.  Further, the Salyer entities offer no authority,
19 and the court is aware of none, for the proposition that a court
20 must hold a compromise to the standards for plan confirmation;
21 the notion would extend the requirements for approval of a
22 compromise well beyond the Woodson/A&C Properties factors.

23      For similar reasons, the court rejects the Salyer entities'
24 contention that there is no satisfactory explanation for the
25 change in the trustee's projections of the likely recovery by

26 _____

27      11.  Supplemental Objection to Motion to Approve Compromise
Between Trustee and Bank of Montreal as Agent for Secured Lenders
28 Pursuant to Federal Rule of Bankruptcy [Procedure] 9019, filed
November 17, 2010, 19:17-19.

- 22 -

1  unsecured creditors -- from an original range of $250,000 to $5
2  million to a more recent projection of $3.7 million to $36.9
3  million.  The Salyer entities mistakenly cite the original range
4  as the trustee's opinion as of the time he filed the present
5  motion; actually, it was as of May 12, 2010.[12]  Thus, the change
6  was not nearly as sudden as the Salyer entities suggest.
7  Further, it appears to be attributable in part to the Australia
8  claims having been liquidated in the interim.

9       The trustee's description of the new projections highlights
10 the speculative nature of the value of the assets -- for each
11 asset, he considered maximum potential recoveries, risks of
12 collection, probability of success based on available evidence,
13 potential defenses, and competing claims, and the time and
14 resources required to bring the claims to resolution.  All of
15 these factors must, of necessity, be estimated.  The court will
16 hold the trustee to no greater level of certainty.

17 **F.   The Trustee Has Properly Exercised His Business Judgment**

18 **1.   The Trustee Has Sufficiently Evaluated the SPC**

19      The Salyer entities originally contended that in arriving at
20 the agreed amount of the SPC, $27,660,000, (1) the trustee
21 improperly relied on asset valuations performed by Chanin and FTI
22 without commissioning an independent evaluation of the supposed
23 loss in value of the collateral, and (2) failed to sufficiently
24 analyze the conclusions on which he relied.  They have now added
25 that (1) the Chanin and FTI reports were based on a valuation

26 ─────────────────────────

27      12.  The Salyer entities cite a memorandum in support of a
   different motion, filed the same day as this one, which in turn,
28 referred to the $250,000 to $5 million range as having been
   projected in a disclosure statement filed May 12, 2010.

- 23 -

1  method that is not the correct one for determining a super-
2  priority claim based on diminution in value of collateral, and
3  (2) BMO would have suffered an equivalent loss in value of its
4  collateral had the bankruptcy not intervened; thus, it suffered
5  no significant loss on account of the bankruptcy or the use of
6  its cash collateral.  The trustee, the Committee, and BMO have
7  each raised a whole host of arguments, both legal and factual, in
8  response.

9      The court declines the Salyer entities' invitation to
10 resolve these disputes.  The discovery the issues have generated
11 and the length of the briefs devoted to their analysis on both
12 sides persuades the court that absent the compromise, the battles
13 would be long, complex, difficult, and costly.  This is the
14 precise type of exercise the compromise seeks to avoid.  It also
15 highlights how vulnerable this case is to collapsing under the
16 weight of litigation, for not only the claims themselves, but the
17 settlement of claims.  And given BMO's asserted interest in
18 virtually all cash remaining in the estate, it is very unlikely
19 the estate could afford either sort of litigation.  In short, it
20 is nearly certain that the cost of this and the other battles the
21 Salyer entities contend must be fought would leave the estate
22 administratively insolvent.

23     In another new challenge, the Salyer entities contend the
24 trustee failed to obtain impartial legal advice in negotiating
25 the compromise, and in particular, in assessing the validity of
26 BMO's claims and liens against the estate and potential claims of
27 the estate against BMO, and therefore, that his evaluation of the
28 compromise as fair and equitable does not reflect a reasonable

exercise of his business judgment.  This argument derives from an allegation of conflicts of interest on the part of the Schnader Harrison firm, which represents the trustee in this case.

The connections on which the argument depends were disclosed as early as June 1, 2009.  The Salyer entities have not objected to the firm's representation of the trustee for the past 18 months, and the court gives very little weight to their sudden concern that this representation rendered the trustee's analysis of the compromise "necessarily tainted" and "deeply flawed."

