⑲

FILED

APR 1 4 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

### UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

In re:                                )    Case No. 09-29162-D-11
                                       )
SK FOODS, L.P.,                        )    Docket Control No. MG-5
                                       )
                  Debtor.              )    Date:  March 30, 2011
                                       )    Time:  10:00 a.m.
                                       )    Dept:  D
                                       )
_____)

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

On March 2, 2011, the law firm of Trepel McGrane Greenfield LLP ("TMG"), filed a final application for compensation and expense reimbursement (the "Motion") for services rendered as special counsel to the chapter 11 trustee in this case, Bradley D. Sharp (the "trustee").[1]  For the reasons set forth below, the court will grant the Motion in part.

### I.   THE POSITIONS OF THE PARTIES

TMG seeks final approval of $301,409.64 in fees and $92,951.79 in costs for the period October 1, 2009 through December 31, 2010, a total of $394,361.43, of which $50,133.70 has previously been approved on an interim basis.  TMG relies on the language of (1) its engagement agreement with the trustee,

---

1.  Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

(2) the trustee's application to employ TMG, (3) the supporting declaration of Christopher D. Sullivan, and (4) the order granting the Application,[2] and on 11 U.S.C. § 328(a) in seeking a contingency fee in the amount of $301,409.64, representing 20% of the net recovery on the estate's claims against B&G Foods, Inc. ("B&G"). TMG's requested costs include $84,425 billed to TMG by the law firm of Stutman, Treister & Glatt PC ("Stutman") for representing TMG in objecting to a motion to approve the trustee's settlement with B&G.

Both the contingency fee and the Stutman fees are in contention: the trustee objects to allowance of the Stutman fees, but not the contingency fee; the Official Committee of Unsecured Creditors (the "Committee") objects to the Stutman fees and the contingency fee, contending TMG should be allowed fees on an hourly basis based on the rates set forth in the Engagement Agreement; the Bank of Montreal ("BMO") requests that the Motion be denied in its entirety. The Committee objects to payment of any compensation from the debtor's estate, contending BMO should be responsible for payment. BMO disagrees.

## II.  ANALYSIS

This court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). The Motion is a core proceeding

---

2.  See Application for Order Authorizing Employment of McGrane Greenfield LLP as Special Counsel to the Trustee, filed November 16, 2009 (the "Application"); Declaration of Christopher D. Sullivan in support of the Application, filed November 16, 2009 (the "Sullivan Declaration"); Master Agreement for Year 2009 Legal Services, Exhibit A to the Sullivan Declaration (the "Engagement Agreement"); Order Approving and Authorizing Employment of McGrane Greenfield LLP as Special Counsel to the Trustee, filed December 23, 2009 (the "Employment Order").

under 28 U.S.C. § 157(b)(2)(B).

**A.   The Contingency Fee Was Approved Under § 328(a)**[3]

1.   Standards for Approval of Compensation of Professionals

Sections 328 and 330 create "a two-tiered system" for approval of the terms of a professional's employment and compensation.  Riker, Danzig, Scherer, Hyland & Perretti v. Official Comm. of Unsecured Creditors (In re Smart World Techs., LLC), 552 F.3d 228, 232 (2nd Cir. 2009).  Under § 330, the court reviews the requested compensation after the services have been performed to determine whether the compensation is reasonable considering the nature, extent, and value of the services.  By contrast, § 328(a) permits the court to "pre-approve" particular terms and conditions of employment as reasonable, and thereby "forgo a full post-hoc reasonableness inquiry."  Id.

If the court pre-approves the terms and conditions under § 328(a), it may thereafter allow different compensation only if those terms and conditions "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  Id., quoting § 328(a).

> These two inquiries are mutually exclusive, as ". . . a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328."

---

3.   BMO is the only party that contends the contingency fee was not approved under § 328(a), and thus, remains subject to approval under § 330.  BMO and the Committee both contend that, even if the fee was approved under § 328(a), it would be improvident to allow it in light of developments not capable of being anticipated at the time it was approved.  This latter argument will be addressed below.

