**FILED**

October 07, 2011

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003821564

**25**

1  Todd J. Dressel (SBN 220812)
CHAPMAN AND CUTLER LLP
2  595 Market Street, 26th Floor
San Francisco, CA 94105
3  Telephone:    (415) 278-9088
Facsimile:    (415) 541-0506
4  dressel@chapman.com

5
James E. Spiotto *(Admitted Pro Hac Vice)*
6  Ann E. Acker *(Admitted Pro Hac Vice)*
James M. Heiser *(Admitted Pro Hac Vice)*
7  CHAPMAN AND CUTLER LLP
111 West Monroe Street
8  Chicago, IL  60603
Telephone:    (312) 845-3000
9  Facsimile:    (312) 516-1900
spiotto@chapman.com
10  acker@chapman.com
heiser@chapman.com
11

12  Attorneys for Bank of Montreal, as Administrative Agent

13              **UNITED STATES BANKRUPTCY COURT**
              **EASTERN DISTRICT OF CALIFORNIA**
14                **SACRAMENTO DIVISION**

15  In re:                              Case No. 09-29161-D-11

16  SK FOODS, L.P.                      Chapter 11

17  a California Limited Partnership, et al.   DCN:  SH-76

18            Debtor.                   **SUPPLEMENTAL MOTION *IN LIMINE***
                                      **REGARDING THE TESTIMONY OF**
19                                      **JOHN P. BRINCKO**

20                                      Judge:    Hon. Robert S. Bardwil

21                                      Date:    October 19, 2011
                                      Time:    9:30 a.m.
22                                      Ctrm:    34
                                              501 I Street, 6th Floor
23                                              Sacramento, CA  95814

24

25

26

27

28  3080259.01.06.B.doc

# TABLE OF CONTENTS

SECTION                              HEADING                                           PAGE

SUMMARY ................................................................................................................1

ARGUMENT ..............................................................................................................2

I.  THE BRINCKO DECLARATION IS ENTITLED TO NO WEIGHT IN EVALUATING
    THE BMO SETTLEMENT AND IS NOT RELEVANT TO THE RULE 9019 INQUIRY ................2

    A.  Brincko's Testimony is Unreliable and Applies Flawed Methodology ................5

        1.  Brincko's Analysis is Internally Inconsistent ................................8

        2.  Brincko's Calculation of Liquidation Value as of the Petition Date is
            Flawed .................................................................................9

            a.  Brincko's Testimony Regarding the Lemoore and Williams
                Fixed Assets Is Inconsistent, Without Basis, and Improperly
                Applies a Forced Liquidation Approach That Results in a
                $54-$70 Million Undervaluation ................................................11

            b.  Brincko's Real Property Valuations Rest on Outlandish
                Assumptions .....................................................................12

            c.  The "Bill and Hold" Inventory Would Increase the Value of the
                Pre-Petition Collateral, Not Reduce It ......................................13

            d.  Brincko Provides No Basis for $5.5 Million in "Wind Down
                Costs" ..........................................................................15

            e.  Brincko's Analysis of the PACA Claims Ignores the Diminution
                in Value of the Collateral Post-Petition ....................................15

            f.  Brincko Fails to Account for Significant Other Events, Including
                the Pre-Petition Funding of the 2009 Pack ..................................16

            g.  Brincko Failed to Account for the Value of the Debtors' Foreign
                Subsidiaries ...................................................................17

    B.  The Salyer Entities Have Failed To Establish That Mr. Brincko Is Even
        Qualified To Give Expert Witness Testimony ..................................................18

II. BRINCKO'S TESTIMONY SHOULD ALSO BE GIVEN NO WEIGHT BECAUSE THE
    SALYER ENTITIES UNFAIRLY AND UNJUSTIFIABLY REFUSED TO PRODUCE
    DOCUMENTS SUPPORTING HIS CONCLUSIONS ................................................20

CONCLUSION ..........................................................................................................22

SUPPLEMENTAL MOTION *IN LIMINE* REGARDING
THE TESTIMONY OF JOHN P. BRINCKO

**TABLE OF AUTHORITIES**

PAGE

## CASES

*Abbott Laboratories v. Brennan*, 952 F.2d 1346 (Fed. Cir. 1991) .......................... 19

*Anderson v. National R.R. Passenger Corp.*, 866 F. Supp. 937 (E.D. Va. 1994)......................... 19

*Children's Broadcasting Corp. v. Walt Disney Co.* 245 F.3d 1008 (8th Cir. 2001) ..................... 3

*Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499 (9th Cir. 1994) ................................... 6

*Continental Lab. Prods., Inc. v. Medax Int'l Inc.*, 195 F.R.D. 675 (S.D. Cal. 2000) ................. 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) ........................... 2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)............................... passim

*DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140 (N.D. Cal. 2003) ................................. 6

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................................ 10

*Guidroz-Brault v. Missouri Pacific Railroad Co.*, 254 F.3d 825 (9th Cir. 2001)......................... 6

*In re Becker*, 51 B.R. 975 (D. Minn. 1985) ........................................................................ 7

*In re California Devices, Inc.*, 126 B.R. 82 (Bankr. N.D. Cal. 1991) ...................................... 7

*In re Colonial Distributing Co.*, 291 F.Supp. 154 (D.S.C. 1968) ............................................ 14

*In re Dow Corning Corp.*, 237 B.R. 364 (Bankr. E.D. Mich. 1999) ...................................... 6, 7

*In re Pacific Gas and Elec. Co.*, 304 B.R. 395 (Bankr. N.D. Cal. 2004) ................................... 4

*In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717 (3d Cir. 1994) ...................................................... 7

*In re T.H. Richards Processing Co.*, 910 F.2d 639 (9th Cir. 1990)........................................ 14

*Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001) ....................................... 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................................................... passim

*Lust By & Through Lust v. Merrell Dow Pharms.*, 89 F.3d 594 (9th Cir. 1996) ................. 3, 6, 11

*Mitchell v. Gencorp Inc.*, 165 F.3d 778 (10th Cir. 1999) ....................................................... 7

