

FILED

OCT 2 4 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 09-29162-D-11 |
| SK FOODS, L.P., | Docket Control No. SH-76 |
| Debtor. | Date:  October 19, 2011<br>Time:  9:30 a.m.<br>Dept:  D |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

This matter returns to this court on remand from the district court.  On September 29, 2010, the chapter 11[1] trustee in this case, Bradley D. Sharp (the "trustee"), filed a Motion to Approve Compromise Between Trustee and Bank of Montreal as Agent for Secured Lenders Pursuant to Federal Rule of Bankruptcy [Procedure] 9019 (the "Motion").  This court granted the Motion over the opposition of Scott Salyer ("Salyer"), president of SK PM Corp., general partner of debtor SK Foods, L.P., together with various entities related to Salyer (collectively, the "Salyer Entities"), who appealed.  By order dated July 11, 2011 (the "Remand Order"), the district court vacated the order approving the compromise and remanded the matter to this court for further

---

1.  Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

1  proceedings consistent with the Remand Order.[2]

2      The Remand Order directed this court to consider a

3  declaration of John P. Brincko that had been filed by the Salyer

4  Entities and that this court had previously excluded.[3]  The court

5  has now considered that declaration; the trustee and Bank of

6  Montreal ("BMO") have taken Mr. Brincko's deposition; the trustee

7  and the Salyer Entities have filed supplemental briefs; and the

8  Salyer Entities have filed a supplemental declaration of Mr.

9  Brincko.[4]  BMO has filed a motion in limine seeking to exclude

10  Mr. Brincko's testimony, and although the court has denied that

11  motion, it has considered BMO's arguments in evaluating the

12  weight to be given Mr. Brinko's testimony.[5]

13      Having reviewed the briefs, declarations, and exhibits filed

14  by the parties, and having heard oral argument, for the reasons

15  stated below, the court will grant the Motion.

16                  **I.  THE SCOPE OF THIS DECISION**

17      The terms of the compromise, the applicable standards for

18  evaluating a proposed compromise, and the court's analysis of and

19  conclusions regarding the compromise are set forth in its

20  _____

21      2.  Salyer v. SK Foods, L.P., U.S. District Court, Eastern
    District of California, Case No. 2:10-cv-03467-LKK, Order filed
22  July 11, 2011.

23      3.  Declaration of John P. Brincko, filed November 17, 2010
    ("Brincko Dec.").

24
        4.  Supplemental Declaration of John P. Brincko, filed
25  October 7, 2011 ("Supp. Brincko Dec.").

26      5.  In reversing this court's order on BMO's original motion
    in limine, the district court considered only the issue of
27  whether the Brincko declaration had been timely filed, and thus,
    "[took] no position on whether it might be proper for the
28  Bankruptcy Court to reject the proffered declaration on other
    grounds."  Remand Order, p. 17, n. 20.

                            - 2 -

1 Memorandum Decision filed December 13, 2010.  This decision will

2 serve to supplement that decision with respect to the only two

3 issues now raised by the Salyer Entities -- (1) whether the

4 compromise is fair and equitable in light of Mr. Brincko's

5 testimony concerning the amount of BMO's diminution in value of

6 its secured claim, and (2) whether the compromise is fair and

7 equitable after considering BMO's filing of an action in the

8 District Court for the Northern District of California (the "San

9 Jose Action") seeking to hold three of the Salyer Entities liable

10 as alter egos on a judgment BMO had previously obtained against

11 an affiliate of the debtor, SK Foods LLC.