The Salyer entities also challenge the adequacy of the trustee's factual investigation of the estate's claims against the BMO Secured Lenders, complaining that the only persons he spoke to, aside from his attorneys, were Salyer and other of the debtor's management personnel.[13]  The court finds the trustee's investigation sufficient.  The Committee also investigated, and supports the compromise.

2.  Distributions Under the Compromise are Reasonable

Finally, the Salyer entities contend the trustee did not exercise reasonable business judgment in agreeing to the cash distributions to be made to BMO under the compromise -- the first $2.3 million plus 80% of the additional cash collected.  The argument comes back to the alleged insufficient disclosure of asset values and claim amounts, such that the Salyer entities cannot determine whether the 20% remaining for other unsecured claims will be meaningful.

---

13.  The Salyer entities do not suggest what other individuals or records, or how many, should have been consulted; they do not make even attempt to make a showing that the claims might have value.

Does the Trustee anticipate recovering more than $2.3 million in proceeds so that the recovery of 20% of the remainder net proceeds to unsecured creditors will be meaningful?  How much more?  How meaningful?  If the Trustee can't recover the full amount of BMO's superiority [sic] claim, a plan can never be confirmed. What is the point of the settlement in that scenario?[14]

These questions provide an appropriate backdrop for the court's conclusions in this matter.  The Salyer entities have consistently demanded levels of certainty achievable only through litigation.  The point of settlement is always to avoid the costs and delays necessary to reach those levels of certainty.  Viewed in this light, the court concludes that the trustee exercised reasonable diligence in forming his business judgment on this matter.

## IV. CONCLUSION

The court concludes that the compromise will remove major pieces of contentious litigation from the estate, resulting in a savings of administrative costs; it will resolve who will pursue what litigation and how the proceeds will be distributed, and it provides the estate with funding essential to the possibility of a recovery by unsecured creditors.  Thus, the court concludes that the compromise is fair and equitable and should not be defeated by any of the arguments advanced by the Salyer entities.

The court will enter an appropriate order.

Dated:  Dec.13    , 2010          *Robert Bardwil*
                                  ROBERT S. BARDWIL
                                  United States Bankruptcy Judge

———————————

14.  Objection to Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to Federal Rule of Bankruptcy [Procedure] 9019, filed October 13, 2010, 11:9-13.

- 26 -

1       **CERTIFICATE OF MAILING**

2   I, Andrea Lovgren, in the performance of my duties as Deputy
Clerk to the Honorable Robert S. Bardwil, mailed by ordinary mail
3 a true copy of the attached document to each of the parties
listed below:

4

Gregory Nuti      Bank of Montreal
5 Schnader Harrison Segal & Lewis c/o James Spiotto
One Montgomery Street, Ste. 2200 Chapman and Cutler
6 San Francisco, CA 94104- 5501 111 W Monroe Street
               Chicago, IL 60603
7 Jaime Dreher
Downey Brand, LLP
8 621 Capitol Mall, 18th Floor  Robert Greenfield
Sacramento, CA 95814-4731  Stutman Treister & Glatt
9             1901 Avenue of the Stars, 12th Fl
Malcolm Segal      Los Angeles, CA 90067
10 Segal & Kirby, LLP
770 L Street, 1440
11 Sacramento, CA 95814
             Erik Martin
12 Andrea Miller      Haynes and Boone, LLP
Nageley Meredith & Miller   201 Main Street, Suite 2200
13 8001 Folsom Blvd., Suite 100  Fort Worth, TX 76102
Sacramento, CA 95826
14             Kristin Madigan
             Quinn Emanuel Urquhart &
Paul Pascuzzi      Sullivan
15 Felderstein Fitzgerald    50 California Street, 22nd Floor
  Willoughby & Pascuzzi   San Francisco, CA 94111
16 400 Capitol Mall, Suite 1450
Sacramento, CA 95814

17

18 Marc Levinson
Orrick Herrington & Sutcliffe
19 400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497

20

Robert Gebhard
21 1 Market Plz Steuart Twr., 8th Fl
San Francisco, CA 94105

22

23

24

25 DATE: December 13, 2010

26           _____
           Deputy Clerk
27

28