1   <u>Id.</u>, at 232-33, quoting <u>Friedman Enters. v. B.U.M Int'l, Inc. (In</u>

2   <u>re B.U.M. Int'l, Inc.)</u>, 229 F.3d 824, 829 (9th Cir. 2000); <u>see</u>

3   <u>also In re First Magnus Fin. Corp.</u>, 2009 Bankr. LEXIS 4534, *23

4   (9th Cir. BAP 2009) ["§§ 328(a) and 330 reflect very different

5   approaches to court review and approval of professional

6   compensation.  Correspondingly, approval of a professional's

7   employment under the terms of either § 328(a) or § 330 legally

8   limits the application of the other provision."].

9       Thus, the crux of the matter here is whether, on the one

10  hand, the court pre-approved TMG's contingency fee under the

11  first sentence of § 328(a), so as to limit further inquiry to an

12  "improvident in light of developments" review under the second

13  sentence, or, on the other hand, left open the possibility of

14  further review of the reasonableness of the contingency fee under

15  § 330.

16      The applicable test in the Ninth Circuit is set forth in

17  <u>Circle K Corp. v. Houlihan, Lokey, Howard & Zukin, Inc. (In re</u>

18  <u>Circle K Corp.)</u>, 279 F.3d 669 (9th Cir. 2001):

19          We hold that unless a professional's retention
            application unambiguously specifies that it seeks
20          approval under § 328, it is subject to review under §
            330.  As a matter of good practice, the bankruptcy
21          court's retention order should likewise specifically
            confirm that the retention has been approved pursuant
22          to § 328 so as to avoid any ambiguity.  The absence of
            such a specific reference in the bankruptcy court's
23          order, however, would not of itself automatically
            override the retention application's invocation of §
24          328.

25  279 F.3d at 671.

26  2.  Procedural Background of TMG's Employment

27      On November 16, 2009, the trustee filed the Application, in

28  which he sought to employ TMG (then known as McGrane Greenfield

- 4 -

LLP) as his special counsel for the purpose of prosecuting claims
to collect certain accounts receivable.  This was a garden-
variety application to employ counsel for a bankruptcy trustee,
indicating only that the trustee sought to employ McGrane
Greenfield "on the basis of [its] experience and knowledge in
prosecuting claims for money damages in bankruptcy-related
litigation," that McGrane Greenfield is competent and skilled in
those matters, and that its attorneys have substantial experience
in providing legal services.  The trustee did not set the
Application for hearing.

In light of the trustee's earlier and ongoing employment
of Schnader Harrison, a large and sophisticated law firm, as his
general bankruptcy counsel, the court questioned the need for
special counsel to perform what appeared to be garden-variety
collection work, and therefore, required the trustee to set the
matter for hearing.  The trustee set the Application for hearing
and served a notice of hearing on the Office of the United States
Trustee, parties requesting special notice in this case, and a
"core group" of creditors and attorneys, including the various
counsel for the debtor, the Committee, Scott Salyer and related
entities, and BMO.

No party opposed the Application or sought clarification of
the terms and conditions of the proposed employment.  At the
hearing, the court expressed its concerns about the trustee's
apparent need to farm out what appeared to be basic collection
work and questioned the terms of compensation, proposed to be the
greater of fees on hourly basis or a 20% contingency fee.
Counsel responded that the work was expected to be not so

- 5 -

straightforward, but could involve setoff rights; he emphasized
that the proposed hourly rates were lower than those normally
charged by McGrane Greenfield.  As further clarification, the
trustee alluded to complex antitrust issues in the B&G matter.
He stated he had discussed the compensation arrangement with the
debtor's secured lenders -- presumably BMO as agent for the major
secured lenders -- and suggested they had approved the
arrangement.[4]  BMO did not appear at the hearing.  As further
discussed below, the court granted the Application.  No party
asked to approve the form of the Employment Order or objected to
the order after it was entered.

3.   The Documents Evidencing the Terms of TMG's Employment

    The Application stated that the trustee sought to employ
McGrane Greenfield "on the terms and conditions stated in [the
Engagement Agreement]."  Application, at ¶9.  The Engagement
Agreement, in turn, set forth the hourly rates to be charged, and
stated, "Subject to Bankruptcy Court approval under section
328(a)," the trustee would pay McGrane Greenfield the greater of
(1) the fees charged by the hour at those hourly rates, plus
costs, or (2) a fee equal to 20% of the amounts recovered (net of
costs) in the collection matters on which McGrane Greenfield was
retained, including the B&G matter.  Engagement Agreement, at
¶¶3, 4.  In his declaration, Christopher D. Sullivan stated,

---

    4.  "I've discussed this with the secured lenders.  They had
some feedback on the first proposal, and this is the subsequent
proposal that we're going forward with that, I think, meets
everybody's needs."  Declaration of Christopher D. Sullivan in
Support of Trepel McGrane Greenfield LLP's Omnibus Reply to
Objections to Its Final Application for Compensation and Expense
Reimbursement, Ex. A, at 6.