*United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) ........................................................... 3

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000)..................................................................... 6

## RULES

FED. R. BANKR. P. 7026(a)(2) ................................................................................... 21

FED. R. BANKR. P. 7037 ............................................................................................... 21

FED. R. BANKR. P. 9019 ................................................................................... 1, 2, 3, 17

FED. R. CIV. P. 37(c)(1) ............................................................................................... 21

FED. R. CIV. PROC. 26(b)(4) ....................................................................................... 21

FED. R. CIV. PROC. 34 ................................................................................................. 20

FED. R. EVID. 104(a) .................................................................................................... 6

FED. R. EVID. 402 ......................................................................................................... 3

FED. R. EVID. 403 ......................................................................................................... 3

FED. R. EVID. 702 ......................................................................................................... 6

## OTHER AUTHORITIES

11 U.S.C. § 507(b) ............................................................................................... 6, 7, 16

CAL. COM. CODE § 2401(2) ....................................................................................... 14

SUPPLEMENTAL MOTION *IN LIMINE* REGARDING
THE TESTIMONY OF JOHN P. BRINCKO

NOW COMES Bank of Montreal, in its capacity as administrative agent (*"BMO"* or the *"Agent"*), and for its Supplemental Motion *in Limine* Regarding the Expert Testimony of John P. Brincko (the *"Motion"*), respectfully states as follows:[1]

### SUMMARY

Assuming it had no other defects, Brincko's testimony is insufficient to overcome the deferential standards applicable to the BMO Settlement under Rule 9019. Notwithstanding this, BMO respectfully submits that the proposed expert testimony of Mr. Brincko should be given little or no weight by the Court in this matter. Despite having no formal education beyond a bachelor's degree from the City College of New York, and having given up his accounting license in 1978, Brincko purports to opine on numerous complex issues of forensic valuation, without providing any basis for his conclusions other than his purported "expert knowledge and experience." However, Brincko cannot properly offer any insight into the valuation of BMO's superpriority claim. A careful review of his declaration reveals that Mr. Brincko fails to identify key aspects of the valuation methodology that he applied, or point to any methodology accepted in the field for his conclusions. Mr. Brincko does not compare the value of comparable assets, performs no discounted cash flow analyses, does not analyze the effects of appreciation or depreciation, or apply any recognizable valuation methodology. Further, Mr. Brincko has no stated expertise in forensic valuation issues, has no published articles on the subject, and has no relevant academic credentials. Rather, he appears to have relied upon bankruptcy schedules, monthly operating reports and other public filings to reach sweeping conclusions regarding the valuation of the Collateral which are contrary to those of numerous professionals who have spent almost two years analyzing the Debtors affairs. As described below, Brincko's alchemic analysis yields nothing helpful to the Court in resolving

---

[1]      Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to FED. R. BANKR. P. 9019 (the *"BMO Settlement"*). BMO incorporates the previously filed Motion *in Limine* dated November 24, 2010, relating to Brincko's expert testimony, by reference as if fully set forth herein.

the pending motion, and appears to have been conceived solely for supporting the Salyer Entities' position in this litigation. For example, Brincko's analysis haphazardly juxtaposes "forced liquidation" and "going concern" value, using whatever metric supports the Salyer Entities' position on a given issue. Further, it is premised on outlandish assumptions, such as that the Lenders would choose to sell real estate for half or one quarter of its value, that book value is the same as market value, that all manufacturing equipment is worth 10-15% of its book value regardless of its type or condition (apparently based on Brincko's experience in an unrelated case involving semiconductors), or other flawed or unsubstantiated assumptions. Mr. Brincko does not compare comparable recoveries in this case, such as the Chase settlement, or apply any consistent and cognizable valuation methodology. For these reasons, the Brincko Declaration fails every prong of the *Daubert* test and it could be excluded under Federal Rule of Evidence 702. However, in light of the District Court's ruling, Brincko's testimony should be given little or no weight if it is considered and the BMO Settlement should be approved.

**ARGUMENT**

**I.    THE BRINCKO DECLARATION IS ENTITLED TO NO WEIGHT IN EVALUATING THE BMO SETTLEMENT AND IS NOT RELEVANT TO THE RULE 9019 INQUIRY**

At the outset, BMO notes that Brincko's testimony is limited to his attempt to value BMO's superpriority claim. *Brincko Tr*. 10:10-13 ("My only opinion is based on value. I wasn't asked to give an opinion on fair and equitable.") Therefore, even taking Brincko's assertions at face value, his report only opines on one aspect of the Rule 9019 inquiry, BMO's superpriority claim, and is insufficient to show that the BMO Settlement, taken as a whole, falls below the lowest range of reasonable outcomes.

A key consideration in evaluating Brincko's testimony is whether he has developed his opinion expressly for the purpose of testifying, as opposed to from matters growing naturally or directly out of the research he conducts independent of the litigation. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) (considering "whether

the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" because the former "provides important, objective proof that the research comports with the dictates of good science.") (on remand). In such cases, experts must meet an even higher standard of precision due to the perceived lack of objectivity. *See Lust,* 89 F.3d at 597. Here, Brincko's testimony is not borne from any academic research or asset valuation work he performs, but rather was simply prepared for the purpose of supporting the Salyer Entities' arguments in this matter. This further undermines the weight his testimony should receive.

Here, Brincko's testimony is also constrained by the "relevance" limitations of FED. R. EVID. 402 and 403. *See, e.g., United States v. Scholl*, 166 F.3d 964, 971 (9th Cir. 1999) (finding that admissibility of expert testimony should be evaluated under FED. R. EVID. 402 to 403). Relevance, in this context, requires that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 591 (holding that the requirement that the expert testimony "'assist the trier of fact' . . . goes primarily to relevance"); *see also, American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after Daubert*, 157 F.R.D. 571, 579 (1994) ("[W]hether the testimony concerns economic principles, accounting standards, property valuation or other non-scientific subjects, it should be evaluated by reference to the 'knowledge and experience' of that particular field."); *see also, Children's Broadcasting Corp. v. Walt Disney Co*. 245 F.3d 1008, 1017-1018 (8th Cir. 2001) (testimony of business valuation expert excluded).