12                          **II.   ANALYSIS**

13 **A.  Mr. Brincko's Testimony**

14      Mr. Brincko was retained by the Salyer Entities to form an

15 opinion of the amount of BMO's § 507(a) super priority claim

16 based on the diminution in value of its collateral during the

17 pendency of the chapter 11 case.  Mr. Brincko's opinion has two

18 components -- first, he believes BMO has actually received more

19 in this case than the liquidation value of its collateral as of

20 the petition date.[6]  As a result, he concludes that "[BMO's]

21 Prepetition Collateral did not diminish in value during the case

22 and thus such an analysis cannot support a super priority claim

23 _____

24      6.  Mr. Brincko testifies that the liquidation value of the
collateral on the petition date, after deducting wind-down costs

25 and claims senior to BMO's, was between $52.5 million and $69.5
million, whereas the amounts already received and expected to be

26 received by BMO total between $70.5 million and $75.7 million.
Thus, "[t]his analysis actually yields net recoveries for [BMO]

27 in _excess_ of liquidation value of between $6.2 million and $18.0
million.  As such, [BMO] will receive more than the value of

28 [its] Prepetition Collateral."  Brincko Dec., ¶9, emphasis in
original.

on behalf of [BMO]."[7]

Second, Brincko has analyzed the costs for which BMO's cash collateral was expended post-petition, and concludes that if BMO had been permitted to foreclose and liquidate its collateral, the same costs, except approximately $3.28 million in professional fees, "would have been required of [BMO] in any scenario, including the liquidation of [its] collateral outside of bankruptcy, and certainly in connection with a receivership."[8] "These figures lend further support to [Brincko's] earlier conclusion, based independently on the Liquidation Analysis, that there was little, if any, diminution in value of [BMO's] Prepetition Collateral."[9]

In short, Brincko's testimony is offered to support a conclusion that BMO did not sustain any diminution in the value of its collateral post-petition, and thus, has no super priority claim.  By contrast, the compromise that is the subject of the Motion provides that BMO will have a $27.6 million super priority claim.  The Salyer Entities conclude from this discrepancy that the compromise figure falls below the lowest point in the range of reasonableness,[10] and thus, does not accurately represent the likelihood of success in litigation.  As a result, they contend, the compromise is not fair and equitable, as required for

---

7.  <u>Id.</u>, ¶9.

8.  <u>Id.</u>, ¶14.

9.  <u>Id.</u>, ¶16.

10.  See <u>Spirtos v. Ray (In re Spirtos)</u>, 2006 Bankr. LEXIS 4894 at *32 (9th Cir. BAP 2006)  quoting <u>In re Pacific Gas & Elec. Co.</u>, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004).

- 4 -

1 approval.[11]

2 **B.  Problems With Mr. Brincko's Testimony**

3 1.  Liquidation Value Versus Going Concern Value

4      The court agrees with the trustee and BMO that there are

5 problems with Mr. Brincko's testimony.  First, he bases his

6 opinion, except with regard to the use of cash collateral (see

7 below), on the liquidation value of the assets, as opposed to a

8 market value or going concern value.  The briefing of this issue

9 amply demonstrates, and the district court pointed out, that the

10 case law goes both ways, with no controlling law in this

11 circuit.[12]  However, in light of Associates Commercial Corp. v.

12 Rash, 520 U.S. 953, 962-65 (1997), going concern value appears

13 more likely the appropriate measure where, as here, the debtor

14 intended to and did retain and use the collateral up to the time

15 of a § 363 sale.

16      In Rash, the Court held that in a chapter 13 case where the

17 debtor proposes to retain a secured creditor's collateral, the

18 value of the collateral, for purposes of bifurcation of the

19 creditor's claim under § 506(a), is its replacement value, not

20 _____

21      11.  See In re Woodson, 839 F.2d 610, 620 (9th Cir. 1988),
   citing A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986).

22
        12.  The district court cited In In re American Mariner
23   Industries, Inc., 734 F.2d 426, 435 (9th Cir. 1984), as appearing
     to hold that liquidation value is the correct value for assessing
24   adequate protection.  However, the American Mariner court
     recognized liquidation value as "one method of providing adequate
25   protection but by no means the only method available to the
     debtor."  734 F.2d at 435.  A debtor should have "maximum
26   flexibility in structuring a proposal for adequate protection,"
     but the result "should as nearly as possible under the
27   circumstances of the case provide the creditor with the value of
     his bargained for rights."  Id.  The district court also
28   questioned whether American Mariner was still good law after
     United Savings Ass'n v. Timbers of Inwood, 484 U.S. 365 (1988).

its foreclosure value.   520 U.S. at 955-56.   The Court emphasized
the language in § 506(a) that value is to be determined in light
of the purpose of the valuation and the proposed disposition or
use of the collateral.   See id. at 962.