1    McGrane Greenfield LLP agrees to be employed under the
2    terms and conditions stated in the [Engagement
     Agreement].  McGrane Greenfield LLP agrees that all
3    professional fees and payment of invoices are subject
     to bankruptcy court approval under 11 U.S.C. §§ 327 and
     328.

4

5    Sullivan Declaration, at ¶6.  The Employment Order states, "All

6    fees are subject to further court approval and subject to

7    Sections 327 and 328(a) of the Bankruptcy Code."  Employment

8    Order, at 2:15-16.

9    4.  Conclusions

10        The court concludes that the Employment Order constituted a

11   pre-approval of the "greater of" the hourly or contingency fee

12   arrangement, thus foreclosing an examination of the contingency

13   fee for reasonableness under § 330.

14        With the exception of the Application, all the relevant

15   documents referred to § 328(a); neither the Application nor any

16   of the other documents referred to § 330.  The Sullivan

17   Declaration stated unambiguously that McGrane Greenfield LLP (1)

18   agreed to be employed under the terms and conditions stated in

19   the Engagement Agreement, and (2) agreed that all professional

20   fees and payment of invoices would be "subject to bankruptcy

21   court approval under 11 U.S.C. §§ 327 and 328."  The Engagement

22   Agreement, in turn, twice referred to McGrane Greenfield's

23   compensation as being "subject to Bankruptcy Court approval under

24   Section 328(a)" -- once in the paragraph setting forth the hourly

25   rates and again in the paragraph setting forth the "greater of"

26   arrangement, which included the contingency fee.

27   / / /

28   / / /

- 7 -

1   The Employment Order states, "All fees are subject to
2   further court approval and subject to Sections 327 and 328(a) of
3   the Bankruptcy Code."  In the court's view, this second clause,
4   together with the specific references to § 328(a) in the Sullivan
5   Declaration and the Engagement Agreement and the absence of any
6   reference to review under § 330, concludes the matter.  As noted
7   above, in terms of the review of fees, §§ 328(a) and 330 are
8   mutually exclusive; thus, if it was the intention of the parties
9   or the court to review TMG's compensation under § 330 after its
10  services were performed, there would have been no need to state
11  in the order that the fees would be subject to review under §
12  328(a).

13  As discussed above, the court had its own concerns about the
14  Application and required notice and a hearing for the very
15  purpose of giving the interested parties an opportunity to
16  present any opposition.  BMO and the others received notice of
17  the hearing, and were plainly made aware that McGrane Greenfield
18  was agreeing to be retained subject to § 328(a).  Given BMO's
19  security interest in virtually all the debtor's assets, including
20  the B&G receivable, BMO had every incentive to ensure, if it so
21  chose, that McGrane Greenfield's fees would instead be subject to
22  review under § 330.  BMO was apparently satisfied with the
23  arrangement at the time; indeed, the trustee suggested at the
24  hearing that alternatives had been discussed with the secured
25  lenders and this arrangement appeared to meet everyone's needs.
26  BMO did not oppose the Application or seek clarification or
27  modification of the terms of the employment, and did not object
28  to the form of the Employment Order.  It will not be heard to do

- 8 -

1  so now.[5]

2      In these circumstances, this court is not free to review the

3  contingency fee under § 330 reasonableness standards, but only to

4  determine if it was improvident in light of developments not

5  capable of being anticipated at the time it was approved.[6]

6  **B.  Subsequent Events Were Capable of Being Anticipated**

7      Where a fee arrangement has been approved in advance under §

8  328(a), the court may vary it later only "if such terms and

9  conditions prove to have been improvident in light of

10  developments not capable of being anticipated at the time of the

11  fixing of such terms and conditions."   § 328(a); Circle K Corp.,

12  279 F.3d at 671; In re Confections by Sandra, Inc., 83 B.R. 729,

13

14      5.  At least twice, BMO quotes the Employment Order as
stating that "[a]ll fees are subject to further court approval."
15  BMO concludes from this language that "any claimed reliance on
Section 328(a) to avoid scrutiny of the contingency fee is
16  misplaced."  Objection of Bank of Montreal as Agent for the
Secured Lenders to the Final Fee Application of Trepel McGrane
17  Greenfield LLP and Expense Reimbursement, filed March 16, 2011
("BMO Objection"), at 5. It is significant that BMO puts the
18  period after the word "approval" and omits the second clause of
the sentence:  "and subject to Sections 327 and 328(a) of the
19  Bankruptcy Code."  BMO clearly seeks to re-write the Employment
Order.