Here, Brincko's testimony is not even relevant to the ultimate at issue in this case, namely whether the proposed settlement falls below the lowest range of reasonable outcomes. This court's role in approving any settlement under Rule 9019 is limited. As BMO has noted, rather than conduct an exhaustive investigation or a "mini-trial on the merits," this court need

only find that the settlement was negotiated in good faith and is reasonable, fair and equitable to approve the BMO Settlement. *In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 416-17 (Bankr. N.D. Cal. 2004). Here, unless the Court is convinced that placing a precise value on the Collateral as of the Petition Date is necessary to assist the Court in deciding whether or not to approve the Motion, the Brincko Declaration should be given no weight in the outcome of the BMO Settlement. Requiring such a substantial showing would defeat the purpose of settlement, because it is this type of wasteful exercise that the Motion seeks to avoid.

Notwithstanding this, at deposition, Brincko maintained his assertion that BMO is entitled to receive nothing on its superpriority claim. *Brincko Tr.* 111:04-06. However, in dong so Brincko revealed other threshold flaws in his analysis which warrant giving little or no weight to his testimony, such as that he never even reviewed BMO's Security Agreement, despite it being of record since the outset of this case:

> Q.     Okay. Did you ever review the lenders' security agreement in this case?
> A.     No.

*Brincko Tr.* 120:12-14; [Dkt. No. 61] (containing Security Agreement). It is unclear how Brincko could have determined that BMO is entitled to receive nothing for its superpriority claim when he did not even review the agreement describing the collateral at issue. This was compounded by the fact that Brincko could not recall whether the Cash Collateral Orders entered in the case determined whether BMO was entitled to a replacement lien:

> Q.     Have you reviewed the cash collateral orders entered in this case?
> A.     I recall reviewing them at one time.
> Q.     Do you understand that the orders created a replacement lean equal to the amount of the cash collateral that was used?
> A.     I don't recall what I understand.
> Q.     You don't have an understanding one way or another.
> A.     I don't recall at this time.

*Brincko Tr.* 108:10-19. Brincko also did not consider critical facts, such as how much of the Debtors' postpetition cash disbursements were used to acquire or create new postpetition

replacement collateral. *Brincko Tr*. 106:24-25; 107:01-02. In fact, Brincko admitted at deposition that his analysis relied on hindsight:

> Q.     And you used hindsight to do your liquidation valuation?
> A.     We certainly did have some hindsight, yes.

*Brincko Tr*. 100:19-21. Despite having the benefit of hindsight, Brincko never considered the market value of the Collateral:

> Q.     Have you done any -- and you've done no analysis of the market value of the fixed assets.
> A.     No. I have not.

*Brincko Tr*. 79:11-13. Yet even with the benefit of hindsight, Brincko continued to haphazardly juxtapose "going concern" value with liquidation value, using whatever metric suite the Salyer Entities:

> Q.     So your assumption was that the company was not going to -- or that SK Foods facilities were not going to continue to operate. They were going to be broken up and sold.
> A.     Exactly.

*Brincko Tr*. 80:12-16. But this cannot be reconciled with his later testimony where he acknowledges that preparations were underway for the 2009 Pack. *Brincko Tr*. 122:09-18. He also acknowledged that he did not account for the significant value advanced by BMO to permit this to occur, or its impact on the value of the pre-petition collateral. *Brincko Tr*. 120:23-25; 121:01-08. Also, as described below, Brincko's failure to account for the prepetition liens on the equity in the Australian subsidiaries, which the Court has found a likelihood of success in showing that the equity in the Australian subsidiaries are assets of SK Foods, L.P., results in $30 million in unaccounted for prepetition collateral which will be shared with the unsecured creditors under the BMO Settlement. Brincko's testimony is not helpful to the Court and it should be stricken or given no weight.

## A.     Brincko's Testimony is Unreliable and Applies Flawed Methodology

To be admissible under Rule 702, an expert's opinion must be "not only relevant, but reliable." *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); FED. R. EVID. 104(a); FED. R. EVID. 702. A proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the proposed testimony meets both *Daubert's* reliability and relevancy requirements. *See, e.g., Lust By & Through Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996); *DSU Med. Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1146 (N.D. Cal. 2003) (granting motion to exclude expert testimony as unreliable). The Supreme Court has characterized the reliability inquiry as an "exacting" one. *Weisgram v. Marley Co.*, 528 U.S. 440, 451 (2000). The Salyer Entities have fallen far short of making the requisite showing that Brincko's testimony is both relevant and reliable.

Under Rule 702, expert testimony is considered to be reliable only if it is based on scientific, technical or other specialized knowledge, and not on conclusions made up of unsupported speculation and subjective beliefs. *Guidroz-Brault v. Missouri Pacific Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001), *see also, Daubert, supra*, 509 U.S. at 589-91. Accordingly, to determine reliability, the District Court must assess (1) whether the reasoning and methodology underlying the expert evidence is scientifically or technically valid, and (2) whether that reasoning and methodology properly can be applied to facts at issue. *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 501 (9th Cir. 1994) (citation omitted). Where the expert testimony is based on faulty methodology or reasoning, the expert's conclusion cannot be credited and is inadmissible. *Id*.

Even if the Court overlooked the threshold defects described above, Brincko's testimony is entitled to little or no weight because his analysis is based entirely on a flawed and unacceptable use of "book value" to value BMO's superpriority claim:

Q. And why did you start with the book value as of the petition date?
A. Because it's the methodology part of 507(b). You always look at the values of the assets as of the date of file.
Q. The book value?
A. Yeah.
Q. Are you aware of any of the cases that want you to look as of the fair market value of the assets as of the filing date?

SUPPLEMENTAL MOTION *IN LIMINE* REGARDING
THE TESTIMONY OF JOHN P. BRINCKO

A.     I'm not aware of any cases that say that.
Q.     All right.  And you didn't make any attempt to determine the fair market value as of the assets as of the petition date.
A.     No, I did not.