> Of prime significance, the replacement-value standard
> accurately gauges the debtor's "use" of the property.
> It values "the creditor's interest in the collateral in
> light of the proposed [repayment plan] reality:   no
> foreclosure sale and economic benefit for the debtor
> derived from the collateral equal to . . . its
> [replacement] value."   The debtor in this case elected
> to use the collateral to generate an income stream.
> That actual use, rather than a foreclosure sale that
> will not take place, is the proper guide under a
> prescription hinged to the property's "disposition or
> use."

Id. at 963, citations omitted.

Unlike § 506(a), § 507(b) does not explicitly link "value"
to the debtor's proposed disposition or use of the collateral;
however, it is intended to ensure that the creditor's interest is
adequately protected while the debtor uses the collateral under §
363 or while the creditor is stayed from foreclosing under § 362.
Using going concern value where, as here, the debtor proposed to
retain the collateral long enough to sell it as a going concern
recognizes reality and more closely accounts for the risks the
creditor takes where, as here, its stipulates to that procedure
and injects new cash to enhance the debtor's prospects.[13]

---

13.

When a debtor surrenders the property, a creditor
obtains it immediately, and is free to sell it and
reinvest the proceeds. . . .   If a debtor keeps the
property and continues to use it, the creditor obtains
at once neither the property nor its value and is
exposed to double risks:   The debtor may again default
and the property may deteriorate from extended use.
(continued...)

## 2.  Conflicting Valuation Standards

A related difficulty with Mr. Brincko's testimony is that he uses different valuation standards for the two components of his analysis, without explanation.  For the debtor's business assets, he uses forced liquidation value, but for his cash collateral analysis, he uses a going concern scenario.  In assessing the diminution in value that resulted from the use of BMO's cash collateral, Mr. Brincko assumes BMO would have obtained a receiver to operate the debtor's business long enough to accomplish a going concern sale.[14]

Neither the Salyer Entities nor Mr. Brincko explains why two different valuation standards were used or why going concern value was not a more appropriate measure of the business assets, since that is what was intended from the outset, it was the basis on which BMO had agreed to the debtor's use of cash collateral, and it is the scenario that actually resulted.  The court need not determine the amount of BMO's super priority claim here or decide on the appropriate valuation method.  It is sufficient that following a careful review of Mr. Brincko's testimony, a serious question remains whether he applied the correct standard.

/ / /

/ / /

---

13. (...continued)
Rash, 520 U.S. at 962.

14.  As BMO phrases it, "[Brincko] assumes [for his cash collateral analysis] that all of the expenses of a lengthy receivership and orderly liquidation would be incurred, but that the most valuable assets of the Debtors [the processing facilities] would be sold in a forced liquidation."  Supplemental Motion in Limine, filed October 7, 2011, p. 12.

3.  Evidence Contrary to Mr. Brincko's Testimony

Mr. Brincko has failed to satisfactorily distinguish expert opinions contrary to his own, although he was aware of them.  In connection with the Motion as presented in the fall of 2010, BMO submitted a declaration of Stan Speer, a financial advisor with experience in turnarounds and restructuring, who testified about an April 2009 analysis prepared for the debtor by FTI Consulting, Inc., and Duff & Phelps/Chanin Partners (the "Chanin report").  The Chanin report was used by the debtor, and later the trustee, to persuade BMO to fund the debtor long enough to enable a § 363 sale.

The Chanin report included valuations based on three standards -- a "fund to going concern sale scenario," an "immediate forced liquidation scenario," and a "forced liquidation post-stalking horse failure scenario."  The report reached the conclusion that "The Fund to Going Concern Sale Scenario yields a significantly higher valuation than the forced liquidation scenario."[15]  Mr. Speer testified that based on the Chanin report's fund to going concern sale scenario, and deducting the amounts actually received and expected to be received by BMO, the remaining amount of its diminution in value claim is between $22 million and $59 million.  This contrasts sharply with Mr. Brincko's conclusion that BMO has actually received and will receive between $6.2 million and $18 million more than it lost, and thus, that the value of BMO's collateral did not diminish at all post-petition.