20
        Similarly, the opposition fails to address the fact that
21  the Sullivan Declaration and the Employment Agreement
unambiguously expressed McGrane Greenfield's agreement to be
22  employed subject to § 328(a), as required by Circle K Corp.  BMO
simply has no response to the conclusion that the documents, as
23  written, were intended to result in employment and compensation
under § 328(a).

24
        6.  This conclusion forecloses BMO's arguments that TMG's
25  services did not confer an actual benefit on the estate and that
the contingency fee is not reasonable.  These arguments and the
26  cases cited, Rubner & Kutner, P.C. v. United States Trustee (In
re Lederman Enterprises, Inc.), 997 F.2d 1321 (10th Cir. 1993),
27  Ferrara & Hantman v. Alvarez (In re Engel), 124 F.3d 567 (3rd
Cir. 1997), and In re Yermakov, 718 F.2d 1465 (9th Cir. 1983),
28  pertain to a § 330 analysis where there has been no pre-approval
under § 328(a).

731 (9th Cir. BAP 1987). "The term 'unanticipated developments'
is subject to a broad interpretation," but "the standard is
high." <u>Ezra | Brutzkus | Gubner LLP v. Integrated Knowledge</u>
<u>Marketing, Inc. (In re Integrated Knowledge Marketing, Inc.)</u>,
2007 Bankr. LEXIS 4845 *27-28 (9th Cir. BAP 2007), citations
omitted.

It is important to recognize that the question is not
whether the subsequent events were anticipated, but whether they
were capable of being anticipated. <u>In re Barron</u>, 225 F.3d 583,
586 (5th Cir. 2000). Thus, in applying the test to the
particular facts before it, one court found each of these
developments to have been capable of being anticipated: that the
recovery was of an unexpectedly significant amount, that the case
proved to be a "slam dunk," and that collection proved relatively
easy. <u>Daniels v. Barron (In re Barron)</u>, 325 F.3d 690, 693-94
(5th Cir. 2003).

In <u>Integrated Knowledge Marketing</u>, the Ninth Circuit
Bankruptcy Appellate Panel found that the fee applicants were
"sophisticated, experienced, and knowledgeable law firms with
extensive experience in bankruptcy law," such that they could be
expected to have foreseen that the adversary defendants would
either purchase or successfully object to most, if not all, the
claims against the estate and then get the underlying bankruptcy
case dismissed. <u>Integrated Knowledge Marketing</u>, 2007 Bankr.
LEXIS 4845, at *28.

In the present case, first, all the parties involved in this
dispute have been represented by experienced and sophisticated
attorneys, most with an extensive background in bankruptcy law.

1  Second, from the commencement of the case, BMO has asserted a

2  lien in virtually all the assets of the estate, including

3  accounts receivable such as the B&G receivable.  As such, BMO has

4  been as active a participant in this case as the trustee; in

5  essence, they have been co-quarterbacks.  Because of BMO's lien

6  against the B&G receivable, the claim could not have been settled

7  without BMO's consent.  It is simply not credible that the

8  parties could not have foreseen that BMO would play a significant

9  role in resolving the claim.

10      BMO now contends that B&G's counterclaim "chilled the

11  enthusiasm of TMG and caused a litigation stalemate,"[7] which

12  required BMO to step into the breach and settle the case.  These

13  developments, according to BMO, were not capable of being

14  anticipated.  As supporting evidence, BMO's Lawrence Mizera

15  suggests that B&G filed the counterclaim "as a result" of the

16  wide-ranging claims asserted in TMG's complaint against it.[8]  He

17  also testifies, "When B&G filed its antitrust counterclaims, TMG

18  could not identify any apparent remedy or defense, and their

19  enthusiasm seemed to cool for pursuing these claims."  Mizera

20  Declaration, at ¶9.  He adds that

21          [t]he myriad of theories asserted by TMG and the
            complex nature of the counterclaim of B&G, especially
22          the antitrust and unfair trade practices allegations,
            resulted in a virtual standoff between the litigants.
23          Protracted and costly litigation appeared likely.