*Brincko Tr.* 52:18-25; 53:01-07.  Brincko's exclusive reliance on the value of the assets on the Debtors' books as of the petition date is flawed.  *See generally, In re California Devices, Inc.*, 126 B.R. 82, 85 (Bankr. N.D. Cal. 1991) (noting § 507(b) claim is governed by "actual loss") (*citing In re Becker*, 51 B.R. 975 (D. Minn. 1985)).  Brincko does not articulate how the "book value" correlates to the actual loss in value suffered by BMO, or show that the condition of the Debtors' books and records was of sufficient quality to warrant reliance on them.  As the Court is aware, much evidence has been submitted in this case calling into question this assumption.  *See, e.g., Seymour Dec.* ¶ 75-86, (*Heiser Dec.* Ex. 2); *Stoughton Davidson Financial Statement Withdrawal Notice* (*Heiser Dec.* Ex. 3) (noting that the Debtors' auditors had withdrawn the June 30, 2008 audited financial statements, undermining reliability of the Debtors' books and records).

Under *Daubert*, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) (*citing In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 745 (3d Cir. 1994)).

The decision in *In re Dow Corning Corp.*, 237 B.R. 364 (Bankr. E.D. Mich. 1999), is instructive.  In *Dow Corning*, creditors objecting to the debtor's plan of reorganization sought to admit "expert" testimony of a certified public accountant who would state that a litigation fund created for the benefit of victims of defective breast implants was insufficient to pay such victims' claims in full.  The court analyzed the *Daubert* test and, applying the test to the facts before it, concluded that the accountant's testimony was not reliable.  Even though, unlike here, the accountant was qualified as an accounting expert, the court determined that the accountant's methodology in determining the insufficiency of the litigation fund was flawed because he failed to account for certain assumptions and risks.  *Id.* at 368, 374.  These flaws

are magnified here because Brincko apparently has not practiced accounting since 1978, and has no professional or academic qualifications which could justify permitting him to opine on such topics:

> Q.    And did you stop accounting as an accountant in 1978?
> A.    I stopped being licensed as a CPA in 1978.  I didn't re-up because I had no need to.  The -- I wasn't in that profession any longer for a year, so I didn't.

*Brincko Tr*. 112:19-23; *see also Brincko Tr*. 112:03-06 ("I have taken some graduate courses, but I never got a master's degree").  While Brincko may have some corporate restructuring experience, and he may be qualified to serve in these roles, this does not by itself qualify him to give expert testimony.

### 1.    Brincko's Analysis is Internally Inconsistent

Probing deeper into the methodology employed by Brincko, it becomes apparent that Brincko's analysis is entirely inconsistent in the methodology employed between his Liquidation Value Analysis and Cash Disbursements Analysis.  For example, the liquidation value analysis assumes that the Agent takes a "forced" liquidation approach and sells each asset piecemeal as quickly as possible, including auctioning off manufacturing equipment piecemeal and selling real property separately at a sales price low enough to attract buyers willing to make a quick purchase.

However, in regard to his Cash Disbursements Analysis, Brincko concludes "based upon my experience, secured creditors in the Lenders' position would have employed a receivership process to sell the Lenders' collateral.  Specifically, the Lenders would have concluded that disposing of their collateral in a manner that allowed a buyer or buyers to continue to operate the underlying business as a going concern would result in the highest recovery on such collateral." *Brincko Dec*., ¶ 10.  This assumption is totally inconsistent with the forced liquidation approach which is the basis for his Liquidation Value Analysis.  Also, in his expert report, Brincko states without explanation or basis that, *inter alia*:

- All of his relevant assumptions are based on book value. *Brincko Dec.*, Ex. 2;[2]

- Based on his experience, the Lenders "would have employed a receivership process." *Brincko Dec.*, ¶ 10; and

- Preference recoveries mitigate diminution in value of the Collateral. *Brincko Dec.*, Ex. 3, p. 4.

However, the Brincko Declaration does not identify any standards, policies, practices, conventions or procedures to support his opinion, so there is no way to test the reliability of his testimony. Brincko does not identify how or why book value is the appropriate metric or whether the book value of the Collateral has any connection to its market value (particularly given the state of the Borrowers' books and records).

As described below, Brincko admits that he has never seen or identified a single piece of the Collateral. Rather, his valuation is based entirely on reviewing bankruptcy schedules, monthly operating reports, and court filings and making generalizations about the Collateral. While the Court may elect to consider it and afford it the minimal weight it deserves in determining whether the BMO Settlement should be approved, Brincko's testimony is wholly insufficient to justify the extraordinary relief of denying the BMO Settlement.

## 2. Brincko's Calculation of Liquidation Value as of the Petition Date is Flawed

To determine whether expert testimony is reliable under *Daubert*, the Court must: (1) assess whether the expert's technique or theory has been tested; (2) assess whether the technique or theory has been subject to peer review and publication; (3) evaluate the known or potential rate of error of the technique or theory when applied; (4) ascertain the existence and maintenance of standards and controls; and (5) determine whether the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 590-94. The Brincko Declaration fails on each account -- it is unhelpful, superfluous, and must be given

---

[2] This assumption was made even though the Debtors' audited financial statements had been withdrawn and SK Foods had told its creditors not to rely on them. *See*, *Heiser Dec.* Ex. 3.

little or no weight. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that evidence must be excluded if the court finds "that there is simply too great an analytical gap between the data and the opinion proffered").

Here, for example, Brincko's decision to use book value (as opposed to a fair market value approach) was apparently the outcome of talking to lawyers he knew, who told him that they would not take a "contingency case" based on the fair market value of the assets:

> Q.    In your view it would be inappropriate to use a fair market value of the assets when doing a liquidation analysis?
>
> A.    Based on my experience, yes. I know there are a hand -- a few cases out there, but they are not similar to this, and my experience has not shown me any of those cases, and most lawyers I've talked to wouldn't take a contingency case on that -- on a matter of that nature.