---

15.  Supplemental Declaration of Bradley D. Sharp, filed October 20, 2010, Ex. C., "Executive Summary – Scenario Comparison."

1    Although Mr. Brincko reviewed Mr. Speer's declaration, he

2    testifies about it only with respect to Mr. Speer's opinions

3    about the use of BMO's cash collateral.  He does not attempt to

4    explain why Mr. Speer's conclusion as to the amount of the

5    diminution in value claim is wrong.

6        As for the Chanin report, in his supplemental declaration,

7    Mr. Brincko testifies that his estimate of the liquidation value

8    of the business assets was comparable to the Chanin report's

9    liquidation value range.  He does not assess, criticize, or even

10   mention the report's other two valuation methods or conclusions.

11   On the issue of going concern value, he says only this:

12       I understand that BMO's analysis in this matter
         compares Debtor's going concern value at Petition Date
13       to the amount for which the debtor's assets were
         actually liquidated in this case.  This "apples to
14       oranges" comparison is faulty in my opinion.  A valid
         comparison would be consistent and would compare the
15       liquidation value on the Petition Date to what the
         debtor actually received on liquidation.[16]
16

17       The problem with this conclusion is that it contradicts Mr.

18   Brincko's own analysis.  In determining how BMO would likely have

19   proceeded absent the bankruptcy and resulting automatic stay, he

20   testified originally:

21       Based on my experience, secured creditors in [BMO's]
         position would have employed a receivership process to
22       sell [their] collateral.  Specifically, [BMO] would
         have concluded that disposing of [its] collateral in a
23       manner that allowed a buyer or buyers to continue to
         operate the underlying business as a going concern
24       would result in the highest recovery on such
         collateral. . . . For these reasons, a disposition of
25       the collateral outside of bankruptcy court would not be
         fundamentally different than the disposition that
26

27

28
         ─────────────────────
         16.  Supp. Brincko Dec., ¶14, emphasis in original.

                                  - 9 -

occurred in this case.[17]

Yet Mr. Brincko's liquidation value analysis of the business assets clearly assumed the assets would be "auctioned off piecemeal to the highest bidder."[18]  This is totally contrary to what actually occurred in the case, as Mr. Brincko himself recognizes.  Thus, it appears Mr. Brincko is the one comparing apples to oranges.

4.  Other Problems With Mr. Brincko's Testimony

The court agrees with the trustee that:

• Mr. Brincko's analysis reflects a superficial understanding of the status of the debtor's business operations at the petition date, including its business cycle and the operations leading up to the start of the 2009 tomato pack;[19]

• Mr. Brincko was unable to offer any understanding of the nature of the debtor's real properties at Lake Tahoe and in Hawaii or of how he had valued them, other than to say that he started with their book values and, as to the Hawaii property, discounted the value in light of depressed values there in recent years;

• Mr. Brincko's analysis of the percentages by which he discounted the values of the debtor's equipment was based on his experience in entirely unrelated industries (semiconductor manufacturing equipment; tractors, trailers, and distribution equipment), and to the extent it was based on food processing

_____

17.  Brincko Dec., §10.

18.  Id., Ex. 3, p. 3.

19.  Mr. Speer's declaration reflects a significantly greater understanding.

- 10 -

1  equipment, he was unable to offer anything other than speculation
2  about how he obtained that information;

3      • The trustee's and BMO's examination of Mr. Brincko's
4  opinions was hampered by the Salyer Entities' counsel's refusal
5  to permit them to review the documents Mr. Brincko considered in
6  forming his opinion; the court's evaluation is similarly
7  hampered.