24  Id. at ¶10.

25  / / /

26  ——————————

27      7.  BMO Objection, at 6.

28      8.  Declaration of Lawrence Mizera in support of BMO
    Objection, filed March 16, 2011 ("Mizera Declaration"), ¶¶8, 9.

First, it is unlikely the parties did not anticipate the
filing of the counterclaim in the adversary proceeding given that
B&G had filed a $3.5 million proof of claim against the estate
two months before the trustee retained McGrane Greenfield.
Second, BMO's position would require the court to accept Mizera's
broad-reaching speculations as fact -- that B&G would not have
filed a counterclaim had TMG included fewer or less sweeping
claims in its complaint, that TMG was not up to the task of
defending against the counterclaim, and that the negotiations
with B&G reached an impasse that only BMO could break.  This is
exactly the sort of second-guessing a professional seeking a
degree of certainty in being employed under § 328(a) may
reasonably expect to be protected from.  Finally, while BMO
and/or the other parties may not have anticipated these
developments (to whatever extent they occurred), all these
things, including that "[p]rotracted and costly litigation
appeared likely" and that BMO would become heavily involved in
the negotiations, were surely capable of being anticipated.

As no party has shown there were developments not capable of
being anticipated at the time the contingency fee arrangement was
approved, the court has no basis on which to revisit it.

**C.  TMG Is Not Entitled to Reimbursement of the Stutman Fees**

TMG contends it was forced to hire Stutman "as a consultant
under ¶6c of the Engagement Letter to 'aid [TMG] in representing
[Trustee].'" Motion, at 11.  Paragraph 6(c) of the Engagement
Agreement provides that the trustee will pay the fees and charges
of expert witnesses, consultants and investigators.

/ / /

- 12 -

1      There is no credible interpretation of the Engagement
2  Agreement under which reimbursement of the Stutman fees may be
3  allowed.   First, ¶6(c) states that TMG will select such
4  consultants "in consultation with [the trustee]."  In contrast,
5  TMG engaged the Stutman firm on its own, without consulting with
6  the trustee.   Second, it appears the Stutman fees were incurred
7  solely to aid TMG in defending its own interests, not "to aid in
8  representing [the trustee]," as required for reimbursement under
9  ¶6(c).   TMG itself states it retained Stutman because a conflict
10 of interest had arisen between TMG and the trustee.

11     TMG cites the <u>Wind N' Wave</u> case for the proposition that
12 fees and expenses incurred in securing an attorney's fee award
13 may be recovered in some instances.  <u>See</u> <u>North Sports, Inc. v.</u>
14 <u>Knupper (In re Wind N' Wave)</u>, 509 F.3d 938, 943-44 (9th Cir.
15 2007), citing <u>Smith v. Edwards & Hale (In re Smith)</u>, 317 F.3d
16 918, 928 (9th Cir. 2002).  The court acknowledges the holding of
17 these cases that the time and expenses of litigating a fee award
18 are compensable where (1) the services performed satisfy the
19 requirements of § 330(a)(4)(A), and (2) the case "exemplifies a
20 'set of circumstances' where the time and expense incurred by the
21 litigation is 'necessary' within the meaning of section
22 330(a)(1)."   <u>Smith</u>, 317 F.3d at 928.

23     TMG contends it was forced to engage the Stutman firm for
24 two reasons -- first, that TMG itself was incapable of defending
25 its contingency fee.

26         TMG is simply not a transactional bankruptcy firm.
           Rather, TMG is a civil litigation firm with a
27         bankruptcy orientation.  Because of this fact, TMG
           needed to call on Stutman's expertise to unwind the
28         complicated circumstances it was being exposed to when

the Trustee and BMO entered into an independent
settlement agreement that raised an obstacle to TMG's
recovery of its fees.[9]

Second, Christopher Sullivan, TMG's lead counsel on this case,

was too busy with a $100 million jury trial to be able to deal

with BMO's opposition to the B&G settlement motion.