*Brincko Tr.* 78:22-25; 79:01-05. BMO respectfully submits that talking to lawyers about fee arrangements does not establish an appropriate valuation methodology, and that such impressionistic generalizations do not warrant denial of the BMO Settlement. *See, Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001) ("impressionistic generalizations" are inadmissible). But even assuming that a "forced liquidation" approach was appropriate, Brincko's application of that approach is inconsistent. For example, he opines that in a "forced liquidation" scenario, a lender would have sold off assets as quickly as possible, but for purposes of his report, he assumed that the Debtors would have continued to pack tomatoes:

> Q.    So you assumed that in the forced liquidation scenario, there would continue to be money expended on packing tomatoes?
>
> A.    Yes. I testified to that the several times earlier today.

*Brincko Tr.* 94:15-19. In other words, Brincko acknowledges that BMO was funding to a going concern sale and that the Debtors would have still continued to pack tomatoes (to support his inventory valuation) but that nonetheless, a "forced liquidation" approach was appropriate. While the Salyer Entities must establish that Brincko's testimony complies with *Daubert* and BMO bears no burden with respect to disproving his conclusions, as described

below, his conclusions do not withstand even basic scrutiny and are entitled to little or no weight in this matter.[3]

        **a.**    **Brincko's Testimony Regarding the Lemoore and Williams Fixed Assets Is Inconsistent, Without Basis, and Improperly Applies a Forced Liquidation Approach That Results in a $54-$70 Million Undervaluation**

Brincko makes sweeping statements without providing any basis for his conclusions, such that he expects only a 10-15% recovery on all "manufacturing equipment" of whatever kind, without differentiating between the specific equipment owned by SK Foods and other businesses. *Brincko Dec.*, Ex. 2, FN4; *see also* Ex. 3, p. 3, ¶ 1 (same). Surely not all "manufacturing equipment" is the same, but according to Brincko, it is all worth 10-15% of its "book value." His conclusion was apparently based on impressions and generalizations from a past case involving semiconductors, rather than any generally accepted principle of asset valuation or any analysis of what value would be received upon sale. *Brincko Tr.* 80:17-21. He also assumes that the unspecified manufacturing equipment would be "auctioned off piecemeal to the highest bidder." *Brincko Dec.*, Ex. 3, p. 3, ¶ 1. However, he provides no basis for why this would happen to the Agent's Collateral or why his "experience" has led him to this conclusion. Notwithstanding this, despite his purported use of hindsight in his analysis, Brincko basically admits that his "hindsight" methodology is flawed in this regard:

> Q.    Does your liquidation analysis assume that the manufacturing equipment would be auctioned off piecemeal?
> A.    Yes.
> Q.    And is that what in fact happened?
> A.    No.

*Brincko Tr.* 42:21-25; 43:01.

---

[3] These flaws are heightened by the fact that Mr. Brincko appears to have been employed by the Salyer Entities' counsel solely for the purpose of testifying in this litigation. The Ninth Circuit has stated that where an expert's opinion is generated only in a litigation context, such opinion will not satisfy the *Daubert* reliability standard unless the expert can "explain precisely" how the expert reached his conclusions and point to some objective source to show reliability. *Lust*, 89 F.3d at 597. No attempt is made to bridge this gap.

Moreover, a closer reading of his declaration reveals that over $108 million of his pre-petition book value is impacted by this flawed methodology. As such, even minor changes in the recovery percentage of this assumption will result in millions of dollars in difference in the analysis. His analysis is also internally inconsistent. He assumes that all of the expenses of a lengthy receivership and orderly liquidation would be incurred, but that the most valuable assets of the Debtors would be sold in a forced liquidation. By way of example, Brincko compares his estimate to the Chanin forced liquidation value, but the Chanin Report estimates a 63-88% recovery on the Lemoore Fixed Assets and a 54-67% recovery on the Williams Fixed Assets in a "Fund to Going Concern Sale" analysis. *Chanin Report* at 20 (*Supplemental Sharp Dec.*, Ex. 4) [Dkt. No. 2381]. As noted above, Brincko acknowledged that BMO was funding through the 2009 Pack and that his analysis assumed that the Debtors would continue to pack tomatoes. However, if the "fund to going concern sale" metric is applied, it results in $34-$47 million in extra value for the Lemoore Fixed Assets and $20-$23 million on the Williams Fixed Assets, for a total of $54-70 million in unaccounted fair value just on the fixed assets alone. This substantial defect is itself sufficient for the Court to give Brincko's testimony no weight.[4]

> **b.    Brincko's Real Property Valuations Rest on Outlandish Assumptions**

Brincko asserts that the real property recovery would be 25-50% of market value because of unspecified "zoning" and "environmental" issues. *Brincko Dec.*, Ex. 3, p. 3 ¶ 2. However, when questioned about the basis for this significant reduction, Brincko could not identify any zoning issues:

Q.    What zoning issues are you aware of that affected the value of the property?

---

[4]    Brincko's analysis is also flawed because it fails to assess the numerous other options the Agent could have employed had the bankruptcy not been filed. For example, if the Agent had not cared about preserving jobs and protecting the growers and creditors, another reasonable approach that could have been taken would have been to shut down the plants for the season and wait to sell the plants in their entirety (individually or together) when the market improved. This approach would provide a whole different set of assumptions to use in determining the value than those used by Brincko.

A.    I don't recall specifically what they were.

Q.    Can you say -- do you know with a any of the zones go issues were that affected the property?

A.    I don't recall at the moment.

*Brincko Tr*. 86:19-25; 87:01-04; *see also Brincko Tr*. 89:11-15 (describing inability to recall zoning issues on Williams property).

Due to these "zoning issues," Brincko asserts that the Agent would sell real estate for *one half to one quarter of its value*. However, he does not identify whether the actual property involved has any of these issues, let alone how this results in a 50-75% reduction in value. When asked to provide a basis for this assertion, Brincko acknowledged that this significant reduction in BMO's Collateral was just a guess:

Q.    What's your basis for that assumption?

A.    Just a range of values that we thought would be needed in a quick -- to attract buyers that are willing to make a quick purchase.