8      In addition, the court agrees with BMO that:

9      • Mr. Brincko relied heavily on the book values of the
10 assets as listed in the debtor's schedules, without considering
11 the very substantial doubts raised about the reliability of the
12 debtor's books and records;[20]

13     • Mr. Brincko was unable to offer any understanding of the
14 zoning and environmental issues he claims played a role in his
15 decision to discount the values of the debtor's processing
16 facilities to 25-50% of their book values, other than a vague
17 reference to the wastewater discharge issues;

18     • BMO has raised significant questions about the validity of
19 Mr. Brincko's deductions on account of the PACA claims and the
20 "bill and hold" inventory, and the Salyer Entities have not
21 addressed these issues;

22     • Mr. Brincko's opinion that BMO would have incurred the
23 same costs in a receivership proceeding (except for $3.28 million
24 in professional fees) is simply too conclusory to carry

25

26     20.  See Declaration of Shondale Seymour (Ex. 2 to
27 Declaration of James Heiser in support of BMO's supplemental
   motion in limine, filed October 7, 2011); March 26, 2009 letter
28 from Shondale Seymour stating that the debtor's June 30, 2008
   financial statements should not be relied on (id., Ex. 3).

- 11 -

significant weight;

• The Salyer Entities have suggested that any diminution in value attributable to the wastewater dispute and the pending criminal charges against Scott Salyer would have occurred anyway if BMO had liquidated its collateral outside of bankruptcy, and thus, that aspect of the diminution in value cannot form the basis of a super priority claim; however, Brincko glossed over the impact of the wastewater dispute and ignored altogether the issue of the criminal charges;[21]

• Brincko's analysis fails to account for the debtor's Australia and New Zealand affiliates.

In this latter regard, BMO contends its lien rights in the assets of the foreign affiliates must be accounted for in its super priority claim. The court is not convinced; however, the fact that BMO asserts this position must be considered in evaluating the compromise. This brings the court to its final point regarding Mr. Brincko's testimony.

It is highly significant that Mr. Brincko addresses only one of the many aspects of the compromise. In addition to resolving the amount of BMO's super priority claim, the compromise establishes the treatment of the claim, allows the claim to be paid over time rather than at plan confirmation as would otherwise be required, see 11 U.S.C. § 1129(a)(9)(A), allows

---

21. BMO, on the other hand, appears to attribute 100% of the diminution resulting from these factors to the bankruptcy process. The trustee, reasonably, avoided an all or nothing approach, recognizing that these issues "would have driven down the price of any sale, regardless of the context" (Declaration of Bradley D. Sharp, filed September 29, 2010, ¶34), but not discounting them altogether.

1  general unsecured creditors to receive payments before full
2  payment of the super priority claim, provides for the ongoing use
3  of BMO's cash collateral, and preserves the Australia assets for
4  the benefit of the estate.  It would be entirely inappropriate
5  for the court to rely solely on Mr. Brincko's testimony on this
6  one narrow issue, even taking it as gospel, to the exclusion of
7  all these other benefits to the estate from the compromise.

8      In short, Mr. Brincko's testimony affects only one issue
9  regarding the "likelihood of success on the merits" component of
10  the analysis.  It changes the range of likely outcomes as to the
11  amount of BMO's diminution in value of its secured claim from a
12  range of $22 million to $59 million to a range of $0 to $59
13  million.  A settlement at $27.6 million remains reasonable,
14  particularly in light of the other components of the analysis.
15  Specifically, as the court emphasized in its original decision on
16  the Motion, virtually all that remains in the estate at this
17  point is litigation claims and some cash.  The cost of litigation
18  of the amount of BMO's super priority claim and of the claims
19  that would remain in the estate if the compromise were not
20  approved would certainly have a severely negative impact on the
21  estate.  The court concludes that the trustee, with an eye to the
22  paramount interests of creditors, has made a reasonable decision
23  as to how much to litigate versus when to compromise.