The court rejects these arguments.  The court is

sufficiently familiar with the nature of the contingency fee

dispute to easily conclude that the decision to engage the

Stutman firm was a choice TMG made on its own and for its own

benefit.  The request for reimbursement of the Stutman fees is

simply a case of overreaching.[10]

**D.  Approved Fees and Costs Will Be Paid By BMO**

The trustee, the Committee, and TMG contend TMG's fees and

costs are payable from the proceeds of the B&G settlement, and

that since those proceeds have been distributed to BMO, payment

should be made by BMO.  BMO contends TMG's compensation, if any,

should be allowed as an administrative claim against the estate.

The following background is pertinent to this dispute.

According to a status conference statement filed in the

trustee's adversary proceeding against B&G, Adv. No. 10-2166, the

litigation had been settled sometime before August 27, 2010.  One

---

9.  Trepel McGrane Greenfield LLP's Omnibus Reply to
Objections to Its Final Application for Compensation and Expense
Reimbursement, at 4.

10.  The court also rejects TMG's argument that the Stutman
representation benefitted the estate because "Stutman's efforts
ultimately resulted in the Trustee's being able to settle with
both BMO and B&G on terms satisfactory to all of the Trustee, TMG
and BMO."  Motion, at 11.  The matter of the contingency fee was
not resolved by Stutman's involvement; it was merely reserved for
another day.

month later, on September 29, 2010 (before the motion to approve
the B&G settlement was filed), the trustee filed a motion to
approve a broad-ranging compromise with BMO pursuant to which,
among other things, the trustee would transfer to BMO the
debtor's accounts receivable and litigation related to those
accounts receivable.  The motion did not mention B&G or the
pending adversary proceeding or in any way indicate that the B&G
receivable or the B&G litigation was excluded from the transfer
provision of the compromise.[11]

The settlement agreement memorializing the BMO compromise
provided that the trustee would cooperate with BMO in realizing
on the accounts receivable and that the costs and expenses of
pursuing recovery would by borne solely by BMO.  The B&G
receivable was not excluded from these provisions.[12]  The
settlement agreement did not mention the adversary proceeding
against B&G.

Thus, although the issue of the source of payment of TMG's
compensation was clearly in play and must have been a point in
issue when the parties negotiated the BMO global compromise, they
left it unaddressed.  The issue first surfaced when TMG filed the
trustee's motion to approve the B&G compromise on October 7,

_____

11.  Several months earlier, in May 2010, the trustee, the
Committee, and BMO had proposed a joint plan of liquidation
containing virtually identical terms with respect to the debtor's
accounts receivable.  Again, there was no mention of the B&G
receivable, although it was clearly in play at that time.  (TMG
had commenced the adversary proceeding against B&G on March 25,
2010.)

12.  The joint plan contained virtually identical provisions
-- the trustee would cooperate with BMO's collection efforts; BMO
would bear the costs.  The plan did not mention the B&G
receivable or purport to exclude it from these provisions.

- 15 -

2010, and BMO filed a limited objection to that motion on October
27, 2010.  TMG then raised the issue in connection with the
motion to approve the BMO compromise by way of a joint limited
objection to that motion and response to BMO's limited objection
to the B&G settlement, filed November 22, 2010.[13]

The parties did not ask the court to resolve the issue in
connection with either the motion to approve the BMO compromise
or the motion to approve the B&G settlement, but simply decided
to reserve their rights on the issue.  They did not undertake to
modify the terms of either compromise and did not address the
issue further in connection with either motion.  The court then
issued a memorandum decision addressing the opposition of the
Salyer entities to the BMO compromise, and granted the motion --
a motion that informed creditors that accounts receivable would
be transferred to BMO, with BMO to bear the associated costs.
The court finds no reason to make an after-the-fact exception for
the B&G receivable.

The court recognizes that BMO apparently became dissatisfied
with TMG's efforts and decided to substitute its own.  However,
that factor is outweighed by the facts that (1) the trustee's

13.  On November 24, 2010, BMO filed a response to TMG's
joint limited objection and response, in which BMO argued only
that the joint limited objection should not be considered because
it had not been filed timely under the briefing schedule set by
the court at the October 27, 2010 hearing.  On December 1, 2010,
TMG filed a response, pointing out that it had had no reason to
suspect a problem with the BMO compromise until after the October
27 hearing had been concluded, and thus, had not attended the
hearing.  As a result, TMG had not been aware of the briefing
schedule, and had filed its joint limited objection by the
deadline that would have applied under LBR 9014-1.