*Brincko Tr*. 85:03-25. Similar defects pervade the remaining aspects of Brincko's property valuation analysis. For example, with respect to certain real estate pledged to BMO that was located in Hawaii, Brincko did not even know what this property was, but indicated that he "would guess that it's a vacation property." *Brincko Tr*. 90:03-15. While admitting that he did not know whether there were any "environmental" or "zoning" issues with the property, he claimed that the significant discount attributed to this property in his report was justified because Hawaii real estate had generally been "depressed for the last several years." *Id*. In fact, Brincko admitted that his assumption was, again, based solely on "book value" and that he could not recall any appraisals or attempts to obtain a fair market value for the real property.

c.    **The "Bill and Hold" Inventory Would Increase the Value of the Pre-Petition Collateral, Not Reduce It**

Brincko also attempts to remove almost $10 million in collateral value from his analysis by removing the "bill and hold" inventory. However, his analysis is flawed and overly simplistic because he assumes that the bill and hold inventory should be subtracted from the pre-petition collateral. Brincko's conclusion was apparently based on his *legal opinion* that

the bill and hold claimants would "have the stronger argument as to holding that inventory." *Brincko Tr*. 126:10-21. Of course, Brincko never physically examined any inventory or other assets of the Debtors, so there is no basis for this assertion. However, where delivery of the products in question has not occurred, the contract must properly qualify as a "bill and hold" purchase in order for the purported purchaser to have any right in the goods. This is because, under California law, title passes upon delivery absent an agreement to the contrary. CAL. COM. CODE § 2401(2). While the bill and hold issue was eventually resolved in the bankruptcy case, in a liquidation scenario, the Agent would have certainly litigated the purported purchaser's right to claim status as a bill and hold purchaser, and, with perhaps one exception, would likely have prevailed on all of its claims and resold the bill and hold inventory for value. *In re T.H. Richards Processing Co*., 910 F.2d 639, 649 (9th Cir. 1990) (noting that under the California UCC, a bank's security interest in a food processor's "inventory" extended both to inventory which was being held by field warehousemen and to bill and hold inventory which was still in possession of processor while it awaited receipt of shipping instructions); *see also, In re Colonial Distributing Co*., 291 F.Supp. 154 (D.S.C. 1968) (where retailers entered into "bill and hold" agreements with liquor wholesaler and paid the full purchase price of liquor held by wholesaler for future delivery without segregating it in wholesaler's warehouse, title to liquor did not pass to retailers at time of agreements, and they were mere creditors of wholesaler). In other words, unless Mr. Salyer's employees properly segregated the "bill and hold" inventory in the warehouse (which they did not), it would have remained subject to the Agent's security interest and the Agent would be entitled to resell it and apply the proceeds to its security interest. As such, rather than a subtraction to the inventory valuation of $10 million, it should be an addition, with perhaps some adjustment made for collections. Of course, Brincko did not address any of this or review any of the contracts to see if they properly qualified as "bill and hold" purchases, but simply subtracted approximately

$10 million (which he reduced further for unspecified reasons) to support his flawed attempt to show the Agent has suffered no diminution in value.[5]

### d. Brincko Provides No Basis for $5.5 Million in "Wind Down Costs"

Brincko's analysis assumes approximately $5.5 million in "wind down costs," but the origin of this number is unknown. Page 4 of Exhibit 3 of the Declaration suggests that Brincko made an "estimation" of these costs, but he provides no methodology or support for this assertion. Brincko does not even identify what these costs include. Yet Brincko has subtracted this substantial sum from the value of the pre-petition collateral in his analysis. *Brincko Dec.*, ¶ 6. This does not comply with *Daubert* and shows that his testimony is not persuasive.

### e. Brincko's Analysis of the PACA Claims Ignores the Diminution in Value of the Collateral Post-Petition

Like Brincko's flawed assumptions regarding the bill and hold inventory, he makes the similar erroneous assumptions regarding the PACA claims. The $2 million figure was arrived at through negotiation in the bankruptcy process and Brincko gives no indication as to why this figure has any relevance outside of the bankruptcy, particularly because the Agent would have vigorously contested the PACA claims (which Mr. Salyer failed to satisfy) had they been asserted as priming the Agent's liens. Brincko admitted that he did not know that this was how the value of the PACA clams was established. *Brincko Tr*. 127:16-25; 128:01-05. Brincko's methodology is also flawed because the Agent is entitled to adequate protection for the diminution in value of its collateral associated with the funding of the PACA trust. Brincko admitted that he did not account for this, but also admitted that if he had, his analysis could change. *Brincko Tr*. 127:16-25; 128:01-05. In the bankruptcy case, since the lien for the PACA trust would be placed on the assets of the debtor where the debtor has failed to properly

---

5    Brincko's analysis also uses differing values for inventory than the weekly inventory numbers provided by Chanin or the Debtors that were the basis for Exhibit A to the Speer Declaration. The net difference is approx $6 million of book value (*e.g.*, Speer used $50.5 million vs. $44.6 million used by Brincko). However, like the rest of the declaration, there is insufficient detail provided by Brincko to reconcile these figures.

pay, or put into a PACA trust by setting aside or earmarking funds to pay PACA claims, the lien would have to be satisfied out of assets available to the estate's general unsecured creditors so that would it not diminish the value of collateral of the secured creditors. Accordingly, paying the $2 million for PACA claims out of the proceeds of the Secured Lenders' collateral was an advance, or diminution in value, of the collateral of the Agent to the detriment of the Agent and the Secured Lenders under the Cash Collateral Order, and the Agent would be entitled to both a replacement lien and a superpriority claim under 507(b). As such, to the extent that the $2 million PACA claim has any relevance to the analysis, it is to show that the Agent suffered a diminution in value for which it is entitled to a superpriority claim, which means that it must be factored into the analysis of the Agent's actual recovery, making the PACA claim at most a wash in the analysis.