24      The court also concludes, as it did before, that the
25  compromise serves the paramount interests of creditors and their
26  reasonable views in the matter.  No parties other than the Salyer
27  Entities, who are the targets of the remaining litigation by both
28  the trustee and BMO, have opposed the compromise.  The Committee,

- 13 -

the class representatives, and creditor Morning Star Packing
Company, Inc., all appeared at the hearing in support of the
Motion.  The court will not simply overlook their views in favor
of Mr. Brincko's less than persuasive testimony.

**C.  The San Jose Action**

Finally, the Salyer Entities make much of an action brought
by BMO against three of the Salyer Entities -- Scott Salyer, the
Scott Salyer Revocable Trust, and SK PM Corp. (the "San Jose
Defendants") -- in the district court in San Jose.  The Salyer
Entities charge BMO with violating the automatic stay, violating
the one-action rule, and making an end-run around the compromise.
In effect, they claim, BMO seeks to recover assets of the San
Jose Defendants by obtaining a judgment against them as alter
egos of an affiliate of the debtor, while at the same time, the
trustee would be pursuing those same assets in the substantive
consolidation action that remains with the estate under the
compromise.  The assets in question appear to be what the parties
refer to as the Australia assets.

First, the court views these assertions with a good deal of
skepticism in light of the fact that the trustee has in recent
months charged the San Jose Defendants and another of the Salyer
Entities, Monterey Peninsula Farms, with asserting ownership of
and interfering with the estate's rights to the Australia assets.
The San Jose Defendants and Monterey Peninsula Farms have
vigorously opposed the trustee's efforts to enjoin the sale,
transfer, or dissipation of the Australia assets.  These same
persons and entities are among those now accusing BMO of
improperly attempting to reach estate assets by way of the San

- 14 -

1  Jose Action.  The San Jose Defendants' and Monterey Peninsula
2  Farms' new-found interest in protecting the estate from BMO is
3  directly contradicted by their opposition to the trustee's
4  efforts to preserve the Australia assets for the benefit of the
5  estate.

6      Second, despite having been informed of these charges
7  against BMO by way of the Salyer Entities' brief in this matter
8  and oral argument at the hearing, the trustee, the Committee, the
9  class representatives, and Morning Star continue to support the
10  compromise.

11      Third, the compromise does not preclude BMO from pursuing
12  the debtor's affiliates to satisfy claims assigned to BMO in the
13  compromise.  In this regard, the Salyer Entities' reliance on
14  footnote 5 of the settlement agreement memorializing the
15  compromise is misplaced.  The footnote merely clarifies that any
16  recoveries BMO might achieve on claims other than those assigned
17  to it on account of its super priority claim (such as claims
18  assigned to it on account of its secured claim) need not be
19  applied against the super priority claim.  There is nothing
20  nefarious in this provision.  Further, to the extent any recovery
21  BMO might achieve by way of the San Jose Action is appropriately
22  applied against the super priority claim (as, for example, if the
23  recovery is on account of the breach of fiduciary duty claim
24  against Salyer), there is no evidence BMO is not intending to so
25  apply the recovery.

26      Finally, the trustee has made it clear he does not view any
27  of the estate's assets or rights to assets as being at risk from
28

the San Jose Action.[22]   In short, the Salyer Entities' argument is self-serving and unpersuasive.

### IV. CONCLUSION

For the reasons set forth above, the court gives little weight to Mr. Brincko's testimony.  However, even giving it full weight would not change the court's opinion on the overall benefits of the compromise to the estate.  The amount of litigation generated by Mr. Brincko's two declarations merely highlights the contentiousness and complexities involved in valuing BMO's super priority claim.  Absent the compromise, the battles -- both this one and the others that would be revived -- would be long, complex, difficult, and costly.  Further, in light of the fact that the estate's cash is BMO's cash collateral, the estate would not be able to afford the litigation.  For these reasons, the Brincko testimony does not change the court's conclusion that the compromise is fair and equitable, and the court will grant the Motion.

The court will enter an appropriate order.

Dated: October 24 , 2011

_Robert Bardwil_
ROBERT S. BARDWIL
United States Bankruptcy Judge

---

22.  See Reply to Response to Trustee's Motion to Set Status Conference, DC No. SH-119, filed August 22, 2011.