In its November 24, 2010 response, BMO chose not to address
the issue of the contingency fee on its merits.

- 16 -

global compromise with BMO and the various components of
consideration given on both sides included a transfer of accounts
receivable to BMO, with BMO to bear the associated costs of
realizing on them, (2) creditors were not informed that an
exception would be made for the B&G receivable, and (3) BMO
received the entire benefit of the receivable.   The court notes
again that BMO was aware of the terms of the trustee's employment
of McGrane Greenfield at the time those terms were approved and
had every incentive and opportunity to object or to negotiate
some other arrangement.

The court resolves this issue without reference to the
apparent waiver of § 506(c) surcharge rights in the final cash
collateral order or to the "waiver of the waiver" alleged by TMG.
This is simply a matter of accounts receivable and the litigation
related to them having been transferred to BMO as part of the
global settlement.[14]   Having received the benefits, BMO will not
be permitted to transfer back to the estate the burdens
associated with that litigation.

───────────────

14.   Indeed, BMO seems to have believed the transfer had
already occurred and that BMO was in a position to resolve the
B&G litigation without reference to the interests of TMG, the
estate, or creditors:

> The Settlement Agreement [with B&G] is silent as to any
> legal fees that the Estate may owe by reason of the
> settlement and does not purport to cover that topic.
> That was the understanding of the parties, and prior to
> executing the Agreement, [BMO] specifically articulated
> its position that the Agreement did not cover the issue
> of any administrative expenses the Estate might owe as
> these were not issues for [BMO] or B&G.

Limited Objection and Reservation of Rights of Bank of Montreal
as Agent for the Secured Lenders Regarding Plaintiff's Motion to
Approve Settlement With B&G Foods, Inc., filed October 27, 2010,
at 4, emphasis added.

### III.    CONCLUSION

For the reasons discussed above, the court will grant the Motion in part.  TMG's request for a contingency fee in an amount equal to 20% of the recovery obtained in the B&G settlement, net of costs, will be granted.  TMG's request for reimbursement of costs, with the exception of the request for reimbursement of the Stutman fees, will be granted.  TMG's request for payment from the proceeds of the B&G settlement will be granted, and BMO will be directed to pay the approved fees and costs.

The amounts that will be approved are calculated as follows:

| | |
|---|---|
| Gross recovery from B&G | $1,600,000.00 |
| Less TMG costs | 7,363.59[15] |
| Net recovery from B&G | 1,592,636.41 |
| Contingency fee equal to 20% | $   318,527.28 |
| Less fees previously advanced | $    48,693.36 |
| Balance due on contingency fee | $   269,833.92 |
| Plus balance due on TMG costs | 5,923.25[16] |
| Balance due on contingency fee & costs | $   275,757.17 |

/ / /

The court will issue an appropriate order.

Dated:  **April 14**, 2011        *Robert Bardwil*
                                  ROBERT S. BARDWIL

---

15.  This figure is, in turn, calculated as follows.  The Motion states that the total billed by Stutman was $84,425.  However, that figure represents only the fees billed by Stutman, and not the costs, $1,163.20.  Thus, the total billed by Stutman, as reflected on the last page of TMG's Exhibit 3, was $85,588.20.  Deducting that figure from the total costs incurred by TMG, $92,951.79, leaves $7,363.59.

16.  Total TMG costs, $7,363.59, less amounts previously advanced, $1,440.34.

**CERTIFICATE OF MAILING**

I, Andrea Lovgren, in the performance of my duties as Deputy Clerk to the Honorable Robert S. Bardwil, caused to be mailed by ordinary mail a true copy of the attached document to each of the parties listed below:

Gregory Nuti
Schnader Harrison Segal & Lewis
One Montgomery Street, Suite 2200
San Francisco, CA 94104

Christopher Sullivan
Trepel McGrane Greenfield
150 California Street, Suite 2200
San Francisco, CA 94111

Jamie Dreyer
Downey Brand, LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731

Marc Levinson
Orrick Herrington & Sutcliffe
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497

James Spiotto
Chapman and Cutler
111 West Monroe Street
Chicago, IL 60603

DATE: April 14, 2011

_Andrea Lovgren_
Deputy Clerk