### f. Brincko Fails to Account for Significant Other Events, Including the Pre-Petition Funding of the 2009 Pack

Mr. Brincko's declaration is also flawed because it does not address the 2009 Pack, or the fact that, instead of pursuing an immediate forced liquidation, the Agent provided both pre-petition (subsequent to February 2009) and post-petition funding of the pack, which had a significant impact on the Debtors valuation as of the petition date. For example, he noted:

> Q. Do you know if those the preparations were underway prior to bankruptcy filing?
> A. I believe they were on their way. I couldn't tell you to what extent.
> Q. Do you know if those preparations continued after the bankruptcy filing?
> A. I don't recall.
> Q. Okay. Did that have any impact on your analysis?
> A. No.

*Brincko Tr.* 122:09-18. Nor does Brincko address the impact of the Salyer Entities' conduct, including the wastewater dispute, on his analysis. The Salyer Entities' recent machinations regarding their assertion of "self help" remedies against Olam only reinforce this point. Further, the Trustee and the Agent have shown that the Salyer Entities' efforts to interfere with the Olam sale and in objecting to every substantive motion, fee application, or other filing in this case have also dramatically increased the administrative costs of this proceeding. Yet

Brincko ignores this, and instead assumes that approximately $7.6 million of professional fees would have been incurred outside of bankruptcy in the hypothetical "receivership" proceeding. *Brincko Dec.*, ¶ 15. Brincko does not provide any breakdown of how or why these costs would be the same, and as such, his methodology is not reliable under *Daubert*. Moreover, Brincko appears to base his opinion on the flawed assumption that the Agent would have required the services of a receiver, would have demanded the receiver to incur the expense of providing the same reports and other fee statements as required under the Bankruptcy Code, or that the administrative costs would have been the same, given that there would not be a means for the Salyer Entities to have caused dilatory objections and the like. To say the least, there would have been no litigation over a plan of liquidation, the 9019 settlement, the 363 sale, or many of the numerous adversary proceedings.

Brincko also concludes that all of the $26 million in post petition costs benefited the lenders and their collateral other than potentially approx $3.3 million of professional fees. There is no detail provided to establish how each of these expenses benefited the lenders' realization of the collateral. Brincko also makes the sweeping conclusion that all of these costs would have been required of the Lenders in any scenario without any specifics. However, a more logical assumption is that the Agent would dispute each cost on an item by item basis. Of course, this type of effort is what the parties are attempting to avoid in the settlement. Here, in order to meet the *Daubert* standard, the Salyer Entities must show that Brincko applied a methodology that is acceptable and useful to the Court. They have failed to do so, and the Brincko Declaration must be excluded.

### g. Brincko Failed to Account for the Value of the Debtors' Foreign Subsidiaries

Compounding these defects is the fact that Brincko failed to factor in any of the claims that the Debtors have relating to their foreign subsidiaries, which were apparently transferred to other Salyer-controlled entities without consideration. Notwithstanding the almost

$30 million in potential value that the Australian equity may add to the pre-petition collateral, Brincko apparently never accounted for any of this value:

> Q. Did you conduct any analysis of any foreign subsidiary held by the debtors?
> A. No.
> Q. Did you have any understanding of whether or not the equity interest in these subsidiaries was part of Bank of Montreal's collateral?
> A. I have no understanding regarding that.
> Q. Was that -- was collateral in the foreign subsidiaries included in your analysis?
> A. They were not included.

*Brincko Tr*. 129:05-17.  As noted in the BMO Settlement, the value received on account of BMO's perfected lien on the Australian equity is being shared with the unsecured creditors, and will provide substantial benefit to the estate.  Thus, the value and protection of this lien must be accounted for in the superpriority analysis.  This further undermines the credibility of Brincko's claims, and Brincko's declaration should be excluded and/or given no weight.

> **B.  The Salyer Entities Have Failed To Establish That Mr. Brincko Is Even Qualified To Give Expert Witness Testimony**

Mr. Brincko has not established that he is qualified to render any of the opinions he has given.  Mr. Brincko does not claim to have authored any scholarly articles of any kind on forensic valuation issues or, for that matter, on any subject.  Mr. Brincko has no Ph.D or any advanced degree in finance or of any other kind.  *Brincko Dec.,* Ex. 1.  Rather, his only post-secondary education appears to be an undergraduate degree in accounting from the City of University of New York, and, although Mr. Brincko was once a certified public accountant, he has not practiced as an accountant since 1978.  *Brincko Dec.,* ¶ 2.  He has failed to demonstrate any specialized knowledge in valuation issues generally, and appears to have no experience in conducting a forensic valuation of a business, which he purports to do in his declaration.

Mr. Brincko also claims to have provided written testimony "*as an expert* in connection with liquidation analyses and business valuations" in various cases.  *Brincko Dec.,* ¶ 3 (emphasis added).  Brincko backed away from this claim at his deposition, but still claimed to have given expert testimony:

Q.   Were -- did the court ever qualify you -- did a court ever qualify you as a expert?

A.   I've testified in a court as an expert, and the court didn't say you can't testify because you're not an expert, many times.

*Brincko Tr*. 113:19-23.  However, this claim appears to be false.  A search of the dockets of the cases he identifies that could be viewed on the PACER system shows only his retention as financial advisor or giving testimony based on personal knowledge, suggesting that he was a mere fact witness.  *See, e.g., In re Spansion Inc*., [Dkt. No. 112], *Motion To Employ John P. Brincko As Chief Restructuring Officer*, *In re Copeland Enters., Inc*., [Dkt. No. 775], *Dec. of John P. Brincko in Support of Plan of Liquidation; In re Strouds*, [Dkt. No. 814], *Declaration of John Brincko in Support of Tenth Interim Application of Brincko Associates, Inc*.[6]

To support his expert qualifications, Mr. Brincko identifies his apparent expertise in turnaround, crisis management and other restructuring services as a financial advisor.  *Brincko Dec., ¶¶* 2-3.  However, even if his credentials qualify him to serve in these roles, Mr. Brincko brings no particular knowledge, training, education, skill or experience to the task for which he has been retained.  Mr. Brincko's declaration does not indicate whether he has taken or taught any courses involving valuation issues.  In fact, his academic experience in this area appears limited to unspecified "speeches" given on the topic:

Q.   Okay.  Have you ever taught or lectured on business valuations?

A.   I have give speeches on it.

*Brincko Tr*. 115:25; 116:01-02.

Here, given this lack of particular expertise, his testimony must be excluded.  *See Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1351 (Fed. Cir. 1991) (affirming district court's refusal to permit expert testimony where expert had no prior experience in analyzing the market for the product in issue); *see also, Anderson v. National R.R. Passenger Corp*., 866 F. Supp. 937, 948 (E.D. Va. 1994) (excluding expert testimony and holding that general

---

[6]   Brincko acknowledged that he served as CRO in the Spansion case.  *Brincko Tr*. 81:09-10.  As such, it is possible that he is simply confusing and conflating the concept of being named in such a role with being an "expert" within the meaning of the Federal Rules.

knowledge is insufficient; absence of experience, training or base of knowledge in the particular field at issue renders testimony inadmissible). As such, while Brincko appears to have some general knowledge or experience in turnaround matters, this is insufficient in and of itself to meet the *Daubert* standard, or warrant this Court giving any weight to his testimony.

## II. BRINCKO'S TESTIMONY SHOULD ALSO BE GIVEN NO WEIGHT BECAUSE THE SALYER ENTITIES UNFAIRLY AND UNJUSTIFIABLY REFUSED TO PRODUCE DOCUMENTS SUPPORTING HIS CONCLUSIONS

After nearly two months of motion practice in which the Salyer Entities sought approval of funds to pay Brincko's past-due invoices, and with his declaration on file for nearly a year, the Salyer Entities finally agreed to produce Brincko for deposition on September 27, 2011. Notwithstanding this, the Salyer Entities asserted that they were entitled to the full 30 days provided under Rule before producing any documents in response to the Trustee's document requests regarding Brincko's testimony. It appeared that the Salyer Entities were attempting to ensure that neither BMO nor the Trustee would have access to documents supporting Brincko's conclusions in time for the deposition. This was compounded by the Salyer Entities' blanket assertion of privilege with respect to communications with Brincko:

> Q. All right.
> Mr. Carlson: Counsel, I take it you have not brought any documents with you today?
> A. Ms. Woodruff: I have not.
> Q. Mr. Carlson: And the basis for that?
> A. Ms. Woodruff: I will respond in the 30 days I am given under the Federal Rule of Civil Procedure Number 34. I can also tell you now that in those 30 days I will respond, that every one of those requests is subject to attorney-client privilege under the new rule.

*Brincko Tr*. 19:09-18. A copy of the requests at issue, which seek the basic documents on which Brincko relied, is attached as Exhibit 4 to the Heiser Declaration.

However, even though the privilege was never properly claimed, this assertion was baseless, because the "new" Rule 26(b)(4) mandates production of documents that, *inter alia*:

(i) relate to expert compensation, (ii) identify facts or data given to the expert that the expert considered, or (iii) identify assumptions that the expert relied on. FED. R. CIV. P. 26(b)(4)(C). Notwithstanding this, the Salyer Entities apparently chose to exploit the tight frame to withhold all communications relating to Brincko. This Court should not countenance such maneuvers and should give Brincko no weight, if it chooses to hear from him at all.[7]

Also compounding the improper presentation of Brincko's testimony is the fact that the Salyer Entities never properly complied with Rule 26 of the Federal Rules of Civil Procedure (which is incorporated and made applicable through Bankruptcy Rule 7026) and FED. R. CIV. P. 37(c)(1) (which is incorporated and made applicable through Bankruptcy Rule 7037) in the first place, which expressly require that a party seeking to use expert witness testimony disclose to the adverse party the name of the expert. *See* FED. R. BANKR. P. 7026(a)(2)). At his deposition, Brincko revealed that he had been retained by one of Salyer's attorneys and had spent at least two to three weeks preparing his report:

> Q. How much time did you spend writing your report?
> A. I think we -- the engagement, we had a very tight deadline, so I think we probably spent -- three of us spent probably two to three weeks writing, doing our research and writing our report.

*Brincko Tr.* 25:21-25. Yet, although a former lawyer for the Salyer Entities claimed to have sent an email shortly before the original hearing, no formal disclosure was made. Brincko could be excluded on this basis alone. *See, Continental Lab. Prods., Inc. v. Medax Int'l Inc.*, 195 F.R.D. 675, 676 (S.D. Cal. 2000) (noting that exclusion of expert is automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26 was justified or was harmless). However, under the circumstances, and to avoid further delay and prejudice, the Court could simply give Brincko some consideration, but find that his testimony does not establish that the BMO Settlement falls below the lowest range of reasonableness.

---

[7] It is also worth noting that the Salyer Entities threatened to terminate Brincko's deposition because Stanley Speer of Alvarez & Marsal, financial advisor to BMO, attempted to observe Brincko's testimony. *Brincko Tr.* 64:13-23.

SUPPLEMENTAL MOTION *IN LIMINE* REGARDING
THE TESTIMONY OF JOHN P. BRINCKO

**CONCLUSION**

Notwithstanding the fact that a precise valuation of the superiority claim is unnecessary to approve the BMO Settlement, Mr. Brincko's testimony is unreliable. He lacks the relevant scientific, technical, or other specialized knowledge to render an expert opinion in this case. While he may be qualified as a financial advisor in some capacity, he lacks the relevant education and experience to opine on issues of valuation, and has failed to properly value the Collateral or apply any recognized or accepted valuation analysis. No further insight into BMO's superpriority claim can be gleaned from his testimony. As such, his declaration does not satisfy the *Daubert* test and must be given little or no weight in deciding upon the BMO Settlement.

WHEREFORE, BMO respectfully requests that the Declaration of John P. Brincko be excluded from consideration or given no weight in this matter, that the BMO Settlement be approved, and that the Court grant such other relief as it deems proper.

Dated:    October 7, 2011            James E. Spiotto
                                     Ann E. Acker
                                     James M. Heiser
                                     Todd J. Dressel
                                     CHAPMAN AND CUTLER LLP


                                     /s/ Todd J. Dressel
                                     _____
                                          Todd J. Dressel
                                     Attorneys for Bank of Montreal